JOSEPH R. LAMAGNA (State Bar No. 246850)
JORDAN KEARNEY (State Bar No. 305483)
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
E-Mail: jlamagna@health-law.com
        jkearney@health-law.com

DEVIN M. SENELICK (State Bar No. 221478)
TARYN A. REID (State Bar No. 328772)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail: dsenelick@health-law.com
        treid@health-law.com

Attorneys for Plaintiff Borrego
Community Health Foundation

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORREGO COMMUNITY HEALTH FOUNDATION, a California nonprofit public benefit corporation;<br><br>Plaintiff,<br><br>vs.<br><br>KAREN HEBETS, an individual; MIKIA WALLIS, an individual; DIANA THOMPSON, f/k/a DIANA TRONCOSO, an individual; HARRY ILSLEY, an individual; DENNIS NOURSE, an individual; MIKE HICKOK, an individual; CHUCK KIMBALL, an individual; PREMIER HEALTHCARE MANAGEMENT, INC., a California Corporation; SUMMIT HEALTHCARE MANAGEMENT, INC., a California Corporation; DARYL PRIEST, an individual; | Case No. **'22 CV 1056 TWR NLS**<br><br>**COMPLAINT**<br><br>Trial Date:      None Set |

NICHOLAS PRIEST, an individual; TRAVIS LYON, an individual; HUSAM E. ALDAIRI, D.D.S., an individual; ALDAIRI DDS, INC., a California corporation; AYED HAWATMEH, D.D.S., an individual; HAWATMEH DENTAL GROUP, P.C., a California Corporation; ALBORZ MEHDIZADEH, D.D.S., an individual; ALBORZ MEHDIZADEH, INC., a California Corporation; JILBERT BAKRAMIAN, D.D.S., an individual; MOHAMMED ALTEKREETI, D.D.S., an individual; MAGALY VELASQUEZ, D.D.S., an individual; MAGALY M. VELASQUEZ DDS PROFESSIONAL DENTAL CORP., a California Corporation; ARAM ARAKELYAN, D.D.S., an individual; NEW MILLENNIUM DENTAL GROUP OF ARAM ARAKELYAN, INC., a California Corporation; MICHAEL HOANG, D.M.D., an individual; WALEED STEPHAN, D.D.S., an individual; W.A. STEPHAN, A DENTAL CORPORATION, a California Corporation; SANTIAGO ROJO, D.D.S., an individual; SANTIAGO A. ROJO, D.D.S., INC., a California Corporation; MARCELO TOLEDO, D.D.S., an individual; MARCELO TOLEDO, D.D.S., INC., a California corporation; MARLENE THOMPSON, D.D.S., an individual; MARLENE THOMPSON, D.D.S., INC., a California Corporation; DOUGLAS NESS, D.D.S., an individual; NESS DENTAL CORPORATION, a California Corporation; GEORGE JARED, D.D.S., an individual; GEORGE JARED, D.D.S., INC., a California corporation; JAMES HEBETS, an individual; THE HEBETS COMPANY, a Missouri Corporation; and DOES 1-250, inclusive.

Defendants.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION/SUMMARY ...................................................... 7

II.  JURISDICTION AND VENUE ..................................................... 8

III. CAST OF CHARACTERS ........................................................... 8

   A.   BORREGO COMMUNITY HEALTH FOUNDATION ...................... 8

   B.   FORMER BORREGO INSIDERS ..................................... 9

   C.   PREMIER, PRIESTS AND OTHER PRIEST-RELATED
        ENTITIES ............................................................... 12

   D.   DEFENDANT DENTISTS ............................................... 12

   E.   JAMES HEBETS AND HIS COMPANIES ........................... 17

   F.   OTHERS ................................................................. 17

   G.   ALTER EGO AND DOE ALLEGATIONS ........................... 18

IV.  THE SCHEMES THAT DAMAGED BORREGO HEALTH ...................... 20

   A.   The Scheme to Form and Sell Entities Formed by Borrego
        Insiders to Borrego Health (the "Borrego MSO/IPA Scheme") .......... 20

   B.   The Scheme to Contract with Premier Allowing Premier to Get
        Paid Tens of Millions of Dollars to Purportedly Provide
        "Management Services" It Was Not Capable of Providing (the
        "Premier Scheme") .................................................. 22

        i.    The Contract Dental Program is Formed ..................... 22

        ii.   Hebets Proposes an MSO Idea, Which Is Rejected by
              Borrego Health .................................................. 24

        iii.  The Borrego Health Insiders Enter Into a Management
              Services Agreement on Borrego Health's Behalf Anyway ........ 26

        iv.   The Borrego Insiders Concealed the Premier Scheme from
              Borrego Health .................................................. 31

        v.    The Damages Suffered by Borrego Health Due to the
              Premier Scheme .................................................. 34

   C.   Certain Contract Dentists Submitted Fraudulent Bills with the
        Knowledge and Support of Premier and the Borrego Insiders (the
        "Fraudulent Dental Billing Scheme") .............................. 36

        i.    Husam E. Aldairi, D.D.S. ....................................... 39

7234243.1

1
2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

3      ii.    Ayed Hawatmeh, D.D.S. ............................................................. 43

4      iii.    Alborz Mehdizadeh, D.D.S. ...................................................... 44

5      iv.    Magaly M. Velasquez, D.D.S. .................................................. 47

6      v.     Aram Arakelyan, D.D.S. .......................................................... 49

7      vi.    Michael Hoang, D.M.D. ........................................................... 50

8      vii.    Waleed Stephan, D.D.S. ........................................................... 51

9      viii.   Santiago Rojo, D.D.S. .............................................................. 52

10     ix.    Mohammed AlTekreeti, D.D.S. ................................................ 53

11     x.     Jilbert Bakramian, D.D.S. ........................................................ 54

12     xi.    Marcelo Toledo, D.D.S. ........................................................... 55

13     xii.    Marlene Thompson, D.D.S. ...................................................... 58

14     xiii.   Douglas Ness, D.D.S. .............................................................. 59

15     xiv.   George Jared, D.D.S. ............................................................... 60

16  D.   Since Premier Was Unable and Unwilling To, a Program
17        Integrity Process is Implemented by Borrego Health ........................... 61

18  E.   Premier and the Borrego Insiders Coverup Fraudulent Billing
        (the "Coverup Scheme") ...................................................................... 66

19  F.   The Borrego Insiders Entered into Leases with Daryl Priest-
20        Owed Entities for Above Market Rents and Terms Many Times
        the Market Amount (the "Priest Leases Scheme") .............................. 73

21  G.   The Borrego Insiders Paid Themselves Above-Market
22        Compensation and Granted Themselves Improper Benefits and
        Covered It Up (the "Compensation/Benefits Scheme") ..................... 82

23  H.   The Borrego Insiders Used Nepotism and Cronyism to Funnel
24        Money to their Friends and Family (the "Nepotism and
        Cronyism Scheme") ............................................................................. 85

25  I.    The Borrego Insiders Tried To Purchase a Country Club to
26        Personally Benefit Themselves (the "De Anza Country Club
        Scheme") .............................................................................................. 86

27  J.    The Borrego Insiders Attempted to Pay Bruce Hebets a $5
28        Million Payout (the "Payout Scheme") ............................................... 87

COMPLAINT

7234243.1

1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

K.   The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")........... 89

L.   Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme")................................................. 92

M.   Borrego Insider Dennis Nourse Sold Property to Borrego Health to be Developed by Priest (the "Property Development Scheme")...... 95

V.    CLEANING HOUSE .................................................................. 98

VI.   THE RICO ENTERPRISE ......................................................... 101

A.   Facts Common To RICO Cause of Action ......................................... 101

B.   Racketeering Activity Distinct from Enterprise ................................. 103

C.   RICO Liability .................................................................. 104

D.   Issuance of Constructive Trusts ............................................... 110

COMPLAINT

## APPENDIX OF EXHIBITS

| EXHIBIT | PAGES | DESCRIPTION |
|---|---|---|
| A | 155-164 | PHCM Management Agreement dated (Effective Date "ED" 3/1/16) |
| B | 165-167 | PHCM Amendment No. 1 to Management Agreement (ED 12/22/16) |
| C | 168-170 | PHCM Amendment No. 2 to Management Agreement (ED 7/1/17) |
| D | 171-187 | Summit Healthcare Management Contract (ED 9/8/17) |
| E | 188-216 | Aldairi Agreement (ED 5/27/16) |
| F | 217-247 | Aldairi DDS, Inc. Agreement (ED 5/29/18) |
| G | 248-275 | Hawatmeh Dental Group Agreement (ED 10/18/17) |
| H | 276-304 | Alborz Mehdizadeh, Inc. Agreement (ED 9/28/16) |
| I | 305-338 | Long Beach Care Dental, Inc. Agreement (ED 12/11/18) |
| J | 339-367 | Velasquez Agreement (ED 11/5/14) |
| K | 368-395 | Arakelyan Agreement (ED 11/17/16) |
| L | 396-426 | Arakelyan DDS. Inc. Agreement (ED 11/29/18) |
| M | 427-489 | Arakelyan DDS. Inc. Agreements (ED 11/29/18) |
| N | 490-520 | Hoang Agreement (ED 11/28/18) |
| O | 521-549 | W.A Stephan Agreement (ED 10/1/16) |
| P | 550-577 | Rojo D.D.S., Inc. Agreement (ED 3/29/17) |
| Q | 578-609 | Toledo D.D.S., Inc. Agreement (ED 6/16/15) |
| R | 610-640 | Thompson, D.D.S., Inc. Agreement (ED 4/18/13) |
| S | 641-669 | Ness Dental Agreement (ED 5/2/16) |
| T | 670-700 | Jared, D.D.S. Agreement (ED 4/19/16) |

7234243.1

Plaintiff Borrego Community Health Foundation ("Borrego Health"), hereby complains and alleges as follows:

I.     **INTRODUCTION/SUMMARY**

1.     Borrego Health is a California nonprofit public benefit corporation operating a Federally Qualified Health Center (also known as a FQHC).  Borrego Health provides primary and related healthcare services to historically underserved areas of San Diego, Riverside, and—until recently—San Bernadino counties.

2.     While Borrego Health was attempting to complete its mission of providing healthcare to underserved communities, certain individuals and entities, both inside and outside of Borrego Health, siphoned off money from Borrego Health that should have benefitted to the community it serves.  The schemes of those various individuals and entities are set forth in detail below.  The schemes include selling useless assets to Borrego Health at inflated prices, entering into one-sided agreements with Borrego Health to its detriment, committing and/or covering up healthcare fraud though improper billing of dental services, entering into leases with Borrego Health that were many times fair market rates and terms, paying themselves above-market salaries and benefits, hiring friends and family members to work for Borrego Health and paying them above-market salaries, and attempting to use Borrego Health to purchase a country club.  Those same individuals and entities worked tirelessly to cover up their misdeeds, and, until recently, were successful is doing so.

3.     The insiders were motivated by various forms of personal benefit.  First, they used the excessive revenue generated by the schemes to set over-market salaries for themselves and create other forms of compensation, such as automotive benefits, retirement benefits, and free healthcare goods and services from Borrego Health.  Second, they used the excessive services and attendant revenue from Medi-Cal to justify employing friends and family members at Borrego Health, also at inflated salaries.  Third, on information and belief, the insiders allowed the outsiders

7234243.1

1  to participate in the fleecing of Borrego Health in exchange for kickbacks and/or

2  other benefits to the insiders.

3      4.    The false and fraudulent billing of dental services has resulted in

4  Borrego Health's suspension by California's Medicaid Program, Medi-Cal.  The

5  state and federal government are also investigating Borrego Health for tax issues, its

6  non-profit status, among many other things, due to these schemes.

7      5.    Fortunately, Borrego Health, through a newly constituted Board of

8  Trustees, has spent considerable time and effort trying to discover and unravel the

9  prior bad conduct to rehabilitate Borrego Health and ensure Borrego Health's

10  viability and compliance going forward.

11     6.    However, Borrego Health has been severely damaged and this action

12  seeks to illuminate the various schemes, to seek financial compensation to recoup

13  funds wrongly siphoned away from Borrego Health, and to hold the wrongdoers

14  responsible for their actions.

15  **II.    JURISDICTION AND VENUE**

16     7.    Venue is proper in this District pursuant to 31 USC section 3732(a) and

17  28 USC section 1391(c).  During the relevant time period, a substantial portion of

18  the events complained of that give rise to Borrego Health's claims occurred in this

19  District.

20  **III.   CAST OF CHARACTERS**

21      **A.    BORREGO COMMUNITY HEALTH FOUNDATION**

22     8.    Plaintiff Borrego Community Health Foundation ("Borrego Health"), is

23  a nonprofit 501(c)(3) Federally Qualified Health Center ("FQHC").  Borrego Health

24  provides high quality, comprehensive, compassionate primary health care to the

25  people in their communities, regardless of their ability to pay, by partnering with

26  licensed medical professionals across Southern California.  Borrego Health operates

27  33 clinics, primarily in underserved desert and inland communities throughout San

28  Diego, Riverside, and—until recently—San Bernardino counties.  Borrego Health

provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19 related testing and vaccinations to over 200,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health tested tens of thousands of Californians for Covid-19 infections, and vaccinated tens of thousands of people against Covid-19. Borrego Health's continued operation is in the public interest and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers quality health care to people who need it.

9.      Much of the services Borrego Health provides to the community is funded by grants, including without limitation grants from the U.S. Health Resources and Services Administration ("HRSA").  Borrego Health received its first HRSA grant in 2003.

10.     Following the initial HRSA grant in 2003, Borrego Health experienced massive growth, expanding its services to what they are today, inclusive of dental, mental health and chiropractic services.  The majority of these services are provided through Borrego Health's internal programs, including brick-and-mortar medical and dental clinics and mobile units.  Borrego Health also operates a contract medical program in which it contracts with private practice providers to serve members of the community.

11.     As a non-profit public benefit corporation, Borrego Health does not have individual shareholders, but rather is operated by a Board of Trustees, all of whom currently serve on a volunteer basis.

**B.      FORMER BORREGO INSIDERS**

12.     <u>Bruce Hebets</u> was a longtime resident of San Diego County and had been a Sergeant with the San Diego Harbor Police Department prior to becoming CEO of Borrego Health Foundation in or around 2004.  Bruce Hebets served as Borrego Health's CEO beginning in 2004 until his retirement in September 2018.

7234243.1

Following a decline in Bruce Hebets' health, Borrego Health's Executive/Finance Committee – with Bruce Hebets' approval – appointed the then Chief Legal Officer, Mikia Wallis, as President of Borrego Health in December 2017, and later as interim CEO following Bruce Hebets' decision to take an extended medical leave, effective June 28, 2018.  Following Bruce Hebets' retirement, effective September 1, 2018, Mikia Wallis was appointed to the position of Borrego Health's CEO.  Bruce Hebets passed away in January 2019.  In light of his death and the settlement of his estate, Bruce Hebets is not named as a defendant in this action though he would have been, if possible.

13.  Defendant Karen Hebets is an individual with her place of residence in Borrego Springs, California.  Karen Hebets was the Vice President of Business Services at Borrego Health.  Karen Hebets was also the wife of Bruce Hebets.

14.  Defendant Mikia Wallis, Esq. is an individual with her place of residence in Julian, California.  Mikia Wallis is an attorney.  She graduated from the University of San Diego School of Law, and was admitted to the California Bar on or about June 1, 2007.  Mikia Wallis was Chief Legal Officer of Borrego Health, and was named interim CEO in June 2018 and CEO in September 2018.  Mikia Wallis was placed on administrative leave from Borrego Health on October 9, 2020, and terminated by Borrego Health on December 15, 2020.

15.  Defendant Diana Thompson, formerly Diana Troncoso, is an individual with her place of residence in San Diego County, California.  Diana Thompson was Borrego Health's Chief Financial Officer from March 2013, and was terminated as of March 2021.  One of Diana Thompson's children is married to one of Bruce Hebets' and Karen Hebets' child, and she shares one or more grandchildren with Bruce Hebets and Karen Hebets.

16.  Defendant Harry Ilsley is an individual with his place of residence in Sheridan, Wyoming.  Harry Ilsley also owns or owned a house in Borrego Springs (near the De Anza Country Club golf course).  Harry Ilsley was a member of

7234243.1

Borrego Health's Board of Trustees and was the Chair of the Board until 2017.  He was also on the Board's Executive/Finance Committee.

17.     Defendant Dennis Nourse in an individual with his place of residence in Cedarburg, Wisconsin.  Dennis Nourse was a former administrator of Borrego Health, and later hired Bruce Hebets to be CEO.  Dennis Nourse was a member of Borrego Health's Board of Trustees from mid-2012 until his resignation, and was a member of the Board's Executive/Finance Committee.

18.     Defendant Mike Hickok in an individual with his place of residence in Borrego Springs, California (near the De Anza Country Club golf course).  Mike Hickok was a member of Borrego Health's Board of Trustees, and was a member of the Board's Executive/Finance Committee.

19.     Defendant Chuck Kimball an individual with his place of residence in Julian, California.  Chuck Kimball was a member of Borrego Health's Board of Trustees starting in approximately 2011, and was the Chair of the Board from 2017 to mid-2019 and Secretary from 2019 until his removal.  Chuck Kimball was also a member of the Board's Executive/Finance Committee.

20.     Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are collectively referred to as "Borrego Insiders."  A subset of Borrego Insiders who served as members of the Borrego Health Board of Trustee are Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball, collectively referred to herein as "Board Insiders."

21.     While some may have described themselves as volunteers, each of the Board Insiders was compensated for his service on the Board, including with free medical care and other benefits.  Moreover, the Board Insiders are being sued not only for their negligent acts and omissions, but their intentional misconduct, including fraud, and their breaches of their fiduciary duties to Borrego Health.

**C.   PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES**

22.   Defendant Premier Healthcare Management, Inc. ("Premier") is a California corporation with its principal place of business in El Cajon, California.

23.   Defendant Summit Healthcare Management, Inc. ("Summit") was a California corporation with its principal place of business in El Cajon, California. Summit merged with Premier in 2019.

24.   Defendant Daryl Priest in an individual with his place of residence in El Cajon, California.  Daryl Priest is the owner of Premier.  Prior to starting Premier Daryl Priest had no material healthcare experience.

25.   Defendant Nicholas ("Nick") Priest, Esq. in an individual with his place of residence in San Diego, California.  Nick Priest was the Chief Executive Officer of Premier.  Nick Priest is the son of Daryl Priest.  Nick Priest is also an attorney.  He graduated from California Western School of Law and was admitted to the California Bar on or about June 21, 2016.  Prior to working at Premier Nick Priest had no material healthcare experience.

26.   Defendant Travis Lyon in an individual with his place of residence in Alpine, California.  Travis Lyon was the President and Chief Operating Officer of Premier.  He is also currently the President of Real Estate Operations at Priest Development Corporation.

27.   Premier, Summit, Daryl Priest, Nick Priest and Travis Lyon are collectively referred to herein as the "Premier Defendants."

**D.   DEFENDANT DENTISTS**

28.   Defendant Husam E. Aldairi, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program. Dr. Aldairi, both individually and through his company Aldairi DDS, Inc., operated several private dental practices, including 40/30 Dental Inc., located at 6175 El Cajon Blvd., San Diego, CA 92215 and 40/30 Dental 2, located at 1166 East Main

7234243.1

1  Street, El Cajon, CA 92021.  Husam Aldairi resides in San Diego County.  Aldairi

2  DDS, Inc., is a California corporation with its principal place of business in El

3  Cajon, California.

4       29.  Defendant Ayed Hawatmeh, D.D.S. is a licensed dentist in California

5  with whom Borrego Health partnered through its contract dental program. Dr.

6  Hawatmeh, both individually and through his company Defendant Hawatmeh

7  Dental Group, P.C., operated several private dental practices, including Bravo

8  Dental Group of Corona located at 1185 Magnolia Avenue #K & #L, Corona, CA

9  92879, and White Smile Dental, located at 3495 East Concours Street, Suite A,

10 Corona, CA 91764.  Ayed Hawatmeh resides in San Bernardino County.  Hawatmeh

11 Dental Group, P.C. is a California corporation, with its principal place of business in

12 Ontario, California.

13      30.  Defendant Alborz Mehdizadeh, D.D.S. is a licensed dentist in

14 California with whom Borrego Health partnered through its contract dental program.

15 Dr. Mehdizadeh, both individually and through his company Defendant Alborz

16 Mehdizadeh, Inc., operated several private dental practices, located at 15080 7th

17 Street, Suite 7, Victorville, CA 92395 and 286 N. San Jacinto Street, Hemet, CA

18 92543.  Alborz Mehdizadeh resides in San Bernardino County in Victorville,

19 California.  Alborz Mehdizadeh, Inc., is a California corporation with its principal

20 place of business in Long Beach, California.

21      31.  Defendant Jilbert Bakramian, D.D.S. is a licensed dentist in California

22 with whom Borrego Health partnered through its contract dental program.  He

23 operated as a sub-provider (i.e., though an arrangement with Dr. Aram Arakelyan

24 but without a direct agreement with Borrego Health).  Jilbert Bakramian resides in

25 Glendale, California.

26      32.  Defendant Mohammed AlTekreeti, D.D.S. is a licensed dentist in

27 California with whom Borrego Health partnered through its contract dental program.

28

7234243.1

1    He operated as a sub-provider under Dr. Husam Aldairi.  Mohammed AlTekreeti

2    resides in San Diego, California.

3            33.    Defendant Magaly Velasquez, D.D.S. is a licensed dentist in California

4    with whom Borrego Health partnered through its contract dental program.  Dr.

5    Velasquez, both individually and through her company, Defendant Magaly M.

6    Velasquez DDS Professional Dental Corp., operated a private dental practice, called

7    U-First Dental Care, located at 9130 Foothill Blvd., Rancho Cucamonga, CA 91730.

8    Magaly Velasquez resides in Rancho Cucamonga, California.  Magaly M.

9    Velasquez DDS Professional Dental is a California corporation with its principal

10   place of business in Rancho Cucamonga, California.

11           34.    Defendant Aram Arakelyan, D.D.S. is a licensed dentist in California

12   with whom Borrego Health partnered through its contract dental program.  Dr.

13   Arakelyan, both individually and through his company, New Millennium Dental

14   Group Of Aram Arakelyan, Inc., operated several private dental practices, including

15   practices located at 19523 E. Cypress Street, Covina, CA 91724 and 10917

16   Paramount Blvd., Downey, CA 90241.  Aram Arakelyan resides in Rancho

17   Cucamonga, California.  New Millennium Dental Group Of Aram Arakelyan, Inc. is

18   a California corporation with its principal place of business in Rancho Cucamonga,

19   California.

20           35.    Defendant Michael Hoang, D.M.D. is a licensed dentist in California

21   with whom Borrego Health partnered through its contract dental program.  He

22   operated a private dental practice, located at 13672 Hawthorne Blvd., Hawthorne,

23   CA 90250.  Michael Hoang resides in Long Beach, California.

24           36.    Defendant Waleed Stephan, D.D.S. is a licensed dentist in California

25   with whom Borrego Health partnered through its contract dental program.  Dr.

26   Stephan, both individually and through his company, Defendant W.A. Stephan, a

27   Dental Corporation, operated a private dental practice, called Stephan Family

28   Dental, located at 860 Jamacha Road, Suite 201, El Cajon, CA 92019.  Waleed

Stephan resides in El Cajon, California.  W.A. Stephan, a Dental Corporation is a California corporation with its principal place of business in San Diego, California.

37.  Defendant Santiago Rojo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Rojo, both individually and through his company Defendant Santiago A. Rojo, D.D.S., Inc., operated a private dental practice, called Family Dentistry Inc., located at 22435 Alessandro Blvd., Suite 106, Moreno Valley, CA 92553.  Santiago Rojo resides in Orlando, Florida.  Santiago A. Rojo, D.D.S., Inc., is a California corporation with its principal place of business in Moreno Valley, California.

38.  Defendant Marcelo Toledo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Toledo, both individually and through his company Defendant Marcelo Toledo D.D.S., Inc., operated private dental practices located at 1701 Palm Canyon Drive, Palm Springs, CA 92262 and 326 N. Riverside Avenue, Rialto, CA 92376.  Marcelo Toledo resides in Grand Terrace, California.  Marcelo Toledo, D.D.S., Inc., is a California corporation with its principal place of business in Rialto, California.

39.  Defendant Marlene Thompson, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program. Dr. Thompson, both individually and through her company Defendant Marlene M. Thompson, D.D.S., Inc., operated a private dental practice located at 988 El Norte Parkway, Escondido, CA 92026.  Marlene Thompson resides in Temecula, California.  Marlene Thompson, D.D.S., Inc., is a California corporation with its principal place of business in Escondido, California.

40.  Defendant Douglas Ness, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Ness, both individually and through his company Defendant Ness Dental Corporation, operated a private dental practice, Crown Dental Group, located at 2405 Transportation Avenue, National City, CA 91950.  Douglas Ness resides in Bonita, California.

7234243.1

1  Ness Dental Corporation is a California corporation with its principal place of

2  business in National City, California.

3      41.   Defendant George Jared, D.D.S. is a licensed dentist in California with

4  whom Borrego Health partnered through its contract dental program.  Dr. Jared,

5  both individually and through his company Defendant George C. Jared, D.D.S., Inc.,

6  operated a private dental practice, East County Family Dental, located at 13465

7  Camino Canada Road, Suite 110-A, El Cajon, CA 92021.  George Jared resides in

8  San Diego, California.  George Jared, D.D.S., Inc., is a California corporation with

9  its principal place of business in El Cajon, California.

10      42.   Other dentists formerly contracted with Borrego Health may have also

11  engaged in actions and omissions that constitute a breach or breaches of their

12  contracts with Borrego Health and/or make material misrepresentations to Borrego

13  Health.  However, the names and identities of those dentists are currently unknown

14  to Borrego Health, and are therefore sued here as Does 1-100.  They are unknown,

15  in part, because Borrego Health does not currently have access to their medical

16  records, patient charts, scheduling information, and other business records to

17  evaluate their care and documentation of services that Borrego Health billed as a

18  result of invoices from the dentists.  Borrego Health intends to seek discovery of

19  such information to evaluate other partner dentists and their sub-providers.

20      43.   Husam E. Aldairi, D.D.S., Aldairi DDS, Inc., Ayed Hawatmeh, D.D.S.,

21  Hawatmeh Dental Group, P.C., Alborz Mehdizadeh, D.D.S., Alborz Mehdizadeh,

22  Inc., Jilbert Bakramian, D.D.S., Mohammed AlTekreeti, D.D.S., Magaly Velasquez,

23  D.D.S., Magaly M. Velasquez DDS, Professional Dental Corp., Aram Arakelyan,

24  D.D.S., New Millennium Dental Group of Aram Arakelyan, Inc., Michael Hoang,

25  DMD, Waleed Stephan, D.D.S., W.A. Stephan, a Dental Corporation, Santiago

26  Rojo, D.D.S., Santiago A. Rojo, D.D.S., Inc., Marcelo Toledo, D.D.S., Marcelo

27  Toledo, D.D.S., Inc., Marlene M. Thompson, D.D.S., Marlene Thompson, D.D.S.,

28  Inc., Douglas Ness, D.D.S., Ness Dental Corporation, George Jared, D.D.S. and

1   George C. Jared, D.D.S., Inc. and Does 1-100 are collectively referred to herein as

2   the "Dentist Defendants."

3   **E.    JAMES HEBETS AND HIS COMPANIES**

4   44.    Defendant James "Jim" Hebets in an individual with his place of

5   residence in Scottsdale, Arizona.  Jim Hebets' is Bruce Hebets' brother.

6   45.    Defendant The Hebets Company is a Missouri Corporation with its

7   principal place of business in Phoenix, Arizona.  Jim Hebets is President and

8   Founder of The Hebets Company, and has or had an ownership interest in The

9   Hebets Company.  The Hebets Company provides accounting and consulting

10   services and hold themselves out as experts in executive compensation to healthcare

11   providers, including other FQHCs, in California and San Diego County.  The Hebets

12   Company is a subsidiary of NFP Corp.  NFP is a network of independent financial

13   advisors that includes over 175 firms in 41 states and Puerto Rico, specializing in

14   life insurance and wealth transfer, corporate and executive benefits, and provides

15   services across the state of California and San Diego County.

16   **F.    OTHERS**

17   46.    Julian Medical Foundation is a California nonprofit corporation, with

18   its principal place of business in Julian, California.

19   47.    Timothy Martinez, D.D.S. graduated from the Harvard School of

20   Dental Medicine in 1986 with a concentration in Health Care Administration.

21   Throughout his 30 year career, he has had extensive experience in FQHC dental

22   programs, state dental Medicaid administration, private practice, and academic

23   positions at the Associate Dean level.  Prior to joining Borrego Health, Dr. Martinez

24   served as the Associate Dean for Community Partnerships and Access to Care for

25   two dental schools, Western University of Health Sciences and the University of

26   New England, and before that, he served as the Massachusetts Medicaid Dental

27   Director as well as the Dental Director for three large FQHCs in the greater Boston

28   area, including the first FQHC in the nation Geiger-Gibson Community Health

7234243.1

1  Center, Boston Health Care for the Homeless, and the South End Community Health
2  Center.  Timothy Martinez spearheaded the Program Integrity unit for Borrego
3  Health, designed to detect and address potential false or fraudulent billing.

4  48.  <u>Maura Tuso, D.D.S.</u> was a licensed dentist in California.  She lost her
5  license and was suspended by Medi-Cal.  Despite this, she provided services for
6  various dentists that were contracted with Borrego Health.  She has since provided
7  documents, evidence, and statements that she observed and engaged in fraudulent
8  practices at the direction of Defendants Husam Aldairi, Mohammed AlTekreeti,
9  Marlene Thompson, Douglas Ness, and George Jared.

10  49.  <u>Dr. Alfredo Ratniewski</u> is the former Chief Medical Officer of Borrego
11  Health.

12  **G.    ALTER EGO AND DOE ALLEGATIONS**

13  50.  Borrego Health is informed and believes that at all relevant times each
14  of the Premier Defendants was the agent and employee of each of the remaining
15  Premier Defendants, and in doing the things hereinafter alleged was acting within
16  the course and scope of such agency and employment.  The Premier Defendants
17  operated in such a way as to make their individual identities indistinguishable, and
18  therefore are mere alter-egos of one another.  The acts and omissions of the Premier
19  Defendants were done in concert with one another in furtherance of their common
20  design and agreement to accomplish a particular result, namely extracting money
21  from Borrego Health.  Moreover, the Premier Defendants aided and abetted each
22  other in accomplishing the acts and omissions alleged herein.  (*See* Restatement
23  (SECOND) of Torts §876 (1979)).  The Premier Defendants, and each of them, fail
24  to recognize the uniqueness and independence of each other.  At all times relevant
25  hereto, there was a such a unity of interest and ownership between the Premier
26  Defendants such that the individual distinctions between them had ceased and that
27  the facts as alleged herein are such that an adherence to the fiction of the separate
28

7234243.1

1   existence of the Premier Defendants would, under the particular circumstances

2   alleged herein, sanction a fraud and/or promote injustice.

3        51.     Borrego Health is informed and believes that at all relevant times Jim

4   Hebets and the Hebets Company were the agent and employee of each other, and in

5   doing the things hereinafter alleged were acting within the course and scope of such

6   agency and employment.  Jim Hebets and the Hebets Company operated in such a

7   way as to make their individual identities indistinguishable, and therefore are mere

8   alter-egos of one another.  The acts and omissions of the Jim Hebets and the Hebets

9   Company were done in concert with one another in furtherance of their common

10   design and agreement to accomplish a particular result, namely extracting money

11   from Borrego Health.  Moreover, Jim Hebets and the Hebets Company aided and

12   abetted each other in accomplishing the acts and omissions alleged herein. (*See*

13   Restatement (SECOND) of Torts §876 (1979)).  Jim Hebets and the Hebets

14   Company, and each of them, fail to recognize the uniqueness and independence of

15   each other.  At all times relevant hereto, there was a such a unity of interest and

16   ownership between Jim Hebets and the Hebets Company such that the individual

17   distinctions between them had ceased and that the facts as alleged herein are such

18   that an adherence to the fiction of their separate existence would, under the

19   particular circumstances alleged herein, sanction a fraud and/or promote injustice.

20        52.     Borrego Health is informed and believes that at all relevant times each

21   of the individual defendant dentists and their affiliated defendant professional

22   corporation(s) were the agent and employee of each other, and in doing the things

23   hereinafter alleged were acting within the course and scope of such agency and

24   employment.  The individual dentists and their affiliated professional corporation(s)

25   operated in such a way as to make their individual identities indistinguishable, and

26   therefore are mere alter-egos of one another.  The acts and omissions of the

27   individual dentists and their affiliated professional corporation(s) were done in

28   concert with one another in furtherance of their common design and agreement to

1   accomplish a particular result, namely extracting money from Borrego Health.

2   Moreover, the individual dentists and their affiliated professional corporation(s)

3   aided and abetted each other in accomplishing the acts and omissions alleged herein.

4   (*See* Restatement (SECOND) of Torts §876 (1979)).  The individual dentists and

5   their affiliated professional corporation(s), and each of them, fail to recognize the

6   uniqueness and independence of each other.  At all times relevant hereto, there was

7   a such a unity of interest and ownership between the individual dentists and their

8   affiliated professional corporation(s) such that the individual distinctions between

9   them had ceased and that the facts as alleged herein are such that an adherence to the

10  fiction of the separate existence of the individual dentists and their affiliated

11  professional corporation(s) would, under the particular circumstances alleged herein,

12  sanction a fraud and/or promote injustice.  However, Borrego Health pleads in the

13  alternative that the individual dentists and their affiliated professional corporation(s)

14  may not have been agents of one another for purposes of the interference causes of

15  action set forth below.

16      53.    Borrego Health is ignorant of the true names and capacities of those

17  defendants sued herein as DOES 101 through 250, and for that reason has sued such

18  defendants by fictitious names.  Borrego Health will seek leave of the Court to

19  amend this Complaint to identify said defendants when their identities are

20  ascertained.

21  **IV.    THE SCHEMES THAT DAMAGED BORREGO HEALTH**

22      **A.    The Scheme to Form and Sell Entities Formed by Borrego Insiders**

23          **to Borrego Health (the "Borrego MSO/IPA Scheme")**

24      54.    One of the earliest discovered schemes concocted by the Borrego

25  Insiders to the detriment of Borrego Health is the formation of Borrego Management

26  Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians

27  Association, A Professional Medical Corporation ("Borrego IPA"), and the sale of

28  those entities to Borrego Health.

7234243.1

55.     While CEO of Borrego Health, Bruce Hebets devised a scheme to have Borrego Health incur unnecessary costs by providing physician services and administrative services to Borrego Health through companies that he and other Borrego Insiders would create and control.  This allowed the Borrego Insiders to improperly profit from those companies at the expense of Borrego Health.

56.     Both Borrego MSO and Borrego IPA were formed on or about July 19, 2010 though the assistance of Mikia Wallis, in-house counsel at Borrego Health. Mikia Wallis provided this service without charge to Borrego MSO or Borrego IPA, using Borrego Health resources to benefit some of the Borrego Insiders.  Borrego MSO and Borrego IPA were potential referral sources for Medi-Cal beneficiaries. Mikia Wallis was listed as the agent for service of process for both entities.

57.     As Bruce Hebets and other Borrego Insiders were not medical professionals, their ownership in Borrego IPA, which was a professional medical corporation, was constrained.  Thus, other friends, cronies, and referral sources became investors, including Dr. Alfredo Ratniewski and his daughter.  Dr. Alfredo Ratniewski was motivated to cooperate, in part, by the Borrego Insiders' decision to overcompensate him as Borrego Health's Chief Medical Officer and to overcompensate his family members who also worked at Borrego Health.

58.     Borrego MSO, on the other hand, is a lay entity, which was supposed to manage the Borrego IPA practice.  Bruce Hebets was sophisticated enough to try to avoid scrutiny of the obvious conflict problems by keeping his name away from Borrego MSO.  Instead, Karen Hebets (Bruce Hebets' wife) was a shareholder, and was named as Borrego MSO's Chief Executive Officer.  Karen Hebets had no experience managing an IPA and was not qualified to do so.

59.     Through Borrego MSO's purported "management" services, Borrego MSO could charge Borrego IPA for unnecessary services, and funnel the funds to Karen Hebets and other Borrego Insiders.

7234243.1

60.     Borrego MSO and Borrego IPA were then contracted with Borrego Health to provide physician and administrative services to Borrego Health. However, these services were already being provided without the unnecessary expense of contracting with outside companies.  Tellingly, Borrego MSO and Borrego IPA did not do business with any other healthcare providers, only Borrego Health.

61.     Eventually, a plan was developed by Bruce Hebets and other Borrego Insiders for Borrego Health to buy Borrego MSO and Borrego IPA.  The entities had no valuable assets to sell to Borrego Health.  The transaction was a sham transaction meant to obscure the self-dealing of Bruce Hebets and other Borrego Insiders.  Mikia Wallis facilitated the transaction, which was culminated with a November 1, 2012 purchase agreement whereby Borrego Health paid $2,000,000 to acquire Borrego MSO and Borrego IPA.

62.     On information and belief, the plan was to take some of that money and pay it to the investors of Borrego IPA.  Thus, all of the investors at Borrego MSO and Borrego IPA would profit at the expense of Borrego Health.

63.     On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**B.     The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme")**

**i.     The Contract Dental Program is Formed**

64.     Borrego Health began a contract dental program in 2014.  In general, the Medi-Cal program recognizes the value of a FQHC expanding the availability of its services, so it allows FQHCs to enter into contracts with private practice healthcare professionals to provide services to the FQHC's members.

65.     In general, "contract dental" describes the arrangement where Borrego Health expanded its service area by entering into contracts with individual dentists and/or their practices.  Under those contracts, the contracted dentists agreed to provide certain dental services to eligible patients of Borrego Health.  Those services would then be billed to Medi-Cal by Borrego Health.  Borrego Health, in turn, pays the dentist a fee for the dental services rendered.

66.     Importantly, the fees that Borrego Health paid to the dentists were far greater than what the dentists would have been paid if they had billed Medi-Cal for the services directly.  Therefore, the dentists were motivated to contract with Borrego Health.  As a result, some dentists were taking their existing patients and converting them to "Borrego Health patients."

67.     The contract dental program expanded so quickly because Medi-Cal paid Borrego Health based a fixed rate for each service that Borrego Health (or its contracted dentists) provided.  The billing is known as "encounter" billing, and each "encounter" or visit Borrego Health (or its contracted dentists) has with a patient is reimbursed the fixed fee amount based on Borrego Health's historic costs.

68.     If the dentists were not contracted with Borrego Health and provided dental services to a Medi-Cal beneficiary, then the dentist would be paid under the Medi-Cal fee schedule, a per service billing method, that is described by many dentists as very low.

69.     The fixed fee, encounter-based payment was high relative to the costs of providing dental services.  This allowed Borrego Health to pay the contracted dentists more than what Medi-Cal would have paid to the dentist directly under the Medi-Cal fee schedule, and still retain a handsome profit.

70.     In each instance Borrego Health was billing Medi-Cal for the services that the contract dentist billed Borrego Health.

71.     Borrego initially managed the contract dental program on its own.

72. By fall 2015, Borrego Health's contract dental program comprised approximately 20 to 25 percent of Borrego Health's total revenue.

### ii. Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health

73. Sometime in 2015, Bruce Hebets, possibly due to his experience with Borrego MSO and Borrego IPA, identified a significant business opportunity for an outside organization to provide management services for dental programs in FQHCs. Specifically, he proposed the idea of Borrego Health contracting with a MSO to provide management services for its contract dental program.

74. Bruce Hebets originally proposed that he would own 100 percent of the MSO, then sell 90-95 percent of it to Daryl Priest and/or others. This would have resulted in a large, direct payment by Daryl Priest and/or others to Bruce Hebets, and then ongoing payments by Borrego Health to Bruce Hebets through the MSO due to Bruce Hebets' retained ownership of 5-10 percent.

75. During an Executive/Finance Committee meeting on August 27, 2015, Bruce Hebets discussed his proposal to form an MSO that would contract with Borrego Health to provide management services for the contract dental program. Borrego Insiders Harry Ilsley, Dennis Nourse, and Mike Hickok were present at this meeting, along with Mikia Wallis and Diana Thompson. These Borrego Insiders supported the proposal. However, Mikia Wallis identified the risk of Bruce Hebets staring a competing company.

76. On September 22, 2015, in an email to Mikia Wallis, outside counsel for Borrego Health warned that any potential MSO arrangement involving Bruce Hebets implicated conflict-of-interest laws, would have to be an arms-length transaction and that any compensation paid to Bruce Hebets under the deal must be at the fair market value. As detailed below, this advice was later ignored.

77. The discussion of the MSO proposal carried over into the next meeting of the Executive/Finance Committee meeting that took place on September 24,

7234243.1

2015.  The minutes from the meeting clearly document the attempt by Bruce Hebets, Mikia Wallis and Diana Thompson to convince the Executive/Finance Committee that Bruce Hebets' proposal was a good idea despite the conflict of interest issue being identified.

78.     For example, the Executive/Finance Committee members were told how no other company could provide this type of novel management services to FQHCs specific to their contract dental program needs.  The Executive/Finance Committee also discussed how Borrego Health could be a part-owner of the MSO. Ultimately, the discussion was tabled for presentation to the entire Board at its October meeting, pending an analysis by outside counsel regarding Bruce Hebets' clear conflict of interest issue.

79.     Ultimately, on or about October 29, 2015, the full Borrego Health Board rejected Bruce Hebets' proposal to enter into an arrangement with a MSO in which he held ownership interest as a result of the inherent conflict of interest.[1] Some Board members who were present at that meeting recall that the Board went as far as rejecting wholesale the idea that Borrego Health use an MSO to manage the contract dental program, regardless of who owned or operated it.  The non-Borrego Insider Board members believed the issue was settled; the MSO would not go forward.  The Borrego Health Board did not approve moving forward with a MSO at all.

80.     Outside counsel for Borrego Health attended the next meeting of the full Borrego Health board.  The Board took no action while they were in the meeting.  On or about December 11, 2015, Mikia Wallis told outside counsel that "the Finance Committee" was reviewing the issue and she would get back to the

---

[1] This experience of the full Board rejecting his proposal likely influences subsequent actions by Bruce Hebets and others to avoid taking issues to the Board again and instead reach deals among Bruce Hebets and the Borrego Insiders.

lawyers.  Mikia Wallis told outside counsel that the issue was put off until the next Board meeting on December 17, 2015.  Outside counsel was prepared to attend that meeting.  However, on December 16, 2015, Mikia Wallis called one of the outside lawyers and said something to the effect of "it appears we will not need you after all."

81.     On December 26, 2015, one of the outside counsel lawyers sent an email to Mikia Wallis asking if she needed anything more on the MSO issue.  Mikia Wallis falsely said that the Borrego Health decided not to move forward with the MSO plan.  In fact, the MSO plan was going forward, albeit in a modified form.

### iii.     The Borrego Health Insiders Enter Into a Management Services Agreement on Borrego Health's Behalf Anyway

82.     Notwithstanding the full Board's rejection of the very idea of an MSO and unbeknownst to Borrego Health, on March 1, 2016, Bruce Hebets and Premier executed a Management Services Agreement for Borrego Health's contract dental program ("Dental MSA").  None of the Borrego Insiders ever brought the Dental MSA to Borrego Health's full Board for consideration or approval.  Instead, the Borrego Insiders negotiated the terms of the arrangement with Premier and Mikia Wallis drafted the Dental MSA.  The Borrego Insiders then proceeded to enter into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board (whom they knew had already rejected the proposal).  A true and correct copy of the Dental MSA is attached hereto as Exhibit A.

83.     Pursuant to the terms of the Dental MSA, Borrego Health was to pay Premier $5 per participating patient visit to any contract dentist for the first 8,000 visits, then $25 per participating patient visit thereafter.  In return, Premier agreed to provide the services to Borrego Health, including without limitation provider contracting (marketing and negotiating) and relations, claims management and processing (including "scrubbing" the contract dental claims for documentation errors or inconsistencies and ensuring claims are in such a format as Borrego Health

1   may bill and submit to DHCS), management information system, quality

2   management, patient management, reporting, and other general administrative

3   services.

4   84.    The Dental MSA underwent two amendments – Amendment 1 and

5   Amendment 2.  The Premier Defendants were able to manipulate and control

6   Borrego Health to such a degree that there were able to take what was an already

7   unreasonable, one-sided agreement and amend it to make it even more unreasonable

8   and one-sided, without offering anything in return.  The first Amendment was

9   effective on or about December 22, 2016 ("Amendment 1") and the second on or

10   about July 1, 2017 ("Amendment 2").  A true and correct copy of Amendment 1 is

11   attached herein as Exhibit B.  A true and correct copy of Amendment 2 is attached

12   herein as Exhibit C.

13   85.    Amendment 1 of the Dental MSA was signed again by Bruce Hebets

14   and Daryl Priest.  Amendment 1 amended the term of the Dental MSA to extend for

15   the five year period beginning January 1, 2017, subject to an automatic renewal of

16   five years.  Amendment 1 also removed provision 3.B. from the Dental MSA which

17   permitted Borrego Health to terminate the Dental MSA without cause.  Amendment

18   1 was completely one-sided to the benefit of Premier, and Borrego Health received

19   no additional consideration.  The Borrego Insiders negotiated the terms of

20   Amendment 1 to the Dental MSA, Mikia Wallis drafted it, and the Borrego Insiders

21   entered into Amendment 1 to the Dental MSA on Borrego Health's behalf, without

22   any notice whatsoever to the full Board.

23   86.    Amendment 2 of the Dental MSA was signed by Mikia Wallis as

24   "Executive Vice President" of Borrego and Daryl Priest.  Amendment 2 to the

25   Dental MSA changed the compensation provisions of the original Dental MSA.  As

26   a result, Amendment 2 obligated Borrego Health to pay Premier $25 per visit,

27   starting at the first visit rather than the previous term of $5 per visit for the first

28   8,000 visits.  Amendment 2 did not obligate Premier to perform any additional

services in exchange for increasing their payment fivefold.  In essence, Amendment 2 conferred a benefit (worth $160,000) to Premier without any corresponding consideration to Borrego Health.  Again, Amendment 2 was completely one-sided to the benefit of Premier, and Borrego Health received no additional consideration. The lack of consideration and other reasons makes Amendment 2 unenforceable, and the Premier Defendants must return the overpaid funds.  The Borrego Insiders negotiated the terms of Amendment 2 to the Dental IPA, Mikia Wallis drafted it, and the Borrego Insiders entered into Amendment 2 to the Dental IPA on Borrego Health's behalf, without any notice whatsoever to the full Board.

87.     The Dental MSA and Amendments should have been provided to the Board for review and approval, but that was avoided by the Borrego Insiders.

88.     On September 8, 2017, Bruce Hebets and Daryl Priest entered into another Management Services Agreement – this time for Borrego's Contract Medical Program ("Medical MSA").  Another of Daryl Priest's companies, Summit Healthcare Management, Inc. (which has subsequently been merged into Premier), agreed to provide services similar to Premier's obligations under the Dental MSA. The terms of the Medical MSA required Borrego Health to pay $25 per patient visit to Summit in exchange for the management services provided.  The Borrego Insiders negotiated the terms of the arrangement with Premier, Mikia Wallis drafted the agreement and the Borrego Insiders entered into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board.  A true and correct copy of the Medical MSA is attached herein as Exhibit D.

89.     As part of both the Dental MSA and Medical MSA, Premier and Summit, through Daryl Priest, represented that they had the skill and experience necessary to fulfill their obligations under the Dental MSA and Medical MSA. Specifically, among other things, they represented they had skilled clinical providers to review and evaluate the claims.

7234243.1

90.     As part of the Dental MSA and corresponding Amendments, Premier Defendants represented to Borrego Health that it was qualified and competent to provide necessary administrative and management services for a FQHC.  The Premier Defendants further represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and other patient information.  The Premier Defendants further represented they would both maintain and allow auditing of all bills generated which related to dental services provided under any agreement between Borrego Health and a contract dental provider.

91.     Exhibit "A" to the Dental MSA further outlines that Premier Defendants represented that they would market and negotiate new contract dental agreements for the benefit of Borrego Health, provide ongoing education and training to contract dental service providers and their staff, and address contract dental service provider eligibility and claims inquiries.  The Premier Defendants represented, among other things: (1) that they would obtain information from the contract dental providers to insure Borrego Health had all information that was required in order to properly and correctly bill Medi-Cal for such claims, (2) that they would monitor the claims, bills and payments to dentists to the benefit of Borrego Health to ensure compliance with all applicable statutes, regulations and laws, (3) that they would provide ongoing education to contracted dental providers to ensure compliance with Borrego Health policies and procedures, (4) regarding patient eligibility, that they would actively track whether or not the services rendered were eligible for reimbursement for each participating patient, and (5) that they would, for the benefit of Borrego Health, perform both short and long-term financial and strategic planning, and manage Borrego Health's relationship with applicable regulatory agencies.

92.     As part of the Medical MSA, the Premier Defendants represented they would comply with all guidelines, laws and regulations governing transactions and

7234243.1

security of electronic health records and patient information.  Premier Defendants further represented that they would provide any and all necessary staff, information systems, and support services needed to perform the services outlined in the Medical MSA.  The Premier Defendants represented, among other things: (1) that they would provide ongoing education to contracted providers to ensure compliance with Borrego Health policies and procedures, (2) that they would obtain information from contracted providers necessary for Borrego Health to properly bill for such claims, (3) that they would monitor claims, billing and payment for contracted providers to ensure Borrego Health's billing practices were compliance with applicable law, (4) as part of monitoring claims, that they would validate the eligibility and completeness of the claims submitted, and (5) that they would assist Borrego Health in verifying the credentials of healthcare providers requesting to partner with Borrego Health.

93.   The Premier Defendants did not perform the obligations set forth in the Dental MSA and Medical MSA.

94.   At the time the Premier Defendants made these representations, they knew they lacked the knowledge, experience and skill to do these things, and that they would not be able to fulfill these promises.  Accordingly, the Premier Defendants did not intend to perform these promises.

95.   At the time the Premier Defendants made these representations, they knew these representations were false or had no reasonable grounds for believing the representations to be true.

96.   Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  Further, the payments from Borrego Health to the dentists were not recouped by Premier if Medi-Cal never paid Borrego Health.

### iv.    The Borrego Insiders Concealed the Premier Scheme from Borrego Health

97.    The Borrego Insiders concealed the Dental MSA, along with Amendment 1 and Amendment 2 thereto, and the Medical MSA from the full Borrego Health Board.  In fact, in August 2017, when the Borrego Insiders met to discuss expanding Borrego Health's relationship with Premier (or another Daryl Priest entity) to manage Borrego Health's nascent contract medical program, the Borrego Insiders (in a recorded conversation) acknowledge that they intentionally kept the 2016 Dental MSA from the full Board and that they intended to do the same with any future arrangement (which turned out to the Medical MSA).

98.    At a meeting of Borrego Insiders on August 31, 2017, Chuck Kimball asked with respect to the contemplated Medical MSA with the Premier Defendants, "…can we just do that in the Executive Committee [i.e. Borrego Insiders only], because I can think of a couple of people that are going to object to that."  Indeed, the Board had already rejected prior efforts for a dental MSO.  Because the Borrego Insiders knew that non-Borrego Insiders would object, the Borrego Insiders ultimately chose to conceal it from the rest of Borrego Health.  After Chuck Kimball asked his question, the following discussion took place (emphasis added):

> BRUCE HEBETS: I guess the way I would answer that is, does this Committee want me to take this to the Board? Or does it feel comfortable enough without it?
>
> MIKE HICKOK: Take what specifically?
>
> CHUCK KIMBALL: The idea?
>
> BRUCE HEBETS: The idea of working with Daryl on the contract.
>
> CHUCK KIMBALL: I think they should be advised about it. I don't know if it's a up or down, we do it or don't do it. But I think --
>
> BRUCE HEBETS: It could be handled however this Committee wants. I can take this to the Board as an up-or-down decision, or just an advisement -- by the way, we are doing this.

7234243.1

CHUCK KIMBALL: <u>I'm wondering if we can get away with doing -- literally, get away with not explaining the details</u>, but saying we are now moving forward on adding Contract Medical to the Contract Dental load that we have, and it should be a great deal and all that sort of thing. If you don't have to go into details, and nobody says, "Well, who's going to run it?"

BRUCE HEBETS: That's fine.

CHUCK KIMBALL: Then, are we in trouble there with (indiscernible) at all? An idea?

MIKIA WALLIS: No. I believe that's already part of the strategic plan, so I don't know if that report even needs approval. But just as a, you know, operational FYI.

CHUCK KIMBALL: An operational FYI is probably -- then I think there wouldn't be any problem presenting it. I think, in my mind, but Dennis and Mike?

MIKE HICKOK: <u>I don't think the Board approved Daryl in the first place</u>.

CHUCK KIMBALL: I think you're right.

MIKE HICKOK: I don't recall ever being asked.  I mean, we discussed it.

CHUCK KIMBALL: I think that was a slam dunk thing. It just happened, didn't it?

DENNIS NOURSE: I think what was discussed was, was it going to be your participation.

[OVERLAPPING SPEAKERS]

DENNIS NOURSE: <u>It might come as a surprise to some to know that Daryl is out there doing this</u>. That was never a part of the vote. And neither should be Contract Medical.

BRUCE HEBETS: The opportunity I put together -- trust me, I really wish that I had a piece of it, or that I received some kind of commission on it.

MIKE HICKOK: Don't we all.

BRUCE HEBETS: Because this is going to be off the (indiscernible) -- is still the only MSO that exists in the country doing this.

DENNIS NOURSE: Can we make that a conditional approval by the --

[OVERLAPPING SPEAKERS]

CHUCK KIMBALL: I was thinking, we are going to retire, like you and I. We could retire and draw a little salary.

MIKIA WALLIS: <u>None of this goes in the minutes</u>.

[OVERLAPPING SPEAKERS]

BRUCE HEBETS: If you were to analyze (indiscernible), he's at like $14- or $15 million a year revenue.

HARRY ILSLEY: Chuck?

CHUCK KIMBALL: Yeah?

HARRY ILSLEY: As I remember, and Bruce, you can correct me if I'm wrong, but <u>when we first talked about, regarding Daryl, we got approval through the Executive Committee only. We did not take that to the Board</u>.

CHUCK KIMBALL: I believe you're right.

HARRY ILSLEY: <u>That's the same with Contract Dental. That was not approved by the Board. That was approved by the Executive Committee</u>. So, I don't think you need to take this matter to the Board. I think the Executive Committee can approve it and go from there on it.

MIKE HICKOK: And Harry, I agree with you; it wouldn't be an up or down decision to the Board, but how about just advising them that this is going to be another program?

HARRY ILSLEY: And that's what we did before. We just advised them what we had done.

99.     Ultimately, the Borrego Insiders determined that Bruce Hebets would "share with the board [his] thoughts of going into contract medical, and just leave it at that." And ultimately, the Borrego Insiders only told the full Board that they were expanding into "contract medical." The Borrego Insiders continued to conceal that there was a third party involved.

100.   At the August 30, 2017 Borrego Health Board meeting, the minutes reflect that "Borrego Health will be pursuing a contract medical program," along with the notation "Information only."

101.   Mike Hickock would present monthly financial reports at each Board meeting. At its highest, the compensation paid to Premier was $20 million in fiscal

year 2019.  During fiscal year 2020, Borrego Health paid $18.15 million to Premier.
However, despite Premier being Borrego Health's highest paid vendor, Mike
Hickok failed to mention the arrangement in his reports.

102.   It was not until the summer of 2020 that Borrego Health board
members other than the Borrego Insiders became aware of the arrangement.

103.   By email on or about July 23, 2020, Borrego Insider Mike Hickok
admitted, "As long as I have been on the board our dealings with them [Premier]
have been secretive mysterious and above all off limits to board members."  Mike
Hickok's email went on to report the basic terms of the Dental MSA and Medical
MSA (along with the total fees paid to Premier the prior year), demonstrating that he
was familiar with the arrangement and its terms.  The email also admitted that,
among other things, the Dental MSA and Medical MSA were never approved by the
full Borrego Health Board, were never put out for competitive bidding, and were
never reported on 990 forms.  Mike Hickok also stated that the arrangement with
Premier "was hardly the extent of [Borrego Health's] involvement with the
principals of Premier Healthcare" and that "no board member has ever seen the
agreement or any other financial documents relating to this entity."  Mike Hickok
did not explain why, since he knew about these arrangements, he had never raised
them prior to this time.  Mike Hickok acknowledged "I have a fiduciary
responsibility…" and that "each and every Board member can potentially be held
accountable legally and financially for allowing an improper (and perhaps illegal)
relationship to continue."

**v.    The Damages Suffered by Borrego Health Due to the
Premier Scheme**

104.   Following the discovery of the Dental MSA and Medical MSA and the
relationship with Premier by the full Borrego Health Board, Borrego Health retained
a valuation expert to determine the maximum fair market value of the services
Premier provided to Borrego Health, if those services were valuable at all.

105.   The valuation, conducted by BKD, determined that the fair market value of the contract dental services Premier was supposed to perform totaled $19 million over the term of the Dental MSA (at that point).  However, Borrego Health paid over $60 million for those services, meaning the Borrego Health overpaid by at least $40 million.  The fair market value of the contract medical services was $145,000 over the term of the Medical MSA (at that point).  Borrego Health paid over $383,000 for those services, meaning the Borrego Health overpaid by over double, or around $238,000.  Moreover, neither of these valuations take into account the various breaches of contract set forth herein, which would reduce the value of the services.

106.   The Dental MSA provides, in pertinent part, that Premier shall "defend, indemnify and hold Borrego Health free and harmless from any obligations, costs, claims, judgments, attorney's fees, or attachments arising from Premier's negligence in the performance of the services contemplated under this Agreement." (*See* Exhibit A, Section 6.)  The Medical MSA states that Summit (now Premier) "shall defend, indemnify and hold Borrego Health, its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement." (*See* Exhibit D, Section 8.)

107.   Borrego Health provided notice of Premier's indemnification obligation, but Premier has not provided any financial support.

108.   Separate and distinct from Premier's contractual duty to indemnify Borrego Health, Premier is also obligated to indemnify Borrego Health under equity principles, if either agreement were not enforceable.  "Equitable indemnity applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party."  *United Services Auto. Ass'n v. Alaska Ins. Co.* (2001) 94 Cal. App. 4th 638, 644-645 (emphasis added); *see also Prince v. Pacific Gas & Elec. Co.* (2009) 45

Cal. 4th 1151, 1163. As such, even if Premier were not contractually bound to indemnify Borrego Health, it still owes Borrego Health a duty of indemnification. *See Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal. 4th 541, 551 ("[C]ontractual promise to 'defend' another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the promisee's defense against such claims. The duty promised is to render, or fund, the service of providing a defense on the promisee's behalf—a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved." [emphasis added]); Civil Code § 2778. As such, Premier is under an obligation to cover the expense of Borrego Health's defense against any claims subject to the Dental MSA and Medical MSA.

109.    On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration. As Bruce Hebets stated at an August 31, 2017 meeting of the Borrego Insiders, "we've already made Daryl rich, but Daryl has made us richer."

**C.    Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")**

110.    Based on both Medi-Cal and Borrego Health's billing and payment structure, some of the dentists were also motivated to provide as many services to Borrego Health patients as possible, in some instances even where the services were not medically unnecessary. Even more egregious, some dentists split services that could have been done in one encounter to multiple encounters so that they could collect multiple times. More egregious than that, some dentists provided multiple services during a single encounter, but billed the services as multiple encounters. Finally, most egregious of all, some dentists billed for services they never provided.

7234243.1

111.   Unbeknownst to Borrego Health, certain contract dentists and dental practices, Premier and the Borrego Insiders schemed to maximize their profits at the expense of the Medi-Cal program and Borrego Health.  Since the dentists were paid on a "per encounter" basis, certain contract dentists, with the knowledge and support of Premier and the Borrego Insiders, among other things (1) provided services were not medically unnecessary, (2) split services that could have been done in one encounter to multiple encounters so that they could collect multiple times, (3) provided multiple services during a single encounter, but billed the services as multiple encounters, and/or (4) billed for services they never provided.  This scheme is detailed below.

112.   Under the Dental MSA, Premier was responsible for claims monitoring, which involved review of claims received by contract dental providers to ensure that claims were compliant with federal and state regulation prior to submission to Borrego Health for final submission to Medi-Cal for payment.  Prior to the Program Integrity implementation (discussed below), Borrego Insider Karen Hebets had responsibility for billing audits and identifying billing discrepancies.

113.   Under the Dental MSA, Premier was also responsible for implementing quality management measures to address patient grievances, audit and survey contract dental providers and provide Borrego Health with the findings of such surveys and audits, and provide education and training to contract dental providers who did not meet the requirements under the quality measures implemented.

114.   The Premier Defendants completely abdicated their responsibilities under the Dental MSA, because effective performance would have undermined the scheme to facilitate contract dentists overbilling Borrego Health for services.  The Premier Defendants understood that the more claims that were submitted benefitted the Premier Defendants, because Premier was compensated by Borrego Health based on the volume of claims.

115.   While it is true that the Premier Defendants were derelict in their duties, their conduct went much further.  The Premier Defendants actively supported the fraud described below.  On information and belief, the Premier Defendants coached dentists on how to fraudulently bill Borrego Health, including coaching them on "claim splitting" and fraudulently billing for non-covered bridges.

116.   Dentists were paid on a per-encounter basis, so in the event that a dentist performed multiple procedures in one encounter, they were still paid for one encounter.  On information and belief, the Premier Defendants coached dentists to split these claims, *i.e.*, bill one encounter on the day it occurred and the next day, so that the dentist could get paid for both.  This is a fraud on Borrego Health and on the government.  It is clear from the following paragraphs that the dentists took this practice to the extreme, sometimes billing for dozens of patient visits for one patient in a single month.

117.   Another way the Dentist Defendants, supported by the Premier Defendants and Borrego Insiders, submitted false and fraudulent bills was through improper billing for bridges.  Dental bridges literally bridge a gap for a missing tooth.  A connected bridge covers both sides of the teeth next to the missing tooth to hold a false tooth in the missing spot.  A bridge is generally not covered by Medi-Cal.  To avoid this non-coverage, on information and belief, the Premier Defendants coached dentists to bill for three crowns – one for missing tooth and one for each tooth beside it – instead of billing for a bridge, and to bill three separate encounters.  In this way, rather than billing for one non-covered service (and one visit), the dentist falsely documented three covered services and fraudulently billed for all three.

118.   Premier routinely approved of services that could not have possibly occurred.  Dentists were required to upload a progress note and an x-ray for Borrego Health to pay the dentists for certain claims.  Borrego Health has also identified dozens of examples in which x-rays clearly demonstrate that the claimed service

7234243.1

1  could not have occurred (e.g., because the x-ray submitted to Premier shows that the

2  tooth supposedly receiving the service is no longer in the mouth of the patient), yet

3  employees from Premier still signed their names to approve the services.

### i. Husam E. Aldairi, D.D.S.

5  119.  On or about May 27, 2016 and May 29, 2018, Husam Aldairi, D.D.S.,

6  both individually and through his company Aldairi DDS, Inc. (collectively,

7  "Aldairi") entered into written dental services agreements (the "Aldairi

8  Agreements") whereby Aldairi agreed to provide primary dental services to

9  participating Borrego Health patients, and Borrego Health agreed to pay Aldairi for

10  those services.  A true and correct copy of the 2016 Aldairi Agreement is attached

11  herein as Exhibit E, and a true and correct copy of the 2018 Aldairi Agreement is

12  attached herein as Exhibit F.

13  120.  Among other things, the Aldairi Agreements required that Aldairi

14  practice dentistry in accordance with all Federal, State and local laws, regulations,

15  and generally accepted principles applicable to the practice of dentistry, and  to

16  prepare, establish, and maintain administrative records, financial records, records

17  pertaining to patient diagnosis and treatment, and information pertaining to the

18  services provided.

19  121.  Aldairi submitted false and fraudulent bills and made other statements

20  which Aldairi knew to be false or had no reasonable grounds for believing their

21  representations were true, which also constitute a breach of the Aldairi

22  Agreement.  A non-exhaustive list of examples is set forth below.  The below

23  examples are demonstrative of a larger pattern and practice of fraudulent and/or

24  unlawful conduct.

25  122.  On May 21, 2020, the Executive Officer of the Dental Board of

26  California (the "Dental Board"), Karen M. Fischer, issued an Accusation against

27  Husam Aldairi alleging Husam Aldairi, dating back to December 2016, committed

28  gross negligence, "repeated acts of professional negligence," and failed to properly

document patient treatment, surgical procedures, diagnosis, and clinical findings. The Accusation sought to revoke or suspend Husam Aldairi's dentist license to practice in California.

123.   On May 25, 2021, the Dental Board and Husam Aldairi agreed to a Stipulated Settlement and Disciplinary Order in which Husam Aldairi "voluntarily, knowingly, and intelligently waive[d] and [gave] up" his legal rights, including a right to hearing on the charges and allegation.  Under the order, Husam Aldairi's dental license to practice in California was revoked, but the revocation was stayed pending  a two-year probationary period.  The Dental Board adopted the order, effective June 24, 2021.

124.   Husam Aldairi never informed Borrego Health of the ongoing Dental Board investigation on his license or the issued Accusation.

125.   Husam Aldairi's failure to inform Borrego Health of the ongoing Dental Board investigation on his license or the issued Accusation, made the First Agreement subject to suspension until the Dental Board issued its final determination on April 29, 2021.

126.   Husam Aldairi's failure to inform Borrego Health of the ongoing Dental Board investigation on his license or the issued Accusation, made the Second Agreement subject to suspension until the Dental Board issued its final determination on April 29, 2021.

127.   In September 2020, Borrego Health conducted a compliance re-audit of Husam Aldairi.  Husam Aldairi had failed his prior audit with Borrego Health, but Borrego Health provided Husam Aldairi another opportunity to obtain compliance with Borrego Health's policies.  Borrego Health even offered Husam Aldairi one-on-one compliance trainings.  For the September 2020 audit, out of the sampled dental record documents pulled for his private practice at the San Diego location, none of them met the documentation requirements under the Aldairi Agreements and Borrego Health's policies for contract dental providers.  Out of the sampled

1  dental record documents pulled for Aldairi DDS, Inc. at the El Cajon location, only

2  three out of 30 claims met the documentation requirements under the Aldairi

3  Agreements and Borrego Health's policies for contract dental providers.

4      128.  The results of Borrego Health's audit from September 2020 of Husam

5  Aldairi indicated that Husam Aldairi had clearly violated the terms of the Aldairi

6  Agreements by his actions, including but not limited to: (1) billing excessive patient

7  visits, including falsifying appointment schedules; (2) failing to maintain adequate

8  documentation to support billing; (3) falsification of medical records; (4) performing

9  services that lacked medical necessity; (5) providing services that fell below the

10 standard of care; (6) providing excessive services; and (7) generating inaccurate

11 billing records, including billing for services not rendered, upcoding, inappropriately

12 splitting services, and billing for services rendered by another provider and/or

13 providers not enrolled in Medi-Cal.

14     129.  For example, patient charts with Husam Aldairi demonstrated in

15 multiple instances that patients presented to his office on several consecutive days to

16 receive dental services, however, patient scheduling did not support such frequent

17 visits.  In some instances, patient charts would have notes for services rendered on

18 days in which Husam Aldairi's offices were closed.[2] Program Integrity calculated a

19 65% rate of potentially falsely billed appointments (meaning no face-to-face

20 encounter).  As an example, the audit found that there were notes written and

21 procedures billed by Husam Aldairi indicating that a face-to-face visit occurred on

22 dates when the office was closed for the Thanksgiving holiday.

23

24

---

25 [2] To protect patient private health information ("PHI") as well as personally
identifiable information ("PII"), the names of the patients in the examples

26 throughout the complaint will not be included.  The specific patient examples are

27 already available to the Dentist Defendants, as they maintain custody of the patient

28 charts

7234243.1

130.   Further examples include: (1) on or about June 2020, a patient in which Husam Aldairi billed Borrego Health for telehealth and emergency dental services completely absent from the patient's chart; (2) on or about July 2019, Husam Aldairi's office billed Borrego for several crowns when x-rays demonstrated a bridge had been placed on the patient; (3) on or about May 2019, Husam Aldairi billed Borrego Health for a partial denture which was never prepared; and (4) on or about February 2020, Husam Aldairi billed Borrego Health as though a patient's root canal was completed over the course of several visits, when x-rays demonstrated it was completed in one visit.  Dr. Aldairi billed Borrego for patient visits that either did not occur or that were provided by providers that were not disclosed to or credentialed by Borrego Health.  One example of extreme excess billing occurred on July 22, 2019. Dr. Aldairi billed Borrego Health for 147 patient visits that he claimed occurred that day.

131.   In October 2019, Dr. Aldairi billed 15 different encounters for a single patient, despite the fact that there are only 23 business days in October.  In May 2020, Dr. Aldairi billed 16 different encounters to a single patient, despite only having 21 business days in that month.  Further, in June 2020, one of Dr. Aldairi's subproviders billed 18 different encounters during the month of June 2020. That same subprovider then billed 34 different encounters for a single patient from the time period of May 2020 to June 2020.  Again, Premier did not flag these bills and took no steps to counsel or discipline this dentist.

132.   In addition to the above, Aldairi hired Maura Tuso in September 2017 to work as a dentist at his dental practice. Dr. Tuso was employed by Dr. Aldairi from September 2017 to January 2018. During the time Dr. Tuso worked for Aldairi, Dr. Tuso was suspended from providing dental services to Medi-Cal patients.  Aldairi was aware that Dr. Tuso was suspended at the time Aldairi hired Dr. Tuso.  Nevertheless, Aldairi allowed Dr. Tuso to see Borrego Health patients and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

133.   Aldairi also hired other dental providers, in addition to Dr. Tuso, who lacked California dental licenses to provide dental services to Borrego Health patients.  Upon information and belief, Aldairi billed Borrego Health for the services that unlicensed dental providers provided to Medi-Cal patients.

134.   As a result of Aldairi's conduct, Borrego Health paid Aldairi and/or for services which were not rendered, that were provided by other physicians, and/or services which were provided during a period of time where the parties' agreements would have otherwise been suspended or terminated.

### ii.      Ayed Hawatmeh, D.D.S.

135.   On or about October 18, 2017, Ayed Hawatmeh, D.D.S., both individually and through his company Hawatmeh Dental Group, P.C. (collectively "Hawatmeh") entered into a written dental services agreement (the "Hawatmeh Agreement") whereby Hawatmeh agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Hawatmeh for those services. A true and correct copy of the Hawatmeh Agreement is attached herein as Exhibit G.

136.   Among other things, the Hawatmeh Agreement required that Hawatmeh practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

137.   Hawatmeh submitted false and fraudulent bills and made other statements which Hawatmeh knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Hawatmeh Agreement.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

138.   Hawatmeh routinely employed the scheme, described above, whereby he would bill for several crowns instead of a single, non-covered bridge.  For example, on or about February 2018, Hawatmeh billed Borrego Health for several crowns were placed over the course of several days when documentation indicated a single bridge was used.

139.   Hawatmeh also billed for services that the x-rays he submitted to Premier to get his claim approved clearly demonstrate could not have possibly occurred.  For example, on or about May and June of 2018, Hawatmeh billed Borrego Health for services performed on a tooth the patient no longer had at the time of service.  On or about May 2017, Hawatmeh billed Borrego Health for preparing a tooth for a crown, which requires shaving down the tooth.  However, x-rays clearly demonstrate that tooth had an implant in that spot, meaning there was no natural tooth for Hawatmeh to prepare to receive a crown.

### iii.    Alborz Mehdizadeh, D.D.S.

140.   On September 28, 2016 and December 11, 2018, Alborz Mehdizadeh, both individually and through his company Alborz Mehdizadeh, Inc. (collectively, "Mehdizadeh") entered into written dental services agreements (the "Mehdizadeh Agreements") whereby Mehdizadeh agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Mehdizadeh for those services. A true and correct copy of the 2016 Mehdizadeh Agreement is attached herein as Exhibit H, and a true and correct copy of the 2018 Mehdizadeh Agreement is attached herein as Exhibit I.

141.   Among other things, the Mehdizadeh Agreements required that Mehdizadeh practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

142.   Mehdizadeh submitted false and fraudulent bills and made other statements which Mehdizadeh knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Mehdizadeh Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

143.   Dr. Mehdizadeh billed Borrego Health for patient visits that either did not occur or that were provided by a providers that were not disclosed to or credentialed by Borrego Health.  For example, he billed for 146 patient visits he claimed to have performed on Saturday, November 16, 2019.

144.   From the period of October 23, 2018 to February 5, 2019, Dr. Mehdizadeh purportedly performed—and billed for—29 surgical extractions on one patient. There are two methods for extractions:  simple extraction (pull the tooth) or surgical extractions (cut the gum).  At the outset, it is unlikely a patient would ever need 29 surgical extractions (as opposed to simple extractions).  Further, even if this were the case, this would never occur in 29 different sittings.  For surgical extractions, the area around the extraction site is numb and the gum is cut open to allow for the extraction. The standard practice when surgically extracting several teeth is to numb and extract several teeth within the same quadrant.  Instead, Dr. Mehdizadeh's billing practices indicate one patient came in for 29 surgical extractions over a six month period.  If these extractions occurred at all, one can only hope that this is a fraudulent billing practice, rather than grotesquely substandard care to subject a patient to this treatment.

145.   Dr. Mehdizadeh further submitted duplicate bills in order to receive reimbursement for the same services multiple times. For example:

- On April 2, 2018, Patient 1 received dental services under Dental Code D2392 for tooth number 14, which involves adding a resin based composite to the tooth. Dr. Mehdizadeh submitted bills for this service

on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On April 4, 2018, Patient 1 also received dental services under Dental Code D2391 for tooth number 18, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On October 31, 2018, Patient 2 received dental services under Dental Code D2392 for tooth number 15, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both November 8, 2018 and November 30, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On August 11, 2018, Patient 3 received dental services under Dental Code D2391 for tooth number 29, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both August 14, 2018 and April 18, 2019.  Premier Defendants reviewed and approved both claims submitted.

146.   On February 24, 2020, Borrego Health conducted a re-audit of Dr. Medizadeh.  Upon arrival, Borrego Health's auditor, Dr. Elias Koutros, requested a sample of specific patient charts. Dr. Mehdizadeh's office informed the auditor that some charts were unavailable because they were taken out of the office. Of the charts available, the charts included exact photocopies from periodontal charting in multiple patient charts.  Periodontal charting includes six measurements per tooth. It is it nearly impossible that multiple patients would have six exactly identical measurements for all of their teeth.  Dr. Koutros indicated to Dr. Medizadeh that he believed the photocopies constituted fraudulent charting given the lack of change in status. Dr. Medizadeh did not deny Dr. Koutros' allegations, and instead informed

1   Dr. Koutros that he wanted the audit to go well, so the charting was prepared with

2   that in mind.

3              iv.    **Magaly M. Velasquez, D.D.S.**

4        147.   On or about November 5, 2014, Magaly M. Velasquez, both

5   individually and through her company Magaly M. Velasquez DDS, Professional

6   Dental Corp. (collectively, "Velasquez") entered into a written dental services

7   agreement (the "Velasquez Agreement") whereby Velasquez agreed to provide

8   primary dental services to participating Borrego Health patients, and Borrego Health

9   agreed to pay Velasquez for those services. A true and correct copy of the

10  Velasquez Agreement is attached herein as Exhibit J.

11       148.   Among other things, the Velasquez Agreement required that Velasquez

12  practice dentistry in accordance with all Federal, State and local laws, regulations,

13  and generally accepted principles applicable to the practice of dentistry, and prepare,

14  establish, and maintain administrative records, financial records, records pertaining

15  to patient diagnosis and treatment, and information pertaining to the services

16  provided.

17       149.   Velasquez submitted false and fraudulent bills and made other

18  statements which Velasquez knew to be false or had no reasonable grounds for

19  believing their representations were true, which also constitute a breach of the

20  Velasquez Agreement.  A non-exhaustive list of examples is set forth below.  The

21  below examples are demonstrative of a larger pattern and practice of fraudulent

22  and/or unlawful conduct.

23       150.   As part of Borrego Health's efforts to clean house, it conducted an

24  audit to evaluate the duplicate claims submitted by Velasquez. The audit found 150

25  claims were duplicative. For example:

26       •   On April 20, 2019, Patient 4 received dental services under Dental

27           Code D2392 for tooth number 21, which involves adding a resin based

28           composite to the tooth.  Dr. Velasquez submitted bills for this service

7234243.1

on both April 26, 2019 and April 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On May 28, 2019, Patient 4 also received dental services under Dental Codes D0220, D0270, and D2751 for teeth numbers 12, 13, and 14. D0220 is one of the billing codes for  initial x-rays, D0270 is the billing code for single films, and D2751 is the billing code intended for porcelain crowns.  Dr. Velasquez submitted bills for these services on June 3, 2019 and June 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On September 17, 2018, Patient 5 received dental services under Dental Code D2391 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both September 18, 2018 and October 10, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On July 11, 2018, Patient 6 received dental services under Dental Codes D2391 and D2392 for tooth number 4, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service on both July 16, 2018 and July 27, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On January 31, 2019, Patient 7 received dental services under Dental Codes D2391 and D2392 for tooth number 5, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service twice on February 4, 2019.  Premier Defendants reviewed and approved both claims submitted.

- In May 2019, Dr. Velasquez billed Borrego Health as though Patient 8 received dental services 26 days in the month, despite there only being 22 business days in May 2019. Dr. Velasquez then billed Borrego

7234243.1

1    Health for 22 visits in June 2019 for that same patient, totaling 48 visits

2    for the same patient over a two month period.

3        **v.**      **Aram Arakelyan, D.D.S.**

4    151.   On November 17, 2016, November 18, 2018, and November 29, 2018,

5    Aram Arakelyan, both individually and through his company New Millennium

6    Dental Group of Aram Arakelyan, Inc. (collectively, "Arakelyan"), entered into

7    written dental services agreements (the "Arakelyan Agreements") whereby

8    Arakelyan agreed to provide primary dental services to participating Borrego Health

9    patients, and Borrego Health agreed to pay Arakelyan for those services.  A true and

10   correct copy of the 2016 Arakelyan Agreement is attached herein as Exhibit K.  A

11   true and correct copy of the November 18, 2018 Arakelyan Agreement is attached

12   herein as Exhibit L.  A true and correct copy of the November 29, 2018 Arakelyan

13   Agreements are attached herein as Exhibit M.

14   152.   Among other things, the Arakelyan Agreements required that

15   Arakelyan practice dentistry in accordance with all Federal, State and local laws,

16   regulations, and generally accepted principles applicable to the practice of dentistry,

17   and prepare, establish, and maintain administrative records, financial records,

18   records pertaining to patient diagnosis and treatment, and information pertaining to

19   the services provided.

20   153.   Arakelyan submitted false and fraudulent bills and made other

21   statements which Arakelyan knew to be false or had no reasonable grounds for

22   believing their representations were true, which also constitute a breach of the

23   Arakelyan Agreements.  A non-exhaustive list of examples is set forth below.  The

24   below examples are demonstrative of a larger pattern and practice of fraudulent

25   and/or unlawful conduct.  For example, (1) on or about January 2019, Dr.

26   Arakelyan's office billed Borrego Health for a filling on a tooth which x-rays noted

27   the patient did not have at the time of service; (2) on or about July 2019, Dr.

28   Arakelyan's office billed Borrego Health for a root canal performed on a tooth

1  which x-rays noted the patient did not have at the time of service; and (3) on or

2  about March 2019, Dr. Arakelyan's office fraudulently submitted multiple claims to

3  Borrego Health for multiple crowns when the supporting documentation attached to

4  the claim indicated the patient actually received a singular bridge.

5      154.   In November 2019, Dr. Arakelyan billed 18 different encounters for a

6  single patient, despite the fact that there are only 20 business days in November,

7  meaning the bills showed this patient came in for dental services nearly every day in

8  November.  Even more shocking, the dentist also billed for 11 additional encounters

9  in August 2019, 13 in September 2019, 13 in October 2019 and—for good

10  measure—three in December 2019, for a total of 58 separate encounters in the

11  course of five months.  Premier did not flag these bills and took no steps to counsel

12  or discipline this dentist.  As a result of Premier Defendants' failings, Borrego

13  Health's Program Integrity program conducted its own audit into Dr. Arakelyan's

14  billing practices.  When these egregious billing practices were discovered, Dr.

15  Arakelyan informed Borrego Health's auditor that it was Premier Defendants who

16  told him to bill in this manner.

17      155.   In February 2020, one of Dr. Arakelyan's subproviders billed 16

18  different encounters for a single patient, despite the fact that there were only 19

19  business days in February 2020, meaning the bills showed this patient came in for

20  dental services almost every day in February 2020.  Premier did not flag these bills

21  and took no steps to counsel or discipline this dentist.

22          **vi.   <u>Michael Hoang, D.M.D.</u>**

23      156.   On or about November 28, 2018, Michael Hoang, D.M.D. entered into

24  a written dental services agreement (the "Hoang Agreement") whereby Hoang

25  agreed to provide primary dental services to participating Borrego Health patients,

26  and Borrego Health agreed to pay Hoang for those services.  A true and correct copy

27  of the Hoang Agreement is attached herein as Exhibit N.

28

7234243.1

157.   Among other things, the Hoang Agreement required that Hoang practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and  to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

158.   Hoang submitted false and fraudulent bills and made other statements which Hoang knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Hoang Agreement. Upon information and belief, Hoang's conduct alleged herein is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

159.   Borrego removed Dr. Hoang from its contract dental program in 2019 because he was billing the same claims *both* to Borrego Health and straight to Denti-Cal.  Dr. Hoang was terminated from Borrego's contract dental program in July 2019.

### vii.   Waleed Stephan, D.D.S.

160.   On October 1, 2016, Waleed Stephan, both individually and through his company W.A. Stephan, A Dental Corporation (collectively, "Stephan"), entered into a written dental services agreement (the "Stephan Agreement") whereby Stephan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Stephan for those services.  A true and correct copy of the Stephan Agreement is attached herein as Exhibit O.

161.   Among other things, the Stephan Agreement required that Stephan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

162.   Stephan submitted false and fraudulent bills and made other statements which Stephan knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Stephan Agreement.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.  For example, on August 13, 2019, Dr. Stephan billed Borrego Health for crowns on teeth numbers 12, 13 and 14 over the course of multiple days. However, the patient care plan documents that a singular bridge was put in place during the course of one appointment.

163.   Dr. Stephan also fraudulently represented that he purchased porcelain crowns for patients, when in fact, he made ceramic crowns himself in his own office.  Program integrity staff became suspicious when Dr. Stephan was able to place crowns in only a day or two, when the lab that Dr. Stephan documented he was using had a much slower turnaround.  Program integrity called the lab that Dr. Stephan documented he was using, and that lab confirmed that it would take 14 days to make a crown.  On further investigation, it was determined that, rather than purchasing the crowns, Dr. Stephan was making them himself out of ceramic with a CEREC machine.  To hide his scheme, he was falsifying documentation to say that he purchased porcelain crowns from a lab.

### viii.   Santiago Rojo, D.D.S.

164.   On March 29, 2017, Santiago Rojo, both individually and through his company Santiago A. Rojo, D.S.S., Inc. (collectively, "Rojo"), entered into a written dental services agreement (the "Rojo Agreement") whereby Rojo agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Rojo for those services.  A true and correct copy of the Rojo Agreement is attached herein as Exhibit P.

165.   Among other things, the Rojo Agreement required that Rojo practice dentistry in accordance with all Federal, State and local laws, regulations, and

1   generally accepted principles applicable to the practice of dentistry, and prepare,

2   establish, and maintain administrative records, financial records, records pertaining

3   to patient diagnosis and treatment, and information pertaining to the services

4   provided.

5   166.   Rojo submitted false and fraudulent bills and made other statements

6   which Rojo knew to be false or had no reasonable grounds for believing their

7   representations were true, which also constitute a breach of the Rojo Agreement.  A

8   non-exhaustive list of examples is set forth below.  The below examples are

9   demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

10   167.   Dr. Rojo billed for visits in California even though he was living in

11   Florida and could not supervise subproviders or directly provide care.  For example,

12   on November 11, 2020, a representative from Borrego Health was onsite at Dr.

13   Rojo's office for an audit.  On that date, Dr. Rojo's staff indicated that Dr. Rojo was

14   in Florida and had been in Florida for almost the entire year of 2020.  Nonetheless,

15   Dr. Rojo submitted claims for services performed in California throughout 2020.

16   Most egregiously, Dr. Rojo subsequently billed for patient visits that he claimed

17   were performed in California on November 11, 2020, a date on which a Borrego

18   employee had physically been in his office and confirmed he was not there.

19   168.   Rather than performing the services himself and completing the

20   documentation, Dr. Rojo regularly had his office manager entering and signing off

21   on patient claims.  Dr. Rojo's patient charts were also largely duplicative, even

22   going so far as to contain duplicate notes regarding patients' response to anesthesia.

23   **ix.   Mohammed AlTekreeti, D.D.S.**

24   169.   On or about August 7, 2017, Hussam Aldairi requested to employ an

25   additional dentist, Mohammed AlTekreeti, to provide primary dental services to

26   Borrego Health patients.  Aldairi represented that AlTekreeti would be under

27   Aldairi's supervision and that AlTekreeti would act in accordance with the Aldairi

28

7234243.1

1  Agreements.  Aldairi hired AlTekreeti shortly after Aldairi's request to Borrego
2  Health.

3      170.   AlTekreeti submitted false and fraudulent bills and made other
4  statements which AlTekreeti knew to be false or had no reasonable grounds for
5  believing their representations were true, which also constitute a breach of the
6  Aldairi Agreements.  A non-exhaustive list of examples is set forth herein.  The
7  below examples are demonstrative of a larger pattern and practice of fraudulent
8  and/or unlawful conduct.  For example, on or about May 2019, Dr. AlTekreeti billed
9  Borrego Health for a partial denture for teeth which supporting documentation
10  indicated were never prepared for dentures.

11      171.   Like Dr. Aldairi, Dr. AlTekreeti billed Borrego for patient visits that
12  either did not occur or that were provided by a providers that were not disclosed to
13  or credentialed by Borrego Health.  For example, Dr. AlTekreeti billed for 135
14  patient visits that he claimed he performed on Tuesday, June 25, 2019.

15          **x.    Jilbert Bakramian, D.D.S.**

16      172.   On or about February 5, 2018, Aram Arakelyan requested to employ an
17  additional dentist, Jilbert Bakramian, to provide primary dental services to Borrego
18  Health patients.  Arakelyan represented that Bakramian would be under Arakelyan's
19  supervision and that Bakramian would act in accordance with the Arakelyan
20  Agreements.  Arakelyan hired Bakramian shortly after Arakelyan's request to
21  Borrego Health.

22      173.   Bakramian submitted false and fraudulent bills and made other
23  statements which Bakramian knew to be false or had no reasonable grounds for
24  believing their representations were true, which also constitute a breach of the
25  Arakelyan Agreements.  A non-exhaustive list of examples is set forth herein. The
26  below examples are demonstrative of a larger pattern and practice of fraudulent
27  and/or unlawful conduct.  For example, (1) on or about January 2019, Dr.
28  Bakramian billed Borrego Health for a filling on a tooth which x-rays noted that the

7234243.1

patient did not have at the time of service; (2) on or about July 2019, Dr. Bakramian billed Borrego Health for a root canal performed on a tooth which x-rays noted that the patient did not have at the time of service; (3) on or about March 2019, Dr. Bakramian billed Borrego Health for multiple crowns when the patient actually received a singular bridge, and (4) on or about May 31, 2019 and June 14, 2019, Dr. Bakramian billed for preparing a tooth for a crown, which requires shaving down the tooth when x-rays clearly demonstrate that tooth had an implant in that spot, meaning there was no natural tooth for Bakramian to prepare to receive a crown.

174.   From July 2019 to August 2019, Dr. Bakramian billed 29 different encounters for a single patient out of the 43 business days during that period. Again, Premier did not flag these bills and took no steps to counsel or discipline this dentist.

175.   Dr. Bakramian regularly billed for more visits in a day than is humanly possible, leading to the conclusion that these visits were either not performed or were performed by unknown and uncredentialed persons.  For example, he billed for 111 patient visits he claimed he performed on July 16, 2019.

### xi.   Marcelo Toledo, D.D.S.

176.   On June 16, 2015, Marcelo Toledo, both individually and through his company Marcelo Toledo, D.S.S., Inc. (collectively, "Toledo"), entered into a written dental services agreement (the "Toledo Agreement") whereby Toledo agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Toledo for those services.  A true and correct copy of the Toledo Agreement is attached herein as Exhibit Q.

177.   Among other things, the Toledo Agreement required that Toledo practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining

7234243.1

1    to patient diagnosis and treatment, and information pertaining to the services

2    provided.

3        178.   Toledo submitted false and fraudulent bills and made other statements

4    which Toledo knew to be false or had no reasonable grounds for believing their

5    representations were true, which also constitute a breach of the Toledo

6    Agreement.  A non-exhaustive list of examples is set forth below.  The below

7    examples are demonstrative of a larger pattern and practice of fraudulent and/or

8    unlawful conduct.

9        179.   For example, (1) on or about July 2018, Dr. Toledo billed for services

10   rendered to a patient during one scheduled visit as though they occurred over the

11   court of four visits, (2) on or about June 2018, Dr. Toledo performed restoration on

12   eight teeth which x-rays demonstrated was not medically necessary, (3) on or about

13   July and August 2018, Dr. Toledo billed for tooth restoration services rendered

14   during single visits as though they were performed over multiple visits, (4) on or

15   about November and December 2018, Dr. Toledo billed for fillings on teeth where

16   the patient already had existing fillings, and (5) billing in excess of 20 patient visits

17   a day, including billing Borrego Health for 97 patient visits that he claimed occurred

18   that day.  Toledo also regularly engaged in the "claim splitting" scheme.  For

19   example, on August 20, 2018, Dr. Toledo charted and billed for a tooth restoration

20   on tooth 19.  In submitting the claim, Toledo submitted old x-rays dated July 23,

21   2018 and August 13, 2018.  Those x-rays indicate the restoration of both tooth 18

22   and tooth 19 had already been completed prior to the August 20, 2018 claim

23   submission.  The x-ray from August 20, 2018 also demonstrates that no further

24   restoration occurred during that patient visit.  Despite this, the claims were billed as

25   two separate visits.  For the same patient, Dr. Toledo billed for identical services

26   rendered to four different teeth.  The patient schedule indicates the patient was not

27   seen on all the days billed between November 7, 2019 and November 13, 2018,

28

7234243.1

180.   For visits in July 2018 for the same patient, the treatment notes are a obviously copied and pasted, including identical blood pressure readings, because the patient had only one visit on July 16, 2018, but it was billed as four separate visits.

181.   For visits in October 2018, again there are five identical blood pressure readings documented in a row.  These visits involved a surface restorations for adjacent teeth, but were billed separately even though they should have been done together.

182.   In another instance, there were restorations on eight separate teeth, and each was billed separately, but there is no imaging to support the need for the restorations.  In such a situation, the dentist is required to secure supplemental documentation to demonstrate medical necessity.

183.   On or about August 20, 2018, Toledo charted and billed for services provided on tooth 19.  X-rays dated July 23 and August 13, 2018 were provided to support the restoration, but the x-rays show that there was a restoration already done by August 13.  There is no evidence of further restoration or any restoration on August 20.  All the work was completed on August 7, but split into two separate dates of billing.

184.   For one patient with dates of service November 7-13, 2018, there are four identical notes with only the tooth number changed, and the schedule does not show the patient was seen (only that the patient was on the schedule).  This is another example of claim splitting and false billing.

185.   For another patient, there is no evidence that the fillings for teeth 4 and 5 were done as billed on November 4 and 14, 2018, respectively.  The pre-procedure x-ray shows existing fillings and is dated October 18, 2018.  The post-procedure x-rays dated December 13, 2018 does not show any change to the fillings for teeth 4 and 5.

7234243.1

1    xii.   **Marlene Thompson, D.D.S.**

2    186.   On or about April 18, 2013, Marlene M. Thompson, D.D.S., both

3  individually and through her company Marlene M. Thompson, D.D.S., Inc.

4  (collectively, "Thompson") entered into a written dental services agreement (the

5  "Thompson Agreement") whereby Thompson agreed to provide primary dental

6  services to participating Borrego Health patients, and Borrego Health agreed to pay

7  Thompson for those services.  A true and correct copy of the Thompson Agreement

8  is attached herein as Exhibit R.

9    187.   Among other things, the Thompson Agreement required that

10  Thompson practice dentistry in accordance with all Federal, State and local laws,

11  regulations, and generally accepted principles applicable the practice of dentistry,

12  and to prepare, establish, and maintain administrative records, financial records,

13  records pertaining to patient diagnosis and treatment, and information pertaining to

14  the services provided.

15    188.   Thompson submitted false and fraudulent bills and made other

16  statements which Thompson knew to be false or had no reasonable grounds for

17  believing their representations were true, which also constitute a breach of the

18  Thompson Agreement.  A non-exhaustive list of examples is set forth below.  The

19  below examples demonstrate a larger pattern and practice of fraudulent and/or

20  unlawful conduct.  For example:

21    • After Dr. Tuso left Dr. Aldairi's office, Thompson hired Maura Tuso to

22     work as a dentist in her Escondido dental practice.  During the time Dr.

23     Tuso worked for Thompson, Dr. Tuso was suspended from providing

24     dental services to Medi-Cal patients.  Thompson was aware that Dr.

25     Tuso was suspended at the time Thompson hired Dr. Tuso.  Thompson

26     then allowed Dr. Tuso to see Borrego Health patients and bill Borrego

27     Health for the services Dr. Tuso provided to Medi-Cal patients.

28

- On October 12, 2018, Thompson placed a patient on the schedule who received services the day prior. Thompson did this to make it appear that the services rendered were spread out over several days, when in fact the patient only received services on June 23, 2018.

- On July 5, 2018, Dr. Tuso provided two fillings to a patient, but was asked to leave the dates blank in her charts. The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one.

- On July 10, 2018, Dr. Tuso provided dental services to a Borrego Health patient, but was asked to leave the dates blank in her charts. The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one. The second visit was documented on a day Dr. Tuso was not staffed to work at Thompson's office. Despite this, the second visit in the patient chart indicates she provided the patient with services that day.

### xiii.   Douglas Ness, D.D.S.

189.   On or about May 2, 2016, Douglas Ness, D.D.S., both individually and through his company Ness Dental Corporation (collectively, "Ness") entered into a written dental services agreement (the "Ness Agreement") whereby Ness agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Ness for those services. A true and correct copy of the Ness Agreement is attached herein as Exhibit S.

190.   Among other things, the Ness Agreement required that Ness practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

7234243.1

191.   Ness submitted false and fraudulent bills and made other statements which Ness knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Ness Agreement.  A non-exhaustive list of examples is set forth below.  The alleged conduct is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

192.   In 2018, Ness hired Maura Tuso to work as a dentist at Crown Dental Group.  During the time Dr. Tuso worked for Ness, Dr. Tuso was suspended from providing dental services to Medi-Cal patients.  Ness was aware that Dr. Tuso was suspended at the time Ness hired Dr. Tuso.  Ness then allowed Dr. Tuso to see Borrego Health patients and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

193.   Ness also hired other dental providers, in addition to Dr. Tuso, who lacked California dental licenses to provide dental services to Borrego Health patients.  Upon information and belief, Ness billed Borrego Health for the services that unlicensed dental providers provided to Medi-Cal patients.

### xiv.   George Jared, D.D.S.

194.   On or On or about April 19, 2016, George C. Jared, D.D.S., both individually and through his company George C. Jared, D.D.S., Inc. (collectively, "Jared") entered into a written dental services agreement (the "Jared Agreement") whereby Jared agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Jared for those services.  A true and correct copy of the Jared Agreement is attached herein as Exhibit T.

195.   Among other things, the Jared Agreement required that Ness practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

7234243.1

196.   Jared submitted false and fraudulent bills and made other statements which Jared knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Jared Agreement.  A non-exhaustive list of examples is set forth below.  Upon information and belief, the alleged conduct is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

197.   Jared hired Maura Tuso to work as a dentist at his dental practice. During the time Dr. Tuso worked for Jared, Dr. Tuso was suspended from providing dental services to Medi-Cal patients.  Jared was aware that Dr. Tuso was suspended at the time Jared hired Dr. Tuso.  Jared then allowed Dr. Tuso to see Borrego Health patients and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

198.   Jared also hired other dental providers, in addition to Dr. Tuso, who lacked California dental licenses to provide dental services to Borrego Health patients.  Upon information and belief, Jared billed Borrego Health for the services that unlicensed dental providers provided to Medi-Cal patients.

**D.      Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health**

199.   Despite its promises to do so, its representations that it could do so, and its concealment of the fact that it could not do so, Premier completely lacked the ability to appropriately conduct claims monitoring.

200.   In fact, it was not until 2019 that Premier hired its first and only employee with any clinical experience whatsoever.  At that point, Premier hired a 2016 dental graduate, Nicholas Tapp, D.D.S.  Unsurprisingly, Nicholas Tapp was related to other employees at Premier.  Nicholas Tapp did not even receive his dental license until October 2017.  Indeed, staff from Borrego Health were largely responsible for training Nicholas Tapp due his lack of knowledge and experience.

7234243.1

201.   Even after hiring Nicholas Tapp, Premier continuously failed to properly review the contract dental claims.  For example, and without limitation, Premier approved claims (and caused Borrego Health to pay for claims (1) where no supporting documentation was provided, (2) for services performed on teeth which—based on x-rays submitted with the claims—were no longer in the patients' mouth, (3) which were duplicate (i.e. same claims, submitted multiple times), and (4) that were facially and obviously not legitimate.

202.   For example, in February 2020, one dentist billed 18 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services all but one business day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  Between June 2020 and July 2020, one dentist billed 30 different encounters for a single patient, meaning the bills showed this patient came in for dental services every other day during that time period. Premier did not flag these bills and took no steps to counsel or discipline this dentist.

203.   As a result, Borrego Health was forced to hire its own employees and develop a Program Integrity program to review and audit contract dental claims and providers.

204.   In May 2017, Borrego Health hired Timothy Martinez, D.D.S. to be its Chief Dental Officer.  In this role, Dr. Timothy Martinez was tasked with developing a "Program Integrity" team for Borrego Health's contract dental program and providing practice management oversight for its in-house dental programs.  To assist in these efforts, Borrego Health and Dr. Martinez hired Nithya Venugopal, DDS, in January 2018 as Borrego Health's Dental Director of Program Integrity.

205.   Among other things, Dr. Timothy Martinez and Dr. Nithya Venugopal were tasked to create a system that would identify patterns on the "back-end" of claims submission (*i.e.* after the claims had been submitted).  Specifically, Dr.

7234243.1

1   Timothy Martinez and Dr. Nithya Venugopal were supposed to identify:  (1)

2   utilization of non-covered services; (2) overutilization of services; (3) incomplete,

3   substandard, unnecessary treatment rendered by providers; and (4) billing

4   discrepancies. The team also sought to develop and implement necessary steps to

5   correct and prevent such issues.

6        206.   On May 5, 2017, the Program Integrity team set up initial evidence-

7   based key references and questions for the new program integrity unit.  The key

8   references and questions were based on the National Medicaid Guidelines the

9   Deputy Inspector General for Evaluation and Inspections May 15, 2015 report

10  authored by Suzanne Murrin, titled: "QUESTIONABLE BILLING FOR

11  MEDICAID PEDIATRIC DENTAL SERVICES IN CALIFORNIA."  The Murrin

12  report reviewed claims submitted by dentists in California to DHCS and found that

13  approximately 8% of the dental providers were billing outliers in terms of CDT

14  codes billed, and of those identified outliers, only approximately 1.8% (or six out of

15  329 dentists) were disciplined by the California Dental Board for failing to meet

16  quality of care standards.  Dr. Timothy Martinez used the Murrin report and its

17  findings, as well as guidance from the 2017 National Medicaid and CHIP Oral

18  Health Symposium (as organized by the Medicaid, Medicare, CHIP Services Dental

19  Association), for reference when developing Borrego Health's internal compliance

20  metrics.  Critically, at the time, there was no other guidance, data or reports setting

21  out proper or improper billing and documentation protocols in the state for FQHCs

22  contracting with private dental offices.

23       207.   The Program Integrity efforts began with a utilization review system

24  which developed an algorithm for analyzing and sorting out outliers, particularly by

25  focusing on high-billing providers among the contract dentists.  As the Program

26  Integrity team's utilization review and claims data analytics capabilities became

27  more robust and sophisticated, the team was soon able to also review for over-

28  utilization of high-cost codes/services (dental providers with a standard deviation of

one or more from the mean as far as individual high-cost codes, such as crowns and surgical extractions), percentage of preventive services and under-utilization of preventive services, as well as billing discrepancies, and lack of medical necessity. Over time, the Program Integrity team also developed a mechanism to view visit count and examine excessive visits.

208.   Additionally, around mid-2019, the Program Integrity team built in certain parameters, referred to as the "enhanced review" parameters, to identify problematic claims during the claims monitoring process, in large part after recognition that Premier was not properly vetting claims during the claims monitoring process, despite Premier's contractual obligation to do so.

209.   Once the utilization review analysis was conducted, the Program Integrity team would conduct site visits and chart reviews to directly assess compliance and suspected fraud, waste, and/or abuse among any dental practices and providers identified as outliers within the contract dental network (meaning providers who were one or more above the standard deviation in the different categories being reviewed).

210.   Specifically, Dr. Nithya Venugopal would receive a report and conduct a closer examination of any outlier practices or providers.  Then, Dr. Nithya Venugopal would work with Borrego Health's utilization management analyst to pull around ten to 15 charts from patients based on excessive patients visits and/or CDT code criteria under question for these providers.

211.   Next, a member of the Program Integrity team would collect information from the patient records regarding visits and services during an actual on-site visit, including supportive documentation such as radiographs, charts, and schedules.  The peer review process was designed to be objective through the use of a template peer review worksheet examining specific criteria.

7234243.1

212.   Based on the results of these findings, the Program Integrity team members would conduct comprehensive records review and assess compliance with Program Integrity rubric, consistent with the Medi-Cal Dental Provider Handbook.

213.   Following the chart reviews and site audits, the Program Integrity team would develop provider report cards and issue a "corrective action plan" to any provider whose practice was identified as deficient across certain criteria.  These plans would detail exactly what deficiencies were identified and how a provider was required to correct and improve his or her practice.  The Program Integrity team aimed to conduct re-audits of providers who had been issued a corrective action plan within 90 days to confirm whether or not the provider had corrected identified deficiencies by again obtaining records from the provider and assessing compliance under the same rubric.

214.   Any follow-up action by the team depended on the results of these peer review and compliance audits.  For example, if the score improved, then the provider would be audited on an annual basis thereafter.

215.   Alternatively, if the score worsened, Dr. Timothy Martinez or Dr. Nithya Venugopal would escalate the matter to Borrego Health's Chief Compliance Officer, Gabriela Alvarado, and Mikia Wallis for determination of further action, up to and including termination of Borrego Health's agreement with the dentist.

216.   Additionally, where the Program Integrity team found evidence suggesting potential provider fraud, waste, and/or abuse, Dr. Timothy Martinez would meet with Gabriela Alvarado to discuss possible recoupment and recovery of funds, notification to DHCS and other state authorities, and submission of a claims inquiry form to DHCS to request an adjustment for either an underpayment or overpayment of claims.

217.   The Program Integrity team, once it came online and established processes after Dr. Timothy Martinez's arrival in 2017, reviewed back-end claims and identified outliers and other billing discrepancies.

E.    **Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme")**

218.   The Borrego Insiders and the Premier Defendants were aware of the conduct and had received complaints and information, but did nothing to stop the practice.  Instead, the Premier Defendants worked with Borrego Insiders, including without limitation Mikia Wallis, to stop further inquiries and protect the dentists from both detection and/or consequences.  As stated herein, the Premier Defendants were incentivized to allow providers to bill as many claims as possible, since Premier was paid on a per claim basis.  The Premier Defendants were further incentivized to cover up for fraudulently billing dentists (including—and especially—the most egregious dentists), since those were the dentists that submitted the highest number of claims and directly increased the amount that Premier was paid.

219.   Further, on information and belief, the Borrego Insiders were incentivized to cover up for the fraudulently billing dentist since those billings allows the other Schemes discussed herein to take place and/or resulted in kickback payments to the Borrego Insiders.

220.   The Premier Defendants and the Borrego Insiders used a number of different methods to cover up for fraudulently billing dentists, including without limitation the Dentist Defendants, as outlined below, including without limitation interference with audits, failing and refusing to reverse false/fraudulent claims, refusal to take action, general avoidance and unavailability and undue pressure.

221.   The Premier Defendants, supported by the Borrego Insiders, would not permit Program Integrity audits to be random.  It required Program Integrity to provide advance notice to dentists, so that the dentists could be more prepared and take steps to avoid detection of problems by the Program Integrity team.

222.   While typically the Program Integrity team would book any compliance review appointments with contract dental providers through one of Premier's

7234243.1

administrative staff, for reasons unknown to Borrego Health, any appointments with Husam Aldairi and Aram Arakelyan (both identified by the Program Integrity team as high-billing providers for certain costly services) were required to be set up by Travis Lyon personally.

223.   Occasionally, the Program Integrity team would identify claims that were falsely or fraudulently billed, and should have bene reversed (*i.e.* the dentists should have refunded the money they received from Borrego Health, and Premier should have returned or credited the per visit fee back to Borrego Health). However, the Premier Defendants and Borrego Insiders, including without limitation Karen Hebets and Diana Thompson, would not follow through on claims reversals.

224.   On several occasions, based on suspicious or outright fraudulent claims activity, Borrego Health's Program Integrity team would recommend and/or request that a contract dental provider have their provider contract with Borrego Health terminated.  The Premier Defendants and Borrego Insiders would regularly support the contract dental providers over Borrego Health and override decisions made by Borrego Health, and would refuse to take action against fraudulently billing providers.

225.    Both Dr. Timothy Martinez and Dr. Nithya Venugopal reported that, whenever they raised issues about Premier to Mikia Wallis, they would immediately receive a call or email from Travis Lyon or Nick Priest.  Clearly, Mikia Wallis was sharing their internal concerns directly with the Premier Defendants.  More often than not, however, neither Premier nor Mikia Wallis actually addressed the underlying issue Dr. Timothy Martinez or Dr. Nithya Venugopal identified with Premier.

226.   Mikia Wallis made herself generally unavailable for meetings with the Program Integrity team.  At most, Program Integrity staff were only allowed to

7234243.1

block 15-minute intervals with her.  As stated by Dr. Venugopal, "[Mikia Wallis] knew what we were doing but hated what we were finding."

227.   Program Integrity team members repeatedly raised issues about certain high-billing providers who they identified as committing "suspect fraud" to Mikia Wallis and Borrego Health's former Chief Compliance Officer, but usually no action was ever taken against providers, who would remain eligible to continue providing and billing for improper services rendered to Borrego Health's patients.

228.   Mikia Wallis would routinely push back or throw up barriers whenever they tried to implement some sort of final audit process for the contract dental providers.  There was also an ongoing push-and-pull in terms of adding new contract dental providers to Borrego Health's network between the Program Integrity team and credentialing committee on one side and Premier and Mikia Wallis on the other.  There were a number of instances where Travis Lyon, supported by Mikia Wallis, attempted to ram a number of new contract dental providers through Borrego Health's credentialing process, despite Dr. Timothy Martinez's insistence that the providers needed to be thoroughly vetted before approving them.

229.   Mikia Wallis defended contract dental providers unreasonably, even after Program Integrity team members informed her of these providers' documented history of problematic billing practices and poor quality.  Mikia Wallis herself reported that she encouraged staff to treat contract dental providers as part of Borrego Health's internal workforce and "to the extent that we feel the dentists have high quality of care, we need to defend them."

230.   At the June 2017 Credentialing Committee, Dr. Timothy Martinez noted and the minutes reflected that Bruce Hebets, along with Premier's Travis Lyon and Nick Priest, all personally attended the meeting.  Usually, credentialing committees are autonomous bodies free from inadvertent pressure of having administration involvement.

231.   There are numerous, specific examples of the Premier Defendants and Borrego Insiders working to cover up for fraudulently billing dentists.  A few of these examples are outlined below.

232.   On April 12, 2017, Dr. Timothy Martinez emailed Travis Lyon to note his concerns with the contract dental program as a result of the HMS/CMS audit findings: "I can start to review with you and your team the three most common pitfalls that Borrego was cited for: EXCESSIVE VISITS, INSUFFICIENT DOCUMENTATION, NOT MEDICALLY NECESSARY.  We can start with catching "EXCESSIVE VISIT" at the time the claim (called a superbill) is scanned by the private dental offices and entered into your data banks."  Thus, the Premier Defendants were aware of issues with excessive visit billing, yet did nothing to detect or prevent such billing, despite their contractual obligation to do so.

233.   Dr. Venugopal noted that dentists as a rule could not be terminated for Program Integrity issues alone.  To terminate a dentist, Dr. Venugopal and Dr. Martinez would have to also raise a quality or credentialing issue.  Even this, though, was insufficient to terminate certain "untouchable" dentists, including Dr. Aldairi, Dr. Arakelyan, Dr. Mehdizadeh and Dr. Hawatmeh (all of whom Program Integrity identified as outlier providers).

234.   In February 2018, some of the Program Integrity team met with the Premier Defendants to review the newly developed contract dental patient forms, which had been created to ensure consistent and accurate documentation across providers.  Though these were Borrego Health forms, Travis Lyon nevertheless retained final say on how and when they were communicated to the contract dental providers – if ever.

235.   Husam Aldairi received "Provider Compliance Reports" on June 14, 2018 and September 13, 2018 following a series of audits conducted by the Program Integrity team during which he received scores of zero (the lowest possible score) in the following categories: proper documentation, eligible provider (meaning that the

7234243.1

1   provider's signature on the claims matches the dental superbill and clinical progress

2   notes as required by the Medi-Cal Dental Provider Hand-book), and medically

3   necessary (meaning that the documentation supports the level of services rendered).

4   To address the clear deficiencies identified in the June 2018 audit, the Program

5   Integrity team also put together a corrective action plan listing out each deficiency

6   in detail and providing actionable steps Husam Aldairi was requested to take to

7   correct the issues.  Husam Aldairi received the corrective action plan and returned a

8   signed copy acknowledging it to the Program Integrity team but never actually

9   worked on improving.  Husam Aldairi also failed multiple peer review audits

10  conducted by Program Integrity team members on March 31 and July 25, 2019, and

11  most recently on August 31, 2020.  The Premier Defendants and the Borrego

12  Insiders, including Mikia Wallis, refused to terminate Husam Aldairi.

13       236.   When Husam Aldairi was up for re-credentialing, Dr. Timothy

14  Martinez recommended against re-credentialing Husam Aldairi but he was

15  overruled by the Premier Defendants and Borrego Insiders, including without

16  limitation Travis Lyon and Mikia Wallis.  Despite the poor performance, the

17  Premier Defendants and Borrego Insiders submitted a "special license" to HRSA to

18  allow Husam Aldairi to have a satellite intermittent dental clinic with Borrego

19  Health (in space owned by another Daryl Priest entity that Borrego Health leased).

20  Husam Aldairi was not actually terminated until the Board Insiders were no longer

21  involved in the matter.

22       237.    In both July and September 2018, Dr. Timothy Martinez notified

23  Mikia Wallis in her capacity as Borrego Health's Chief Legal Officer about the

24  results of the Program Integrity team's first analytics ran on the contract dentists,

25  including those identified as outliers within the program.  Mikia Wallis did not do

26  anything to address the outliers.

27       238.   Mikia Wallis was informed of billing issues with Dr. Tina Cho.  For

28  example, Dr. Martinez emailed Mikia Wallis on July 2, 2019 acknowledging

1  "aberrant billing behavior" and attaching a document titled, "tina cho.docx," which

2  included examples of problematic claims.  However, on October 6, 2020, Mikia

3  Wallis sent a letter to Special Agent Supervisor Craig Eastep which (falsely) stated

4  that Borrego Health had no knowledge of potential billing discrepancies for services

5  provided by Dr. Tina Cho.

6      239.   On October 12, 2019, a member of the Program Integrity team

7  instructed that Borrego Health will deny claims for issues that he considers to be

8  "black and white issues."  Travis Lyon responded, "Is Koutros and Venugopal

9  aware that Ms. Wallis does not want us to use the Denti-Cal regulations as a reason

10 to deny claims?"

11     240.   In March 2019, dentist Maura Tuso called Borrego Health's

12 compliance hotline.  She left a message indicating that she wanted to report fraud.

13 Dr. Timothy Martinez facilitated a telephone conference to respond to Maura Tuso,

14 which took place on March 18, 2019.  Travis Lyon joined Dr. Timothy Martinez on

15 the call.

16     241.   Maura Tuso alleged that there was fraud occurring, including

17 manipulating charts.  Dr. Timothy Martinez asked Maura Tuso to email any details.

18 When these allegations were reported to Mikia Wallis, Mikia Wallis stated that

19 Maura Tuso had lost her license and was not credible, and to cease any further

20 investigation.  Shockingly, despite knowledge that Maura Tuso had lost her license

21 (and, thus, was suspended from Medi-Cal) and using this information in an attempt

22 to discredit her, the Premier Defendants and Borrego Insiders did nothing to prevent

23 Maura Tuso from continuing to provide services through other contract dentists (and

24 billing for them) or to remedy prior improper bills where Mauro Tuso provided

25 services.

26     242.   On January 27, 2020, a member of the Program Integrity team

27 conducted a surprise compliance audit of Dr. Aram Arakelyan.  Dr. Aram Arakelyan

28 refused to allow staff to audit the charts and called Travis Lyon to intervene.  This

resulted in a meeting with Mikia Wallis, Travis Lyon, and Dr. Timothy Martinez, and a subsequent meeting with Premier's counsel.

243.   Following this meeting, on March 2, 2020, counsel for Premier informed a member of the Program Integrity team over the phone that such surprise audits of the contract dental providers were unlawful and that all audits required written notice to contract dental providers at least five days before any audit.  This is false.

244.   Borrego Health requested and harangued Premier repeatedly to activate a "Prior Authorization" requirement, which required outlier providers and practices to obtain prior authorization from Borrego Health before performing certain high-cost services.  In a meeting on May 21, 2020, the Program Integrity team was told by Travis Lyon that he promised it would be turned on by June 1, 2020.  It was never activated.

245.   In a quality meeting on June 16, 2020, Dr. Venugopal told Travis Lyon that individual dentists were billing bridges as single unit crowns, and directed him to send a communication to providers that this practice must stop.  Travis Lyon refused.

246.   As late as September 2020, when questioned about the accusation from the California Dental Board against Husam Aldairi, Mikia Wallis continued to defend him.  She asserted that an external reviewer said Husam Aldairi's care was "exquisite" and that he was a "QI [Quality Improvement] success story."  This directly contradicts what Program Integrity and credentialing staff reported to Mikia Wallis regarding the poor quality of care by Husam Aldairi.

247.   On October 7, 2020, Dr. Nithya Venugopal presented audit findings regarding Husam Aldairi to Mikia Wallis, Dr. Timothy Martinez, Dr. Edgar Bulloch (Borrego Health's former CMO and CEO), and Mark Connelly (Borrego Health's Chief Operations Officer).  The presentation focused on the fact that Husam Aldairi had most likely falsely billed for excessive visits, in particular where no face-to-face

1   encounter occurred, and improperly documented or falsified records, and finally

2   often provided services below the standard of care or that lacked medical necessity.

3   Within the first ten minutes of the presentation, Mikia Wallis walked out.

4       248.   Borrego Health requested that Premier run a report on 2020 claims and

5   identify any duplicates.  In September 2020, Premier provided a report identifying

6   over 600 claims that were duplicated, meaning they were billed by Premier on

7   behalf of the dentists multiple times.  Borrego Health was not aware of the

8   duplication at the time it paid the invoices of both the dentists and Premier for the

9   duplicate claims.  Despite notice of the duplication the Premier Defendants and the

10  Borrego Insiders did not reverse the claims, and the dentists did not repay the

11  claims.  Although this report was only for 2020, Borrego Health is informed and

12  believes that the same issues would exist in years prior to 2020.

13      249.   As a result, Borrego Health was forced to pay both Premier and several

14  contract dental providers for services which should not have been paid or for

15  services which were never rendered.

16      250.   On information and belief, the Borrego Insiders were compensated for

17  this access and control through kickbacks or other payments or remuneration.

18      **F.**    **The Borrego Insiders Entered into Leases with Daryl Priest-Owed**

19          **Entities for Above Market Rents and Terms Many Times the**

20          **Market Amount (the "Priest Leases Scheme")**

21      251.   Borrego Health only owns two of its facilities.  Therefore, Borrego

22  Health must otherwise procure real property for its facilities.  This is accomplished

23  by going to into the marketplace and securing facility leases in Southern California.

24  The resulting leases should be from an arm's length transaction at market prices, and

25  the leases should be submitted to the Borrego Health Board of Trustees for approval.

26  Borrego Health's facility leases must be: (1) entered into for a lawful purpose; (2)

27  sought competitively, and subjected to a diligent market value analysis; and (3) to

28  the extent reasonably possible, for no more than fair market rent and reasonable

7234243.1

1   duration.  The leases must also include reasonable terms under which the FQHC can

2   terminate the lease.

3       252.   Yet, the next scheme involved Borrego Health leasing certain real

4   property from the Premier Defendants or entities related to the Premier Defendants

5   at rents and terms that were well above market.  Borrego Health was victimized by

6   three grossly over-priced, 30-plus-year term facility leases engineered by the

7   Borrego Insiders and the Premier Defendants or entities related to the Premier

8   Defendants.  The total combined full-term price of these three leases is over $100

9   million dollars.  As detailed below, these leases were never subject to due diligence

10  and were executed by the Borrego Insiders, without submitting them to the full

11  Board for analysis, review, and informed consent and approval.  Once in place, the

12  leases were concealed from the full Borrego Health Board.  The reason for hiding

13  them from the full Board is clear:  recent independent appraisals by CBRE show the

14  total combined lease prices are $58 million over fair market rent.

15      253.   The leases at issue that are above fair market rent, without good cause,

16  and without the fully informed consent of the Board, are per se unlawful *ab initio*,

17  because, *inter alia*, they are entered into for an unlawful purpose, namely to defraud

18  Borrego Health for millions of dollars, while at the same time exposing Borrego

19  Health to regulatory sanctions and related adverse financial and tax consequences.

20      254.   Promenade Square, LLC ("Promenade") is a California limited liability

21  company whose primary place of business is in El Cajon, California.  Promenade is

22  engaged in the commercial real estate business.  Borrego Health is informed and

23  believes that Promenade's sole member and manager is Daryl Priest.  Promenade is

24  the owner and lessor of the structures and appurtenances located at 133 and 155

25  West Main Street, El Cajon, County of San Diego, California, of which Borrego

26  Health is the lessee ("Promenade Lease").

27      255.   DRP Holdings, LLC ("DRP") is a California limited liability company

28  whose primary place of business is in El Cajon, California.  DRP is engaged in the

commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Daryl Priest.  DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which Borrego Health is the lessee ("DRP Lease").

256.   Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California. Inland Valley is engaged in the commercial real estate business. Plaintiff is informed and believes that Inland Valley's sole member and manager is Daryl Priest.  By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which Borrego Health is the lessee ("Inland Valley Lease").  The Borrego Insiders and Premier Defendants decided to have Borrego Health sign the lease for the Barstow facility before the facility even existed. On information and belief, the Premier Defendants then presented the over-market lease to a federally insured lending institution to help obtain financing for the facility (making Borrego Health in essence a participant in the development and financing of the Barstow facility).

257.   For the sake of brevity, and because Borrego Health is informed and believes that Daryl Priest is the sole owner, member, and manager of Promenade, DRP, and Inland Valley:  (a) Promenade, DRP, and Inland Valley are also referred to collectively as the "Priest LLCs"; and (b) the three leases Borrego Health entered into with the Priest LLCs are referred to collectively as the "Priest Leases."

258.   Daryl Priest (who owns the three Priest LLCs), Travis Lyon and the Borrego Insiders worked together to devise a scheme under which Borrego Health was a conduit of federal healthcare funds to pay for the overpriced Priest Leases. Daryl Priest, Travis Lyons and the Borrego Insiders worked together to make management and operational decisions at Borrego Health to allow the Priest Leases to be entered and to remain in operation undisclosed to Borrego Health's full board.

259.   Daryl Priest is an experienced owner and lessor of commercial properties.  Travis Lyon is an experienced commercial real estate development and management executive.  Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must each present their commercial leases to banks providing them with mortgages and other funding related to their leased properties. Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, must perform due diligence regarding their lessees, before entering into a 30+ year lease that will be reviewed by lenders providing millions of dollars of financing to Promenade, DRP, and Inland Valley.  Daryl Priest and Travis Lyon are therefore presumed to know Borrego Health's business, including that it is a non-profit health care provider doing business with federally-funded health programs.  Daryl Priest and Travis Lyon are presumed to know fair market rent, that the stated rent in the Priest Leases is over fair market rent, and that the lease terms of 30+ years are far beyond fair market lease terms (especially in the absence of terms allowing Borrego Health to terminate the lease on reasonable notice).  Under these facts and circumstances, Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley, are charged with knowledge that they were each entering into an over-fair market rent lease with a non-profit FQHC.

260.   Mikia Wallis and the Borrego Insiders knew or should have known that the Priest Leases were well above market rents and terms.

261.   Mikia Wallis and the Borrego Insiders knew or should have known that the Priest Leases would need to be approved by the full Board of Trustees.

262.   With minimum due diligence, the over-fair market rent price and excessive duration of the Promenade Lease, DRP Lease, and Inland Valley Lease, combined with the absence of any term allowing Borrego Health to terminate a lease prior to their respective lease terms, would have been readily apparent.

7234243.1

263.   No rational, informed Board of Trustees for a non-profit FQHC would have, or could have, lawfully approved the Promenade Lease, DRP Lease, or Inland Valley Lease for, inter alia, the following reasons:

a.      The lease terms are unconscionable, and would result in the diversion of millions of "over-fair market rent" dollars of federal health program money to the Priest-owned entities;

b.      The Promenade Lease calls for payment of nearly $40,000 per month over fair market rent, or more than $15,000,000 over fair market rent over the 33-year life of the lease;

c.      The DRP Lease calls for payment of nearly $39,000 per month over fair market rent, or approximately $14,000,000 over fair market rent over the 30-year life of the lease;

d.      The Inland Valley Lease calls for payment of more than $80,000 per month over fair market rent, or approximately $29,000,000 above fair market rent over the 30-year life of the lease;

e.      Approximately 90% of the revenue received by Borrego Health is paid by government funded health programs (Medi-Cal and Medicare), and therefore if the Priest Leases are enforceable, the vast majority of the over-fair market rent dollars paid could be government health program money;

f.      The over-fair market rent facility lease payments expose Borrego Health to reductions in the allowed reimbursements paid Borrego Health in prior years; and

g.      The close relationship between the Borrego Insiders and Daryl Priest and Travis Lyon (and, by extension, the Priest-owned LLCs) exposes the non-profit FQHC to adverse federal and state tax consequences.  The fact that the rent money would inure to insiders meant Borrego Health could be found to be failing in its obligations to ensure that its assets were being used predominantly for charitable purposes, exposing it to possible revocation of its 501(c)(3) status.

7234243.1

264.   If enforceable, the Priest Leases would have siphoned $58 million in over-fair market rent money from Borrego Health over the life of the leases.  Two of the leases (Inland Valley Lease in Barstow and DRP Lease in San Bernardino) have been terminated.  The Promenade Lease in El Cajon remains in operation with Borrego Health paying twice fair market rent under protest, with permission of the DHCS monitor overseeing Borrego Health's operations since late 2020.  Without judicial intervention on the Promenade Square lease, and without recovery of the $11.8 million in overpaid rent to date, the actions of the Borrego Insiders and a handful of Priest entities will continue to present an immediate threat to disable an essential provider of primary healthcare services to underserved inland communities in San Diego, San Bernardino, and Riverside Counties.

265.   The Priest Leases were concealed from the full Borrego Health Board. Mikia Wallis and the Borrego Insiders knew what was contained in regular reports to the full Borrego Health board, and more importantly, what was not.  The Borrego Insiders knew that financial reports presented to the full board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long lease terms.  Financial reports to the full Borrego Health Board include only the aggregate rents paid on all facilities.  The Borrego Insiders knew that Borrego Health's personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.  Thus, unless the Priest Leases themselves were presented to the full Board of Trustees for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.

266.   The Borrego Insiders knew that full Board of Borrego Health would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the Borrego Insiders managing the relationship with Priest LLCs decided to present the leases.  Thus, unless disclosed

by the Borrego Insiders, there was no way that Borrego Health would be put on notice of the terms of the three subject leases, or that the Borrego Insiders were working with Daryl Priest, Travis Lyon, and, through them, the three Priest LLC to make all management and operations decisions pertaining to the over-market leases for Borrego Health, and in a manner contrary to Borrego Health's financial and compliance interests.  The fact of injury from the leases and from the defendants' participation in Borrego Health's facilities procurement and operations and therefore could not be discovered.

267.   The Borrego Insiders' continued concealment of the leases from Borrego Health was a separate breach of fiduciary duty and/or duty of care in furtherance of the scheme to steal money from Borrego Health every time a monthly rent check was mailed to Borrego Health.

268.   The Priest Leases Scheme victimized Borrego Health in at least three ways:

a.   <u>Exposure to State Suspensions and Federal Disqualification</u>: In California, government funded health program funds flow to FQHCs under the oversight of the California Department of Health Care Services ("DHCS").  DHCS is empowered to suspend all reimbursement for the provision of health care services to Medi-Cal members in accordance with, *inter alia,* Welfare and Institutions Code section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23. Further, HRSA/Bureau of Primary Health Care ("BPHC") monitors FQHCs and can suspend and/or disqualify Borrego Health from the FQHC program, including, *inter alia,* an action by HRSA requiring Borrego Health to cease all activities in the program pending corrective action (45 CFR 75.375) and possible suspension under HHS regulations (2 CFR Part 376, 45 CFR 75.2).  DHCS is presently allowing Borrego Health to continue operations under the guidance, oversight, and direction of a DHCS-appointed independent monitor.

b.      <u>Reimbursement rate adjustments</u>: The cost of owning, renting, maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs providing primary health care services.  As such, CMS recognizes the fair market value of facility costs reasonably incurred and truthfully reported by FQHCs in determining the reimbursement rates to be paid clinics operated by the FQHC.  Cost reporting in excess of fair market value inflates the FQHC's mandatory cost reports required under title 42 of the United States Code section 1395g, and exposes Borrego Health to an order that it retroactively amend its cost reports, potentially leading to a reduction in reimbursement rates paid by federally funded health programs.

c.      <u>Non-profit 501(c)(3) tax status</u>:  Contract payments to disqualified persons in excess of fair market values (or other unlawful diversion of a non-profit entity's revenue to falsely disguise profits as operating expenses) can result in tax liability and/or loss of non-profit tax exemption status at both the federal and state levels.  (*See,* e.g., Internal Revenue Code sections 4958(c)(1) and 4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

269.   The concealment of the Priest Leases Scheme detailed above and of the fact of injury resulting therefrom worked to perfection until it came to light in late 2020.  At that time, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to Borrego Health in conjunction with an investigation unrelated to the Priest Leases.  In the course of the investigation, numerous contracts were reviewed, including the Priest Leases.

270.   Independent certified commercial real estate appraisers made the following findings:  (a) on the Promenade Lease (El Cajon location), Borrego Health was paying $39,104.75 a month above fair market rent, or $469,257 above fair market rent per year; (b) on the DRP Lease (San Bernardino location), Borrego Health was paying $38,405.95 a month above fair market rent, or $460,871.40

7234243.1

above fair market rent per year; and (c) on the Inland Valley Lease (Barstow location), Borrego Health was paying $80,025.25 a month above fair market rent, or $960,303 above fair market rent per year.  Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well.  A reasonable fair market term for these commercial leases is three to five years.

271.   In order to remain in operation, Borrego Health signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at Borrego Health.  As is relevant here, DHCS' monitor directed Borrego Health to: (1) stop paying above fair market rent on the Priest Leases; and (2) take action to address over-fair market rent payments, excessive 30-year lease terms, and the failure to include lease provisions under which Borrego Health may terminate the leases.

272.   In response, the Priest LLCs acted in unison.  The Priest LLCs demanded that Borrego Health continue to make over-fair market rent payments under the Priest Leases.  In a May 25, 2021 email, the Priest LLCs threatened that Borrego Health's failure to pay the demanded rent on any one of the Priest Leases will result in immediate eviction proceedings as to all three locations that are the subject of the Priest Leases.

273.   The Priest Leases are the subject of a related litigation pending as Case 3:21-cv-04117-L-AGS, entitled *Borrego Community Health Foundation v. Inland Valley Investments, LLC, et al*.

274.   Because Borrego Health had no constructive or inquiry notice of the fact of injury throughout the eight-year life of the Priest Leases Scheme, Borrego Health's right to recover money stolen by defendants extends back to the commencement of each lease.  The accrual date applicable to RICO claims under the discovery rule (and to all other causes of action pled herein) is at the earliest

7234243.1

1  October 2020, and Borrego Health may sue to recover for the entire eight years of

2  losses.

3      275.   On information and belief, the Borrego Insiders were compensated for

4  this access and control through kickbacks or other payments or remuneration.

5      **G.**    **The Borrego Insiders Paid Themselves Above-Market**

6          **Compensation and Granted Themselves Improper Benefits and**

7          **Covered It Up (the "Compensation/Benefits Scheme")**

8      276.   <u>Bruce Hebets</u> received a high salary from Borrego Health.  For

9  instance, in 2016, Bruce Hebets received more than $383,000 in salary, plus over

10  $126,000 in "bonus," in addition to a "car allowance" of $1,000 per month and a

11  "cell allowance" of $350 per month.  In 2017, Bruce Hebets received more than

12  $529,000 in salary, plus over $87,000 in "bonus," in addition to the car and cell

13  allowance.  In 2018 (partial year), Bruce Hebets received more than $467,000 in

14  salary, plus over $321,000 in "bonus," in addition to the car and cell allowance.

15      277.   <u>Karen Hebets</u> also received a high salary from Borrego Health.  For

16  instance, in 2016, Karen Hebets received more than $227,000 in salary, plus over

17  $40,000 in "bonus".  In 2017, Karen Hebets received more than $228,000 in salary,

18  plus over $51,000 in "bonus".  In 2018 and 2019, Karen Hebets received more than

19  $228,000 in salary, plus over $41,000 in "bonus".  In 2020, these salaries were

20  reduced to more than $205,000 with a bonus of over $10,000.

21      278.   <u>Diana Thompson, formerly Diana Troncoso</u>, also received a high salary

22  from Borrego Health.  For instance, in 2017, Diana Thompson was paid nearly

23  $338,000.

24      279.   <u>Mikia Wallis</u> also received a high salary from Borrego Health.  For

25  instance, in 2017, Mikia Wallis was paid over $440,000.

26      280.   The Borrego Insiders then proceeded to disguise their above-market

27  salary and benefits by using improper evaluations.  For instance, the Borrego

28

Insiders used Jim Hebets and his companies to create a bogus evaluation of the compensation packages, concluding—unsurprisingly—that they were appropriate.

281.   One Borrego Insider even stated that the executives kept their base salary low but took additional payments as "bonuses" and received other benefits "to avoid scrutiny."

282.   The Bored Insiders also received compensation and other improper benefits.  In July 2015, Bruce Hebets inquired from counsel whether or not a FQHC can pay or compensate board members, but counsel informed him that payments were prohibited, other than very narrow exceptions.  Nevertheless, the Board Insiders received remuneration and benefits from Borrego Health, and were therefore effectively compensated by Borrego Health and incentivized to keep these Schemes going.

283.   For instance, the Board Insiders received free access to Borrego Health programs, benefits, prescription drugs and even hearing aids.

284.   An email from Mike Hickok dated August 31, 2020, confirmed the practice of improper remuneration and benefits to Board Insiders:

> This policy has existed since Borrego Health was founded.  I asked about this once myself (I currently get my pharmacy prescriptions  as a perk) and was told this was an acceptable practice. My understanding is staff and families get the same perk plus no charge for medical and dental care. As far as the missive that the  cost of these items should be put back into the healthcare of the community is almost too laughable to be taken seriously in view of the tens of millions of dollars we waste with double paying Providers or paying them for doing little to no work or paying firms like Premier Healthcare millions of dollars that in-house staff could do and much less expensively or the many (probably most) real estate leases that we pay exorbitantly over market rent and for well in excess of typical lease terms. I've been trying to call attention to these issues for *years* and gotten nowhere until the Borrego Sun stared to expose them. Alan Kuehn has been blowing the whistle for years about medicare fraud in the contract dental practice and the only thing that this board chose to do regarding him was blackball him as a board member because he was threatening to Makia and Tim Martinez and the ongoing scam with Premier Healthcare.

So now calling attention to Trustees getting a perk of free pharmacy as some sort of impropriety is (on second thought) not *almost* laughable it takes the cake ….

285.   Later, as discussed below, when this arrangement was revealed, the Borrego Health Board ended the practice.

286.   In 2019, Compensation Resources, Inc. ("CRI") was retained by Borrego Health to review and analyze the compensation of 15 Borrego Health executives.  CRI issued its report on or about July 19, 2019.  In sum, of the 15 executives reviewed, the CRI report concluded that the "Total Compensation Package (TCP) for eleven (11) of the Borrego officers is currently above the high end of their respective Market Ranges of Reasonableness."  In early 2020, a second CRI analysis was conducted for the other employees of Borrego Health, which also found excessive salaries.

287.   Mikia Wallis and the Borrego Insiders failed to raise the issues of nepotism, cronyism and above-market compensation to the full Borrego Health Board, and took steps to conceal the issues.  When asked by the full Borrego Health Board to investigate and report on the compensation, Mikia Wallis' submitted multiple reports which lacked the necessary information to make any appropriate decisions.

288.   For instance, in one version of Mikia Wallis' report she used the salaries that had recently been reduced by an "equitable" adjustment, effectively attempting to conceal the past problems.

289.   On top of that, Bruce Hebets and Jim Hebets schemed to create a 162B Executive Bonus Plan that would pay Bruce Hebets and others additional compensation (a tax-free payment of $5,000 per month) while also siphoning millions to Jim Hebets' insurance company.

290.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**H.    The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme")**

291.    Bruce Hebets and Karen Hebets hired their family members to work at Borrego Health.  The nepotistic hires benefited the Hebets family, so that they were encouraged to keep the above-described Schemes operating.  This included Bruce and Karen's daughter Tiffany Hebets (Collections Clerk, paid approximately $46,700/year and daughter Amanda Troncoso (Lead Billing Internal Auditor, base salary $49,920/year).  Amanda Troncoso is also the daughter-in-law of Diana Thompson.

292.    Mikia Wallis created a position for her husband, Jeremy Noble, at Borrego Health.  Jeremy Noble was hired to be Director of Site Facility Compliance for Borrego Health in exchange for an annual base salary of $120,000, despite the fact that he lacked the skills needed for the position.  Jeremy Noble was later arrested and charged with illegal firearms possession.  Borrego Health is informed and believes that the criminal case (Case No. SCN420059) is ongoing.

293.    Diana Thompson hired her family members to work in Borrego Health's billing department and elsewhere.  The nepotistic hires benefited Diana Thompson and her family, so that she was encouraged to keep the above-described schemes operating.  Moreover, by populating her department with family members, it effectively eliminated any meaningful oversight.  These family members included: (1) her brother Jose Alfredo Villafana, IT Technician (base salary $45,760/year); (2) her brother Luis Troncoso, Facilities Maintenance Worker 3 (base salary: $57,200/year); (3) her sister Breanda Troncoso, Biller 2 (base salary $40,352/year); (4) her step-son Julian Thompson, Accounting Clerk 1 (base salary $45,739/year); (5) her step-son Jordan Thompson, Biller 2 (base salary $35,360); and (6) her daughter-in-law Amanda Troncoso, Lead Billing Internal Auditor (base salary

1  $49,920/year).  Borrego Health even hired Diana Thompson's father to provide
2  gardening services for Borrego Health.

3      294.   On information and belief, the Borrego Insiders were compensated for
4  this access and control through kickbacks or other payments or remuneration.

5   **I.    The Borrego Insiders Tried To Purchase a Country Club to**
6   **Personally Benefit Themselves (the "De Anza Country Club**
7   **Scheme")**

8      295.   The October 2017 Executive/Finance Committee meeting was
9  recorded.  In that meeting, the Board Insiders and staff attendees (including Bruce
10 Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal to purchase the
11 De Anza Country Club located in Borrego Springs.  On information and belief: (1)
12 the country club was not performing well economically and was contemplating
13 selling its assets or filing for bankruptcy, (2) some Borrego Insiders own or owned
14 homes nearby whose property values would face decline, and (3) some Borrego
15 Insiders were creditors of the country club through a limited liability company.

16     296.   Three of the four Board Insiders (Mike Hickok, Dennis Nourse, and
17 Harry Ilsley) were members and nearby homeowners at De Anza Country Club
18 during a period when the club was financially distressed and looking for a purchaser.
19 Mike Hickok was on the De Anza Board of Trustees and headed a committee at De
20 Anza to arrange a purchaser for the country club.

21     297.   Following the October 2017 meeting, Borrego Health made a formal
22 offer to purchase the country club, including paying earnest money on the deal.  As
23 usual, the Borrego Insiders did not take the De Anza transaction to the full Board for
24 its review or approval.

25     298.   In fact, in the recorded October 2017 Executive/Finance Committee
26 meeting, the Borrego Insiders explicitly acknowledge that members of the full
27 Board would disapprove of such a purchase.  Borrego Health does not know why
28 the Borrego Insiders wanted a FQHC—*i.e.*, a healthcare provider for underserved

communities—to purchase a country club, though Borrego Health suspects that some or all of those individuals would personally benefit from such a transaction, at the expense of Borrego Health.

299.   By email dated November 18, 2017, outside counsel for Borrego Health advised Mikia Wallis that there were potentially "severe consequences" to Borrego Health from the proposed transaction, outlining some of the major potential issues.

300.   Ultimately, for reasons also unknown to Borrego Health, the deal did not move forward, and de Anza returned the earnest money.

## J.     The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme")

301.   In or about March 2018, Bruce Hebets suffered from a worsening illness and decided to step down from his position as CEO.  Without putting it on the agenda, the Borrego Insiders proposed a $5 million payout for Bruce Hebets as part of a "transition agreement."  Around that time, the idea was first presented to the full Board of Trustees.  At that time it was first presented to the full Board, an agreement had already been created, which was drafted by Mikia Wallis.

302.   Mikia Wallis drafted the agreement at Bruce Hebets' request.  Mikia Wallis did not advise Borrego Health to get separate counsel with respect to the agreement, and told a Borrego Health Board member on or about April 5, 2018 that she "represented no one" in the transaction, despite that fact that she was Borrego Health's Chief Legal Officer and would shortly become Borrego Health's CEO. The Board member encouraged Mikia Wallis to do her own research about to whom she owes a duty of loyalty as general counsel for Borrego Health.  Mikia Wallis argued that she was not required to represent the best interests of the organization (which is wrong), that she did not represent anyone with respect to this transaction, and that there was nothing wrong with having drafted the contract for Bruce Hebets.

303.   The Borrego Insiders did not do any diligence or get an independent analysis with respect to a proper amount for a buyout under the circumstances.  Two other Board members, who were not Board Insiders, objected to the payout, stated that additional diligence was required and asked for the vote to be delayed to allow for additional evaluation.

304.   During the discussion of the transition agreement, the Borrego Insiders argued that the extremely high buyout was appropriate due to the fact that Bruce Hebets had not received retirement benefits.  However, this was false as Bruce Hebets had a 162B plan.  (The existence of the 162B plan was concealed by the Borrego Insiders, including from the auditor retained to evaluate the appropriate amount of Bruce Hebets' payout.)

305.   The vote on the "transition agreement" and buyout was postponed to a later meeting.

306.   At the April 5, 2018 Borrego Health Board meeting, the issue was discussed.  The Borrego Insiders brought a man named Frank Church, who was supposedly an "independent auditor," to appear by phone in the meeting.  Frank Church did not appear to have any expertise or knowledge regarding the reasonableness of the payout.

307.   Later, still needing an independent evaluation of the payout amount, at the insistence of the non-Borrego Insider Board Trustees, Borrego Health retained FW Cook to conduct an evaluation.  FW Cook employee Marty Katz provided the results.  After reviewing salaries and payouts for other CEOs, FW Cook concluded that an appropriate payout would be $2 million, not the $5 million that Bruce Hebets and Mikia Wallis proposed.  The analysis was provided without knowledge of the 162B plan and benefits, and was therefore fundamentally flawed.

308.   However, this payout amount was eventually agreed to by the full Borrego Health Board and Bruce Hebets.  Months after the $2 million payout had already been completed, Borrego Health once again consulted with FW cook about

the propriety of the 162B plan.  At that time, Marty Katz explained that he was told by Mikia Wallis that payments made to a 162B plan for Bruce Hebets' benefits were performance-based bonuses, which was false.  In actuality, this was a part of Bruce Hebets' regular compensation.  Marty Katz told a Borrego Health Board member that if he had known this information, the payout amount would have been lower.

309.   The Borrego Insiders also attempted to conceal the impropriety of the generous 162B plan offered to some Borrego Insiders.  In spring or summer 2019, certain Borrego Health Board Trustees asked Mikia Wallis to evaluate the current 162B plan and, if necessary, find alternative plans.  Mikia Wallis invited an individual to address the issue with the full Borrego Health board.  The individual identified himself as "Jim" without providing a last name.  He proceeded to praise the 162B plan.  It was only when a non-Borrego Insider Board member asked for his last name did Jim disclose that he was, in fact, Jim Hebets.

310.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

### K.     The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")

311.   The Borrego Insiders entered into an arrangements, on behalf of Borrego Health, with Jim Hebets and/or companies owned or controlled by Jim Hebets, The Hebets Company, funneling additional Borrego Health funds to Borrego Insider cronies and family members.

312.   For instance, the Borrego Insiders collaborated to have Jim Hebets and/or his companies review and approve sham, inflated salaries for Borrego Health executives, including the Borrego Insiders.

313.   Jim Hebets directed the review and approval process through The Hebets Company.  However, when the sham fair market value analyses were presented to the Borrego Health Board, Jim Hebets ensured that his name was removed by the masthead and documents were carefully drafted to avoid reference

1   to Jim Hebets and to conceal his involvement and obvious conflict of interest, even

2   neglecting to mention his last name when introducing himself.

3       314.   Jim Hebets' firm, The Hebets Company, is located in Phoenix,

4   Arizona.  On the website (www.hebetsco.com), he boasts of specializing in FQHCs

5   and creating ways to increase executive compensation/benefits beyond what is

6   specified in IRS code for qualified 403(b) or 457(b) plans.

7       315.   The Hebets Company's current website makes it perfectly clear that

8   their agenda is to maximize executive compensation:

> Today's competitive labor market makes it increasingly difficult for
> businesses to hire and retain highly skilled employees. The Hebets
> Company's Executive Compensation and Supplemental Fringe Benefits
> division assists these enterprises in designing and implementing innovative
> compensation and benefit programs for purposes of recruiting and rewarding
> those key executives who are instrumental to the profitability of the company.
> Legislative changes over the years have repeatedly reduced the qualified plan
> benefits that can be allocated to this select group of highly compensated
> employees resulting in "reverse discrimination". But there are many
> worthwhile solutions.

16      316.   Jim Hebets' firm also boasts that it provides "Estate planning for the

17  'exceptionally wealthy,'" a seeming mismatch for Borrego as a non-profit, but

18  perhaps exactly what Bruce Hebets sought and why Jim Hebets was involved.

19      317.   Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with

20  The Hebets Company to increase executive compensation through contributions

21  through automatic "bonuses" that were paid to 162B plans.  These automatic

22  bonuses paid to many Borrego Insiders, including Bruce Hebets, Diana Thompson,

23  Mikia Wallis, and Karen Hebets.

24      318.   Though the 162B plans appeared at first glance to be life insurance

25  plans, they were never intended as such but were instead a strategy to pay above

26  market to insiders without added scrutiny or tax liability.  Bruce Hebets and Karen

27  Hebets worked directly with the Vice President and General Manager of The Hebets

28

7234243.1

1  Company to "borrow" from their 162B accounts and transfer the funds from their
2  respective 162B plans into their checking account.

3     319.   These were significant payments.  As of 2015, Bruce Hebets was
4  receiving $3,500 per month for his 162B plan, and by 2017, he was receiving $5,000
5  per month.  These amounts were free of taxes, as on top of these payments, Borrego
6  Health was also paying a tax true up.  As a result of this scheme, Bruce Hebets,
7  Karen Hebets, and other Borrego Insiders got tax free bonuses every month, which
8  they subsequently cashed out.

9     320.   Even after the loans, the value of these plans was substantial.  As of
10 July 9, 2018, Bruce Hebets' 162B life insurance value was $1,236,000.  It appears
11 this approximate value was paid out to Bruce Hebets' estate at the time of his death
12 after a long illness in January 2019.

13    321.   These 162B plan payments also created a windfall for Jim Hebets and
14 The Hebets Company, which sold and managed the plan.  As of July 2020, Borrego
15 was paying $240,000 per month for the 162B plans.  This is immensely
16 disproportionate.

17    322.   For scale, Borrego Health paid in full for a bridge life insurance policy
18 that would allow staff losing their 162B plan benefit to retain up to two-times their
19 salary, up to $500,000, in group term life insurance until they could select their own
20 insurance at their own cost via annual open enrollment.  The cost of that plan was
21 $15,420 per month.

22    323.   The Borrego Insiders, Jim Hebets, and The Hebets Company knew that
23 the Borrego Health Board members would rely on the compensation analyses and
24 would have no other resource to question them.  Thus, the compensation analyses
25 were presented to the Board of Trustees for vetting and approval, but there was no
26 way that Borrego Health would be put on notice of Jim Hebets' and his company's
27 involvement or of any potential financial or other injury associated with, or caused
28 in whole or in part by the flawed compensation analyses.  Nor would the Board have

1   any access to facts that might put them on inquiry notice that the Borrego Insiders,

2   Jim Hebets, and The Hebets Company were working together to siphon funds from

3   Borrego Health.

4       324.   On information and belief, the Borrego Insiders were compensated for

5   this access and control through kickbacks or other payments or remuneration.

6   **L.      Borrego Insider Chuck Kimball Leased a Barn to Borrego Health**

7   **         (the "Julian Barn Scheme")**

8       325.   Julian Medical Foundation, Inc. is a 501(c)(3) organization. Its stated

9   mission is "To foster the presence and availability of high quality health and

10  medical care within the Julian area including being the owner of a rural health clinic

11  in Julian and the promotion and sponsorship of activities addressing community-

12  wide issues of health and safety."

13      326.   Julian Medical Foundation sought out property in Julian, California and

14  solicited Bruce Hebets to operate a clinic in Julian. Chuck Kimball led the efforts

15  while he was an officer of Julian Medical Foundation.

16      327.   Bruce Hebets and Chuck Kimball were acquaintances prior to their

17  relationship at Borrego Health.

18      328.   Chuck Kimball repeatedly emailed Bruce Hebets starting in April 2009

19  regarding acquiring a barn to serve as a site for a future clinic operated by Borrego

20  Health in Julian. The target property identified by Chuck Kimball was a horse barn

21  and surrounding land located at 2717 A Street in Julian, California (the "Horse

22  Barn").

23      329.   Chuck Kimball saw an opportunity to benefit the Julian Medical

24  Foundation to the detriment of Borrego Health. Julian Medical Foundation could

25  acquire the property, but it was not in a position to utilize it, finance it without

26  subsidization, or develop it. Chuck Kimball wanted Borrego Health to subsidize the

27  acquisition and development of the property and insulate Julian Medical Foundation

28  from any risk from acquiring the property.

7234243.1

330.   Thus, Julian Medical Foundation would acquire a property that was not useable in its current state, but Borrego Health would bear the risk of the acquisition by paying all costs of acquisition and ongoing financing to Julian Medical Foundation, including incurring liability for any mortgages secured by Julian Medical Foundation.

331.   In July and August 2009, Chuck Kimball began a fundraising drive for Julian Medical Foundation to acquire a property in Julian for a medical clinic.

332.   Even before Julian Medical Foundation was able to acquire the Horse Barn, Chuck Kimball coordinated the drafting of a lease between the Horse Barn owners and Borrego Health.

333.   Later, Chuck Kimball proposed that Julian Medical Foundation lease the Horse Barn to Borrego Health with Julian Medical Foundation as the landlord.

334.   Borrego Health agreed to lease the Horse Barn without even considering whether there was a market for the services should the Horse Barn be remodeled to accommodate a new clinic.  Instead, market analyses were conducted years later with the Horse Barn remaining unused by Borrego Health.

335.   In October 2010, Borrego Health entered into an agreement with Julian Medical Foundation and Chuck Kimball to lease the Horse Barn.  The lease terms were one-sided and the product of Julian Medical Foundation and Chuck Kimball exerting control over Borrego Health.

336.   The leased space was not necessary and the Horse Barn was unneeded and unusable.

337.   Initially, there was no specific lease amount specified.  Instead, it was set at whatever expenses Julian Medical Foundation had to own the property.  As a result of the ambiguity of the monthly rent, the Borrego Insiders and Julian Medical Foundation could manipulate the amount of rent for Borrego Health to pay to the Julian Medical Foundation.

7234243.1

338.   The Horse Barn was unusable by Borrego Health, but it paid the full rent to Julian Medical Foundation and then subleased the Horse Barn back to the original owners at a significant loss to Borrego Health, only reinforcing that the fair market rent for the Horse Barn was far less than Borrego Health was paying.

339.   The Borrego Insiders and Julian Medical Foundation were all aware that Borrego Health had no use for a barn and no intention to utilize it.  Yet, they set the term of the lease at 20 years in duration, with no termination clause for Borrego Health, not even if the property was never developed into a medical clinic.  If the lease were to be terminated or abandoned, Borrego Health agreed to pay off all mortgages on the Horse Barn.

340.   Later, by First Amendment to the lease dated November 7, 2013, Borrego Health agreed to Julian Medical Foundation's demand to increase the rent from at least $6,284 per month to $7,179, despite no additional consideration being offered by Julian Medical Foundation and Chuck Kimball.  The only justification was increased costs incurred by Julian Medical Foundation due to a property tax increase.

341.   Ultimately, the Horse Barn lease was so unsustainable that Borrego Health had to negotiate with Chuck Kimball to release Borrego Health from the lease, but that did not occur until 2022.  At that point, Chuck Kimball was aware of government scrutiny.

342.   Neither Chuck Kimball nor the Julian Medical Foundation has returned or forgiven any rent for the Horse Barn.

343.   The Borrego Insiders knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see The Horse Barn lease unless it was presented to them.  Thus, unless the Horse Barn lease itself was presented to the Board for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by

1    over-market leases.  Nor would the Board have any access to facts that might put
2    them on inquiry notice that the Borrego Insiders were working together to siphon
3    funds from Borrego Health.

4        344.   On information and belief, the Borrego Insiders were compensated for
5    this access and control through kickbacks or other payments or remuneration.

6    **M.    Borrego Insider Dennis Nourse Sold Property to Borrego Health to**
7    **be Developed by Priest (the "Property Development Scheme")**

8        345.   Bruce Hebets and Dennis Nourse were friends prior to their
9    relationship at Borrego Health.

10       346.   Dennis Nourse owned commercial property located on Palm Canyon
11   Drive in Borrego, Springs with Assessor Parcel Number ("APN") 198-010-23-00
12   ("Palm Canyon Parcel"), which fronts on Palm Canyon Drive just west of Country
13   Club Road.

14       347.   Dennis Nourse saw an opportunity to benefit himself by facilitating a
15   sale the Palm Canyon Parcel and involving Borrego Health.

16       348.   Dennis Nourse approached Bruce Hebets to discuss a sale.  Bruce
17   Hebets saw an opportunity to involve Daryl Priest to develop the property, who he
18   had familiarity with after two other clinic leases.

19       349.   Dennis Nourse, Bruce Hebets, and Daryl Priest collaborated so that
20   Daryl Priest would acquire the commercially worthless parcel from Dennis Nourse,
21   and then have it developed by Daryl Priest and his affiliated companies.  Once it
22   was developed, the property would then be leased to Borrego Health at
23   commercially unreasonable terms.

24       350.   Thus, the scheme was hatched whereby Dennis Nourse would be
25   overpaid for the Palm Canyon Parcel, half of which was undevelopable foothills.
26   Daryl Priest and his entities would overpay, but make up any loss by overcharging
27   Borrego Health for development and the lease of the property.  The Borrego Insiders
28   would sacrifice Borrego Health's interests could further ingratiate himself with

7234243.1

1  Daryl Priest and to keep Dennis Nourse cooperative on the Executive/Finance
2  Committee and to buy off Dennis Nourse as a future collaborator.

3       351.   Daryl Priest, though a wholly owned subsidiary created to purchase the
4  Palm Canyon Parcel, Inland Development, LLC, entered into a contract with Dennis
5  Nourse for the purchase.

6       352.   Contemporaneously, Bruce Hebets negotiated lease terms with Daryl
7  Priest that were disadvantageous to Borrego Health.

8       353.   Dennis Nourse and Bruce Hebets brought the proposal to the
9  Executive/Finance Committee, which was controlled by Borrego Insiders, including
10  Dennis Nourse.

11       354.   Bruce Hebets and Mikia Wallis knew that such a business arrangement
12  blatantly involved conflicts of interests.  As a result, Bruce Hebets directed Mikia
13  Wallis to perform an analysis demonstrating how the transaction could proceed with
14  Dennis Nourse recusing himself from a vote.

15       355.   Rather than conduct an impartial and independent analysis, Mikia
16  Wallis endeavored to perform an outcome-oriented and flawed "analysis" that
17  would give the Executive/Finance Committee poor legal advice that the arrangement
18  was acceptable, at the expense of Borrego Health.

19       356.   Mikia Wallis brought the cursory analysis supporting the transaction to
20  Bruce Hebets to ask him if she "was on the right track."  Thus, she was not
21  exercising proper independence as Borrego Health's attorney, and was instead being
22  controlled and directed by and agreeing to be nothing more than an instrument of
23  Bruce Hebets.

24       357.   Mikia Wallis completed her internal analysis to the satisfaction of
25  Bruce Hebets, and then sent it to outside counsel, who did not practice in the area of
26  real estate transactions or conflict of interests issues for review and approval.  With
27  minor modification, outside counsel approved the analysis, and the matter was
28  brought to the Executive/Finance Committee for approval.

7234243.1

358.   The Board Insiders approved the proposed transaction with little questioning or scrutiny, including agreeing to the one-sided lease terms that Bruce Hebets had negotiated with Daryl Priest.

359.   Daryl Priest then immediately negotiated a lease with Borrego Health (the "Nourse Parcel Lease"), even though there was no land yet acquired by Daryl Priest and no structure to lease.

360.   The lease terms were not commercially reasonable, and included an agreement that Borrego Health would start paying full rent after Daryl Priest secured approved building plans, even though no one realistically expected to be able to occupy a finished structure for more than a year later.

361.   In other words, Borrego Health would be paying full rent for no property and still paying for much of the construction costs with no building to even use.

362.   The development of the land, however, still had to go through the local government approval process, including its design review committee.  At the design review committee, the development was met with resistance.

363.   Rather than counter the resistance, Daryl Priest sought to modify the terms of the deal to further his interests and make Borrego Health's position even less desirable.

364.   Daryl Priest proposed that Borrego Health purchase the Palm Canyon Parcel directly from Dennis Nourse, and that Daryl Priest would then develop the property under contract with Borrego Health.

365.   Thus it was agreed that the purchase agreement negotiated by Daryl Priest would be assigned to Borrego Health.  Borrego Health would return Daryl Priest's earnest money, and Borrego Health would pay $400,000 Dennis Nourse to purchase the Palm Canyon Parcel.

366.   This time, Bruce Hebets and Dennis Nourse decided not to go back to the full Borrego Health Board of Trustees or even the Board Insiders.

7234243.1

367.   Instead, Bruce Hebets and Denis Nourse brought Borrego Insider Harry Ilsley into the fold.  Harry Ilsley knew that the Board should have been involved, but agreed to work with Bruce Hebets and Denis Nourse to get the deal closed.

368.   Harry Ilsley, Dennis Nourse, and Bruce Hebets knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see acquisition documents unless he or Bruce Hebets presented them.  Thus, unless the deal documents were presented to the Board of Trustees for vetting and approval, they would not know of any potential financial or other injury associated with, or caused in whole or in part by the real property transaction.  Nor would the Board have any access to facts that might put them on inquiry notice that Harry Ilsley, Bruce Hebets, and Dennis Nourse were working together to siphon funds from Borrego Health to Dennis Nourse and Daryl Priest.

369.   As usual, Bruce Hebets and Mikia Wallis facilitated and directed the actions necessary to execute the deal documents without knowledge of Borrego Health's full Board.

370.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

## V.   CLEANING HOUSE

371.   After Bruce Hebets' death, the Borrego Health board found themselves picking up the pieces of a highly disorganized organization.  Since that time, the current Board (all of whom serve on a volunteer basis) has undertaken monumental efforts to identify and correct a number of issues in the organization.  Some of those efforts are set forth below.

372.   All of the Board Insiders have resigned or have removed been from the Borrego Health Board, including most recently the removal of Mike Hickok (Treasurer) and Chuck Kimball (Secretary) on October 2, 2020.  Ten new and

1  diverse members were also added to the board between 2019 and 2020 and the
2  Board was expanded to 13 members.

3       373.   The Board also began the process of a governance overhaul, including
4  compiling a governance policy and making updates to Borrego Health's Bylaws and
5  other key policies (through the progress was slow due to actions of both Chuck
6  Kimball and Mikia Wallis, who blocked a number of reform efforts before their
7  removals).

8       374.   The Board retained outside counsel to complete governance overhaul,
9  including Bylaws and policies, and develop Committees with clear committee
10 charters.

11      375.   A Board Policy Manual consisting of updated organization Bylaws and
12 key governance policies was compiled by Board members and presented in April
13 2019.  The electronic Board Policy Book was officially adopted by the Board in
14 June 2020.

15      376.   Current Board members are now required to complete a 3.5-hour Board
16 training by Compensation Resources, Inc. and NACH, and Borrego Health has
17 developed materials for on-boarding new Board members.  Board members are also
18 required to complete 3 hours of on-line trainings and Borrego Health has offered
19 additional NACH Board Governance Training to Board members.

20      377.   Borrego Health created and staffed the position of Governance
21 Manager to assist the Board and committees in producing clear Board minutes,
22 agendas, and helping to keep Board committees on track.

23      378.   Borrego Health retained Compensation Resources Inc. ("CRI") to
24 analyze executive officer compensation and benefits and complete an Executive
25 Compensation study (July 2019) and expanded CRI contract to look at total
26 compensation system-wide (2020).  CRI also conducted Board training on
27 governance with a focus on Board responsibility for oversight with respect to
28 compensation (2019).

7234243.1

379.   In 2019, Borrego Health retained another company to review retirement benefits and develop new retirement plan.  The new company also will assist Borrego Health in developing more equitable total compensation plan, including performance bonus structure.

380.   Borrego Health also created new mechanisms to prevent improper arrangements, including overhauling the delegation of authority and procurement policies, creating the Board Audit Committee (2019), hiring new auditors (2020), and conducting a detailed review of IRS Form 990 (2019).

381.   Mikia Wallis was removed as CEO on October 8, 2020.  All other staff in any way implicated by DHCS or DOJ to be involved in misconduct have been removed.  The entire executive leadership team was replaced.

382.   In October 2020, Borrego Health closed its contract dental program and replaced staff employed within the program who had been identified by DOJ and DHCS.

383.   Borrego Health terminated its relationship with Priest-related entities, terminating its leases at the Barstow and D Street locations, seeking amendment in Federal Court of its lease at the El Cajon site, and terminating its contracts with Premier.

384.   Borrego Health invested significantly in its compliance program. Borrego Health established a Compliance Department led by an experienced Chief Compliance Officer, and staffed the department to include a Director of Compliance, Director of Program Integrity, Compliance Auditor and Compliance Analyst.  At the Board level, Borrego Health created the Audit and Compliance Committee in January 2022, which hears detailed monthly compliance reports.

385.   Borrego Health also created a Compliance Program Manual and Compliance Hotline to assist with effectively identifying and resolving compliance concerns.  Borrego Health instituted a series of compliance trainings, including monthly staff compliance education, bimonthly billing and coding compliance

7234243.1

trainings (instituted April 2022), code of conduct training, compliance team site visits (instituted January 2022), and executive training on fraud and abuse topics.

386.    Borrego Health engaged external auditing services from to evaluate its current claims, identify areas for improvement, and train staff and providers on those issues.

387.    Borrego Health has also invested in internal fraud prevention efforts aimed at individuals.  Borrego Health retained a compensation review company to review executive compensation, with the result of review leading to executive compensation reform.  Borrego Health also implemented new conflict of interest policies, a restrictive employment of relatives policy, and has limited the Board's delegated authority to Borrego Health staff.

388.    Borrego Health has also implemented efforts to increase transparency of financials.  Borrego Health has ensured that management reports are now available at the clinic level and are incorporated into Board reports available to the full board and has instituted a provider dashboard to monitor financial metrics.

## VI.    THE RICO ENTERPRISE

### A.    Facts Common To RICO Cause of Action

389.    The "Enterprise" is Borrego Health, a non-profit corporation in good standing, which the Defendants secretly commandeered for their own criminal purposes.  Bruce Hebets' death in 2019 does not alter the fact of his participation (as a Borrego Health insider) with Defendants in the operation and management of Borrego Health, as described below.  If Bruce Hebets were alive, he would be named as a defendant herein.

390.    Borrego Health is a FQHC engaged in interstate commerce, with a mission to provide high quality, comprehensive, compassionate primary healthcare to people in their communities, regardless of their ability to pay.  Borrego Health operated over 20 clinics, and continues to operate more than a dozen, primarily in underserved desert and inland communities throughout San Diego, Riverside, and

1    San Bernardino counties.  Borrego Health provides essential services in Family

2    Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology,

3    Cardiology, and HIV/Hepatitis C, most of whom cannot obtain affordable

4    comprehensive primary care from other sources.  During the recent pandemic,

5    Borrego Health has tested tens of thousands of Californians for Covid-19 infection

6    and has vaccinated tens of thousands of people for Covid-19.  Borrego Health's

7    continued operation is in the public interest.

8        391.   Although all of the Defendants named in this action are defendants in

9    the RICO cause of action, Daryl Priest, Nick Priest, Travis Lyon, Premier, Summit,

10   Jim Hebets, Hebets & McGuire, LLC, and The Hebets Company, The Julian

11   Medical Foundation, and Husam Aldairi, D.D.S., Aram Arakelyan, D.D.S., Ayed

12   Hawatmeh, D.D.S., Magaly Velasquez, D.D.S., Marcelo Toledo, D.D.S., Michael

13   Hoang, D.M.D., Santiago Rojo, D.D.S., Waleed Stephan, D.D.S., Mohammed

14   AlTekreeti, D.D.S., Jilbert Bakramian, D.D.S., Marlene Thompson, D.D.S., George

15   Jared, D.D.S., Douglas Ness, D.D.S., and Alborz Mehdizadeh, D.D.S., and DOES 1-

16   250, are "Outsiders" to Borrego Health.

17       392.   The Defendants are associated with the Enterprise in that they were

18   either (1) Borrego Health executives or Board members, (2) the Enterprise's

19   landlords, (3) contracted dental providers, or (4) other outside vendors.

20       393.   The Defendants are entities and individuals separate from the

21   Enterprise, and none of the Defendants is alleged to be the Enterprise, or its

22   members.

23       394.   Borrego Health is both the RICO enterprise and the victim.  Borrego

24   Health has lost tens of millions of dollars as a result of the Defendants' fraudulent

25   conduct and suffered other damages, including without limitation an inability to be

26   paid by Medi-Cal for in-house dental services, an inability to provide contract dental

27   services, and an exposure for repayment to the Medi-Cal program for claims that

28

7234243.1

1  were caused to be submitted by defendants and contract dentists that were not

2  payable.

3      395.   The unlawful acts described herein were devised, directed and

4  maintained by the Defendants who had control over, participated in, and/or took part

5  in Borrego Health's operations and management.

6      **B.    Racketeering Activity Distinct from Enterprise**

7      396.   The pattern of racketeering described herein is separate and distinct

8  from the Enterprise, due to both the relationship between the activities of the

9  Enterprise and the pattern of racketeering activity, and how the racketeering activity

10 differs from the usual daily activities of the enterprise is as follows:

11     397.   Borrego Health, the Enterprise, is engaged in interstate commerce

12 acting as a FQHC.  It acquires good and products from across the country, including

13 medical supplies.  It utilizes the internet and United States banking system to

14 facilitate its operations, including using electronic billing to bill and receive

15 payment from Medi-Cal.  Borrego Health also regularly uses mail to pay vendors

16 and acquire good and products, including medical supplies and medications.

17     398.   Defendants worked together to perpetrate a number of schemes to steal

18 money from the Enterprise paid to the Enterprise by state and federal payers

19 utilizing primarily state and federal funds paid by Medi-Cal.  The schemes that

20 Borrego Health in currently aware of are described above as the "Borrego MSO/IPA

21 Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the

22 "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits

23 Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club

24 Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn

25 Scheme" and the "Property Development Scheme".

26     399.   Each of these Schemes was contrary to the ordinary and regular

27 operations and management of Borrego Health, and involved Outsider Defendants

28

7234243.1

1  effectively taking over the management and operations of Borrego Health in
2  furtherance of these Schemes.

3      400.   The primary mission of Borrego Health, as a FQHC, is the provision of
4  healthcare to under-served communities.  All efforts of Borrego Health are to be
5  directed at the efficient accomplishment of this mission.

6      **C.     RICO Liability**

7      401.   18 USC §§1962 (c) and (d):  As detailed herein, Defendants' conduct is
8  unlawful under 18 U.S.C. 1962(c), and is also unlawful as a conspiracy under 18
9  U.S.C. § 1962(d).

10      402.   18 USC § 1341 (Mail Fraud):  The purpose of the "Borrego MSO/IPA
11 Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the
12 "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits
13 Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club
14 Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn
15 Scheme" and the "Property Development Scheme" was to effectively steal money
16 from Borrego Health

17      403.   In the manner detailed above, Defendants participated in devising
18 and/or intending to devise the Schemes to perform the fraudulent acts described
19 herein.

20      404.   The Schemes could not work without the use of the United States Mail,
21 which was used for the purpose of executing the Schemes.

22      405.   Among other things and without limitation, the mail was used to send
23 correspondence and payments under the Premier Scheme, to send bills and
24 payments for the Fraudulent Dental Billing Scheme, to send rent checks under the
25 Priest Leases Scheme, and to send rent checks under the Julian Barn Scheme.

26      406.   Each individual mailing was an individual act essential to the success
27 of the scheme (and therefore material) and constitutes a separate loss the victim

28

7234243.1

suffered as of the date of mailing.  This constitutes hundreds of predicate acts under 18 USC 1341 (Mail Fraud).

407.   18 USC § 1343 (Wire Fraud):  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme" and the "Property Development Scheme" was to effectively steal money from Borrego Health.

408.   In the manned detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein, and to use the interstate electronic transmission of documents for the purpose of executing, or attempting to execute, the Schemes.  The Schemes were used to steal funds from a federally funded and regulated FQHC, which in turn would result in the inflation of reimbursement rates the Federal Government would pay to the FQHC (Borrego Health) for thousands of patient encounters, as follows:

409.   Borrego Health is largely funded by state and federal health care dollars (primarily Medi-Cal), administered by and through the California Department of Healthcare Services.  Borrego Health must account for its lawful operating expenditures every year to the Center for Medicare and Medicaid Services (CMS), a federal agency within the United States department of Health and Human Services.

410.   The amount of funds stolen through the Schemes described herein are accounted for and included as facilities operating expenses reported to CMS.  These stolen funds would not be reported as individual line items on an annual CMD cost report.  Rather, the stolen funds would then be melded into and combined and aggregated with all other facilities operating costs of over 20 Southern California clinics operated by Borrego Health, and then reported as an unidentified part of Borrego Health's annual cost reports submitted to CMS.

411.   In turn, the United States uses Borrego Health's annual cost reports to CMS in calculating the proper level of federal health care funding (or "reimbursement rates") to direct to Borrego Health.  Thus, inflated CMS cost reports, unless detected, inevitably result in increases in federally funded reimbursement rates for a FQHC such as Borrego Health.  This has the effect of compounding the crime by causing to federal government to cover some or all of the cost of the crime by way of increased reimbursement rates paid Borrego Health based on inflated expenses incurred by Borrego Health as a result of the Schemes.

412.   In addition, false or fraudulent bills were submitted electronically to Medi-Cal (and Borrego Health) under the Fraudulent Dental Services Scheme.

413.   The unlawful Schemes described above, including the electronic communications described above, constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the Schemes that Borrego Health could not avoid.

414.   Racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 (engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses). In addition to Mail Fraud and Wire Fraud, the Schemes constitute a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").

415.   "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health care offense.'" 18 USC § 24 defines "Federal health care offense" as including "a violation of, or a criminal conspiracy to violate" any of the statutes set forth herein.

416.   18 USC § 669 (Theft or embezzlement in connection with health care): Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally

misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both.  "Health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.  The Schemes described herein are the means by which Defendants, and each of them, stole and converted to their own use public healthcare benefits paid Borrego Health by state and federal agencies at a time Borrego Health was the rightful owner of those funds.  In addition, in this particular statute, Borrego Health itself qualifies under the broad definition of "health care benefit program." Borrego Health is an "entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."  The theft and from Borrego Health exceeds $20,000,000.

417.   18 USC § 1347 (Health care fraud):  Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, in connection with the delivery of or payment for healthcare benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.  Here, by the Schemes described herein, Defendants, and each of them, defrauded Borrego Health and obtained money and/or property owned by and/or under the custody or control of Borrego Health.  These Schemes were substantial factor in and direct cause of the theft of funds under the custody and control of Borrego Health.  The Schemes were a substantial factor in and direct cause of the theft of more than $20,000,000 of funds under the custody and control of Borrego Health and Medi-Cal.

7234243.1

418.   18 USC § 1001 (False Statements or entries generally):  Section 1001 is violated if someone knowingly or willfully conceals or covers up by any trick, scheme or device a material fact, which act is within the jurisdiction of a department or agency of the United States.  Here, Defendants were involved in the Schemes that, as described herein, meet the elements of section 1001, in that the Defendants "knowingly or willfully conceal or cover up by any trick, scheme or device a material fact."  The Schemes were used, in part, to steal funds from a federally funded and regulated FQHC.

419.   Other federal healthcare offenses:  In addition, the facts alleged herein also amount to "federal healthcare offenses" under the following statutes: 18 USC § 371 ("Conspiracy to commit offense or to defraud United States"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC §1035 ("False statements relating to health care matters"); 18 USC § 287 ("False, fictitious or fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

420.   The specific contracts entered into in furtherance of the scheme to steal money from Borrego Health are the: Borrego MSO, Borrego IPA, Dental MSA, Medical MSA, Aldairi Agreements, Hawatmeh Agreement, Mehdizadeh Agreements, Velasquez Agreement, Arakelyan Agreements, Hoang Agreement, Stephan Agreement, Rojo Agreement, Toledo Agreement, Thompson Agreement, Ness Agreement, Jared Agreement, Nourse Parsel Lease, CRI Contract, Julian Barn Lease, transition agreement, and Priest Leases.

421.   The Schemes were concealed by Defendants and most did not come to light until, at the earliest, October 2020 during a government investigation.  But for that unrelated investigation, the Schemes may have remain undiscovered.

422.   Because Borrego Health plaintiff had no constructive or inquiry notice of the fact of injury throughout the life of the Schemes, its right to recover money stolen by Defendants extends back to the commencement of each of the Schemes.

423.  **Four Year RICO "Reach Back:"**  Even if the Schemes were somehow communicated to persons who would ordinarily provide that information to the Borrego Health Board, it is still entitled to recover funds stolen under the Schemes going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

424.  Borrego Health, the United States, and the State of California are victims of the Schemes here.  Borrego Health was victimized by the amount of money stolen.  The Federal Government is a victim to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore additional federal funds being improperly paid Borrego Health.  The Federal Government may have also been harmed if it provided federal matching dollars for any duplicative, unnecessary and unsupported dental services paid by Medi-Cal.

425.  The State of California is a victim to the extent to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore causing additional state Medicaid funds being improperly paid Borrego Health.  The State of California may have also been harmed if it paid Borrego Health for any duplicative, unnecessary and unsupported dental services.

426.  The predicate acts described above relate to each other as part of a common plan.  The predicate acts are a part of a common plan to steal money from Borrego Health.  Each act is related as to its purpose, results, participants, victims and method of commission.  The predicates form a closed-end series of related predicates extending over a substantial period.

427.  The facts described herein also demonstrate the existence of a conspiracy between Defendants.  **(18 USC § 1962(d).)**

7234243.1

428.   By way of their knowing participation in the scheme, each of the Defendants is a culpable person for purposes of **18 U.S.C. § 1964.**

429.   But for the Schemes detailed above, Borrego Health would not have entered into improper and above-market leases and other transactions, would have had a compliant and properly billed contract dental program, would not have attempted to buy a country club, etc.  Accordingly, Borrego Health has been damaged by the Schemes in an amount to be proven at trial.

430.   Accordingly, Borrego Health is entitled to damages in an amount to be proven at trial, trebled pursuant to statute, together with reasonable attorneys' fees and costs, and interest.

**D.     Issuance of Constructive Trusts**

431.   As outlined in detail herein, Borrego Health provided payment to various Defendants.  Those Defendants committed wrongful acts to receive money that they were not entitled to.

432.   Borrego Health has a right to the money wrongfully taken by Defendants.

433.   As such, Borrego Health seeks to have any and all funds wrongfully paid to Defendants placed in a constructive trust.


**<u>FIRST CAUSE OF ACTION</u>**

(Violations under the Racketeer Influenced and Corrupt

Organizations ("RICO") Act)

Against All Defendants

434.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

435.   As set forth herein, Defendants improperly engaged in a pattern of prohibited racketeering activity.

436.   As set forth herein, Defendants conduct gives rise to a cause of action for violation of RICO, and that unlawful conduct was the proximate cause of the Borrego Health's injury.

## SECOND CAUSE OF ACTION

(Breach of Contract)

Against Premier Defendants

437.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

438.   Borrego Health and Premier Defendants entered into the Dental MSA, including amendments thereto, and the Medical MSA.

439.   Borrego Health did all, or substantially all, of the significant things that the Dental MSA and Medical MSA required it to do, or was excused from doing so,

440.   As set forth herein, Premier Defendants breached the Dental MSA and Medical MSA.

441.   As a result of Premier Defendants' breaches of the MSAs, Borrego Health was damaged in an amount to be proven at trial.  Premier Defendants' failures to fulfill its obligations was a substantial factor in causing Borrego Health's harm.

## THIRD CAUSE OF ACTION

(Breach of Contract)

Against Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc.

442.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

443.   Borrego Health, Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc. entered into the Aldairi Agreements.

7234243.1

444.   Borrego Health did all, or substantially all, of the significant things that the Aldairi Agreements required or Borrego Health was excused from doing so.

445.   Aldairi violated the terms of the Aldairi Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth which the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

446.   As a result of Aldairi's conduct, Borrego Health was damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

(Breach of Contract)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

447.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

448.   Borrego Health, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C. entered into the Hawatmeh Agreements.

449.   Borrego Health did all, or substantially all, of the significant things that the Hawatmeh Agreements required or Borrego Health was excused from doing so.

450.   Hawatmeh violated the terms of the Hawatmeh Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services

7234243.1

1   not rendered, including billing for services performed on teeth which the patients no
2   longer had at the time of service, upcoding, and inappropriately splitting services.

3   451.   As a result of Hawatmeh's conduct, Borrego Health was damaged in an
4   amount to be proven at trial.

### FIFTH CAUSE OF ACTION

(Breach of Contract)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

452.   Borrego Health reincorporates each of the above paragraphs as though
fully set forth herein.

453.   Borrego Health, Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh,
Inc. entered into the Mehdizadeh Agreements.

454.   Borrego Health did all, or substantially all, of the significant things that
the Mehdizadeh Agreements required or Borrego Health was excused from doing
so.

455.   Mehdizadeh violated the terms of the Mehdizadeh Agreements through
their conduct, including but not limited to: (1) billing excessive patient visits; (2)
failing to maintain adequate documentation to support billing; (3) falsification of
medical records; (4) performing services that lacked medical necessity; (5)
providing services that fell below the standard of care; (6) providing excessive
services; and (7) generating inaccurate billing records, including billing for services
not rendered, including billing for services performed on teeth the patients no longer
had at the time of service, upcoding, and inappropriately splitting services.

456.   As a result of Mehdizadeh's conduct, Borrego Health was damaged in
an amount to be proven at trial.

/ / /
/ / /
/ / /

7234243.1

## SIXTH CAUSE OF ACTION

(Breach of Contract)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

457.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

458.   Borrego Health, Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp. entered into the Velasquez Agreement.

459.   Borrego Health did all, or substantially all, of the significant things that the Velasquez Agreement required or Borrego Health was excused from doing so.

460.   Velasquez violated the terms of the Velasquez Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

461.   As a result of Velasquez's conduct, Borrego Health was damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

(Breach of Contract)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

462.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

7234243.1

463.   Borrego Health, Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc. entered into the Arakelyan Agreements.

464.   Borrego Health did all, or substantially all, of the significant things that the Arakelyan Agreements required or Borrego Health was excused from doing so.

465.   Arakelyan violated the terms of the Arakelyan Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

466.   As a result of Arakelyan's conduct, Borrego Health was damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

(Breach of Contract)

Against Michael Hoang, D.M.D.

467.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

468.   Borrego Health and Michael Hoang, D.M.D. entered into the Hoang Agreement.

469.   Borrego Health did all, or substantially all, of the significant things that the Hoang Agreement required or Borrego Health was excused from doing so.

470.   Hoang violated the terms of the Hoang Agreement through his conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing

7234243.1

services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

471.   As a result of Hoang's conduct, Borrego Health was damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

(Breach of Contract)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

472.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

473.   Borrego Health, Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation entered into the Stephan Agreement.

474.   Borrego Health did all, or substantially all, of the significant things that the Stephan Agreement required or Borrego Health was excused from doing so.

475.   Stephan violated the terms of the Stephan Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

476.   As a result of Stephan's conduct, Borrego Health was damaged in an amount to be proven at trial.

7234243.1

## **TENTH CAUSE OF ACTION**

### (Breach of Contract)

Against Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc.

477.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

478.   Borrego Health, Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc. entered into the Rojo Agreement.

479.   Borrego Health did all, or substantially all, of the significant things that the Rojo Agreement required or Borrego Health was excused from doing so.

480.   Rojo violated the terms of the Rojo Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

481.   As a result of Rojo's conduct, Borrego Health was damaged in an amount to be proven at trial.

## **ELEVENTH CAUSE OF ACTION**

### (Breach of Contract)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

482.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

483.   Borrego Health, Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc. entered into the Toledo Agreement.

7234243.1

484.   Borrego Health did all, or substantially all, of the significant things that the Toledo Agreement required or Borrego Health was excused from doing so.

485.   Toledo violated the terms of the Toledo Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

486.   As a result of Toledo's conduct, Borrego Health was damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

(Breach of Contract)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

487.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

488.   Borrego Health, Marlene Thompson, D.D.S. and Marlene Thompson, D.D.S., Inc. entered into the Thompson Agreement.

489.   Borrego Health did all, or substantially all, of the significant things that the Thompson Agreement required or Borrego Health was excused from doing so.

490.   Thompson violated the terms of the Thompson Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

491.   As a result of Thompson's conduct, Borrego Health was damaged in an amount to be proven at trial.

7234243.1

**THIRTEENTH CAUSE OF ACTION**

(Breach of Contract)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

492.    Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

493.    Borrego Health, Douglas Ness, D.D.S. and Ness Dental Corporation entered into the Ness Agreement.

494.    Borrego Health did all, or substantially all, of the significant things that the Ness Agreement required or Borrego Health was excused from doing so.

495.    Ness violated the terms of the Ness Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services performed by unlicensed and suspected dental providers.

496.    As a result of Ness's conduct, Borrego Health was damaged in an amount to be proven at trial.

**FOURTEENTH CAUSE OF ACTION**

(Breach of Contract)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

497.    Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

498.    Borrego Health, George Jared, D.D.S. and George Jared, D.D.S., Inc. entered into the Jared Agreement.

499.    Borrego Health did all, or substantially all, of the significant things that the Jared Agreement required or Borrego Health was excused from doing so.

500.    Jared violated the terms of the Jared Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

7234243.1

501.   As a result of Jared's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Premier Defendants

502.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

503.   The Premier Defendants represented to Borrego Health that they were qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf. Premier Defendants further represented they had qualified and experienced staff to develop their own quality management team to oversee Borrego Health's contract dental program.

504.   The Premier Defendants' representations were false at the time they were made. At the time Borrego Health entered into the Dental MSA with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system. Upon information and belief, Premier Defendants knew their representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

505.   Borrego Health reasonably relied on Premier Defendants' representations, believing it was capable of evaluating contract dental program claims for necessity and accuracy.

506.   As a result of relying on Premier Defendants' representations, Borrego Health submitted claims to Medi-Cal that were not supportable and to pay dentists and the billing company for services that should not have been paid. Borrego Health further suffered financial harm as a result of paying both Premier Defendants and the contract dentists for services not properly reimbursable.

7234243.1

507.   Borrego Health's reliance on Premier Defendants' representation regarding their qualifications and representations that they would properly review and process the claims was a substantial factor in causing Borrego Health's financial harm.

### SIXTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

508.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

509.   In part, Aldairi misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Aldairi also represented they would submit accurate claims information to Borrego Health for reimbursement.

510.   Aldairi's representations were false at the time they were made.  Upon information and belief, Aldairi knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

511.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi Agreements and the false and fraudulent bills submitted by Aldairi (and any related communication) to Borrego Health.

512.   Borrego Health reasonably relied on Aldairi's representations.

7234243.1

513.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

514.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

515.   In part, Hawatmeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hawatmeh also represented they would submit accurate claims information to Borrego Health for reimbursement.

516.   Hawatmeh's representations were false at the time they were made. Upon information and belief, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

517.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

518.   Borrego Health reasonably relied on Hawatmeh's representations.

519.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

7234243.1

## EIGHTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

520.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

521.   In part, Alborz Mehdizadeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Mehdizadeh also represented they would submit accurate claims information to Borrego Health for reimbursement.

522.   Mehdizadeh's representations were false at the time they were made. Upon information and belief, Mehdizadeh knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

523.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

524.   Borrego Health reasonably relied on Mehdizadeh'S representations.

525.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

7234243.1

## NINETEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Magaly Velasquez D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

526.    Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

527.    In part, Velasquez misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.  Velasquez also represented they would submit accurate claims information to Borrego Health for reimbursement.

528.    Velasquez's representations were false at the time they were made. Upon information and belief, Velasquez knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

529.    As set forth herein, Velasquez made various misrepresentations, including without limitation the misrepresentations made in connection with the Velasquez Agreement and the false and fraudulent bills submitted by Velasquez (and any related communication) to Borrego Health.

530.    Borrego Health reasonably relied on Velasquez's representations.

531.    As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

7234243.1

## TWENTIETH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram Arakelyan, Inc.

532.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

533.   In part, Arakelyan misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Arakelyan also represented they would submit accurate claims information to Borrego Health for reimbursement.

534.   Arakelyan representations were false at the time they were made. Upon information and belief, Arakelyan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

535.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

536.   Borrego Health reasonably relied on Arakelyan's representations.

537.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

7234243.1

## **TWENTY-FIRST CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Michael Hoang, D.M.D.

538.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

539.   In part, Michael Hoang, D.M.D. misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health  patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hoang also represented they would submit accurate claims information to Borrego Health for reimbursement.

540.   Michael Hoang, D.M.D.'s representations were false at the time they were made. Upon information and belief, Michael Hoang, D.M.D. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

541.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

542.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

543.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

7234243.1

## **TWENTY-SECOND CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

544.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

545.   In part, Stephan misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Stephan also represented they would submit accurate claims information to Borrego Health for reimbursement.

546.   Stephan's representations were false at the time they were made. Upon information and belief, Stephan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

547.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

548.   Borrego Health reasonably relied on Stephan's representations.

549.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

7234243.1

## TWENTY-THIRD CAUSE OF ACTION

(Intentional Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

550.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

551.   In part, Rojo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Rojo also represented they would submit accurate claims information to Borrego Health for reimbursement.

552.   Rojo's representations were false at the time they were made. Upon information and belief, Rojo knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

553.   As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

554.   Borrego Health reasonably relied on Rojo's representations.

555.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

COMPLAINT

7234243.1

## TWENTY-FOURTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

556.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

557.   In part, Toledo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Toledo also represented they would submit accurate claims information to Borrego Health for reimbursement.

558.   Toledo's representations were false at the time they were made. Upon information and belief, Toledo knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

559.   As set forth herein, Toledo made various misrepresentations, including without limitation the misrepresentations made in connection with the Toledo Agreement and the false and fraudulent bills submitted by Toledo (and any related communication) to Borrego Health.

560.   Borrego Health reasonably relied on Toledo's representations.

561.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

7234243.1

**TWENTY-FIFTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

562.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

563.   In part, Thompson misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Thompson also represented they would submit accurate claims information to Borrego Health for reimbursement.

564.   Thompson's representations were false at the time they were made. Upon information and belief, Thompson knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

565.   Borrego Health reasonably relied on Thompson's representations.

566.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-SIXTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

567.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

568.   In part, Ness misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and

7234243.1

generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Ness also represented they would submit accurate claims information to Borrego Health for reimbursement.

569.   Ness' representations were false at the time they were made. Upon information and belief, Ness knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

570.   Borrego Health reasonably relied on Ness' representations.

571.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-SEVENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

572.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

573.   In part, Jared misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Jared also represented they would submit accurate claims information to Borrego Health for reimbursement.

7234243.1

574.   Jared's representations were false at the time they were made.  Upon information and belief, Jared knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

575.   Borrego Health reasonably relied on Jared's representations.

576.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Premier Defendants

577.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

578.   Premier Defendants represented to Borrego Health that it was qualified and capable of reviewing, "scrubbing," and processing contract dental claims on Borrego Health's behalf. Premier Defendants further represented it had qualified and experienced staff to develop its own quality management team to oversee Borrego Health's contract dental program.

579.   Premier Defendants had no reasonable grounds for believing their representations were true at the time they were made. At the time Borrego Health entered into the MSA with Premier, Premier lacked any clinical staff to properly review claims and develop a quality management system.

580.   Premier Defendants intended for Borrego Health to rely on its representations to persuade Borrego Health to retain Premier's services.

581.   Borrego Health reasonably relied on Premier's representations, believing it was capable of evaluating contract dental program claims for necessity and accuracy.

7234243.1

582.   As a result of relying on Premier Defendant's representations, Borrego Health  submitted claims to Medi-Cal that were not supportable and to pay dentists and the billing company for services that should not have been paid. Borrego further suffered financial harm as a result of paying both Premier Defendants and the contract dentists for services not properly reimbursable.

583.   Borrego Health's reliance on Premier Defendants' representation regarding their qualifications and representations that they would properly review and process the claims was a substantial factor in causing Borrego Health harm.

## TWENTY-NINTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

584.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

585.   As outlined above, Aldairi made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Aldairi also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

586.   As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi Agreements and the false and fraudulent bills submitted by Aldairi (and any related communication) to Borrego Health.

587.   Aldairi had no reasonable grounds for believing their representations were true at the time they were made.

588.   Aldairi intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

589.   Borrego Health reasonably relied on Aldairi's representations.

590.   As a result of relying on Aldairi's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Aldairi for services that should not have been paid.

591.   Borrego Health's reliance on Aldairi's representations was a substantial factor in causing Borrego Health harm.

## THIRTIETH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

592.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

593.   As outlined above, Hawatmeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Hawatmeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

594.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

595.   Hawatmeh had no reasonable grounds for believing their representations were true at the time they were made.

596.   Hawatmeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Hawatmeh.

597.   Borrego Health reasonably relied on Hawatmeh's representations.

598.   As a result of relying on Hawatmeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Hawatmeh for services that should not have been paid.

7234243.1

599. Borrego Health's reliance on Hawatmeh's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-FIRST CAUSE OF ACTION

(Negligent Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

600. Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

601. As outlined above, Mehdizadeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Mehdizadeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

602. As set forth herein, Mehdizadeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

603. Mehdizadeh had no reasonable grounds for believing their representations were true at the time they were made.

604. Mehdizadeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Mehdizadeh.

605. Borrego Health reasonably relied on Mehdizadeh's representations.

606. As a result of relying on Mehdizadeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid MehdizadeH for services that should not have been paid.

607. Borrego Health's reliance on Mehdizadeh's representations was a substantial factor in causing Borrego Health harm.

7234243.1

1

## THIRTY-SECOND CAUSE OF ACTION

2

(Negligent Misrepresentation)

3

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional

4

Dental Corp.

5       608.   Borrego Health reincorporates each of the above paragraphs as though

6   fully set forth herein.

7       609.   As outlined above, Velasquez made several representations to Borrego

8   Health regarding the scope and nature of the services they would provide to Borrego

9   Health patients.  Velasquez also represented to Borrego Health that the claims

10   submitted for reimbursement would be accurate.

11       610.   As set forth herein, Velasquez made various misrepresentations,

12   including without limitation the misrepresentations made in connection with the

13   Velasquez Agreement and the false and fraudulent bills submitted by Velasquez

14   (and any related communication) to Borrego Health.

15       611.   Velasquez had no reasonable grounds for believing their

16   representations were true at the time they were made.

17       612.   Velasquez intended for Borrego Health to rely on their representations

18   to persuade Borrego Health to continue to contract with Velasquez.

19       613.   Borrego Health reasonably relied on Velasquez's representations.

20       614.   As a result of relying on Velasquez's representations, Borrego Health

21   submitted claims to Medi-Cal that were not supportable and paid Velasquez for

22   services that should not have been paid.

23       615.   Borrego Health's reliance on Velasquez's representations was a

24   substantial factor in causing Borrego Health harm.

25   / / /

26   / / /

27   / / /

28   / / /

7234243.1

**THIRTY-THIRD CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Aram Arakelyan, D.D.S. and New millennium Dental Group of Aram Arakelyan, Inc.

616.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

617.   As outlined above, Arakelyan made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Arakelyan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

618.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

619.   Arakelyan had no reasonable grounds for believing his representations were true at the time they were made.

620.   Arakelyan intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Arakelyan.

621.   Borrego Health reasonably relied on Arakelyan's representations.

622.   As a result of relying on Arakelyan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Arakelyan for services that should not have been paid.

623.   Borrego Health's reliance on Arakelyan's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

7234243.1

## THIRTY-FOURTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Michael Hoang, D.M.D.

624.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

625.   As outlined above, Michael Hoang, D.M.D. made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Hoang also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

626.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

627.   Michael Hoang, D.M.D. had no reasonable grounds for believing their representations were true at the time they were made.

628.   Michael Hoang, D.M.D. intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Michael Hoang, D.M.D.

629.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

630.   As a result of relying on Michael Hoang, D.M.D.'s representations, Borrego Health  submitted claims to Medi-Cal that were not supportable and paid Michael Hoang, D.M.D. for services that should not have been paid.

631.   Borrego Health's reliance on Michael Hoang, D.M.D.'s representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

## THIRTY-FIFTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

632.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

633.   As outlined above, Stephan made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Stephan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

634.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

635.   Stephan had no reasonable grounds for believing their representations were true at the time they were made.

636.   Stephan intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Stephan.

637.   Borrego Health reasonably relied on Stephan's representations.

638.   As a result of relying on Stephan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Stephan for services that should not have been paid.

639.   Borrego Health's reliance on Stephan's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

/ / /

7234243.1

## THIRTY-SIXTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

640.    Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

641.    As outlined above, Rojo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Rojo also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

642.    As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

643.    Rojo had no reasonable grounds for believing their representations were true at the time they were made.

644.    Rojo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Rojo.

645.    Borrego Health reasonably relied on Rojo's representations.

646.    As a result of relying on Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.'s representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Rojo for services that should not have been paid.

647.    Borrego Health's reliance on Rojo's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

7234243.1

## THIRTY-SEVENTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

648.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

649.   As outlined above, Toledo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Toledo also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

650.   As set forth herein, Toledo made various misrepresentations, including without limitation the misrepresentations made in connection with the Toledo Agreement and the false and fraudulent bills submitted by Toledo (and any related communication) to Borrego Health.

651.   Toledo had no reasonable grounds for believing their representations were true at the time they were made.

652.   Toledo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Toledo.

653.   Borrego Health reasonably relied on Toledo's representations.

654.   As a result of relying on Toledo's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Toledo for services that should not have been paid.

655.   Borrego Health's reliance on Toledo's representations was a substantial factor in causing Borrego Health harm.

/ / /

/ / /

/ / /

/ / /

/ / /

7234243.1

## THIRTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

656.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

657.   As outlined above, Thompson made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Thompson also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

658.   Thompson had no reasonable grounds for believing their representations were true at the time they were made.

659.   Thompson. intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Thompson.

660.   Borrego Health reasonably relied on Thompson's representations.

661.   As a result of relying on Thompson's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Thompson for services that should not have been paid.

662.   Borrego Health's reliance on Thompson's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-NINTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

663.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

664.   As outlined above, Ness made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego

7234243.1

Health patients. Ness also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

665.   Ness had no reasonable grounds for believing their representations were true at the time they were made.

666.   Ness intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Ness.

667.   Borrego Health reasonably relied on Ness' representations.

668.   As a result of relying on Ness' representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Ness for services that should not have been paid.

669.   Borrego Health's reliance on Ness' representations was a substantial factor in causing Borrego Health harm.

## FORTIETH CAUSE OF ACTION

(Negligent Misrepresentation)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

670.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

671.   As outlined above, Jared made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Jared also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

672.   Jared had no reasonable grounds for believing their representations were true at the time they were made.

673.   Jared intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jared.

7234243.1

674.   Borrego Health reasonably relied on Jared's representations.

675.   As a result of relying on Jared's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Jared for services that should not have been paid.

676.   Borrego Health's reliance on Jared's representations was a substantial factor in causing Borrego Health harm.

### FORTY-FIRST CAUSE OF ACTION

(Legal Malpractice)

Against Defendant Mikia Wallis

677.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

678.   Mikia Wallis was originally hired by Borrego Health to serve as its Chief Legal Officer.  Mikia Wallis later served in a dual capacity as the President and interim CEO of Borrego Health.  As Borrego Health's attorney, agent and fiduciary, Mikia Wallis has a duty to act with reasonable care and to act for the benefit of Borrego Health.

679.   As outlined herein, Mikia Wallis breached her legal duties to Borrego Health.

680.   As a direct and proximate result of Mikia Wallis' breaches, Borrego Health was damaged in an amount to be proven at trial.

### FORTY-SECOND CAUSE OF ACTION

(Fraudulent Concealment)

Against Borrego Insiders and Premier Defendants

681.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

7234243.1

682.   The Borrego Insiders and Premier Defendants owed duties to Borrego Health.

683.   As outlined herein, the Borrego Insiders and Premier Defendants intentionally failed to disclose pertinent facts to Borrego Health regarding Borrego Health's business operations and took actions to conceal such facts from Borrego Health.

684.   Borrego Health was not aware of the facts Borrego Insiders and Premier Defendants concealed from Borrego Health.

685.   The Borrego Insiders and Premier Defendants  intended to deceive Borrego Health by failing to disclose/concealing such facts.

686.   Had the Borrego Insiders and Premier Defendants disclosed the withheld and concealed information, Borrego Health would have taken different actions then it did.

687.   Borrego Health was harmed as a result of the Borrego Insiders and Premier Defendants' conduct.

688.   The Borrego Insiders and Premier Defendants' concealment was a substantial factor in causing Borrego Health's harm.

## FORTY-THIRD CAUSE OF ACTION

(False Promise)

Against All Defendants

689.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

690.   As outlined herein, each and every Defendant made promises to Borrego Health.

691.   Defendants did not intend to perform on the promises made at the time they made those promises to Borrego Health.

692.   Defendants intended for Borrego Health to rely on those promises.

7234243.1

693.   Borrego Health reasonably relied on Defendants' promises.

694.   Defendants did not perform the actions they promised to perform.

695.   Borrego Health was harmed as a result of Defendants' failures to perform the actions promised.

696.   Borrego Health's reliance on Defendants' promises was a substantial factor in causing Borrego Health harm.

### FORTY-FOURTH CAUSE OF ACTION

(Conversion)

Against All Defendants

697.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

698.   As set forth herein, Defendants substantially interfered with Borrego Health's personal property by knowingly taking money from Borrego Health for which Defendants were not entitled to, or at least prevented Borrego Health from receiving the full funds to which it was entitled.

699.    As set forth herein, Borrego Health did not consent to Defendants improper withholding of funds that were rightfully owned by Borrego Health.

700.   As set forth herein, Borrego Health was harmed.

701.   As set forth herein, Defendants' conduct was a substantial factor in causing plaintiff's harm.

### FORTY-FIFTH CAUSE OF ACTION

(Inducing Breach of Contract)

Against All Defendants

702.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

703.   Borrego Health had a contract with Medi-Cal.

7234243.1

704.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

705.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

706.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health.

707.   Defendants' conduct did cause the contracted dental providers to breach their contracts with Borrego Health.

708.   As a result of Defendants' conduct, Borrego Health was harmed.

709.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-SIXTH CAUSE OF ACTION

(Intentional Interference with Contractual Relations)

Against All Defendants

710.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

711.   Borrego Health had a contract with Medi-Cal.

712.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

713.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

714.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health, which thereby impacted Borrego Health's contract with Medi-Cal.

715.   Defendants' conduct made Borrego Health's performance under their contracts expensive and difficult.

7234243.1

716.   Defendants intended to disrupt performance of the contracts or at least knew that disruption of performance was substantially certain to occur by their conduct.

717.   As a result of Defendants' conduct, Borrego Health was harmed.

718.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

**FORTY-SEVENTH CAUSE OF ACTION**

(Intentional Interference with Prospective Economic Relations)

Against All Defendants

719.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

720.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

721.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

722.   Defendants knew of  Borrego Health's economic relationship with Medi-Cal.

723.   Defendants knew of Borrego Health's economic relationships with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

724.   As outlined herein, Defendants engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

725.    Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

726.   As a result of Defendants' conduct, Borrego Health was harmed.

727.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## **FORTY-EIGHTH CAUSE OF ACTION**

(Negligent Interference with Prospective Economic Relations)

Against All Defendants

728.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

729.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

730.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

731.   Defendants knew or should have known of  Borrego Health's contract with Medi-Cal.

732.   Defendants knew or should have known of Borrego Health's contracts with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

733.   As outlined herein, Defendants knew or should have known Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers would be disrupted if they failed to act with reasonable care.

734.   As outlined herein, Defendants failed to act with reasonable care when they engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

735.    Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

7234243.1

736.   As a result of Defendants' conduct, Borrego Health was harmed.

737.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-NINTH CAUSE OF ACTION

(Violations of Business & Professions Code § 17200, *et seq.*)

Against All Defendants

738.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

739.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

740.   The UCL imposes strict liability. Borrego Health need not prove that defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

741.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

742.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

743.   As outlined herein, Defendants' actions were unfair.

744.   As outlined herein, Defendants' acts and practices constitute fraudulent business acts or practices as they have deceived Borrego Health and are highly likely to deceive members of the consuming public, including members of the contract dental program and/or members of the relevant state agencies.

7234243.1

**FIFTIETH CAUSE OF ACTION**

(Conspiracy)

Against All Defendants

745.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

746.   As set forth herein, the facts involving the multiple schemes demonstrate the existence of a conspiracy between and among the Defendants, all of whom acted as co-conspirators of another.

747.   Borrego Health was harmed by Defendants' actions.

748.   Defendants were responsible for Borrego Health's harm.

749.   Defendants were aware of each other's plans and agreed/intended such wrongful acts to be committed.

**FIFTY-FIRST CAUSE OF ACTION**

(Breach of Fiduciary Duty)

Against Borrego Insiders

750.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

751.   The Borrego Insiders owed fiduciary duties to Borrego Health.

752.   As outlined herein, the Borrego Insiders breached their duties to Borrego Health.

753.   Borrego Health was damaged by Borrego Insiders' breaches.

**FIFTY-SECOND CAUSE OF ACTION**

(Constructive Fraud)

Against Borrego Insiders and Premier Defendants

754.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

7234243.1

755.   Borrego Insiders and Premier Defendants acted as Borrego Health's agents, corporate officers and/or fiduciaries.

756.   Borrego Insiders and Premier Defendants acted on Borrego Health's behalf in several transactions as outlined above.

757.   As outlined above, Borrego Insiders and Premier Defendants knew, or should have known, pertinent information to the transactions.

758.   Borrego Insiders and Premier Defendants misled Borrego Health by failing to disclose such pertinent information and/or omitting such pertinent information from Borrego Health.

759.   As a result of Borrego Insiders and Premier Defendants' failure to disclose such information, Borrego Health was harmed.

760.   Borrego Insiders and Premier Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FIFTY-THIRD CAUSE OF ACTION

(Unjust Enrichment/Restitution)

Against all Defendants

761.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.

762.   As outlined herein, Defendants unjustly received a benefit at the expense of Borrego Health.

## PRAYER

With respect to the First Cause of Action—RICO (As to All Defendants)

a.   For damages in an amount to be proven at trial, trebled pursuant to statute;

b.   Pre-judgment and post-judgment interest; and

c.   Reasonable attorney's fees and costs.

7234243.1

With respect to the RICO, Intentional Misrepresentation, Negligent Misrepresentation, False Promise, Fraudulent Concealment, Constructive Fraud, Conspiracy, and Violations of the UCL Causes of Action (As to All Defendants):

    a.    For imposition of a constructive trust in an amount subject to be proven at trial and on any real or personal property purchased with a portion of that amount;

    b.    For punitive damages where allowed by law; and

    c.    Pre-judgment and post-judgment interest.

With respect to all other causes of action:

    a.    For damages in an amount to be proven at trial;

    b.    Reasonable attorney's fees and costs as allowed by law;

    c.    For punitive damages where allowed by law; and

    d.    Such other and further relief the Court deems just and proper.

DATED:  July 19, 2022              HOOPER, LUNDY & BOOKMAN, P.C.

By: _____

                          DEVIN M. SENELICK
Attorneys for Plaintiff Borrego Community Health Foundation

7234243.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTENTIONALLY

# OMITTED

7234243.1