

**DHCS**

MICHELLE BAASS
*DIRECTOR*

State of California—Health and Human Services Agency
# Department of Health Care Services



GAVIN NEWSOM
*GOVERNOR*

December 29, 2021

Board of Trustees
c/o Dr. Edgar Bulloch, Chief Executive Officer
Borrego Community Health Foundation
P.O. Box 2369
Borrego Springs, CA 92004-2369

**RE: Notice of Corrective Action Plan**

Dear Trustees:

As you are aware, the Department of Health Care Services (DHCS) implemented a payment suspension on Borrego Community Health Foundation (Borrego) on November 18, 2020, as a result of an investigation for fraud against the Medi-Cal program. The payment suspension prohibited Borrego from directly or indirectly receiving any reimbursement for the provision of health care service to Medi-Cal members, including payments made by DHCS and any Medi-Cal managed care plans that contract with Borrego. The payment suspension was imposed in accordance with Welfare and Institutions Code, section 14107.11, and the Code of Federal Regulations, Title 42, section 455.23.

On January 27, 2021, and February 26, 2021, DHCS and Borrego entered into a Term Sheet and a Stipulated Agreement (The Agreements), respectively, which provided that DHCS would partially lift Borrego's Medi-Cal payment suspension relating to medical services provided to Medi-Cal members. The payment suspension and Medi-Cal reimbursement prohibition imposed on Borrego continues in full force and effect as it relates to the provision of Medi-Cal dental services. We have attached the Agreements to this correspondence for your convenience.

Pursuant to the terms of the Agreements, Borrego agreed to certain actions such as compliance with all federal and state Medi-Cal laws and the retention and payment of an independent monitor selected solely by DHCS to observe and analyze Borrego's overall operations and make recommendations for improvement.

Dr. Edgar Bulloch
December 29, 2021
Page 2

The Stipulated Agreement dated February 26, 2021, states the following in
Paragraph 9(b)(ix):

> Borrego shall promptly and fully implement all corrective action identified
> by the independent monitor or DHCS upon notice from DHCS.
> Corrective action could include, but is not limited to, the removal of paid
> and non-paid personnel implicated in misconduct related to Medi-Cal
> billing and the return of any overbilling amounts. A failure by Borrego to
> promptly and fully implement the corrective action may, at DHCS' discretion,
> subject Borrego to immediate reinstatement of the November 18, 2020,
> Medi- Cal payment suspension.

Pursuant to the Agreements, the Berkeley Research Group (BRG) was retained by
Borrego on February 9, 2021, as the Independent Compliance Monitor (ICM), and
immediately began their assessment of Borrego's overall operations. As stated
previously, BRG has completed a preliminary assessment of Borrego's operations
and has identified deficiencies that will be addressed in a multi-phase Corrective
Action Plan (CAP).

This letter serves as formal notice that DHCS is issuing a second CAP to Borrego.
DHCS requires that Borrego, its Board of Trustees, and its Executive Management
Team review the attached CAP and take the actions required within the specified
timeframes. Please note that CAP Action Items that pertain to the initial CAP issued
August 3, 2021, that have not been completed are being addressed in a
supplemental letter to that CAP. It is imperative that those Action Items as well as
the Action Items contained in this CAP be completed in a timely manner. As stated in
the letter dated August 3, 2021, DHCS is requiring that Borrego's Chief Executive
Officer report the status of CAP actions to BRG on a weekly basis and Borrego
formally acknowledge  the receipt of this correspondence, and the second CAP within
10 days from its receipt.

Failure to act on the required actions within the requested timeframes may result in a
partial payment suspension, or full reinstatement of the 100% payment suspension that
was initially imposed in accordance with Welfare and Institutions Code, section
14107.11, and the Code of Federal Regulations (CFR), Title 42, section 455.23.

Should you have any questions concerning the CAP, please feel free to contact
Stuart Busby, Senior Advisor at stuart.busby@dhcs.ca.gov or (916) 247-5801.

Sincerely,

Bruce Lim, CPA
Deputy Director

# Table of Contents

**CORRECTIVE ACTION PLAN NUMBER  2 – FINDINGS AND REQUIRED ACTIONS**...........4

**OUTSOURCING OF BILLING**...................................................................................4

**VACANCIES**........................................................................................................4

**COMPLIANCE PROGRAM**......................................................................................4

**QUALITY ASSURANCE**.........................................................................................5

    Grievance Process and Compliance Hotline.................................................5

**OPERATIONAL METRICS**.......................................................................................6

**INTERNAL CONTROLS**..........................................................................................6

**FINANCIAL PERFORMANCE**..................................................................................7

**INDEPENDENT AUDITOR FINDINGS** .....................................................................7

    Internal Control Weaknesses .......................................................................7

    Contingent Liabilities....................................................................................8

**LEASE AGREEMENTS**...........................................................................................8

**POLICIES AND PROCEDURES** ..............................................................................9

    Additional Internal Control Weaknesses......................................................9

**BOARD OF TRUSTEES ENGAGEMENT** ...............................................................10

    Compliance, Human Resources and Operations........................................10

**INFORMATION TECHNOLOGY**.............................................................................11

**REQUIRED REGULATORY FILINGS** ....................................................................12

    Federal Form 990 .......................................................................................12

**PRODUCTION OF BOARD MINUTES AND AUDIO TAPES / TRANSCRIPTS OF BOARD COMMITEE MEETINGS**......................................................................................12

## CORRECTIVE ACTION PLAN NUMBER  2 – FINDINGS AND REQUIRED ACTIONS

### OUTSOURCING OF BILLING
**Finding:**
In a letter dated January 5, 2021, to the DHCS Deputy Director of Audits and Investigations, Bruce Lim, Borrego committed to outsourcing its billing department to a third-party servicer.  Borrego executed an outsourcing agreement with Greenway Health in late September 2021 with a projected implementation date of February 1, 2022.

**Required Action**:
1. Borrego must implement the outsourcing of the billing department on February 1, 2022, pursuant to the agreement with Greenway Health.
2. Borrego, in conjunction with the outsourced billing agreement, must develop an implementation project plan with a timeline leading up to the "go-live" date of February 1, 2022. Borrego must provide this project plan to the ICM for review and approval prior to implementation.

**Timeframe:**
Borrego must complete required action 1 by February 1, 2022.  Borrego must complete required action 2 within 30 days of receipt of this CAP

### VACANCIES
**Finding:**
Borrego has an Interim Chief Information Officer, Interim Chief Compliance Officer, and an Interim Director of Human Resources.

**Required Action:**
Borrego must recruit and fill all the interim positions with a permanent employee.

**Timeframe:**
Borrego is in the process of recruiting permanent replacements for Interim positions.  All positions must be filled with permanent staff within 90 days of receipt of this CAP.

### COMPLIANCE PROGRAM
**Finding:**
The ICM has completed a review of the Borrego Compliance program and has discussed the program's current functionality with the current Interim Compliance Officer (ICO). Borrego has not implemented a robust compliance program as required by the Agreements and has not funded the hiring of compliance department staff.  The ICM's observations and requirements concerning the compliance program and its implementation are contained in Attachment A of this CAP.

**Required Action:**
Borrego's Compliance Program Description (CPD) must be revised to reflect all of the required components and activities specified in the HRSA Compliance Manual, as well as the compliance requirements for an organization participating in CMS funded programs including but not limited to Medicare and Medi-Cal.  In

addition to ensuring the CPD includes the recommendations in Attachment A, Borrego and its Board of Trustees must ensure the program is operational.

**Timeframe:**
1. Borrego's compliance department must provide written reports to the board of trustees and meet with the full board and compliance committee, in executive session, with 15 days of receipt of this CAP.
2. Borrego must implement testing of call claims submitted to payers and DHCS within 30 days of receipt of this CAP.
3. Borrego must revise its CPD within 60 days of receipt of this CAP to include all the information in Attachment A.
4. Borrego must recruit and hire a compliance department team within 90 days of receipt of this CAP.
5. Borrego must fully effectuate all aspects of the revised CPD within 120 days of receipt of this CAP.
6. Borrego must have the ICM's review and approval prior to implementation of these action items.

## QUALITY ASSURANCE
### Grievance Process and Compliance Hotline
The purpose of the formal grievance process is to document and track patient complaints from intake to resolution and to feed quality concerns to a Potential Quality Issue (PQI) process that enhances the overall healthcare delivery system. The ICM has completed a review of the Borrego's grievance process and has the following findings:

**Finding:**
Borrego's current grievance process is materially below industry standards and does not comply with California and CMS grievance process requirements in that:

1. Borrego employs no review tools;
2. Borrego does not document issues for follow-up, findings or determinations;
3. No trending of grievance statistics is performed; and
4. No evidence of a Medical Doctor (MD) review.

In addition, an examination of the phone volume of Borrego's alleged grievance calls by the ICM indicates that Borrego's Grievance Manager is not documenting every contact or call received by the grievance line. The ICM has discussed these findings with the ICO and IQD who agree with the ICM's assessment.

**Required Action:**
Borrego must implement a grievance process that is compliant with California and CMS requirements for accepting and investigating patient complaints as follows:
1. Develop and implement a policy for documenting all patient complaints.
2. Develop and implement grievance review tools including a scoring tool for grievances.
3. Define the process and responsibilities for documenting, and retaining patient complaints in detail, as well as the investigative findings.
4. Where a quality issue is identified, the grievance process must report the quality issue to the PQI committee who must act and document the action taken; and

5. Borrego must trend filed grievances to identify systemic issues and processes, and/or individual physician or treating provider issues.

**Timeframe:**
1. Borrego must complete required action numbers 1, 2, and 3, within 30 days of receipt of this CAP.
2. Borrego must complete actions 4 and 5 within 60 days of receipt of this CAP.
3. Borrego must submit to the ICM for review and approval, all action items prior to implementation.

## OPERATIONAL METRICS
**Finding:**
1. Borrego does not have standardized reports that provide monthly, quarterly, or annual reporting of key metrics or Key Performance Indicators (KPIs) for its clinical, financial, or administrative operations. The absence of these metrics or KPIs such as patient visits per doctor, number of referrals processed by employee, bills processed by employee, patient eligibility verified prior to visit, or the number of visits that are billable, leaves Borrego's clinic leadership and senior management without key information to understand the challenges or issues that are impacting clinic operations and profitability. Additionally, metrics or KPIs pertaining to the reporting of worker productivity is utilized by organizations to develop staffing patterns for departments and are useful as part of the employee performance evaluations.
2. Borrego also has not used historical metrics or KPIs to compare and contrast current performance to historical performance, which is necessary to provide clinic and senior management critical information to manage the organization effectively.

**Required Action:**
1. Borrego must create, implement, and distribute key metric and KPI reports to all management levels of the organization including clinic management.
2. Borrego must distribute key metrics and KPI reports monthly.
3. Borrego must create a process for reviewing metrics and KPIs that includes utilizing the information to make and implement decisions specific to the efficiency, and effectiveness of operations, as well as financial profitability.

**Timeframe:**
Borrego is required to implement action items 1, 2, and 3 within 60 days of receipt of this CAP.

## INTERNAL CONTROLS
**Finding:**
Borrego has not effectuated internal controls in the past 12 months to address internal control weaknesses including:
1. Entering into leases without termination clauses and including lease rates above FMV.
2. Management entering into contracts without board approval.
3. The failure to record financial liabilities on a timely basis.
4. Making payments outside of the Accounts Payable (AP) system; and
5. Nepotism in key financial positions.

To date, Borrego has not implemented the internal controls that are necessary to

ensure the integrity of the organization's overall operations which was called out by their external financial auditor's report.

**Required Action:**
1. Borrego must establish a policy that would require bidding or a request for proposal for all outside services or contracts over an established threshold amount.
2. Borrego must implement internal controls and segregate duties that prevents nepotism as well as minimize the exposure to collusion and internal fraud schemes that can be perpetrated as a result of nepotistic relationships, and the lack of internal controls.
3. Borrego must establish a process that is inclusive of operations, finance and legal for the oversight of lease negotiations. This process must include but not be limited to the review of leases, contracts, and substantial business ventures.

**Timeframe:**
Borrego must develop and implement internal controls as specified in these action items within 30 days of receipt of this CAP.


## FINANCIAL PERFORMANCE
**Finding:**
Borrego continues to experience operating losses at numerous clinics as well as a significant decline in cash balances from $42 million to less than $20 million from the period of February 1, 2021, to November 30, 2021. Borrego has taken no significant action to turnaround the organization's financial performance. Borrego's medical program has lost money for multiple years.

**Required Action:**
1. Borrego must produce a turnaround plan that addresses the overall profitability and sustainability of operations.
2. The turnaround plan must consider individual clinic performance and the reduction of corporate overhead.
3. The turnaround plan must also consider new clinics that are under construction and the production of a five-year forecast for those clinics. The five-year forecast must use realistic assumptions and indicate that the clinic is profitable within six months of commencing operations. If the forecast indicates that the clinic will lose money, then consideration must be given to the abandonment of the construction project and the costs related to such abandonment.

**Timeframe:**
Borrego must submit the aforementioned turnaround plan to the ICM within 30 days of receipt of this CAP.

## INDEPENDENT AUDITOR FINDINGS
### Internal Control Weaknesses
**Finding:**
In the June 30, 2021, Independent Audit of Borrego, the external auditors identified and reported material and other control weaknesses to the Board of Trustees as follows:

1. Missing approval of payroll time entries by supervisors. Nineteen out of the 38-time sheets reviewed had no documentation that the timesheet had been approved by supervisor.  One out of 20 had no documentation of the pay rate in the employee personnel file.
2. An inaccurate application of the sliding fees per the approved schedule.
3. A 100% error rate for 32 sampled journal entries (JEs). There was no evidence of review and approval of the JEs prior to posting to the GL and there were gaps in number sequencing of the JEs.
4. Patient Encounters - Patient information forms were not available and/or did not exist. This condition existed for 18 out of 30 dental patients sampled and 25 out of 30 non-dental patients sampled.

**Required Action:**
1. Borrego must implement an effective compliance testing program for the complete revenue cycle.
2. Borrego and its operational, and payroll departments must ensure all time sheets are approved by supervisors.  Borrego and its payroll department must ensure that all pay rate approvals are documented in the employee's personnel file.
3. Borrego must implement the proper approvals and controls for all JEs prior to posting to the GL.
4. Borrego must implement the proper approvals, disclosures, controls and testing around the sliding fee scale.

**Timeframe:**
Borrego is required to implement all action items within 30 days of receipt of this CAP.

## Contingent Liabilities
**Finding:**
Borrego's Interim CFO represented to the Independent Auditors that the contingent liability for the DHCS 340 (b) Pharmacy Audits was not quantifiable, when a range of $12 million to $15 million had been disclosed by Borrego and calculated by DHCS.  As a result, the liability was not recorded on the draft financial statements presented to the Board of Trustees as of June 30, 2021. The financial statements have since been restated by the Independent Auditors to reflect the liability.

**Required Action and Timeframe**
Borrego must ensure that all contingent liabilities are reviewed by the Board of Trustees and the Executive Management Team when making the required representations during the annual independent audit immediately

## LEASE AGREEMENTS
**Finding:**
The ICM has identified a lease with Tower Energy for the future Borrego medical clinic in Coachella, CA, as having no termination clause. Additionally, the lease may not be at FMV. The ICM's observations are as follows:

1. The lease requires Borrego to pay operating expenses including all tax liabilities. The combined payments of lease itself, operating expenses, and taxes by Borrego may result in a higher cost than FMV.
2. The lease has a 15-year duration and contains no termination clause for the tenant Borrego.
3. Borrego has not completed a FMV review to ensure lease rates meet FMV.

**Required Action:**
1. Borrego must complete a FMV analysis appraisal and provide the results to the Board of Trustees and the ICM.
2. Borrego must evaluate the legality of the leases and determine the legal options for restructuring the lease to FMV with a termination clause or outright termination.
3. If the appraisal determines that the lease value is above FMV, Borrego must attempt to renegotiate the lease terms to FMV. Additionally, Borrego must attempt to renegotiate the lease terms to include a termination clause with a reasonable notice period.
4. If Borrego is unable to renegotiate the lease terms, then Borrego must attempt to terminate the lease by mutual agreement of the parties or seek other legal remedies, as Borrego must not pay higher than FMV lease rates to any lessor.

**Timeframe:**
Borrego must complete the required actions within 90 days of receipt of this CAP.

**Finding:**
The ICM identified real property lease agreements between Borrego and Riverside Community Health Foundation (RCHF). The current CEO and President of RCHF was the Chairman of the Board of Borrego, and currently serves as a board member at Borrego. While the appropriate insider disclosures pertaining to the lease agreements have been made, it is not known if the premises leased by Borrego from RCHF are at FMV, as a FMV report was determined to not exist.

**Required Action:**
Borrego must complete a FMV analysis appraisal as to each property in the lease agreements and provide the results to the Board of Trustees and the ICM.

**Timeframe:**
Borrego must complete the required actions within 90 days of receipt of this CAP.

## POLICIES AND PROCEDURES
### Additional Internal Control Weaknesses
**Finding:**
The ICM has identified several "Policies and Procedures" that result in internal control weaknesses as follows:
1. When applying for grant funding, Borrego's grants and contracts department does not consult with the operational leadership of the individual clinics to determine if the clinics possess the ability to comply with the terms of the grant.
2. Borrego's payer contracting department has functioned independently of Operations, Finance, and Compliance Departments. The absence of a financial, operational, and compliance review of payer contracting is a

continuation of the historical "silo" approach at Borrego. This silo approach creates gaps in information for the operating team which could result in Borrego failing to meet contractual obligations.

3. Borrego does not have protocols or procedures to ensure that the staff, executive leadership team, and the Board of Trustees are trained and educated in the HRSA requirements for Federally Qualified Health Clinic (FQHC) operations. Further, Borrego does not provide training and education specific to state and federal laws concerning FQHC operations, the California State Plan as it pertains to FQHCs, governance, financial reporting, internal controls, and ethical conduct.

**Required Action:**

1. Borrego must establish policies and procedures that require the contract and grant department to consult with individual clinic grant recipients and assess the ability to comply with the terms, and requirements of the grant.
2. Borrego must create a standardized process for payer contracting that will include an annual, or other predetermined period, review of contract terms by all departments within the organization.
3. Borrego must establish a program that specifically addresses staff, executive management, and Board of Trustee education and training in the area of FQHC operations. Consideration must be given to but not limited to all state, federal laws, and local laws that pertain to an FHQC, The CA State Plan as it pertains to FQHCs, governance, financial reporting, internal controls, and ethical conduct.

**Timeframe:**
Borrego must complete the required action items within 90 days of receipt of this CAP.

**BOARD OF TRUSTEES ENGAGEMENT**
**Compliance, Human Resources and Operations**
**Finding:**

1. The Board of Trustees has not aggressively addressed the compliance testing program for the billing of payers.
2. The Board of Trustees has no effective reporting mechanism to determine if corporate and clinical operations are working effectively and efficiently, and if senior leadership is achieving its goals.
3. The Board has not established a formal reporting mechanism which would identify the most serious compliance, operational, and human resource issues, as well as the progress being made with the DHCS and ICM CAP, and other Audit and Information requests.
4. The Borrego executive team is currently a mix of interim and permanent employees. The executive team continues to operate within silos when managing and communicating within the organization.

**Required Action:**

1. The Board must establish a Compliance Committee that will meet monthly with Compliance Department staff. The purpose of the monthly meeting is to develop an understanding of compliance issues, discuss proposed solutions, and establish expectations for the timing of resolution of compliance program staffing, testing, and overall compliance issues.

2.  The Board of Trustees must ensure that the compliance department and overall program is adequately staffed, and funded.
3.  The Board of Trustees must establish a mechanism by which it is informed by management on a timely basis of human resource, compliance, finance, and operating issues.
4.  The Board of Trustees must ensure that the executive management team of Borrego implements compliance program testing for the billing of payers.
5.  Upon the employment and staffing of a permanent senior executive team, the Board must employ a management consulting firm to evaluate each individual's management style including decision making abilities. The management consultant will work with the executive team to improve communication and the success of decision making.

**Timeframe:**
1.  Action items 1,2, 3, and 4 must be completed within 30 days of receipt of this CAP.
2.  Action item 5 must be implemented within 60 days of hiring a complete permanent executive team.

## INFORMATION TECHNOLOGY
**Finding:**
1.  Borrego's Information Technology (IT) Department is understaffed. Additionally, it lacks individuals with specific knowledge and expertise of the IT process to increase the level of information reporting. As a result of these limitations, Borrego's data systems have minimal management reporting capabilities.
2.  Borrego does not have a consolidated process for configuring the Intergy system within its IT department. Different departments have owned the configuration of the system, creating both internal control and data validation process issues regarding system configuration, and accuracy.
3.  Borrego does not have processes in place for the maintenance of the Intergy System for the updating CPT Code files, fee schedules, and payer agreements. The responsibility for updating these key data sets has been assigned to the Finance Department when it must reside in the IT Department.
4.  Borrego has employed an Interim Chief IT Officer who has made significant progress in reorganizing the department but there is still significant work to be completed such as process standardization, system testing configuration, and system recovery processes.

**Required Action:**
1.  Borrego must complete the reorganization of the IT functions including the hiring of missing skill sets identified by the ICM.
2.  Borrego must assign to the IT Department the maintenance and configuration of all of the modules of the Intergy System and any other systems utilized by Borrego for patient care, in-house clinic, and contract medical provider billing.
3.  Borrego must establish a process and timeline for the updating of the CPT Codes, fee schedules and payer contracts by the IT department.

**Timeframe:**
Borrego is required to implement all action items within 60 days of receipt of this CAP.

## REQUIRED REGULATORY FILINGS
### Federal Form 990
**Finding:**

Borrego's Form 990, Federal Return of Organization Exempt from Income Tax (Form 990) for Tax Year 2019 was submitted to the Internal Revenue Service (IRS) on May 17, 2021, well after the due date of November 16, 2020, subjecting Borrego to penalties of up to $50,000 for the late filing of the information return. Additionally, it was determined by the ICM, the return was not reviewed by the Board of Trustees prior to submission, even though Borrego's Form 990 claimed that this review was performed in the Schedule O disclosures in the original return. It was determined by the ICM and the Board of Trustees subsequent to the filing of the original return, that inaccuracies existed in respect to the related party transactions and disclosures required. These inaccuracies resulted in Borrego requesting a Private Letter Ruling from the IRS, as well as Borrego amending the original return on September 16, 2021.

**Required Action:**

The Board of Trustees must establish written policies and procedures concerning the preparation, review, and submission of the Form 990. These policies, at a minimum must address the selection of a qualified preparer, the due date of the return, the sources of information used to prepare the return, procedures used to verify the accuracy of the return, and the review and approval by the Board of Trustees prior to the submission to the IRS, as well as the transmission of the return to the IRS, CA Franchise Tax Board, and CA Department of Justice.

**Timeframe:**

Borrego is required to implement required action items on any subsequent filings prior to transmitting the respective information returns to the aforementioned authorities.

## PRODUCTION OF BOARD MINUTES AND AUDIO TAPES / TRANSCRIPTS OF BOARD COMMITEE MEETINGS
**Finding:**

The ICM's review of Borrego's correspondence revealed that transcripts and audio tapes exist of board and board committee meetings. The ICM requested Borrego to provide access to all unredacted transcripts, audio tapes, and minutes of board and board committee meetings in writing on February 12 and March 8, 2021. The ICM subsequently followed up with Borrego management verbally throughout the normal course of the engagement, but have not received access to the materials requested pending Borrego's outside counsel's review of the documents.

As part of their engagement and scope of work, the ICM requires access to this information in order to continue the analysis of board and employee relationships, as well as to determine if all business transactions and potential conflicts of interest have been disclosed by Borrego. To date, Borrego has not provided the requested unredacted transcripts, audio tapes, and minutes of its board and board committee meetings.

**Required Action and Timeframe:**
Borrego must provide the ICM access to the aforementioned unredacted transcripts, audio tapes, and minutes of its board and board committee meetings through a secure protocol within 15 days of receipt of this CAP.

**ATTACHMENT A**
**ELEMENTS OF THE COMPLIANCE PROGRAM DESCRIPTION**

The Compliance Program Description (CPD) must reflect the required components and activities as defined by the HRSA Compliance Manual and not just reiterate the standards. Additionally, the CPD must describe how the standards and requirements will be effectuated. At a minimum, the following items should be addressed in the CPD:

1. Measure compliance with the following:
    a. Annual review of a needs assessment.
    b. Assessment of required health service needs.
    c. Effectiveness of clinical staffing.
    d. Review of accessibility.
    e. Assessment of medical emergencies.
    f. How continuity of care and hospital admissions will be assessed.
    g. Evaluation of the sliding fee program.
    h. How the Compliance Program and Quality Management Program will interface.
    i. Evaluation of key management staff positions.
    j. Review of contracts and procurement procedures.
    k. Annual evaluation of compliance of vendors.
    l. Assessment of the effectiveness of the Conflict-of-Interest process including all employees, officers, board members, and agents for the organization.
    m. Define how collaborative relationships will be monitored for effectiveness.
    n. Describe how the organization utilizes financial management and internal control systems that reflect Generally Accepted Accounting Principles (GAAP) or the Government Accounting Standards Board (GASB) Principles for financial management and accounting systems.
    o. Address billing and collections monitoring to include the education of members, assessment of member charges and the adherence to billing policies.
    p. Assess current budgeting processes and identify the portion of the budget supported by Federal award programs.
    q. Assess whether a program monitoring and data reporting system is in place that oversees the operations of Federal award-supported activities, and that applicable data and reporting is monitored, and completed as required.
    r. Assess annually the Board authority process including review of bylaws, adherence to meeting schedules, adherence to the defined roles and responsibilities, and the integrity of the Board minutes for content and completeness.
    s. Assess annually that the Board composition is comprised of at least 51 percent of individuals that utilize the clinics services on a regular basis and that the non-member representatives are selected for their expertise, and skills in related matters of the community.

1

**ATTACHMENT A**
**ELEMENTS OF THE COMPLIANCE PROGRAM DESCRIPTION**

    t.  Annually determine and document that of the non-member Board representatives, no more than one-half derive more than 10 percent of their annual income form the health care industry.

    u.  Annually determine and document that a Board member is not an employee of the center, a spouse, child, parent, brother or sister by blood or marriage of a center employee.

    v.  Define how compliance with the Federal Tort Claims Act will be accomplished.

2. The CPD must address the implementation of the required activities noted below and not just reiterate the regulations:

    a.  The implementation of compliance related policies, procedures, and a standard of conduct.

    b.  The designation a Compliance Officer and the role of the Compliance Committee.

    c.  How effective education and training of Trustees, employees, and members will be conducted.

    d.  The development and the effectuation of effective lines of communication within the organization.

    e.  How internal compliance monitoring and auditing will be completed, reported, and acted on.

    f.  How standards will be enforced through well-publicized disciplinary guidelines when non-compliance is identified.

    g.  How to respond promptly to identified offenses and deploy immediate and effective correction actions.

3. The CPD must address the implementation of specific testing program and processes for the internal billing of services, services provided by contract medical providers, as well as third party servicers. At a minimum it should include:

    a.  The data elements that will be tested.

    b.  The sampling techniques for selection of the data elements.

    c.  The testing procedures and units of measure.

    d.  The criteria, timing, reporting and distribution of the test results.

4. The CPD must address how non-compliance is monitored and formally reported to the executive management team and the Board of trustees.

5. The CPD must incorporate into the compliance program, compliance requirements for the Medi-Cal, Medicare, and Medicare Advantage programs.

6. The CPD must ensure that all inquiries and complaints received through the compliance hot-line and e-mail box are documented along with the resolution or outcome. Regular reports should be made by the Compliance Officer to Executive Management and the Board of Trustees concerning the volume and type of contact, as well as the resolution or outcome of the inquiry or complaint.

7. The CPD must implement a requirement that the Compliance Department reviews and approves all operational and financial contracts prior to implementation, to determine that they are at: arms-length, Fair Market Value

**ATTACHMENT A**
**ELEMENTS OF THE COMPLIANCE PROGRAM DESCRIPTION**

(FMV), compliant with all local, state, and federal laws, not nepotistic, and in conformity with policies and procedures. These contracts include but are not limited to leases, contract medical services, outside services and vendors, as well as construction contracts.

8. The CPD must establish and implement a staffing plan for the Compliance Department that gives consideration to the number of personnel years necessary to implement and conduct the overall compliance activities that are required.  The plan must consider a timeline for hiring qualified individuals to fill the required and necessary positions.

9. The CPD must contain a provision on the annual assessment of the by-laws of the organization, to determine if they are up to date and in compliance with all federal, state, and local laws.

10. The CPD must contain a provision that assesses whether the Board of Trustees is adhering to meeting schedules, minutes are accurate and complete, and if there are any conflicts of the defined duties and responsibilities of the Board of Trustees.

11. The CPD must define how compliance with the Federal Tort Claims Act will be accomplished

3

**DHCS AND BORREGO TERM SHEET**

This Term Sheet is intended to outline an agreement between the Department of Health Care Services (DHCS) and Borrego Community Health Foundation (Borrego) (the Parties) regarding a November 18, 2020 Medi-Cal[1] payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11. The payment suspension prohibits Borrego from directly or indirectly receiving any reimbursement for the provision of health care service to Medi-Cal members, including payments made by DHCS and any Medi-Cal managed care plans that contract with Borrego.

This Term Sheet is provisional and is executed in contemplation of a formal settlement agreement. If a formal settlement agreement is not fully executed within 30 calendar days of the full execution of this Term Sheet, all provisions of this Term Sheet are immediately null and void, and the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11 will be reinstated.

**Agreement Terms:**

1. Borrego agrees:

    A. To comply with all federal and state Medi-Cal law, including, but not limited to, proper billing for Medi-Cal services.

    B. To cooperate and comply with all DHCS audits and investigations activities as scheduled.

    C. To preserve all of its business, billing, and patient records until the conclusion of the Department of Justice's investigation and DHCS' payment suspension, as modified, is resolved; and further agrees to take all necessary steps to suspend all regularly scheduled document destruction activities.

    D. To retain and reimburse an independent monitor selected solely by DHCS who shall have complete and full access to all books and records in Borrego's possession, custody, or control; locations; employees; officers; and board members. The independent monitor shall be authorized to attend all Borrego operational meetings and participate in all Borrego activities, including open and closed board meetings, except Borrego may exclude attorney-client oral and written communications and the monitor may be excluded from Borrego meetings with their legal counsel regarding attorney-client privileged information. Borrego agrees to provide a privilege log to the monitor for all excluded oral and written communications and meetings. The independent monitor shall have unrestricted access to all electronic and paper records in Borrego's possession, custody, or control. The monitor shall report directly to DHCS.

    E. To finalize the retention of the independent monitor within 7 calendar days of DHCS identifying the independent monitor, subject to DHCS review and approval of the contract terms. DHCS will evalua█████████████████████ services

---

[1] For the purposes of this Term Sheet, all references to the term "Medi-Cal" shall mean Medi-Cal and Medicaid.

semiannually, and will discuss its determination with Borrego. The monitor shall remain in place until DHCS determines that the independent monitor is no longer necessary.

F. To be responsible for timely payment of all costs and fees associated with the independent monitor's services.

G. To institute a robust corporate integrity and compliance program to ensure compliance with all Medi-Cal law in accordance with the recommendations of the independent monitor.

H. That the independent monitor shall provide periodic reports to DHCS as requested. The reports shall be in a manner and format determined by DHCS. The independent monitor's reporting duties are solely to DHCS. DHCS is not obligated to share the independent monitor's reports with Borrego.

I. That the independent monitor shall schedule periodic meetings with Borrego and DHCS to discuss corporate integrity, corrective action, and compliance with federal and state Medi-Cal law.

J. To promptly implement all corrective action identified by the independent monitor or DHCS upon notice from DHCS.  Corrective action could include, but not be limited to, removal of paid and non-paid personnel implicated in misconduct related to Medi-Cal billing. A failure by Borrego to timely and properly implement the corrective action may, at DHCS' discretion, subject Borrego to immediate reinstatement of the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11.

K. To not receive reimbursement from DHCS, Medi-Cal managed care plans, or the Medi-Cal program for dental services provided to Medi-Cal members until DHCS either further modifies the payment suspension or lifts the payment suspension in its entirety.

L. To use Code 3 (dental services) when submitting dental claims to DHCS, the Medi-Cal managed care plans, and the Medi-Cal program. If Borrego receives reimbursement for any dental claims, it must return those payments to DHCS, the Medi-Cal managed care plan, or the Medi-Cal program within 30 calendar days. The failure to return dental claim reimbursement may, at DHCS' discretion, subject Borrego to the reinstatement of the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11.

M. To include the rendering provider's name and NPI on all claims submitted to DHCS and Medi-Cal managed care plans.

2. Payment Suspension                    ███████████████████

A. The November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11, which prohibited Borrego from directly or indirectly receiving any reimbursement for the provision of health care service to Medi-Cal members, including payments made by DHCS and any Medi-Cal managed care plans that contract with Borrego, is modified as follows.

   1) Within 10 calendar days of the full execution of this Term Sheet, DHCS will partially lift Borrego's Medi-Cal payment suspension relating to medical services provided to Medi-Cal members. Once the suspension is partially lifted, Medi-Cal managed care plans may resume reimbursing Borrego for the provision of medically necessary services provided to Medi-Cal members. Borrego may also begin submitting claims to DHCS for fee-for-service medical services and wrap payments.

   2) The payment suspension and Medi-Cal reimbursement prohibition imposed on Borrego will continue in full force and effect as it relates to the provision of Medi-Cal dental services, until DHCS further modifies the payment suspension. Reimbursement for Borrego's dental claims will be determined through the resolution of the payment suspension.

3. Waiver of Appeal Rights

A. Borrego is represented by legal counsel and is fully aware of its legal rights to contest the payment suspension, including (without limitation) the right to appeal the payment suspension pursuant to Welfare and Institutions Code, section 14043.65 and Code of Civil Procedure, section 1085.

B. Subject to Paragraph C, Borrego voluntarily, knowingly, and intelligently waives and give up its rights to challenge or to seek any further review of:

   1) The November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11;

   2) This Term Sheet; and

   3) The subsequent formal settlement agreement memorializing this Term Sheet.

C. In the event that DHCS determines that Borrego has failed to perform any of its obligations under this Term Sheet or under the subsequent formal settlement agreement and further modifies the payment suspension, Borrego shall be permitted to challenge DHCS' action pursuant to Welfare and Institutions Code, sections 14043.65 and 14123.05.

4. Scope of Term Sheet

A.  No provision in this Term Sheet is intended to limit or restrict the ongoing or new investigations of Borrego's Medi-Cal activities.

B.  No provision in this Term Sheet is intended to limit or restrict the filing of a criminal or civil action, or limit any claims that may be made in any such action, by any federal, state, or local prosecuting, administrative, or regulatory authorities.

C.  In the event that DHCS identifies new or different information demonstrating that Borrego is non-compliant with Medi-Cal laws or regulations, DHCS, at its discretion, may at any time:

   1)  impose a temporary suspension pursuant to Welfare and Institutions Code, section 14043.36 or

   2)  reinstate or modify the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11.

D.  No provision in this Term Sheet precludes DHCS from taking action to recover any overpayments Borrego may have received.

5.  Additional Provisions

A.  A violation of any provision of this Term Sheet or subsequent formal settlement agreement may subject Borrego, at DHCS' discretion, to an immediate reinstatement of the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11.

B.  This Term Sheet shall be effective on the date that all parties have signed the Term Sheet.

C.  This Term Sheet may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties further agreed that faxed, scanned, or electronically signed signature pages and multiple signature pages shall have the same force and effect as the originals.

D.  A fully executed formal settlement agreement between the Parties will supersede the provisions of this Term Sheet.

**APPROVED AND ACCEPTED:**

Dated: 1·27·2021

EDGAR BULLOCH, MD

Page 4 of 5

Interim Chief Executive Officer for
BORREGO COMMUNITY HEALTH FOUNDATION

Dated: _1/27/21_

█████████████████████████

DEPARTMENT OF HEALTH CARE SERVICES

██████████████████████

**APPROVED AS TO FORM:**

███████████████████████

Dated: _January 27, 2021_

JOSEPH R. LAMAGNA

Attorney for BORREGO COMMUNITY HEALTH
FOUNDATION

████████████████████

Dated: _1/27/21_

JOHN PUENTE

Chief Counsel for DEPARTMENT OF HEALTH CARE
SERVICES

Page 5 of 5

<u>AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE</u>
<u>SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION TO MODIFY</u>
<u>NOVEMBER 18, 2020 PAYMENT SUSPENSION PURSUANT TO WELFARE AND</u>
<u>INSTITUTIONS CODE, SECTION 14107.11</u>

1.      The California Department of Health Care Services ("DHCS" or "Department") and Borrego Community Health Foundation ("Borrego") (collectively, "the Parties") enter into the following stipulated agreement ("Agreement").

<u>RECITALS</u>

2.      Borrego is enrolled in the California Medical Assistance Program ("Medi-Cal") and is a non-profit 501(c)(3) Federally Qualified Health Center (FQHC).  Edgar Bulloch, MD is the current Interim Chief Executive Officer of Borrego. Borrego is represented in this matter by Joseph LaMagna of Hooper, Lundy & Bookman, P.C.

3.      On November 18, 2020, DHCS sent a Notice of Payment Suspension (NPS) to Borrego and Medi-Cal managed care plans who contract with Borrego (Attachment A). The payment suspension prohibited Borrego from directly or indirectly receiving any reimbursement for the provision of health care service to Medi-Cal members, including payments made by DHCS and any Medi-Cal managed care plans that contract with Borrego. The payment suspension was imposed in accordance with Welfare and Institutions Code, section 14107.11, and the Code of Federal Regulations, Title 42, section 455.23.

4.      Borrego is currently under investigation by the California Attorney General's Division of Medi-Cal Fraud and Elder Abuse for fraud against the Medi-Cal program.

5.      On December 16, 2020, the Parties held a meet and confer conference pursuant to Welfare and Institutions Code, section 14123.05 to discuss the payment suspension.

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE
SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

6.     On January 27, 2021, DHCS and Borrego executed a Term Sheet outlining an agreement regarding the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11 (Attachment B). Pursuant to the Term Sheet, DHCS partially lifted the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11 as it related to medical services provided to Medi-Cal members.  The payment suspension and Medi-Cal reimbursement prohibition imposed on Borrego continued in full force and effect as it relates to the provision of Medi-Cal dental services. Borrego agreed to the appointment of an independent monitor selected by DHCS whose duties included instituting a robust corporate integrity and compliance program at Borrego. Borrego also waived its appeal rights relating to (a) the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11; (b) the Term Sheet, and (c) the contemplated formal agreement.

7.     On January 29, 2021, DHCS sent a letter notifying Borrego of the modified payment suspension.

8.     The provisions of this Agreement supersede the Term Sheet.

<u>TERMS</u>

9.     In order to avoid the expense, inconvenience, and uncertainty of litigation, Borrego agrees as follows:

a.  General Terms

   i.  Borrego must comply with all federal and state Medi-Cal law, including, but not limited to, proper billing for Medi-Cal services.

   ii.  Borrego must cooperate and comply with all routine and non-routine DHCS audits and investigations activities.

   iii.  Borrego must preserve all of its business, billing, and patient records until the conclusion of the D█████████████gation; DHCS' payment suspension, as modified, is resolved; and in accordance with all applicable

state and federal record retention requirements, whichever is later. Borrego further agrees to take all necessary steps to suspend all regularly scheduled document destruction activities.

b. Independent Monitor

    i. On February 9, 2021, Berkeley Research Group, LLC and Borrego entered into an independent monitor agreement (Attachment C). The terms of this independent monitor agreement are incorporated herein. In the event of any conflict between this Agreement and this independent monitor contract, the terms of this Agreement shall control.

    ii. If the independent monitor becomes unable or unwilling to continue its duties, or DHCS determines that it is appropriate to appoint a new independent monitor, Borrego must finalize the retention of the new independent monitor within 7 calendar days of DHCS identifying the new independent monitor, subject to DHCS review and approval of the contract terms.

    iii. Subject to the limitations of the attorney-client privilege described below, Borrego agrees that the independent monitor has complete and full access to all books and records in Borrego's possession, custody, or control; locations; employees; independent contractors; officers; board members; and any other Borrego affiliates. Borrego agrees to make employees, independent contractors, officers, board members, and any other Borrego affiliates available for interviews and to cooperate with the independent monitor and DHCS. Borrego agrees that the independent monitor is authorized to attend all Borrego operational meetings and participate in all Borrego activities, including open and closed board meetings, except Borrego may exclude attorney-client oral and written communications and the monitor may be exc██████████████████s with their legal

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

counsel regarding attorney-client privileged information. Borrego agrees to provide a privilege log to the monitor for all excluded oral and written communications and meetings. Borrego agrees that the independent monitor has unrestricted access to all electronic and paper records in Borrego's possession, custody, or control, except for attorney-client privileged materials. Borrego and the independent monitor may contact DHCS to discuss any questions about Borrego's assertion of the attorney-client privilege. Borrego agrees that the independent monitor is permitted to conduct periodic and/or unannounced reviews of Borrego at any time, with or without prior notification to Borrego.

iv.  Borrego is responsible for timely payment of all costs and fees associated with the independent monitor's services.

v.  Borrego agrees that the independent monitor shall take direction from and work exclusively for the benefit of DHCS. Borrego agrees that monitor shall report directly to DHCS.

vi.  Borrego agrees that the independent monitor shall provide periodic reports to DHCS as requested. Borrego agrees that the reports shall be in a manner and format determined by DHCS. The independent monitor's reporting duties are solely to DHCS. DHCS is not obligated to share the independent monitor's reports with Borrego.

vii.  Borrego agrees that the independent monitor shall schedule periodic meetings with Borrego and DHCS to discuss corporate integrity, corrective action, and compliance with federal and state Medi-Cal law.

viii.  Borrego shall institute a robust corporate integrity and compliance program to ensure compliance with all Medi-Cal law in accordance with the recommendations of the independent monitor.

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

ix.   Borrego shall promptly and fully implement all corrective action identified by the independent monitor or DHCS upon notice from DHCS. Corrective action could include, but is not limited to, removal of paid and non-paid personnel implicated in misconduct related to Medi-Cal billing and the return of any overbilling amounts. A failure by Borrego to promptly and fully implement the corrective action may, at DHCS' discretion, subject Borrego to immediate reinstatement of the November 18, 2020 Medi-Cal payment suspension.

x.    Borrego agrees to conduct a retrospective review of  claims billed to the Medi-Cal program, including but not limited to overpaid claims, including wrap around (Code 18) payments, beginning from January 1, 2016 to the present, which will be overseen by the independent monitor and DHCS, and/or by any other entity contracted by DHCS or the independent monitor. Given the volume of claims involved, statistically valid sampling and extrapolation may be used at the discretion of DHCS and the independent monitor consistent with statistical extrapolation and probability sampling guidelines in California Code of Regulations, Title 22, section 51458.2 and all other applicable authorities. Borrego acknowledges its obligation, pursuant to Section 1128J(d)(1) of the Social Security Act and all other applicable authorities, to report and return any overpayments to Medi-Cal. Borrego agrees to use its best efforts to cooperate and identify overpayments and repay them. DHCS reserves all rights to pursue any remedies against Borrego, including, but not limited to, repayment, payment suspensions, temporary suspensions, interest, and penalties.

xi.   Neither Borrego nor any of its officers, employees, independent contractors, or any other affiliate of Borrego shall do anything to hinder or obstruct the independent monitor's ██████████████████endent monitor contract

and pursuant to this Agreement. Borrego agrees to honestly, fully, and continuously cooperate with any of its contracted health care service plans, DHCS, and/or the independent monitor in the continuing investigation of Borrego. Upon request by DHCS, Borrego agrees to provide a notice approved by DHCS to each Borrego officer, employee, independent contractor, or affiliate with a directive to fully and openly cooperate with and provide information directly to the independent monitor and/or to DHCS. Borrego shall not represent the identity of the independent monitor in terms that may otherwise conceal the purpose or authority of the independent monitor.

xii. Borrego agrees that the independent monitor is explicitly permitted to communicate with DHCS in any manner and disclose any information to DHCS without limitation and without notification to Borrego. DHCS may communicate with the independent monitor and/or exchange information with the independent monitor at any time that DHCS deems necessary and for any purpose related to any matter regarding Borrego.

xiii. Borrego acknowledges and accepts that all communications and records between Borrego and the independent monitor may be disclosed to DHCS. This includes any documents the independent monitor believes that DHCS should review.

xiv. DHCS will evaluate the continuing need for monitor services semiannually, and will discuss its determination with Borrego. The monitor shall remain in place until DHCS determines that the independent monitor is no longer necessary.

c. Payment Suspension

i. The November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to We[REDACTED] section 14107.11, which

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE
SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

prohibited Borrego from directly or indirectly receiving any reimbursement for the provision of health care service to Medi-Cal members, including payments made by DHCS and any Medi-Cal managed care plans that contract with Borrego, is modified as follows.

ii.   As of January 29, 2021, DHCS has partially lifted Borrego's Medi-Cal payment suspension relating to medical services provided to Medi-Cal members. Medi-Cal managed care plans may resume reimbursing Borrego for the provision of medically necessary medical services provided to Medi-Cal members. Borrego may also submit medical claims to DHCS for fee-for-service medical services and wrap payments.

iii.   The payment suspension and Medi-Cal reimbursement prohibition imposed on Borrego continues in full force and effect as it relates to the provision of Medi-Cal dental services. Reimbursement for Borrego's dental claims will be determined through the resolution of the payment suspension.

iv.   Borrego is prohibited from receiving reimbursement from DHCS, Medi-Cal managed care plans, or the Medi-Cal program for dental services provided to Medi-Cal members until DHCS either further modifies the payment suspension or lifts the payment suspension in its entirety. Medi-Cal managed care plans will continue to be directed that they are prohibited from reimbursing Borrego's dental claims until further notice.

v.   Borrego must use Code 3 (dental services) when submitting dental claims to DHCS, the Medi-Cal managed care plans, and the Medi-Cal program. If Borrego receives reimbursement for any dental claims, it must return those payments to DHCS, the Medi-Cal managed care plan, or the Medi-Cal program within 30 calendar days. The failure to return dental claim reimbursement may, at DHCS' discretion, subject Borrego to the reinstatement of the No ████████████████ payment suspension

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11.

    vi. Borrego must include the actual rendering provider's name and NPI on all claims submitted to DHCS and Medi-Cal managed care plans.

d. Waiver of Appeal Rights

    i. Borrego is represented by legal counsel and is fully aware of its legal rights to contest the payment suspension, including (without limitation) the right to appeal the payment suspension pursuant to Welfare and Institutions Code, section 14043.65 and Code of Civil Procedure, section 1085.

    ii. Subject to Paragraph 8(d)(iii), Borrego voluntarily, knowingly, and intelligently waives and give up its rights to challenge or to seek any further review of:

        1. The November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11;

        2. The Term Sheet; and

        3. This Agreement.

    iii. In the event that DHCS determines that Borrego has failed to perform any of its obligations under this Agreement and further modifies the payment suspension, Borrego shall be permitted to challenge DHCS' action pursuant to Welfare and Institutions Code, sections 14043.65 and 14123.05.

e. Scope of Agreement

    i. No provision in this Agreement is intended to limit or restrict the ongoing or new investigations of Borrego's Medi-Cal activities.

    ii. No provision in this Agreement is intended to limit or restrict the filing of a criminal or civil action, or limit any claims that may be made in any such action, by any federal, state, or local prosecuting, administrative, or regulatory authorities.

    iii.  In the event that DHCS identifies new or different information demonstrating that Borrego is non-compliant with Medi-Cal laws or regulations, DHCS, at its discretion, may at any time:

        1.  impose a temporary suspension pursuant to Welfare and Institutions Code, section 14043.36 or

        2.  impose a new payment suspension, reinstate, or modify an existing payment suspension, pursuant to Welfare and Institutions Code, section 14107.11.

    iv.  No provision in this Agreement precludes DHCS from taking action to recover any overpayments Borrego may have received.

    v.  Nothing in this Agreement shall, nor shall this Agreement be construed to, limit or affect in any way any rights any individual enrollee may have under any law or laws, including without limitation remedies available to the enrollee under Medi-Cal law, including the Knox-Keene Health Care Service Act of 1975.

    vi.  The adoption of this Agreement shall not operate as a policy directive nor be considered precedential or binding upon DHCS regarding similar issues that may arise with other parties or in another action concerning Borrego, pending or future. It is expressly understood that the terms of this Agreement pertain to this specific action and are not intended to affect any other action that is not mentioned herein.

f.  Enforcement of Agreement

    i.  Borrego agrees that DHCS may exercise any and all aspects of its enforcement authority to enforce Borrego's compliance with any and/or all of its obligations under this Agreement, and that any remedy available to the Director is not exclusive, and may be sought and employed in any

combination with civil, criminal, and other administrative remedies deemed warranted by the Director to enforce this Agreement.

ii.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

iii. Each Party irrevocably submits to the jurisdiction of the California Office of Administrative Hearings and Appeals located in Sacramento, or the California superior court located in Sacramento County, over any suit, action or other proceeding arising out of or relating to this Agreement and irrevocably agrees that all claims with respect to any such suit, action or proceeding may be heard and determined in such venue.

iv.  A violation of any provision of this Agreement may subject Borrego, at DHCS' discretion, to an immediate reinstatement of the November 18, 2020 Medi-Cal payment suspension imposed on Borrego pursuant to Welfare and Institutions Code, section 14107.11. Violations of this Agreement include but are not limited to Borrego's officers and executives failing to fulfill any of its obligations under this Agreement; acting in a manner contrary to the terms of this Agreement; or repudiating any part of this Agreement either verbally, in writing, or by conduct. Borrego agrees to require its officers, executives, independent contractors, and employees to comply with the terms of this Agreement and further agrees to take immediate remedial action in the event that any of these individuals fails to fulfill the obligations of this Agreement, acts in a manner contrary to the terms of this Agreement, or repudiates any part of this Agreement verbally, in writing, or by conduct. Borrego's failure to take appropriate action to ensure compliance with this Agreement against such officer, employee, independent contractor, or affiliated individual shall provide the basis for a violation of this Agreem█████████████████████

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

g.  Additional Provisions

    i.  This Agreement shall be effective on the date that all parties have signed the Agreement.

    ii.  The Parties have carefully read and have fully discussed or had the opportunity to fully discuss with counsel and understand and acknowledge the effects of this Agreement, its significance, and its consequences. The Parties acknowledge and agree that each had full opportunity to consult with attorneys or legal or other advisors of their choice.

    iii.  The undersigned warrant that they have authority to agree to the terms of this Agreement and that this Agreement was entered into without threat or coercion. The Parties enter into this Agreement freely, knowingly, and voluntarily.

    iv.  The Parties further agree that this Agreement is the product of their mutual preparation and accordingly shall not be deemed to have been prepared or drafted by either party. The Parties further agree that any court seeking to interpret this Agreement should construe it as the product of mutual preparation.

    v.  This Agreement is intended by the Parties to be an integrated writing representing the complete, final, and exclusive embodiment of their Agreement. It supersedes any and all prior or contemporaneous agreements, understandings, discussions, negotiations, and commitments (written or oral), including the Term Sheet. This Agreement may not be altered, amended, modified, supplemented, or otherwise changed except by a writing executed by an authorized representative of each of the Parties.

    vi.  This Agreement shall be binding upon and inure to the benefit of the Parties and to their respective successors in interest, licensees, heirs, representatives, executo███████████████████nd assigns.

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

vii.  The Parties will each bear their own attorneys' fees and costs.

viii. If any of the terms of this Agreement are found to be invalid, illegal, or unenforceable in any respect, the remaining provisions shall nevertheless be binding with the same effect as if the invalid, illegal, or unenforceable terms or terms were originally deleted.

ix.   The Parties acknowledge that this Agreement is a public record as required by Government Code section 11517, subdivision (d).

x.    Borrego is familiar with the provisions of California Civil Code section 1542, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Borrego, being aware of California Civil Code section 1542, expressly waives any rights it may have under this section, as well as under any other statutes or common law principals of similar effect, with respect to claims for damages against the State of California and/or DHCS resulting from the dispute or facts that are the subject of this Agreement.

xi.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties further agreed that faxed, scanned, or electronically signed signature pages and multiple signature pages shall have the same force and effect as the originals.



STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE
SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

1

2

3    Dated: 2·25·2021

4

5

6

7    Dated: 2/26/21

8

9

10

11

12

13

14

15   Dated: February 26, 2021

16

17

18

19   Dated: February 26, 2021

20

21

22

23

24

25

26

27

28

**APPROVED AND ACCEPTED:**

EDGAR BULLOCH, MD

Interim Chief Executive Officer for
BORREGO COMMUNITY HEALTH
FOUNDATION

BRUCE LIM, CPA

Deputy Director, Audits and Investigations, for
DEPARTMENT OF HEALTH CARE SERVICES


**APPROVED AS TO FORM:**

JOSEPH R. LAMAGNA

Attorney for BORREGO COMMUNITY HEALTH
FOUNDATION

JOHN PUENTE

Chief Counsel for DEPARTMENT OF HEALTH
CARE SERVICES

Page 13 of 13

STIPULATION AND AGREEMENT BETWEEN THE CALIFORNIA DEPARTMENT OF HEALTH CARE
SERVICES AND BORREGO COMMUNITY HEALTH FOUNDATION

Redaction Date:  3/10/2022 10:19:23 AM

# Redaction Log

## Redaction Reasons by Exemption

| Reason | Description | Pages (Count) |
|--------|-------------|---------------|
|        |             | 2(1)<br>20(1)<br>21(4)<br>34(4) |