JOSEPH R. LAMAGNA (State Bar No. 246850)
JORDAN KEARNEY (State Bar No. 305483)
**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
E-Mail: jlamagna@health-law.com
         jkearney@health-law.com

DEVIN M. SENELICK (State Bar No. 221478)
TARYN A. REID (State Bar No. 328772)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail: dsenelick@health-law.com
         treid@health-law.com

Attorneys for Plaintiff Borrego
Community Health Foundation

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORREGO COMMUNITY HEALTH FOUNDATION, a California nonprofit public benefit corporation;<br><br>Plaintiff,<br><br>vs.<br><br>KAREN HEBETS, an individual; MIKIA WALLIS, an individual; DIANA THOMPSON, f/k/a DIANA TRONCOSO, an individual; HARRY ILSLEY, an individual; DENNIS NOURSE, an individual; MIKE HICKOK, an individual; CHUCK KIMBALL, an individual; PREMIER HEALTHCARE MANAGEMENT, INC., a California Corporation; SUMMIT HEALTHCARE MANAGEMENT, INC., a California Corporation; DARYL PRIEST, an individual; NICHOLAS PRIEST, an individual; TRAVIS LYON, an | Case No. 3:22-cv-01056-AJB-AGS<br><br>Hon. Anthony J. Battaglia<br><br>**FIRST AMENDED COMPLAINT**<br><br>Trial Date:        None Set |

1   individual; HUSAM E. ALDAIRI,
    D.D.S., an individual; ALDAIRI DDS,
2   INC., a California corporation; AYED
    HAWATMEH, D.D.S., an individual;
3   HAWATMEH DENTAL GROUP, P.C.,
    a California Corporation; ALBORZ
4   MEHDIZADEH, D.D.S., an individual;
    ALBORZ MEHDIZADEH, INC., a
5   California Corporation; JILBERT
    BAKRAMIAN, D.D.S., an individual;
6   MOHAMMED ALTEKREETI, D.D.S.,
    an individual; MAGALY VELASQUEZ,
7   D.D.S., an individual; MAGALY M.
    VELASQUEZ DDS PROFESSIONAL
8   DENTAL CORP., a California
    Corporation; ARAM ARAKELYAN,
9   D.D.S., an individual; NEW
    MILLENNIUM DENTAL GROUP OF
10  ARAM ARAKELYAN, INC., a
    California Corporation; MICHAEL
11  HOANG, D.M.D., an individual;
    WALEED STEPHAN, D.D.S., an
12  individual; W.A. STEPHAN, A
    DENTAL CORPORATION,
13  a California Corporation; SANTIAGO
    ROJO, D.D.S., an individual;
14  SANTIAGO A. ROJO, D.D.S., INC., a
    California Corporation; MARCELO
15  TOLEDO, D.D.S., an individual;
    MARCELO TOLEDO, D.D.S., INC., a
16  California corporation; MARLENE
    THOMPSON, D.D.S., an individual;
17  MARLENE THOMPSON, D.D.S., INC.,
    a California Corporation; DOUGLAS
18  NESS, D.D.S., an individual; NESS
    DENTAL CORPORATION, a California
19  Corporation; GEORGE JARED, D.D.S.,
    an individual; GEORGE JARED, D.D.S.,
20  INC., a California corporation; JAMES
    HEBETS, an individual; THE HEBETS
21  COMPANY, a Missouri Corporation;
    KBH HEALTHCARE CONSULTING,
22  LLC and DOES 1-250, inclusive.

23              Defendants.

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION/SUMMARY ....................................................... 7

II.     JURISDICTION AND VENUE ...................................................... 8

III.    CAST OF CHARACTERS ........................................................... 9

        A.      BORREGO COMMUNITY HEALTH FOUNDATION ..................... 9

        B.      FORMER BORREGO INSIDERS ...................................... 10

        C.      PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES ................................................................... 12

        D.      DEFENDANT DENTISTS .............................................. 13

        E.      JAMES HEBETS AND HIS COMPANIES ........................... 17

        F.      OTHERS ................................................................. 18

        G.      ALTER EGO AND DOE ALLEGATIONS ........................... 19

IV.     RULE 9(b) REQUIREMENTS ...................................................... 21

V.      THE SCHEMES THAT DAMAGED BORREGO HEALTH ...................... 22

        A.      The Scheme to Form and Sell Entities Formed by Borrego Insiders to Borrego Health (the "Borrego MSO/IPA Scheme") ........... 22

        B.      The Scheme to Contract with Premier Allowing Premier to Get Paid Tens of Millions of Dollars to Purportedly Provide "Management Services" It Was Not Capable of Providing (the "Premier Scheme") ............................................................ 24

            i.      The Contract Dental Program is Formed ................................... 24

            ii.     Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health ........................................................................... 25

            iii.    The Borrego Health Insiders Enter Into a Management Services Agreement on Borrego Health's Behalf Anyway ........ 28

            iv.     The Damages Suffered by Borrego Health Due to the Premier Scheme ................................................................... 39

        C.      Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme") .............................................. 42

            i.      Husam E. Aldairi, D.D.S. ........................................................ 47

            ii.     Ayed Hawatmeh, D.D.S. ........................................................ 53

7275860.1

## **TABLE OF CONTENTS**

Page

iii.   Alborz Mehdizadeh, D.D.S. ....................................................... 57

iv.   Magaly M. Velasquez, D.D.S. ................................................... 60

v.   Aram Arakelyan, D.D.S. ............................................................ 64

vi.   Michael Hoang, D.M.D. ........................................................... 66

vii.   Waleed Stephan, D.D.S. ........................................................... 68

viii.   Santiago Rojo, D.D.S. ............................................................... 69

ix.   Mohammed Al Tekreeti, D.D.S. ................................................ 71

x.   Jilbert Bakramian, D.D.S. ......................................................... 72

xi.   Marcelo Toledo, D.D.S. ............................................................ 75

xii.   Marlene Thompson, D.D.S. ....................................................... 78

xiii.   Douglas Ness, D.D.S. ............................................................... 81

xiv.   George Jared, D.D.S. ................................................................ 83

D.   Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health ........................... 85

E.   Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme") ........................................................... 89

F.   The Borrego Insiders Entered into Leases with Daryl Priest-Owed Entities for Above Market Rents and Terms Many Times the Market Amount (the "Priest Leases Scheme") ............................. 97

G.   The Borrego Insiders Paid Themselves Above-Market Compensation and Granted Themselves Improper Benefits and Covered It Up (the "Compensation/Benefits Scheme") .................... 106

H.   The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme") .......................................................... 109

I.   The Borrego Insiders Tried To Purchase a Country Club to Personally Benefit Themselves (the "De Anza Country Club Scheme") ............................................................................. 111

J.   The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million Payout (the "Payout Scheme") ..................................... 113

K.   The Borrego Insiders Funneled Money to Bruce Hebets' Brother, Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme") ......... 116

7275860.1

1

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

2

3    L.    Borrego Insider Chuck Kimball Leased a Barn to Borrego Health
          (the "Julian Barn Scheme")................................................................ 120

4

5    M.    Borrego Insider Dennis Nourse Sold Property to Borrego Health
          to be Developed by Priest (the "Property Development Scheme").... 123

6    N.    Bruce Hebets and Karen Hebets Create a Sham "Consulting"
          Company and Contract with Premier To Obtain Payments From
7          Premier for the Various Schemes Which Benefited the Premier
          Defendants (the "KBH Healthcare Consulting Scheme") ................. 126

8

VI.    CLEANING HOUSE ........................................................................ 130

9

VII.   CHAPTER 11 BANKRUPTCY ........................................................ 132

10

VIII.  THE RICO ENTERPRISE ............................................................... 133

11

12    B.    Facts Common To RICO Cause of Action ....................................... 136

13    C.    Racketeering Activity Distinct from Enterprise ............................... 138

14    D.    RICO Liability ................................................................................ 139

E.    Issuance of Constructive Trusts ...................................................... 145

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

7275860.1

**APPENDIX OF EXHIBITS**

| EXHIBIT | PAGES | DESCRIPTION |
|---------|-------|-------------|
| A | 191-200 | PHCM Management Agreement dated (Effective Date "ED" 3/1/16) |
| B | 201-203 | PHCM Amendment No. 1 to Management Agreement (ED 12/22/16) |
| C | 204-206 | PHCM Amendment No. 2 to Management Agreement (ED 7/1/17) |
| D | 207-223 | Summit Healthcare Management Contract (ED 9/8/17) |
| E | 224-252 | Aldairi Agreement (ED 5/27/16) |
| F | 253-283 | Aldairi DDS, Inc. Agreement (ED 5/29/18) |
| G | 284-311 | Hawatmeh Dental Group Agreement (ED 10/18/17) |
| H | 312-340 | Alborz Mehdizadeh, Inc. Agreement (ED 9/28/16) |
| I | 341-373 | Long Beach Care Dental, Inc. Agreement (ED 12/11/18) |
| J | 374-402 | Velasquez Agreement (ED 11/5/14) |
| K | 403-430 | Arakelyan Agreement (ED 11/17/16) |
| L | 431-461 | Arakelyan DDS. Inc. Agreement (ED 11/29/18) |
| M | 462-524 | Arakelyan DDS. Inc. Agreements (ED 11/29/18) |
| N | 525-555 | Hoang Agreement (ED 11/28/18) |
| O | 556-584 | W.A Stephan Agreement (ED 10/1/16) |
| P | 585-612 | Rojo D.D.S., Inc. Agreement (ED 3/29/17) |
| Q | 613-644 | Toledo D.D.S., Inc. Agreement (ED 6/16/15) |
| R | 645-675 | Thompson, D.D.S., Inc. Agreement (ED 4/18/13) |
| S | 676-704 | Ness Dental Agreement (ED 5/2/16) |
| T | 705-734 | Jared, D.D.S. Agreement (ED 4/19/16) |

7275860.1

Plaintiff Borrego Community Health Foundation ("Borrego Health"), hereby complains and alleges as follows:

I.      **INTRODUCTION/SUMMARY**

1.      Borrego Health is a California nonprofit public benefit corporation operating a Federally Qualified Health Center (also known as a FQHC). Borrego Health provides primary and related healthcare services to historically underserved areas of San Diego, Riverside, and—until recently—San Bernadino counties.

2.      While Borrego Health was attempting to complete its mission of providing healthcare to underserved communities, certain individuals and entities, both inside and outside of Borrego Health, siphoned off money from Borrego Health that should have benefitted to the community it serves. The schemes of those various individuals and entities are set forth in detail below. The schemes include selling useless assets to Borrego Health at inflated prices, entering into one-sided agreements with Borrego Health to its detriment, committing and/or covering up healthcare fraud though improper billing of dental services, entering into leases with Borrego Health that were many times fair market rates and terms, paying themselves above-market salaries and benefits, hiring friends and family members to work for Borrego Health and paying them above-market salaries, and attempting to use Borrego Health to purchase a country club. Those same individuals and entities worked tirelessly to cover up their misdeeds, and, until recently, were successful is doing so.

3.      The insiders were motivated by various forms of personal benefit. First, they used the excessive revenue generated by the schemes to set over-market salaries for themselves and create other forms of compensation, such as automotive benefits, retirement benefits, and free healthcare goods and services from Borrego Health. Second, they used the excessive services and attendant revenue from Medi-Cal to justify employing friends and family members at Borrego Health, also at inflated salaries. Third, on information and belief, the insiders allowed the outsiders

7

to participate in the fleecing of Borrego Health in exchange for kickbacks and/or other benefits to the insiders.  For instance, Bruce Hebets and Karen Hebets set up a sham "consulting" company which entered into a sham agreement which paid them $2 million of funds that had been previously stolen from Borrego Health.  Each and every one of the Defendants received one or more improper benefits and/or payments as a result of the schemes described below, and was incentivized to act in furtherance of those schemes, actively seek to conceal those schemes and/or breached their duties to prevent or stop those schemes.

4.     The false and fraudulent billing of dental services has resulted in Borrego Health's suspension by California's Medicaid Program, Medi-Cal.  The state and federal government are also investigating Borrego Health for tax issues, its non-profit status, among many other things, due to these schemes.

5.     Fortunately, Borrego Health, through a newly constituted Board of Trustees, has spent considerable time and effort trying to discover and unravel the prior bad conduct to rehabilitate Borrego Health and ensure Borrego Health's viability and compliance going forward.

6.     However, Borrego Health has been severely damaged and this action seeks to illuminate the various schemes, to seek financial compensation to recoup funds wrongly siphoned away from Borrego Health, and to hold the wrongdoers responsible for their actions.

## II.     JURISDICTION AND VENUE

7.     Venue is proper in this District pursuant to 31 USC section 3732(a) and 28 USC section 1391(c).  During the relevant time period, a substantial portion of the events complained of that give rise to Borrego Health's claims occurred in this District.

7275860.1

III.   **CAST OF CHARACTERS**

A.   **BORREGO COMMUNITY HEALTH FOUNDATION**

8.   Plaintiff Borrego Community Health Foundation ("Borrego Health"), is a nonprofit 501(c)(3) Federally Qualified Health Center ("FQHC").  Borrego Health provides high quality, comprehensive, compassionate primary health care to the people in their communities, regardless of their ability to pay, by partnering with licensed medical professionals across Southern California.  Borrego Health operates 33 clinics, primarily in underserved desert and inland communities throughout San Diego, Riverside, and—until recently—San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, HIV/Hepatitis C and Covid-19 related testing and vaccinations to over 200,000 patients, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health tested tens of thousands of Californians for Covid-19 infections, and vaccinated tens of thousands of people against Covid-19.  Borrego Health's continued operation is in the public interest and, despite the harm it has suffered and the way it has been manipulated by its former executives and trustees, it delivers quality health care to people who need it.

9.   Much of the services Borrego Health provides to the community is funded by grants, including without limitation grants from the U.S. Health Resources and Services Administration ("HRSA").  Borrego Health received its first HRSA grant in 2003.

10.   Following the initial HRSA grant in 2003, Borrego Health experienced massive growth, expanding its services to what they are today, inclusive of dental, mental health and chiropractic services.  The majority of these services are provided through Borrego Health's internal programs, including brick-and-mortar medical and dental clinics and mobile units.  Borrego Health also operates a contract medical

7275860.1

1 | program in which it contracts with private practice providers to serve members of
2 | the community.

3 | 11. As a non-profit public benefit corporation, Borrego Health does not
4 | have individual shareholders, but rather is operated by a Board of Trustees, all of
5 | whom currently serve on a volunteer basis.

6 | **B.   FORMER BORREGO INSIDERS**

7 | 12. <u>Bruce Hebets</u> was a longtime resident of San Diego County and had
8 | been a Sergeant with the San Diego Harbor Police Department prior to becoming
9 | CEO of Borrego Health Foundation in or around 2004. Bruce Hebets served as
10 | Borrego Health's CEO beginning in 2004 until his retirement in September 2018.
11 | Following a decline in Bruce Hebets' health, Borrego Health's Executive/Finance
12 | Committee – with Bruce Hebets' approval – appointed the then Chief Legal Officer,
13 | Mikia Wallis, as President of Borrego Health in December 2017, and later as interim
14 | CEO following Bruce Hebets' decision to take an extended medical leave, effective
15 | June 28, 2018. Following Bruce Hebets' retirement, effective September 1, 2018,
16 | Mikia Wallis was appointed to the position of Borrego Health's CEO. Bruce Hebets
17 | passed away in January 2019. In light of his death and the settlement of his estate,
18 | Bruce Hebets is not named as a defendant in this action though he would have been,
19 | if possible.

20 | 13. <u>Defendant Karen Hebets</u> is an individual with her place of residence in
21 | Borrego Springs, California. Karen Hebets was the Vice President of Business
22 | Services at Borrego Health. Karen Hebets was also the wife of Bruce Hebets.

23 | 14. <u>Defendant KBH Healthcare Consulting, LLC</u> was a California Limited
24 | Liability Company with its principal place of business in Borrego Springs,
25 | California. Bruce Hebets and Karen Hebets were its only members, sharing a 50-50
26 | interest.

27 | 15. <u>Defendant Mikia Wallis, Esq.</u> is an individual with her place of
28 | residence in Julian, California. Mikia Wallis is an attorney. She graduated from the

7275860.1

University of San Diego School of Law, and was admitted to the California Bar on or about June 1, 2007. Mikia Wallis was Chief Legal Officer of Borrego Health, and was named interim CEO in June 2018 and CEO in September 2018. Mikia Wallis was also on Borrego Health's Board of Trustees until October 2, 2020. Mikia Wallis was placed on administrative leave from Borrego Health on October 9, 2020, and terminated by Borrego Health on December 15, 2020.

16.    Defendant Diana Thompson, formerly Diana Troncoso, is an individual with her place of residence in San Diego County, California. Diana Thompson was Borrego Health's Chief Financial Officer from March 2013, and was terminated as of March 2021. One of Diana Thompson's children is married to one of Bruce Hebets' and Karen Hebets' child, and she shares one or more grandchildren with Bruce Hebets and Karen Hebets.

17.    Defendant Harry Ilsley is an individual with his place of residence in Sheridan, Wyoming. Harry Ilsley also owns or owned a house in Borrego Springs (near the De Anza Country Club golf course). Harry Ilsley was a member of Borrego Health's Board of Trustees and was the Chair of the Board until 2017. He was also on the Board's Executive/Finance Committee.

18.    Defendant Dennis Nourse in an individual with his place of residence in Cedarburg, Wisconsin. Dennis Nourse was a former administrator of Borrego Health, and later hired Bruce Hebets to be CEO. Dennis Nourse was a member of Borrego Health's Board of Trustees from mid-2012 until his resignation, and was a member of the Board's Executive/Finance Committee.

19.    Defendant Mike Hickok in an individual with his place of residence in Borrego Springs, California (near the De Anza Country Club golf course). Mike Hickok was a member of Borrego Health's Board of Trustees, and was a member of the Board's Executive/Finance Committee.

20.    Defendant Chuck Kimball an individual with his place of residence in Julian, California. Chuck Kimball was a member of Borrego Health's Board of

7275860.1

Trustees starting in approximately 2011, and was the Chair of the Board from 2017 to mid-2019 and Secretary from 2019 until his removal.  Chuck Kimball was also a member of the Board's Executive/Finance Committee.

21.   Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are collectively referred to as "Borrego Insiders."  A subset of Borrego Insiders who served as members of the Borrego Health Board of Trustee are Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball, collectively referred to herein as "Board Insiders."

22.   While some may have described themselves as volunteers, each of the Board Insiders was compensated for his service on the Board, including with free medical care and other benefits.  Moreover, the Board Insiders are being sued not only for their negligent acts and omissions, but their intentional misconduct, including fraud, and their breaches of their fiduciary duties to Borrego Health.

## C.   PREMIER, PRIESTS AND OTHER PRIEST-RELATED ENTITIES

23.   Defendant Premier Healthcare Management, Inc. ("Premier") is a California corporation with its principal place of business in El Cajon, California.

24.   Defendant Summit Healthcare Management, Inc. ("Summit") was a California corporation with its principal place of business in El Cajon, California.  Summit merged with Premier in 2019.

25.   Defendant Daryl Priest in an individual with his place of residence in El Cajon, California.  Daryl Priest is the owner of Premier.  Prior to starting Premier Daryl Priest had no material healthcare experience.

26.   Defendant Nicholas ("Nick") Priest, Esq. in an individual with his place of residence in San Diego, California.  Nick Priest was the Chief Executive Officer of Premier.  Nick Priest is the son of Daryl Priest.  Nick Priest is also an attorney.  He graduated from California Western School of Law and was admitted to

7275860.1

1   the California Bar on or about June 21, 2016.  Prior to working at Premier Nick

2   Priest had no material healthcare experience.

3       27.   Defendant Travis Lyon in an individual with his place of residence in

4   Alpine, California.  Travis Lyon was the President and Chief Operating Officer of

5   Premier.  He is also currently the President of Real Estate Operations at Priest

6   Development Corporation.

7       28.   Premier, Summit, Daryl Priest, Nick Priest and Travis Lyon are

8   collectively referred to herein as the "Premier Defendants."

9   **D.    DEFENDANT DENTISTS**

10      29.   Defendant Husam E. Aldairi, D.D.S. is a licensed dentist in California

11  with whom Borrego Health partnered through its contract dental program. Dr.

12  Aldairi, both individually and through his company Defendant Aldairi DDS, Inc.,

13  operated several private dental practices, including 40/30 Dental Inc., located at

14  6175 El Cajon Blvd., San Diego, CA 92215 and 40/30 Dental 2, located at 1166

15  East Main Street, El Cajon, CA 92021.  Husam Aldairi resides in San Diego County.

16  Aldairi DDS, Inc., is a California corporation with its principal place of business in

17  El Cajon, California.

18      30.   Defendant Ayed Hawatmeh, D.D.S. is a licensed dentist in California

19  with whom Borrego Health partnered through its contract dental program. Dr.

20  Hawatmeh, both individually and through his company Defendant Hawatmeh

21  Dental Group, P.C., operated several private dental practices, including Bravo

22  Dental Group of Corona located at 1185 Magnolia Avenue #K & #L, Corona, CA

23  92879, and White Smile Dental, located at 3495 East Concours Street, Suite A,

24  Corona, CA 91764.  Ayed Hawatmeh resides in San Bernardino County.  Hawatmeh

25  Dental Group, P.C. is a California corporation, with its principal place of business in

26  Ontario, California.

27      31.   Defendant Alborz Mehdizadeh, D.D.S. is a licensed dentist in

28  California with whom Borrego Health partnered through its contract dental program.

7275860.1

1   Dr. Mehdizadeh, both individually and through his company <u>Defendant Alborz</u>

2   <u>Mehdizadeh, Inc.</u>, operated several private dental practices, located at 15080 7th

3   Street, Suite 7, Victorville, CA 92395 and 286 N. San Jacinto Street, Hemet, CA

4   92543.  Alborz Mehdizadeh resides in San Bernardino County in Victorville,

5   California.  Alborz Mehdizadeh, Inc., is a California corporation with its principal

6   place of business in Long Beach, California.

7        32.   <u>Defendant Jilbert Bakramian, D.D.S.</u> is a licensed dentist in California

8   with whom Borrego Health partnered through its contract dental program.  He

9   operated as a sub-provider (i.e., though an arrangement with Dr. Aram Arakelyan

10   but without a direct agreement with Borrego Health).  Jilbert Bakramian resides in

11   Glendale, California.

12        33.   <u>Defendant Mohammed Al Tekreeti, D.D.S.</u> is a licensed dentist in

13   California with whom Borrego Health partnered through its contract dental program.

14   He operated as a sub-provider under Dr. Husam Aldairi.  Mohammed Al Tekreeti

15   resides in San Diego, California.

16        34.   <u>Defendant Magaly Velasquez, D.D.S.</u> is a licensed dentist in California

17   with whom Borrego Health partnered through its contract dental program.  Dr.

18   Velasquez, both individually and through her company, <u>Defendant Magaly M.</u>

19   <u>Velasquez DDS Professional Dental Corp.</u>, operated a private dental practice, called

20   U-First Dental Care, located at 9130 Foothill Blvd., Rancho Cucamonga, CA 91730.

21   Magaly Velasquez resides in Rancho Cucamonga, California.  Magaly M.

22   Velasquez DDS Professional Dental is a California corporation with its principal

23   place of business in Rancho Cucamonga, California.

24        35.   <u>Defendant Aram Arakelyan, D.D.S.</u> is a licensed dentist in California

25   with whom Borrego Health partnered through its contract dental program.  Dr.

26   Arakelyan, both individually and through his company, <u>Defendant New Millennium</u>

27   <u>Dental Group Of Aram Arakelyan, Inc.</u>, operated several private dental practices,

28   including practices located at 19523 E. Cypress Street, Covina, CA 91724 and

10917 Paramount Blvd., Downey, CA 90241.  Aram Arakelyan resides in Rancho Cucamonga, California.  New Millennium Dental Group Of Aram Arakelyan, Inc. is a California corporation with its principal place of business in Rancho Cucamonga, California.

36.  Defendant Michael Hoang, D.M.D. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  He operated a private dental practice, located at 13672 Hawthorne Blvd., Hawthorne, CA 90250.  Michael Hoang resides in Long Beach, California.

37.  Defendant Waleed Stephan, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Stephan, both individually and through his company, Defendant W.A. Stephan, a Dental Corporation, operated a private dental practice, called Stephan Family Dental, located at 860 Jamacha Road, Suite 201, El Cajon, CA 92019.  Waleed Stephan resides in El Cajon, California.  W.A. Stephan, a Dental Corporation is a California corporation with its principal place of business in San Diego, California.

38.  Defendant Santiago Rojo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Rojo, both individually and through his company Defendant Santiago A. Rojo, D.D.S., Inc., operated a private dental practice, called Family Dentistry Inc., located at 22435 Alessandro Blvd., Suite 106, Moreno Valley, CA 92553.  Santiago Rojo resides in Orlando, Florida.  Santiago A. Rojo, D.D.S., Inc., is a California corporation with its principal place of business in Moreno Valley, California.

39.  Defendant Marcelo Toledo, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Toledo, both individually and through his company Defendant Marcelo Toledo D.D.S., Inc., operated private dental practices located at 1701 Palm Canyon Drive, Palm Springs, CA 92262 and 326 N. Riverside Avenue, Rialto, CA 92376.  Marcelo

7275860.1

Toledo resides in Grand Terrace, California.  Marcelo Toledo, D.D.S., Inc., is a California corporation with its principal place of business in Rialto, California.

40.    Defendant Marlene Thompson, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program. Dr. Thompson, both individually and through her company Defendant Marlene M. Thompson, D.D.S., Inc., operated a private dental practice located at 988 El Norte Parkway, Escondido, CA 92026.  Marlene Thompson resides in Temecula, California.  Marlene Thompson, D.D.S., Inc., is a California corporation with its principal place of business in Escondido, California.

41.    Defendant Douglas Ness, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Ness, both individually and through his company Defendant Ness Dental Corporation, operated a private dental practice, Crown Dental Group, located at 2405 Transportation Avenue, National City, CA 91950.  Douglas Ness resides in Bonita, California. Ness Dental Corporation is a California corporation with its principal place of business in National City, California.

42.    Defendant George Jared, D.D.S. is a licensed dentist in California with whom Borrego Health partnered through its contract dental program.  Dr. Jared, both individually and through his company Defendant George C. Jared, D.D.S., Inc., operated a private dental practice, East County Family Dental, located at 13465 Camino Canada Road, Suite 110-A, El Cajon, CA 92021.  George Jared resides in San Diego, California.  George Jared, D.D.S., Inc., is a California corporation with its principal place of business in El Cajon, California.

43.    Other dentists formerly contracted with Borrego Health may have also engaged in actions and omissions that constitute a breach or breaches of their contracts with Borrego Health and/or make material misrepresentations to Borrego Health.  However, the names and identities of those dentists are currently unknown to Borrego Health, and are therefore sued here as Does 1-100.  They are unknown,

1  in part, because Borrego Health does not currently have access to their medical

2  records, patient charts, scheduling information, and other business records to

3  evaluate their care and documentation of services that Borrego Health billed as a

4  result of invoices from the dentists.  Borrego Health intends to seek discovery of

5  such information to evaluate other partner dentists and their sub-providers.

6      44.   Husam E. Aldairi, D.D.S., Aldairi DDS, Inc., Ayed Hawatmeh, D.D.S.,

7  Hawatmeh Dental Group, P.C., Alborz Mehdizadeh, D.D.S., Alborz Mehdizadeh,

8  Inc., Jilbert Bakramian, D.D.S., Mohammed Al Tekreeti, D.D.S., Magaly

9  Velasquez, D.D.S., Magaly M. Velasquez DDS, Professional Dental Corp., Aram

10  Arakelyan, D.D.S., New Millennium Dental Group of Aram Arakelyan, Inc.,

11  Michael Hoang, DMD, Waleed Stephan, D.D.S., W.A. Stephan, a Dental

12  Corporation, Santiago Rojo, D.D.S., Santiago A. Rojo, D.D.S., Inc., Marcelo

13  Toledo, D.D.S., Marcelo Toledo, D.D.S., Inc., Marlene M. Thompson, D.D.S.,

14  Marlene Thompson, D.D.S., Inc., Douglas Ness, D.D.S., Ness Dental Corporation,

15  George Jared, D.D.S. and George C. Jared, D.D.S., Inc. and Does 1-100 are

16  collectively referred to herein as the "Dentist Defendants."

17      **E.   JAMES HEBETS AND HIS COMPANIES**

18      45.   Defendant James "Jim" Hebets in an individual with his place of

19  residence in Scottsdale, Arizona.  Jim Hebets is Bruce Hebets' brother.

20      46.   Defendant The Hebets Company is a Missouri Corporation with its

21  principal place of business in Phoenix, Arizona.  Jim Hebets is President and

22  Founder of The Hebets Company, and has or had an ownership interest in The

23  Hebets Company.  The Hebets Company provides accounting and consulting

24  services and hold themselves out as experts in executive compensation to healthcare

25  providers, including other FQHCs, in California and San Diego County.  The Hebets

26  Company is a subsidiary of NFP Corp.  NFP is a network of independent financial

27  advisors that includes over 175 firms in 41 states and Puerto Rico, specializing in

28

7275860.1

1   life insurance and wealth transfer, corporate and executive benefits, and provides

2   services across the state of California and San Diego County.

3       **F.     OTHERS**

4       47.   Julian Medical Foundation is a California nonprofit corporation, with

5   its principal place of business in Julian, California.

6       48.   Timothy Martinez, D.D.S. graduated from the Harvard School of

7   Dental Medicine in 1986 with a concentration in Health Care Administration.

8   Throughout his 30 year career, he has had extensive experience in FQHC dental

9   programs, state dental Medicaid administration, private practice, and academic

10  positions at the Associate Dean level.  Prior to joining Borrego Health, Dr. Martinez

11  served as the Associate Dean for Community Partnerships and Access to Care for

12  two dental schools, Western University of Health Sciences and the University of

13  New England, and before that, he served as the Massachusetts Medicaid Dental

14  Director as well as the Dental Director for three large FQHCs in the greater Boston

15  area, including the first FQHC in the nation Geiger-Gibson Community Health

16  Center, Boston Health Care for the Homeless, and the South End Community Health

17  Center.  Timothy Martinez spearheaded the Program Integrity unit for Borrego

18  Health, designed to detect and address potential false or fraudulent billing.

19      49.   Maura Tuso, D.D.S. was a licensed dentist in California.  She lost her

20  license and was suspended by Medi-Cal.  Despite this, she provided services for

21  various dentists that were contracted with Borrego Health.  She has since provided

22  documents, evidence, and statements that she observed and engaged in fraudulent

23  practices at the direction of Defendants Husam Aldairi, Mohammed Al Tekreeti,

24  Marlene Thompson, Douglas Ness, and George Jared.

25      50.   Dr. Alfredo Ratniewski is the former Chief Medical Officer of Borrego

26  Health.

27

28

7275860.1

### G.   ALTER EGO AND DOE ALLEGATIONS

51.    Borrego Health is informed and believes that at all relevant times each of the Premier Defendants was the agent and employee of each of the remaining Premier Defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and employment.  The Premier Defendants operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Premier Defendants were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, the Premier Defendants aided and abetted each other in accomplishing the acts and omissions alleged herein.  (*See* Restatement (SECOND) of Torts §876 (1979)).  The Premier Defendants, and each of them, fail to recognize the uniqueness and independence of each other.  At all times relevant hereto, there was a such a unity of interest and ownership between the Premier Defendants such that the individual distinctions between them had ceased and that the facts as alleged herein are such that an adherence to the fiction of the separate existence of the Premier Defendants would, under the particular circumstances alleged herein, sanction a fraud and/or promote injustice.

52.    Borrego Health is informed and believes that at all relevant times Jim Hebets and the Hebets Company were the agent and employee of each other, and in doing the things hereinafter alleged were acting within the course and scope of such agency and employment.  Jim Hebets and The Hebets Company operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another.  The acts and omissions of the Jim Hebets and The Hebets Company were done in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from Borrego Health.  Moreover, Jim Hebets and The Hebets Company aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See*

7275860.1

1   Restatement (SECOND) of Torts §876 (1979)).  Jim Hebets and The Hebets

2   Company, and each of them, fail to recognize the uniqueness and independence of

3   each other.  At all times relevant hereto, there was a such a unity of interest and

4   ownership between Jim Hebets and The Hebets Company such that the individual

5   distinctions between them had ceased and that the facts as alleged herein are such

6   that an adherence to the fiction of their separate existence would, under the

7   particular circumstances alleged herein, sanction a fraud and/or promote injustice.

8        53.    Borrego Health is informed and believes that at all relevant times each

9   of the individual defendant dentists and their affiliated defendant professional

10  corporation(s) were the agent and employee of each other, and in doing the things

11  hereinafter alleged were acting within the course and scope of such agency and

12  employment.  The individual dentists and their affiliated professional corporation(s)

13  operated in such a way as to make their individual identities indistinguishable, and

14  therefore are mere alter-egos of one another.  The acts and omissions of the

15  individual dentists and their affiliated professional corporation(s) were done in

16  concert with one another in furtherance of their common design and agreement to

17  accomplish a particular result, namely extracting money from Borrego Health.

18  Moreover, the individual dentists and their affiliated professional corporation(s)

19  aided and abetted each other in accomplishing the acts and omissions alleged herein.

20  (*See* Restatement (SECOND) of Torts §876 (1979)).  The individual dentists and

21  their affiliated professional corporation(s), and each of them, fail to recognize the

22  uniqueness and independence of each other.  At all times relevant hereto, there was

23  a such a unity of interest and ownership between the individual dentists and their

24  affiliated professional corporation(s) such that the individual distinctions between

25  them had ceased and that the facts as alleged herein are such that an adherence to the

26  fiction of the separate existence of the individual dentists and their affiliated

27  professional corporation(s) would, under the particular circumstances alleged herein,

28  sanction a fraud and/or promote injustice.  However, Borrego Health pleads in the

1    alternative that the individual dentists and their affiliated professional corporation(s)

2    may not have been agents of one another for purposes of the interference causes of

3    action set forth below.

4         54.    Borrego Health is ignorant of the true names and capacities of those

5    defendants sued herein as DOES 101 through 250, and for that reason has sued such

6    defendants by fictitious names.  Borrego Health will seek leave of the Court to

7    amend this Complaint to identify said defendants when their identities are

8    ascertained.

9    **IV.    <u>RULE 9(b) REQUIREMENTS</u>**

10        55.    Several of Borrego Health's claims are subject to Federal Rules of Civil

11   Procedure Rule 9(b). Federal Rules of Civil Procedure Rule 9(b) states, "In alleging

12   fraud or mistake, a party must state with particularity the circumstances constituting

13   fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

14   may be alleged generally." Fed. R. Civ. P. 9(b). Notably, "[u]nder Ninth Circuit law,

15   a pleading is sufficient for purposes of Rule 9(b) if it identifies the circumstances

16   constituting fraud so that the defendant can prepare an adequate answer. While

17   conclusory allegations will not suffice, statements which provide the time, place and

18   nature of the alleged fraudulent activities will." *Zatkin v. Primuth*, 551 F.Supp. 39,

19   42 (S.D. Cal. 1982) (*citing Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602,

20   611 (9th Cir.1977); *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th

21   Cir.1973)). For claims subject to Rule 9(b), the complaint must include "the who,

22   what, when, where, and the how of the misconduct charged." *Aton Center, Inc. v.*

23   *Northwest Administrators, Inc.*, No. 21CV1843-L-MSB, 2022 WL 4229307 *4

24   (Sept. 13, 2022 S.D. Cal.) (*quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

25   1106 (9th Cir. 2003)). Importantly, however, a plaintiff need not plead every

26   instance of fraud in order to "plead with particularity." Any assertion that only

27   offering a sampling of alleged misconduct does not comply with Rule 9(b) is

28   "unsupported by law." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-

7275860.1

0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.). "The Ninth Circuit has stated Rule 9(b)'s particularity requirement can be met through use of sampling." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.) (*citing Edeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010). "Although it is not mandatory that [Plaintiff] provide representative examples, such examples would go a long way in providing the necessary particularity under Rule 9(b)." *Satmodo, LLC v. Whenever Communications*, No. 17-CV-0192, 2017 WL 637132 *2 (Dec. 8, 2017 S.D.C.A.) (*quoting Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 Fed.Appx. 535, 537 (9th Cir. 2010)).  The below allegations and representative examples provide the "who, what, when, where, and how" of the alleged misconduct to put all Defendants on proper notice and is therefore sufficiently pled under Rule 9(b).

## V.    THE SCHEMES THAT DAMAGED BORREGO HEALTH

### A.    The Scheme to Form and Sell Entities Formed by Borrego Insiders to Borrego Health (the "Borrego MSO/IPA Scheme")

56.    One of the earliest discovered schemes concocted by the Borrego Insiders to the detriment of Borrego Health is the formation of Borrego Management Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians Association, A Professional Medical Corporation ("Borrego IPA"), and the sale of those entities to Borrego Health.

57.    While CEO of Borrego Health, Bruce Hebets devised a scheme to have Borrego Health incur unnecessary costs by providing physician services and administrative services to Borrego Health through companies that he and other Borrego Insiders would create and control.  This allowed the Borrego Insiders to improperly profit from those companies at the expense of Borrego Health.

58.    Both Borrego MSO and Borrego IPA were formed on or about July 19, 2010 through the assistance of Mikia Wallis, in-house counsel at Borrego Health. Mikia Wallis provided this service without charge to Borrego MSO or Borrego IPA,

7275860.1

using Borrego Health resources to benefit some of the Borrego Insiders. Borrego MSO and Borrego IPA were potential referral sources for Medi-Cal beneficiaries. Mikia Wallis was listed as the agent for service of process for both entities.

59.     As Bruce Hebets and other Borrego Insiders were not medical professionals, their ownership in Borrego IPA, which was a professional medical corporation, was constrained.  Thus, other friends, cronies, and referral sources became investors, including Dr. Alfredo Ratniewski and his daughter.  Dr. Alfredo Ratniewski was motivated to cooperate, in part, by the Borrego Insiders' decision to overcompensate him as Borrego Health's Chief Medical Officer and to overcompensate his family members who also worked at Borrego Health.

60.     Borrego MSO, on the other hand, is a lay entity, which was supposed to manage the Borrego IPA practice.  Bruce Hebets was sophisticated enough to try to avoid scrutiny of the obvious conflict problems by keeping his name away from Borrego MSO.  Instead, Karen Hebets (Bruce Hebets' wife) was a shareholder, and was named as Borrego MSO's Chief Executive Officer.  Karen Hebets had no experience managing an IPA and was not qualified to do so.

61.     Through Borrego MSO's purported "management" services, Borrego MSO could charge Borrego IPA for unnecessary services, and funnel the funds to Karen Hebets and other Borrego Insiders.

62.     Borrego MSO and Borrego IPA were then contracted with Borrego Health to provide physician and administrative services to Borrego Health.  However, these services were already being provided without the unnecessary expense of contracting with outside companies.  Tellingly, Borrego MSO and Borrego IPA did not do business with any other healthcare providers, only Borrego Health.

63.     Eventually, a plan was developed by Bruce Hebets and other Borrego Insiders for Borrego Health to buy Borrego MSO and Borrego IPA.  The entities had no valuable assets to sell to Borrego Health.  The transaction was a sham

7275860.1

1   transaction meant to obscure the self-dealing of Bruce Hebets and other Borrego
2   Insiders.  Mikia Wallis facilitated the transaction, which was culminated with a
3   November 1, 2012 purchase agreement whereby Borrego Health paid $2,000,000 to
4   acquire Borrego MSO and Borrego IPA.

5        64.    On information and belief, the plan was to take some of that money and
6   pay it to the investors of Borrego IPA.  Thus, all of the investors at Borrego MSO
7   and Borrego IPA would profit at the expense of Borrego Health.

8        65.    On information and belief, the Borrego Insiders were compensated for
9   this access and control through kickbacks or other payments or remuneration.

10       **B.**     **The Scheme to Contract with Premier Allowing Premier to Get**
11                  **Paid Tens of Millions of Dollars to Purportedly Provide**
12                  **"Management Services" It Was Not Capable of Providing (the**
13                  **"Premier Scheme")**

14           **i.**     **The Contract Dental Program is Formed**

15       66.    Borrego Health began a contract dental program in 2014.  In general,
16   the Medi-Cal program recognizes the value of a FQHC expanding the availability of
17   its services, so it allows FQHCs to enter into contracts with private practice
18   healthcare professionals to provide services to the FQHC's members.

19       67.    In general, "contract dental" describes the arrangement where Borrego
20   Health expanded its service area by entering into contracts with individual dentists
21   and/or their practices.  Under those contracts, the contracted dentists agreed to
22   provide certain dental services to eligible patients of Borrego Health.  Those
23   services would then be billed to Medi-Cal by Borrego Health.  Borrego Health, in
24   turn, pays the dentist a fee for the dental services rendered.

25       68.    Importantly, the fees that Borrego Health paid to the dentists were far
26   greater than what the dentists would have been paid if they had billed Medi-Cal for
27   the services directly.  Therefore, the dentists were motivated to contract with

28

7275860.1

Borrego Health.  As a result, some dentists were taking their existing patients and converting them to "Borrego Health patients."

69.   The contract dental program expanded so quickly because Medi-Cal paid Borrego Health based a fixed rate for each service that Borrego Health (or its contracted dentists) provided.  The billing is known as "encounter" billing, and each "encounter" or visit Borrego Health (or its contracted dentists) has with a patient is reimbursed the fixed fee amount based on Borrego Health's historic costs.

70.   If the dentists were not contracted with Borrego Health and provided dental services to a Medi-Cal beneficiary, then the dentist would be paid under the Medi-Cal fee schedule, a per service billing method, that is described by many dentists as very low.

71.   The fixed fee, encounter-based payment was high relative to the costs of providing dental services.  This allowed Borrego Health to pay the contracted dentists more than what Medi-Cal would have paid to the dentist directly under the Medi-Cal fee schedule, and still retain a handsome profit.

72.   In each instance Borrego Health was billing Medi-Cal for the services that the contract dentist billed Borrego Health.

73.   Borrego initially managed the contract dental program on its own.

74.   By fall 2015, Borrego Health's contract dental program comprised approximately 20 to 25 percent of Borrego Health's total revenue.

ii.   **Hebets Proposes an MSO Idea, Which Is Rejected by Borrego Health**

75.   Sometime in 2015, Bruce Hebets, possibly due to his experience with Borrego MSO and Borrego IPA, identified a significant business opportunity for an outside organization to provide management services for dental programs in FQHCs.  Specifically, he proposed the idea of Borrego Health contracting with a MSO to provide management services for its contract dental program.

7275860.1

76.     Bruce Hebets originally proposed that he would own 100 percent of the MSO, then sell 90-95 percent of it to Daryl Priest and/or others.  This would have resulted in a large, direct payment by Daryl Priest and/or others to Bruce Hebets, and then ongoing payments by Borrego Health to Bruce Hebets through the MSO due to Bruce Hebets' retained ownership of 5-10 percent.

77.     During an Executive/Finance Committee meeting on August 27, 2015, Bruce Hebets discussed his proposal to form an MSO that would contract with Borrego Health to provide management services for the contract dental program. Borrego Insiders Harry Ilsley, Dennis Nourse, and Mike Hickok were present at this meeting, along with Mikia Wallis and Diana Thompson.  These Borrego Insiders supported the proposal.  However, Mikia Wallis identified the risk of Bruce Hebets staring a competing company.

78.     On September 22, 2015, in an email to Mikia Wallis, outside counsel for Borrego Health warned that any potential MSO arrangement involving Bruce Hebets implicated conflict-of-interest laws, would have to be an arms-length transaction and that any compensation paid to Bruce Hebets under the deal must be at the fair market value.  As detailed below, this advice was later ignored.

79.     The discussion of the MSO proposal carried over into the next meeting of the Executive/Finance Committee meeting that took place on September 24, 2015.  The minutes from the meeting clearly document the attempt by Bruce Hebets, Mikia Wallis and Diana Thompson to convince the Executive/Finance Committee that Bruce Hebets' proposal was a good idea despite the conflict of interest issue being identified.

80.     For example, the Executive/Finance Committee members were told how no other company could provide this type of novel management services to FQHCs specific to their contract dental program needs.  The Executive/Finance Committee also discussed how Borrego Health could be a part-owner of the MSO. Ultimately, the discussion was tabled for presentation to the entire Board at its

7275860.1

1  October meeting, pending an analysis by outside counsel regarding Bruce Hebets'

2  clear conflict of interest issue.

3       81.    On October 21, 2015, Bruce Hebets arranged a phone call with Diana

4  Thompson, Mikia Wallis, and Dennis Nourse. Upon information and belief, the

5  nature of this call was to further discuss the proposed MSO.

6       82.    Ultimately, on or about October 29, 2015, the full Borrego Health

7  Board rejected Bruce Hebets' proposal to enter into an arrangement with a MSO in

8  which he held ownership interest as a result of the inherent conflict of interest.[1]

9  Some Board members who were present at that meeting recall that the Board went

10  as far as rejecting wholesale the idea that Borrego Health use an MSO to manage the

11  contract dental program, regardless of who owned or operated it.  The non-Borrego

12  Insider Board members believed the issue was settled; the MSO would not go

13  forward.  The Borrego Health Board did not approve moving forward with a MSO

14  at all.

15       83.    Outside counsel for Borrego Health attended the next meeting of the

16  full Borrego Health board.  The Board took no action while they were in the

17  meeting.  On or about December 11, 2015, Mikia Wallis told outside counsel that

18  "the Finance Committee" was reviewing the issue and she would get back to the

19  lawyers.  Mikia Wallis told outside counsel that the issue was put off until the next

20  Board meeting on December 17, 2015.  Outside counsel was prepared to attend that

21  meeting.  However, on December 16, 2015, Mikia Wallis called one of the outside

22  lawyers and said something to the effect of "it appears we will not need you after

23  all."

24

25

26  _____

27  [1] This experience of the full Board rejecting his proposal likely influences
subsequent actions by Bruce Hebets and others to avoid taking issues to the Board

28  again and instead reach deals among Bruce Hebets and the Borrego Insiders.

84.     On December 26, 2015, one of the outside counsel lawyers sent an email to Mikia Wallis asking if she needed anything more on the MSO issue.  Mikia Wallis falsely said that the Borrego Health decided not to move forward with the MSO plan.  In fact, the MSO plan was going forward, albeit in a modified form.

### iii.     The Borrego Health Insiders Enter Into a Management Services Agreement on Borrego Health's Behalf Anyway

85.     Notwithstanding the full Board's rejection of the very idea of an MSO and unbeknownst to Borrego Health, on March 1, 2016, Bruce Hebets and Premier executed a Management Services Agreement for Borrego Health's contract dental program ("Dental MSA").  None of the Borrego Insiders ever brought the Dental MSA to Borrego Health's full Board for consideration or approval.  Instead, the Borrego Insiders negotiated the terms of the arrangement with Premier and Mikia Wallis drafted the Dental MSA.  The Borrego Insiders then proceeded to enter into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board (whom they knew had already rejected the proposal).  A true and correct copy of the Dental MSA is attached hereto as Exhibit A.

86.     The existence of the Dental MSA was kept concealed by the Borrego Insiders.  In 2016, the person in charge of the contract dental program was Cynthia Preciado.  Cynthia Preciado was in charge of developing a team to manually scrub dental claims.  When the program became too large for her staff, Cynthia Preciado began developing a relationship with a vendor that would charge a total of $500,000 to develop and implement a process for scrubbing and submitting contract dental claims.

87.     Cynthia Preciado had this plan in motion and had even traveled to Utah to meet with the vendor to develop the process.  Then, in February 2016, she got a call from Bruce Hebets who told her that, effective immediately, she was no longer in charge of the contract dental program.  She drove to the office to speak with Bruce Hebets and Diana Thompson, but both refused to discuss the matter with her.

7275860.1

1   Only later was Cynthia Preciado informed of the arrangement with Daryl Priest.

2   She was instructed to hand everything over to Daryl Priest's son, Nick Priest, who

3   was running Premier.

4       88.    What followed was essentially a "hostile takeover" of contract dental,

5   spearheaded by Travis Lyon.  Cynthia Preciado was not included in any

6   conversations, but was told to hand over all relevant documents.  Cynthia Preciado's

7   access to the ShareDrive (the system which allowed her and her team to review

8   claims) was terminated. All of Cynthia Preciado's team was fired.

9       89.    Even before the execution of the Dental MSA on March 1, 2016, there

10   were ongoing discussions between the Board Insiders, Bruce Hebets, and the

11   Premier Defendants in order to ensure the Dental MSA moved forward. Indeed,

12   Cynthia Preciado documented her concerns in emails. On February 11, 2016 (weeks

13   before the Dental MSA was signed) Cynthia Preciado e-mailed Bruce Hebets

14   expressing her concerns. She stated:

15
16       "…there has been comments made that Daryl [Priest] and Travis [Lyon] are
   highly integrated with upper management and the Board of Directors
   interpreted as a measure of intimidation. There is a tone of 'better than you.'"
17

18       90.    Cynthia Preciado expressed her concerns later on to both Bruce Hebets

19   and the other Borrego Insiders, but her concerns were promptly disregarded and

20   concealed by the Borrego Insiders whenever such concerns were raised.

21       91.    Just as they kept Cynthia Preciado in the dark, Bruce Hebets and the

22   Borrego Insiders never informed the entire Borrego Health Board of the Dental

23   MSA, meaning that the Premier Defendants were highly integrated with the Borrego

24   Insiders long before the Dental MSA was even signed.

25       92.    Pursuant to the terms of the Dental MSA, Borrego Health was to pay

26   Premier $5 per participating patient visit to any contract dentist for the first 8,000

27   visits, then $25 per participating patient visit thereafter.  In return, Premier agreed to

28   provide the services to Borrego Health, including without limitation provider

1   contracting (marketing and negotiating) and relations, claims management and

2   processing (including "scrubbing" the contract dental claims for documentation

3   errors or inconsistencies and ensuring claims are in such a format as Borrego Health

4   may bill and submit to DHCS), management information system, quality

5   management, patient management, reporting, and other general administrative

6   services.

7        93.    The Dental MSA underwent two amendments – Amendment 1 and

8   Amendment 2.  The Premier Defendants were able to manipulate and control

9   Borrego Health to such a degree that there were able to take what was an already

10  unreasonable, one-sided agreement and amend it to make it even more unreasonable

11  and one-sided, without offering anything in return.  The first Amendment was

12  effective on or about December 22, 2016 ("Amendment 1") and the second on or

13  about July 1, 2017 ("Amendment 2").  A true and correct copy of Amendment 1 is

14  attached herein as Exhibit B.  A true and correct copy of Amendment 2 is attached

15  herein as Exhibit C.

16       94.    Amendment 1 of the Dental MSA was signed again by Bruce Hebets

17  and Daryl Priest.  Amendment 1 amended the term of the Dental MSA to extend for

18  the five year period beginning January 1, 2017, subject to an automatic renewal of

19  five years.  Amendment 1 also removed provision 3.B. from the Dental MSA which

20  permitted Borrego Health to terminate the Dental MSA without cause.  Amendment

21  1 was completely one-sided to the benefit of Premier, and Borrego Health received

22  no additional consideration.  The Borrego Insiders negotiated the terms of

23  Amendment 1 to the Dental MSA, Mikia Wallis drafted it, and the Borrego Insiders

24  entered into Amendment 1 to the Dental MSA on Borrego Health's behalf, without

25  any notice whatsoever to the full Board.

26       95.    Amendment 2 of the Dental MSA was signed by Mikia Wallis as

27  "Executive Vice President" of Borrego and Daryl Priest.  Amendment 2 to the

28  Dental MSA changed the compensation provisions of the original Dental MSA.  As

7275860.1

a result, Amendment 2 obligated Borrego Health to pay Premier $25 per visit, starting at the first visit rather than the previous term of $5 per visit for the first 8,000 visits.  Amendment 2 did not obligate Premier to perform any additional services in exchange for increasing their payment fivefold.  In essence, Amendment 2 conferred a benefit (worth $160,000) to Premier without any corresponding consideration to Borrego Health.  Again, Amendment 2 was completely one-sided to the benefit of Premier, and Borrego Health received no additional consideration. The lack of consideration and other reasons makes Amendment 2 unenforceable, and the Premier Defendants must return the overpaid funds.  The Borrego Insiders negotiated the terms of Amendment 2 to the Dental IPA, Mikia Wallis drafted it, and the Borrego Insiders entered into Amendment 2 to the Dental IPA on Borrego Health's behalf, without any notice whatsoever to the full Board.

96.     The Dental MSA and Amendments should have been provided to the Board for review and approval, but that was avoided by the Borrego Insiders.

97.     On September 8, 2017, Bruce Hebets and Daryl Priest entered into another Management Services Agreement – this time for Borrego's Contract Medical Program ("Medical MSA").  Another of Daryl Priest's companies, Summit Healthcare Management, Inc. (which has subsequently been merged into Premier), agreed to provide services similar to Premier's obligations under the Dental MSA. The terms of the Medical MSA required Borrego Health to pay $25 per patient visit to Summit in exchange for the management services provided.  The Borrego Insiders negotiated the terms of the arrangement with Premier, Mikia Wallis drafted the agreement and the Borrego Insiders entered into the agreement on Borrego Health's behalf, without any notice whatsoever to the full Board.  A true and correct copy of the Medical MSA is attached herein as Exhibit D.

98.     As part of both the Dental MSA and Medical MSA, Premier and Summit, through Daryl Priest, represented that they had the skill and experience necessary to fulfill their obligations under the Dental MSA and Medical MSA.

7275860.1

1   Specifically, among other things, they represented they had skilled clinical providers

2   to review and evaluate the claims.

3         99.     As part of the Dental MSA and corresponding Amendments, Premier

4   Defendants represented to Borrego Health that it was qualified and competent to

5   provide necessary administrative and management services for a FQHC.  The

6   Premier Defendants further represented they would comply with all guidelines, laws

7   and regulations governing transactions and security of electronic health records and

8   other patient information.  The Premier Defendants further represented they would

9   both maintain and allow auditing of all bills generated which related to dental

10  services provided under any agreement between Borrego Health and a contract

11  dental provider.

12        100.   Exhibit "A" to the Dental MSA further outlines that Premier

13  Defendants represented that they would market and negotiate new contract dental

14  agreements for the benefit of Borrego Health, provide ongoing education and

15  training to contract dental service providers and their staff, and address contract

16  dental service provider eligibility and claims inquiries.  The Premier Defendants

17  represented, among other things: (1) that they would obtain information from the

18  contract dental providers to insure Borrego Health had all information that was

19  required in order to properly and correctly bill Medi-Cal for such claims, (2) that

20  they would monitor the claims, bills and payments to dentists to the benefit of

21  Borrego Health to ensure compliance with all applicable statutes, regulations and

22  laws, (3) that they would provide ongoing education to contracted dental providers

23  to ensure compliance with Borrego Health policies and procedures, (4) regarding

24  patient eligibility, that they would actively track whether or not the services

25  rendered were eligible for reimbursement for each participating patient, and (5) that

26  they would, for the benefit of Borrego Health, perform both short and long-term

27  financial and strategic planning, and manage Borrego Health's relationship with

28  applicable regulatory agencies.

7275860.1

101.   As part of the Medical MSA, the Premier Defendants represented they would comply with all guidelines, laws and regulations governing transactions and security of electronic health records and patient information.  Premier Defendants further represented that they would provide any and all necessary staff, information systems, and support services needed to perform the services outlined in the Medical MSA.  The Premier Defendants represented, among other things: (1) that they would provide ongoing education to contracted providers to ensure compliance with Borrego Health policies and procedures, (2) that they would obtain information from contracted providers necessary for Borrego Health to properly bill for such claims, (3) that they would monitor claims, billing and payment for contracted providers to ensure Borrego Health's billing practices were compliance with applicable law, (4) as part of monitoring claims, that they would validate the eligibility and completeness of the claims submitted, and (5) that they would assist Borrego Health in verifying the credentials of healthcare providers requesting to partner with Borrego Health.

102.   The Premier Defendants did not perform the obligations set forth in the Dental MSA and Medical MSA.  Rather, once the Dental MSA and Amendments were executed, the Premier Defendants trained dentists how to maximize their revenue at the expense of Borrego Health, which also increased Premier's revenue because Premier received $25 per claim.  The Premier Defendants represented that they were reviewing and scrubbing dental claims for accuracy, however, as outlined herein, thousands of unsubstantiated, duplicate and/or fraudulent claims were paid to dentists.  For each of these claims, Premier wrongfully received payment.  Further details of Premier Defendants' conduct and breaches are alleged below.

103.   Bruce Hebets and the Borrego Insiders knew that $25 per claim was an unreasonably high price.  Before the Dental MSA was signed, Cynthia Preciado told them that $5 per claim would be reasonable.

FIRST AMENDED COMPLAINT

7275860.1

104.   At the time the Premier Defendants made these representations, they knew they lacked the knowledge, experience and skill to do these things, and that they would not be able to fulfill these promises.  Accordingly, the Premier Defendants did not intend to perform these promises.

105.   At the time the Premier Defendants made these representations, they knew these representations were false or had no reasonable grounds for believing the representations to be true.

106.   Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  Further, the payments from Borrego Health to the dentists were not recouped by Premier if Medi-Cal never paid Borrego Health.The Borrego Insiders Concealed the Premier Scheme from Borrego Health

107.   The Borrego Insiders concealed the Dental MSA, along with Amendment 1 and Amendment 2 thereto, and the Medical MSA from the full Borrego Health Board.  In fact, in August 2017, when the Borrego Insiders met to discuss expanding Borrego Health's relationship with Premier (or another Daryl Priest entity) to manage Borrego Health's nascent contract medical program, the Borrego Insiders (in a recorded conversation) acknowledge that they intentionally kept the 2016 Dental MSA from the full Board and that they intended to do the same with any future arrangement (which turned out to the Medical MSA).

108.   At a meeting of Borrego Insiders on August 31, 2017, Chuck Kimball asked with respect to the contemplated Medical MSA with the Premier Defendants, "…can we just do that in the Executive Committee [i.e. Borrego Insiders only], because I can think of a couple of people that are going to object to that."  Indeed, the Board had already rejected prior efforts for a dental MSO.  Because the Borrego Insiders knew that non-Borrego Insiders would object, the Borrego Insiders ultimately chose to conceal it from the rest of Borrego Health.  After Chuck Kimball asked his question, the following discussion took place (emphasis added):

7275860.1

BRUCE HEBETS: I guess the way I would answer that is, does this Committee want me to take this to the Board? Or does it feel comfortable enough without it?

MIKE HICKOK: Take what specifically?

CHUCK KIMBALL: The idea?

BRUCE HEBETS: The idea of working with Daryl on the contract.

CHUCK KIMBALL: I think they should be advised about it. I don't know if it's a up or down, we do it or don't do it. But I think --

BRUCE HEBETS: It could be handled however this Committee wants. I can take this to the Board as an up-or-down decision, or just an advisement -- by the way, we are doing this.

CHUCK KIMBALL: I'm wondering if we can get away with doing -- literally, get away with not explaining the details, but saying we are now moving forward on adding Contract Medical to the Contract Dental load that we have, and it should be a great deal and all that sort of thing. If you don't have to go into details, and nobody says, "Well, who's going to run it?"

BRUCE HEBETS: That's fine.

CHUCK KIMBALL: Then, are we in trouble there with (indiscernible) at all? An idea?

MIKIA WALLIS: No. I believe that's already part of the strategic plan, so I don't know if that report even needs approval. But just as a, you know, operational FYI.

CHUCK KIMBALL: An operational FYI is probably -- then I think there wouldn't be any problem presenting it. I think, in my mind, but Dennis and Mike?

MIKE HICKOK: I don't think the Board approved Daryl in the first place.

CHUCK KIMBALL: I think you're right.

MIKE HICKOK: I don't recall ever being asked.  I mean, we discussed it.

CHUCK KIMBALL: I think that was a slam dunk thing. It just happened, didn't it?

DENNIS NOURSE: I think what was discussed was, was it going to be your participation.

[OVERLAPPING SPEAKERS]

DENNIS NOURSE: <u>It might come as a surprise to some to know that Daryl is out there doing this</u>. That was never a part of the vote. And neither should be Contract Medical.

BRUCE HEBETS: The opportunity I put together -- trust me, I really wish that I had a piece of it, or that I received some kind of commission on it.

MIKE HICKOK: Don't we all.

BRUCE HEBETS: Because this is going to be off the (indiscernible) -- is still the only MSO that exists in the country doing this.

DENNIS NOURSE: Can we make that a conditional approval by the --

[OVERLAPPING SPEAKERS]

CHUCK KIMBALL: I was thinking, we are going to retire, like you and I. We could retire and draw a little salary.

MIKIA WALLIS: <u>None of this goes in the minutes</u>.

[OVERLAPPING SPEAKERS]

BRUCE HEBETS: If you were to analyze (indiscernible), he's at like $14- or $15 million a year revenue.

HARRY ILSLEY: Chuck?

CHUCK KIMBALL: Yeah?

HARRY ILSLEY: As I remember, and Bruce, you can correct me if I'm wrong, but <u>when we first talked about, regarding Daryl, we got approval through the Executive Committee only. We did not take that to the Board</u>.

CHUCK KIMBALL: I believe you're right.

HARRY ILSLEY: <u>That's the same with Contract Dental. That was not approved by the Board. That was approved by the Executive Committee</u>. So, I don't think you need to take this matter to the Board. I think the Executive Committee can approve it and go from there on it.

MIKE HICKOK: And Harry, I agree with you; it wouldn't be an up or down decision to the Board, but how about just advising them that this is going to be another program?

HARRY ILSLEY: And that's what we did before. We just advised them what we had done.

FIRST AMENDED COMPLAINT

7275860.1

109.   Ultimately, the Borrego Insiders determined that Bruce Hebets would "share with the board [his] thoughts of going into contract medical, and just leave it at that."  And ultimately, the Borrego Insiders only told the full Board that they were expanding into "contract medical."  The Borrego Insiders continued to conceal that there was a third party involved.

110.   At the August 30, 2017 Borrego Health Board meeting, the minutes reflect that "Borrego Health will be pursuing a contract medical program," along with the notation "Information only."

111.   Beyond intentionally omitting information about the Dental MSA and Medical MSA from the full Borrego Health Board, the Borrego Insiders also implemented several internal mechanisms to conceal the Premier Scheme. One example of this is seen through Diana Thompson and Karen Hebets' significant violations of the nepotism policy (see the below "Nepotism and Cronyism Scheme"). Diana Thompson and Karen Hebets hired several family members to place in the billing and accounting department at Borrego Health. These family members did not have any prior experience in the healthcare industry, let alone FQHC experience.  Karen Hebets and Diana Thompson then created a training protocol, in which the two "trained" their family members how to review the EOBs and claims submissions for errors and duplications.  As a direct result of Karen Hebets' and Diana Thompson's training, their family members allowed thousands of duplicate claims to be improperly processed.

112.   When non-familial employees requested to receive more broad departmental trainings, Diana Thompson instead ensured that employees were only trained for isolated projects.  This allowed the process of reviewing the fraudulent claims to be insulated and hidden from Borrego Health as a whole.

113.   Further, prior to 2020, Mikia Wallis ensured that the details included in Board and Executive Committee meeting minutes were kept to a minimum.  After these meetings, Mikia Wallis would request her assistant send her the draft minutes

so she could redline, edit, amend and delete information. That way, any subsequent requests for minutes would not reveal any details about what was discussed as it related to the alleged Schemes. For example, during the August 31, 2017 Executive Committee meeting, the Borrego Insiders were discussing the ongoing agreement with Daryl Priest and Premier. During the discussion, Mikia Wallis stated: "None of this goes in the minutes."

114.   On January 20, 2017, Travis Lyon told employees in Borrego Health's finance department that any communication regarding the Dental MSA needed to solely be directed to Travis Lyon.  This was to conceal from other Borrego Health employees what total monthly revenue Premier was receiving as a result of the Dental MSA.

115.   Mike Hickok would present monthly financial reports at each Board meeting.  At its highest, the compensation paid to Premier was $20 million in fiscal year 2019.  During fiscal year 2020, Borrego Health paid $18.15 million to Premier. However, despite Premier being Borrego Health's highest paid vendor, Mike Hickok failed to mention the arrangement in his reports.

116.   During the January 31, 2019 Executive Committee meeting, Mike Hickok admitted to Chuck Kimball that the Borrego Insiders had been keeping the full Borrego Health Board "out of the loop" (his words) as it pertained to Borrego Health's growth and the contract dental program.

117.   It was not until the summer of 2020 that Borrego Health Board members other than the Borrego Insiders became aware of the arrangement.

118.   By email on or about July 23, 2020, Borrego Insider Mike Hickok admitted, "As long as I have been on the board our dealings with them [Premier] have been secretive mysterious and above all off limits to board members."  Mike Hickok's email went on to report the basic terms of the Dental MSA and Medical MSA (along with the total fees paid to Premier the prior year), demonstrating that he was familiar with the arrangement and its terms.  The email also admitted that,

7275860.1

among other things, the Dental MSA and Medical MSA were never approved by the full Borrego Health Board, were never put out for competitive bidding, and were never reported on 990 forms.  Mike Hickok also stated that the arrangement with Premier "was hardly the extent of [Borrego Health's] involvement with the principals of Premier Healthcare" and that "no board member has ever seen the agreement or any other financial documents relating to this entity."  Mike Hickok did not explain why, since he knew about these arrangements, he had never raised them prior to this time.  Mike Hickok acknowledged "I have a fiduciary responsibility…" and that "each and every Board member can potentially be held accountable legally and financially for allowing an improper (and perhaps illegal) relationship to continue."

119.   It is clear that the Borrego Insiders were using contract dental as a source of money to fund their own enrichment. And others were in on this Scheme. When Jim Hebets (who was not employed by Borrego Health) was approached about possible cuts to the above-market, lucrative 162B plans the he sold to Borrego Health (alleged below), Jim Hebets responded on August 1, 2018, "Are you really sure that the board will actually want to cut these benefits given the good news about Contract Dental."

120.   Further, at a September 24, 2020 Finance Committee Meeting, the Dental MSA was discussed. Trustee Keenan Freeman indicated that billing software companies usually charge between $3-6 per claim, and that $25 per claim was outside of fair market value. Diana Thompson reassured Keenan Freeman that when the Dental MSA was entered into, several other vendors quoted 10%-12% of total revenue, which equated to approximately $25 per claim.

### iv.   <u>The Damages Suffered by Borrego Health Due to the Premier Scheme</u>

121.   Following the discovery of the Dental MSA and Medical MSA and the relationship with Premier by the full Borrego Health Board, Borrego Health retained

7275860.1

1  a valuation expert to determine the maximum fair market value of the services

2  Premier provided to Borrego Health, if those services were valuable at all.

3      122.   The valuation, conducted by BKD, determined that the fair market

4  value of the contract dental services Premier was supposed to perform totaled $19

5  million over the term of the Dental MSA (at that point).  However, Borrego Health

6  paid over $60 million for those services, meaning the Borrego Health overpaid by at

7  least $40 million.  The fair market value of the contract medical services was

8  $145,000 over the term of the Medical MSA (at that point).  Borrego Health paid

9  over $383,000 for those services, meaning the Borrego Health overpaid by over

10  double, or around $238,000.  Moreover, neither of these valuations take into account

11  the various breaches of contract set forth herein, which would reduce the value of

12  the services.

13      123.   The Dental MSA provides, in pertinent part, that Premier shall "defend,

14  indemnify and hold Borrego Health free and harmless from any obligations, costs,

15  claims, judgments, attorney's fees, or attachments arising from Premier's negligence

16  in the performance of the services contemplated under this Agreement." (*See*

17  Exhibit A, Section 6.)  The Medical MSA states that Summit (now Premier) "shall

18  defend, indemnify and hold Borrego Health, its officers, employees and agents

19  harmless from and against any and all liability, loss, expense (including reasonable

20  attorney's fees) or claims for injury or damages arising out of the performance of

21  this Agreement." (*See* Exhibit D, Section 8.)

22      124.   Borrego Health provided notice of Premier's indemnification

23  obligation, but Premier has not provided any financial support.

24      125.   Separate and distinct from Premier's contractual duty to indemnify

25  Borrego Health, Premier is also obligated to indemnify Borrego Health under equity

26  principles, if either agreement were not enforceable.  "Equitable indemnity applies

27  in cases in which one party pays a debt for which another is primarily liable and

28  which in equity and good conscience should have been paid by the latter

7275860.1

party." *United Services Auto. Ass'n v. Alaska Ins. Co.* (2001) 94 Cal. App. 4th 638, 644-645 (emphasis added); *see also Prince v. Pacific Gas & Elec. Co.* (2009) 45 Cal. 4th 1151, 1163.  As such, even if Premier were not contractually bound to indemnify Borrego Health, it still owes Borrego Health a duty of indemnification. *See Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal. 4th 541, 551 ("[C]ontractual promise to 'defend' another against specified claims clearly connotes an obligation of active responsibility, from the outset, for the promisee's defense against such claims.  The duty promised is to render, or fund, the service of providing a defense on the promisee's behalf—a duty that necessarily arises as soon as such claims are made against the promisee, and may continue until they have been resolved." [emphasis added]); Civil Code § 2778.  As such, Premier is under an obligation to cover the expense of Borrego Health's defense against any claims subject to the Dental MSA and Medical MSA.

126.  On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.  As Bruce Hebets stated at an August 31, 2017 meeting of the Borrego Insiders, "we've already made Daryl rich, but Daryl has made us richer."

127.  In addition, when the fraud related to the contract dental program was uncovered, both the contract dental and in-house dental programs were treated as fraudulent by the Department of Health Care Services and payments were suspended in amount to be proven at trial.  Under the payment suspension, Borrego Health has not been paid for the in-house dental services since the suspension was implemented in November 2020.

128.  In addition, Borrego Health was also forced to hire an independent monitor pursuant to the terms of the November 2020 partial Medi-Cal suspension. These monitors have cost Borrego Health $2.7 million thus far.

129.  In addition, Borrego Health has also been forced to close both its Riverside and Barstow clinics.

7275860.1

130.   In addition, Borrego Health has also been forced to incur significant legal and consulting fees, in an amount to be proven at trial.

131.   In addition, Borrego Health has also lost a significant numbers of staff, and continues to have difficulty retaining employees.

**C.    Certain Contract Dentists Submitted Fraudulent Bills with the Knowledge and Support of Premier and the Borrego Insiders (the "Fraudulent Dental Billing Scheme")**

132.   Based on both Medi-Cal and Borrego Health's billing and payment structure, some of the dentists were also motivated to provide as many services to Borrego Health patients as possible, in some instances even where the services were not medically unnecessary.  Even more egregious, some dentists split services that could have been done in one encounter to multiple encounters so that they could collect multiple times.  More egregious than that, some dentists provided multiple services during a single encounter, but billed the services as multiple encounters.  Finally, most egregious of all, some dentists billed for services they never provided.

133.   Unbeknownst to Borrego Health, certain contract dentists and dental practices, Premier and the Borrego Insiders schemed to maximize their profits at the expense of the Medi-Cal program and Borrego Health.  Since the dentists were paid on a "per encounter" basis, certain contract dentists, with the knowledge and support of Premier and the Borrego Insiders, among other things (1) provided services were not medically unnecessary, (2) split services that could have been done in one encounter to multiple encounters so that they could collect multiple times, (3) provided multiple services during a single encounter, but billed the services as multiple encounters, and/or (4) billed for services they never provided.  This scheme is detailed below.

134.   As part of the Dental MSA, Premier, through the Premier Defendants, were involved in the engagement and outreach of new dental providers for the contract dental program. Once the Premier Defendants found potential contract

7275860.1

dental providers, the Premier Defendants provided the dentists with a copy of their original Contract Dental Agreement.  The Premier Defendants then reviewed the terms and conditions of the agreements with the dentists, including reviewing and explaining the addendums which addressed the billing and payment structure under Medi-Cal.  (*See i.e.* Ex. L, Addendum E.)  The Premier Defendants did this for all Dental Defendants with the exception of Velasquez and Thompson.

135.   Under the Dental MSA, Premier was also responsible for training the Dental Defendants on how to properly submit their claims to Premier for payment. Premier employee, Maria Elena Fernandez, and Travis Lyon provided training to the Dental Defendants. The Borrego Insiders were also involved in ensuring Premier Defendants trained the contract dental providers in a way to maximize profits from the schemes.  For example, on February 20, 2018, Karen Hebets and Travis Lyon had an afternoon phone call to discuss training protocols.

136.   Under the Dental MSA, Premier was responsible for claims monitoring, which involved review of claims received by contract dental providers to ensure that claims were compliant with federal and state regulation prior to submission to Borrego Health for final submission to Medi-Cal for payment.  Prior to the Program Integrity implementation (discussed below), Borrego Insider Karen Hebets had responsibility for billing audits and identifying billing discrepancies.

137.   Under the Dental MSA, Premier was also responsible for implementing quality management measures to address patient grievances, audit and survey contract dental providers and provide Borrego Health with the findings of such surveys and audits, and provide education and training to contract dental providers who did not meet the requirements under the quality measures implemented.

138.   The Premier Defendants completely abdicated their responsibilities under the Dental MSA, because effective performance would have undermined the scheme to facilitate contract dentists overbilling Borrego Health for services.  The Premier Defendants understood that the more claims that were submitted benefitted

1    the Premier Defendants, because Premier was compensated by Borrego Health
2    based on the volume of claims.

3          139.   While it is true that the Premier Defendants were derelict in their
4    duties, their conduct went much further.  The Premier Defendants actively supported
5    the fraud described below.  On information and belief, the Premier Defendants
6    coached dentists on how to fraudulently bill Borrego Health, including coaching
7    them on "claim splitting" and fraudulently billing for non-covered bridges.

8          140.   Dentists were paid on a per-encounter basis, so in the event that a
9    dentist performed multiple procedures in one encounter, they were still paid for one
10   encounter.  The Premier Defendants coached dentists to split these claims, *i.e.*, bill
11   one encounter on the day it occurred and the next day, so that the dentist could get
12   paid for both.  This is a fraud on Borrego Health and on the government.  It is clear
13   from the following paragraphs that the dentists took this practice to the extreme,
14   sometimes billing for dozens of patient visits for one patient in a single month.

15         141.   Another way the Dentist Defendants, supported by the Premier
16   Defendants and Borrego Insiders, submitted false and fraudulent bills was through
17   improper billing for bridges.  Dental bridges literally bridge a gap for a missing
18   tooth.  A connected bridge covers both sides of the teeth next to the missing tooth to
19   hold a false tooth in the missing spot.  A bridge is generally not covered by Medi-
20   Cal.  To avoid this non-coverage, on information and belief, the Premier Defendants
21   coached dentists to bill for three crowns – one for missing tooth and one for each
22   tooth beside it – instead of billing for a bridge, and to bill three separate encounters.
23   In this way, rather than billing for one non-covered service (and one visit), the
24   dentist falsely documented three covered services and fraudulently billed for all
25   three.

26         142.   Premier routinely approved of services that could not have possibly
27   occurred.  Dentists were required to upload a progress note and an x-ray for Borrego
28   Health to pay the dentists for certain claims.  Borrego Health has also identified

7275860.1

dozens of examples in which x-rays clearly demonstrate that the claimed service could not have occurred (e.g., because the x-ray submitted to Premier shows that the tooth supposedly receiving the service is no longer in the mouth of the patient), yet employees from Premier still signed their names to approve the services.

143.   After the Premier Defendants received the claims from the Dental Defendants, they would e-mail the bills to Diana Thompson, Karen Hebets, Julian Thompson, and other family members Borrego Insiders hired to Borrego Health's finance department.  Premier would electronically submit the Dental Defendants' claims to Borrego Health then e-mail its invoices for the claims it processed.  This occurred on a monthly basis.  For example, on December 10, 2019, Travis Lyon e-mailed Diana Thompson with Premier's November 2019 invoice.  The invoice included a total of 79,217 claims.  Of those claims, Aldairi billed 2,190 claims, which was nearly ten times higher than the average claims billed by other contract dental providers that month.  To put this further into perspective, Aldairi would have needed to see over 115 patients every business day that month to reach that total. During that same month, Stephan billed for 1,195 claims, over five times the average claims billed by other contract dental providers that month.  The Premier Defendants did not flag these billing practices as suspicious to Borrego Health. Rather, Premier Defendants pushed these claims forward, represented it reviewed the claims to confirm they were legitimate and had the required supporting documentation, and demanded $25 per claim they allegedly reviewed.  And despite these clear outliers, once the invoices were sent to Diana Thompson, she did not take any action to bring attention to these discrepancies, instead pushing them through Borrego Health's finance department for her step-son Julian Thompson to process Premier's payment.  Julian Thompson then mailed Premier a check for $1,980,425.00.  Additionally, the greater number of claims, the more staff Borrego Health's finance department would need to keep the scheme concealed, allowing

7275860.1

1  Diana Thompson more opportunities to hire more of her family for positions in

2  which they lacked the qualifications.

3       144.   In another example, on January 20, 2020, Travis Lyon e-mailed Diana

4  Thompson with Premier's invoice for the December 2019 claims, which totaled

5  58,437 contract dental claims.  In the December 2019 invoice, a single office run by

6  Aldairi submitted 1,680 claims alone, over ten times the average number of claims

7  of the other dental providers.  Another dentist, Stephan, billed 1,062 claims during

8  that one month for one of his offices, over six times the average number of claims

9  submitted by the other contract dental providers.  The Premier Defendants did not

10 flag these billing practices as suspicious to Borrego Health. Rather, the Premier

11 Defendants pushed these claims forward, represented it reviewed the claims to

12 confirm they were legitimate and had the required supporting documentation, and

13 demanded $25 per claim they allegedly reviewed.  And despite these clear outliers,

14 once the invoices were sent to Diana Thompson, she did not take any action to bring

15 attention to these discrepancies, instead pushing them through Borrego Health's

16 finance department for her step-son to process Premier's payment and mail Premier

17 a check for $1,460,925.00.  Additionally, the greater number of claims, the more

18 staff Borrego Health's finance department would need to keep the scheme

19 concealed, allowing Diana Thompson more opportunities to hire more of her family

20 for positions in which they lacked the qualifications.

21      145.   In another example, on March 16, 2020, Travis Lyon e-mailed Diana

22 Thompson with Premier's invoice for the February 2020 claims, which totaled

23 67,928 contract dental claims. In the February 2020 invoice, a single office run by

24 Aldairi submitted 2,042 claims alone, over ten times the average number of claims

25 of the other dental providers.  Another dentist, Arakelyan, billed 1,072 claims during

26 that one month for one of his offices, over five times the average number of claims

27 submitted by the other contract dental providers.  Another dentist, Stephan, billed

28 1,291 claims during that one month for one of his offices, over six times the average

FIRST AMENDED COMPLAINT

7275860.1

1   number of claims submitted by the other contract dental providers.  The Premier

2   Defendants did not flag these billing practices as suspicious to Borrego Health.

3   Rather, Premier pushed these claims forward, represented it reviewed the claims to

4   confirm they were legitimate and had the required supporting documentation, and

5   demanded $25 per claim they allegedly reviewed.  And despite these clear outliers,

6   once the invoices were sent to Diana Thompson, she did not take any action to bring

7   attention to these discrepancies, instead pushing them through Borrego Health's

8   finance department for her step-son to process Premier's payment and mail Premier

9   a check for $1,698,200.00. Additionally, the greater number of claims, the more

10  staff Borrego Health's finance department would need to keep the scheme

11  concealed, allowing Diana Thompson more opportunities to hire more of her family

12  for positions in which they lacked the qualifications.

13              i.      **Husam E. Aldairi, D.D.S.**

14          146.   On or about May 27, 2016 and May 29, 2018, Husam Aldairi, D.D.S.,

15  both individually and through his company Aldairi DDS, Inc. (collectively,

16  "Aldairi") entered into written dental services agreements (the "Aldairi

17  Agreements") whereby Aldairi agreed to provide primary dental services to

18  participating Borrego Health patients, and Borrego Health agreed to pay Aldairi for

19  those services.  Husam Aldairi is the sole officer and director of Husam Aldairi,

20  D.D.S. Husam Aldairi also operates as the Chief Executive Officer, Secretary and

21  Chief Financial officer of Husam Aldairi, D.D.S. Husam Aldairi is also the agent for

22  service of process for Husam Aldairi, D.D.S. Husam Aldairi maintains complete

23  ownership, management and control of Husam Aldairi, D.D.S. As such, while the

24  parties to the Aldairi Agreements are Borrego Health and Husam Aldairi, D.D.S.,

25  Husam Aldairi, as the alter ego and/or sole owner of Husam Aldairi, D.D.S. and as

26  signatory of the Aldairi Agreements, is capable of being held personally liable under

27  the Aldairi Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true

28  and correct copy of the 2016 Aldairi Agreement is attached herein as Exhibit E, and

7275860.1

1    a true and correct copy of the 2018 Aldairi Agreement is attached herein as Exhibit

2    F.

3      147.   As a participant in Borrego Health's contract dental program, Aldairi

4    was involved in Borrego Health's operations by providing dental services to

5    Borrego Health patients.

6      148.   Among other things, the Aldairi Agreements required that Aldairi

7    practice dentistry in accordance with all Federal, State and local laws, regulations,

8    and generally accepted principles applicable to the practice of dentistry, and  to

9    prepare, establish, and maintain administrative records, financial records, records

10    pertaining to patient diagnosis and treatment, and information pertaining to the

11    services provided.

12      149.   Aldairi submitted false and fraudulent bills and made other statements

13    which Aldairi knew to be false or had no reasonable grounds for believing their

14    representations were true, which also constitute a breach of the Aldairi

15    Agreement.  A non-exhaustive list of examples is set forth below.  The below

16    examples are demonstrative of a larger pattern and practice of fraudulent and/or

17    unlawful conduct.

18      150.   On May 21, 2020, the Executive Officer of the Dental Board of

19    California (the "Dental Board"), Karen M. Fischer, issued an Accusation against

20    Husam Aldairi alleging Husam Aldairi, dating back to December 2016, committed

21    gross negligence, "repeated acts of professional negligence," and failed to properly

22    document patient treatment, surgical procedures, diagnosis, and clinical findings.

23    The Accusation sought to revoke or suspend Husam Aldairi's dentist license to

24    practice in California.

25      151.   On May 25, 2021, the Dental Board and Husam Aldairi agreed to a

26    Stipulated Settlement and Disciplinary Order in which Husam Aldairi "voluntarily,

27    knowingly, and intelligently waive[d] and [gave] up" his legal rights, including a

28    right to hearing on the charges and allegation.  Under the order, Husam Aldairi's

dental license to practice in California was revoked, but the revocation was stayed
pending a two-year probationary period. The Dental Board adopted the order,
effective June 24, 2021.

152.   Husam Aldairi never informed Borrego Health of the ongoing Dental
Board investigation on his license or the issued Accusation.

153.   Husam Aldairi's failure to inform Borrego Health of the ongoing
Dental Board investigation on his license or the issued Accusation, made the First
Agreement subject to suspension until the Dental Board issued its final
determination on April 29, 2021.

154.   Husam Aldairi's failure to inform Borrego Health of the ongoing
Dental Board investigation on his license or the issued Accusation, made the Second
Agreement subject to suspension until the Dental Board issued its final
determination on April 29, 2021.

155.   In September 2020, Borrego Health conducted a compliance re-audit of
Husam Aldairi. Husam Aldairi had failed his prior audit with Borrego Health, but
Borrego Health provided Husam Aldairi another opportunity to obtain compliance
with Borrego Health's policies. Borrego Health even offered Husam Aldairi one-
on-one compliance trainings. For the September 2020 audit, out of the sampled
dental record documents pulled for his private practice at the San Diego location,
none of them met the documentation requirements under the Aldairi Agreements
and Borrego Health's policies for contract dental providers. Out of the sampled
dental record documents pulled for Aldairi DDS, Inc. at the El Cajon location, only
three out of 30 claims met the documentation requirements under the Aldairi
Agreements and Borrego Health's policies for contract dental providers.

156.   The results of Borrego Health's audit from September 2020 of Husam
Aldairi indicated that Husam Aldairi had clearly violated the terms of the Aldairi
Agreements by his actions, including but not limited to: (1) billing excessive patient
visits, including falsifying appointment schedules; (2) failing to maintain adequate

7275860.1

1   documentation to support billing; (3) falsification of medical records; (4) performing

2   services that lacked medical necessity; (5) providing services that fell below the

3   standard of care; (6) providing excessive services; and (7) generating inaccurate

4   billing records, including billing for services not rendered, upcoding, inappropriately

5   splitting services, and billing for services rendered by another provider and/or

6   providers not enrolled in Medi-Cal.

7         157.   For example, patient charts with Husam Aldairi demonstrated in

8   multiple instances that patients presented to his office on several consecutive days to

9   receive dental services, however, patient scheduling did not support such frequent

10  visits.  In some instances, patient charts would have notes for services rendered on

11  days in which Husam Aldairi's offices were closed.[2] Program Integrity calculated a

12  65% rate of potentially falsely billed appointments (meaning no face-to-face

13  encounter).  As an example, the audit found that there were notes written and

14  procedures billed by Husam Aldairi indicating that a face-to-face visit occurred on

15  dates when the office was closed for the Thanksgiving holiday.

16        158.   Further examples include: (1) on or about June 2020, a patient in which

17  Husam Aldairi billed Borrego Health for telehealth and emergency dental services

18  completely absent from the patient's chart; (2) on or about July 2019, Husam

19  Aldairi's office billed Borrego for several crowns when x-rays demonstrated a

20  bridge had been placed on the patient; (3) on or about May 2019, Husam Aldairi

21  billed Borrego Health for a partial denture which was never prepared; and (4) on or

22

23  [2] To protect patient private health information ("PHI") as well as personally
    identifiable information ("PII"), the names of the patients in the examples
24  throughout the complaint will not be included.  The specific information, including
    names, dates of service, and all other information, are already available to the
25  Dentist Defendants, as they maintain custody of the patient charts.  Borrego Health
    alleges that each claim referenced throughout this FAC represents a specific claim
26  the dentist submitted to Borrego Health.  Borrego Health can produce the specific
27  information for each alleged claim to the Dentist Defendants.

28

7275860.1

about February 2020, Husam Aldairi billed Borrego Health as though a patient's root canal was completed over the course of several visits, when x-rays demonstrated it was completed in one visit.  Dr. Aldairi billed Borrego for patient visits that either did not occur or that were provided by providers that were not disclosed to or credentialed by Borrego Health.  One example of extreme excess billing occurred on July 22, 2019. Dr. Aldairi billed Borrego Health for 147 patient visits that he claimed occurred that day.

159.   In October 2019, Dr. Aldairi billed 15 different encounters for a single patient, despite the fact that there are only 23 business days in October.  In May 2020, Dr. Aldairi billed 16 different encounters to a single patient, despite only having 21 business days in that month.  Further, in June 2020, one of Dr. Aldairi's subproviders billed 18 different encounters during the month of June 2020. That same subprovider then billed 34 different encounters for a single patient from the time period of May 2020 to June 2020.  Again, Premier did not flag these bills and took no steps to counsel or discipline this dentist.

160.   Review of Aldairi's claims data indicates he carried out his excessive visits scheme to great effect.  Aldairi billed for more than five visits for the same patient in a seven day period 6,340 times between February 2017 and January 2021. It would be unusual for an individual ever to require dental service every weekday for an entire week.  However, during the approximately five year span, Aldairi represented that he had that unusual occurrence happen 6,340 times.  During that same period, he billed for twelve or more visits in a 30-day period for the same patient more than 3,837 times.

161.   Aldairi submitted these claims to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be

7275860.1

submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

162.   Further, at the beginning of the COVID-19 pandemic, when most dental offices were closed or working at near-zero capacity, Aldairi's office continued to be hyper-productive.  To do this, Aldairi increased his billing of teledentistry (D9995) and emergency visits (D9430).  However, Borrego Health's recent review of the charts indicated that these visit types were not documented in the progress notes for the patients, calling into question whether they actually occurred.

163.   In addition to the above, Aldairi hired Maura Tuso in September 2017 to work as a dentist at his dental practice. Dr. Tuso was employed by Dr. Aldairi from September 2017 to January 2018. During the time Dr. Tuso worked for Aldairi, Dr. Tuso was suspended from providing dental services to Medi-Cal patients.  Aldairi was aware that Dr. Tuso was suspended at the time Aldairi hired Dr. Tuso.  Nevertheless, Aldairi allowed Dr. Tuso to see Borrego Health patients and bill Borrego Health for the services Dr. Tuso provided to Medi-Cal patients.

164.   Aldairi also hired other dental providers, in addition to Dr. Tuso, who lacked California dental licenses to provide dental services to Borrego Health patients.  Upon information and belief, Aldairi billed Borrego Health for the services that unlicensed dental providers provided to Medi-Cal patients.

165.   As a result of Aldairi's conduct, Borrego Health paid Aldairi and/or for services which were not rendered, that were provided by other physicians, and/or services which were provided during a period of time where the parties' agreements would have otherwise been suspended or terminated.

166.   As alleged above, the Premier Defendants and the Borrego Insiders worked diligently to ensure that Aldairi's fraudulent practices could continue,

7275860.1

1    preventing every effort by Program Integrity to terminate Aldairi, even going as far

2    as only allowing Travis Lyon to speak directly to Aldairi.

3                        **ii.      Ayed Hawatmeh, D.D.S.**

4          167.   On or about October 18, 2017, Ayed Hawatmeh, D.D.S., both

5    individually and through his company Hawatmeh Dental Group, P.C. (collectively

6    "Hawatmeh") entered into a written dental services agreement (the "Hawatmeh

7    Agreement") whereby Hawatmeh agreed to provide primary dental services to

8    participating Borrego Health patients, and Borrego Health agreed to pay Hawatmeh

9    for those services. Ayed Hawatmeh is the sole officer, Chief Executive Officer, and

10   the agent for service of process for Hawatmeh Dental Group, P.C. As such, while

11   the parties to the Hawatmeh Agreement are Borrego Health and Hawatmeh Dental

12   Group, P.C., Ayed Hawatmeh, as the alter ego and/or sole owner of Hawatmeh

13   Dental Group, P.C. and as signatory of the Hawatmeh Agreement, is capable of

14   being held personally liable under the Hawatmeh Agreement. (*See i.e. Irey v. Len*

15   (1961) 191 Cal. App. 2d 13.)

16         168.   A true and correct copy of the Hawatmeh Agreement is attached herein

17   as Exhibit G.

18         169.   As a participant in Borrego Health's contract dental program,

19   Hawatmeh was involved in Borrego Health's operations by providing dental

20   services to Borrego Health patients.

21         170.   Among other things, the Hawatmeh Agreement required that

22   Hawatmeh practice dentistry in accordance with all Federal, State and local laws,

23   regulations, and generally accepted principles applicable the practice of dentistry,

24   and to prepare, establish, and maintain administrative records, financial records,

25   records pertaining to patient diagnosis and treatment, and information pertaining to

26   the services provided.

27         171.   Hawatmeh submitted false and fraudulent bills and made other

28   statements which Hawatmeh knew to be false or had no reasonable grounds for

7275860.1

believing their representations were true, which also constitute a breach of the Hawatmeh Agreement.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

172.   Hawatmeh routinely employed the scheme, described above, whereby he would bill for several crowns instead of a single, non-covered bridge.  For example, on or about February 2018, Hawatmeh billed Borrego Health for several crowns were placed over the course of several days when documentation indicated a single bridge was used.

173.   Hawatmeh also billed for services that the x-rays he submitted to Premier to get his claim approved clearly demonstrate could not have possibly occurred.  For example, on or about May and June of 2018, Hawatmeh billed Borrego Health for services performed on a tooth the patient no longer had at the time of service.  Hawatmeh billed Borrego Health for a visit on February 22, 2018 for preparing a tooth for a crown, which requires shaving down the tooth.  However, x-rays of that patient from May 2017 clearly demonstrate that tooth had an implant in that spot, meaning there was no natural tooth for Hawatmeh to prepare to receive a crown. (*See, supra,* n. 2).

174.   In late 2018, Borrego Health became concerned that Hawatmeh was billing for excessive visits when it identified that he had billed for 26 visits for one patient in one month. Borrego Health put a hold on paying Hawatmeh's invoices.

175.   On November 26, 2018, Dr. Hawatmeh confirmed via email that a biller in his office was responsible for "billing discrepancies." On November 29, 2018, Dr. Hawatmeh sent an email to Premier staff identifying dozens of visits for 20 patients that were improperly billed.

176.   That same day, Mr. Lyon emailed Dr. Martinez an excel file with patient visits for which Hawatmeh billed, which stated:

1   "In just a quick cursory review of one of the patients (REDACTED) I can see

2   that there are a handful of claims that were billed to Borrego, that do not exist

3   in the patient chart.  It looks like the 2952 visits were fabricated and some of

4   the visits where multiple teeth were surgically extracted, they were billed as

5   showing they happened in multiple visits."

6   177.   Despite knowing of these improper visits, on November 30, 2018,

7   Travis Lyon emailed Dr. Martinez and Dr. Venugopal that the billing issue was

8   "isolated," argued Hawatmeh should be allowed to self-audit, and encouraged

9   Program Integrity to only audit three additional charts.

10   178.   The Premier Defendants allowed these excessive, unsubstantiated, and

11   duplicative claims to be submitted to Borrego Health for processing and payment,

12   because Premier received $25 per claim submitted to Borrego Health.  Further, once

13   the claims had reached Borrego Health, Karen Hebets and Diana Thompson had

14   trained their family members not to flag these claims as potentially fraudulent.

15   179.   Program Integrity then sought to terminate Hawatmeh's provider

16   contract, but this effort was stopped by Travis Lyon and the Premier Defendants. On

17   December 7, 2018, the Premier Defendants pushed back on immediately terminating

18   Hawatmeh's provider contract under the pretext that such a move would complicate

19   the ongoing Program Integrity audit.  Premier's lawyer, Erin Minelli, advised

20   Borrego Health against terminating Hawatmeh and told Borrego Health to pay

21   outstanding invoices.

22   180.   The same week, Travis Lyon sent an email to Dr. Martinez with a list

23   of Hawatmeh's patients who received six or more crowns.  Travis Lyon used this

24   example of gross over-utilization to justify *continuing* to pay Hawatmeh, claiming:

25   "If we can continue to keep Dr. Hawatmeh's cooperation I believe we can facilitate

26   an audit of all the patient charts in this list…." and that "We believe it is critical to

27   encourage continued cooperation with Dr. Hawatmeh to facilitate continued audits

28

7275860.1

1   and investigations necessary to determine the extent of Borrego's potential

2   liability."

3   181.   Travis Lyon continued to put pressure on Program Integrity to release

4   the hold on Hawatmeh's invoices. On December 10, 2018, Mr. Lyon emailed Dr.

5   Martinez acknowledging that there are "phantom claims" and "potential over-

6   utilization" in the set of invoices, but that Borrego Health should go ahead and pay

7   half of the invoices.  On December 11, 2018, Karen Hebets sent an email, copying

8   Diana Thompson, instructing staff to pay Hawatmeh.  Diana Thompson then

9   emailed Travis Lyon to assure him Hawatmeh's check was forthcoming. Travis

10  Lyon responded that he "just spoke with Hawatmeh" and asks that the checks be

11  sent FedEx overnight rather than via courier.

12  182.   Ultimately, Program Integrity completed a full-file review of each of

13  Dr. Hawatmeh's offices. The results of this audit lead to Program Integrity

14  recommending his termination. Hawatmeh was terminated from the contract dental

15  program on September 17, 2019. The significant delay in terminating Hawatmeh

16  (and the harm caused during that period) is attributable to the Premier Defendants

17  and Borrego Insiders, who prolonged Hawatmeh's tenure so that they (and

18  Hawatmeh) could continue to benefit from his fraudulent billing.

19  183.   Subsequent review of Hawatmeh's billing patterns demonstrate the

20  extent of his excessive billing, which was of course confirmed through the 2019

21  audit of his patient charts.  During his time billing to Borrego Health, Hawatmeh

22  billed for twelve or more visits for the same patient in a 30-day period more than

23  6,500 times.  He billed five or more visits for the same patient in a 7-day period

24  more than 6,600 times.  It would be unusual for an individual ever to require dental

25  services every weekday for an entire week.  However, during the approximately five

26  year span, Hawatmeh represented that he had that unusual occurrence happen over

27  6,600 times.

28

7275860.1

### iii.   <u>Alborz Mehdizadeh, D.D.S.</u>

184.   On September 28, 2016 and December 11, 2018, Alborz Mehdizadeh, both individually and through his company Alborz Mehdizadeh, Inc. (collectively, "Mehdizadeh") entered into written dental services agreements (the "Mehdizadeh Agreements") whereby Mehdizadeh agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Mehdizadeh for those services. Alborz Mehdizadeh is the sole officer and director of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Alborz Mehdizadeh, Inc. Alborz Mehdizadeh is also the agent for service of process for Alborz Mehdizadeh, Inc. Alborz Mehdizadeh maintains complete ownership, management and control of Alborz Mehdizadeh, Inc. As such, while the parties to the original Mehdizadeh Agreement are Borrego Health and Alborz Mehdizadeh, Inc., Alborz Mehdizadeh, as the alter ego and/or sole owner of Alborz Mehdizadeh, Inc. and as signatory of the Mehdizadeh Agreements, is capable of being held personally liable under the Mehdizadeh Agreements. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)

185.   A true and correct copy of the 2016 Mehdizadeh Agreement is attached herein as Exhibit H, and a true and correct copy of the 2018 Mehdizadeh Agreement is attached herein as Exhibit I.

186.   As a participant in Borrego Health's Contract Dental program, Mehdizadeh was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

187.   Among other things, the Mehdizadeh Agreements required that Mehdizadeh practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

7275860.1

188.   Mehdizadeh submitted false and fraudulent bills and made other statements which Mehdizadeh knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Mehdizadeh Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

189.   Dr. Mehdizadeh billed Borrego Health for patient visits that either did not occur or that were provided by a providers that were not disclosed to or credentialed by Borrego Health.  For example, he billed for 146 patient visits he claimed to have performed on Saturday, November 16, 2019.

190.   From the period of October 23, 2018 to February 5, 2019, Dr. Mehdizadeh purportedly performed—and billed for—29 surgical extractions on one patient. There are two methods for extractions:  simple extraction (pull the tooth) or surgical extractions (cut the gum).  At the outset, it is unlikely a patient would ever need 29 surgical extractions (as opposed to simple extractions).  Further, even if this were the case, this would never occur in 29 different sittings.  For surgical extractions, the area around the extraction site is numb and the gum is cut open to allow for the extraction. The standard practice when surgically extracting several teeth is to numb and extract several teeth within the same quadrant.  Instead, Dr. Mehdizadeh's billing practices indicate one patient came in for 29 surgical extractions over a six month period.  If these extractions occurred at all, one can only hope that this is a fraudulent billing practice, rather than grotesquely substandard care to subject a patient to this treatment.

191.   This was not an isolated incident. Mehdizadeh's billing records showed that he regularly billed contiguous dates of service (*i.e.,* multiple days in a row) for surgical extractions. These are either fraudulent claim-splitting or substandard care, either of which would make the claims unpayable.

7275860.1

192.   Dr. Mehdizadeh further submitted duplicate bills in order to receive reimbursement for the same services multiple times. For example:

- On April 2, 2018, Patient 1 received dental services under Dental Code D2392 for tooth number 14, which involves adding a resin based composite to the tooth. Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On April 4, 2018, Patient 1 also received dental services under Dental Code D2391 for tooth number 18, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both April 26, 2018 and May 1, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On October 31, 2018, Patient 2 received dental services under Dental Code D2392 for tooth number 15, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both November 8, 2018 and November 30, 2018.  Premier Defendants reviewed and approved both claims submitted.

193.   On August 11, 2018, Patient 3 received dental services under Dental Code D2391 for tooth number 29, which involves adding a resin based composite to the tooth.  Dr. Mehdizadeh submitted bills for this service on both August 14, 2018 and April 18, 2019.  Premier Defendants reviewed and approved both claims submitted. On February 24, 2020, Borrego Health conducted a re-audit of Dr. Medizadeh.  Upon arrival, Borrego Health's auditor, Dr. Elias Koutros, requested a sample of specific patient charts. Dr. Mehdizadeh's office informed the auditor that some charts were unavailable because they were taken out of the office. Of the charts available, the charts included exact photocopies from periodontal charting in multiple patient charts.  Periodontal charting includes six measurements per tooth. It is it nearly impossible that multiple patients would have six exactly identical

7275860.1

1    measurements for all of their teeth.  Dr. Koutros indicated to Dr. Medizadeh that he

2    believed the photocopies constituted fraudulent charting given the lack of change in

3    status. Dr. Medizadeh did not deny Dr. Koutros' allegations, and instead informed

4    Dr. Koutros that he wanted the audit to go well, so the charting was prepared with

5    that in mind.

6        194.   Review of Mehdizadeh's claims data indicates he carried out his

7    excessive visits scheme to great effect.  Mehdizadeh billed for more than five visits

8    for the same patient in a seven day period 4,091 times between February 2017 and

9    January 2021.  It would be unusual for an individual ever to require dental service

10   every weekday for an entire week.  However, during the approximately five year

11   span, Mehdizahdeh represented that he had that unusual occurrence happen over

12   4,000 times.  During that same period, he billed for twelve or more visits for the

13   same patient in a 30-day period more than 5,902 times.

14       195.   Medizadeh submitted these claims and others to the Premier

15   Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

16   were obligated to perform their due diligence in reviewing the claims for accuracy

17   and ensuring supporting documentation was submitted alongside the claims.  The

18   Premier Defendants allowed these excessive, unsubstantiated, and duplicative

19   claims to be submitted to Borrego Health for processing and payment, because

20   Premier received $25 per claim submitted to Borrego Health.  Further, once the

21   claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

22   their family members not to flag these claims as potentially fraudulent.

23              **iv.    Magaly M. Velasquez, D.D.S.**

24       196.   On or about November 5, 2014, Magaly M. Velasquez, both

25   individually and through her company Magaly M. Velasquez DDS, Professional

26   Dental Corp. (collectively, "Velasquez") entered into a written dental services

27   agreement (the "Velasquez Agreement") whereby Velasquez agreed to provide

28   primary dental services to participating Borrego Health patients, and Borrego Health

7275860.1

agreed to pay Velasquez for those services. Magaly Velasquez is the sole officer and director of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez is also the agent for service of process for Magaly M. Velasquez DDS, Professional Dental Corp. Magaly Velasquez maintains complete ownership, management and control of Magaly M. Velasquez DDS, Professional Dental Corp. As such, while the parties to the Velasquez Agreement are Borrego Health and Magaly M. Velasquez DDS, Professional Dental Corp., Magaly Velasquez, as the alter ego and/or sole owner of Magaly M. Velasquez DDS, Professional Dental Corp., and as signatory of the Velasquez Agreement, is capable of being held personally liable under the Velasquez Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)

197.   A true and correct copy of the Velasquez Agreement is attached herein as Exhibit J.

198.   As a participant in Borrego Health's contract dental program, Velasquez was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

199.   Among other things, the Velasquez Agreement required that Velasquez practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

200.   Velasquez submitted false and fraudulent bills and made other statements which Velasquez knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Velasquez Agreement.  A non-exhaustive list of examples is set forth below.  The

7275860.1

below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

201.   As part of Borrego Health's efforts to clean house, it conducted an audit to evaluate the duplicate claims submitted by Velasquez. The audit found 150 claims were duplicative. For example:

- On April 20, 2019, Patient 4 received dental services under Dental Code D2392 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both April 26, 2019 and April 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On May 28, 2019, Patient 4 also received dental services under Dental Codes D0220, D0270, and D2751 for teeth numbers 12, 13, and 14. D0220 is one of the billing codes for  initial x-rays, D0270 is the billing code for single films, and D2751 is the billing code intended for porcelain crowns.  Dr. Velasquez submitted bills for these services on June 3, 2019 and June 27, 2019.  Premier Defendants reviewed and approved both claims submitted.

- On September 17, 2018, Patient 5 received dental services under Dental Code D2391 for tooth number 21, which involves adding a resin based composite to the tooth.  Dr. Velasquez submitted bills for this service on both September 18, 2018 and October 10, 2018.  Premier Defendants reviewed and approved both claims submitted.

- On July 11, 2018, Patient 6 received dental services under Dental Codes D2391 and D2392 for tooth number 4, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service on both July 16, 2018 and July 27, 2018.  Premier Defendants reviewed and approved both claims submitted.

7275860.1

- On January 31, 2019, Patient 7 received dental services under Dental Codes D2391 and D2392 for tooth number 5, which involves adding a resin based composite to the tooth. Dr. Velasquez submitted bills for this service twice on February 4, 2019.  Premier Defendants reviewed and approved both claims submitted.

- In May 2019, Dr. Velasquez billed Borrego Health as though Patient 8 received dental services 26 days in the month, despite there only being 22 business days in May 2019. Dr. Velasquez then billed Borrego Health for 22 visits in June 2019 for that same patient, totaling 48 visits for the same patient over a two month period.

202.   Review of Velasquez's claims data indicates she carried out the excessive visits scheme to great effect.  Velasquez billed for more than five visits for the same patient in a seven day period 4,552 times between February 2017 and January 2021.  It would be unusual for an individual ever to require dental service every weekday for an entire week.  However, during the approximately five year span, Velasquez represented that he had that unusual occurrence happen 4,552 times.  During that same period, she billed for twelve or more visits for the same patient in a 30-day period more than 2,656 times.

203.   Velasquez then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

FIRST AMENDED COMPLAINT

7275860.1

### v.  <u>Aram Arakelyan, D.D.S.</u>

204.   On November 17, 2016, November 18, 2018, and November 29, 2018, Aram Arakelyan, both individually and through his company New Millennium Dental Group of Aram Arakelyan, Inc. (collectively, "Arakelyan"), entered into written dental services agreements (the "Arakelyan Agreements") whereby Arakelyan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Arakelyan for those services. A true and correct copy of the 2016 Arakelyan Agreement is attached herein as Exhibit K.  A true and correct copy of the November 18, 2018 Arakelyan Agreement is attached herein as Exhibit L.  A true and correct copy of the November 29, 2018 Arakelyan Agreements are attached herein as Exhibit M.

205.   Aram Arakelyanis the sole officer and director of New Millennium Dental Group. Aram Arakelyan also operates as the Chief Executive Officer, Secretary and Chief Financial officer of New Millennium Dental Group. Aram Arakelyan is also the agent for service of process of New Millennium Dental Group. Aram Arakelyan maintains complete ownership, management and control of New Millennium Dental Group.

206.   As a participant in Borrego Health's contract dental program, Arakelyan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

207.   Among other things, the Arakelyan Agreements required that Arakelyan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

208.   Arakelyan submitted false and fraudulent bills and made other statements which Arakelyan knew to be false or had no reasonable grounds for

7275860.1

believing their representations were true, which also constitute a breach of the Arakelyan Agreements.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.  For example, (1) on or about January 2019, Dr. Arakelyan's office billed Borrego Health for a filling on a tooth which x-rays noted the patient did not have at the time of service; (2) on or about July 2019, Dr. Arakelyan's office billed Borrego Health for a root canal performed on a tooth which x-rays noted the patient did not have at the time of service; and (3) on or about March 2019, Dr. Arakelyan's office fraudulently submitted multiple claims to Borrego Health for multiple crowns when the supporting documentation attached to the claim indicated the patient actually received a singular bridge.

209.   In November 2019, Dr. Arakelyan billed 18 different encounters for a single patient, despite the fact that there are only 20 business days in November, meaning the bills showed this patient came in for dental services nearly every day in November.  Even more shocking, the dentist also billed for 11 additional encounters in August 2019, 13 in September 2019, 13 in October 2019 and—for good measure—three in December 2019, for a total of 58 separate encounters in the course of five months.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  As a result of Premier Defendants' failings, Borrego Health's Program Integrity program conducted its own audit into Dr. Arakelyan's billing practices.  When these egregious billing practices were discovered, Dr. Arakelyan informed Borrego Health's auditor that it was Premier Defendants who told him to bill in this manner.

210.   In January 2020, Dr. Venugopal attempted to conduct an on-site audit of Arakelyan's office. However, upon arrival, Dr. Venugopal was denied access to the office. Premier's attorney later called Dr. Venugopal and indicated that audits needed to go through Premier and that surprise audits were not allowed by law. Dr.

7275860.1

1  Venugopal informed Mikia Wallis of this issue, and Mikia Wallis did not challenge

2  Premier's false position. This allowed egregious billing practices to continue.

3      211.   In February 2020, one of Dr. Arakelyan's subproviders billed 16

4  different encounters for a single patient, despite the fact that there were only 19

5  business days in February 2020, meaning the bills showed this patient came in for

6  dental services almost every day in February 2020.  Premier did not flag these bills

7  and took no steps to counsel or discipline this dentist.

8      212.   Premier and the Borrego insiders worked diligently to ensure that

9  Arakelyan's fraudulent practices could continue to fund their scheme, preventing

10  every effort by Program Integrity to terminate him, even going as far as only

11  allowing Travis Lyon to speak directly to Arakelyan.

12      213.   Review of Arakelyan's claims data indicates he carried out his

13  excessive visits scheme to great effect.  Arakelyan billed for more than five visits

14  for the same patient in a seven day period 8,919 times between February 2017 and

15  January 2021, which is more than any other provider.  It would be unusual for an

16  individual ever to require dental service every weekday for an entire week.

17  However, during the approximately five year span, Arakelyan represented that he

18  had that unusual occurrence happen 8,919 times.  During that same period, he billed

19  for twelve or more visits for the same patient in a 30-day period more than 5,988

20  times.

21          **vi.    Michael Hoang, D.M.D.**

22      214.   On or about November 28, 2018, Michael Hoang, D.M.D. entered into

23  a written dental services agreement (the "Hoang Agreement") whereby Hoang

24  agreed to provide primary dental services to participating Borrego Health patients,

25  and Borrego Health agreed to pay Hoang for those services.  A true and correct copy

26  of the Hoang Agreement is attached herein as Exhibit N.

27

28

7275860.1

215.   As a participant in Borrego Health's contract dental program, Hoang was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

216.   Among other things, the Hoang Agreement required that Hoang practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and  to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

217.   Hoang submitted false and fraudulent bills and made other statements which Hoang knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Hoang Agreement. Upon information and belief, Hoang's conduct alleged herein is demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

218.   Hoang then submitted these claims to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these fraudulent claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

219.   Borrego Health removed Dr. Hoang from its contract dental program in 2019 because he was billing the same claims *both* to Borrego Health and straight to Denti-Cal.  Dr. Hoang was terminated from Borrego Health's contract dental program in July 2019.

7275860.1

### vii.   <u>Waleed Stephan, D.D.S.</u>

220.   On October 1, 2016, Waleed Stephan, both individually and through his company W.A. Stephan, A Dental Corporation (collectively, "Stephan"), entered into a written dental services agreement (the "Stephan Agreement") whereby Stephan agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Stephan for those services.  Waleed Stephan is the sole director and Chief Executive Officer of W.A. Stephan, A Dental Corporation. Waleed Stephan maintains complete ownership and control of W.A. Stephan, A Dental Corporation. As such, while the parties to the Stephan Agreement are Borrego Health and W.A. Stephan, A Dental Corporation, Waleed Stephan, as the alter ego and/or sole owner of W.A. Stephan, A Dental Corporation, and as signatory of the Stephan Agreement, is capable of being held personally liable under the Stephan Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Stephan Agreement is attached herein as Exhibit O.

221.   As a participant in Borrego Health's contract dental program, Stephan was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

222.   Among other things, the Stephan Agreement required that Stephan practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

223.   Stephan submitted false and fraudulent bills and made other statements which Stephan knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Stephan Agreement.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or

7275860.1

1   unlawful conduct.  For example, on August 13, 2019, Dr. Stephan billed Borrego

2   Health for crowns on teeth numbers 12, 13 and 14 over the course of multiple days.

3   However, the patient care plan documents that a singular bridge was put in place

4   during the course of one appointment.

5         224.   Stephan also fraudulently represented that he purchased porcelain

6   crowns for patients, when in fact, he made ceramic crowns himself in his own

7   office.  Program Integrity staff became suspicious when Dr. Stephan was able to

8   place crowns in only a day or two, when the lab that Dr. Stephan documented he

9   was using had a much slower turnaround.  Program Integrity called the lab that Dr.

10  Stephan documented he was using, and that lab confirmed that it would take 14 days

11  to make a crown.  On further investigation, it was determined that, rather than

12  purchasing the crowns, Dr. Stephan was making them himself out of ceramic with a

13  CEREC machine.  To hide his scheme, he was falsifying documentation to say that

14  he purchased porcelain crowns from a lab.

15        225.   Stephan then submitted these claims and others to the Premier

16  Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

17  were obligated to perform their due diligence in reviewing the claims for accuracy

18  and ensuring supporting documentation was submitted alongside the claims.  The

19  Premier Defendants allowed these claims to be submitted to Borrego Health for

20  processing and payment, because Premier received $25 per claim submitted to

21  Borrego Health.  Further, once the claims had reached Borrego Health, Karen

22  Hebets and Diana Thompson had trained their family members not to flag these

23  claims as potentially fraudulent.

24              **viii.   Santiago Rojo, D.D.S.**

25        226.   On March 29, 2017, Santiago Rojo, both individually and through his

26  company Santiago A. Rojo, D.D.S., Inc. (collectively, "Rojo"), entered into a

27  written dental services agreement (the "Rojo Agreement") whereby Rojo agreed to

28  provide primary dental services to participating Borrego Health patients, and

7275860.1

Borrego Health agreed to pay Rojo for those services. Santiago Rojo is the sole officer and director of Santiago A. Rojo, D.D.S., Inc. Santiago Rojo also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Santiago A. Rojo, D.D.S., Inc. Santiago Rojo maintains complete ownership, management and control of Santiago A. Rojo, D.D.S., Inc. As such, while the parties to the Rojo Agreement are Borrego Health and Santiago A. Rojo, D.D.S., Inc., Santiago Rojo, as the alter ego and/or sole owner of Santiago A. Rojo, D.D.S., Inc., and as signatory of the Rojo Agreement, is capable of being held personally liable under the Rojo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Rojo Agreement is attached herein as Exhibit P.

227.   As a participant in Borrego Health's contract dental program, Rojo was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

228.   Among other things, the Rojo Agreement required that Rojo practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

229.   Rojo submitted false and fraudulent bills and made other statements which Rojo knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Rojo Agreement.  A non-exhaustive list of examples is set forth below.  The below examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

230.   Dr. Rojo billed for visits in California even though he was living in Florida and could not supervise subproviders or directly provide care.  For example, on November 11, 2020, a representative from Borrego Health was onsite at Dr. Rojo's office for an audit.  On that date, Dr. Rojo's staff indicated that Dr. Rojo was

1    in Florida and had been in Florida for almost the entire year of 2020.  Nonetheless,

2    Dr. Rojo submitted claims for services performed in California throughout 2020.

3    Most egregiously, Dr. Rojo subsequently billed for patient visits that he claimed

4    were performed in California on November 11, 2020, a date on which a Borrego

5    employee had physically been in his office and confirmed he was not there.

6        231.   Rather than performing the services himself and completing the

7    documentation, Dr. Rojo regularly had his office manager entering and signing off

8    on patient claims.  Dr. Rojo's patient charts were also largely duplicative, even

9    going so far as to contain duplicate notes regarding patients' response to anesthesia.

10                   **ix.    Mohammed Al Tekreeti, D.D.S.**

11       232.   On or about August 7, 2017, Hussam Aldairi requested to employ an

12   additional dentist, Mohammed Al Tekreeti, to provide primary dental services to

13   Borrego Health patients.  Aldairi represented that Al Tekreeti would be under

14   Aldairi's supervision and that Al Tekreeti would act in accordance with the Aldairi

15   Agreements.  Aldairi hired Al Tekreeti shortly after Aldairi's request to Borrego

16   Health.

17       233.   As a sub-provider in Borrego Health's contract dental program, Al

18   Tekreeti was involved in Borrego Health's operations by providing dental services

19   to Borrego Health patients.

20       234.   Al Tekreeti submitted false and fraudulent bills and made other

21   statements which Al Tekreeti knew to be false or had no reasonable grounds for

22   believing their representations were true, which also constitute a breach of the

23   Aldairi Agreements.  A non-exhaustive list of examples is set forth herein.  The

24   below examples are demonstrative of a larger pattern and practice of fraudulent

25   and/or unlawful conduct.  For example, on or about May 2019, Dr. Al Tekreeti

26   billed Borrego Health for a partial denture for teeth which supporting documentation

27   indicated were never prepared for dentures.

28

7275860.1

235.   Like Dr. Aldairi, Dr. Al Tekreeti billed Borrego for patient visits that either did not occur or that were provided by a providers that were not disclosed to or credentialed by Borrego Health.  For example, Dr. Al Tekreeti billed for 135 patient visits that he claimed he performed on Tuesday, June 25, 2019.

236.   Review of Al Tekreeti's claims data indicates he carried out his excessive visits scheme to great effect.  Al Tekreeti billed for more than five visits for the same patient in a seven day period 576 times between February 2017 and January 2021, which is more than any other provider.  It would be unusual for an individual ever to require dental service every weekday for an entire week. However, during the approximately five year span, Al Tekreeti represented that he had that unusual occurrence happen 576 times.  During that same period, he billed for twelve or more visits for the same patient in a 30-day period more than 1,169 times.

237.   Al Tekreeti then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### x.   Jilbert Bakramian, D.D.S.

238.   On or about February 5, 2018, Aram Arakelyan requested to employ an additional dentist, Jilbert Bakramian, to provide primary dental services to Borrego Health patients.  Arakelyan represented that Bakramian would be under Arakelyan's supervision and that Bakramian would act in accordance with the Arakelyan

7275860.1

1   Agreements.  Arakelyan hired Bakramian shortly after Arakelyan's request to
2   Borrego Health.

3       239.   As a sub-provider in Borrego Health's contract dental program,
4   Bakramian was involved in Borrego Health's operations by providing dental
5   services to Borrego Health patients.

6       240.   Bakramian submitted false and fraudulent bills and made other
7   statements which Bakramian knew to be false or had no reasonable grounds for
8   believing their representations were true, which also constitute a breach of the
9   Arakelyan Agreements.  A non-exhaustive list of examples is set forth herein. The
10  below examples are demonstrative of a larger pattern and practice of fraudulent
11  and/or unlawful conduct.  For example, (1) on or about January 2019, Dr.
12  Bakramian billed Borrego Health for a filling on a tooth which x-rays noted that the
13  patient did not have at the time of service; (2) on or about July 2019, Dr. Bakramian
14  billed Borrego Health for a root canal performed on a tooth which x-rays noted that
15  the patient did not have at the time of service; (3) on or about March 2019, Dr.
16  Bakramian billed Borrego Health for multiple crowns when the patient actually
17  received a singular bridge, and (4) on or about May 31, 2019 and June 14, 2019, Dr.
18  Bakramian billed for preparing a tooth for a crown, which requires shaving down
19  the tooth when x-rays clearly demonstrate that tooth had an implant in that spot,
20  meaning there was no natural tooth for Bakramian to prepare to receive a crown.

21      241.   The Premier Defendants allowed Bakramian's fraudulent practices to
22  continue.  Obviously improper claims were regularly approved.  For example, to
23  approve a crown, a Premier reviewer was required to affirmatively review the x-ray
24  and progress notes and click, "Reviewer approved," and Premier's software
25  maintains a log of which reviewer approved claims and when.  On January 20, 2020,
26  Premier reviewer J.D. approved a crown for a patient on tooth #30, when the x-rays
27  submitted to Premier clearly showed that the tooth already had an implant with a
28  restoration.  Worse still, on January 28, 2020, Premier reviewer S.N. approved the

7275860.1

1  same claim a *second time* (same code, same date of service, same tooth #30).  Both

2  times, Premier looked the other way in furtherance of its scheme.

3       242.   From July 2019 to August 2019, Dr. Bakramian billed 29 different

4  encounters for a single patient out of the 43 business days during that period.

5  Again, Premier did not flag these bills and took no steps to counsel or discipline this

6  dentist.

7       243.   Dr. Bakramian regularly billed for more visits in a day than is humanly

8  possible, leading to the conclusion that these visits were either not performed or

9  were performed by unknown and uncredentialed persons.  For example, he billed for

10 111 patient visits he claimed he performed on July 16, 2019.

11      244.   Bakramian's excessive visits were a pattern, not an isolated incident.

12 Bakramian billed for more than five visits for the same patient in a seven day period

13 3,470 times between February 2017 and January 2021.  It would be unusual for an

14 individual ever to require dental service every weekday for an entire week.

15 However, during the approximately five year span, Bakramian represented that he

16 had that unusual occurrence happen 3,470 times.  During that same period, he billed

17 for twelve or more visits in a 30-day period for the same patient more than 4,538

18 times.

19      245.   Bakramian then submitted these claims and others to the Premier

20 Defendants seeking payment.  The Premier Defendants, under the Dental MSA,

21 were obligated to perform their due diligence in reviewing the claims for accuracy

22 and ensuring supporting documentation was submitted alongside the claims.  The

23 Premier Defendants allowed these excessive, unsubstantiated, and duplicative

24 claims to be submitted to Borrego Health for processing and payment, because

25 Premier received $25 per claim submitted to Borrego Health.  Further, once the

26 claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained

27 their family members not to flag these claims as potentially fraudulent.

28

7275860.1

### xi.   Marcelo Toledo, D.D.S.

246.   On June 16, 2015, Marcelo Toledo, both individually and through his company Marcelo Toledo, D.D.S., Inc. (collectively, "Toledo"), entered into a written dental services agreement (the "Toledo Agreement") whereby Toledo agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Toledo for those services. Marcelo Toledo is the sole officer and director of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Marcelo Toledo, D.D.S., Inc. Marcelo Toledo maintains complete ownership, management and control of Marcelo Toledo, D.D.S., Inc. As such, while the parties to the Toledo Agreement are Borrego Health and Marcelo Toledo, D.D.S., Inc., Marcelo Toledo, as the alter ego and/or sole owner of Marcelo Toledo, D.D.S., Inc., and as signatory of the Toledo Agreement, is capable of being held personally liable under the Toledo Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.)  A true and correct copy of the Toledo Agreement is attached herein as Exhibit Q.

247.   As a participant in Borrego Health's contract dental program, Toledo was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

248.   Among other things, the Toledo Agreement required that Toledo practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

249.   Toledo submitted false and fraudulent bills and made other statements which Toledo knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Toledo Agreement.  A non-exhaustive list of examples is set forth below.  The below

7275860.1

examples are demonstrative of a larger pattern and practice of fraudulent and/or unlawful conduct.

250.   For example, (1) on or about July 2018, Dr. Toledo billed for services rendered to a patient during one scheduled visit as though they occurred over the court of four visits, (2) on or about June 2018, Dr. Toledo performed restoration on eight teeth which x-rays demonstrated was not medically necessary, (3) on or about July and August 2018, Dr. Toledo billed for tooth restoration services rendered during single visits as though they were performed over multiple visits, (4) on or about November and December 2018, Dr. Toledo billed for fillings on teeth where the patient already had existing fillings, and (5) billing in excess of 20 patient visits a day, including billing Borrego Health for 97 patient visits that he claimed occurred that day.  Toledo also regularly engaged in the "claim splitting" scheme.  For example, on August 20, 2018, Dr. Toledo charted and billed for a tooth restoration on tooth 19.  In submitting the claim, Toledo submitted old x-rays dated July 23, 2018 and August 13, 2018.  Those x-rays indicate the restoration of both tooth 18 and tooth 19 had already been completed prior to the August 20, 2018 claim submission.  The x-ray from August 20, 2018 also demonstrates that no further restoration occurred during that patient visit.  Despite this, the claims were billed as two separate visits.  For the same patient, Dr. Toledo billed for identical services rendered to four different teeth.  The patient schedule indicates the patient was not seen on all the days billed between November 7, 2019 and November 13, 2018,

251.   For visits in July 2018 for the same patient, the treatment notes are a obviously copied and pasted, including identical blood pressure readings, because the patient had only one visit on July 16, 2018, but it was billed as four separate visits.

252.   For visits in October 2018, again there are five identical blood pressure readings documented in a row.  These visits involved a surface restorations for

7275860.1

1 adjacent teeth, but were billed separately even though they should have been done

2 together.

3    253.   In another instance, there were restorations on eight separate teeth, and

4 each was billed separately, but there is no imaging to support the need for the

5 restorations.  In such a situation, the dentist is required to secure supplemental

6 documentation to demonstrate medical necessity.

7    254.   On or about August 20, 2018, Toledo charted and billed for services

8 provided on tooth 19.  X-rays dated July 23 and August 13, 2018 were provided to

9 support the restoration, but the x-rays show that there was a restoration already done

10 by August 13.  There is no evidence of further restoration or any restoration on

11 August 20.  All the work was completed on August 7, but split into two separate

12 dates of billing.

13    255.   For one patient with dates of service November 7-13, 2018, there are

14 four identical notes with only the tooth number changed, and the schedule does not

15 show the patient was seen (only that the patient was on the schedule).  This is

16 another example of claim splitting and false billing.

17    256.   For another patient, there is no evidence that the fillings for teeth 4 and

18 5 were done as billed on November 4 and 14, 2018, respectively.  The pre-procedure

19 x-ray shows existing fillings and is dated October 18, 2018.  The post-procedure x-

20 rays dated December 13, 2018 does not show any change to the fillings for teeth 4

21 and 5.

22    257.   Toledo's excessive visits were a pattern, not an isolated incident.

23 Toledo billed for more than five visits for the same patient in a seven day period 582

24 times between February 2017 and January 2021.  It would be unusual for an

25 individual ever to require dental service every weekday for an entire week.

26 However, during the approximately five year span, Toledo represented that he had

27 that unusual occurrence happen 582 times.  During that same period, he billed for

28 twelve or more visits in a 30-day period for the same patient more than 410 times.

7275860.1

258.    Toledo then submitted these claims and others to the Premier Defendants seeking payment.  The Premier Defendants, under the Dental MSA, were obligated to perform their due diligence in reviewing the claims for accuracy and ensuring supporting documentation was submitted alongside the claims.  The Premier Defendants allowed these excessive, unsubstantiated, and duplicative claims to be submitted to Borrego Health for processing and payment, because Premier received $25 per claim submitted to Borrego Health.  Further, once the claims had reached Borrego Health, Karen Hebets and Diana Thompson had trained their family members not to flag these claims as potentially fraudulent.

### xii.    Marlene Thompson, D.D.S.

259.    On or about April 18, 2013, Marlene M. Thompson, D.D.S., both individually and through her company Marlene M. Thompson, D.D.S., Inc. (collectively, "Thompson") entered into a written dental services agreement (the "Thompson Agreement") whereby Thompson agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Thompson for those services. Marlene Thompson is the sole officer and director of Marlene M. Thompson, D.D.S., Inc. Marlene Thompson also operates as the Chief Executive Officer, Secretary and Chief Financial officer of Marlene M. Thompson, D.D.S., Inc. Marlene Thompson is also the designated agent for service of process for Marlene M. Thompson, D.D.S., Inc. Marlene Thompson maintains complete ownership, management and control of Marlene M. Thompson, D.D.S., Inc. As such, while the parties to the Thompson Agreement are Borrego Health and Marlene M. Thompson, D.D.S., Inc., Marlene Thompson, as the alter ego and/or sole owner of Marlene M. Thompson, D.D.S., Inc., and as signatory of the Thompson Agreement, Marlene Thompson is capable of being held personally liable under the Thompson Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Thompson Agreement is attached herein as Exhibit R.

7275860.1

260.   As a participant in Borrego Health's contract dental program, Thompson was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

261.   Among other things, the Thompson Agreement required that Thompson practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.Thompson submitted false and fraudulent bills and made other statements which Thompson knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Thompson Agreement.  A non-exhaustive list of examples is set forth below.  The below examples demonstrate a larger pattern and practice of fraudulent and/or unlawful conduct.  For example:

- After Dr. Tuso left Dr. Aldairi's office, Thompson hired Maura Tuso to work as a dentist in her Escondido dental practice. During the time Dr. Tuso worked for Thompson, Dr. Tuso was suspended from participating in Medi-Cal in any capacity. When Thompson hired Dr. Tuso, the generally accepted practice for employers receiving federal and state healthcare funds was to check the suspended and ineligible provider lists prior to hiring employees. Thompson failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring her. Thompson then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal patients. As a suspended provider, all the treatment provided by Dr. Tuso was not subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section 14043.61; *see also* 22 C.C.R. section 51303.) On October 12, 2018, Thompson placed a patient on the schedule who received services the day prior.  Thompson

7275860.1

did this to make it appear that the services rendered were spread out over several days, when in fact the patient only received services on June 23, 2018.

- On July 5, 2018, Dr. Tuso provided two fillings to a patient, but was asked to leave the dates blank in her charts.  The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one.

- On July 10, 2018, Dr. Tuso provided dental services to a Borrego Health patient, but was asked to leave the dates blank in her charts. The patient chart was then filled in to show the services rendered occurred over the course of two visits instead of one.  The second visit was documented on a day Dr. Tuso was not staffed to work at Thompson's office.  Despite this, the second visit in the patient chart indicates she provided the patient with services that day.

262.   To avoid detection, Thompson submitted bills for Dr. Tuso's services in her own name. In other words, Thompson submitted claims to Borrego Health for services she did not perform. Further, Thompson submitted claims to Borrego Health for services performed by a suspended provider. Borrego Health then paid Thompson for services Thompson should not have been paid for. Thompson, through her conduct and misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal which were not subject to reimbursement.

263.   Thompson also instructed Dr. Tuso and other dentists in her office to perform as many services as possible in one visit, then leave the dates on the patient charts blank to allow for the services to be billed over multiple days (as alleged in the above examples.

264.   The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Thompson was submitting fraudulent bills for all services rendered by Dr. Tuso.

FIRST AMENDED COMPLAINT

7275860.1

### xiii.   <u>Douglas Ness, D.D.S.</u>

265.   On or about May 2, 2016, Douglas Ness, D.D.S., both individually and through his company Ness Dental Corporation (collectively, "Ness") entered into a written dental services agreement (the "Ness Agreement") whereby Ness agreed to provide primary dental services to participating Borrego Health patients, and Borrego Health agreed to pay Ness for those services. Doug Ness is the sole officer and director of Ness Dental Corporation. Doug Ness also operates as the Chief Executive Officer, Secretary and Chief Financial officer of the Ness Dental Corporation. Doug Ness is also the designated agent for service of process for the Ness Dental Corporation. Doug Ness maintains complete ownership, management and control of Ness Dental Corporation. As such, while the parties to the Ness Agreement are Borrego Health and Ness Dental Corporation, Doug Ness, as the alter ego and/or sole owner of the Ness Dental Corporation, and as signatory of the Ness Agreement, Ness is capable of being held personally liable under the Ness Agreement. (*See i.e. Irey v. Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Ness Agreement is attached herein as Exhibit S.

266.   As a participant in Borrego Health's contract dental program, Ness was involved in Borrego Health's operations by providing dental services to Borrego Health patients.

267.   Among other things, the Ness Agreement required that Ness practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, and to prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided.

268.   Ness submitted false and fraudulent bills and made other statements which Ness knew to be false or had no reasonable grounds for believing their representations were true, which also constitute a breach of the Ness Agreement.

7275860.1

1    The alleged conduct is demonstrative of a larger pattern and practice of fraudulent

2    and/or unlawful conduct.

3        269.    In 2018, Ness hired Maura Tuso to work as a dentist at Ness' dental

4    office, Crown Dental Group. During the time Dr. Tuso worked for Ness, Dr. Tuso

5    was suspended from participating in Medi-Cal in any capacity. When submitting her

6    new hire paperwork to Ness, Dr. Tuso told Ness that she was on the suspended

7    provider list. In spite of this, Ness allowed Dr. Tuso to continue to work for him and

8    to provide dental services to Borrego and Medi-Cal patients. As a suspended

9    provider, the treatment and services provided by Dr. Tuso was not subject to

10    payment by Borrego Health or Medi-Cal. (*See* Welf. & Institutions Code section

11    14043.61; *see also* 22 C.C.R. section 51303.)

12        270.    To avoid detection, Ness submitted bills for Dr. Tuso's services in his

13    own name. In other words, Ness submitted claims to Borrego Health for services he

14    did not perform. Further, Ness submitted claims to Borrego Health for services

15    performed by a suspended provider. Borrego Health then paid Ness for services

16    Ness should not have been paid for. Ness, through his conduct and

17    misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal

18    which were not subject to reimbursement. Ness also instructed Dr. Tuso and other

19    dentists in his office to perform as many services as possible in one visit, then leave

20    the dates on the patient charts blank to allow for the services to be billed over

21    multiple days.

22        271.    Ness also hired other dental providers, in addition to Dr. Tuso, who

23    lacked California dental licenses to provide dental services to Borrego Health

24    patients. These hires included a husband and wife pair. These individuals were not

25    licensed to practice dentistry in California and performed services on Borrego

26    Health patients. Upon information and belief, Ness billed Borrego Health for these

27    services in the same manner Ness did for Dr. Tuso. The above mentioned conduct

28    ties directly into the greater Fraudulent Dental Billing Scheme, as Ness was

7275860.1

1  submitting fraudulent bills for all services rendered by Dr. Tuso and the other

2  unlicensed dental providers that were employed by Ness.

3      **xiv.**   **George Jared, D.D.S.**

4    272.   On or On or about April 19, 2016, George C. Jared, D.D.S., both

5  individually and through his company George C. Jared, D.D.S., Inc. (collectively,

6  "Jared") entered into a written dental services agreement (the "Jared Agreement")

7  whereby Jared agreed to provide primary dental services to participating Borrego

8  Health patients, and Borrego Health agreed to pay Jared for those services. George

9  Jared is the Chief Executive Officer and sole director of George C. Jared, D.D.S.

10  Inc. As such, while the parties to the Jared Agreement are Borrego Health and

11  George C. Jared, D.D.S., Inc., George Jared, as the alter ego and/or sole owner of

12  George C. Jared, D.D.S., Inc., and as signatory of the Jared Agreement, Jared is

13  capable of being held personally liable under the Jared Agreement. (*See i.e. Irey v.*

14  *Len* (1961) 191 Cal. App. 2d 13.) A true and correct copy of the Jared Agreement is

15  attached herein as Exhibit T.

16    273.   As a participant in Borrego Health's contract dental program, Jared was

17  involved in Borrego Health's operations by providing dental services to Borrego

18  Health patients.

19    274.   Among other things, the Jared Agreement required that Jared practice

20  dentistry in accordance with all Federal, State and local laws, regulations, and

21  generally accepted principles applicable the practice of dentistry, and to prepare,

22  establish, and maintain administrative records, financial records, records pertaining

23  to patient diagnosis and treatment, and information pertaining to the services

24  provided.

25    275.   Jared submitted false and fraudulent bills and made other statements

26  which Jared knew to be false or had no reasonable grounds for believing their

27  representations were true, which also constitute a breach of the Jared

28

7275860.1

1  Agreement.  Upon information and belief, the alleged conduct is demonstrative of a

2  larger pattern and practice of fraudulent and/or unlawful conduct.

3      276.   Jared hired Maura Tuso to work as a dentist at his dental practice.

4  During the time Dr. Tuso worked for Jared, Dr. Tuso was suspended from

5  participating in Medi-Cal in any capacity. When Jared hired Dr. Tuso, the generally

6  accepted practice for employers receiving federal and state healthcare funds was to

7  check the suspended and ineligible provider lists prior to hiring employees. Jared

8  failed to check the suspended and ineligible provider lists for Dr. Tuso before hiring

9  her. Jared then allowed Dr. Tuso to provide dental services to Borrego and Medi-Cal

10  patients. As a suspended provider, all the treatment provided by Dr. Tuso was not

11  subject to payment by Borrego or Medi-Cal. (*See* Welf. & Institutions Code section

12  14043.61; *see also* 22 C.C.R. section 51303.)

13      277.

14      278.   Jared also hired other dental providers, in addition to Dr. Tuso, who

15  lacked California dental licenses to provide dental services to Borrego Health

16  patients.  Upon information and belief, Jared billed Borrego Health for the services

17  that unlicensed dental providers provided to Medi-Cal patients.

18      279.   To avoid detection, Jared submitted bills for Dr. Tuso's services in his

19  own name. In other words, Jared submitted claims to Borrego Health for services he

20  did not perform. Further, Jared submitted claims to Borrego Health for services

21  performed by a suspended provider. Borrego Health then paid Jared for services

22  Jared should not have been paid for. Jared, through his conduct and

23  misrepresentations, led Borrego Health to improperly submit claims to Medi-Cal

24  which were not subject to reimbursement.

25      280.   Jared also instructed Dr. Tuso and other dentists in his office to perform

26  as many services as possible in one visit, then leave the dates on the patient charts

27  blank to allow for the services to be billed over multiple days.

28

FIRST AMENDED COMPLAINT

7275860.1

281.   The above mentioned conduct ties directly into the greater Fraudulent Dental Billing Scheme, as Jared was submitting fraudulent bills for all services rendered by Dr. Tuso.

**D.    Since Premier Was Unable and Unwilling To, a Program Integrity Process is Implemented by Borrego Health**

282.   Despite its promises to do so, its representations that it could do so, and its concealment of the fact that it could not do so, Premier completely lacked the ability to appropriately conduct claims monitoring.

283.   In fact, it was not until 2019 that Premier hired its first and only employee with any clinical experience whatsoever.  At that point, Premier hired a 2016 dental graduate, Nicholas Tapp, D.D.S.  Unsurprisingly, Nicholas Tapp was related to other employees at Premier.  Nicholas Tapp did not even receive his dental license until October 2017.  Indeed, staff from Borrego Health were largely responsible for training Nicholas Tapp due his lack of knowledge and experience.

284.   Even after hiring Nicholas Tapp, Premier continuously failed to properly review the contract dental claims.  For example, and without limitation, Premier approved claims (and caused Borrego Health to pay for claims (1) where no supporting documentation was provided, (2) for services performed on teeth which—based on x-rays submitted with the claims—were no longer in the patients' mouth, (3) which were duplicate (i.e. same claims, submitted multiple times), and (4) that were facially and obviously not legitimate.

285.   For example, in February 2020, one dentist billed 18 different encounters for a single patient, despite the fact that there were only 19 business days in February 2020, meaning the bills showed this patient came in for dental services all but one business day in February 2020.  Premier did not flag these bills and took no steps to counsel or discipline this dentist.  Between June 2020 and July 2020, one dentist billed 30 different encounters for a single patient, meaning the bills showed

7275860.1

1    this patient came in for dental services every other day during that time period.

2    Premier did not flag these bills and took no steps to counsel or discipline this dentist.

3        286.   As a result, Borrego Health was forced to hire its own employees and

4    develop a Program Integrity program to review and audit contract dental claims and

5    providers, tasks which Premier Defendants were supposed to perform under the

6    Dental MSA.

7        287.   In May 2017, Borrego Health hired Timothy Martinez, D.D.S. to be its

8    Chief Dental Officer.  In this role, Dr. Timothy Martinez was tasked with

9    developing a "Program Integrity" team for Borrego Health's contract dental

10   program and providing practice management oversight for its in-house dental

11   programs.  To assist in these efforts, Borrego Health and Dr. Martinez hired Nithya

12   Venugopal, DDS, in January 2018 as Borrego Health's Dental Director of Program

13   Integrity.

14       288.   Among other things, Dr. Timothy Martinez and Dr. Nithya Venugopal

15   were tasked to create a system that would identify patterns on the "back-end" of

16   claims submission (*i.e.* after the claims had been submitted).  Specifically, Dr.

17   Timothy Martinez and Dr. Nithya Venugopal were supposed to identify:  (1)

18   utilization of non-covered services; (2) overutilization of services; (3) incomplete,

19   substandard, unnecessary treatment rendered by providers; and (4) billing

20   discrepancies. The team also sought to develop and implement necessary steps to

21   correct and prevent such issues.

22       289.   On May 5, 2017, the Program Integrity team set up initial evidence-

23   based key references and questions for the new program integrity unit.  The key

24   references and questions were based on the National Medicaid Guidelines the

25   Deputy Inspector General for Evaluation and Inspections May 15, 2015 report

26   authored by Suzanne Murrin, titled: "QUESTIONABLE BILLING FOR

27   MEDICAID PEDIATRIC DENTAL SERVICES IN CALIFORNIA."  The Murrin

28   report reviewed claims submitted by dentists in California to DHCS and found that

1   approximately 8% of the dental providers were billing outliers in terms of CDT

2   codes billed, and of those identified outliers, only approximately 1.8% (or six out of

3   329 dentists) were disciplined by the California Dental Board for failing to meet

4   quality of care standards.  Dr. Timothy Martinez used the Murrin report and its

5   findings, as well as guidance from the 2017 National Medicaid and CHIP Oral

6   Health Symposium (as organized by the Medicaid, Medicare, CHIP Services Dental

7   Association), for reference when developing Borrego Health's internal compliance

8   metrics.  Critically, at the time, there was no other guidance, data or reports setting

9   out proper or improper billing and documentation protocols in the state for FQHCs

10  contracting with private dental offices.

11      290.   The Program Integrity efforts began with a utilization review system

12  which developed an algorithm for analyzing and sorting out outliers, particularly by

13  focusing on high-billing providers among the contract dentists.  As the Program

14  Integrity team's utilization review and claims data analytics capabilities became

15  more robust and sophisticated, the team was soon able to also review for over-

16  utilization of high-cost codes/services (dental providers with a standard deviation of

17  one or more from the mean as far as individual high-cost codes, such as crowns and

18  surgical extractions), percentage of preventive services and under-utilization of

19  preventive services, as well as billing discrepancies, and lack of medical necessity.

20  Over time, the Program Integrity team also developed a mechanism to view visit

21  count and examine excessive visits.

22      291.   Additionally, around mid-2019, the Program Integrity team built in

23  certain parameters, referred to as the "enhanced review" parameters, to identify

24  problematic claims during the claims monitoring process, in large part after

25  recognition that Premier was not properly vetting claims during the claims

26  monitoring process, despite Premier's contractual obligation to do so.

27      292.   Once the utilization review analysis was conducted, the Program

28  Integrity team would conduct site visits and chart reviews to directly assess

7275860.1

1   compliance and suspected fraud, waste, and/or abuse among any dental practices

2   and providers identified as outliers within the contract dental network (meaning

3   providers who were one or more above the standard deviation in the different

4   categories being reviewed).

5       293.   Specifically, Dr. Nithya Venugopal would receive a report and conduct

6   a closer examination of any outlier practices or providers.  Then, Dr. Nithya

7   Venugopal would work with Borrego Health's utilization management analyst to

8   pull around ten to 15 charts from patients based on excessive patients visits and/or

9   CDT code criteria under question for these providers.

10      294.   Next, a member of the Program Integrity team would collect

11  information from the patient records regarding visits and services during an actual

12  on-site visit, including supportive documentation such as radiographs, charts, and

13  schedules.  The peer review process was designed to be objective through the use of

14  a template peer review worksheet examining specific criteria.

15      295.   Based on the results of these findings, the Program Integrity team

16  members would conduct comprehensive records review and assess compliance with

17  Program Integrity rubric, consistent with the Medi-Cal Dental Provider Handbook.

18      296.   Following the chart reviews and site audits, the Program Integrity team

19  would develop provider report cards and issue a "corrective action plan" to any

20  provider whose practice was identified as deficient across certain criteria.  These

21  plans would detail exactly what deficiencies were identified and how a provider was

22  required to correct and improve his or her practice.  The Program Integrity team

23  aimed to conduct re-audits of providers who had been issued a corrective action plan

24  within 90 days to confirm whether or not the provider had corrected identified

25  deficiencies by again obtaining records from the provider and assessing compliance

26  under the same rubric.

27

28

7275860.1

297.   Any follow-up action by the team depended on the results of these peer review and compliance audits.  For example, if the score improved, then the provider would be audited on an annual basis thereafter.

298.   Alternatively, if the score worsened, Dr. Timothy Martinez or Dr. Nithya Venugopal would escalate the matter to Borrego Health's Chief Compliance Officer, Gabriela Alvarado, and Mikia Wallis for determination of further action, up to and including termination of Borrego Health's agreement with the dentist.

299.   Additionally, where the Program Integrity team found evidence suggesting potential provider fraud, waste, and/or abuse, Dr. Timothy Martinez would meet with Gabriela Alvarado to discuss possible recoupment and recovery of funds, notification to DHCS and other state authorities, and submission of a claims inquiry form to DHCS to request an adjustment for either an underpayment or overpayment of claims.

300.   The Program Integrity team, once it came online and established processes after Dr. Timothy Martinez's arrival in 2017, reviewed back-end claims and identified outliers and other billing discrepancies.

**E.     Premier and the Borrego Insiders Coverup Fraudulent Billing (the "Coverup Scheme")**

301.   The Borrego Insiders and the Premier Defendants were aware of the conduct and had received complaints and information, but did nothing to stop the practice.  Instead, the Premier Defendants worked with Borrego Insiders, including without limitation Mikia Wallis, Diana Thompson, and Karen Hebets to stop further inquiries and protect the dentists from both detection and/or consequences.  As stated herein, the Premier Defendants were incentivized to allow providers to bill as many claims as possible, since Premier was paid on a per claim basis.  The Premier Defendants were further incentivized to cover up for fraudulently billing dentists (including—and especially—the most egregious dentists), since those were the

7275860.1

1   dentists that submitted the highest number of claims and directly increased the
2   amount that Premier was paid.

3   302.   The Borrego Insiders were incentivized to cover up for the fraudulently
4   billing dentist since those billings allowed the other Schemes discussed herein to
5   take place and/or resulted in kickback payments to the Borrego Insiders. For
6   example, as an alleged above, Diana Thompson and Karen Hebets hired several
7   family members to place in the billing and accounting department at Borrego
8   Health. These family members were trained to ignore errors and duplications in the
9   claims submitted by the Dental Defendants through the Premier Defendants. .

10   303.   The Premier Defendants and the Borrego Insiders used a number of
11   different methods to cover up for fraudulently billing dentists, including without
12   limitation the Dentist Defendants, as outlined below, including without limitation
13   interference with audits, failing and refusing to reverse false/fraudulent claims,
14   refusal to take action, general avoidance and unavailability and undue pressure.

15   304.   The Premier Defendants, supported by the Borrego Insiders, would not
16   permit Program Integrity audits to be random.  It required Program Integrity to
17   provide advance notice to dentists, so that the dentists could be more prepared and
18   take steps to avoid detection of problems by the Program Integrity team.

19   305.   While typically the Program Integrity team would book any compliance
20   review appointments with contract dental providers through one of Premier's
21   administrative staff, for reasons unknown to Borrego Health, any appointments with
22   Husam Aldairi and Aram Arakelyan (both identified by the Program Integrity team
23   as high-billing providers for certain costly services) were required to be set up by
24   Travis Lyon personally.

25   306.   Occasionally, the Program Integrity team would identify claims that
26   were falsely or fraudulently billed, and should have been reversed (*i.e.* the dentists
27   should have refunded the money they received from Borrego Health, and Premier
28   should have returned or credited the per visit fee back to Borrego Health).

7275860.1

1  However, the Premier Defendants and Borrego Insiders, including without

2  limitation Karen Hebets and Diana Thompson, would not follow through on claims

3  reversals.

4         307.   On several occasions, based on suspicious or outright fraudulent claims

5  activity, Borrego Health's Program Integrity team would recommend and/or request

6  that a contract dental provider have their provider contract with Borrego Health

7  terminated.  The Premier Defendants and Borrego Insiders would regularly support

8  the contract dental providers over Borrego Health and override decisions made by

9  Borrego Health, and would refuse to take action against fraudulently billing

10  providers.

11         308.   On several occasions in 2019, during Program Integrity's

12  communications with contract dentists, Dr. Venugopal and Dr. Koutros were

13  informed by contract dental providers that the Premier Defendants told dentists that

14  if they did not bill for specific conditions, regardless of the patients' true health

15  status. Program Integrity was also informed that the Premier Defendants were

16  training and/or encouraging contract dental providers to split the claims up in certain

17  manners, asserting that if the contract dental providers did not bill for specific

18  conditions over multiple days, that the contract dental provider would not receive

19  payment from Borrego Health. When Program Integrity brought these concerns to

20  Travis Lyon, he denied the assertions and reassured Program Integrity that re-

21  training would take place to address confusion from the contract dental providers.

22  After this, the Premier Defendants became more proactive in taking steps to conceal

23  their schemes, working alongside Borrego Insiders Diana Thompson and Karen

24  Hebets to ensure duplicative claims would continue to be submitted for billing.

25         309.   Both Dr. Timothy Martinez and Dr. Nithya Venugopal reported that,

26  whenever they raised issues about Premier to Mikia Wallis, they would immediately

27  receive a call or email from Travis Lyon or Nick Priest.  Clearly, Mikia Wallis was

28  sharing their internal concerns directly with the Premier Defendants.  More often

7275860.1

than not, however, neither Premier nor Mikia Wallis actually addressed the underlying issue Dr. Timothy Martinez or Dr. Nithya Venugopal identified with Premier.

310.   Mikia Wallis made herself generally unavailable for meetings with the Program Integrity team.  At most, Program Integrity staff were only allowed to block 15-minute intervals with her.  As stated by Dr. Venugopal, "[Mikia Wallis] knew what we were doing but hated what we were finding."

311.   Program Integrity team members repeatedly raised issues about certain high-billing providers who they identified as committing "suspect fraud" to Mikia Wallis and Borrego Health's former Chief Compliance Officer, but usually no action was ever taken against providers, who would remain eligible to continue providing and billing for improper services rendered to Borrego Health's patients.

312.   Mikia Wallis would routinely push back or throw up barriers whenever they tried to implement some sort of final audit process for the contract dental providers.  There was also an ongoing push-and-pull in terms of adding new contract dental providers to Borrego Health's network between the Program Integrity team and credentialing committee on one side and Premier and Mikia Wallis on the other.  There were a number of instances where Travis Lyon, supported by Mikia Wallis, attempted to ram a number of new contract dental providers through Borrego Health's credentialing process, despite Dr. Timothy Martinez's insistence that the providers needed to be thoroughly vetted before approving them.

313.   Mikia Wallis defended contract dental providers unreasonably, even after Program Integrity team members informed her of these providers' documented history of problematic billing practices and poor quality.  Mikia Wallis herself reported that she encouraged staff to treat contract dental providers as part of Borrego Health's internal workforce and "to the extent that we feel the dentists have high quality of care, we need to defend them."

7275860.1

314.    At the June 2017 Credentialing Committee, Dr. Timothy Martinez noted and the minutes reflected that Bruce Hebets, along with Premier's Travis Lyon and Nick Priest, all personally attended the meeting.  Usually, credentialing committees are autonomous bodies free from inadvertent pressure of having administration involvement.

315.    There are numerous, specific examples of the Premier Defendants and Borrego Insiders working to cover up for fraudulently billing dentists.  A few of these examples are outlined below.

316.    On April 12, 2017, Dr. Timothy Martinez emailed Travis Lyon to note his concerns with the contract dental program as a result of the HMS/CMS audit findings: "I can start to review with you and your team the three most common pitfalls that Borrego was cited for: EXCESSIVE VISITS, INSUFFICIENT DOCUMENTATION, NOT MEDICALLY NECESSARY.  We can start with catching "EXCESSIVE VISIT" at the time the claim (called a superbill) is scanned by the private dental offices and entered into your data banks."  Thus, the Premier Defendants were aware of issues with excessive visit billing, yet did nothing to detect or prevent such billing, despite their contractual obligation to do so.

317.    Dr. Venugopal noted that dentists as a rule could not be terminated for Program Integrity issues alone.  To terminate a dentist, Dr. Venugopal and Dr. Martinez would have to also raise a quality or credentialing issue.  Even this, though, was insufficient to terminate certain "untouchable" dentists, including Dr. Aldairi, Dr. Arakelyan, Dr. Mehdizadeh and Dr. Hawatmeh (all of whom Program Integrity identified as outlier providers).

318.    In February 2018, some of the Program Integrity team met with the Premier Defendants to review the newly developed contract dental patient forms, which had been created to ensure consistent and accurate documentation across providers.  Though these were Borrego Health forms, Travis Lyon nevertheless

7275860.1

1   retained final say on how and when they were communicated to the contract dental

2   providers – if ever.

3       319.   Husam Aldairi received "Provider Compliance Reports" on June 14,

4   2018 and September 13, 2018 following a series of audits conducted by the Program

5   Integrity team during which he received scores of zero (the lowest possible score) in

6   the following categories: proper documentation, eligible provider (meaning that the

7   provider's signature on the claims matches the dental superbill and clinical progress

8   notes as required by the Medi-Cal Dental Provider Hand-book), and medically

9   necessary (meaning that the documentation supports the level of services rendered).

10  To address the clear deficiencies identified in the June 2018 audit, the Program

11  Integrity team also put together a corrective action plan listing out each deficiency

12  in detail and providing actionable steps Husam Aldairi was requested to take to

13  correct the issues.  Husam Aldairi received the corrective action plan and returned a

14  signed copy acknowledging it to the Program Integrity team but never actually

15  worked on improving.  Husam Aldairi also failed multiple peer review audits

16  conducted by Program Integrity team members on March 31 and July 25, 2019, and

17  most recently on August 31, 2020.  The Premier Defendants and the Borrego

18  Insiders, including Mikia Wallis, refused to terminate Husam Aldairi.

19      320.   When Husam Aldairi was up for re-credentialing, Dr. Timothy

20  Martinez recommended against re-credentialing Husam Aldairi but he was

21  overruled by the Premier Defendants and Borrego Insiders, including without

22  limitation Travis Lyon and Mikia Wallis.  Despite the poor performance, the

23  Premier Defendants and Borrego Insiders submitted a "special license" to HRSA to

24  allow Husam Aldairi to have a satellite intermittent dental clinic with Borrego

25  Health (in space owned by another Daryl Priest entity that Borrego Health leased).

26  Husam Aldairi was not actually terminated until the Board Insiders were no longer

27  involved in the matter.

28

FIRST AMENDED COMPLAINT

7275860.1

321.    In both July and September 2018, Dr. Timothy Martinez notified Mikia Wallis in her capacity as Borrego Health's Chief Legal Officer about the results of the Program Integrity team's first analytics ran on the contract dentists, including those identified as outliers within the program.  Mikia Wallis did not do anything to address the outliers.

322.    Mikia Wallis was informed of billing issues with Dr. Tina Cho.  For example, Dr. Martinez emailed Mikia Wallis on July 2, 2019 acknowledging "aberrant billing behavior" and attaching a document titled, "tina cho.docx," which included examples of problematic claims.  However, on October 6, 2020, Mikia Wallis sent a letter to Special Agent Supervisor Craig Eastep which (falsely) stated that Borrego Health had no knowledge of potential billing discrepancies for services provided by Dr. Tina Cho.

323.    On October 12, 2019, a member of the Program Integrity team instructed that Borrego Health will deny claims for issues that he considers to be "black and white issues."  Travis Lyon responded, "Is Koutros and Venugopal aware that Ms. Wallis does not want us to use the Denti-Cal regulations as a reason to deny claims?"

324.    In March 2019, dentist Maura Tuso called Borrego Health's compliance hotline.  She left a message indicating that she wanted to report fraud.  Dr. Timothy Martinez facilitated a telephone conference to respond to Maura Tuso, which took place on March 18, 2019.  Travis Lyon joined Dr. Timothy Martinez on the call.

325.    Maura Tuso alleged that there was fraud occurring, including manipulating charts.  Dr. Timothy Martinez asked Maura Tuso to email any details.  When these allegations were reported to Mikia Wallis, Mikia Wallis stated that Maura Tuso had lost her license and was not credible, and to cease any further investigation.  Shockingly, despite knowledge that Maura Tuso had lost her license (and, thus, was suspended from Medi-Cal) and using this information in an attempt

7275860.1

1   to discredit her, the Premier Defendants and Borrego Insiders did nothing to prevent

2   Maura Tuso from continuing to provide services through other contract dentists (and

3   billing for them) or to remedy prior improper bills where Mauro Tuso provided

4   services.

5       326.   On January 27, 2020, a member of the Program Integrity team

6   conducted a surprise compliance audit of Dr. Aram Arakelyan.  Dr. Aram Arakelyan

7   refused to allow staff to audit the charts and called Travis Lyon to intervene.  This

8   resulted in a meeting with Mikia Wallis, Travis Lyon, and Dr. Timothy Martinez,

9   and a subsequent meeting with Premier's counsel.

10      327.   Following this meeting, on March 2, 2020, counsel for Premier

11  informed a member of the Program Integrity team over the phone that such surprise

12  audits of the contract dental providers were unlawful and that all audits required

13  written notice to contract dental providers at least five days before any audit.  This is

14  false.

15      328.   Borrego Health requested and harangued Premier repeatedly to activate

16  a "Prior Authorization" requirement, which required outlier providers and practices

17  to obtain prior authorization from Borrego Health before performing certain high-

18  cost services.  In a meeting on May 21, 2020, the Program Integrity team was told

19  by Travis Lyon that he promised it would be turned on by June 1, 2020.  It was

20  never activated.

21      329.   In a quality meeting on June 16, 2020, Dr. Venugopal told Travis Lyon

22  that individual dentists were billing bridges as single unit crowns, and directed him

23  to send a communication to providers that this practice must stop.  Travis Lyon

24  refused.

25      330.   As late as September 2020, when questioned about the accusation from

26  the California Dental Board against Husam Aldairi, Mikia Wallis continued to

27  defend him.  She asserted that an external reviewer said Husam Aldairi's care was

28  "exquisite" and that he was a "QI [Quality Improvement] success story."  This

7275860.1

1    directly contradicts what Program Integrity and credentialing staff reported to Mikia

2    Wallis regarding the poor quality of care by Husam Aldairi.

3        331.   On October 7, 2020, Dr. Nithya Venugopal presented audit findings

4    regarding Husam Aldairi to Mikia Wallis, Dr. Timothy Martinez, Dr. Edgar Bulloch

5    (Borrego Health's former CMO and CEO), and Mark Connelly (Borrego Health's

6    Chief Operations Officer).  The presentation focused on the fact that Husam Aldairi

7    had most likely falsely billed for excessive visits, in particular where no face-to-face

8    encounter occurred, and improperly documented or falsified records, and finally

9    often provided services below the standard of care or that lacked medical necessity.

10   Within the first ten minutes of the presentation, Mikia Wallis walked out.

11       332.   Borrego Health requested that Premier run a report on 2020 claims and

12   identify any duplicates.  In September 2020, Premier provided a report identifying

13   over 600 claims that were duplicated, meaning they were billed by Premier on

14   behalf of the dentists multiple times.  Borrego Health was not aware of the

15   duplication at the time it paid the invoices of both the dentists and Premier for the

16   duplicate claims.  Despite notice of the duplication the Premier Defendants and the

17   Borrego Insiders did not reverse the claims, and the dentists did not repay the

18   claims.  Although this report was only for 2020, Borrego Health is informed and

19   believes that the same issues would exist in years prior to 2020.

20       333.   As a result, Borrego Health was forced to pay both Premier and several

21   contract dental providers for services which should not have been paid or for

22   services which were never rendered.

23       334.   On information and belief, the Borrego Insiders were compensated for

24   this access and control through kickbacks or other payments or remuneration.

25   **F.    The Borrego Insiders Entered into Leases with Daryl Priest-Owned**

26   **Entities for Above Market Rents and Terms Many Times the**

27   **Market Amount (the "Priest Leases Scheme")**

28

FIRST AMENDED COMPLAINT

335.   Borrego Health only owns two of its facilities.  Therefore, Borrego Health must otherwise procure real property for its facilities.  This is accomplished by going to into the marketplace and securing facility leases in Southern California.  The resulting leases should be from an arm's length transaction at market prices, and the leases should be submitted to the Borrego Health Board of Trustees for approval.  Borrego Health's facility leases must be: (1) entered into for a lawful purpose; (2) sought competitively, and subjected to a diligent market value analysis; and (3) to the extent reasonably possible, for no more than fair market rent and reasonable duration.  The leases must also include reasonable terms under which the FQHC can terminate the lease.

336.   Yet, the next scheme involved Borrego Health leasing certain real property from the Premier Defendants or entities related to the Premier Defendants at rents and terms that were well above market.  Borrego Health was victimized by three grossly over-priced, 30-plus-year term facility leases engineered by the Borrego Insiders and the Premier Defendants or entities related to the Premier Defendants.  The total combined full-term price of these three leases is over $100 million dollars.  As detailed below, these leases were never subject to due diligence and were executed by the Borrego Insiders, without submitting them to the full Board for analysis, review, and informed consent and approval.  Once in place, the leases were concealed from the full Borrego Health Board.  The reason for hiding them from the full Board is clear:  recent independent appraisals by CBRE show the total combined lease prices are $58 million over fair market rent.

337.   The leases at issue that are above fair market rent, without good cause, and without the fully informed consent of the Board, are per se unlawful *ab initio*, because, *inter alia*, they are entered into for an unlawful purpose, namely to defraud Borrego Health for millions of dollars, while at the same time exposing Borrego Health to regulatory sanctions and related adverse financial and tax consequences.

7275860.1

338.   Promenade Square, LLC ("Promenade") is a California limited liability company whose primary place of business is in El Cajon, California.  Promenade is engaged in the commercial real estate business.  Borrego Health is informed and believes that Promenade's sole member and manager is Daryl Priest.  Promenade is the owner and lessor of the structures and appurtenances located at 133 and 155 West Main Street, El Cajon, County of San Diego, California, of which Borrego Health is the lessee ("Promenade Lease").

339.   DRP Holdings, LLC ("DRP") is a California limited liability company whose primary place of business is in El Cajon, California.  DRP is engaged in the commercial real estate business.  Plaintiff is informed and believes that DRP's sole member and manager is Daryl Priest.  DRP is the owner and lessor of the structures and appurtenances located at 590 North D Street, City of San Bernardino, County of San Bernardino, California, of which Borrego Health is the lessee ("DRP Lease").

340.   Inland Valley Investments, LLC ("Inland Valley") is a California limited liability company whose primary place of business is in El Cajon, California. Inland Valley is engaged in the commercial real estate business. Plaintiff is informed and believes that Inland Valley's sole member and manager is Daryl Priest.  By way of assignment from DRP, Inland Valley is now the lessor of the structures and appurtenances located at 750 East Main Street, City of Barstow, County of San Bernardino, California, of which Borrego Health is the lessee ("Inland Valley Lease").  The Borrego Insiders and Premier Defendants decided to have Borrego Health sign the lease for the Barstow facility before the facility even existed. On information and belief, the Premier Defendants then presented the over-market lease to a federally insured lending institution to help obtain financing for the facility (making Borrego Health in essence a participant in the development and financing of the Barstow facility). As further demonstration of the interconnectedness of this Scheme, Travis Lyon, who was the CEO of Premier (a healthcare company), was the broker for the construction loan in connection with

7275860.1

1    the Barstow deal and personally collected signatures from Bruce Hebets and Diana

2    Thompson (then, Troncoso).

3        341.   For the sake of brevity, and because Borrego Health is informed and

4    believes that Daryl Priest is the sole owner, member, and manager of Promenade,

5    DRP, and Inland Valley:  (a) Promenade, DRP, and Inland Valley are also referred

6    to collectively as the "Priest LLCs"; and (b) the three leases Borrego Health entered

7    into with the Priest LLCs are referred to collectively as the "Priest Leases."

8        342.   Daryl Priest (who owns the three Priest LLCs), Travis Lyon and the

9    Borrego Insiders worked together to devise a scheme under which Borrego Health

10   was a conduit of federal healthcare funds to pay for the overpriced Priest Leases.

11   Daryl Priest, Travis Lyons and the Borrego Insiders worked together to make

12   management and operational decisions at Borrego Health to allow the Priest Leases

13   to be entered and to remain in operation undisclosed to Borrego Health's full board.

14       343.   Daryl Priest is an experienced owner and lessor of commercial

15   properties.  Travis Lyon is an experienced commercial real estate development and

16   management executive.  Daryl Priest and Travis Lyon, on behalf of Promenade,

17   DRP, and Inland Valley, must each present their commercial leases to banks

18   providing them with mortgages and other funding related to their leased properties.

19   Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and Inland Valley,

20   must perform due diligence regarding their lessees, before entering into a 30+ year

21   lease that will be reviewed by lenders providing millions of dollars of financing to

22   Promenade, DRP, and Inland Valley.  Daryl Priest and Travis Lyon are therefore

23   presumed to know Borrego Health's business, including that it is a non-profit health

24   care provider doing business with federally-funded health programs.  Daryl Priest

25   and Travis Lyon are presumed to know fair market rent, that the stated rent in the

26   Priest Leases is over fair market rent, and that the lease terms of 30+ years are far

27   beyond fair market lease terms (especially in the absence of terms allowing Borrego

28   Health to terminate the lease on reasonable notice).  Under these facts and

7275860.1

1   circumstances, Daryl Priest and Travis Lyon, on behalf of Promenade, DRP, and

2   Inland Valley, are charged with knowledge that they were each entering into an

3   over-fair market rent lease with a non-profit FQHC.

4        344.   Mikia Wallis and the Borrego Insiders knew or should have known that

5   the Priest Leases were well above market rents and terms.

6        345.   Mikia Wallis and the Borrego Insiders knew or should have known that

7   the Priest Leases would need to be approved by the full Board of Trustees.

8        346.   With minimum due diligence, the over-fair market rent price and

9   excessive duration of the Promenade Lease, DRP Lease, and Inland Valley Lease,

10  combined with the absence of any term allowing Borrego Health to terminate a lease

11  prior to their respective lease terms, would have been readily apparent.

12       347.   No rational, informed Board of Trustees for a non-profit FQHC would

13  have, or could have, lawfully approved the Promenade Lease, DRP Lease, or Inland

14  Valley Lease for, inter alia, the following reasons:

15            a.     The lease terms are unconscionable, and would result in the

16  diversion of millions of "over-fair market rent" dollars of federal health program

17  money to the Priest-owned entities;

18            b.     The Promenade Lease calls for payment of nearly $40,000 per

19  month over fair market rent, or more than $15,000,000 over fair market rent over the

20  33-year life of the lease;

21            c.     The DRP Lease calls for payment of nearly $39,000 per month

22  over fair market rent, or approximately $14,000,000 over fair market rent over the

23  30-year life of the lease;

24            d.     The Inland Valley Lease calls for payment of more than $80,000

25  per month over fair market rent, or approximately $29,000,000 above fair market

26  rent over the 30-year life of the lease;

27            e.     Approximately 90% of the revenue received by Borrego Health is

28  paid by government funded health programs (Medi-Cal and Medicare), and therefore

7275860.1

if the Priest Leases are enforceable, the vast majority of the over-fair market rent dollars paid could be government health program money;

f.      The over-fair market rent facility lease payments expose Borrego Health to reductions in the allowed reimbursements paid Borrego Health in prior years; and

g.      The close relationship between the Borrego Insiders and Daryl Priest and Travis Lyon (and, by extension, the Priest-owned LLCs) exposes the non-profit FQHC to adverse federal and state tax consequences.  The fact that the rent money would inure to insiders meant Borrego Health could be found to be failing in its obligations to ensure that its assets were being used predominantly for charitable purposes, exposing it to possible revocation of its 501(c)(3) status.

348.   If enforceable, the Priest Leases would have siphoned $58 million in over-fair market rent money from Borrego Health over the life of the leases.  Two of the leases (Inland Valley Lease in Barstow and DRP Lease in San Bernardino) have been terminated.  The Promenade Lease in El Cajon remains in operation with Borrego Health paying twice fair market rent under protest, with permission of the DHCS monitor overseeing Borrego Health's operations since late 2020.  Without judicial intervention on the Promenade Square lease, and without recovery of the $11.8 million in overpaid rent to date, the actions of the Borrego Insiders and a handful of Priest entities will continue to present an immediate threat to disable an essential provider of primary healthcare services to underserved inland communities in San Diego, San Bernardino, and Riverside Counties.

349.   The Priest Leases were concealed from the full Borrego Health Board. Mikia Wallis and the Borrego Insiders knew what was contained in regular reports to the full Borrego Health board, and more importantly, what was not.  The Borrego Insiders knew that financial reports presented to the full board did not include or otherwise call out the individual facility rents in a way that might suggest that they were over market or had unreasonably long lease terms.  Financial reports to the full

7275860.1

Borrego Health Board include only the aggregate rents paid on all facilities.  The Borrego Insiders knew that Borrego Health's personnel would make monthly rent payments as requested, without questioning the reasonableness of those monthly rent payments.  Thus, unless the Priest Leases themselves were presented to the full Board of Trustees for vetting and approval, there was absolutely no way that Borrego Health would be put on notice of any potential financial or other injury associated with, or caused in whole or in part by over-market leases.

350.   The Borrego Insiders knew that full Board of Borrego Health would review only those contracts presented to them, and that they would never have reason to see the Priest LLC leases unless the Borrego Insiders managing the relationship with Priest LLCs decided to present the leases.  Thus, unless disclosed by the Borrego Insiders, there was no way that Borrego Health would be put on notice of the terms of the three subject leases, or that the Borrego Insiders were working with Daryl Priest, Travis Lyon, and, through them, the three Priest LLC to make all management and operations decisions pertaining to the over-market leases for Borrego Health, and in a manner contrary to Borrego Health's financial and compliance interests.  The fact of injury from the leases and from the defendants' participation in Borrego Health's facilities procurement and operations and therefore could not be discovered.

351.   The Borrego Insiders' continued concealment of the leases from Borrego Health was a separate breach of fiduciary duty and/or duty of care in furtherance of the scheme to steal money from Borrego Health every time a monthly rent check was mailed to Borrego Health.

352.   The Priest Leases Scheme victimized Borrego Health in at least three ways:

a.   <u>Exposure to State Suspensions and Federal Disqualification</u>: In California, government funded health program funds flow to FQHCs under the oversight of the California Department of Health Care Services ("DHCS").  DHCS

1    is empowered to suspend all reimbursement for the provision of health care services

2    to Medi-Cal members in accordance with, *inter alia,* Welfare and Institutions Code

3    section 14107.11 and Title 42 of the Code of Federal Regulations section 455.23.

4    Further, HRSA/Bureau of Primary Health Care ("BPHC") monitors FQHCs and can

5    suspend and/or disqualify Borrego Health from the FQHC program, including, *inter*

6    *alia,* an action by HRSA requiring Borrego Health to cease all activities in the

7    program pending corrective action (45 CFR 75.375) and possible suspension under

8    HHS regulations (2 CFR Part 376, 45 CFR 75.2).  DHCS is presently allowing

9    Borrego Health to continue operations under the guidance, oversight, and direction

10   of a DHCS-appointed independent monitor.

11            b.      Reimbursement rate adjustments: The cost of owning, renting,

12   maintaining, and upgrading clinic facilities is a substantial cost center for FQHCs

13   providing primary health care services.  As such, CMS recognizes the fair market

14   value of facility costs reasonably incurred and truthfully reported by FQHCs in

15   determining the reimbursement rates to be paid clinics operated by the FQHC.  Cost

16   reporting in excess of fair market value inflates the FQHC's mandatory cost reports

17   required under title 42 of the United States Code section 1395g, and exposes

18   Borrego Health to an order that it retroactively amend its cost reports, potentially

19   leading to a reduction in reimbursement rates paid by federally funded health

20   programs.

21            c.      Non-profit 501(c)(3) tax status:  Contract payments to

22   disqualified persons in excess of fair market values (or other unlawful diversion of a

23   non-profit entity's revenue to falsely disguise profits as operating expenses) can

24   result in tax liability and/or loss of non-profit tax exemption status at both the federal

25   and state levels.  (*See,* e.g., Internal Revenue Code sections 4958(c)(1) and

26   4958(f)(1) and related Treasury Department Regulations in section 53.4958-3.)

27        353.   The concealment of the Priest Leases Scheme detailed above and of the

28   fact of injury resulting therefrom worked to perfection until it came to light in late

2020.  At that time, following October 2020 raids by state and federal law enforcement authorities, DHCS suspended payment of federal funds to Borrego Health in conjunction with an investigation unrelated to the Priest Leases.  In the course of the investigation, numerous contracts were reviewed, including the Priest Leases.

354.   Independent certified commercial real estate appraisers made the following findings:  (a) on the Promenade Lease (El Cajon location), Borrego Health was paying $39,104.75 a month above fair market rent, or $469,257 above fair market rent per year; (b) on the DRP Lease (San Bernardino location), Borrego Health was paying $38,405.95 a month above fair market rent, or $460,871.40 above fair market rent per year; and (c) on the Inland Valley Lease (Barstow location), Borrego Health was paying $80,025.25 a month above fair market rent, or $960,303 above fair market rent per year.  Additionally, the lease terms of 30 to 33 years on the Priest Leases is unreasonably over market as well.  A reasonable fair market term for these commercial leases is three to five years.

355.   In order to remain in operation, Borrego Health signed an agreement with DHCS in February 2021 under which an independent monitor selected by DHCS would institute a robust corporate integrity and compliance program at Borrego Health.  As is relevant here, DHCS' monitor directed Borrego Health to: (1) stop paying above fair market rent on the Priest Leases; and (2) take action to address over-fair market rent payments, excessive 30-year lease terms, and the failure to include lease provisions under which Borrego Health may terminate the leases.

356.   In response, the Priest LLCs acted in unison.  The Priest LLCs demanded that Borrego Health continue to make over-fair market rent payments under the Priest Leases.  In a May 25, 2021 email, the Priest LLCs threatened that Borrego Health's failure to pay the demanded rent on any one of the Priest Leases

FIRST AMENDED COMPLAINT

7275860.1

1  will result in immediate eviction proceedings as to all three locations that are the

2  subject of the Priest Leases.

3      357.   The Priest Leases are the subject of a related litigation pending as Case

4  3:21-cv-04117-L-AGS, entitled *Borrego Community Health Foundation v. Inland*

5  *Valley Investments, LLC, et al*.

6      358.   Because Borrego Health had no constructive or inquiry notice of the

7  fact of injury throughout the eight-year life of the Priest Leases Scheme, Borrego

8  Health's right to recover money stolen by defendants extends back to the

9  commencement of each lease.  The accrual date applicable to RICO claims under

10  the discovery rule (and to all other causes of action pled herein) is at the earliest

11  October 2020, and Borrego Health may sue to recover for the entire eight years of

12  losses.

13      359.   On information and belief, the Borrego Insiders were compensated for

14  this access and control through kickbacks or other payments or remuneration.

15  **G.    The Borrego Insiders Paid Themselves Above-Market**

16  **Compensation and Granted Themselves Improper Benefits and**

17  **Covered It Up (the "Compensation/Benefits Scheme")**

18      360.   <u>Bruce Hebets</u> received a high salary from Borrego Health.  For

19  instance, in 2016, Bruce Hebets received more than $383,000 in salary, plus over

20  $126,000 in "bonus," in addition to a "car allowance" of $1,000 per month and a

21  "cell allowance" of $350 per month.  In 2017, Bruce Hebets received more than

22  $529,000 in salary, plus over $87,000 in "bonus," in addition to the car and cell

23  allowance.  The decision to increase Bruce Hebets' salary in 2017 was made by

24  Harry Ilsley, Dennis Nourse, and Mike Hickok without conducting any

25  compensation study to determine what a fair market salary would be for a FQHC.

26  The three Borrego Insiders then represented to the full Borrego Health Board that

27  this salary was fair market and was in line with other comparable FQHCs (which

28  would later be refuted when an actual compensation study was conducted). In 2018

7275860.1

1  (partial year), Bruce Hebets received more than $467,000 in salary, plus over
2  $321,000 in "bonus," in addition to the car and cell allowance.

3      361.   <u>Karen Hebets</u> also received a high salary from Borrego Health.  For
4  instance, in 2016, Karen Hebets received more than $227,000 in salary, plus over
5  $40,000 in "bonus".  In 2017, Karen Hebets received more than $228,000 in salary,
6  plus over $51,000 in "bonus".  In 2018 and 2019, Karen Hebets received more than
7  $228,000 in salary, plus over $41,000 in "bonus".  In 2020, these salaries were
8  reduced to more than $205,000 with a bonus of over $10,000.

9      362.   <u>Diana Thompson, formerly Diana Troncoso</u>, also received a high salary
10  from Borrego Health.  For instance, in 2017, Diana Thompson was paid nearly
11  $338,000.

12     363.   <u>Mikia Wallis</u> also received a high salary from Borrego Health.  For
13  instance, in 2017, Mikia Wallis was paid over $440,000.

14     364.   The Borrego Insiders then proceeded to disguise their above-market
15  salary and benefits by using improper evaluations.  For instance, the Borrego
16  Insiders used Jim Hebets and his companies to create a bogus evaluation of the
17  compensation packages, concluding—unsurprisingly—that they were appropriate.

18     365.   One Borrego Insider even stated that the executives kept their base
19  salary low but took additional payments as "bonuses" and received other benefits
20  "to avoid scrutiny."

21     366.   The Board Insiders also received compensation and other improper
22  benefits.  In July 2015, Bruce Hebets inquired from counsel whether or not a FQHC
23  can pay or compensate board members, but counsel informed him that payments
24  were prohibited, other than very narrow exceptions.  Nevertheless, the Board
25  Insiders received remuneration and benefits from Borrego Health, and were
26  therefore effectively compensated by Borrego Health and incentivized to keep these
27  Schemes going.

28

7275860.1

367.   For instance, the Board Insiders received free access to Borrego Health programs, benefits, prescription drugs and even hearing aids.

368.   An email from Mike Hickok dated August 31, 2020, confirmed the practice of improper remuneration and benefits to Board Insiders:

> This policy has existed since Borrego Health was founded.  I asked about this once myself (I currently get my pharmacy prescriptions  as a perk) and was told this was an acceptable practice. My understanding is staff and families get the same perk plus no charge for medical and dental care. As far as the missive that the  cost of these items should be put back into the healthcare of the community is almost too laughable to be taken seriously in view of the tens of millions of dollars we waste with double paying Providers or paying them for doing little to no work or paying firms like Premier Healthcare millions of dollars that in-house staff could do and much less expensively or the many (probably most) real estate leases that we pay exorbitantly over market rent and for well in excess of typical lease terms. I've been trying to call attention to these issues for *years* and gotten nowhere until the Borrego Sun stared to expose them. Alan Kuehn has been blowing the whistle for years about medicare fraud in the contract dental practice and the only thing that this board chose to do regarding him was blackball him as a board member because he was threatening to Makia and Tim Martinez and the ongoing scam with Premier Healthcare.
>
> So now calling attention to Trustees getting a perk of free pharmacy as some sort of impropriety is (on second thought) not *almost*  laughable it takes the cake ….

369.   Later, as discussed below, when this arrangement was revealed, the Borrego Health Board ended the practice.  However, in a September 2, 2020 e-mail between Mikia Wallis and the 2020 Board of Directors, it was clear that Mikia Wallis had never looked into the legality of such a practice during her tenure at Borrego Health. Further, none of the Board Insiders evaluated whether it was consistent with the by-laws or HRSA guidelines to allow such a practice.

370.   In 2019, Compensation Resources, Inc. ("CRI") was retained by Borrego Health to review and analyze the compensation of 15 Borrego Health executives.  CRI issued its report on or about July 19, 2019.  In sum, of the 15 executives reviewed, the CRI report concluded that the "Total Compensation Package (TCP) for eleven (11) of the Borrego officers is currently above the high

FIRST AMENDED COMPLAINT

7275860.1

end of their respective Market Ranges of Reasonableness."  In early 2020, a second CRI analysis was conducted for the other employees of Borrego Health, which also found excessive salaries.

371.   Mikia Wallis and the Borrego Insiders failed to raise the issues of nepotism, cronyism and above-market compensation to the full Borrego Health Board, and took steps to conceal the issues.  When asked by the full Borrego Health Board to investigate and report on the compensation, Mikia Wallis' submitted multiple reports which lacked the necessary information to make any appropriate decisions.

372.   For instance, in one version of Mikia Wallis' report she used the salaries that had recently been reduced by an "equitable" adjustment, effectively attempting to conceal the past problems.

On top of that, Bruce Hebets and Jim Hebets schemed to create a 162B Executive Bonus Plan that would pay Bruce Hebets and others additional compensation (a tax-free payment of $5,000 per month) while also siphoning millions to Jim Hebets' insurance company.

373.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**H.     The Borrego Insiders Used Nepotism and Cronyism to Funnel Money to their Friends and Family (the "Nepotism and Cronyism Scheme")**

374.   Bruce Hebets and Karen Hebets hired their family members to work at Borrego Health.  The nepotistic hires benefited The Hebets family, so that they were encouraged to keep the above-described Schemes operating.  This included Bruce and Karen's daughter Tiffany Hebets (Collections Clerk, paid approximately $46,700/year and daughter Amanda Troncoso (Lead Billing Internal Auditor, base salary $49,920/year).  Amanda Troncoso is also the daughter-in-law of Diana Thompson.

375.   Mikia Wallis created a position for her husband, Jeremy Noble, at Borrego Health.  Jeremy Noble was hired to be Director of Site Facility Compliance for Borrego Health in exchange for an annual base salary of $120,000, despite the fact that he lacked the skills needed for the position.  Jeremy Noble was later arrested and charged with illegal firearms possession.  Borrego Health is informed and believes that the criminal case (Case No. SCN420059) is ongoing.

376.   Diana Thompson hired her family members to work in Borrego Health's billing department and elsewhere.  The nepotistic hires benefited Diana Thompson and her family, so that she was encouraged to keep the above-described schemes operating.  Moreover, by populating her department with family members, it effectively eliminated any meaningful oversight.  These family members included: (1) her brother Jose Alfredo Villafana, IT Technician (base salary $45,760/year); (2) her brother Luis Troncoso, Facilities Maintenance Worker 3 (base salary: $57,200/year); (3) her sister Breanda Troncoso, Biller 2 (base salary $40,352/year); (4) her step-son Julian Thompson, Accounting Clerk 1 (base salary $45,739/year); (5) her step-son Jordan Thompson, Biller 2 (base salary $35,360); and (6) her daughter-in-law Amanda Troncoso, Lead Billing Internal Auditor (base salary $49,920/year).  Borrego Health even hired Diana Thompson's father to provide gardening services for Borrego Health.

377.   By hiring family members, as well as individuals that lacked experience in the healthcare industry and FQHC space, Borrego Insiders were able to conceal Schemes and the funds being funneled between and amongst the Defendants.  As already alleged herein, Diana Thompson and Karen Hebets trained their family members in the accounting department on how to review and process claims. While this task was supposed to be performed by the Premier Defendants, they failed to do so. As a result, the Dental Defendants provided incorrect and fraudulent claims to Premier, who then submitted the claims to Borrego Health.  The Borrego Insiders' family members failed to recognize the issues with the claims due

7275860.1

1  to inexperience and the deceptive training provided by Karen Hebets and Diana

2  Thompson.

3      378.   On information and belief, the Borrego Insiders were compensated for

4  this access and control through kickbacks or other payments or remuneration.

5  **I.**    **The Borrego Insiders Tried To Purchase a Country Club to**

6      **Personally Benefit Themselves (the "De Anza Country Club**

7      **Scheme")**

8      379.   The October 2017 Executive/Finance Committee meeting was

9  recorded.  In that meeting, the Board Insiders and staff attendees (including Bruce

10  Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal to purchase the

11  De Anza Country Club located in Borrego Springs.  According to the meeting

12  discussions: (1) the country club was not performing well economically and was

13  contemplating selling its assets or filing for bankruptcy, (2) some Borrego Insiders

14  own or owned homes nearby whose property values would face decline, and (3)

15  some Borrego Insiders were creditors of the country club through a limited liability

16  company.

17      380.   Three of the four Board Insiders (Mike Hickok, Dennis Nourse, and

18  Harry Ilsley) were members and nearby homeowners at De Anza Country Club

19  during a period when the club was financially distressed and looking for a purchaser.

20  Mike Hickok was on the De Anza Board of Trustees and headed a committee at De

21  Anza to arrange a purchaser for the country club.

22      381.   Mike Hickok mentioned that he wanted Borrego Health to buy the club

23  so that Borrego Health would pay membership fees and subsequently offer "free"

24  membership and free golf course access to the medical and dental providers Borrego

25  Health partnered with.  Hickok admitted that most Borrego Health employees would

26  not want this service, but that it made sense for Borrego Health to buy the country

27  club since there was a "fire sale."

28

FIRST AMENDED COMPLAINT

7275860.1

382.   Borrego Insiders decided not to present the plan to purchase the country club to the full Borrego Health Board.  Specifically, Chuck Kimball indicated several times during the meeting that if the issue were presented to the full Borrego Health Board, the Board would "f**k it up." (Explicative removed.) Kimball went on to state that the purpose of the Executive Committee was to make decisions without consulting the full Borrego Health Board.

383.   Following the October 2017 meeting, Borrego Health made a formal offer to purchase the country club, including paying earnest money on the deal.  As usual, the Borrego Insiders did not take the De Anza transaction to the full Board for its review or approval.

384.   Borrego Insiders sent a letter of intent and a "good-faith deposit" to De Anza, without the knowledge or approval of the full Board.  It was only after De Anza shared the letter with its shareholders that this scheme was discovered by others.

385.   In fact, in the recorded October 2017 Executive/Finance Committee meeting, the Borrego Insiders explicitly acknowledge that members of the full Board would disapprove of such a purchase.  Borrego Health does not know why the Borrego Insiders wanted a FQHC—*i.e*., a healthcare provider for underserved communities—to purchase a country club, though Borrego Health suspects that some or all of those individuals would personally benefit from such a transaction, at the expense of Borrego Health.

386.   By email dated November 18, 2017, outside counsel for Borrego Health advised Mikia Wallis that there were potentially "severe consequences" to Borrego Health from the proposed transaction, outlining some of the major potential issues.

387.   The Borrego Insiders continued to pursue this deal into 2018, even after telling the full Board that it was "dead," and to hide that fact from the full Board. Diana Thompson stated, in an Executive Committee meeting in 2018, "when we left

1   the last meeting with the board, the full board, we said or the executive committee,

2   we said, we're not going to pursue this. We do have the obligation to notify them

3   that we're discussing this."

4        388.   The Borrego Insiders acknowledged that they were interested parties.

5   At one point, in a 2018 Executive Committee meeting, Harry Ilsley said, "But do we

6   really -- the three of you have got to recuse yourself from voting. That you have

7   ownership in the LLC, you have homes that may be devalued if De Anza goes

8   away."  It is not clear which three individuals or what LLC he was referencing.

9        389.   The Borrego Insiders actively sought to conceal this proposed

10   transaction, with one Borrego Insider stating at a 2018 Executive Committee

11   meeting, "someone has offered to partner with us but the details are totally

12   unknown. I personally don't want that information to leak out anywhere, but it's in

13   the community already, I suppose, and you may hear about it and I don't want to

14   have you have to call me to find out what's going on, okay?"

15        390.   It appears that Mike Hickok and Harry Illsley were unable to obtain a

16   written favorable vote from a majority of the equity members at the De Anza club.

17   Therefore, despite the Borrego Insider's efforts, the deal did not move forward, and

18   de Anza returned the earnest money.

19        **J.**     **The Borrego Insiders Attempted to Pay Bruce Hebets a $5 Million**

20                  **Payout (the "Payout Scheme")**

21        391.   In or about March 2018, Bruce Hebets suffered from a worsening

22   illness and decided to step down from his position as CEO.  Without putting it on

23   the agenda, the Borrego Insiders proposed a $5 million payout for Bruce Hebets as

24   part of a "transition agreement."  Around that time, the idea was first presented to

25   the full Board of Trustees.  At that time it was first presented to the full Board, an

26   agreement had already been created, which was drafted by Mikia Wallis.

27        392.   Mikia Wallis drafted the agreement at Bruce Hebets' request.  Mikia

28   Wallis did not advise Borrego Health to get separate counsel with respect to the

agreement, and told a Borrego Health Board member on or about April 5, 2018 that she "represented no one" in the transaction, despite that fact that she was Borrego Health's Chief Legal Officer and would shortly become Borrego Health's CEO. The Board member encouraged Mikia Wallis to do her own research about to whom she owes a duty of loyalty as general counsel for Borrego Health. Mikia Wallis argued that she was not required to represent the best interests of the organization (which is wrong), that she did not represent anyone with respect to this transaction, and that there was nothing wrong with having drafted the contract for Bruce Hebets.

393. Despite her protestations to the Board, Mikia Wallis was aware of her conflict. At one Executive Committee meeting in 2018, Mikia Wallis discussed presenting a proposed agreement to the full Board. She said, "My concern is, I don't know that's best coming from me, considering the inherent conflict of interest."

394. The Borrego Insiders did not do any diligence or get an independent analysis with respect to a proper amount for a buyout under the circumstances. Two other Board members, who were not Board Insiders, objected to the payout, stated that additional diligence was required and asked for the vote to be delayed to allow for additional evaluation.

395. During the discussion of the transition agreement, the Borrego Insiders argued that the extremely high buyout was appropriate due to the fact that Bruce Hebets had not received retirement benefits. However, this was false as Bruce Hebets had a 162B plan. (The existence of the 162B plan was concealed by the Borrego Insiders, including from the auditor retained to evaluate the appropriate amount of Bruce Hebets' payout.)

396. The vote on the "transition agreement" and buyout was postponed to a later meeting.

397. At the April 5, 2018 Borrego Health Board meeting, the issue was discussed. The Borrego Insiders brought a man named Frank Church, who was supposedly an "independent auditor," to appear by phone in the meeting. Frank

1  Church did not appear to have any expertise or knowledge regarding the

2  reasonableness of the payout.

3      398.   On July 13, 2018, Chuck Kimball e-mailed Mikia Wallis and Diana

4  Thompson, stating that Bruce Hebets indicated that he would retire, but wanted to

5  remain on payroll at a "reduced rate" for 5 years at a rate from his $500,000 annual

6  salary. Chuck Kimball proceeded to state that after Bruce Hebets retired, Mikia

7  Wallis and the Board Insiders would be completely in charge of Borrego Health.

8      399.   Later, still needing an independent evaluation of the payout amount, at

9  the insistence of the non-Borrego Insider Board Trustees, Borrego Health retained

10 FW Cook to conduct an evaluation.  FW Cook employee Marty Katz provided the

11 results.  After reviewing salaries and payouts for other CEOs, FW Cook concluded

12 that an appropriate payout would be $2 million, not the $5 million that Bruce Hebets

13 and Mikia Wallis proposed.  The analysis was provided without knowledge of the

14 162B plan and benefits, and was therefore fundamentally flawed.

15     400.   During the valuation process, Chuck Kimball and Mikia Wallis

16 exchanged several e-mails, including an e-mail on September 27, 2018 which

17 indicates an intent to exclude non-Borrego Insiders from Bruce Hebets' retirement

18 negotiations.

19     401.   After this valuation occurred, Chuck Kimball proposed offering an

20 accelerated payment structure to ensure Bruce Hebets received the full amount

21 before his passing. During these e-mail exchanges with Mikia Wallis, Chuck

22 Kimball admitted that the Borrego Insiders were making decisions about Borrego

23 Health which involved "dodging the law."

24     402.   This $2 million payout amount was eventually agreed to by the full

25 Borrego Health Board and Bruce Hebets.

26     403.   Months after the $2 million payout had already been completed,

27 Borrego Health once again consulted with FW cook about the propriety of the 162B

28 plan.  At that time, Marty Katz explained that he was told by Mikia Wallis that

7275860.1

1   payments made to a 162B plan for Bruce Hebets' benefits were performance-based

2   bonuses, which was false.  In actuality, this was a part of Bruce Hebets' regular

3   compensation.  Marty Katz told a Borrego Health Board member that if he had

4   known this information, the payout amount would have been lower.

5       404.   The Borrego Insiders also attempted to conceal the impropriety of the

6   generous 162B plan offered to some Borrego Insiders.  In spring or summer 2019,

7   certain Borrego Health Board Trustees asked Mikia Wallis to evaluate the current

8   162B plan and, if necessary, find alternative plans.  Mikia Wallis invited an

9   individual to address the issue with the full Borrego Health board.  The individual

10  identified himself as "Jim" without providing a last name.  He proceeded to praise

11  the 162B plan.  It was only when a non-Borrego Insider Board member asked for his

12  last name did Jim disclose that he was, in fact, Jim Hebets.

13      405.   Minutes from a meeting of Borrego Insiders from June 12, 2020

14  indicate that Borrego Health received a 20% remittance payment penalty from the

15  IRS as a result of the Board Insider's decision to pay Bruce Hebets an excess of $1

16  million in 2018.

17      406.   On information and belief, the Borrego Insiders were compensated for

18  this access and control through kickbacks or other payments or remuneration.

19  **K.      The Borrego Insiders Funneled Money to Bruce Hebets' Brother,**

20  **Jim Hebets, and Jim Hebets' Firm (the "Jim Hebets Scheme")**

21      407.   The Borrego Insiders entered into an arrangements, on behalf of

22  Borrego Health, with Jim Hebets and/or companies owned or controlled by Jim

23  Hebets, The Hebets Company, funneling additional Borrego Health funds to

24  Borrego Insider cronies and family members.

25      408.   For instance, the Borrego Insiders collaborated to have Jim Hebets

26  and/or his companies review and approve sham, inflated salaries for Borrego Health

27  executives, including the Borrego Insiders.

28

409.   Jim Hebets directed the review and approval process through The Hebets Company.  However, when the sham fair market value analyses were presented to the Borrego Health Board, Jim Hebets ensured that his name was removed by the masthead and documents were carefully drafted to avoid reference to Jim Hebets and to conceal his involvement and obvious conflict of interest, even neglecting to mention his last name when introducing himself.

410.   Jim Hebets' firm, The Hebets Company, is located in Phoenix, Arizona.  On the website (www.hebetsco.com), he boasts of specializing in FQHCs and creating ways to increase executive compensation/benefits beyond what is specified in IRS code for qualified 403(b) or 457(b) plans.

411.   The Hebets Company's current website makes it perfectly clear that their agenda is to maximize executive compensation:

> Today's competitive labor market makes it increasingly difficult for businesses to hire and retain highly skilled employees. The Hebets Company's Executive Compensation and Supplemental Fringe Benefits division assists these enterprises in designing and implementing innovative compensation and benefit programs for purposes of recruiting and rewarding those key executives who are instrumental to the profitability of the company. Legislative changes over the years have repeatedly reduced the qualified plan benefits that can be allocated to this select group of highly compensated employees resulting in "reverse discrimination". But there are many worthwhile solutions.

412.   Jim Hebets' firm also boasts that it provides "Estate planning for the 'exceptionally wealthy,'" a seeming mismatch for Borrego as a non-profit, but perhaps exactly what Bruce Hebets sought and why Jim Hebets was involved.

413.   Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with The Hebets Company to increase executive compensation through contributions through automatic "bonuses" that were paid to 162B plans.  These automatic bonuses paid to many Borrego Insiders, including Bruce Hebets, Diana Thompson, Mikia Wallis, and Karen Hebets.

7275860.1

414.   Though the 162B plans appeared at first glance to be life insurance plans, they were never intended as such but were instead a strategy to pay above market to insiders without added scrutiny or tax liability.  Bruce Hebets and Karen Hebets worked directly with the Vice President and General Manager of The Hebets Company to "borrow" from their 162B accounts and transfer the funds from their respective 162B plans into their checking account.

415.   These were significant payments.  As of 2015, Bruce Hebets was receiving $3,500 per month for his 162B plan, and by 2017, he was receiving $5,000 per month.  These amounts were free of taxes, as on top of these payments, Borrego Health was also paying a tax true up.  As a result of this scheme, Bruce Hebets, Karen Hebets, and other Borrego Insiders got tax free bonuses every month, which they subsequently cashed out.

416.   Even after the loans, the value of these plans was substantial.  As of July 9, 2018, Bruce Hebets' 162B life insurance value was $1,236,000.  It appears this approximate value was paid out to Bruce Hebets' estate at the time of his death after a long illness in January 2019.

417.   Jim Hebets and The Hebets Company actively attempted to persuade Borrego Health to continue to use the 162B plans through The Hebets Company. For example, in July 2019, Jim Hebets e-mailed Mikia Wallis explaining the nature of the 162B program and the benefits of the plan. During these discussions, Jim Hebets made several misrepresentations. For example, Jim Hebets represented that the 162B would not subject Borrego Health to tax penalties. However, as alleged herein by way of example, the 162B plan in fact subjected Borrego Health to a tax penalty due to Bruce Hebets total compensation exceeding $1 million.

418.   These 162B plan payments also created a windfall for Jim Hebets and The Hebets Company, which sold and managed the plan.  As of July 2020, Borrego Health was paying $240,000 per month for the 162B plans.  This is immensely disproportionate.

FIRST AMENDED COMPLAINT

7275860.1

419.   For scale, Borrego Health paid in full for a bridge life insurance policy that would allow staff losing their 162B plan benefit to retain up to two-times their salary, up to $500,000, in group term life insurance until they could select their own insurance at their own cost via annual open enrollment.  The cost of that plan was $15,420 per month.

420.   The Borrego Insiders, Jim Hebets, and The Hebets Company knew that the Borrego Health Board members would rely on the compensation analyses and would have no other resource to question them.  Thus, the compensation analyses were presented to the Board of Trustees for vetting and approval, but there was no way that Borrego Health would be put on notice of Jim Hebets' and his company's involvement or of any potential financial or other injury associated with, or caused in whole or in part by the flawed compensation analyses.  Nor would the Board have any access to facts that might put them on inquiry notice that the Borrego Insiders, Jim Hebets, and The Hebets Company were working together to siphon funds from Borrego Health.

421.   There is little doubt that Borrego Health has only begun to scratch the surface of Jim Hebets' involvement in these Schemes.  Jim Hebets met repeatedly alone and away from the Borrego Health offices with Bruce Hebets and Daryl Priest.  Because Jim Hebets lived in Arizona, he would have had to travel for these in-person meetings with Daryl Priest.  For example, Jim Hebets, Bruce Hebets, Jim Hebets' son, and Daryl Priest met at Coasterra Mexican Restaurant in San Diego on March 18, 2016.  On February 27, 2018, they met in the lobby of Loews Resort in Coronado.

422.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.  For example, each time Bruce Hebets would give Jim Hebets access to his contacts at other FQHCs, Jim Hebets executed a "Compensation Split Arrangement between The Hebets Company and Bruce Hebets" that falsely listed Bruce Hebets as the

7275860.1

"Insurance Agent" and paid Bruce 10% of the proceeds.  Jim Hebets and Bruce Hebets executed such arrangements after Jim Hebets made sales to Rural Health Care, Inc., San Ysidro Health Center, Tony Weber (CEO of Golden Valley Health Centers), and Francisco Castellon (CEO of Omni Family Health).  It is likely that discovery will uncover similar arrangements in which the money Jim Hebets siphoned off from Borrego Health would make it back to Bruce Hebets and/or Defendants.

**L.** **Borrego Insider Chuck Kimball Leased a Barn to Borrego Health (the "Julian Barn Scheme")**

423.   Julian Medical Foundation, Inc. is a 501(c)(3) organization.  Its stated mission is "To foster the presence and availability of high quality health and medical care within the Julian area including being the owner of a rural health clinic in Julian and the promotion and sponsorship of activities addressing community-wide issues of health and safety."

424.   Julian Medical Foundation sought out property in Julian, California and solicited Bruce Hebets to operate a clinic in Julian.  Chuck Kimball led the efforts while he was Vice President of Julian Medical Foundation.

425.   Bruce Hebets and Chuck Kimball were acquaintances prior to their relationship at Borrego Health.

426.   Chuck Kimball repeatedly emailed Bruce Hebets starting in April 2009 regarding acquiring a barn to serve as a site for a future clinic operated by Borrego Health in Julian.  The target property identified by Chuck Kimball was a horse barn and surrounding land located at 2717 A Street in Julian, California (the "Horse Barn").

427.   Chuck Kimball saw an opportunity to benefit the Julian Medical Foundation to the detriment of Borrego Health.  Julian Medical Foundation could acquire the property, but it was not in a position to utilize it, finance it without subsidization, or develop it.  Chuck Kimball wanted Borrego Health to subsidize the

acquisition and development of the property and insulate Julian Medical Foundation from any risk from acquiring the property.

428.   Thus, Julian Medical Foundation would acquire a property that was not useable in its current state, but Borrego Health would bear the risk of the acquisition by paying all costs of acquisition and ongoing financing to Julian Medical Foundation, including incurring liability for any mortgages secured by Julian Medical Foundation.

429.   In July and August 2009, Chuck Kimball began a fundraising drive for Julian Medical Foundation to acquire a property in Julian for a medical clinic.

430.   Even before Julian Medical Foundation was able to acquire the Horse Barn, Chuck Kimball coordinated the drafting of a lease between the Horse Barn owners and Borrego Health.

431.   Later, Chuck Kimball proposed that Julian Medical Foundation lease the Horse Barn to Borrego Health with Julian Medical Foundation as the landlord.

432.   Borrego Health agreed to lease the Horse Barn without even considering whether there was a market for the services should the Horse Barn be remodeled to accommodate a new clinic.  Instead, market analyses were conducted years later with the Horse Barn remaining unused by Borrego Health.

433.   In October 2010, Borrego Health entered into an agreement with Julian Medical Foundation and Chuck Kimball to lease the Horse Barn.  The lease terms were one-sided and the product of Julian Medical Foundation and Chuck Kimball exerting control over Borrego Health.

434.   The leased space was not necessary and the Horse Barn was unneeded and unusable.

435.   Initially, there was no specific lease amount specified.  Instead, it was set at whatever expenses Julian Medical Foundation had to own the property.  As a result of the ambiguity of the monthly rent, the Borrego Insiders and Julian Medical

7275860.1

1  Foundation could manipulate the amount of rent for Borrego Health to pay to the

2  Julian Medical Foundation.

3      436.   The Horse Barn was unusable by Borrego Health, but it paid the full

4  rent to Julian Medical Foundation and then subleased the Horse Barn back to the

5  original owners at a significant loss to Borrego Health, only reinforcing that the fair

6  market rent for the Horse Barn was far less than Borrego Health was paying.

7      437.   The Borrego Insiders and Julian Medical Foundation were all aware

8  that Borrego Health had no use for a barn and no intention to utilize it.  Yet, they set

9  the term of the lease at 20 years in duration, with no termination clause for Borrego

10 Health, not even if the property was never developed into a medical clinic.  If the

11 lease were to be terminated or abandoned, Borrego Health agreed to pay off all

12 mortgages on the Horse Barn.

13     438.   Later, by First Amendment to the lease dated November 7, 2013,

14 Borrego Health agreed to Julian Medical Foundation's demand to increase the rent

15 from at least $6,284 per month to $7,179, despite no additional consideration being

16 offered by Julian Medical Foundation and Chuck Kimball.  The only justification

17 was increased costs incurred by Julian Medical Foundation due to a property tax

18 increase.

19     439.   Ultimately, the Horse Barn lease was so unsustainable that Borrego

20 Health had to negotiate with Chuck Kimball to release Borrego Health from the

21 lease, but that did not occur until 2022.  At that point, Chuck Kimball was aware of

22 government scrutiny.

23     440.   Neither Chuck Kimball nor the Julian Medical Foundation has returned

24 or forgiven any rent for the Horse Barn.

25     441.   The Borrego Insiders knew that Borrego Health Board members would

26 review only those contracts presented to them, and that they would never have

27 reason to see The Horse Barn lease unless it was presented to them.  Thus, unless

28 the Horse Barn lease itself was presented to the Board for vetting and approval,

1    there was absolutely no way that Borrego Health would be put on notice of any

2    potential financial or other injury associated with, or caused in whole or in part by

3    over-market leases.  Nor would the Board have any access to facts that might put

4    them on inquiry notice that the Borrego Insiders were working together to siphon

5    funds from Borrego Health.

6       442.   On information and belief, the Borrego Insiders were compensated for

7    this access and control through kickbacks or other payments or remuneration.

8      **M.**     **Borrego Insider Dennis Nourse Sold Property to Borrego Health to**

9          **be Developed by Priest (the "Property Development Scheme")**

10       443.   Bruce Hebets and Dennis Nourse were friends prior to their

11    relationship at Borrego Health.

12       444.   Dennis Nourse owned commercial property located on Palm Canyon

13    Drive in Borrego, Springs with Assessor Parcel Number ("APN") 198-010-23-00

14    ("Palm Canyon Parcel"), which fronts on Palm Canyon Drive just west of Country

15    Club Road.

16       445.   Dennis Nourse saw an opportunity to benefit himself by facilitating a

17    sale the Palm Canyon Parcel and involving Borrego Health.

18       446.   Dennis Nourse approached Bruce Hebets to discuss a sale.  Bruce

19    Hebets saw an opportunity to involve Daryl Priest to develop the property, who he

20    had familiarity with after two other clinic leases.

21       447.   Dennis Nourse, Bruce Hebets, and Daryl Priest collaborated so that

22    Daryl Priest would acquire the commercially worthless parcel from Dennis Nourse,

23    and then have it developed by Daryl Priest and his affiliated companies.  Once it

24    was developed, the property would then be leased to Borrego Health at

25    commercially unreasonable terms.

26       448.   Thus, the scheme was hatched whereby Dennis Nourse would be

27    overpaid for the Palm Canyon Parcel, half of which was undevelopable foothills.

28    Daryl Priest and his entities would overpay, but make up any loss by overcharging

7275860.1

Borrego Health for development and the lease of the property.  The Borrego Insiders would sacrifice Borrego Health's interests could further ingratiate himself with Daryl Priest and to keep Dennis Nourse cooperative on the Executive/Finance Committee and to buy off Dennis Nourse as a future collaborator.

449.   Daryl Priest, though a wholly owned subsidiary created to purchase the Palm Canyon Parcel, Inland Development, LLC, entered into a contract with Dennis Nourse for the purchase.

450.   Contemporaneously, Bruce Hebets negotiated lease terms with Daryl Priest that were disadvantageous to Borrego Health.

451.   Dennis Nourse and Bruce Hebets brought the proposal to the Executive/Finance Committee, which was controlled by Borrego Insiders, including Dennis Nourse.

452.   Bruce Hebets and Mikia Wallis knew that such a business arrangement blatantly involved conflicts of interests.  As a result, Bruce Hebets directed Mikia Wallis to perform an analysis demonstrating how the transaction could proceed with Dennis Nourse recusing himself from a vote.

453.   Rather than conduct an impartial and independent analysis, Mikia Wallis endeavored to perform an outcome-oriented and flawed "analysis" that would give the Executive/Finance Committee poor legal advice that the arrangement was acceptable, at the expense of Borrego Health.

454.   Mikia Wallis brought the cursory analysis supporting the transaction to Bruce Hebets to ask him if she "was on the right track."  Thus, she was not exercising proper independence as Borrego Health's attorney, and was instead being controlled and directed by and agreeing to be nothing more than an instrument of Bruce Hebets.

455.   Mikia Wallis completed her internal analysis to the satisfaction of Bruce Hebets, and then sent it to outside counsel, who did not practice in the area of real estate transactions or conflict of interests issues for review and approval.  With

7275860.1

1  minor modification, outside counsel approved the analysis, and the matter was

2  brought to the Executive/Finance Committee for approval.

3      456.   The Board Insiders approved the proposed transaction with little

4  questioning or scrutiny, including agreeing to the one-sided lease terms that Bruce

5  Hebets had negotiated with Daryl Priest.

6      457.   Daryl Priest then immediately negotiated a lease with Borrego Health

7  (the "Nourse Parcel Lease"), even though there was no land yet acquired by Daryl

8  Priest and no structure to lease.

9      458.   The lease terms were not commercially reasonable, and included an

10  agreement that Borrego Health would start paying full rent after Daryl Priest secured

11  approved building plans, even though no one realistically expected to be able to

12  occupy a finished structure for more than a year later.

13      459.   In other words, Borrego Health would be paying full rent for no

14  property and still paying for much of the construction costs with no building to even

15  use.

16      460.   The development of the land, however, still had to go through the local

17  government approval process, including its design review committee.  At the design

18  review committee, the development was met with resistance.

19      461.   Rather than counter the resistance, Daryl Priest sought to modify the

20  terms of the deal to further his interests and make Borrego Health's position even

21  less desirable.

22      462.   Daryl Priest proposed that Borrego Health purchase the Palm Canyon

23  Parcel directly from Dennis Nourse, and that Daryl Priest would then develop the

24  property under contract with Borrego Health.

25      463.   Thus it was agreed that the purchase agreement negotiated by Daryl

26  Priest would be assigned to Borrego Health.  Borrego Health would return Daryl

27  Priest's earnest money, and Borrego Health would pay $400,000 Dennis Nourse to

28  purchase the Palm Canyon Parcel.

464.   This time, Bruce Hebets and Dennis Nourse decided not to go back to the full Borrego Health Board of Trustees or even the Board Insiders.

465.   Instead, Bruce Hebets and Denis Nourse brought Borrego Insider Harry Ilsley into the fold.  Harry Ilsley knew that the Board should have been involved, but agreed to work with Bruce Hebets and Denis Nourse to get the deal closed.

466.   Harry Ilsley, Dennis Nourse, and Bruce Hebets knew that Borrego Health Board members would review only those contracts presented to them, and that they would never have reason to see acquisition documents unless he or Bruce Hebets presented them.  Thus, unless the deal documents were presented to the Board of Trustees for vetting and approval, they would not know of any potential financial or other injury associated with, or caused in whole or in part by the real property transaction.  Nor would the Board have any access to facts that might put them on inquiry notice that Harry Ilsley, Bruce Hebets, and Dennis Nourse were working together to siphon funds from Borrego Health to Dennis Nourse and Daryl Priest.

467.   As usual, Bruce Hebets and Mikia Wallis facilitated and directed the actions necessary to execute the deal documents without knowledge of Borrego Health's full Board.

468.   On information and belief, the Borrego Insiders were compensated for this access and control through kickbacks or other payments or remuneration.

**N.     Bruce Hebets and Karen Hebets Create a Sham "Consulting" Company and Contract with Premier To Obtain Payments From Premier for the Various Schemes Which Benefited the Premier Defendants (the "KBH Healthcare Consulting Scheme")**

469.   As discussed herein, various schemes were implemented which benefited Premier and the Premier Defendants which were hatched with the participation of support of the Borrego Insiders, including without limitation Bruce

7275860.1

1   Hebets and Karen Hebets.  This fact begs the question:  what was in it for Bruce
2   Hebets and Karen Hebets?

3       470.   Although Borrego Health alleges on information and belief that the
4   Borrego Insiders were compensated for their participation in the various schemes
5   through kickbacks or other payments or remuneration, the KBH Healthcare
6   Consulting Scheme is one example which Borrego Health has recently discovered.

7       471.   KBH Healthcare Consulting was created in February 2017.  The
8   business address listed with the California Secretary of State is 3283 Broken Arrow
9   Road, Borrego Springs, California 92004.  At the time, this address is also listed as
10  the home address for Bruce Hebets and Karen Hebets.

11      472.   The Operating Agreement for KBH Healthcare Consulting was drafted
12  by Mikia Wallis and the Articles of Incorporation for KBH Healthcare Consulting
13  were created and filed by Mikia Wallis, at the same time she was Chief Legal
14  Officer for Borrego Health.  The Operating Agreement states that Bruce Hebets and
15  Karen Hebets will each of 50 percent ownership, and each will contribute $500 of
16  capital.

17      473.   On or about February 1, 2017, KBH Healthcare Consulting entered
18  into a written contract with Premier entitled "Consulting Agreement" (the
19  KBH/Premier Contract").  The "services" that KBH Healthcare Consulting agreed
20  to provide pertained to OMNI Family Health, which Premier apparently wanted to
21  contract with to manage their dental services.  KBH Healthcare Consulting was
22  supposed to "assist [Premier] in the  procurement  of  a  management  contract
23  regarding management of dental services with OMNI Family Health," to "consult on
24  a weekly basis on the current status of the management agreement between
25  [Premier] and OMNI Family Health," to "advise and  assist [Premier] with
26  compliance  of  regulations  relating  to  the operation of FQHCs as to dental
27  services," to "advice [sic] [Premier] on changes to laws and regulations relating to

28

1    FQHC," and to "advise and assist [Premier] as to best practices related to

2    management of dental services for a FQHC."

3        474.   Under the KBH/Premier Contract, KBH Healthcare was to be paid a

4    retainer of $200,000 and 5 percent of the "adjusted net income" from amounts

5    received from Premier's contract with OMNI Family Health.  Notably, other than

6    describing the type of services that may be provided, the Premier/KBH Contract

7    Amendment does not have any requirements that KBH Helathcare Consultant spend

8    any minimum number of hours, accomplish any minimum number of tasks or have

9    any preconditions to payment of $2 million whatsoever.

10        475.   Bruce Hebets and Karen Hebets sent the signed KBH/Premier Contract

11   to Daryl Priest on February 10, 2017.  By email the same day, Bruce Hebets sent an

12   email to Daryl Priest which read, "Here is the signed contract what time can I get

13   the check" [sic].

14        476.   Apparently, Premier never was able to contract with OMNI, so the

15   sham contract designed to funnel money from Premier and the Premier Defendants

16   to Bruce Hebets and Karen Hebets failed to work as intended.  Undeterred, the

17   Scheme was modified.

18        477.    In May 2017, the Premier/KBH Contract was amended (the

19   "Premier/KBH Contract Amendment").  The Premier/KBH Contract Amendment

20   stated that the "services" KBH Healthcare Consulting was to provide was to assist

21   Premier in the "procurement of management services agreements regarding

22   management of dental services with FQHC's in the State of California and in other

23   states," "to consult on a weekly basis on the current status of the management

24   services agreement between [Premier] and any FQHC," to "advise and assist

25   [Premier] with compliance matters," and "to advice [sic] [Premier] on changes to

26   laws and regulations relating to the operation of FQHC," and "to advise and assist

27   [Premier] as to the best practices related to management of dental services for a

28   FQHC."

7275860.1

478.   The Premier/KBH Contract Amendment noted that a $200,000 retainer had already been paid to KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets).  The Premier/KBH Contract Amendment also required Premier to pay KBH Healthcare Consultants (owed 50-50 by Bruce Hebets and Karen Hebets) the sums of $75,000 per month for a term of 24 months (*i.e.* a total of $2 million).  Notably, other than describing the type of services that may be provided, the Premier/KBH Contract Amendment does not have any requirements that KBH Healthcare Consultant spend any minimum number of hours, accomplish any minimum number of tasks or have any preconditions to payment of $2 million whatsoever.

479.   KBH Healthcare Consulting had a bank account with Chase, including a debit card.

480.   On or about February 13, 2017, a deposit of $200,000 was made to that account, which corresponds to the retainer amount due under the KBH/Premier Contract.

481.   On or about August 23, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.

482.   Between August 26 and September 1, 2017. the debit card was used to obtain cash advances at Barona Resort and Casino for over $20,000.

483.   On or about September 20, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $5,000.  The following day, attempts were made to withdraw money in excess of $5,000.

484.   Between October 11 and 12, 2017, the debit card was used to obtain cash advances at Barona Resort and Casino for over $9,000.  On October 12, 2017, two attempts to withdraw $1,000 each were declined.

485.   On or about June 8, 2019, the debit card was used to obtain cash advances at Barona Resort and Casino for over $4,000.

7275860.1

# VI.     **CLEANING HOUSE**

486.   After Bruce Hebets' death, the Borrego Health board found themselves picking up the pieces of a highly disorganized organization.  Since that time, the current Board (all of whom serve on a volunteer basis) has undertaken monumental efforts to identify and correct a number of issues in the organization.  Some of those efforts are set forth below.

487.   All of the Board Insiders have resigned or have removed been from the Borrego Health Board, including most recently the removal of Mike Hickok (Treasurer) and Chuck Kimball (Secretary) on October 2, 2020.  Ten new and diverse members were also added to the board between 2019 and 2020 and the Board was expanded to 13 members.

488.   The Board also began the process of a governance overhaul, including compiling a governance policy and making updates to Borrego Health's Bylaws and other key policies (through the progress was slow due to actions of both Chuck Kimball and Mikia Wallis, who blocked a number of reform efforts before their removals).

489.   The Board retained outside counsel to complete governance overhaul, including Bylaws and policies, and develop Committees with clear committee charters.

490.   A Board Policy Manual consisting of updated organization Bylaws and key governance policies was compiled by Board members and presented in April 2019.  The electronic Board Policy Book was officially adopted by the Board in June 2020.

491.   Current Board members are now required to complete a 3.5-hour Board training by Compensation Resources, Inc. and NACH, and Borrego Health has developed materials for on-boarding new Board members.  Board members are also required to complete 3 hours of on-line trainings and Borrego Health has offered additional NACH Board Governance Training to Board members.

7275860.1

492.   Borrego Health created and staffed the position of Governance Manager to assist the Board and committees in producing clear Board minutes, agendas, and helping to keep Board committees on track.

493.   Borrego Health retained Compensation Resources Inc. ("CRI") to analyze executive officer compensation and benefits and complete an Executive Compensation study (July 2019) and expanded CRI contract to look at total compensation system-wide (2020).  CRI also conducted Board training on governance with a focus on Board responsibility for oversight with respect to compensation (2019).

494.   In 2019, Borrego Health retained another company to review retirement benefits and develop new retirement plan.  The new company also will assist Borrego Health in developing more equitable total compensation plan, including performance bonus structure.

495.   Borrego Health also created new mechanisms to prevent improper arrangements, including overhauling the delegation of authority and procurement policies, creating the Board Audit Committee (2019), hiring new auditors (2020), and conducting a detailed review of IRS Form 990 (2019).

496.   Mikia Wallis was removed as CEO on October 8, 2020.  All other staff in any way implicated by DHCS or DOJ to be involved in misconduct have been removed.  The entire executive leadership team was replaced.

497.   In October 2020, Borrego Health closed its contract dental program and replaced staff employed within the program who had been identified by DOJ and DHCS.

498.   Borrego Health terminated its relationship with Priest-related entities, terminating its leases at the Barstow and D Street locations, seeking amendment in Federal Court of its lease at the El Cajon site, and terminating its contracts with Premier.

7275860.1

499.   Borrego Health invested significantly in its compliance program. Borrego Health established a Compliance Department led by an experienced Chief Compliance Officer, and staffed the department to include a Director of Compliance, Director of Program Integrity, Compliance Auditor and Compliance Analyst.  At the Board level, Borrego Health created the Audit and Compliance Committee in January 2022, which hears detailed monthly compliance reports.

500.   Borrego Health also created a Compliance Program Manual and Compliance Hotline to assist with effectively identifying and resolving compliance concerns.  Borrego Health instituted a series of compliance trainings, including monthly staff compliance education, bimonthly billing and coding compliance trainings (instituted April 2022), code of conduct training, compliance team site visits (instituted January 2022), and executive training on fraud and abuse topics.

501.   Borrego Health engaged external auditing services from to evaluate its current claims, identify areas for improvement, and train staff and providers on those issues.

502.   Borrego Health has also invested in internal fraud prevention efforts aimed at individuals.  Borrego Health retained a compensation review company to review executive compensation, with the result of review leading to executive compensation reform.  Borrego Health also implemented new conflict of interest policies, a restrictive employment of relatives policy, and has limited the Board's delegated authority to Borrego Health staff.

503.   Borrego Health has also implemented efforts to increase transparency of financials.  Borrego Health has ensured that management reports are now available at the clinic level and are incorporated into Board reports available to the full board and has instituted a provider dashboard to monitor financial metrics.

## VII.   CHAPTER 11 BANKRUPTCY

504.   Borrego Health filed for bankruptcy under Chapter 11 of the Bankruptcy Code on September 12, 2022 in the Southern District of California.

7275860.1

505.   The bankruptcy filing was necessary because of a lack of liquidity.

506.   The most significant financial exposure was related to obligations to DHCS, as a result of the "Premier Scheme" and the "Fraudulent Dental Billing Scheme."  However, all of the Schemes described herein had a material financial impact of either increasing liabilities or decreasing revenue or both.

507.   For example, the manipulation of Borrego Health to invest in an unnecessary 162B plan diverted funds from operations to an unnecessary benefits plan that provided financial benefits for Jim Hebets, The Hebets Company and Bruce Hebets to the detriment of Borrego Health.

508.   Had the Defendants not taken advantage of Borrego Health as described herein, Borrego Health would not have the liquidity issues it is currently experiencing.

509.   Borrego Health also would not have been subjected to oversight by an expensive monitor or been subject to a payment suspension by DHCS, including the ongoing dental payment suspension, which is causing it not to be paid for in-house dental services.

510.   Uncompensated in-house dental services are resulting in a loss of approximately $350,000 per month of revenue.

## VIII.   **THE RICO ENTERPRISE**

511.   "The elements of a civil RICO claim are simple enough: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (*citing* 18 U.S.C. §§ 1964(c), 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

512.   For the purpose of additional clarity and for the convenience of Defendants and the Court, below is further detail of the RICO allegation which is pled with particularity in conformity with FRCP Rule 9(b).

7275860.1

513.   **Conduct**:  "To satisfy the 'conduct' element of a Section 1962(c) claim, a plaintiff must allege facts that the defendant had 'some part in directing [the enterprise's] affairs.' *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). Notably, "Relevant considerations to whether this element is met include whether the defendant 'occup[ies] a position in the chain of command ... through which the affairs of the enterprise are conducted,' whether it 'knowingly implement[ed] [the] decisions of upper management,' and whether its 'participation was vital to the mission's success.'" *LD v. United Behavioral Health*, 508 F. Supp.3d 583, 602 (N.D.C.A. 2020) (*citing Walter v. Dravson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). "In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Ketayi v. Health Enrollment Group*, 516 F. Supp.3d 1092, 1136 (S.D.C.A, 2021) (*quoting Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743, 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (*quoting Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted)).

514.   **Of an Enterprise**: "The definition of 'enterprise' in the text of RICO is fairly straightforward. In its entirety, the definition is as follows: ' "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (*citing* 18 U.S.C. § 1961(4)). "As is evident from the text, this definition is not very demanding. A single 'individual' is an enterprise under RICO. Similarly, a single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal

1   entity' are all enterprises." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir.

2   2007). In *Odom v. Microsoft Corp.*, the Ninth Circuit explained, "We take this

3   opportunity to join the circuits that hold that an associated-in-fact enterprise under

4   RICO does not require any particular organizational structure, separate or otherwise.

5   *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (citation and internal

6   quotation marks omitted). The *Odom* Court turned to the Supreme Court decision in

7   the *United States v. Turkette*, to note the criteria for an associated-in-fact enterprise,

8   "The Supreme Court in *Turkette* articulated the criteria for an associated-in-fact

9   enterprise under RICO. According to the Court, an associated-in-fact enterprise is 'a

10  group of persons associated together for a common purpose of engaging in a course

11  of conduct.' To establish the existence of such an enterprise, a plaintiff must provide

12  both 'evidence of an ongoing organization, formal or informal,' and 'evidence that

13  the various associates function as a continuing unit.'" *Odom v. Microsoft Corp.*, 486

14  F.3d 541, 552 (9th Cir. 2007) (citation and internal quotation marks omitted).

15      515.   **Through a Pattern**:  The Supreme Court in *H.J. Inc. v. Northwestern

16  Bell Telephone Co.* settled the long held debate of what constituted a "pattern" for

17  RICO. The Court held, "To establish a RICO pattern it must also be shown that the

18  predicates themselves amount to, or that they otherwise constitute a threat of,

19  *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492

20  U.S. 229, 240 (1989). The Court continued, continuity is, " … centrally a temporal

21  concept – and particularly so in the RICO context, where what must be continuous,

22  RICO's predicate acts or offenses, and the relationship these predicates must bear

23  one to another, are distinct requirements." *H.J. Inc. v. Northwestern Bell Telephone

24  Co.*, 492 U.S. 229, 241 (1989). Importantly, "A RICO pattern may surely be

25  established if the related predicates themselves involve a distinct threat of long-term

26  racketeering activity, either implicit or explicit." *H.J. Inc. v. Northwestern Bell

27  Telephone Co.*, 492 U.S. 229, 241 (1989).

28

516.   **Racketeering / Predicate Acts**:  Predicate acts, "… involve conduct that is 'chargeable' or 'indictable,' and 'offense[s]' that are 'punishable,' under various criminal statutes. As defined in the statute, racketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (*citing* § 1961(1)).

517.   **Causing Injury**:  "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). Importantly, "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.' The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." (citation and internal quotation marks omitted). *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985).

**B.     Facts Common To RICO Cause of Action**

518.   The "Enterprise" is Borrego Health, a non-profit corporation in good standing, which the Defendants secretly commandeered for their own criminal purposes.  Bruce Hebets' death in 2019 does not alter the fact of his participation (as a Borrego Health insider) with Defendants in the operation and management of Borrego Health, as described below.  If Bruce Hebets were alive, he would be named as a defendant herein.

7275860.1

519.   Borrego Health is a FQHC engaged in interstate commerce, with a mission to provide high quality, comprehensive, compassionate primary healthcare to people in their communities, regardless of their ability to pay.  Borrego Health operated over 20 clinics, and continues to operate more than a dozen, primarily in underserved desert and inland communities throughout San Diego, Riverside, and San Bernardino counties.  Borrego Health provides essential services in Family Practice, Pediatrics, OB/GYN, Internal Medicine, Podiatry, Dermatology, Cardiology, and HIV/Hepatitis C, most of whom cannot obtain affordable comprehensive primary care from other sources.  During the recent pandemic, Borrego Health has tested tens of thousands of Californians for Covid-19 infection and has vaccinated tens of thousands of people for Covid-19.  Borrego Health's continued operation is in the public interest.

520.   Although all of the Defendants named in this action are defendants in the RICO cause of action, Daryl Priest, Nick Priest, Travis Lyon, Premier, Summit, Jim Hebets, The Hebets Company, The Julian Medical Foundation, and Husam Aldairi, D.D.S., Aram Arakelyan, D.D.S., Ayed Hawatmeh, D.D.S., Magaly Velasquez, D.D.S., Marcelo Toledo, D.D.S., Michael Hoang, D.M.D., Santiago Rojo, D.D.S., Waleed Stephan, D.D.S., Mohammed Al Tekreeti, D.D.S., Jilbert Bakramian, D.D.S., Marlene Thompson, D.D.S., George Jared, D.D.S., Douglas Ness, D.D.S., and Alborz Mehdizadeh, D.D.S., and DOES 1-250, are "Outsiders" to Borrego Health.

521.   The Defendants are associated with the Enterprise in that they were either (1) Borrego Health executives or Board members, (2) the Enterprise's landlords, (3) contracted dental providers, or (4) other outside vendors.

522.   The Defendants are entities and individuals separate from the Enterprise, and none of the Defendants is alleged to be the Enterprise, or its members.

FIRST AMENDED COMPLAINT

7275860.1

523.   Borrego Health is both the RICO enterprise and the victim.  Borrego Health has lost tens of millions of dollars as a result of the Defendants' fraudulent conduct and suffered other damages, including without limitation an inability to be paid by Medi-Cal for in-house dental services, an inability to provide contract dental services, and an exposure for repayment to the Medi-Cal program for claims that were caused to be submitted by defendants and contract dentists that were not payable.

524.   The unlawful acts described herein were devised, directed and maintained by the Defendants who had control over, participated in, and/or took part in Borrego Health's operations and management.

C.     **Racketeering Activity Distinct from Enterprise**

525.   The pattern of racketeering described herein is separate and distinct from the Enterprise, due to both the relationship between the activities of the Enterprise and the pattern of racketeering activity, and how the racketeering activity differs from the usual daily activities of the enterprise is as follows:

526.   Borrego Health, the Enterprise, is engaged in interstate commerce acting as a FQHC.  It acquires good and products from across the country, including medical supplies.  It utilizes the internet and United States banking system to facilitate its operations, including using electronic billing to bill and receive payment from Medi-Cal.  Borrego Health also regularly uses mail to pay vendors and acquire good and products, including medical supplies and medications.

527.   Defendants worked together to perpetrate a number of schemes to steal money from the Enterprise paid to the Enterprise by state and federal payers utilizing primarily state and federal funds paid by Medi-Cal.  The schemes that Borrego Health in currently aware of are described above as the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club

138

7275860.1

Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme," the "Property Development Scheme" and the "KBH Healthcare Consulting Scheme."

528.   Each of these Schemes was contrary to the ordinary and regular operations and management of Borrego Health, and involved Outsider Defendants effectively taking over the management and operations of Borrego Health in furtherance of these Schemes.

529.   The primary mission of Borrego Health, as a FQHC, is the provision of healthcare to under-served communities.  All efforts of Borrego Health are to be directed at the efficient accomplishment of this mission.

**D.    RICO Liability**

530.   <u>18 USC §§1962 (c) and (d)</u>:  As detailed herein, Defendants' conduct is unlawful under 18 U.S.C. 1962(c), and is also unlawful as a conspiracy under 18 U.S.C. § 1962(d).

531.   <u>18 USC § 1341 (Mail Fraud)</u>:  The purpose of the "Borrego MSO/IPA Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting Scheme was to effectively steal money from Borrego Health.

532.   In the manner detailed above, Defendants participated in devising and/or intending to devise the Schemes to perform the fraudulent acts described herein.

533.   The Schemes could not work without the use of the United States Mail, which was used for the purpose of executing the Schemes.

534.   Among other things and without limitation, the mail and e-mail was used to send correspondence and payments under the Premier Scheme, to send bills

1  and payments for the Fraudulent Dental Billing Scheme, to send rent checks under

2  the Priest Leases Scheme, and to send rent checks under the Julian Barn Scheme.

3     535.   Each individual mailing was an individual act essential to the success

4  of the scheme (and therefore material) and constitutes a separate loss the victim

5  suffered as of the date of mailing.  This constitutes hundreds of predicate acts under

6  18 USC 1341 (Mail Fraud).

7     536.   18 USC § 1343 (Wire Fraud):  The purpose of the "Borrego MSO/IPA

8  Scheme", the "Premier Scheme", "Fraudulent Dental Billing Scheme", the

9  "Coverup Scheme", the "Priest Leases Scheme", the "Compensation/Benefits

10  Scheme", the "Nepotism and Cronyism Scheme", the "De Anza Country Club

11  Scheme", the "Payout Scheme", the "Jim Hebets Scheme", the "Julian Barn

12  Scheme", the "Property Development Scheme" and the KBH Healthcare Consulting

13  Scheme was to effectively steal money from Borrego Health.

14     537.   In the manned detailed above, Defendants participated in devising

15  and/or intending to devise the Schemes to perform the fraudulent acts described

16  herein, and to use the interstate electronic transmission of documents for the purpose

17  of executing, or attempting to execute, the Schemes.  The Schemes were used to

18  steal funds from a federally funded and regulated FQHC, which in turn would result

19  in the inflation of reimbursement rates the Federal Government would pay to the

20  FQHC (Borrego Health) for thousands of patient encounters, as follows:

21     538.   Borrego Health is largely funded by state and federal health care dollars

22  (primarily Medi-Cal), administered by and through the California Department of

23  Healthcare Services.  Borrego Health must account for its lawful operating

24  expenditures every year to the Center for Medicare and Medicaid Services (CMS), a

25  federal agency within the United States department of Health and Human Services.

26     539.   The amount of funds stolen through the Schemes described herein are

27  accounted for and included as facilities operating expenses reported to CMS.  These

28  stolen funds would not be reported as individual line items on an annual CMD cost

7275860.1

report.  Rather, the stolen funds would then be melded into and combined and aggregated with all other facilities operating costs of over 20 Southern California clinics operated by Borrego Health, and then reported as an unidentified part of Borrego Health's annual cost reports submitted to CMS.

540.   In turn, the United States uses Borrego Health's annual cost reports to CMS in calculating the proper level of federal health care funding (or "reimbursement rates") to direct to Borrego Health.  Thus, inflated CMS cost reports, unless detected, inevitably result in increases in federally funded reimbursement rates for a FQHC such as Borrego Health.  This has the effect of compounding the crime by causing to federal government to cover some or all of the cost of the crime by way of increased reimbursement rates paid Borrego Health based on inflated expenses incurred by Borrego Health as a result of the Schemes.

541.   In addition, false or fraudulent bills were submitted electronically to Medi-Cal (and Borrego Health) under the Fraudulent Dental Services Scheme.

542.   The unlawful Schemes described above, including the electronic communications described above, constitutes predicate acts under 18 USC §1343 (Wire Fraud) that are a material part of the Schemes that Borrego Health could not avoid.

543.   Racketeering activity as described in 18 USC § 1961(1)(B), as an act indictable under 18 USC § 1957 (engaging in monetary transactions in property derived from specified unlawful activity that includes Federal healthcare offenses). In addition to Mail Fraud and Wire Fraud, the Schemes constitute a pattern of racketeering activity as described in 18 USC § 1961(1)(B), as acts indictable under 18 USC § 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").

544.   "Specified unlawful activity" is, in turn, defined in 18 USC § 1956 as including "any act or activity constituting an offense involving a 'Federal health

1    care offense.'" 18 USC § 24 defines "Federal health care offense" as including "a

2    violation of, or a criminal conspiracy to violate" any of the statutes set forth herein.

3        545.   18 USC § 669 (Theft or embezzlement in connection with health care):

4    Whoever knowingly and willfully embezzles, steals, or otherwise without authority

5    converts to the use of any person other than the rightful owner, or intentionally

6    misapplies any of the moneys, funds, securities, premiums, credits, property, or

7    other assets of a health care benefit program, shall be fined under this title or

8    imprisoned not more than 10 years, or both.  "Health care benefit program" means

9    any public or private plan or contract, affecting commerce, under which any medical

10   benefit, item, or service is provided to any individual, and includes any individual or

11   entity who is providing a medical benefit, item, or service for which payment may

12   be made under the plan or contract.  The Schemes described herein are the means by

13   which Defendants, and each of them, stole and converted to their own use public

14   healthcare benefits paid Borrego Health by state and federal agencies at a time

15   Borrego Health was the rightful owner of those funds.  In addition, in this particular

16   statute, Borrego Health itself qualifies under the broad definition of "health care

17   benefit program." Borrego Health is an "entity who is providing a medical benefit,

18   item, or service for which payment may be made under the plan or contract."  The

19   theft and from Borrego Health exceeds $20,000,000.

20       546.   18 USC § 1347 (Health care fraud):  Whoever knowingly and willfully

21   executes, or attempts to execute, a scheme or artifice (1) to defraud any healthcare

22   benefit program; or (2) to obtain, by means of false or fraudulent pretenses,

23   representations, or promises, any of the money or property owned by, or under the

24   custody or control of, any healthcare benefit program, in connection with the

25   delivery of or payment for healthcare benefits, items, or services, shall be fined

26   under this title or imprisoned not more than 10 years, or both.  Here, by the Schemes

27   described herein, Defendants, and each of them, defrauded Borrego Health and

28   obtained money and/or property owned by and/or under the custody or control of

142

FIRST AMENDED COMPLAINT

7275860.1

1    Borrego Health.  These Schemes were substantial factor in and direct cause of the

2    theft of funds under the custody and control of Borrego Health.  The Schemes were a

3    substantial factor in and direct cause of the theft of more than $20,000,000 of funds

4    under the custody and control of Borrego Health and Medi-Cal.

5        547.   <u>18 USC § 1001 (False Statements or entries generally)</u>:  Section 1001 is

6    violated if someone knowingly or willfully conceals or covers up by any trick,

7    scheme or device a material fact, which act is within the jurisdiction of a department

8    or agency of the United States.  Here, Defendants were involved in the Schemes

9    that, as described herein, meet the elements of section 1001, in that the Defendants

10   "knowingly or willfully conceal or cover up by any trick, scheme or device a

11   material fact."  The Schemes were used, in part, to steal funds from a federally

12   funded and regulated FQHC.

13       548.   <u>Other federal healthcare offenses</u>:  In addition, the facts alleged herein

14   also amount to "federal healthcare offenses" under the following statutes: 18 USC

15   § 371 ("Conspiracy to commit offense or to defraud United States"); 18 USC §1035

16   ("False statements relating to health care matters"); 18 USC §1035 ("False

17   statements relating to health care matters"); 18 USC § 287 ("False, fictitious or

18   fraudulent claims"); 18 USC §1349 ("Attempt and conspiracy").

19       549.   The specific contracts entered into in furtherance of the scheme to steal

20   money from Borrego Health are the: Borrego MSO, Borrego IPA, Dental MSA,

21   Medical MSA, Aldairi Agreements, Hawatmeh Agreement, Mehdizadeh

22   Agreements, Velasquez Agreement, Arakelyan Agreements, Hoang Agreement,

23   Stephan Agreement, Rojo Agreement, Toledo Agreement, Thompson Agreement,

24   Ness Agreement, Jared Agreement, Nourse Parcel Lease, CRI Contract, Julian Barn

25   Lease, transition agreement, KHB/Premier Contract and Amendment and Priest

26   Leases.

27

28

7275860.1

550.   The Schemes were concealed by Defendants and most did not come to light until, at the earliest, October 2020 during a government investigation.  But for that unrelated investigation, the Schemes may have remained undiscovered.

551.   Because Borrego Health plaintiff had no constructive or inquiry notice of the fact of injury throughout the life of the Schemes, its right to recover money stolen by Defendants extends back to the commencement of each of the Schemes.

552.   **Four Year RICO "Reach Back:"**  Even if the Schemes were somehow communicated to persons who would ordinarily provide that information to the Borrego Health Board, it is still entitled to recover funds stolen under the Schemes going back four years prior to the filing of the complaint, since each lease payment constitutes a separate wrongful act.

553.   Borrego Health, the United States, and the State of California are victims of the Schemes here.  Borrego Health was victimized by the amount of money stolen.  The Federal Government is a victim to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore additional federal funds being improperly paid Borrego Health.  The Federal Government may have also been harmed if it provided federal matching dollars for any duplicative, unnecessary and unsupported dental services paid by Medi-Cal.

554.   The State of California is a victim to the extent to the extent the inflated expenses incurred by Borrego Health as a result of the Schemes were included on annual cost reports to CMS (described above) that resulted in increased reimbursement rates, and therefore causing additional state Medicaid funds being improperly paid Borrego Health.  The State of California may have also been harmed if it paid Borrego Health for any duplicative, unnecessary and unsupported dental services.

7275860.1

555.   The predicate acts described above relate to each other as part of a common plan.  The predicate acts are a part of a common plan to steal money from Borrego Health.  Each act is related as to its purpose, results, participants, victims and method of commission.  The predicates form a closed-end series of related predicates extending over a substantial period.

556.   The facts described herein also demonstrate the existence of a conspiracy between Defendants.  **(18 USC § 1962(d).)**

557.    By way of their knowing participation in the scheme, each of the Defendants is a culpable person for purposes of **18 U.S.C. § 1964.**

558.   But for the Schemes detailed above, Borrego Health would not have entered into improper and above-market leases and other transactions, would have had a compliant and properly billed contract dental program, would not have attempted to buy a country club, etc.  Accordingly, Borrego Health has been damaged by the Schemes in an amount to be proven at trial.

559.   Accordingly, Borrego Health is entitled to damages in an amount to be proven at trial, trebled pursuant to statute, together with reasonable attorneys' fees and costs, and interest.

**E.     Issuance of Constructive Trusts**

560.   As outlined in detail herein, Borrego Health provided payment to various Defendants.  Those Defendants committed wrongful acts to receive money that they were not entitled to.

561.   Borrego Health has a right to the money wrongfully taken by Defendants.

562.   As such, Borrego Health seeks to have any and all funds wrongfully paid to Defendants placed in a constructive trust.

FIRST AMENDED COMPLAINT

7275860.1

**FIRST CAUSE OF ACTION**

(Violations under the Racketeer Influenced and Corrupt

Organizations ("RICO") Act)

Against All Defendants

563.   Borrego Health reincorporates each of the above paragraphs as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread racketeering enterprise designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

564.   As set forth herein, Defendants improperly engaged in a pattern of prohibited racketeering activity.

565.   As set forth herein, Defendants conduct gives rise to a cause of action for violation of RICO, and that unlawful conduct was the proximate cause of the Borrego Health's injury.

**SECOND CAUSE OF ACTION**

(Breach of Contract)

Against Premier

566.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

567.   Borrego Health and Premier entered into the Dental MSA, including amendments thereto, and the Medical MSA.

568.   Borrego Health did all, or substantially all, of the significant things that the Dental MSA and Medical MSA required it to do, or was excused from doing so,

569.   As set forth herein, Premier breached the Dental MSA and Medical MSA.

7275860.1

570.   As a result of Premier's breaches of the MSAs, Borrego Health was damaged in an amount to be proven at trial.  Premier's failures to fulfill its obligations was a substantial factor in causing Borrego Health's harm.

## THIRD CAUSE OF ACTION

(Breach of Contract)

Against Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc.

571.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

572.   Borrego Health, Husam Aldairi, D.D.S. and Aldairi D.D.S., Inc. entered into the Aldairi Agreements.

573.   Borrego Health did all, or substantially all, of the significant things that the Aldairi Agreements required or Borrego Health was excused from doing so.

574.   Aldairi violated the terms of the Aldairi Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth which the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

575.   As a result of Aldairi's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

(Breach of Contract)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

576.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 167 through 183, inclusive, as though fully set forth herein.

FIRST AMENDED COMPLAINT

7275860.1

577.    Borrego Health, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C. entered into the Hawatmeh Agreements.

578.    Borrego Health did all, or substantially all, of the significant things that the Hawatmeh Agreements required or Borrego Health was excused from doing so.

579.    Hawatmeh violated the terms of the Hawatmeh Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth which the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

580.    As a result of Hawatmeh's conduct, Borrego Health was damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

(Breach of Contract)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

581.    Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

582.    Borrego Health, Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc. entered into the Mehdizadeh Agreements.

583.    Borrego Health did all, or substantially all, of the significant things that the Mehdizadeh Agreements required or Borrego Health was excused from doing so.

584.    Mehdizadeh violated the terms of the Mehdizadeh Agreements through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5)

7275860.1

1  providing services that fell below the standard of care; (6) providing excessive

2  services; and (7) generating inaccurate billing records, including billing for services

3  not rendered, including billing for services performed on teeth the patients no longer

4  had at the time of service, upcoding, and inappropriately splitting services.

5      585.   As a result of Mehdizadeh's conduct, Borrego Health was damaged in

6  an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

(Breach of Contract)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional

Dental Corp.

11     586.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

12 145, 196 through 203, inclusive, as though fully set forth herein.

13     587.   Borrego Health, Magaly Velasquez, D.D.S. and Magaly M. Velasquez

14 DDS, Professional Dental Corp. entered into the Velasquez Agreement.

15     588.   Borrego Health did all, or substantially all, of the significant things that

16 the Velasquez Agreement required or Borrego Health was excused from doing so.

17     589.   Velasquez violated the terms of the Velasquez Agreement through their

18 conduct, including but not limited to: (1) billing excessive patient visits; (2) failing

19 to maintain adequate documentation to support billing; (3) falsification of medical

20 records; (4) performing services that lacked medical necessity; (5) providing

21 services that fell below the standard of care; (6) providing excessive services; and

22 (7) generating inaccurate billing records, including billing for services not rendered,

23 including billing for services performed on teeth the patients no longer had at the

24 time of service, upcoding, and inappropriately splitting services.

25     590.   As a result of Velasquez's conduct, Borrego Health was damaged in an

26 amount to be proven at trial.

27

28

7275860.1

1

## **SEVENTH CAUSE OF ACTION**

2

(Breach of Contract)

3

Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram

4

Arakelyan, Inc.

5      591.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

6    145, 204 through 213, inclusive, as though fully set forth herein.

7      592.   Borrego Health, Aram Arakelyan, D.D.S. and New Millennium Dental

8    Group of Aram Arakelyan, Inc. entered into the Arakelyan Agreements.

9      593.   Borrego Health did all, or substantially all, of the significant things that

10   the Arakelyan Agreements required or Borrego Health was excused from doing so.

11     594.   Arakelyan violated the terms of the Arakelyan Agreements through

12   their conduct, including but not limited to: (1) billing excessive patient visits; (2)

13   failing to maintain adequate documentation to support billing; (3) falsification of

14   medical records; (4) performing services that lacked medical necessity; (5)

15   providing services that fell below the standard of care; (6) providing excessive

16   services; and (7) generating inaccurate billing records, including billing for services

17   not rendered, including billing for services performed on teeth the patients no longer

18   had at the time of service, upcoding, and inappropriately splitting services.

19     595.   As a result of Arakelyan's conduct, Borrego Health was damaged in an

20   amount to be proven at trial.

21

## **EIGHTH CAUSE OF ACTION**

22

(Breach of Contract)

23

Against Michael Hoang, D.M.D.

24     596.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

25   145, 214 through 219, inclusive, as though fully set forth herein.

26     597.   Borrego Health and Michael Hoang, D.M.D. entered into the Hoang

27   Agreement.

28

FIRST AMENDED COMPLAINT

7275860.1

598.   Borrego Health did all, or substantially all, of the significant things that the Hoang Agreement required or Borrego Health was excused from doing so.

599.   Hoang violated the terms of the Hoang Agreement through his conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

600.   As a result of Hoang's conduct, Borrego Health was damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

(Breach of Contract)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

601.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

602.   Borrego Health, Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation entered into the Stephan Agreement.

603.   Borrego Health did all, or substantially all, of the significant things that the Stephan Agreement required or Borrego Health was excused from doing so.

604.   Stephan violated the terms of the Stephan Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered,

1  including billing for services performed on teeth the patients no longer had at the

2  time of service, upcoding, and inappropriately splitting services.

3      605.   As a result of Stephan's conduct, Borrego Health was damaged in an

4  amount to be proven at trial.

5  **TENTH CAUSE OF ACTION**

6  (Breach of Contract)

7      Against Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S., Inc.

8      606.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

9  145, 226 through 231, inclusive, as though fully set forth herein.

10      607.   Borrego Health, Santiago Rojo, D.D.S. and Santiago A. Rojo, D.D.S.,

11  Inc. entered into the Rojo Agreement.

12      608.   Borrego Health did all, or substantially all, of the significant things that

13  the Rojo Agreement required or Borrego Health was excused from doing so.

14      609.   Rojo violated the terms of the Rojo Agreement through their conduct,

15  including but not limited to: (1) billing excessive patient visits; (2) failing to

16  maintain adequate documentation to support billing; (3) falsification of medical

17  records; (4) performing services that lacked medical necessity; (5) providing

18  services that fell below the standard of care; (6) providing excessive services; and

19  (7) generating inaccurate billing records, including billing for services not rendered,

20  including billing for services performed on teeth the patients no longer had at the

21  time of service, upcoding, and inappropriately splitting services.

22      610.   As a result of Rojo's conduct, Borrego Health was damaged in an

23  amount to be proven at trial.

24  **ELEVENTH CAUSE OF ACTION**

25  (Breach of Contract)

26      Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

27      611.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

28  145, 246 through 258, inclusive, as though fully set forth herein.

7275860.1

612.   Borrego Health, Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc. entered into the Toledo Agreement.

613.   Borrego Health did all, or substantially all, of the significant things that the Toledo Agreement required or Borrego Health was excused from doing so.

614.   Toledo violated the terms of the Toledo Agreement through their conduct, including but not limited to: (1) billing excessive patient visits; (2) failing to maintain adequate documentation to support billing; (3) falsification of medical records; (4) performing services that lacked medical necessity; (5) providing services that fell below the standard of care; (6) providing excessive services; and (7) generating inaccurate billing records, including billing for services not rendered, including billing for services performed on teeth the patients no longer had at the time of service, upcoding, and inappropriately splitting services.

615.   As a result of Toledo's conduct, Borrego Health was damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

(Breach of Contract)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

616.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 259 through 264, inclusive, as though fully set forth herein.

617.   Borrego Health, Marlene Thompson, D.D.S. and Marlene Thompson, D.D.S., Inc. entered into the Thompson Agreement.

618.   Borrego Health did all, or substantially all, of the significant things that the Thompson Agreement required or Borrego Health was excused from doing so.

619.   Thompson violated the terms of the Thompson Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services not rendered, and billing for services performed by unlicensed and suspected dental providers.

7275860.1

620.   As a result of Thompson's conduct, Borrego Health was damaged in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

(Breach of Contract)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

621.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

622.   Borrego Health, Douglas Ness, D.D.S. and Ness Dental Corporation entered into the Ness Agreement.

623.   Borrego Health did all, or substantially all, of the significant things that the Ness Agreement required or Borrego Health was excused from doing so.

624.   Ness violated the terms of the Ness Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing for services performed by unlicensed and suspected dental providers.

625.   As a result of Ness's conduct, Borrego Health was damaged in an amount to be proven at trial.

## FOURTEENTH CAUSE OF ACTION

(Breach of Contract)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

626.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

627.   Borrego Health, George Jared, D.D.S. and George Jared, D.D.S., Inc. entered into the Jared Agreement.

628.   Borrego Health did all, or substantially all, of the significant things that the Jared Agreement required or Borrego Health was excused from doing so.

629.   Jared violated the terms of the Jared Agreement through their conduct, including but not limited to, generating inaccurate billing records, including billing

7275860.1

1 for services not rendered, and billing for services performed by unlicensed and
2 suspected dental providers.

3     630.   As a result of Jared's conduct, Borrego Health was damaged in an
4 amount to be proven at trial.

5 **FIFTEENTH CAUSE OF ACTION**

6 (Intentional Misrepresentation)

7 Against Premier Defendants

8     631.   Borrego Health reincorporates paragraphs 1 through 54, 66 through
9 334, inclusive, as though fully set forth herein.

10     632.   The Premier Defendants represented to Borrego Health that they were
11 qualified and capable of reviewing, "scrubbing," and processing contract dental
12 claims on Borrego Health's behalf.  The Premier Defendants further represented
13 they had qualified and experienced staff to develop their own quality management
14 team to oversee Borrego Health's contract dental program.

15     633.   The Premier Defendants' representations were false at the time they
16 were made. At the time Borrego Health entered into the Dental MSA with Premier,
17 Premier lacked any clinical staff to properly review claims and develop a quality
18 management system. Upon information and belief, The Premier Defendants knew
19 their representations were false at the time they were made, or that the
20 representations where made recklessly without regard for their truth.

21     634.   Borrego Health reasonably relied on the Premier Defendants'
22 representations, believing it was capable of evaluating contract dental program
23 claims for necessity and accuracy.

24     635.   Borrego Health's reliance on the Premier Defendants' representation
25 regarding their qualifications and representations that they would properly review
26 and process the claims was a substantial factor in causing Borrego Health's harm.

27     636.   As a direct and proximate result, Borrego Health was harmed in an
28 amount to be proven at trial.

FIRST AMENDED COMPLAINT

7275860.1

## SIXTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

637.    Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 146 through 166, inclusive, as though fully set forth herein.

638.    In part, Aldairi misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Aldairi also represented they would submit accurate claims information to Borrego Health for reimbursement.

639.    Aldairi's representations were false at the time they were made.  Upon information and belief, Aldairi knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

640.    As set forth herein, Aldairi made various misrepresentations, including without limitation the misrepresentations made in connection with the Aldairi Agreements and the false and fraudulent bills submitted by Aldairi (and any related communication) to Borrego Health.

641.    Borrego Health reasonably relied on Aldairi's representations.

642.    As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

FIRST AMENDED COMPLAINT

7275860.1

643.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 167 through 183, inclusive, as though fully set forth herein.

644.   In part, Hawatmeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hawatmeh also represented they would submit accurate claims information to Borrego Health for reimbursement.

645.   Hawatmeh's representations were false at the time they were made. Upon information and belief, Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

646.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

647.   Borrego Health reasonably relied on Hawatmeh's representations.

648.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

### (Intentional Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

649.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

650.   In part, Alborz Mehdizadeh misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws,

1  regulations, and generally accepted principles applicable the practice of dentistry,

2  hire qualified and licensed dental professionals to provide dental services to Borrego

3  Health patients, and prepare, establish, and maintain administrative records,

4  financial records, records pertaining to patient diagnosis and treatment, and

5  information pertaining to the services provided. Mehdizadeh also represented they

6  would submit accurate claims information to Borrego Health for reimbursement.

7      651.   Mehdizadeh's representations were false at the time they were made.

8  Upon information and belief, Mehdizadeh knew the representations were false at the

9  time they were made, or that the representations where made recklessly without

10  regard for their truth.

11      652.   As set forth herein, Aldairi made various misrepresentations, including

12  without limitation the misrepresentations made in connection with the Mehdizadeh

13  Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any

14  related communication) to Borrego Health.

15      653.   Borrego Health reasonably relied on Mehdizadeh'S representations.

16      654.   As a direct and proximate result, Borrego Health was harmed in an

17  amount to be proven at trial.

18  ### NINETEENTH CAUSE OF ACTION

19  (Intentional Misrepresentation)

20  Against Magaly Velasquez D.D.S. and Magaly M. Velasquez DDS, Professional

21  Dental Corp.

22      655.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

23  145, 196 through 203, inclusive, as though fully set forth herein.

24      656.   In part, Velasquez misrepresented to Borrego Health that they would

25  practice dentistry in accordance with all Federal, State and local laws, regulations,

26  and generally accepted principles applicable the practice of dentistry, hire qualified

27  and licensed dental professionals to provide dental services to Borrego Health

28  patients, and prepare, establish, and maintain administrative records, financial

FIRST AMENDED COMPLAINT

7275860.1

1  records, records pertaining to patient diagnosis and treatment, and information

2  pertaining to the services provided.  Velasquez also represented they would submit

3  accurate claims information to Borrego Health for reimbursement.

4      657.   Velasquez's representations were false at the time they were made.

5  Upon information and belief, Velasquez knew the representations were false at the

6  time they were made, or that the representations where made recklessly without

7  regard for their truth.

8      658.   As set forth herein, Velasquez made various misrepresentations,

9  including without limitation the misrepresentations made in connection with the

10  Velasquez Agreement and the false and fraudulent bills submitted by Velasquez

11  (and any related communication) to Borrego Health.

12      659.   Borrego Health reasonably relied on Velasquez's representations.

13      660.   As a direct and proximate result, Borrego Health was harmed in an

14  amount to be proven at trial.

15  **TWENTIETH CAUSE OF ACTION**

16  (Intentional Misrepresentation)

17  Against Aram Arakelyan, D.D.S. and New Millennium Dental Group of Aram

18  Arakelyan, Inc.

19      661.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

20  145, 204 through 213, inclusive, as though fully set forth herein.

21      662.   In part, Arakelyan misrepresented to Borrego Health that he would

22  practice dentistry in accordance with all Federal, State and local laws, regulations,

23  and generally accepted principles applicable the practice of dentistry, hire qualified

24  and licensed dental professionals to provide dental services to Borrego Health

25  patients, and prepare, establish, and maintain administrative records, financial

26  records, records pertaining to patient diagnosis and treatment, and information

27  pertaining to the services provided. Arakelyan also represented they would submit

28  accurate claims information to Borrego Health for reimbursement.

159

7275860.1

663.   Arakelyan representations were false at the time they were made. Upon information and belief, Arakelyan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

664.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan (and any related communication) to Borrego Health.

665.   Borrego Health reasonably relied on Arakelyan's representations.

666.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-FIRST CAUSE OF ACTION

(Intentional Misrepresentation)

Against Michael Hoang, D.M.D.

667.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 214 through 219, inclusive, as though fully set forth herein.

668.   In part, Michael Hoang, D.M.D. misrepresented to Borrego Health that he would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health  patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Hoang also represented they would submit accurate claims information to Borrego Health for reimbursement.

669.   Michael Hoang, D.M.D.'s representations were false at the time they were made. Upon information and belief, Michael Hoang, D.M.D. knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

FIRST AMENDED COMPLAINT

7275860.1

670.   As set forth herein, Hoang made various misrepresentations, including without limitation the misrepresentations made in connection with the Hoang Agreement and the false and fraudulent bills submitted by Hoang (and any related communication) to Borrego Health.

671.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

672.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-SECOND CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

673.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

674.   In part, Stephan misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Stephan also represented they would submit accurate claims information to Borrego Health for reimbursement.

675.   Stephan's representations were false at the time they were made. Upon information and belief, Stephan knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

676.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan

7275860.1

1   Agreement and the false and fraudulent bills submitted by Stephan (and any related

2   communication) to Borrego Health.

3        677.   Borrego Health reasonably relied on Stephan's representations.

4        678.   As a direct and proximate result, Borrego Health was harmed in an

5   amount to be proven at trial.

6                     **TWENTY-THIRD CAUSE OF ACTION**

7                          (Intentional Misrepresentation)

8            Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

9        679.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

10  145, 226 through 231, inclusive, as though fully set forth herein.

11       680.   In part, Rojo misrepresented to Borrego Health that they would practice

12  dentistry in accordance with all Federal, State and local laws, regulations, and

13  generally accepted principles applicable the practice of dentistry, hire qualified and

14  licensed dental professionals to provide dental services to Borrego Health patients,

15  and prepare, establish, and maintain administrative records, financial records,

16  records pertaining to patient diagnosis and treatment, and information pertaining to

17  the services provided. Rojo also represented they would submit accurate claims

18  information to Borrego Health for reimbursement.

19       681.   Rojo's representations were false at the time they were made. Upon

20  information and belief, Rojo knew the representations were false at the time they

21  were made, or that the representations where made recklessly without regard for

22  their truth.

23       682.   As set forth herein, Rojo made various misrepresentations, including

24  without limitation the misrepresentations made in connection with the Rojo

25  Agreement and the false and fraudulent bills submitted by Rojo (and any related

26  communication) to Borrego Health.

27       683.   Borrego Health reasonably relied on Rojo's representations.

28

7275860.1

684.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## **TWENTY-FOURTH CAUSE OF ACTION**

### (Intentional Misrepresentation)

### Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

685.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 246 through 258, inclusive, as though fully set forth herein.

686.   In part, Toledo misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Toledo also represented they would submit accurate claims information to Borrego Health for reimbursement.

687.   Toledo's representations were false at the time they were made. Upon information and belief, Toledo knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

688.   As set forth herein, Toledo made various misrepresentations, including without limitation the misrepresentations made in connection with the Toledo Agreement and the false and fraudulent bills submitted by Toledo (and any related communication) to Borrego Health.

689.   Borrego Health reasonably relied on Toledo's representations.

690.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

7275860.1

**TWENTY-FIFTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

691.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 259 through 264, inclusive, as though fully set forth herein.

692.   In part, Thompson misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Thompson also represented they would submit accurate claims information to Borrego Health for reimbursement.

693.   Thompson's representations were false at the time they were made. Upon information and belief, Thompson knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

694.   Borrego Health reasonably relied on Thompson's representations.

695.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

**TWENTY-SIXTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Douglas Ness, D.D.S. and Ness Dental Corporation

696.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

697.   In part, Ness misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and

164

7275860.1

licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Ness also represented they would submit accurate claims information to Borrego Health for reimbursement.

698.   Ness' representations were false at the time they were made. Upon information and belief, Ness knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

699.   Borrego Health reasonably relied on Ness' representations.

700.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## TWENTY-SEVENTH CAUSE OF ACTION

### (Intentional Misrepresentation)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

701.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

702.   In part, Jared misrepresented to Borrego Health that they would practice dentistry in accordance with all Federal, State and local laws, regulations, and generally accepted principles applicable the practice of dentistry, hire qualified and licensed dental professionals to provide dental services to Borrego Health patients, and prepare, establish, and maintain administrative records, financial records, records pertaining to patient diagnosis and treatment, and information pertaining to the services provided. Jared also represented they would submit accurate claims information to Borrego Health for reimbursement.

703.   Jared's representations were false at the time they were made.  Upon information and belief, Jared knew the representations were false at the time they

7275860.1

1 were made, or that the representations where made recklessly without regard for

2 their truth.

3     704.   Borrego Health reasonably relied on Jared's representations.

4     705.   As a direct and proximate result, Borrego Health was harmed in an

5 amount to be proven at trial.

6 **TWENTY-EIGHTH CAUSE OF ACTION**

7 (Negligent Misrepresentation)

8 Against Premier Defendants

9     706.   Borrego Health reincorporates paragraphs 1 through 54, 66 through

10 334, inclusive, as though fully set forth herein.

11     707.   The Premier Defendants represented to Borrego Health that it was

12 qualified and capable of reviewing, "scrubbing," and processing contract dental

13 claims on Borrego Health's behalf.  The Premier Defendants further represented that

14 Premier had qualified and experienced staff to develop its own quality management

15 team to oversee Borrego Health's contract dental program.

16     708.   The Premier Defendants had no reasonable grounds for believing their

17 representations were true at the time they were made. At the time Borrego Health

18 entered into the MSAs with Premier, Premier lacked any clinical staff to properly

19 review claims and develop a quality management system.

20     709.   The Premier Defendants intended for Borrego Health to rely on its

21 representations to persuade Borrego Health to retain Premier's services.

22     710.   Borrego Health reasonably relied on the Premier Defendants'

23 representations, believing Premier was capable of evaluating contract dental

24 program claims for necessity and accuracy.

25     711.   Borrego Health's reliance on the Premier Defendants' representation

26 regarding their qualifications and representations that they would properly review

27 and process the claims was a substantial factor in causing Borrego Health harm.

28

7275860.1

1    712.   As a direct and proximate result, Borrego Health was harmed in an

2    amount to be proven at trial.

3                    **TWENTY-NINTH CAUSE OF ACTION**

4                        (Negligent Misrepresentation)

5                 Against Husam Aldairi, D.D.S. and Aldairi DDS, Inc.

6    713.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

7    145, 146 through 166, inclusive, as though fully set forth herein.

8    714.   As outlined above, Aldairi made several representations to Borrego

9    Health regarding the scope and nature of the services they would provide to Borrego

10   Health patients. Aldairi also represented to Borrego Health that the claims submitted

11   for reimbursement would be accurate and for services performed by a dental

12   provider eligible to serve Medi-Cal patients.

13   715.   As set forth herein, Aldairi made various misrepresentations, including

14   without limitation the misrepresentations made in connection with the Aldairi

15   Agreements and the false and fraudulent bills submitted by Aldairi (and any related

16   communication) to Borrego Health.

17   716.   Aldairi had no reasonable grounds for believing their representations

18   were true at the time they were made.

19   717.   Aldairi intended for Borrego Health to rely on their representations to

20   persuade Borrego Health to continue to contract with Husam Aldairi, D.D.S. and

21   Aldairi DDS, Inc.

22   718.   Borrego Health reasonably relied on Aldairi's representations.

23   719.   As a result of relying on Aldairi's representations, Borrego Health

24   submitted claims to Medi-Cal that were not supportable and paid Aldairi for services

25   that should not have been paid.

26   720.   Borrego Health's reliance on Aldairi's representations was a substantial

27   factor in causing Borrego Health harm.

28

7275860.1

**THIRTIETH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Ayed Hawatmeh, D.D.S. and Hawatmeh Dental Group, P.C.

721.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 167 through 183, inclusive, as though fully set forth herein.

722.   As outlined above, Hawatmeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Hawatmeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

723.   As set forth herein, Hawatmeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Hawatmeh Agreement and the false and fraudulent bills submitted by Hawatmeh (and any related communication) to Borrego Health.

724.   Hawatmeh had no reasonable grounds for believing their representations were true at the time they were made.

725.   Hawatmeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Hawatmeh.

726.   Borrego Health reasonably relied on Hawatmeh's representations.

727.   As a result of relying on Hawatmeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Hawatmeh for services that should not have been paid.

728.   Borrego Health's reliance on Hawatmeh's representations was a substantial factor in causing Borrego Health harm.

**THIRTY-FIRST CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Alborz Mehdizadeh, D.D.S. and Alborz Mehdizadeh, Inc.

729.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 184 through 195, inclusive, as though fully set forth herein.

168

730.   As outlined above, Mehdizadeh made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Mehdizadeh also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

731.   As set forth herein, Mehdizadeh made various misrepresentations, including without limitation the misrepresentations made in connection with the Mehdizadeh Agreement and the false and fraudulent bills submitted by Mehdizadeh (and any related communication) to Borrego Health.

732.   Mehdizadeh had no reasonable grounds for believing their representations were true at the time they were made.

733.   Mehdizadeh intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Mehdizadeh.

734.   Borrego Health reasonably relied on Mehdizadeh's representations.

735.   As a result of relying on Mehdizadeh's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid MehdizadeH for services that should not have been paid.

736.   Borrego Health's reliance on Mehdizadeh's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-SECOND CAUSE OF ACTION

(Negligent Misrepresentation)

Against Magaly Velasquez, D.D.S. and Magaly M. Velasquez DDS, Professional Dental Corp.

737.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 196 through 203, inclusive, as though fully set forth herein.

738.   As outlined above, Velasquez made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego

7275860.1

Health patients.  Velasquez also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

739.   As set forth herein, Velasquez made various misrepresentations, including without limitation the misrepresentations made in connection with the Velasquez Agreement and the false and fraudulent bills submitted by Velasquez (and any related communication) to Borrego Health.

740.   Velasquez had no reasonable grounds for believing their representations were true at the time they were made.

741.   Velasquez intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Velasquez.

742.   Borrego Health reasonably relied on Velasquez's representations.

743.   As a result of relying on Velasquez's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Velasquez for services that should not have been paid.

744.   Borrego Health's reliance on Velasquez's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-THIRD CAUSE OF ACTION

(Negligent Misrepresentation)

Against Aram Arakelyan, D.D.S. and New millennium Dental Group of Aram Arakelyan, Inc.

745.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 204 through 213, inclusive, as though fully set forth herein.

746.   As outlined above, Arakelyan made several representations to Borrego Health regarding the scope and nature of the services he would provide to Borrego Health patients.  Arakelyan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

747.   As set forth herein, Arakelyan made various misrepresentations, including without limitation the misrepresentations made in connection with the

7275860.1

1  Arakelyan Agreements and the false and fraudulent bills submitted by Arakelyan
2  (and any related communication) to Borrego Health.

3      748.   Arakelyan had no reasonable grounds for believing his representations
4  were true at the time they were made.

5      749.   Arakelyan intended for Borrego Health to rely on his representations to
6  persuade Borrego Health to continue to contract with Arakelyan.

7      750.   Borrego Health reasonably relied on Arakelyan's representations.

8      751.   As a result of relying on Arakelyan's representations, Borrego Health
9  submitted claims to Medi-Cal that were not supportable and paid Arakelyan for
10  services that should not have been paid.

11      752.   Borrego Health's reliance on Arakelyan's representations was a
12  substantial factor in causing Borrego Health harm.

13                    **THIRTY-FOURTH CAUSE OF ACTION**
14                       (Negligent Misrepresentation)
15                       Against Michael Hoang, D.M.D.

16      753.   Borrego Health reincorporates paragraphs 1 through 54, 132 through
17  145, 214 through 219, inclusive, as though fully set forth herein.

18      754.   As outlined above, Michael Hoang, D.M.D. made several
19  representations to Borrego Health regarding the scope and nature of the services he
20  would provide to Borrego Health patients.  Hoang also represented to Borrego
21  Health that the claims submitted for reimbursement would be accurate.

22      755.   As set forth herein, Hoang made various misrepresentations, including
23  without limitation the misrepresentations made in connection with the Hoang
24  Agreement and the false and fraudulent bills submitted by Hoang (and any related
25  communication) to Borrego Health.

26      756.   Michael Hoang, D.M.D. had no reasonable grounds for believing their
27  representations were true at the time they were made.

28

7275860.1

757.   Michael Hoang, D.M.D. intended for Borrego Health to rely on his representations to persuade Borrego Health to continue to contract with Michael Hoang, D.M.D.

758.   Borrego Health reasonably relied on Michael Hoang, D.M.D.'s representations.

759.   As a result of relying on Michael Hoang, D.M.D.'s representations, Borrego Health  submitted claims to Medi-Cal that were not supportable and paid Michael Hoang, D.M.D. for services that should not have been paid.

760.   Borrego Health's reliance on Michael Hoang, D.M.D.'s representations was a substantial factor in causing Borrego Health harm.

## THIRTY-FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

Against Waleed Stephan, D.D.S. and W.A. Stephan, a Dental Corporation

761.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 220 through 225, inclusive, as though fully set forth herein.

762.   As outlined above, Stephan made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Stephan also represented to Borrego Health that the claims submitted for reimbursement would be accurate.

763.   As set forth herein, Stephan made various misrepresentations, including without limitation the misrepresentations made in connection with the Stephan Agreement and the false and fraudulent bills submitted by Stephan (and any related communication) to Borrego Health.

764.   Stephan had no reasonable grounds for believing their representations were true at the time they were made.

765.   Stephan intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Stephan.

766.   Borrego Health reasonably relied on Stephan's representations.

172

7275860.1

767.   As a result of relying on Stephan's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Stephan for services that should not have been paid.

768.   Borrego Health's reliance on Stephan's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-SIXTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.

769.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 226 through 231, inclusive, as though fully set forth herein.

770.   As outlined above, Rojo made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients.  Rojo also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

771.   As set forth herein, Rojo made various misrepresentations, including without limitation the misrepresentations made in connection with the Rojo Agreement and the false and fraudulent bills submitted by Rojo (and any related communication) to Borrego Health.

772.   Rojo had no reasonable grounds for believing their representations were true at the time they were made.

773.   Rojo intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Rojo.

774.   Borrego Health reasonably relied on Rojo's representations.

775.   As a result of relying on Santiago Rojo, D.D.S. and Santiago Rojo, D.D.S., Inc.'s representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Rojo for services that should not have been paid.

7275860.1

1     776.   Borrego Health's reliance on Rojo's representations was a substantial

2 factor in causing Borrego Health harm.

3                **THIRTY-SEVENTH CAUSE OF ACTION**

4                   (Negligent Misrepresentation)

5       Against Marcelo Toledo, D.D.S. and Marcelo Toledo, D.D.S., Inc.

6     777.   Borrego Health reincorporates paragraphs 1 through 54, 132 through

7 145, 246 through 258, inclusive, as though fully set forth herein.

8     778.   As outlined above, Toledo made several representations to Borrego

9 Health regarding the scope and nature of the services they would provide to Borrego

10 Health patients. Toledo also represented to Borrego Health that the claims submitted

11 for reimbursement would be accurate.

12     779.   As set forth herein, Toledo made various misrepresentations, including

13 without limitation the misrepresentations made in connection with the Toledo

14 Agreement and the false and fraudulent bills submitted by Toledo (and any related

15 communication) to Borrego Health.

16     780.   Toledo had no reasonable grounds for believing their representations

17 were true at the time they were made.

18     781.   Toledo intended for Borrego Health to rely on their representations to

19 persuade Borrego Health to continue to contract with Toledo.

20     782.   Borrego Health reasonably relied on Toledo's representations.

21     783.   As a result of relying on Toledo's representations, Borrego Health

22 submitted claims to Medi-Cal that were not supportable and paid Toledo for services

23 that should not have been paid.

24     784.   Borrego Health's reliance on Toledo's representations was a substantial

25 factor in causing Borrego Health harm.

26                **THIRTY-EIGHTH CAUSE OF ACTION**

27                   (Negligent Misrepresentation)

28   Against Marlene M. Thompson, D.D.S. and Marlene M. Thompson, D.D.S., Inc.

FIRST AMENDED COMPLAINT

7275860.1

785.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 259 through 264, inclusive, as though fully set forth herein.

786.   As outlined above, Thompson made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Thompson also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

787.   Thompson had no reasonable grounds for believing their representations were true at the time they were made.

788.   Thompson. intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Thompson.

789.   Borrego Health reasonably relied on Thompson's representations.

790.   As a result of relying on Thompson's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Thompson for services that should not have been paid.

791.   Borrego Health's reliance on Thompson's representations was a substantial factor in causing Borrego Health harm.

## THIRTY-NINTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against Douglas Ness, D.D.S. and Ness Dental Corporation

792.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 265 through 271, inclusive, as though fully set forth herein.

793.   As outlined above, Ness made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Ness also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

7275860.1

794.   Ness had no reasonable grounds for believing their representations were true at the time they were made.

795.   Ness intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Ness.

796.   Borrego Health reasonably relied on Ness' representations.

797.   As a result of relying on Ness' representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Ness for services that should not have been paid.

798.   Borrego Health's reliance on Ness' representations was a substantial factor in causing Borrego Health harm.

## FORTIETH CAUSE OF ACTION

### (Negligent Misrepresentation)

Against George C. Jared, D.D.S. and George C. Jared, D.D.S., Inc.

799.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 272 through 281, inclusive, as though fully set forth herein.

800.   As outlined above, Jared made several representations to Borrego Health regarding the scope and nature of the services they would provide to Borrego Health patients. Jared also represented to Borrego Health that the claims submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

801.   Jared had no reasonable grounds for believing their representations were true at the time they were made.

802.   Jared intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jared.

803.   Borrego Health reasonably relied on Jared's representations.

804.   As a result of relying on Jared's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Jared for services that should not have been paid.

805.   Borrego Health's reliance on Jared's representations was a substantial factor in causing Borrego Health harm.

## FORTY-FIRST CAUSE OF ACTION

(Legal Malpractice)

Against Defendant Mikia Wallis

806.   Borrego Health reincorporates paragraphs 1 through 145, 282 through 503, inclusive, as though fully set forth herein.

807.   Mikia Wallis was originally hired by Borrego Health to serve as its Chief Legal Officer.  Mikia Wallis later served in a dual capacity as the President and interim CEO of Borrego Health.  As Borrego Health's attorney, agent and fiduciary, Mikia Wallis has a duty to act with reasonable care and to act for the benefit of Borrego Health.

808.   As outlined herein, Mikia Wallis breached her legal duties to Borrego Health.

809.   As a direct and proximate result of Mikia Wallis' breaches, Borrego Health was damaged in an amount to be proven at trial.

## FORTY-SECOND CAUSE OF ACTION

(Fraudulent Concealment)

Against Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company

810.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

811.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company owed duties to Borrego Health.

812.   As outlined herein, the Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company intentionally failed to disclose pertinent facts to Borrego Health regarding Borrego Health's business operations and took actions to conceal such facts from Borrego Health.

7275860.1

813.   Borrego Health was not aware of the facts Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company concealed from Borrego Health.

814.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company intended to deceive Borrego Health by failing to disclose/concealing such facts.

815.   Had the Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company disclosed the withheld and concealed information, Borrego Health would have taken different actions then it did.

816.   Borrego Health was harmed as a result of the Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's conduct.

817.   The Borrego Insiders, the Premier Defendants, Jim Hebets, and The Hebets Company's concealment was a substantial factor in causing Borrego Health's harm.

## FORTY-THIRD CAUSE OF ACTION

### (False Promise)

### Against All Defendants

818.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

819.   As outlined herein, each and every Defendant made promises to Borrego Health.

820.   Defendants did not intend to perform on the promises made at the time they made those promises to Borrego Health.

821.   Defendants intended for Borrego Health to rely on those promises.

822.   Borrego Health reasonably relied on Defendants' promises.

823.   Defendants did not perform the actions they promised to perform.

824.   Borrego Health was harmed as a result of Defendants' failures to perform the actions promised.

7275860.1

825.   Borrego Health's reliance on Defendants' promises was a substantial factor in causing Borrego Health harm.

## FORTY-FOURTH CAUSE OF ACTION

(Conversion)

Against All Defendants

826.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.

827.   As set forth herein, Defendants substantially interfered with Borrego Health's personal property by knowingly taking money from Borrego Health for which Defendants were not entitled to, or at least prevented Borrego Health from receiving the full funds to which it was entitled.

828.    As set forth herein, Borrego Health did not consent to Defendants improper withholding of funds that were rightfully owned by Borrego Health.

829.   As set forth herein, Borrego Health was harmed.

830.   As set forth herein, Defendants' conduct was a substantial factor in causing plaintiff's harm.

## FORTY-FIFTH CAUSE OF ACTION

(Inducing Breach of Contract)

Against All Defendants

831.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

832.   Borrego Health had a contract with Medi-Cal.

833.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

834.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

FIRST AMENDED COMPLAINT

7275860.1

835.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health.

836.   Defendants' conduct did cause the contracted dental providers to breach their contracts with Borrego Health.

837.   As a result of Defendants' conduct, Borrego Health was harmed.

838.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## **FORTY-SIXTH CAUSE OF ACTION**

(Intentional Interference with Contractual Relations)

Against All Defendants

839.   Borrego Health reincorporates paragraphs 1 through 54, 66 through 334, inclusive, as though fully set forth herein.

840.   Borrego Health had a contract with Medi-Cal.

841.   Borrego Health had contracts with its contract dental providers, including the corporate entities of the individually named Dentist Defendants.

842.   Defendants knew of Borrego Health's contracts with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

843.   Through the conduct alleged herein, Defendants intended to cause the contracted dental providers to breach the terms of their contract with Borrego Health, which thereby impacted Borrego Health's contract with Medi-Cal.

844.   Defendants' conduct made Borrego Health's performance under their contracts expensive and difficult.

845.   Defendants intended to disrupt performance of the contracts or at least knew that disruption of performance was substantially certain to occur by their conduct.

846.   As a result of Defendants' conduct, Borrego Health was harmed.

7275860.1

847.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-SEVENTH CAUSE OF ACTION

(Intentional Interference with Prospective Economic Relations)

Against All Defendants

848.   Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

849.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

850.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

851.   Defendants knew of  Borrego Health's economic relationship with Medi-Cal.

852.   Defendants knew of Borrego Health's economic relationships with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

853.   As outlined herein, Defendants engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

854.    Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

855.   As a result of Defendants' conduct, Borrego Health was harmed.

856.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-EIGHTH CAUSE OF ACTION

(Negligent Interference with Prospective Economic Relations)

Against All Defendants

FIRST AMENDED COMPLAINT

7275860.1

857.   Borrego Health reincorporates paragraphs 1 through 46, 66 through 334, inclusive, as though fully set forth herein.

858.   Borrego Health was in an economic relationship with Medi-Cal, which provided an economic benefit to Borrego Health.

859.   Borrego Health was in economic relationships with its contract dental providers, including the corporate entities of the individually named Dentist Defendants, which provided an economic benefit to Borrego Health.

860.   Defendants knew or should have known of  Borrego Health's contract with Medi-Cal.

861.   Defendants knew or should have known of Borrego Health's contracts with the corporate Dentist Defendants, as well as the contracts with individual contract dental providers.

862.   As outlined herein, Defendants knew or should have known Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers would be disrupted if they failed to act with reasonable care.

863.   As outlined herein, Defendants failed to act with reasonable care when they engaged in wrongful conduct that was intended to disrupt Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers.

864.    Borrego Health's relationships with Medi-Cal, the corporate Dentist Defendants, and Borrego Health's contract dental providers were disrupted.

865.   As a result of Defendants' conduct, Borrego Health was harmed.

866.   Defendants' conduct was a substantial factor in causing Borrego Health's harm.

## FORTY-NINTH CAUSE OF ACTION

(Violations of Business & Professions Code § 17200, *et seq.*)

Against All Defendants

FIRST AMENDED COMPLAINT

7275860.1

867.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread unfair and/or fraudulent business activities designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants. However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

868.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

869.   The UCL imposes strict liability. Borrego Health need not prove that defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

870.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

871.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

872.   As outlined herein, Defendants' actions were unfair.

873.   As outlined herein, Defendants' acts and practices constitute fraudulent business acts or practices as they have deceived Borrego Health and are highly likely to deceive members of the consuming public, including members of the contract dental program and/or members of the relevant state agencies.

7275860.1

**FIFTIETH CAUSE OF ACTION**

(Conspiracy)

Against All Defendants

874.   Borrego Health reincorporates paragraphs 1 through 485, inclusive, as though fully set forth herein.  This is due to the fact that Borrego Health believes that each and every one of the actions and omissions described above are part of the same, far-reaching and widespread conspiracy designed and carried out to steal money from Borrego Health and funnel that money, directly or indirectly, to the Defendants.  However, in the alternative, any one of or any combination of the above-listed Schemes would be sufficient to state a claim against the Defendants alleged to be involved in that Scheme or those Schemes.

875.   As set forth herein, the facts involving the multiple Schemes described above demonstrate the existence of a conspiracy between and among the Defendants to act in furtherance of those Schemes, all of whom acted as co-conspirators of another.

876.   Borrego Health was harmed by Defendants' actions.

877.   Defendants were responsible for Borrego Health's harm.

878.   Defendants were aware of each other's plans and agreed/intended such wrongful acts to be committed.

**FIFTY-FIRST CAUSE OF ACTION**

(Breach of Fiduciary Duty)

Against Borrego Insiders

879.   Borrego Health reincorporates paragraphs 1 through 510, inclusive, as though fully set forth herein.

880.   The Borrego Insiders owed fiduciary duties to Borrego Health.

881.   As outlined herein, the Borrego Insiders breached their duties to Borrego Health.

882.   Borrego Health was damaged by the Borrego Insiders' breaches.

184

7275860.1

**FIFTY-SECOND CAUSE OF ACTION**

(Constructive Fraud)

Against Borrego Insiders and Premier Defendants

883.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as though fully set forth herein.

884.   The Borrego Insiders and the Premier Defendants acted as Borrego Health's agents, corporate officers and/or fiduciaries.

885.   The Borrego Insiders and the Premier Defendants acted on Borrego Health's behalf in several transactions as outlined above.

886.   As outlined above, the Borrego Insiders and the Premier Defendants knew, or should have known, pertinent information to the transactions.

887.   The Borrego Insiders and the Premier Defendants misled Borrego Health by failing to disclose such pertinent information and/or omitting such pertinent information from Borrego Health.

888.   As a result of the Borrego Insiders' and the Premier Defendants' failure to disclose such information, Borrego Health was harmed.

889.   The Borrego Insiders' and the Premier Defendants' conduct was a substantial factor in causing Borrego Health's harm.

**FIFTY-THIRD CAUSE OF ACTION**

(Unjust Enrichment/Restitution)

Against all Defendants

890.   Borrego Health reincorporates paragraphs 1 through 562, inclusive, as though fully set forth herein.

891.   As outlined herein, Defendants unjustly received a benefit at the expense of Borrego Health.

**FIFTY-FOURTH CAUSE OF ACTION**

(Intentional Misrepresentation)

Against Jim Hebets and The Hebets Company

FIRST AMENDED COMPLAINT

7275860.1

892.   Borrego Health reincorporates paragraphs 1 through 46, 360 through 422, inclusive, as though fully set forth herein.

893.   Jim Hebets and The Hebets Company represented to Borrego Health, among other things, that the 162B plans would not subject Borrego Health to tax penalties, and that the 162B plan provided a fair market benefit package that was superior to other options.

894.   Jim Hebets and The Hebets Company's representations were false at the time they were made. For example, Borrego Health suffered a tax penalty from the IRS as a direct result of Bruce Hebets' 162B plan.

895.   Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

896.   As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health suffered harm.

897.   Borrego Health's reliance on Jim Hebets' and The Hebets Company's representations was a substantial factor in causing Borrego Health's harm.

## FIFTY-FIFTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Jim Hebets and The Hebets Company

898.   Borrego Health reincorporates paragraphs 1 through 46, 360 through 422, inclusive, as though fully set forth herein.

899.   As outlined above, Jim Hebets and The Hebets Company made several representations to Borrego Health regarding the scope and nature of the services they would provide and the benefits Borrego Health would receive from those services.

900.   Jim Hebets and The Hebets Company had no reasonable grounds for believing their representations were true at the time they were made.

FIRST AMENDED COMPLAINT

7275860.1

901.   Jim Hebets and The Hebets Company intended for Borrego Health to rely on their representations to persuade Borrego Health to continue to contract with Jim Hebets and The Hebets Company.

902.   Borrego Health reasonably relied on Jim Hebets' and The Hebets Company's representations.

903.   As a result of relying on Jim Hebets' and The Hebets Company's representations, Borrego Health was harmed.

904.   Borrego Health's reliance on Jim Hebets and The Hebets Company's representations were a substantial factor in causing Borrego Health harm.

### FIFTY-SIXTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

905.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

906.   In part, Al Tekreeti misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

907.   Al Tekreeti's representations were false at the time they were made. Upon information and belief, Al Tekreeti knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

908.   Borrego Health reasonably relied on Al Tekreeti's representations.

909.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

### FIFTY-SEVENTH CAUSE OF ACTION

(Intentional Misrepresentation)

Against Jilbert Bakramian, D.D.S.

910.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

7275860.1

911.   In part, Bakramian misrepresented to Borrego Health that he would submit accurate claims information to Borrego Health for reimbursement.

912.   Bakramian's representations were false at the time they were made. Upon information and belief, Bakramian knew the representations were false at the time they were made, or that the representations where made recklessly without regard for their truth.

913.   Borrego Health reasonably relied on Bakramian's representations.

914.   As a direct and proximate result, Borrego Health was harmed in an amount to be proven at trial.

## FIFTY-EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation)

Against Mohammed Al Tekreeti, D.D.S.

915.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 232 through 237, inclusive, as though fully set forth herein.

916.   As outlined above, Al Tekreeti made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for the services performed by a dental provider eligible to serve Medi-Cal patients.

917.   Al Tekreeti had no reasonable grounds for believing his representations were true at the time they were made.

918.   Al Tekreeti intended for Borrego Health to rely on his representations.

919.   Borrego Health reasonably relied on Al Tekreeti's representations.

920.   As a result of relying on Al Tekreeti's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Al Tekreeti for services that should not have been paid.

921.   Borrego Health's reliance on Al Tekreeti's representations was a substantial factor in causing Borrego Health harm.

FIRST AMENDED COMPLAINT

7275860.1

**FIFTY-NINTH CAUSE OF ACTION**

(Negligent Misrepresentation)

Against Jilbert Bakramian, D.D.S.

922.   Borrego Health reincorporates paragraphs 1 through 54, 132 through 145, 238 through 245, inclusive, as though fully set forth herein.

923.   As outlined above, Bakramian made several representations to Borrego Health, including that the claims he submitted for reimbursement would be accurate and for services performed by a dental provider eligible to serve Medi-Cal patients.

924.   Bakramian had no reasonable grounds for believing their representations were true at the time they were made.

925.   Bakramian intended for Borrego Health to rely on their representations.

926.   Borrego Health reasonably relied on Bakramian's representations.

927.   As a result of relying on Bakramian's representations, Borrego Health submitted claims to Medi-Cal that were not supportable and paid Bakramian for services that should not have been paid.

928.   Borrego Health's reliance on Bakramian's representations was a substantial factor in causing Borrego Health harm.

**PRAYER**

With respect to the First Cause of Action—RICO (As to All Defendants)

    a.    For damages in an amount to be proven at trial, trebled pursuant to statute;

    b.    Pre-judgment and post-judgment interest; and

    c.    Reasonable attorney's fees and costs.

With respect to the RICO, Intentional Misrepresentation, Negligent Misrepresentation, False Promise, Fraudulent Concealment, Constructive Fraud, Conspiracy, and Violations of the UCL Causes of Action (As to All Defendants):

7275860.1

1        a.     For imposition of a constructive trust in an amount subject to be proven

2                 at trial and on any real or personal property purchased with a portion of

3                 that amount;

4        b.     For punitive damages where allowed by law; and

5        c.     Pre-judgment and post-judgment interest.

6

7    With respect to all other causes of action:

8        a.     For damages in an amount to be proven at trial;

9        b.     Reasonable attorney's fees and costs as allowed by law;

10       c.     For punitive damages where allowed by law; and

11       d.     Such other and further relief the Court deems just and proper.

12

13   DATED:  November 4, 2022       HOOPER, LUNDY & BOOKMAN, P.C.

14

15

16   By: _____

17                    DEVIN M. SENELICK

18   Attorneys for Plaintiff Borrego Community
     Health Foundation

19

20

21

22

23

24

25

26

27

28

7275860.1

# EXHIBIT A

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT is made and entered into as of this 1st day of March, 2016, by and between BORREGO COMMUNITY HEALTH FOUNDATION ("BCHF"), a California Non-Profit Corporation, and PREMIER HEALTH CARE MANAGEMENT, INC. ("PHCM"), a California Corporation.

## RECITALS

WHEREAS, BCHF is a 501(c)(3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Health Centers ("FQHC"). BCHF currently operates FQHCs throughout Riverside, San Bernardino and San Diego Counties. The FQHCs provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services;

WHEREAS, BCHF desires to contract with PHCM to obtain various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients ("Participating Patients"); and

WHEREAS, PHCM desires to contract with BCHF to provide those management services.

NOW, THEREFORE, in consideration of the recitals, covenants, conditions and promises herein contained, the parties agree as follows:

### 1. DUTIES AND SERVICES

A. BCHF agrees and covenants:

    i. To take actions as necessary to meet its obligations under any existing and/or future agreements with contract dentists or other professionals performing contract dental services for BCHF ("Dental Agreements").

    ii. BCHF shall maintain a Care Coordinator Specialist and Dental Director as set forth in the Dental Agreements and shall notify PHCM of the name and contact information for each position.

    iii. Where required under the Dental Agreements and this Agreement, BCHF shall cooperate and timely provide PHCM with all required information to allow PHCM to timely fulfill all of its obligations under this Agreement. BCHF shall provide PHCM access to its Electronic Health Records ("EHR") to allow PHCM to determine if a particular patient is a "Participating Patient" as that term is defined in the Dental Agreements.

    iv. BCHF shall timely and fully bill the appropriate payor for payment of all dental services performed by dentists under the Dental Agreements.

    v. BCHF shall be responsible for and shall timely pay all sums owing to dentists under any Dental Agreements providing PHCM with a copy of all such payments.

    vi. Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.



vii.  Provide feedback on PHCM's proposed contract dental services management plan and work diligently with PHCM to determine mutually agreeable terms for any such management plan.

viii.  To coordinate with PHCM regarding quality management/peer review and compliance with terms of Dental Agreements.

ix.  To provide copies of all Dental Agreements between BCHF and contract dental service providers to PHCM.

x.  To be financially responsible for the following:

1.  All fees due and payable to contract dentists and other contract dental service providers for services provided under any Dental Agreements.

2.  Cost of all insurance policies in the name of BCHF, as required by this agreement.

3.  All fees due PHCM under the terms of this Agreement.

B.  PHCM agrees and covenants:

i.  To provide the managerial and other related services to BCHF as described in Exhibit "A", attached hereto and incorporated herein by reference, in furtherance of BCHF's contract dental programs. The duties listed on Exhibit "A" are considered by both parties to be material components of this Agreement. Any breach of such duties will be considered a material breach of this Agreement.

ii.  Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

2.  **COMPENSATION AND BILLING**

A.  Compensation. In consideration for the services to be provided by PHCM pursuant to this agreement as described in Exhibit "A" and as reasonably contemplated thereby, BCHF shall compensate PHCM the sum of five dollars ($5.00) per visit for the first 8,000 participating patient visits to any contract dentist pursuant to any active Dental Agreement.

BCHF shall compensate PHCM the sum of twenty-five dollars ($25.00) per visit in excess of 8,000 visits for any calendar month.

For purposes of this section, a "patient visit" shall be a visit for which (i) PHCM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

B.  Billing. PHCM shall bill BCHF monthly for its services and remit to BCHF a statement during each month. Payments contemplated under this agreement shall reflect services performed in the current month, not monthly in arrears unless otherwise mutually agreed to in writing. Payment of all monies due PHCM for its fees shall be paid on or before the 10th calendar day of each month.

C.  PHCM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to dental services under all

Dental Agreements. This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to dental services under any Dental Agreement; (ii) all payments or funds received relating to dental services under any Dental Agreement including but not limited to any payments or funds received from patients or dentists.

3. **TERMS OF CONTRACT**

   A. Term. The term of this agreement shall be three (3) years commencing from the date of execution set forth above unless terminated pursuant in accordance with this agreement.

   B. Termination. This Agreement may be terminated by either party, without cause, by either party providing the other party with one-hundred eighty (180) days written notice.

   C. Termination for Cause. Either party may terminate this agreement for cause. Cause shall be considered the failure of either party to perform, keep or fulfill any material covenant, undertaking, obligation, or condition set forth in this agreement and the continuance of any such default for a period of thirty (30) days after written notice of such failure.

      Notwithstanding the foregoing, BCHF shall be entitled to terminate this Agreement immediately, with or without notice, upon determination by the Health Resources and Services Administration ("HRSA") or any other federal or state agency with regulatory or advisory authority over BCHF that this Agreement violates any rule or program requirement pertaining to a FQHC.

   D. Renewal. This agreement will automatically renew on the third anniversary for an additional three (3) years under the same terms and conditions as at the renewal date.

4. **ASSIGNMENT**

   Neither PHCM nor BCHF may assign its rights or obligations under this agreement without the prior written consent of the other party.

5. **INDEPENDENT CONTRACTORS**

   PHCM and BCHF are independent contracting parties and the relationship between them is that of independent contractors. Nothing in this agreement shall be construed to create a principal-agent, employer-employee, master-servant or any relationship other than that of independent contractors.

6. **INDEMNITY**

   PHCM shall defend, indemnify and hold BCHF free and harmless from any obligations, costs, claims, judgments, attorney's fees, or attachments arising from PHCM's negligence in the performance of the services contemplated under this Agreement.

7. **INSURANCE**

   A. Each Party, at its sole cost and expense, will obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, comprehensive general liability insurance covering the Party, its employees, agents, servants, and independent contractors, against loss in the nature of fire, theft, business interruption, general liability, and negligence, with a minimum liability limit of Two



Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) in the annual aggregate. Each Party shall provide the other Party with written notice at least thirty (30) days prior to any cancellation or amendment of the Party's policy.

B. Each Party shall, at its sole cost and expense, obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, workers' compensation insurance as required by the laws of the State of California.

## 8. **MISCELLANEOUS PROVISIONS**

A. This Agreement shall be upheld in accordance with the laws of the State of California.

B. Notices to either party shall be in writing and sent by registered or certified mail, addressed to the party at the addresses set forth at the conclusion of this agreement. Any notice given in accordance with this Section shall be effective upon the receipt of said notice or five (5) calendar days following haven given said notice, whichever is earlier. Notice shall be given as follows:

| | |
|---|---|
| If to BCHF: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Bruce Hebets<br>Fax:  (760) 767-1135<br>Email:  bhebets@borregomedical.org |
| Copy of notices to: | Borrego Community Health Foundation<br>P.O. Box 2369<br>Borrego Springs, CA  920004<br>Attn: Mikia Wallis, Chief Legal Officer<br>Fax:  (858) 634-6989<br>Email: mwallis@borregomedical.org |
| If to PHCM: | Premier Health Care Management, Inc.<br>124 Main Street, Suite 240<br>El Cajon, CA 92020<br>Fax: (619) 444-8597<br>Attn:  Daryl R. Priest<br>Email: daryl@priesthomes.com |
| Copy of notices to: | Fitch Law Firm, APC<br>Stephen J. Fitch, Esq.<br>3465 Camino Del Rio South, Ste. 250<br>San Diego, CA 92108<br>Telephone No. (619) 282-8100<br>Email: steve@fitchlawfirm.com |

C. This agreement may not be modified except by written amendment signed by both parties.

D. If any provision of this agreement shall be determined to be illegal or invalid for any reason, the remaining provisions shall continue in full force and effect unless the illegality or invalidity prevents the accomplishments of the objectives and purposes of



EXHIBIT A
PAGE 195

this agreement.

E.   This agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

F.   The headings contained in this agreement are for reference purposes only and shall not affect the meaning or interpretation of this agreement.

G.   If any action at law or in equity is necessary to enforce or interpret the terms of this agreement, the prevailing party in any such action shall be entitled to payment of its reasonable attorney's fees and costs from the other party.

H.   Each party to this agreement warrants, authorizes, and represents that the individual executing this agreement is acting within the course and scope of their employment, is authorized to enter this agreement, and has the authority to bind the business entity by executing this agreement.

I.   All parties shall comply with all applicable laws, ordinances, codes and regulations of federal, state, and local governments.

J.   No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision of this agreement.  No waiver shall be considered binding unless executed by the parties.

K.   This is a wholly integrated Agreement. This Agreement sets forth the entire agreement between all parties with regard to the subject matter hereof. No other agreements, covenants, representations, or warranties, express or implied, oral or written, have been made by either party to the other with respect to the subject matter of this agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, and representations, covenants, and warranties, with respect to the subject matter hereof are hereby waived, merged herein and superseded hereby.

L.   In order to perform functions as identified in Exhibit "A", and which are necessary to enable BCHF's compliance with all relevant privacy, security and other legal requirements, the parties hereby agree that PHCM is a Business Associate as defined in the appropriate regulations, as noted in Exhibit "B", executed by both parties and incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as set forth on the first page.

For BCHF:                                                    For PHCM:

_____                      _____

Bruce Hebets, CEO                                    Daryl Priest, President

Dated: ___2·24-/6___                            Dated: 2-24-16

## Exhibit "A"

### Scope of Management and Other Services of PHCM

The purpose of this list of services is to identify and delineate services to be provided by PHCM in furtherance of its duties under this agreement with BCHF concerning BCHF's contract dental program and care of BCHF's participating patients. PHCM shall provide any and all necessary staff, office space, information systems, and support services set forth below and all services reasonably contemplated as necessary to perform any such services.

I.  CONTRACT DENTAL MANAGEMENT

    a.  PROVIDER CONTRACTING

        i.  Market and negotiate new Dental Agreements between BCHF and new Contract Dentists throughout the service areas in which BCHF operates FQHCs. Currently, BCHF operates FQHCs in Riverside, San Diego and San Bernardino Counties. Further, PHCM may market and negotiate new Dental Agreements in any other service area in which BCHF is otherwise authorized to provide dental services.

        ii.  Amend current Dental Agreements at the direction of BCHF

        iii.  Maintain files containing current and historical Dental Agreements

        iv.  Track renewal dates of Dental Agreements.

    b.  PROVIDER RELATIONS

        i.  Maintain database of contract dental service providers and contract dental service provider demographics.

        ii.  Monitor contract dental service providers' ability to speak additional languages

        iii.  Provide contract dental service provider roster as necessary

        iv.  Assist with development and updates of contract dental service provider manuals

        v.  Produce and distribute contract dental service provider manuals

        vi.  Provide ongoing communication, education, and training to contract dental service provider and their staffs regarding BCHF policies and procedures

        vii.  Provide ongoing communication, education, and training to contract dental service provider and their staff regarding any changes in scope of services and fee schedules.

        viii.  Provide telephone line for contract dental service provider inquiries

        ix.  Answer contract dental service provider eligibility inquiries

        x.  Answer contract dental service provider claims inquiries

        xi.  Create and distribute administrative forms

        xii.  Develop and distribute contract dental service provider newsletter

II.  CLAIM MANAGEMENT

        i.  PHCM shall obtain from contracted dentists such information relating to claims and submit the same to BCHF in a format that enables BCHF to



1

bill for such claims. As part of this service and based on a receipt of information from BCHF, PHCM shall monitor claims, billing and payment to dentists.

III.   MANAGEMENT INFORMATION SYSTEM

    a. Provide a computerized management information system to process and store data pertaining to demographics of and services provided to Participating Patients;

    b. Provide appropriate data security and, among other necessary functions:

        i.   Restrict access to data security in compliance with applicable federal and state laws and regulations

        ii.  Restrict access to data of participating patients

        iii. Restrict access to data by user and security classification

        iv.  Compliance with HIPAA and any other regulations concerning participating patient data

        v.   Provide physical security at all buildings that house data

    c. Provide BCHF-maintained Web-based access to data for contract dental providers and their staff for its hardware, Internet connectivity and web-browsing for the following, but not limited functions:

        i.   Claims inquiries

        ii.  Claims submission

        iii. Eligibility inquiries

        iv.  Authorization inquiries

        v.   Authorization submission

    d. Help Desk and Support

        i.   Provide, maintain and support issues related to data access

        ii.  Maintain all servers and network connections for PHCM systems

        iii. Provide and maintain all desktop systems/hardware at PHCM operations center(s)

        iv.  Provide and maintain all software (including licensing and troubleshooting) at PHCM operations center(s)

        v.   Provide training and support to contract dental service users and their staff remotely

        vi.  Provide and maintain phone system for calls directed to PHCM operations center(s)

    e. Remote System Access

        i.   Provide remote access to management information system

        ii.  Support remote access connectivity

IV.   QUALITY MANAGEMENT ("QM")





2

a. QM PLAN, POLICIES AND PROCEDURES

    i. Assist with the implementation of a QM plan after reviewing BCHF's operation of its contract dental services

    ii. Implement a standard QM Policy and Procedure Manual that meets appropriate standards and regulations

    iii. Resolve participating patient grievance and appeals issues as outlined in PHCM's QM plan

b. QM MEETINGS

    i. Schedule and prepare agenda, meeting minutes, and material for monthly QM Committee meetings

    ii. Attend QM Committee meetings

    iii. Coordinate and prepare for any contract dental program audits from any regulatory agencies

c. QM REPORTING

    i. Provide reports for QM Committee meetings

    ii. Provide reports as required for QM delegation reporting

    iii. Track and report participating patient grievance and appeals issues

    iv. Perform contract dental service provider surveys and report survey's findings

    v. Perform participating patient surveys and report survey's findings

V. PARTICIPATING PATIENT MANAGEMENT

a. ELIGIBILITY VERIFICATION

    i. Reconcile eligibility data to load into management information system

    ii. Maintain participating patient eligibility database

    iii. Identify each participating patient by using established identification number

    iv. Assist with determination of participating patient eligibility for services prior to provision of services

    v. Maintain and track eligibility of services for each participating patient

b. PARTICIPATING PATIENT SERVICES

    i. Provide telephone line for participating patient inquiries

    ii. Answer participating patient eligibility inquiries

    iii. Answer participating patient claims inquiries

    iv. Generate telephone tracking reports

VI. REPORTING – Data is reported on a per month basis and compared to BCHF and



3

industry benchmarks when available

    a. Patient and Encounter information as required to be reported in the aggregate on BCHF's Uniform Data System (UDS) Report

    b. Claim and Payment data

## VII.   GENERAL ADMINISTRATION

    a. Monitor all components of BCHF's Contract Dental Program

    b. Coordinate printing of all forms and letterhead (as needed) on BCHF stationery

    c. Process participating patient and contract dental service provider-related mail, both incoming and outgoing

    d. Short and long-range financial and strategic planning

    e. Contract dental service provider and regulatory agency/agencies relationship management

4

# EXHIBIT B

## AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT

This **AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT** (this "Amendment No. 1") is made as of this **ㄹㄹ** day of December, 2016, by and between **BORREGO COMMUNITY HEALTH FOUNDATION.**, a California Non-Profit Corporation ("BCHF"), and **PREMIER HEALTH CARE MANAGEMENT, INC.**, a California Corporation ("PHCM"). BCHF and PHCM are sometimes hereinafter referred to as the "Parties" collectively or a "Party" individually.

### R E C I T A L S

A. BCHF and PHCM entered into that certain Management Agreement dated March 1, 2016, ("Management Agreement") covering various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients.

B. All defined terms used herein but not defined herein shall have the meaning ascribed to such terms in the Management Agreement.

C. BCHF and PHCM now wish to amend the Management Agreement to, among other things, extend the Term of the Management Agreement upon the terms, covenants, and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, promises and conditions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date the Parties agree as follows:

### AGREEMENT

1.  Section 3A.    Section 3A of the Management Agreement is hereby amended as follows:

    3A.    TERM. The term of this agreement shall be extended as follows: The extended term of this agreement shall be five (5) years commencing from January 1, 2017 unless terminated pursuant in accordance with this agreement.

2.  Section 3B.    Section 3B of the Management Agreement is hereby deleted in its entirety.

3.  Section 3D.    Section 3D of the Management Agreement is herby amended as follows:

    3D.    Renewal. This agreement will automatically renew on January 1, 2022 for an additional five (5) years under the same terms and conditions as at the renewal date.

4.  Miscellaneous.

    4.1    Capitalized Terms/Definitions. Each capitalized term used in this Amendment No. 1 and not defined herein shall be deemed to have the same meaning ascribed to it in the Management Agreement.

    4.2    Continuing Effect. Except as specifically provided in this Amendment No. 1, the provisions of the Management Agreement shall remain unchanged and in full force and effect. In the event of a conflict between the Management Agreement and this Amendment No. 1, this Amendment No. 1 shall control.

    4.3    Authority. Each person executing this Amendment No. 1 on behalf of a Party represents and warrants that it has the full power, authority, and legal right to execute and deliver this Amendment No. 1 on behalf of such Party and that this Amendment No. 1 constitutes the legal, valid and binding obligations of such Party, its representatives, successors and assigns, enforceable against such Party or Parties in accordance with its terms.

1

4.4     Approvals. BCHF warrants and represents to PHCM that BCHF has obtained any approvals from any third parties, that are necessary to make this Amendment No. 1 enforceable against BCHF and all such third parties, their heirs, representatives, successors and assigns. BCHF shall defend, indemnify and save harmless PHCM from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section.

4.5     Counterparts. To facilitate execution of this Amendment No. 1, this Amendment No. 1 may be executed in one or more counterparts as may be convenient or required, and an executed copy of this Amendment No. 1 delivered electronically by facsimile or e-mail shall have the effect of an original, executed instrument. All counterparts of this Amendment No. 1 shall collectively constitute a single instrument; but, in making proof of this Amendment No. 1 it shall not be necessary to produce or account for more than one such counterpart executed by each Party hereto. It shall not be necessary for the signature of, or on behalf of, each Party hereto, or that the signature of all persons required to bind any such Party appear on each counterpart of this Amendment No. 1.

4.6     No Construction Against Draftsman. No inference in favor of or against any Party shall be drawn from the fact that such Party has drafted any provision of this Amendment No. 1 or that such provisions have been drafted on behalf of said Party.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement as set forth on the first page.

For BCHF:

For PHCM:

Bruce Hebets, CEO
Dated: 12-22-16

Daryl Priest, President
Dated: 12-22-2016

2

EXHIBIT B
PAGE 203

# EXHIBIT C

EXHIBIT C
PAGE 204

## AMENDMENT NO. 2 TO MANAGEMENT AGREEMENT

This AMENDMENT NO. 2 TO MANAGEMENT AGREEMENT ("**Amendment No. 2**") is made as of July 1, 2017, by and between BORREGO COMMUNITY HEALTH FOUNDATION., a California Non-Profit Corporation ("**BCHF**"), and PREMIER HEALTH CARE MANAGEMENT, INC., a California Corporation ("**PHCM**"). BCHF and PHCM are sometimes hereinafter referred to as the "Parties" collectively or a "Party" individually.

### RECITALS

A.      BCHF and PHCM entered into that certain Management Agreement dated March 1, 2016 as amended by Amendment No.1 ("**Management Agreement**") covering various management services relating to BCHF's Contract Dental Program, whereby BCHF contracts with private dental practices to provide covered dental services to BCHF patients.

B.      BCHF and PHCM now wish to amend the Management Agreement upon the terms, covenants, and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants, promises and conditions hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, as of the Effective Date the Parties agree as follows:

1.      Article 2 of the Management Agreement is hereby deleted and the following Article 6 is added as follows:

A.      Compensation. In consideration for the services to be provided by PHCM pursuant to this agreement as described in Exhibit "A" and as reasonably contemplated thereby, BCHF shall compensate PHCM the sum of twenty-five dollars ($25.00) per "patient visit" processed in any given month, less returned claims for incompleteness, for participating patient visits to any contracted or sub-contracted dentist pursuant to any active Dental Agreement.   For purposes of this section, a "patient visit" shall be a visit for which (i) PHCM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

B.      Billing. PHCM shall bill BCHF monthly for its services and remit to BCHF a statement by the 10th of each month for visits processed for the preceding month less any returned visits as a credit against the total.  Payment of all monies due PHCM for its fees shall be paid on or before the 20th calendar day of each month.

C.      Review.  PHCM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to dental services under all Dental Agreements.  This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to dental services under any Dental Agreement; (ii) all payments or funds received relating to dental services under any Dental Agreement including but not limited to any payments or funds received from patients or dentists.

D.      No Referral.      It is specifically agreed and understood between the parties that

1

EXHIBIT C
PAGE 205

nothing in this Agreement is intended to provide payment or benefit of any kind (directly or indirectly), for the referral of patients to BCHF but compensation hereunder is for management services provided.

2.    This Amendment No. 2 may be executed simultaneously or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Amendment No. 2.

3.    Any conflict between the terms of this Amendment No. 2 and the Management Agreement the terms of this Amendment No. 2 shall control.

4.    Except as specifically provided herein all terms shall have the same meaning as defined in the Management Agreement.

5.    Except as specifically amended herein, the Management Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment No. 2 effective as of the date first written above.

PHCM:                                             BCHF:

Premier Health Care Management, Inc.              Borrego Community Health Foundation
a California corporation                          a California non-profit public benefit corporation

By: _____                    By: _____
      Daryl R. Priest, President                  Name:  MIKIA  WALLIS
                                                  Its:  EXECUTIVE  VP

2

EXHIBIT C
PAGE 206

# EXHIBIT D

# MANAGEMENT SERVICES AGREEMENT
# CONTRACT MEDICAL PROPGRAM

THIS MANAGEMENT SERVICES AGREEMENT ("**Agreement**") is made as of September 8, 2017 ("**Effective Date**"), by and between BORREGO COMMUNITY HEALTH FOUNDATION, A CALIFORNIA NON-PROFIT CORPORATION ("**BCHF**") and SUMMIT HEALTHCARE MANAGEMENT, INC A CALIFORNIA CORPORATION ("**SHM**"). BCHF or SHM may sometimes also be individually referred to as the "Party" or collectively as the "Parties"

## RECITALS

**WHEREAS**, BCHF is a 501(c)(3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Health Centers ("**FQHC**"). BCHF currently operates FQHCs in San Diego County. The FQHCs provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("**BPHC**") within the United States Department of Health and Human Services ("**DHHS**"),

**WHEREAS**, BCHF in order to increase access to primary health care for underserved populations and improve health outcomes, while preserving and enhancing its integrity and autonomy, has entered into Medical Service And Establishment of Intermittent Clinic Agreements with qualified doctors and clinics to provide medical services in underserved areas and BCHF desires to enter into other additional agreements with other doctors and clinics ("**Contract Medical Program**"); and

**WHEREAS**, BCHF desires to contract with SHM to obtain various management services relating to BCHF's Contract Medical Program; and

**WHEREAS**, SHM desires to contract with BCHF to provide those management services

## AGREEMENT

NOW, THEREFORE, in consideration of the recitals, covenants, conditions and promises herein contained, the parties agree as follows:

1     **RETENTION OF SHM**

1 01     BCHF hereby appoints and retains SHM for management services relating to the Contract Medical Program and hereby grants to SHM the authority and responsibility, as specifically set forth herein, to manage certain aspects of the administrative, financial, billing and operational activities relating to the Contract Medical Program in all counties where BCHF operates a FQHC, currently or at any time during the term of this Agreement, or is otherwise authorized to provide medical services.

2     **DESIGNATED REPRESENTATIVE**

2.01     SHM will designate one or more representatives who will act as the primary point of contact for BCHF for matters related to this Agreement and who shall make themselves available to consult with the directors, officers and department heads of BCHF, at reasonable times upon request of BCHF, concerning all matters relating to this Agreement. BCHF will designate one or more representatives who will act as the primary point of contact for SHM for matters related to this Agreement and who will have the authority to provide instructions, clarifications or make decisions when so requested by SHM  Either Party may replace such representative with an individual of comparable qualification and experience by notifying the other Party in writing of such new appointment



EXHIBIT D
PAGE 208

3  **DUTIES AND SERVICES**

3.01  BCHF agrees and covenants:

3.01.1  To take actions as necessary to meet its obligations under any existing and/or future agreements with contract doctors and clinics or other professionals performing contract medical services for BCHF ("**Medical Services Agreements**" or singularly "**Medical Service Agreement**"). A form Medical Services Agreement is attached hereto as **Exhibit "C"** and by this reference made a part hereof.

3.01.2  BCHF shall maintain a Care Coordinator Specialist and Medical Director and shall notify SHM of the name and contact information for each position.

3.01.3  BCHF shall cooperate and timely provide SHM with all required information to allow SHM to timely fulfill all of its obligations under this Agreement. BCHF shall provide SHM full access to its Electronic Health Records ("EHR"). BCHF shall coordinate and cooperate with SHM in the interface of its EHR to SHM's systems including claims, scheduling, credentialing and education  BCHF shall cooperate with SHM in considering system upgrades and changes that more effective and economical result in the providing the services contemplated under this Agreement.

3 01 4  BCHF shall under the terms of this Agreement provide access to SHM to its sites and operating systems to assist SHM in integrating its systems with BCHF and to better provide the service contemplated under this Agreement

3.01.5  To better assist in the communication with doctors and clinics or other professionals performing contract medical services under the Medical Services Agreements, BCHF shall coordinate the SHM on the method and means of as to the flow of information and questions between BCHF and the contract medical providers.

3.01.6  BCHF shall timely and fully bill the appropriate payor for payment of all medical services performed by doctors under the Medical Services Agreements

3.01.7  BCHF shall be responsible for and shall timely pay all sums owing to doctors and clinics under any Medical Services Agreements providing SHM with a copy of all such payments.

3.01.8  To comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

3.01.9  To provide feedback on SHM's proposed contract medical services management plan and work diligently with SHM to determine mutually agreeable terms for any such management plan

3.01.10  To provide copies of all Medical Services Agreements between BCHF and contract medical service providers to SHM.

3.01.11  To be financially responsible for the following:

a  Pay all fees due and payable to contract doctors and clinics and other contract medical service providers for services provided under any Medical Services Agreements

b.  Cost of all insurance policies in the name of BCHF, as required by this agreement.

c.  All fees due SHM under the terms of this Agreement.

3.02  SHM agrees and covenants

3.02.1  To provide the managerial and other related services to BCHF as described in Exhibit "A", attached hereto and incorporated herein by reference, in furtherance of BCHF's Contract Medical Services Programs ("**Management Services**")  Said Management Services shall be provided in two phases as set forth in **Exhibit "A"**.



3 02 2   Comply with all guidelines, laws and regulations which govern transactions and security of electronic health records and other patient information.

## 4     COMPENSATION AND BILLING

4 01     Compensation   In consideration for services to be provided by SHM pursuant to this agreement as described in **Exhibit "A"** and as reasonably contemplated thereby, BCHF shall compensate SHM the sum of twenty-five dollars ($25.00) per visit processed in any given month, less returned claims for incompleteness, for participating patient visits to any contracted or sub-contracted doctors pursuant to any active Medical Services Agreement

For purposes of this section, a "patient visit" shall be a visit for which (i) SHM provides BCHF with a complete and clean claim, including all pertinent treatment and demographic information; and (ii) for which BCHF receives payment from the appropriate payor for the participating patient visit.

4.02     Billing   SHM shall bill BCHF monthly for its services and remit to BCHF a statement by the 10th of each month for visits processed for the preceding month less any returned visits as a credit against the total Payment of all monies due SHM for its fees shall be paid on or before the 20th calendar day of each month.

4 03     Review.   SHM, upon two (2) days written notice to BCHF, shall have the right to review, copy and audit if desired the billing and payment records relating to medical services under all Medical Services Agreements. This right to review, copy and audit if desired shall include access to all electronic and paper copies of (i) all bills generated related to medical services under any Medical Services Agreement; (ii) all payments or funds received relating to medical services under any Medical Services Agreement including but not limited to any payments or funds received from patients or doctors.

4 04     No Referral   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to provide payment or benefit of any kind (directly or indirectly), for the referral of patients to BCHF but compensation hereunder is for the Management Services provided hereunder

## 5     TERM AND TERMINATION

5 01     The term of this Agreement shall be for a period of five (5) years, commencing on the Effective Date   This Agreement shall automatically renew for succeeding terms of five (5) year terms unless either Party, at least one hundred eighty (180) days prior to the expiration of any term, gives written notice of its intention not to renew said Agreement.

5.02     This Agreement may be terminated by either Party upon thirty (30) days prior written notice for any of the following reasons:

a.     Institution by a Party of proceedings of any nature under any laws of the United States or of any state, whether now existing or subsequently enacted or amended, for the relief of debtors wherein such Party is seeking relief as a debtor,

b.     A general assignment by a Party for the benefit of creditors;

c     The institution by a Party, in the capacity of a debtor, of a proceeding in which such Party seeks relief from its indebtedness under any section or chapter of the Federal Bankruptcy Act as now existing or hereafter amended or becoming effective,

d     The institution against a Party, by one or more of its creditors, of a proceeding under any section or chapter of the Federal Bankruptcy Act as now existing or hereafter amended or becoming effective, which proceeding is not dismissed, stayed or discharged within a period of sixty (60) days after the filing thereof or if stayed, which stay is thereafter lifted without a contemporaneous discharge or dismissal of such proceeding;

e.      A proposed plan of arrangement or other action by a Party's creditors taken as a result of a general meeting of the creditors of such Party;

f.      The appointment of a receiver, trustee or like officer, to take possession of a Party's assets, which receivership remains undischarged for a period of thirty (30) days from the date of its imposition;

g.      The material breach of this Agreement by either Party, provided that such breach continues uncured for a period of thirty (30) days after written notice thereof has been given by one of the Parties to the other;

h       The issuance of a final order of any governmental agency or court which has competent jurisdiction over Parties hereto which order requires the termination of this Agreement

5.03    Notwithstanding the foregoing, BCHF shall be entitled to terminate this Agreement immediately, with or without notice, upon determination by the Health Resources and Services Administration ("**HRSA**") or any other federal or state agency with regulatory or advisory authority over BCHF that this Agreement violates any rule or program requirement pertaining to a FQHC provided the Agreement cannot be modified to correct the violation.

## 6.    ASSIGNMENT

6 01    Neither SHM nor BCHF may assign its rights or obligations under this agreement without the prior written consent of the other party

## 7     INDEPENDENT CONTRACTOR

7.01    The relationship between SHM and BCHF is that of independent contractors. Neither SHM nor BCHF is a member, partner, agent, representative, employee, employer, or joint venturer of the other. Each Party expressly denies any obligation to compensate the other's employees, contractors, or agents  As independent contractors, each Party shall be liable for that Party's own debt, obligations, acts and omissions. SHM is responsible for the payment of all withholding, social security and other taxes and benefits for SHM and SHM's agents or employees. SHM is responsible for filing all necessary tax returns on SHM's own behalf  SHM, its agents, employees and independent contractors shall not be eligible for any employee benefit plan offered by BCHF. BCHF is responsible for the payment of all withholding, social security and other taxes and benefits for BCHF and BCHF's agents or employees. BCHF is responsible for filing all necessary tax returns on BCHF's own behalf. BCHF, its agents, employees and independent contractors shall not be eligible for any employee benefit plan offered by SHM

## 8.    INDEMNITY

8.01    SHM shall defend, indemnify and hold BCHF, its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement  To the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of BCHF, its officers, agents, or employees, said indemnification attributable to SHM may be reduced proportionally, provided the negligent or intentional acts or omissions of BCHF, its officers, agents or employees rises to the level of a clear and convincing standard.

## 9     INSURANCE

9 01    Each Party, at its sole cost and expense, will obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, comprehensive general liability insurance covering the Party, its employees, agents, servants, and independent contractors, against loss in the nature of fire, theft, business interruption, general liability, and negligence, with a minimum liability limit of Two Million Dollars



($2,000,000) per occurrence and Two Million Dollars ($2,000,000) in the annual aggregate Each Party shall provide the other Party with written notice at least thirty (30) days prior to any cancellation or amendment of the Party's policy.

9.02    Each Party shall, at its sole cost and expense, obtain and maintain in full force and effect during the term of this Agreement, and all renewals and extensions thereof, workers' compensation insurance as required by the laws of the State of California

## 10    CONFIDENTIALITY AND INTELLECTUAL PROPERTY

10.01    The Parties acknowledge that during the term of this Agreement, the Parties will acquire or have access to information regarding the business operations of the other Party including, but not limited to, information regarding pricing, billing, claims, compensation, patient lists, provider lists, business operations, provider agreements, trade secrets and business and technical manuals ("**Confidential Information**"). The Parties acknowledge that the non-violating Party would suffer financial harm if such Confidential Information were to be disclosed to third Parties As a condition of this Agreement, the Parties agree not to disclose to, or otherwise discuss such Confidential Information with any third party without the express written consent of the other Party or as expressly required by law The provisions of this Section shall survive the termination of this Agreement.

10.02    The Parties acknowledges that each Party, in connection with its business, has developed certain operating manuals, symbols, trademarks, trade names, service marks, designs, patient lists, procedures, processes, and other copyrighted, patented, trademarked, or legally protectable information which is confidential and proprietary to the Party that constitute its trade secrets. The Parties shall not use any name, symbol, mark, or other proprietary information of the other Party except as expressly permitted.

10.03    SHM and its employees, agents and independent contractors shall safeguard the confidentiality of all medical information pertaining to patients of BCHF and shall comply with all federal and state laws and regulations and all BCHF rules or policies with respect to the use and disclosure of such information, including but not limited to the provisions of the Business Associate Agreement as set forth in **Exhibit "B"** of this Agreement, attached hereto and made a part hereof

10.04    During the course of this Agreement SHM as part of its business may collect, correlate, extract and compile data including but not limited to statistical data that does not constitute "Protected Health Information". SHM shall retain ownership of all such data and may use same as SHM determines in its sole business judgment.

10.05    SHM has and will develop software and other inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets (collectively "**Intellectual Property**") in its performance of its duties under this Agreement. Said Intellectual Property is and shall remain owned by SHM or one of its affiliated companies  No such Intellectual Property, whether or not patentable or registrable under copyright or similar laws shall be deemed "works made for hire," as that term is defined in the United States Copyright Act and BCHF shall not acquire nor claim any interest in any such Intellectual Property

## 11    MISCELLANEOUS

11.01    This Agreement shall be governed by and construed in accordance with the laws of the State of California  Any actions, arbitration or proceedings instituted by either Party with respect to any matters arising under or growing out of this Agreement shall be brought and tried only in the courts located in the San Diego County, and each of the Parties hereto expressly waives its rights under any applicable statute to cause any such action or proceeding to be brought or tried elsewhere

11 02    This Agreement supersedes any and all other agreements either oral or written or implied between the Parties  Each party acknowledges that no representation, inducements, policies or agreements have been made



by any party or anyone acting on behalf of any party which is not embodied herein and that no other agreements, statement or promise not contained in this contract shall be valid or binding on either party except as provided herein

11.03    Time is expressly of essence with respect to this Agreement.

11.04    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall not be effective until the execution and delivery between each of the parties of at least one set of counterparts. The parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original. Any one of such completely executed counterparts shall be sufficient proof of this Agreement.

11.05    No amendment or modification of the terms or conditions of this Agreement shall be valid unless in writing and signed by the parties hereto.

11.06    If any term or provision of this Agreement is determined to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid provisions or part thereof shall be stricken from this Agreement and such provision shall not affect the legality, enforceability, or validity of the remainder of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then this stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

11.07    The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any person

11.08    The recitals set forth at the beginning of this Agreement of any matters or facts shall be conclusive proof of the truthfulness thereof and the terms and conditions set forth in the recitals, if any, shall be deemed a part of the Agreement

11 09    Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement.

11.10    Any titles, captions or paragraphs contained in this Agreement are for convenience only and shall not be deemed part of the contents of this Agreement, and shall in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

11.11    The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto, their successors, assigns, and legal representatives, except that no Party may assign or transfer its rights or obligations under this Agreement in any manner other than as provided in this Agreement.

11.12    The rights and obligations of each Party to this Agreement shall inure solely to the benefit of the Parties hereto, and no persons or entity, including a doctor under a Medical Services Agreement, shall be a third party beneficiary of this Agreement.

11.13    A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

11.14    Any notice required or permitted by this Agreement shall be given in writing sent by overnight delivery, personal delivery or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid as follows·

MANAGEMENT SERVICES AGREEMENT<br>CONTRACT MEDICAL PROGRAM<br>BORREGO COMMUNITY HEALTH FOUNDATION<br>6



| If to BCHF. | Borrego Community Health Foundation |
|---|---|
| | P O Box 2369 |
| | Borrego Springs, CA  920004 |
| | Attn: Bruce Hebets |
| | Fax: (760) 767-5051 |
| | Email: bhebets@borregomedical.org |
| | |
| Copy of notices to: | Borrego Community Health Foundation |
| | P.O. Box 2369 |
| | Borrego Springs, CA  920004 |
| | Attn· Mikia Wallis, Chief Legal Officer |
| | Fax  (760) 767-6722 |
| | Email. mwallis@borregomedical org |
| | |
| If to SHM | Summit Healthcare Management, Inc. |
| | 124 Main Street, Suite 240 |
| | El Cajon, Ca 92020 |
| | Fax: (619) 444-8597 |
| | Attn   Daryl R Priest |
| | Email: darly@priesthomes.com |
| | |
| Copy of notices to | Fitch Law Firm, APC |
| | Stephen J Fitch, Esq |
| | 3465 Camino Del Rio South, Ste. 250 |
| | San Diego, CA 92108 |
| | Telephone No. (619) 282-8100 |
| | Email  steve@fitchlawfirm.com |

11.15.   In the event of default by a party in payment of any items owing to the other party, the defaulting party shall pay interest at the rate of two (2) points over the published prime rate of Bank of America or the maximum rate permitted by law, whichever is less, on each such obligation from the day it is due until received by non-defaulting party

11 16   ALTERNATIVE DISPUTE RESOLUTION.

11.16.1  Claims Subject to Judicial Reference, Selection of Referee   All Claims (defined below), including any and all questions of law or fact relating thereto, shall, at the written request of any party, be determined by Reference ("**Reference**") pursuant to Section 638 et, seq, of the California Code of Civil Procedure, as the same may be amended from time to time, except as set forth herein.

11.16.2  Referee.  The parties, by mutual written agreement, shall select a single neutral referee, who shall be a retired state or federal court judge or justice with substantial experience in the relevant matters to be determined  In the event that the parties cannot agree upon a referee within ten (10) days of a written request to do so by any party, then either party may file a lawsuit in the county in which the Property is located for purposes of appointment of a referee under California Code of Civil Procedure sections 638 and 640, as the same may be amended by any successor statutes thereto  A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.  The parties shall equally bear the fees and expenses of the referee unless the referee otherwise provides in the statement of decision

11 16.3  Time is of the Essence.  The parties agree that time is of the essence in conducting the Reference proceedings  Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (a) set the matter for a status and trial-setting conference within fifteen (15) days



after the date of selection of the referee, (b) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of said conference, and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision

11 16 4    Conduct of Reference   Except as provided in this Agreement, the Reference shall be conducted pursuant to Applicable State Law (defined below)   The referee shall determine all issues relating to the applicability, interpretation, legality and enforceability of this Agreement.   Except as expressly set forth in this Agreement, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript   The party making such a request shall have the obligation to arrange for and pay the court reporter   Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial   The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication.   The referee shall issue a decision pursuant to Section 644 of the California Code of Civil Procedure, as the same may be amended from time to time. The referee's decision shall be entered by the court as a judgment or an order in the same manner as if the action had been tried by the court   The final judgment or order from any appealable decision or order entered by the referee shall be fully appealable as provided by law.   The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a Reference proceeding under this provision.

11.16.5   Severability.   In the event that any provision of this Section 8 16 is found to be illegal or unenforceable, the remainder of this Agreement shall remain in full force and effect.   In the event that the enabling legislation which provides for the appointment of a referee is repealed and no successor statute is enacted, any dispute between the parties that otherwise would be determined by Reference shall be resolved and determined by binding arbitration in accordance with the California Arbitration Act, Sections 1280 through 1294 2 of the California Code of Civil Procedure, as the same may be amended from time to time   The provisions of this Agreement with respect to a Reference proceeding shall apply to any such arbitrator, who shall have the same qualifications as the referee and who shall be selected in the same manner as the referee stated herein.

11 16 6   Miscellaneous.   In the event that multiple Claims are asserted, some of which are found not subject to this Agreement, the parties agree to stay the proceedings of the Claims not subject to this Agreement until all other Claims are resolved in accordance with this Agreement   In the event that Claims are asserted against multiple parties, some of whom are not subject to this Agreement, the parties agree to sever the Claims subject to this Agreement and resolve them in accordance with this Agreement

11.16.7   Definitions.   As used in this Section 11.16 only.

"Applicable State Law" shall mean the laws of the State of California.

"Claim" shall mean any claim, cause of action, action, dispute or controversy between or among the parties, whether sounding in contract, tort or otherwise, which arises out of or relates to. (i) this Agreement or any document related to this Agreement, (ii) any negotiations or communications relating to any of this Agreement, whether or not incorporated into this Agreement or any indebtedness evidenced thereby; or (iii) any alleged agreements, promises, representations or transactions in connection therewith.  "Claim" shall exclude any claim, cause of action, dispute or controversy between or among the parties (a) any matter which is within the jurisdiction of a probate or small claims court, or (b) an action for bodily injury or wrongful death   The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction or other



provisional remedies, shall not constitute a waiver of the right to have all Claims determined by Reference under this provision

IN WITNESS WHEREOF, the undersigned have executed this Management Services Agreement effective as of the date first written above

**SHM:**

Summit Healthcare Management, Inc.
a California corporation

By _____

Daryl R. Priest, President

**BCHF:**

Borrego Community Health Foundation
a California non-profit public benefit corporation

By: _____

Name: BRUCE HEBETS

Its: CEO

EXHIBIT D
PAGE 216

**EXHIBIT A**
**SHM'S SCOPE OF SERVICES**

The purpose of this list of services is to identify and delineate services to be provided by SHM in furtherance of its duties under this agreement with BCHF.  SHM shall provide any and all necessary staff, office space, information systems, and support services set forth below and all services reasonably contemplated as necessary to perform any such services.

I.    CONTRACT DOCTOR MANAGEMENT
      a.  PROVIDER CONTRACTING
            i.   Market and negotiate new Medical Services Agreements between BCHF and new contract   doctors and clinics throughout the service area in which BCHF operates FQHCs. Currently, BCHF operates FQHCs in San Diego County
            ii   Amend current Medical Service Agreements at the direction of BCHF
            iii.  Maintain files containing current and historical Medical Service Agreements.
            iv.  Track renewal dates of Medical Service Agreements.

      b.  PROVIDER RELATIONS
            i.   Maintain database of contract doctors and service providers and contract doctor service provider demographics.
            ii.  Monitor contract doctor service providers' ability to speak additional languages
            iii.  Provide contract doctor service provider roster to contain Contract Provider and/or Sub-Contractor Provider Name, Office Name, Office Address, Tax Reporting Name, Tax Reporting Address, TIN, W-9 Effective Date, Contract Date and shall be provided within 48 hour request of BCHF staff as necessary
            iv   Assist with development and updates of contract doctor service provider manuals
            v.   Produce and distribute contract doctor service provider manuals
            vi.  Provide ongoing communication, education, and training to contract doctor service provider and their staffs regarding BCHF policies and procedures
            vii.  Provide ongoing communication, education, and training to contract doctor service provider and their staff regarding any changes in scope of services and fee schedules.
            viii.  Provide telephone line for contract doctor service provider inquiries
            ix.  Answer contract doctor service provider eligibility inquiries
            x.   Answer contract doctor service provider claims inquiries
            xi   Create and distribute administrative forms

II.   CLAIM MANAGEMENT

      a.  SHM shall obtain from contracted doctors such information relating to claims and submit the same to BCHF in a format that enables BCHF to bill for such claims  As part of this service and based on a receipt of information from BCHF, SHM shall monitor claims, billing and payment to doctors.

      b.  SHM will track visit, to receipt of superbill claim, to validation of eligibility and completeness of visit, to transfer to BCHF Billing Department for submission to Third Party Payor, to validation of invoice creation and payment with notation of check date and check number associated to each visit processed, with the ability to cross reference and provide documentation and reporting to provide proof of payment for each visit and that each visit is invoiced and paid only once, and potentially that each visit has been processed and paid by third party payor.

III.  MANAGEMENT INFORMATION SYSTEM

      a.  Provide a computerized management information system to process and store data pertaining to demographics of and services provided to Participating Patients;

    b.  Provide appropriate data security and, among other necessary functions:
        i  Restrict access to data security in compliance with applicable federal and state laws and regulations
        ii.  Restrict access to data of participating patients
        iii.  Restrict access to data by user and security classification
        iv.  Compliance with HIPAA and any other regulations concerning participating patient data
        v.  Provide physical security at all buildings that house data

    c.  Provide BCHF-maintained Web-based access to data for BCHF staff as determined appropriate, such as Billing and Finance staff, and contract medical providers and their staff for its hardware, Internet connectivity and web-browsing for the following, but not limited functions:
        i.  Claims inquiries, including payment status
        ii  Claims submission
        iii  Eligibility inquiries
        iv  Authorization inquiries
        v.  Authorization submission

    d  Help Desk and Support
        i.  Provide, maintain and support issues related to data access
        ii.  Maintain all servers and network connections for SHM systems
        iii  Provide and maintain all desktop systems/hardware at SHM operations center(s)
        iv.  Provide and maintain all software (including licensing and troubleshooting) at SHM operations center(s)
        v.  Provide training and support to BCHF staff and contract medical service users and their staff remotely
        vi.  Provide and maintain phone system for calls directed to SHM operations center(s)

    e.  Remote System Access
        i.  Provide remote access to management information system
        ii  Support remote access connectivity

IV        PARTICIPATING PATIENT MANAGEMENT

    a.  ELIGIBILITY VERIFICATION
        i.  Reconcile eligibility data to load into management information system
        ii.  Maintain participating patient eligibility database
        iii.  Identify each participating patient by using established identification number
        iv.  Assist with determination of participating patient eligibility for services prior to provision of services
        v.  Maintain and track eligibility of services for each participating patient
    b.  PARTICIPATING PATIENT SERVICES
        i.  Provide telephone line for participating patient inquiries
        ii.  Answer participating patient eligibility inquiries
        iii.  Answer participating patient claims inquiries
        iv.  Generate telephone tracking reports.

V.        GENERAL ADMINISTRATION

    a.  Monitor all components of BCHF's Contract Medical Program
    b.  Coordinate printing of all forms and letterhead (as needed) on BCHF stationery
    c  Process participating patient and contract medical service provider-related mail, both incoming and outgoing
    d.  Short and long-range financial and strategic planning in conjunction with BCHF staff and departments to include Finance department.

MANAGEMENT SERVICES AGREEMENT
EXHIBIT "A"
11



e    Contract medical service provider and regulatory agency/agencies relationship management

VI.    CREDENTIALING

SHM shall assist BCHF in the collection, organization, and tracking of documents necessary for verifying credentials of health care practitioners and definition of their privileges as required for increased patient safety, reduction of medical errors and the provision of high quality health care services. Services shall be performed to the standards set forth in BPHC Policy Information Notice 2001-16.



## EXHIBIT B

## BUSINESS ASSOCIATE AGREEMENT

In order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164 relating to the privacy and security of Protected Health Information, and notwithstanding any contrary provisions of the underlying agreement, the Parties agree to the following:

### A   DEFINITIONS

**"Designated Record Set"** shall mean a group of records maintained by or for BCHF that is (i) the medical records and billing records about individuals maintained by or for BCHF, (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for BCHF to make decisions about individuals. As used herein the term "Record" means any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for BCHF.

**"Electronic Transaction Rule"** shall mean the standards for processing standard transactions and code sets at 45 C.F.R Parts 160 and 162.

**"Privacy Standards"** shall mean the Standard for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164.

**"Protected Health Information"** shall mean any information, whether oral or recorded in any form or medium: (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164

**"Secretary"** shall mean the Secretary of the Department of Health and Human Services.

**"Security Rule"** shall mean the security standards for the protection of electronic Protected Health Information at 45 C F R Parts 160 and 164.

### B.   OBLIGATIONS OF SHM

1.   Use of Protected Health Information   SHM shall not use Protected Health Information received from BCHF in any manner that would constitute a violation of the Privacy Standards if used by BCHF, except that SHM may use Protected Health Information (i) as permitted or required pursuant to the Agreement between BCHF and SHM, (ii) for SHM's proper management and administrative services, (iii) to carry out the legal responsibilities of SHM, or (iv) as required by law. As between SHM and BCHF, BCHF is the owner of all Protected Health Information

2.   Disclosure of Protected Health Information.   SHM shall not disclose Protected Health Information received from BCHF that would constitute a violation of the Privacy Standards if disclosed by BCHF, except that SHM may disclose Protected Health Information (i) in a manner permitted pursuant to this Agreement, (ii) for SHM's proper management and administrative services, or (iii) as required by law. To the extent SHM discloses Protected Health Information to a third party as permitted in accordance with this Agreement, SHM must obtain, prior to making any such disclosure, (a) reasonable assurances from such third party that such Protected Health Information will be held confidential as provided pursuant to this Agreement and only used or disclosed as required by law or for the lawful purposes for which it was disclosed to such third party, and (b) an agreement from such



third party to immediately notify SHM of any breaches of the confidentiality of the Protected Health Information, to the extent it has obtained knowledge of such breach  Notwithstanding the foregoing, SHM shall refer all requests for Protected Health Information pursuant to subpoena or any other discovery request or judicial or administrative order mandating disclosure to BCHF within two (2) business days of receipt. It shall be BCHF's responsibility to make all determinations regarding compliance with any such mandated disclosure.

3.      Accounting of Disclosures. SHM agrees to document disclosures of Protected Health Information and information related to such disclosures as would be required for BCHF to respond to a request by an individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR § 164 528

4.      Safeguards Against Misuse of Information  SHM agrees that it will implement appropriate safeguards to prevent the use or disclosure of Protected Health Information other than pursuant to the terms and conditions of this Agreement. SHM further agrees to implement administrative, physical and technical safeguards consistent with the requirements of the Security Rule that reasonably and appropriately protect the confidentiality, integrity and availability of electronic Protected Health Information that it creates, receives, maintains or transmits on behalf of BCHF.

5       Reporting of Disclosures of Protected Health Information. SHM shall within five (5) days of becoming aware of a disclosure of Protected Health Information in violation of this Agreement by SHM, its officers, directors, employees, contractors, or agents or by a third party to which SHM disclosed Protected Health Information pursuant to Section 2 of this Exhibit, report any such disclosure to BCHF.  SHM further agrees to report to BCHF any security incident of which it becomes aware as required by the Security Rule.

6       Mitigation. SHM agrees to mitigate, to the extent practicable, any harmful effect that is known to SHM of a use or disclosure of Protected Health Information by SHM in violation of the requirements of this Agreement

7       Agreements by Third Parties. SHM shall enter into an agreement with any agent or subcontractor that will have access to Protected Health Information that is received from, or created or received by SHM on behalf of BCHF pursuant to which such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to SHM pursuant to this Agreement with respect to such Protected Health Information.

8.      Access to Information. Within five (5) days of a request by BCHF for access to Protected Health Information about an individual contained in a Designated Record Set, SHM shall make available to BCHF such Protected Health Information for so long as such information is maintained in the Designated Record Set  In the event any individual requests access to Protected Health Information directly from SHM, SHM shall within two (2) business days forward such request to BCHF. It shall be BCHF's responsibility to make all determinations regarding granting or denying any such access requested

9.      Availability of Protected Health Information for Amendment  Within ten (10) days of receipt of a request from BCHF for the amendment of an individual's Protected Health Information or a record regarding an individual contained in a Designated Record Set (for so long as the Protected Health Information is maintained in the Designated Record Set), SHM shall provide such information to BCHF for amendment and incorporate any such amendments in the Protected Health Information as required by 45 C.F.R. § 164.526. In the event the request for an amendment is delivered directly to SHM, SHM shall within two (2) business days forward such request to BCHF. It shall be BCHF's responsibility to make any determinations regarding granting or denying any such amendment requested.

10      Requests for Accounting of Disclosures. Within ten (10) days of notice by BCHF to SHM that it has received a request for an accounting of disclosures of Protected Health Information regarding an individual during the six (6) years prior to the date on which the accounting was requested, SHM shall make available to BCHF such information as is in SHM's possession and is required for BCHF to make the accounting required by 45 C.F.R. § 164 528  At a minimum, SHM shall provide BCHF with the following information: (i) the date of the disclosure, (ii) the name of the entity or person who received the Protected Health Information, and if known, the address of such entity or person, (iii) a brief description of the Protected Health Information disclosed, and (iv) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure  In the



event the request for an accounting is delivered directly to SHM, SHM shall within two (2) business days forward such request to BCHF It shall be BCHF's responsibility to prepare and deliver any such accounting requested by an individual, subject to SHM's obligations set forth in this Section. SHM hereby agrees to implement an appropriate recordkeeping process to enable it to comply with the requirements of this Section.

11      Electronic Transactions. If SHM conducts any Standard Transaction for or on behalf of BCHF, SHM shall comply with the requirements under the Electronic Transaction Rule

12      Availability of Books and Records. SHM hereby agrees to make its internal practices, books and records, including policies and procedures, relating to the use and disclosure of Protected Health Information received from, or created or received by SHM on behalf of BCHF available to BCHF or to the Secretary for purposes of the Secretary determining the BCHF's and SHM's compliance with the Privacy Standards

## C.      TERMINATION OF AGREEMENT WITH SHM

1.      Termination Upon Breach of Provision to Protected Health Information  Any other provision of this Agreement notwithstanding, this Agreement may be terminated by BCHF upon thirty (30) days written notice to SHM in the event that SHM breaches any provision contained in this Agreement and such breach is not cured within such thirty (30) day period; provided, however, that in the event that termination of this Agreement is not feasible in BCHF's sole discretion, SHM hereby acknowledges that BCHF shall have the right to report the breach to the Secretary In addition, BCHF retains the right to seek injunction and other legal and equitable rights and remedies available under the law as necessary to prevent unauthorized use and disclosure of Protected Health Information.

2      Return or Destruction of Protected Health Information upon Termination. Upon termination of the Agreement, SHM shall either return or destroy all Protected Health Information received from BCHF or created or received by SHM on behalf of BCHF and which SHM or any subcontractor still maintains in any form  SHM shall notify BCHF of any such destruction. SHM shall not retain any copies of such Protected Health Information  In the event that BCHF and SHM mutually agree that it is not feasible to return or destroy such Protected Health Information, the terms and provisions of Article B shall survive termination of this Agreement and such Protected Health Information shall be used and disclosed solely for such purpose or purposes, which prevented the return or destruction of such Protected Health Information



**EXHIBIT C**

**TEMPLATE OF MEDICAL SERVICES AGREEMENT**

# EXHIBIT E

**AGREEMENT BETWEEN
HUSAM E. ALDAIRI, DDS
AND
BORREGO COMMUNITY HEALTH FOUNDATION
FOR
DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 27, 2016 between Borrego Community Health Foundation ("BCHF") and Husam E. Aldairi, DDS. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon located at: 133 Main Street, El Cajon, CA 92020. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the San Diego, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to received dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II. **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III. **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV. **PROFESSIONAL SERVICES**

A. **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B. **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.  PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.  AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.  SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.  NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's  ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.  QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.  QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility

and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.    POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.    PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.    AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2.  Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3.  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4.  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.    NOTIFICATION.  "Dentist"** shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of

any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B.  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF."

C.  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k ) (3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

A.  **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.  **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.  **TIMING OF PAYMENT.**  Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B. VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C. REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D. REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E. REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

## X.   LEGAL

**A. LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW.  "Dentist"** will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".   Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENDIALITY

**A.** Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

**A.** **TERM.** This Agreement begins on May 27, 2016 and  shall be automatically and
**B.**   Successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**C.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**D.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**E.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**F.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**G.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

EXHIBIT E

PAGE 235

otherwise agreed.

**E.**   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.**   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.**   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.**   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

**Bruce Hebets, CEO**                              **Dr. Husam E.  Aldairi, DDS.**

Borrego Community Health Foundation

Date: _____ 6-10-16 _____              Date: _____ 6/6/16. _____

Address:  PO Box 2369                        Address: 6175 El Cajon Blvd,
               Borrego Springs, CA 92004                    San Diego, CA 92115

Phone: (619) 444-5704                        Phone: 619-583-4030

Contact: Travis Lyon                          Contact: Rawaa, Office Manager

E-mail: cdtlyon@borregomedical.org           E-mail:  4030dental@gmail.com

EXHIBIT E
PAGE 236

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients
will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root
canals are subject to prior review and authorization by the Dental Director.  If the service is not
within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private
patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

Dr. Husam E. Aldairi, DDS
40-30 Dental
6175 El Cajon Blvd
San Diego, CA 92215

**PHONE:** 619-583-4030
**Fax:**

**During the hours of:**

| | |
|---|---|
| **Monday---** | **10-8** |
| **Tuesday** | **10-8** |
| **Wednesday—** | **10-8** |
| **Thursday** | **10-8** |
| **Friday** | **10-8** |
| **Saturday** | |

**Tax ID**

**NPI number Entity type Code   1053301291**

**NPI number Entity type Code**

## CONFIDENTIALITY OF STUDENT INFORMATION / PROTECTED HEALTH INFORMATION (PHI)

### HIPAA BUSINESS ASSOCIATE ADDENDUM

This Agreement is made effective the 27th day of May, 2016 by and between, Borrego Health, hereinafter referred to as "Covered Entity", and Husam E. Aldairi, DDS. Hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

### RECITALS:

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 27, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

A.  Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

EXHIBIT E
PAGE 241

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. Specific definitions:

    1.    Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Dr. Husam E. Aldairi, DDS.

            Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    2.    HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    3.    Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    4.    Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    CONFIDENTIALITY AND SECURITY REQUIREMENTS

A. Business Associate agrees:

    1.    Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.    To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4.  In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5.  To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6.  To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7.  To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8.  To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9.  To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B.  Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1.  As necessary to perform the services set forth in the underlying Service Agreement; and/or

2.  As required by law.

3.  Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

   A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

   A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

   B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

   C.   Obligations of Business  Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

   D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

   A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.  <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.  <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.  <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                    **BUSINESS ASSOCIATE:**

By:_____          By:_____
   **Bruce Hebets, CEO**                   **Dr. Husam E. Aldairi, DDS**

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets, CEO
Borrego Community Health Foundation

Husam E. Aldairi, DDS

6-10-16
Date

6 6 16
Date

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740, D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751, D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740, D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

**Addendum "F"**

DENTAL SERVICES SLIDING FEE SCALE SUMMARY OF BENEFITS

Eligibility:
The application process and eligibility requirements are the same as for all other services. The levels of poverty are also the same as published by the Federal Government every year and implemented by April 1st. The poverty level is calculated using the established guidelines for family size and income.

All of the requirements of non-discrimination apply to the Dental Services Sliding Fee Scale. Patients with family income at or below 100% of Federal Poverty Level (FPL) pay a nominal fee of $50 per visit. If the family size and income is between 101% and 200%, the charges are based on the percent discount approved for each level of eligibility.

Benefits:
This is a limited benefit program that provides discounted rates for services rendered within Borrego Health Dental Services sites only. It does not extend to services rendered by specialists to whom Borrego Health dentists may need to refer patients for additional care from time to time. The scope of benefits is limited to the scope outlined in Section 5 of the Denti-Cal Handbook.

Adults and children with commercial insurance may apply for the sliding fee to assist with the cost of co-payments and deductibles. The percentage allowed per level of eligibility is deducted from the
balance owed by the patient. For patients with family income at or below 100% and the deductible or the co-payment is less than the nominal fee of $50, the less of the two will be collected.

Adults and children eligible determined eligible for Share of Cost (SOC), they may apply for the sliding fee. The first visit will include treatment planning to determine their eligibility for full scope Medi-Cal. Policies and procedures for managing SOC will be followed prior to initiating treatment.

The program includes:
- Exams and x-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (limited to scope of General Dentistry)
- Root Canals (limited to scope of General Dentistry)
- Crowns (limited to non-precious metal)
- Dentures (Co-payment of $150)
- Bridges (Co-payment of 50% of cost)
- Crowns (noble metals excluded)

Exclusions:
- Referrals to any specialists including but not limited to:
  - Oral surgeons
  - Endodontists
  - Periodontists
  - Orthodontists
  - Pedodontists
- Teeth whitening
- Orthotics not listed above
- Orthodontics
- Nobel metal crowns

EXHIBIT E

PAGE 250

- Cosmetic procedures
- Mouth guards

Dental Sliding Fee Discount
2016

| Sliding Fee | A | B | C | D | E |
|---|---|---|---|---|---|
| | | | | | |
| Level of Poverty | 0-100% | 101-125% | 126-150% | 151-175% | 176 -200% |
| Maximum Discount | $50 | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

6-10-16

Date

Husam E. Aldairi, DDS

6 6 16

Date

## Addendum "G"

## HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development. Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers. Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification. A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained. PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system. This monthly fee will only be assessed once the online storage system is implemented. Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract. All other terms and conditions remain the same.

SIGNATURES:

Bruce Hebets, CEO
Borrego Community Health Foundation

Husam E. Aldairi, DDS,

Date   6-10-16

Date   6/6/16

# EXHIBIT F

# AGREEMENT BETWEEN
## ALDAIRI DDS INC
### AND
## BORREGO COMMUNITY HEALTH FOUNDATION
### FOR
### DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aldairi DDS Inc. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the El Cajon area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

    A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

    B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

II. **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III. **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV. **PROFESSIONAL SERVICES**

A. **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B. **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.  **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.  **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.  **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.  **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.  **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.   NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A. FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B. ENCOUNTER SUBMISSION.** Dentist will complete a superbill every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C. TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A. AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES. "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.  As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.    VERIFICATION OF PATIENT STATUS.**  "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.    REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.**  The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.    REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.    REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.    LEGAL**

**A.    LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW. "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.  To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A. PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.  PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this  Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

**A.** Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.** **TERM.**  This Agreement begins on May 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.**   **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.**   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

**XV.**   **GENERAL PROVISIONS**

**A.**   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.**   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.**   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.**   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

otherwise agreed.

**E. NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F. DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G. CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H. ENTIRE AGREEMENT.** This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: _____ 5 . 31 . 2018 _____

Address: PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: tlyon@borregohealth.org

Aldairi DDS Inc

Date: _____ 5/31/18 _____

Address:      1166 E. Main St.
                    El Cajon, Ca.   92021

Phone:    (619) 478-4030

Contact: Ahmed Alobaidi

E-mail: HusamAldairi@borregomedical.onmicrosoft.com

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, | 1 or more | Per quadrant | $120 per visit |

| | D2160, D2161 | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open | $365 global |

| | | | & Med and Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Aldairi DDS Inc.

40/30 Dental 2
1166 East Main Street
El Cajon, Ca.    92021

---

Phone: (619) 478-4030

During the hours of:

| Monday, | Tuesday, | Wednesday, | Thursday, | Friday, |
|---------|----------|------------|-----------|---------|
| 9-6pm   | 9-6      | 9-6        | 9-6       | 9-6     |

---

NPI Number - Organization _____

NPI Number- Individual        1053301291

Copies attached

EXHIBIT F
PAGE 270

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the _____ day of May, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aldairi DDS Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.  Catch-all definition:
       The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

1.  Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aldairi DDS Inc.

2.  Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:
1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   <u>AVAILABILITY OF PHI</u>

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   <u>TERM/TERMINATION</u>

A.   <u>Term.</u> The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   <u>Termination.</u> Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   <u>Obligations of Business Associate Upon Termination.</u> Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   <u>Survival</u>.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   <u>MISCELLANEOUS</u>

A.   <u>Third Parties; Survival.</u> Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. **Amendment; Independent Parties.** This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. **Minimum Requirements.** The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_5 · 31 · 2018_____
Date

**BUSINESS ASSOCIATE:**

_____
Aldairi DDS Inc.

_5/31/18_____
Date

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Aldairi DDS Inc.

_____5 · 31 · 2018_____
Date

_____5/31/18_____
Date

EXHIBIT F
PAGE 277

Addendum "E"
## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - | D3320 | 2 or more | Excludes final | $365 global |

| Bicuspid | | | restoration. Open & Med and Finished RCT included in global fee. | |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration. Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |
| Dentures (Includes | D5110, D5120 | 6 or more | Maxillary and | $635 each |

| first 2 adjustments) | | | Mandibular | denture – global |
|---|---|---|---|---|
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

5 · 31 · 2018

Date

Aldairi DDS Inc.

5 · 31 · 18

Date

# EXHIBIT G

## AGREEMENT BETWEEN
## HAWATMEH DENTAL GROUP P.C.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of October _____, 2017 between Borrego Community Health Foundation ("BCHF") and Hawatmeh Dental Group P.C. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the Corona, Ontario and Rancho Cucamonga area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.  **DEFINITIONS**

A.  **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.  **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.  **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

timely manner.

**B.**   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.**   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.**   **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

   1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

   2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

   3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

   4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.**   **NOTIFICATION.**  "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.**   **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

EXHIBIT G

PAGE 288

B.  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

VII.   **CONTRACTS WITH OTHERS**

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

VIII.   **COMPENSATION**

A.  **FEE SCHEDULE.**  "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.  **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.  **TIMING OF PAYMENT.**  Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

IX.   **CASE MANAGEMENT**

A.  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.  As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B.   **VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C.   **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D.   **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E.   **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.   **LEGAL**

A.   **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.    **RECORD KEEPING AND REPORTING**

A.  **PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B.  **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C.  **PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D.  **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E.  **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.** "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.** It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A.   Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on October ____18____, 2017 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B. TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C. TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D. TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E. IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F. SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A. AMENDMENT/MODIFICATION.** This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B. ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C. EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D. EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

EXHIBIT G
PAGE 295

otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO                                    Hawatmeh Dental Group P.C.
Borrego Community Health Foundation

Date: _____10/20/2017_____              Date: _____Oct 18/2017_____

Address: PO Box 2369                             Address:  1185 Magnolia Ave. #K, #L
Borrego Springs, CA 92004                                    Corona, Ca.   92879

Phone: (619) 444-5704                            Phone:   Dr. Hawatmeh / Teresa (Mgr.)

Contact: Travis Lyon                               Contact: (951) 898-9223 / (951)790-9975

E-mail: tlyon@borregohealth.org             E-mail:  bravodentalcorona@hotmail.com

EXHIBIT G
PAGE 296

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

735

**Addendum "C"**
**Location of Service**

All dental services under this agreement will be rendered at the following 3 locations:

**Location #1 – Hawatmeh Dental Group P.C.**
                    Bravo Dental Group of Corona
Address:       1185 Magnolia Avenue, #K & #L
                    Corona, Ca.   92879
Phone:        (951) 898-9223

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-3:00pm | Closed | Closed |

NPI Number - Organization        1649704347

NPI Number- Individual      1043515653

**Location #2 – ~~Hawatmeh Dental Group P.C.~~**        *AYED Hawatmeh D.D.S Inc*
Address:      White Smile Dental      *D . B . A*
                   3495 East Concours Street, Suite A
                   Ontario, Ca.   91764
Phone:        (909) 483-1379

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-2:00pm | Closed | Closed |

NPI Number - Organization        1831613645

NPI Number- Individual      1043515653

**Location #3 – ~~Hawatmeh Dental Group P.C.~~**        *AYED Hawatmeh D.D.S*
Address:   ~~Rancho Family Dentistry~~                                    *In.*
*D.B.A* 8977 East Foothill Blvd. Suite E - F
             Rancho Cucamonga, Ca.   92879
Phone:        (909) 581-0244

During the hours of:

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-6:00pm | 9:00-3:30pm | Closed | Closed |

NPI Number - Organization      1831613645

NPI Number- Individual      1043515653

Copies attached

EXHIBIT G
PAGE 300

## CONFIDENTIALITY OF STUDENT INFORMATION /
## PROTECTED HEALTH INFORMATION (PHI)

## HIPAA BUSINESS ASSOCIATE ADDENDUM

This Agreement is made effective the _i K_ day of October, 2017 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Hawatmeh Dental Group P.C. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

### RECITALS:

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated October _i_, 2017 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.  Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

1.  Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Hawatmeh Dental Group P.C.

2.  Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:
1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

EXHIBIT G

PAGE 302

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

    A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

    A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

    B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

    C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

    D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

    A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____10/20/2017_____
Date

**BUSINESS ASSOCIATE:**

_____
Hawatmeh Dental Group P.C.

_____Oct 18/2017_____
Date

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

**SCOPE OF BENEFITS**

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

**EMERGENCY COVERAGE**

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

**SLIDING FEE**

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Hawatmeh Dental Group P.C.

_____10 / 20 / 2017_____
Date

_____Oct 18/17_____
Date

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
|  |  |  |  |  |
|  |  |  |  |  |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

Date   10/20/2017

Hawatmeh Dental Group P.C.

Date   Oct 18/2017

# EXHIBIT H

### AGREEMENT BETWEEN
### ALBORZ MEHDIZADEH, INC.
### AND
### BORREGO COMMUNITY HEALTH
### FOUNDATION FOR DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of Sept. 28th  2016 between Borrego Community Health Foundation ("BCHF") and  ALBORZ MEHDIZADEH, INC.  ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Bernardino, Riverside and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in Victorville , area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

    A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

    B.   **SCOPE OF SERVICES.** Those services approved by the Health Resource and

EXHIBIT H
PAGE 313

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

**II.   ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.   INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.   PROFESSIONAL SERVICES**

**A.   COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.   SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.   PRIOR AUTHORIZATION.**  For dental services needing individual consideration

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval.  This does not apply to treatment paid directly by Denti-Cal.

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.   QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.      POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.      PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.      AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1.  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2.  Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3.  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4.  The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.      NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.      NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**      It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

**VII.   CONTRACTS WITH OTHERS**

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

**VIII.   COMPENSATION**

**A.** **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.** **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.** **TIMING OF PAYMENT.** Payment will be made on claims that are paid to "BCHF" by third party payors. The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement. Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

**IX.   CASE MANAGEMENT**

**A.** **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B.   **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C.   **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D.   **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E.   **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.   **LEGAL**

A.   **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F.R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII. CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

A. **TERM.** This Agreement begins on __Sept. 28th__, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to

the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 10/7/2016

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

_____   ALBORZ MEHDIZADEH, INC.   _____

*A. Mehdizadeh*
A. Mehdizadeh (Sep 29, 2016)

Date: 09/28/2016

Address: 15080 7th Street Suite #7    Victorv

 2nd Location: 286 N. San Jacinto St   Heme

Phone: (818)913-8097

Contact: Dr. Alborz Mehdizadeh

E-mail almediza@gmail.com

EXHIBIT H
PAGE 324

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

DBA VICTORVILLE DENTAL OFFICE OF ALBORZ MEHDIZADEH, INC.

Address 15080 7th Street Suite #7    Victorville, CA 92395

2nd Location: 286 N. San Jacinto St   Hemet, CA 92395

Phone: (818)913-8097

During the hours of:

Victorville, CA = Monday - Tuesday - Thursday - Friday: 10AM - 7PM    Wed/Sat/Sun: Closed

Hemet, CA = Monday & Wednesday & Friday 11AM - 7PM    Saturday 10AM-5PM

NPI Number - Organization 1427437516

NPI Number- Individual 1184058984

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the <u>Sept. 28th</u>, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and <u>ALBORZ MEHDIZADEH, INC.</u> hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated <u>Sept. 28th</u>, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   <u>DEFINITIONS</u>

   A.   <u>Catch-all definition</u>:
   The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.   <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean <u>ALBORZ MEHDIZADEH, INC.</u>

    2.   <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.   <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.   <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.   <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

EXHIBIT H
PAGE 331

policies and procedures.

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.     AVAILABILITY OF PHI

    A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.     TERM/TERMINATION

    A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

    B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

    C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

    D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.      MISCELLANEOUS

    A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.  <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.  <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.  <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

COVERED ENTITY:

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____10/7/2016_____
Date

BUSINESS ASSOCIATE:

_A.Mehdizadeh_____
A.Mehdizadeh (Sep 29, 2016)
Dentist
ALBORZ MEHDIZADEH, INC.

_____09/28/2016_____
Date

EXHIBIT H
PAGE 334

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_10/7/2016_____
Date

_____
*A.Mehdizadeh (Sep 29, 2016)*
Dentist
ALBORZ MEHDIZADEH, INC.

_09/28/2016_____
Date

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150,  D0120 D0210,  D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150,  D0120 D0210,  D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140,  D7210 D2140,  D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140,  D2150, D2160,  D2161 D2330,  D2331, D2332,  D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750,  D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

### DENTAL SLIDING FEE SCALE
### SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

10/7/2016
Date

A.Mehdizadeh (Sep 29, 2016)
Dentist
ALBORZ MEHDIZADEH, INC.

09/28/2016
Date

EXHIBIT H
PAGE 339

## Addendum "G"

### HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law.   Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development.  Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers.   Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification.  A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained.   PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system.  This monthly fee will only be assessed once the online storage system is implemented.  Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract.  All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Date   10/7/2016

_____
A.Mehdizadeh (Sep 29, 2016)
Dentist
ALBORZ MEHDIZADEH, INC.

_____
09/28/2016
Date

# EXHIBIT I

EXHIBIT I
PAGE 341

## AGREEMENT BETWEEN
## Long Beach Care Dental Inc.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of December 11, 2018 between Borrego Community Health Foundation ("BCHF") and Long Beach Care Dental Inc. ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Long Beach, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.  **DEFINITIONS**

A.  **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.  **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT I
PAGE 342

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.  **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

EXHIBIT I
PAGE 343

services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.** **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.** **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.** **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.** **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.** **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.    "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.** **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

3

EXHIBIT I
PAGE 344

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

4

EXHIBIT I
PAGE 345

(2) years following termination, however such termination is affected.

**C.**  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

EXHIBIT I

PAGE 346

**B. VERIFICATION OF PATIENT STATUS.**    "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C. REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D. REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E. REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A. LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

EXHIBIT I
PAGE 347

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW. "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.  To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.  RECORD KEEPING AND REPORTING**

**A.  PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

7

EXHIBIT I
PAGE 348

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.  PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

8

EXHIBIT I
PAGE 349

XII.   **INSURANCE**

A. **PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

EXHIBIT I
PAGE 350

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A.   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on December 11, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

10

EXHIBIT I
PAGE 351

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.   **IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A.   **AMENDMENT/MODIFICATION.**   This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.   Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**   This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**   A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**   Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**   Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

11

EXHIBIT I
PAGE 352

B. **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D. **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E. **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F. **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

Long Beach Care Dental Inc.

_____

Date: 12/19/2018

Date: 12-18-18

PO Box 2369
Borrego Springs, CA 92004

Address:2800 Pacific Ave. Suite B
Long Beach, CA 90806

12

EXHIBIT I
PAGE 353

Phone: (619) 444-5704

Phone:   562-989-3030

Contact: Dr. Mehdizadeh

E-mail: almediza@gmail.com

13

EXHIBIT I
PAGE 354

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

EXHIBIT I
PAGE 355

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

EXHIBIT I
PAGE 356

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

15

EXHIBIT I
PAGE 357

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

EXHIBIT I
PAGE 358

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Long Beach Care Dental Inc.

Address

2800 Pacific Ave, Suite B, Long Beach, CA 90806

Phone:  562-989-3030

During the hours of:

Monday, Tuesday, Wednesday, Thursday, Friday, Saturday
~~Closed~~   10-6       Closed       10-6   10-6:30   9-3

10 - 6

NPI Number - Organization 1265981369

NPI Number- Individual 1184058984 - Mehdizadeh

Copies attached

19

EXHIBIT I
PAGE 359

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 11th day of December, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Long Beach Care Dental Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated December 11, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

   A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

EXHIBIT I
PAGE 360

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.   <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Long Beach Care Dental Inc..

    2.   <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.   <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.   <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.   <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

19

EXHIBIT I
PAGE 361

breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

20

EXHIBIT I
PAGE 362

4.   Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.   Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.   Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.   Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.   Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.   Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.   The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.   Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

EXHIBIT I
PAGE 363

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

22

EXHIBIT I
PAGE 364

V.    MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.   Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.   Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.   Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Mikia Wallis, CEO

**BUSINESS ASSOCIATE:**

_____
Long Beach Care Dental Inc.

25

EXHIBIT I
PAGE 365

Borrego Community Health Foundation

12/19/2018
Date

12-18-18
Date

EXHIBIT I
PAGE 366

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Long Beach Care Dental Inc.

12/19/2018
_____
Date
27

12-18-18
_____
Date

EXHIBIT I
PAGE 367

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT I
PAGE 368

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
|  |  |  |  |  |

26

EXHIBIT I
PAGE 369

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

27

EXHIBIT I
PAGE 370

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT I
PAGE 371

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

EXHIBIT I
PAGE 372

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Long Beach Care Dental Inc.

12/19/2018
_____
Date

12-18-18
_____
Date

33

EXHIBIT I
PAGE 373

# EXHIBIT J

## AGREEMENT BETWEEN
## MAGALY M. VELASQUEZ DDS,
## PROFESSIONAL DENTAL CORP.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 5, 2014  between Borrego Community Health Foundation ("BCHF") and Magaly M. Velasquez DDS, Professional Dental Corp   ("Dentist"), collectively the "Parties"

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Cathedral City located at  69175 Ramon Rd  Cathedral City CA 92234 The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC

**WHEREAS,**  "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement   The "Dentist" provides the desired scope of services that meet the FQHC criteria, and

**WHEREAS**, "Dentist" operates and administers a private practice in the Rancho Cucamonga City area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients  (Refer to Addendum "C" for dental office address and contact information )

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows

I.   **DEFINITIONS**

    A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

    B.   **SCOPE** OF SERVICES.  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II.   ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III.   INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV.   PROFESSIONAL SERVICES

A.   **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

B.   **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**  For dental services needing individual consideration

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service. In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.  **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt

F.  **SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C F R §51c 303(f).  "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.  **NON-DISCRIMINATION.** "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.  **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.  **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.  Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.  Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

EXHIBIT J
PAGE 377

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following.

  1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

  2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

  3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

  4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E. NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI. NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

B.  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.  COMPENSATION

A.  **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.  **ENCOUNTER SUBMISSION.** Dentist will complete a superbill every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.  **TIMING OF PAYMENT.**  Payment will be made on claims that are paid to "BCHF" by third party payors   The payment will be processed and made three weeks from the date of receipt by BCHF the "Dentist" with a detailed explanation of reimbursement Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B. VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C. REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D. REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E. REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X. LEGAL**

**A. LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D. COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1   To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C. PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State

laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.** The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate, and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.   Workers' Compensation, as required under California State law

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees  Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements  Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students

## XIII. CONFIDENDIALITY

A. Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware  The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

A. **TERM.**  This Agreement begins on November 5, 2014 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other

sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B. **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C. **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D. **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E. **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A. **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B. **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D. **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed

E.  **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.  **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.  **CHOICE OF LAW.**  This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.  **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter  No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date._____ 11-14-14

Address: 4343 Yaqui Pass Road

Borrego Springs, CA 92004

Phone: 760-767-5051

Contact. Cynthia Preciado

E-mail cpreciado@borregomedical.org

Magaly Velasquez, DDS

Date·_____ 11 - 5 - 14

Address:  9130 Foothill Blvd.

Rancho Cucamonga, CA 91730

Phone 909-466-4999

Contact: _Martha_____

E-mail:_____

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

9130 Foothill Blvd

Rancho Cucamonga, CA 91730

Phone.  909-466-4999

During the hours of:

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This HIPAA Business Associate Addendum ("Addendum") supplements and is made a part of the agreement ("Agreement") be and between Borrego Community Health Foun dation, ("BCHF") and Magaly M Velasquez, DDS,Professional Dental Corp (" Dentist" and Business Associate") and is effective as of the date of the original agreement (the "Addendum Effective Date")

RECITALS

WHEREAS, "BCHF", pursuant to the terms of the Agreement, wishes to disclose to Business Associate certain information, some of which may constitute Protected Health Information ("PHI") for the purpose of providing Dental Services to Participating Patients, and

WHEREAS, PHI means any information, whether oral or recorded in any form or medium (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164, and

WHEREAS, Business Associate is an individual or entity which provides services, arranges, performs or assists in the performance or activities of "BCHF" and who uses or discloses PHI, pursuant to the HIPAA Regulations, 45 CFR Section 160 103, and

WHEREAS, BCHF and Business Associate desire to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with HIPAA and the HIPAA Regulations and other applicable laws and regulations, and

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, Title 45 CFR Section 164 504(e), as the same may be amended from time to time

NOW, THEREFORE, in consideration of the mutual promises made below and the exchange of information pursuant to the Agreement, this Addendum (herein collectively the "Agreement"), the Parties agree as follows

1.  Responsibilities of Business Associate

    a_  Permitted Uses and Disclosures  Business Associate may use and/or disclose PHI received by Business Associate pursuant to the Agreement and this Addendum solely for the purpose of performing its obligations under the Agreement and this Addendum

EXHIBIT J

PAGE 391

b. <u>Restrictions of PHI.</u> Business Associate shall notify "BCHF" in writing within twenty-four (24) hours of receipt of any request by residents, Students or their representatives to restrict the use and disclosure of the PHI Business Associate maintains for or on behalf of "BCHF"  Upon written notice from "BCHF", Business Associate agrees to comply with any instructions to modify, delete or otherwise restrict the use and disclosure of PHI it maintains for or on behalf of "BCHF".

c. <u>Use and Disclosure of PHI.</u> Business Associate may, if necessary, use and disclose PHI (i) for the proper management and administration of Business Associate's business  or (ii)  to carry out Business Associate's legal responsibilities.

d. <u>Nondisclosure.</u> Business Associate is not authorized and shall not use or further disclose "BCHF's" PHI other than as permitted under the Agreement or this Addendum, or as required by law or regulation

e  <u>Data Aggregation.</u> Except as otherwise limited by this Addendum and upon "BCHF's" request, Business Associate may use PHI to provide data aggregation services relating to BCHF's healthcare operations as permitted by 45 CFR Section 164.504.

f. <u>Safeguards.</u> Business Associate shall use appropriate administrative, technical and physical safeguards to prevent any use or disclosure of "BCHF's" PHI other than as provided for by the Agreement and this Addendum.

g. <u>Notification of Breach.</u> Business Associate shall notify "BCHF" in writing within one (1) working day of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI and/or any actual or suspected use or disclosure Of PHI in violation of the Agreement, this Addendum, HIPAA, the HIPAA regulations, or any applicable federal and state laws and regulations. Business Associate shall take (i) prompt corrective action to cure any such deficiencies  and  (ii)  any  other  action  pertaining  to  such  unauthorized disclosure as may be required by all applicable federal and state laws and regulations.

h. <u>Compliance with Law.</u> Business Associate shall comply with all applicable federal and state laws and regulations, including, if applicable under the terms and requirements of the Agreement, the HIPAA Standards for Electronic Transactions, 45 CFR Parts 160 and 162

i. <u>Business Associate's Agents.</u> Business Associate shall ensure that its employees, agents, and subcontractors who receive "BCHF's" PHI from Business Associate will agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI. Additionally, all employees, agents, and subcontractors shall promptly notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached.

j. <u>Inspection of Information.</u> Business Associate shall, within twenty-four (24) hours, excluding weekends and holidays, of receipt of a written or oral request

allow "BCHF" and, if authorized in writing by "BCHF", allow the subject of the PHI to inspect records as may be required to fulfill "BCHF's" obligations to provide access to "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

k.  **Copies of Information.** Business Associate shall, within two (2) calendar days of receipt of a written or oral request, make available to "BCHF", and if authorized in writing by BCHF, to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide a copy of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

l.  **Accounting of Information.** Business Associate shall, within twenty (20) calendar days of receipt of a written request, make available to "BCHF" and, if authorized in writing by "BCHF", to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide an accounting of disclosures of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524. The accounting shall include a listing of PHI disclosures that occurred during the past six (6) years, commencing April 14, 2003. Each accounting entry shall include. (1) the date of the disclosure; (ii) the name and address of the entity or person who received the PHI; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose and basis for the disclosure, a copy of a written authorization for the disclosure pursuant to 45 CFR Section 164.508, or a copy of a written request for the disclosure pursuant to 45 CFR Sections 164.502 and/or 164 512.

m  Business Associate shall inform "BCHF" within five (5) working days of receipt of any request by or on behalf of the subject of the PHI to amend the PHI Business Associate maintains for or on behalf of "BCHF". Business Associate shall, within twenty (20) calendar days of receipt of a written request, make the subject's PHI available to "BCHF" as may be required to fulfill "BCHF's" obligations to amend PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.526, and other applicable federal and state laws and regulations Business Associate shall, as directed by "BCHF", incorporate any Addendums to "BCHF's" PHI into copies of such PHI maintained and disclosed by Business Associate.

n.  **Chain of Trust.** If applicable, Business Associate shall protect the integrity and confidentiality of any "BCHF" PHI electronically exchanged between Business Associate, "BCHF", and others pursuant to 45 SCR Part 142

o.  **Regulatory Compliance** Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from "BCHF" (or

created or received by Business Associate on behalf of "BCHF") available to any state or federal agency, including the U S. Department of Health and Human Services, for purposes of determining "BCHF's" compliance with the HIPAA Regulations

p. <u>Record Retention:</u> Business Associate shall retain all HIPAA-related documentation pertaining to "BCHF's" PHI for a period of six (6) years, as required by HIPAA and the HIPAA regulations.

q. <u>Audits, Inspection, and Enforcement.</u> Upon reasonable notice "BCHF" may inspect the facilities, systems, books, and records of Business Associate to monitor compliance with the Agreement and this Addendum. Business Associate shall promptly remedy any violation of any terms of the Agreement of this Addendum and shall certify such remedy in writing to "BCHF".

2   <u>Termination</u>

a. <u>Material Breach.</u> A breach by Business Associate of any material provision of this Addendum, as determined by "BCHF", shall constitute a material breach of the Agreement, and shall provide grounds for immediate termination of the Agreement by "BCHF".

b. <u>Effect of Termination</u> Upon termination of the Agreement for any reason, Business Associate shall return or, at the option of "BCHF", destroy all PHI received from "BCHF", or created and received by Business Associate on behalf of "BCHF", that Business Associate still maintains in any form, and shall retain no copies of such PHI If return or destruction is not feasible, as determined by "BCHF", Business Associate shall continue to extend indefinitely the protections of this Addendum to such PHI, and immediately terminate any further use or disclosure of such PHI.

3.   <u>Changes to the Addendum</u>

a. <u>Compliance with Law.</u> The "Parties" acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that changes to this Addendum may be required to ensure compliance with such developments. The "Parties" specifically agree to take such action as may be necessary to implement the standards and requirements of HIPAA, the HIPAA Regulations and other applicable federal and state laws and regulations relating to the security or confidentiality of PHI.

b. <u>Negotiations.</u> In the event that a federal or state law, statue, or regulation materially affects the Agreement or this Addendum, the "Parties" agree to negotiate immediately in good faith any necessary or appropriate revisions to the Agreement or this Addendum. If the "Parties" are unable to reach an agreement concerning such revisions within the earlier of sixty (60) calendar days after the date of notice seeking negotiations or the effective date of a change in law or regulation, or if the change is effective immediately, then "BCHF" may immediately terminate this Agreement upon written notice to Business Associate.

4.   <u>Insurance and Indemnification</u>

a. <u>Insurance.</u> Each Party, at its sole cost and expense, shall insure its activities in connection with this Addendum. Specifically, Business Associate and "BCHF" shall each obtain, keep in force and maintain insurance or equivalent programs of self-insurance with appropriate limits that shall cover losses that may arise

from breach of this Addendum, breach of security, or any unauthorized use of disclosure of PHI. It should be expressly understood, however, that the insurance required herein shall in no way limit the liability of Business Associate or "BCHF" with respect to its activities in connection with this Addendum

b. <u>Indemnification by Business Associate</u> Business Associate agrees to defend at BCHF's election, indemnify, and hold harmless "BCHF", its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of Business Associate, its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

c. <u>Indemnification by "BCHF".</u>   "BCHF" agrees to defend at Business Associate's election, indemnify, and hold harmless Business Associate, its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of "BCHF", its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

5.   <u>Miscellaneous Provisions</u>

a. <u>Assistance in Litigation or Administrative Proceedings.</u> Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under the Agreement and this Addendum, available to "BCHF" at no cost to "BCHF" to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings against "BCHF", its directors, officers, agents or employees based upon claimed violation of HIPAA, the HIPAA Regulations or other federal and state laws and regulations relating to security and privacy and arising out of the Agreement or this Addendum.

b. <u>No Third Party Beneficiaries.</u> Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer upon any person other than "BCHF", Business Associate and their respective successors or assignees, any rights, remedies, obligations or liabilities whatsoever.

c. <u>Notice to Secretary.</u> If "BCHF" knows of a pattern of activity or practice of Business Associate that constitutes a material breach or violation of Business Associate's obligation under this Addendum, if the breach or violation continues, and if termination of this Addendum is not feasible, "BCHF" is required by HIPAA and the HIPAA Regulations to report the problem to the Secretary of Health and Human Services

d. <u>Survival.</u> The obligations of Business Associate under Sections 1(j), 1(k), 1(1), 1(m), 1(p), 2(b), 4(b), 4(c) and 5(a) of this Addendum shall survive the termination of this Agreement.

e. <u>Notices.</u> Any notices to be given to either party shall be made via U.S. Mail or express courier to the addresses given below:

BCHF:          Borrego Community Health Foundation

               Attn. Bruce Hebets, Chief Executive Officer

               Corporate Office

               4343 Yaqui Pass Road

               P.O. Box 2369

               Borrego Springs, CA 92004-2369

               Phone. (760) 767-6433



Dentist.       Magaly Velasquez, DDS

               9130 Foothill Blvd

               Rancho Cucamonga, CA 91730

               Phone· 909-466-4999

f.   Interpretation. Any Each Party may change its address and that of its representative for notice by giving notice in the manner provided above.

g   Interpretation. Any ambiguity in this Addendum shall be resolved ın favor of a meaning that permits "BCHF" to comply with HIPAA, the HIPAA Regulations, and other applicable federal and state laws and regulations.

**SIGNATURES:**

Bruce Hebets, CEO

Borrego Community Health Foundation

Date:_____ 11.14-14

Magaly Velasquez, DDS

Dentist _____

Date:_____ 11 - 5 - 14.

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets CEO                                    Dentist: *Magaly Velasquez. DDS*

Date: _____11-14-14_____                    Date: _____11-5-14_____



Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 ∽ton plate | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

Addendum "F"
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook -- Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date: _____ 11 7 14

Dentist: *Magaly Velasquez, DDS*

Date: _____ 11-5-14.

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

# EXHIBIT K

**AGREEMENT BETWEEN
NEW MILLENNIUM DENTAL GROUP OF ARAM ARAKELYAN, INC
AND
BORREGO COMMUNITY HEALTH FOUNDATION FOR
DENTAL SERVICES**

THIS DENTAL SERVICES AGREEMENT ("Agreement") is entered into as of November 17th, 2016 between Borrego Community Health Foundation ("BCHF") and New Millennium Dental Group of Aram Arakelyan, Inc. ("Dentist"), collectively the "Parties".

## RECITALS

WHEREAS, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside, San Bernardino, and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

WHEREAS, "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

WHEREAS, "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

WHEREAS, "Dentist" operates and administers a private practice in the San Bernardino area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.   **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II.    **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.    **PROFESSIONAL SERVICES**

A.    **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.    **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.    **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.    **PRIOR AUTHORIZATION.** For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service. In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the

dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement. If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.** Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f). "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.** "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE.** "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements. Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization. Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and

procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C. "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or

attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII. CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII. COMPENSATION

A. **FEE SCHEDULE.** "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B. **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit. The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation. Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C. **TIMING OF PAYMENT.** Payment will be made on claims that are paid to "BCHF" by third party payors. The payment will be processed and made on the 15$_{th}$ day of each month to the "Dentist" with a detailed explanation of reimbursement. Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX. CASE MANAGEMENT

A. **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.  "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating

Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C.   **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D.   **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E.   **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.   **LEGAL**

A.   **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B.   **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is

grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F.R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI. **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is

later, "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.** "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.** Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.** "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

XII. **INSURANCE**

A. **PROOF OF COVERAGE.** The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability Insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000)    in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability Insurance on a per occurrence basis with a single limit of not less than one million dollars  ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the  aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or  omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and  all  liability,  loss, expense (including reasonable attorney's fees) or claims for injury or  damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or  employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees  and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent  such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

XIII.   **CONFIDENTIALITY**

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or

its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.    The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.    TERM AND TERMINATION

A.    **TERM.**  This Agreement begins on November 17th, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.    **TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.    **TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.    **TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.    **IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.    **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by

"BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or un-enforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

New Millennium Dental Group of Aram
Arakelyan, Inc

Date: 11-18-2016

Date: 11/17/2016

Address: PO Box 2369
Borrego Springs, CA 92004

Address: 599 Inland Center Drive, #110
San Bernardino, CA 94808

Phone: (619) 444-5704

Phone: 909-383-1600

Contact: Travis Lyon

Contact: Hilda

E-mail: cdtlyon@borregomedical.org

E-mail: aramdds@prodigy.net

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal. These are outlined in Section 5 of the Provider Manual under "Maximum Allowances". Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type. Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |

| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

New Millennium Dental Group of Aram Arakelyan, Inc.

599 Inland Center Drive, #110
San Bernardino, CA 94808

Phone:      909-383-1600
Cellular:   ████████████

During the hours of:

Monday, Tuesday, Wednesday, Thursday,   Friday
  10-6      10-6      10-6         10-6          10-6

NPI Individual –   1710036181

NPI Corporation -- 1528189388

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the November 17, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and New Millennium Dental Group of Aram Arakelyan, Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 17, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the

HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.  <u>Business Associate</u>. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean New Millennium Dental Group of Aram Arakelyan, Inc.

    2.  <u>Covered Entity</u>. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.  <u>HIPAA Rules</u>.   "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.  <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.  <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the

time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(II) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered

entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available

Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D.   Survival. The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.   Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create

any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date   11-18-2016

**BUSINESS ASSOCIATE:**

New Millennium Dental Group of Aram Arakelyan, Inc.

Date   11/17/2016

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
New Millennium Dental Group of Aram
Arakelyan, Inc.

_____11- 18- 2016_____
Date

_____11/17/2016_____
Date

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| | | | | |
|---|---|---|---|---|
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750,  D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

DENTAL SERVICES SLIDING FEE SCALE SUMMARY OF BENEFITS

<u>Eligibility:</u>
The application process and eligibility requirements are the same as for all other services. The levels of poverty are also the same as published by the Federal Government every year and implemented by April 1st. The poverty level is calculated using the established guidelines for family size and income.

All of the requirements of non-discrimination apply to the Dental Services Sliding Fee Scale. Patients with family income at or below 100% of Federal Poverty Level (FPL) pay a nominal fee of $50 per visit. If the family size and income is between 101% and 200%, the charges are based on the percent discount approved for each level of eligibility.

<u>Benefits:</u>
This is a limited benefit program that provides discounted rates for services rendered within Borrego Health Dental Services sites only. It does not extend to services rendered by specialists to whom Borrego Health dentists may need to refer patients for additional care from time to time. The scope of benefits is limited to the scope outlined in Section 5 of the Denti-Cal Handbook.

Adults and children with commercial insurance may apply for the sliding fee to assist with the cost of co-payments and deductibles. The percentage allowed per level of eligibility is deducted from the
balance owed by the patient. For patients with family income at or below 100% and the deductible or the co-payment is less than the nominal fee of $50, the less of the two will be collected.

Adults and children eligible determined eligible for Share of Cost (SOC), they may apply for the sliding fee. The first visit will include treatment planning to determine their eligibility for full scope Medi-Cal. Policies and procedures for managing SOC will be followed prior to initiating treatment.

<u>The program includes:</u>
- Exams and x-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (limited to scope of General Dentistry)
- Root Canals (limited to scope of General Dentistry)
- Crowns (limited to non-precious metal)
- Dentures (Co-payment of $150)
- Bridges (Co-payment of 50% of cost)
- Crowns (noble metals excluded)

<u>Exclusions:</u>
- Referrals to any specialists including but not limited to:
  - Oral surgeons
  - Endodontists
  - Periodontists
  - Orthodontists
  - Pedodontists
- Teeth whitening
- Orthotics not listed above
- Orthodontics
- Nobel metal crowns

- Cosmetic procedures
- Mouth guards

Dental Sliding Fee Discount
2016

| Sliding Fee | A | B | C | D | E |
|---|---|---|---|---|---|
| Level of Poverty | 0-100% | 101-125% | 126-150% | 151-175% | 176 -200% |
| Maximum Discount | $50 | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

New Millennium Dental Group of Aram
Arakelyan, Inc.

___11-18-2016___
Date

___11/17/2016___
Date

# EXHIBIT L

EXHIBIT L
PAGE 431

**AGREEMENT BETWEEN
ARAM ARAKELYAN DDS, INC.
AND
BORREGO COMMUNITY HEALTH FOUNDATION
FOR
DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aram Arakelyan DDS, Inc. ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Los Angeles, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B. **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

EXHIBIT L
PAGE 432

II.   **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.   **COVERED SERVICES.**   Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

EXHIBIT L
PAGE 433

services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE**.   Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.    "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

EXHIBIT L
PAGE 434

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

   **C.**  **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

   **D.**  **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

     1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

     2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

     3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

     4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

   **E.**  **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

  **VI.**  **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

   **A.**  It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

   **B.**  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

EXHIBIT L
PAGE 435

(2) years following termination, however such termination is affected.

**C.**  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.  FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.  ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.  TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.  AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

EXHIBIT L

PAGE 436

**B.   VERIFICATION OF PATIENT STATUS.**     "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.     "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.   The information will be made available in a timely manner according to established policies and procedures.   "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

6

EXHIBIT L
PAGE 437

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B. COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C. MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A. PROGRAMMATIC RECORDS**.    "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

7

EXHIBIT L
PAGE 438

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C. PARTICIPATING PATIENT RECORDS**. "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**. Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**. "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed. "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

8

EXHIBIT L
PAGE 439

**XII.   INSURANCE**

A. **PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

9

EXHIBIT L
PAGE 440

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

**A.**   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

**A.**   **TERM.**  This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.**   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.**   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.**   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

10

EXHIBIT L
PAGE 441

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

**XV.   GENERAL PROVISIONS**

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

11

EXHIBIT L
PAGE 442

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

Aram Arakelyan DDS, Inc

Date: 12/06/2018

Date: 12/06/2018

PO Box 2369
Borrego Springs, CA 92004

Address: 5165 Whittier Blvd.
Los Angeles, Ca 90022

Phone: (619) 444-5704

Phone:   (323) 981-7104

Contact: Dr. Arakelyan

E-mail: aramdds@prodigy.net

12

EXHIBIT L
PAGE 443

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

13

EXHIBIT L
PAGE 444

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

EXHIBIT L
PAGE 445

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

15

EXHIBIT L
PAGE 446

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

16

EXHIBIT L

PAGE 447

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Aram Arakelyan DDS, Inc
5165 Whittier Blvd.
Los Angeles, Ca 90022

_____

Phone:  (323) 981-7104

During the hours of:

Monday, Wednesday, Thursday, Saturday: 10:00 am – 7:00 pm
_____

_____

NPI Number - Organization _____

NPI Number- Individual: 1710036181

Copies attached

EXHIBIT L
PAGE 448

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 29th day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aram Arakelyan DDS, Inc hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").
**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated  November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

   A.   Catch-all definition:
   The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an

EXHIBIT L
PAGE 449

inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.  <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aram Arakelyan DDS, Inc.

    2.  <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.  <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.  <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.  <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:
    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

EXHIBIT L
PAGE 450

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT L
PAGE 451

4.   Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.   Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.   Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.   Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.   Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.   Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.   The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.   Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

EXHIBIT L
PAGE 452

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

22

EXHIBIT L
PAGE 453

and/or the business relationship of the Parties. and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                  **BUSINESS ASSOCIATE:**

_____                        _____
Mikia Wallis, CEO                                Aram Arakelyan DDS, Inc
Borrego Community Health Foundation

12/06/2018                                       12/07/2018
_____                        _____
Date                                             Date

23

EXHIBIT L
PAGE 454

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

Aram Arakelyan DDS, Inc

12/06/2018
_____
Date

12/06/2018
_____
Date

24

EXHIBIT L
PAGE 455

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

EXHIBIT L
PAGE 456

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
|  |  |  |  |  |

26

EXHIBIT L
PAGE 457

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

27

EXHIBIT L
PAGE 458

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

EXHIBIT L
PAGE 459

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

EXHIBIT L
PAGE 460

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
Date

Aram Arakelyan DDS, Inc

12/06/2018
Date

30

EXHIBIT L
PAGE 461

# EXHIBIT M

### AGREEMENT BETWEEN
### ARAM ARAKELYAN, DDS
### AND
### BORREGO COMMUNITY HEALTH FOUNDATION
### FOR
### DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Aram Arakelyan, DDS ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").   The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.   The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Covina and Downey, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.    **DEFINITIONS**

    A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

    B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and

1

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II.   **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

   A.   **COVERED SERVICES.**   Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

   B.   **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

   C.   **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

   D.   **PRIOR AUTHORIZATION.**   For dental services needing individual consideration

2

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE**.   "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

3

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.  POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.   Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.  PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.  AUTHORITY.**   "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.  NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.   "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.    NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**  It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

4

party by the other party.

**B.**   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.**   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

**VII.**   **CONTRACTS WITH OTHERS**

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

**VIII.**   **COMPENSATION**

**A.**   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.**   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.**   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.   Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement. Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

**IX.**   **CASE MANAGEMENT**

**A.**   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business

5

hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

**B.   VERIFICATION OF PATIENT STATUS.**      "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".   If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.     LEGAL**

**A. LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

6

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.   COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.   MISREPRESENTATION**.   "Dentist"   acknowledges   and   agrees   that   willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.   COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.   To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.   To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.   To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.   To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.   To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

7

## XI.    RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS**.    "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.    PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State

8

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

**XII.   INSURANCE**

**A. PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.** "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.** It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

9

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A. Except as is necessary in the performance   of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)   also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.**   This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.   Renewal is subject to "BCHF's"

10

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.** **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.** **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.** **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.** **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.** **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.** **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.** **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.** **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.** **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

11

otherwise agreed.

**E. NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F. DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G. CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H. ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation

Aram Arakelyan, DDS

Date: 12/06/2018

Date: 12/06/2018

PO Box 2369
Borrego Springs, CA 92004

Address: 19523 E. Cypress Street
Covina, CA 91724

Phone: (619) 444-5704

Phone:    (626) 331-4538

Contact: Aram Arakelyan, DDS

E-mail: aramdds@prodigy.net

12

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

13

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.   Crowns and root canals are subject to prior review and authorization by the Dental Director.   If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and | D1120 in combo with | 1 | Must be in | $100 per visit |

14

| Fluoride application | D1206, D1208 | | combination. | |
|---|---|---|---|---|
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a | D3346 | 1 or more | All treatments | $305 global |

15

| Root Canal - Anterior | | | must be after 12 months of initial visit | |
|---|---|---|---|---|
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of | D9230 | 1 | Additional | $35 |

16

| Nitrous Oxide | | | payment in combo with other procedures | |
|---|---|---|---|---|

17

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Aram Arakelyan, DDS

NPI Number- Individual 1710036181

Address: 19523 E. Cypress Street                    NPI Number – Organization _____
        Covina, CA 91724
Phone:  (626) 331-4538
Hours: Tue 10am-7pm
        Thur 10am-7pm
        Fri 10am-7pm

Address: 10917 Paramount Blvd.                     NPI Number – Organization _____
        Downey, CA 90241
Phone:  (562) 659-7246
Hours: Mon 10am-7pm
        Wed 10am-7pm
        Fri 10am-7pm
        Sat 10am-7pm

Copies attached

18

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective November 29, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Aram Arakelyan, DDS hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.      DEFINITIONS

   A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

19

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

    1.    Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Aram Arakelyan, DDS.

    2.    Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:
    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

20

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

21

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

22

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this

23

Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.    MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.  Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.  Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.  Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance.  If, after such thirty-day period, the Agreement fails to comply with the

24

HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

**BUSINESS ASSOCIATE:**

Mikia Wallis, CEO
Borrego Community Health Foundation

Aram Arakelyan, DDS

12/06/2018

Date

12/06/2018

Date

25

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Aram Arakelyan, DDS

12/06/2018
_____
Date

12/06/2018
_____
Date

26

EXHIBIT M
PAGE 488

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |

27

| application | | | | |
|---|---|---|---|---|
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $305 global |

28

| | | | | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |

29

| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
|---|---|---|---|---|
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |
| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

30

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal

31

fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018

Date

Aram Arakelyan, DDS

12/06/2018

Date

32

**AGREEMENT BETWEEN
RESEDA DENTAL OFFICE OF ARAM YELIAZYAN AND ARAM ARAKELYAN, INC.
AND
BORREGO COMMUNITY HEALTH FOUNDATION
FOR
DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 29, 2018 between Borrego Community Health Foundation ("BCHF") and Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc. ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Reseda, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.    **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

1

II.  **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.  **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.  **PROFESSIONAL SERVICES**

A.  **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.  **SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.  **DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.  **PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

EXHIBIT M

PAGE 496

services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.  **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.  **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.  **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.  **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.  **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.   "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.  **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.** **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.** **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.** **NOTIFICATION. "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.** **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

(2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A. FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B. ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C. TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A. AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

**B.   VERIFICATION OF PATIENT STATUS.**     "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.     "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.   The information will be made available in a timely manner according to established policies and procedures.   "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**   The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.    LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

6

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.  To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A.  PROGRAMMATIC RECORDS**.   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

7

Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.   PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

8

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**  "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**  It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**  Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E.   INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

9

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A.   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on November 29, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

10

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

    **E.   IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

    **F.   SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

    **A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

    **B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

    **C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

    **D. EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

    **E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

    **F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

## SIGNATURES:

Mikia Wallis, CEO
Borrego Community Health Foundation

Reseda Dental Office of Aram Yeliazyan
and Aram Arakelyan, Inc.

_____

_____

Date:____12/06/2018_____

Date:____12/06/2018_____

PO Box 2369
Borrego Springs, CA 92004

Address: 18554 Sherman Way
        Reseda, Ca 91335

Phone: (619) 444-5704

Phone:   (818) 708-9919

Contact: Dr. Arakelyan

E-mail: aramdds@prodigy.net

12

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

15

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

16

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc.

18554 Sherman Way
Reseda, Ca 91335

_____

Phone:  (818) 708-9919

During the hours of:

Tuesday, Thursday and Saturday: 10:00 am – 7:00 pm_____

_____

_____

NPI Number - Organization _____

NPI Number- Individual: 1710036181

Copies attached

17

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 29th day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated  November 29, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.  Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B. <u>Specific definitions</u>:

    1.    <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Reseda Dental Office of Aram Yeliazyan and Aram Arakelyan, Inc..

    2.    <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A. Business Associate agrees:

    1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

19

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

20

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

III.   AVAILABILITY OF PHI

   A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

   A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

   B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

   C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

   D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

   A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

22

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

   IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                    **BUSINESS ASSOCIATE:**

_____                       _____

Mikia Wallis, CEO                                      Reseda Dental Office of Aram Yeliazyan
Borrego Community Health Foundation                    and Aram Arakelyan, Inc.

12/06/2018

_____                       _____
Date                                                         12/07/2018
                                                      Date

23

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

_____
Reseda Dental Office of Aram Yeliazyan
and Aram Arakelyan, Inc.

12/06/2018
_____
Date

12/06/2018
_____
Date

24

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration. Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |

26

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

27

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

_____
Mikia Wallis, CEO
Borrego Community Health Foundation

12/06/2018
_____
Date

_____
Reseda Dental Office of Aram Yeliazyan
and Aram Arakelyan, Inc.

_____12/06/2018_____
Date

EXHIBIT M
PAGE 524

# EXHIBIT N

# AGREEMENT BETWEEN
# MICHAEL HOANG, DMD
# AND
# BORREGO COMMUNITY HEALTH FOUNDATION
# FOR
# DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of November 28 2018 between Borrego Community Health Foundation ("BCHF") and Michael Hoang, DMD ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS, "**BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in Hawthorne, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

1

## II.   ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III.   INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV.   PROFESSIONAL SERVICES

**A.   COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.   SERVICE AVAILABILITY.**   "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well-being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**   "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.   PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third-party payors, an additional list of

2

services requiring prior approval may be provided by "BCHF". As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.    AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.    SLIDING FEE**.   Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.    NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.    QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.    QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.  The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.  Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.   "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.    POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this

3

agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular, "BCHF" shall retain ultimate authority over the following:

  1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

  2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

  3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

  4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI. **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two

4

(2) years following termination, however such termination is affected.

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed within 35 days of receipt of a superbill and adequate supporting documentation for each visit.  Payment will be made on a weekly basis to the "Dentist" with a detailed explanation of reimbursement.  Both Dentist and BCHF will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.

EXHIBIT N
PAGE 530

**B. VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C. REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D. REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E. REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training.  "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A. LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement.  "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other

6

support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.  COMPLIANCE WITH THE LAW.  "**Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.  MISREPRESENTATION**.  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency and will be cause for immediate termination under XIV of this Agreement.

**D.  COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1.  To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2.  To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3.  To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4.  To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5.  To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

**XI.    RECORD KEEPING AND REPORTING**

**A.  PROGRAMMATIC RECORDS**.    "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its

7

Section 330 grant.

**B.  FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C.   PARTICIPATING PATIENT RECORDS**.  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D.  RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

**E.  OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

EXHIBIT N

PAGE 533

### XII.   INSURANCE

**A. PROOF OF COVERAGE.**  The **"**Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.** "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1.  General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.  Workers' Compensation, as required under California State law.

3.  Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.** It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E. INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such

9

liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A.   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)   also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A.   **TERM.**  This Agreement begins on November 28, 2018 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other  sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.   **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.   **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.   **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any

term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.   **IMMEDIATE TERMINATION.**   In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.   **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

XV.   **GENERAL PROVISIONS**

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.   Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has

11

failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Mikia Wallis, CEO
Borrego Community Health Foundation


Date: 12/06/2018

PO Box 2369
Borrego Springs, CA 92004

Phone: (619) 444-5704

Michael Hoang, DMD


Date: 11/29/18

Address: 13672 Hawthorne Blvd.
            Hawthorne, CA 90250-5810

Phone:   310-644-5097

Contact: Dr. Michael Hoang

E-mail: mkhoangdmd@gmail.com

12

**Addendum "A"**
**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".   Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

13

**Addendum "B"**
**Compensation of Dental Services**
**Pediatric Medi-Cal**

Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | CDT Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $140 per |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1120 - D1206, D1208 | 1 | Refer to Denti-Cal manual. | $150 per |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1120 in combo with D1206, D1208 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Per quadrant | $120 per visit |

14

| | | | | |
|---|---|---|---|---|
| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $150 per visit |
| Prefabricated Crowns (Stainless Steel / Resin) | D2930, D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $175 global $280 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpotomy / Pulpal Debridement | D3220, D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and | $365 global |

15

EXHIBIT N

| | | | Finished RCT included in global fee. | |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | None | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Incision and Drainage of Abcess | D7510, D7520 | 1 | None | $115 |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |
| Inhalation of Nitrous Oxide | D9230 | 1 | Additional payment in combo with other procedures | $35 |

EXHIBIT N
PAGE 541

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

Michael Hoang, DMD

Address: 13672 Hawthorne Blvd., Hawthorne, CA 90250-5810

_____

Phone:  310-644-5097

During the hours of:

Monday – Friday, 9a-5p

_____

_____

_____

NPI Number - Organization 1407232507

NPI Number- Individual 1407232507

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 28 day of November, 2018 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Michael Hoang, DMD. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated November 28, 2018 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

   A.   Catch-all definition:
   The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.   Specific definitions:

1.   Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Michael Hoang, DMD.

2.   Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.   HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.   Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.   Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.   Business Associate agrees:
1.   Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.   To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.   To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR

19

164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

EXHIBIT N

4.  Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.  Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.  Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.  Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.  The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.  Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

21

III.   AVAILABILITY OF PHI

A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

22

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. **Amendment; Independent Parties.** This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. **Minimum Requirements.** The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                    **BUSINESS ASSOCIATE:**

_____                _____
Mikia Wallis, CEO                                      Michael Hoang, DMD
Borrego Community Health Foundation

12/06/2018                                             11/29/18
_____                _____
**Date**                                               **Date**

23

EXHIBIT N
PAGE 548

## Addendum "D"
### ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Mikia Wallis, CEO
Borrego Community Health Foundation

Michael Hoang, DMD

12/06/2018

11/29/18

Date

Date

24

**Addendum "E"**
**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns and root canals are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0120 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $110 per visit |
| Comprehensive Exam and X-rays | D0150 in combo with D0210, D0220, D0230, D0272, D0274, D0330 | 1 | Refer to Denti-Cal manual. | $130 per visit |
| Routine Exam and X-rays with Prophy | D0120 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and  D1110 | 1 | Refer to Denti-Cal manual. | $140 per visit |
| Comprehensive Exam and X-rays with Prophy | D0150 in combo with D0210,D0220, D0230,D0272, D0274, D0330 - and D1110 | 1 | Refer to Denti-Cal manual. | $150 per visit |
| Problem focused oral evaluation only with X-ray | D9430 D0220, D0230, D0270 | 1 | For relief of pain and medication | $100 |
| Prophylaxis and Fluoride application | D1110 in combo with D1206, D1208 | 1 | Must be in combination. | $110 per visit |
| Fillings - Amalgam | D2140, D2150, D2160, D2161 | 1 or more | Treatment to be completed per quadrant, unless documented | $120 per visit |

25

| Fillings – Resin Based Composite Anterior & Posteriors | D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Treatment to be completed per quadrant, unless documented | $150 per visit |
|---|---|---|---|---|
| Prefabricated Crowns (Stainless Steel / Resin) | D2931, D2932 | 1 or more | 2 per visit | $200 per visit |
| Extractions - simple | D7111, D7140 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $120 per visit |
| Extractions - surgical | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $185 |
| Surgical Removal of Roots | D7250 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $140 |
| Biopsy Soft Tissue | D7286 | 1 or more | Per Visit | $45 |
| Alveoloplasty | D7310 | 1 or more | Per Visit | $70 |
| Removal of Torus Palatinus | D7472 | 1 or more | Per Visit | $280 |
| Removal of Torus Mandibulars | D7473 | 1 or more | Per Visit | $140 |
| Frenulectomy | D7960 | 1 or more | Per Visit | $280 |
| Excision of Pericoronal Gingiva | D7971 | 1 or more | Per Visit | $70 |
| Pulpal Debridement | D3221 | 1 | Excludes final restoration | $140 per visit |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration. Open & Med and Finished RCT included in global fee. | $305 global |
| Retreatment of a Root Canal - Anterior | D3346 | 1 or more | All treatments must be after 12 months of initial visit | $305 global |
| | | | | |

26

| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $365 global |
|---|---|---|---|---|
| Retreatment of a Root Canal - Bicuspid | D3347 | 1 or more | All treatments must be after 12 months of initial visit | $365 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration.  Open & Med and Finished RCT included in global fee. | $465 global |
| Retreatment of a Root Canal - Molar | D3348 | 2 or more | All treatments must be after 12 months of initial visit | $465 global |
| Apicoectomy Anterior | D3410 | 1 | None | $140 per visit |
| Crown | D2751, D2740, D2791 | 2 or more | Prep and delivery in global fee. | $475 global |
| Crown Post and Core (indirect or pre-fabricated) | D2952,D2954 | 1 | Payment included in addition to Crown Delivery | $105 |
| Recement Permanent Crown | D2920 | 1 | All treatments must be after 12 months of initial visit | $75 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $100 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Periodontal Maintenance | D4910 | 1 | See Denti-Cal Guidelines (only once a calendar quarter, must be within 24 months of SRP) | $140 |
| Gingivectomy or Gingivoplasty | D4211 | 1 | 1 to 3 teeth, per quadrant | $110 |
| Incision and Drainage of Abscess | D7510, D7520 | 1 | None | $115 |

EXHIBIT N

PAGE 552

| Dentures (Includes first 2 adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $635 each denture – global |
| Removable Partial – Cast Metal (Includes first 2 adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $660 each partial – global |
| Removable Partial – Resin Based | D5211, D5212 | 3 or more | Maxillary and Mandibular | $360 each partial - global |
| Repairs | D5510, D5520 D5610, D5640 D5650, D5660 | 1 or more | Maxillary and Mandibular | $110 each visit |
| Repair Cast Framework | D5620 | 1 | None | $325 per visit |
| Repair/Replace Broke Clasp | D5630 | 1 | None | $140 per visit |
| Adjustments only (not following delivery) | D5410, D5411 D5421, D5422 | 1 | Maxillary and Mandibular | $70 per visit |
| Reline (in office) | D5730, D5731 D5740, D5741 | 1 | Maxillary and Mandibular | $120 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $225 - global |
| Tissue Conditioning | D5850, D5851 | 1 | Maxillary and Mandibular | $120 per visit |
| Palliative Treatment for Dental Pain with X-ray | D9110 in combo with D0220, D0230, D0270 | 1 | None | $100 per visit |

28

**Addendum "F"**
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➤ Oral Surgery
  - ➤ Endodontist
  - ➤ Periodontist
  - ➤ Orthodontist
  - ➤ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

### Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Mikia Wallis, CEO
Borrego Community Health Foundation
12/06/2018

Date

Michael Hoang, DMD

11/29/18

Date

30

# EXHIBIT O

**AGREEMENT BETWEEN**
W. A. STEPHAN, A DENTAL CORPORATION
**AND**
**BORREGO COMMUNITY HEALTH**
**FOUNDATION FOR DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of
___10/01/2016___2016 between Borrego Community Health Foundation ("BCHF") and
A. STEPHAN, A DENTAL CORPORATI ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout San Bernardino, Riverside and San Diego Counties. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS,** "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in El Cajon_____, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

   A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B. **SCOPE OF SERVICES.** Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

**II.  ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.  INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.  PROFESSIONAL SERVICES**

**A.  COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.  SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.  DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.  PRIOR AUTHORIZATION.**  For dental services needing individual consideration

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE.**  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.**  "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E.   NOTIFICATION.**  "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**   It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

**B.**  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

**C.**  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.**  **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.**  **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.**  **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.**  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X. **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

A. **PROGRAMMATIC RECORDS.**  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.**  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.**  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.**  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with  applicable  Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

**A.   PROOF OF COVERAGE.**  The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

**B.**   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

**C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.** This Agreement begins on ___10/01/2016_____, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to

EXHIBIT O

PAGE 566

the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.    TERMINATION WITHOUT CAUSE.** Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.    TERMINATION FOR CONVENIENCE.** This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.    TERMINATION FOR BREACH.** This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.    IMMEDIATE TERMINATION.** In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.    SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

**XV.    GENERAL PROVISIONS**

**A.    AMENDMENT/MODIFICATION.** This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed. Amendments will take effect upon the date of execution of both parties.

**B.    ASSIGNMENT.** This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.    EFFECT OF WAIVER.** A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.    EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: _10 · 21 · 2016_____

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

W. A. STEPHAN, A DENTAL CORPORATION

_waleed stephan_
waleed stephan (Sep 30, 2016)

Date: 10/01/2016_____

Address: 860 JAMACHA ROAD SUITE 201

EL CAJON CA 92019_____

Phone: 619-593-3000_____

Contact: Athra Stephan_____

E-mail stephandental@gmail.com

EXHIBIT O
PAGE 568

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit -- multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit -- multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

DBA Stephan Family Dental

Address 860 JAMACHA ROAD SUITE 201

EL CAJON CA 92019

Phone: 619-593-3000

During the hours of:

Monday thru Friday: 9am - 6pm

Saturday: 8am - 2pm

Sunday: Closed

NPI Number - Organization 1336565092

NPI Number- Individual 1841477387

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the <u>10/01/2016</u>, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and <u>W. A. STEPHAN, A DENTAL CORP</u> hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated <u>10/01/2016</u>, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   <u>DEFINITIONS</u>

   A. <u>Catch-all definition</u>:
   The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

1.  <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean <u>W. A. STEPHAN, A DENTAL CORPORATION</u>

2.  <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.  <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4.  In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5.  To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6.  To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7.  To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8.  To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9.  To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B.  Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1.  As necessary to perform the services set forth in the underlying Service Agreement; and/or

2.  As required by law.

3.  Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4.   Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5.   Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6.   Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7.   Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8.   Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C.   Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D.   The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E.   Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   AVAILABILITY OF PHI

A.  Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.  Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.  Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.  Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

D.  Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.  Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties.  No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control.  The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.  In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____

Bruce Hebets, CEO
Borrego Community Health Foundation

_____*10 -21 -2016*_____
Date

**BUSINESS ASSOCIATE:**

*waleed stephan*
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

_10/01/2016_____
Date

## Addendum "D"
## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

*waleed stephan*
waleed stephan (Sep 30, 2016)
_____
Dentist
W. A. STEPHAN, A DENTAL CORP

_____*10 -21-2016*_____
Date

_____10/01/2016_____
Date

EXHIBIT O
PAGE 579

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE
SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |


Bruce Hebets, CEO
Borrego Community Health Foundation

_10 - 21 - 2016_
Date

_waleed stephan_
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

10/01/2016
Date

EXHIBIT O
PAGE 583

## Addendum "G"

### HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law.  Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development.  Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers.  Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification.  A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained.   PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system.  This monthly fee will only be assessed once the online storage system is implemented.  Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract.  All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
waleed stephan
waleed stephan (Sep 30, 2016)
Dentist
W. A. STEPHAN, A DENTAL CORP

_____10-21-2016_____
Date

_____10/01/2016_____
Date

# EXHIBIT P

**AGREEMENT BETWEEN**
**SANTIAGO A. ROJO, D.D.S., INC**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of March **29**, 2017 between Borrego Community Health Foundation ("BCHF") and Santiago A. Rojo, D.D.S., Inc. ("Dentist"), collectively the "Parties".

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC).  BCHF operates clinics throughout San Diego, San Bernardino, and Riverside Counties.  The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS").  The approved scope includes performance of primary dental services; and

**WHEREAS**, "BCHF" desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS**, "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS**, "Dentist" operates and administers a private practice in the Moreno Valley area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

   A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

   B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are

authorized to be rendered by BCHF to residents of the specified service area.

**II.   ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.   INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.   PROFESSIONAL SERVICES**

**A.   COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

**B.   SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

**C.   DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

**D.   PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior

to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**. "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a

timely manner.

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above. In particular, "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

**E. NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services. "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI. NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

EXHIBIT P
PAGE 589

B.   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

A.   **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.   **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

A.   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.

The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to

entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

   1. To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

   2. To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

   3. To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U.S.C. § 1251 et seq.), as amended;

   4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

   5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS.** "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested.  In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS.** "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C. **PARTICIPATING PATIENT RECORDS.**  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS.**  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.  In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".  Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS.**  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and

confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.**  The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or

omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII. CONFIDENTIALITY

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

A. **TERM.** This Agreement begins on March **29**, 2017 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination. Renewal is subject to "BCHF's"

determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B.  **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C.  **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D.  **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E.  **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F.  **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

XV.  **GENERAL PROVISIONS**

A.  **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B.  **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.  **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.  **EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless

otherwise agreed.

E.  **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.  **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.  **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.  **ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 3 - 31 - 2017

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

Santiago A. Rojo, D.D.S., Inc.

Date: 3/29/2017

Address: 22435 Alessandro Blvd., Ste. 106

Moreno Valley, Ca. 92553

Phone: (951) 656-3100

Contact: Dr. Rojo

E-mail: rojodental@gmail.com

**Addendum "A"**

**Scope of Services**

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

## Addendum "B"

### Compensation of Dental Services
### Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not | $100 |

| | | | in scope. | |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

## Addendum "C"

### Location of Service

All dental services under this agreement will be rendered at:

Santiago A. Rojo, D.D.S., Inc.

Family Dentistry Inc.
22435 Alessandro Blvd., Suite 106
Moreno Valley, Ca.  92553

Phone:   (951) 656-3100

During the hours of:

| | |
|---|---|
| Monday | 9-6pm |
| Tuesday | 9-6pm |
| Wednesday | 9-6pm |
| Thursday | 9-6pm |
| Friday | 9-6pm |
| Saturday | 8-3pm |
| Sunday | Closed |

NPI Number - Organization  1659621613

NPI Number- Individual         1073744389

Copies attached

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the ___29___ day of March, 2017 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Santiago A. Rojo, D.D.S., Inc.hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated March ___29___, 2017 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.    DEFINITIONS

    A.  Catch-all definition:
       The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.    <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Santiago A. Rojo, D.D.S., Inc.

    2.    <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

    3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement.  Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware.  Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.  Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.  In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.    AVAILABILITY OF PHI

    A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.    TERM/TERMINATION

    A. Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

    B. Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

    C. Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

    D. Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.    MISCELLANEOUS

    A. Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

EXHIBIT P
PAGE 606

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B. **Amendment; Independent Parties.** This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. **Minimum Requirements.** The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**                                      **BUSINESS ASSOCIATE:**

_____                    _____
Bruce Hebets, CEO                                        Santiago A. Rojo, D.D.S., Inc.
Borrego Community Health Foundation

3 - 31 - 2017                                                    3/29/2017
_____                    _____
Date                                                            Date

Received Time Mar. 30.  2017  3:44PM No. 3108

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Santiago A. Rojo, D.D.S., Inc

**3 - 31 - 2017**
_____
Date

**3/29/2017**
_____
Date

EXHIBIT P
PAGE 608

## Addendum "E"

### COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below. Crowns, root canals and bridges are subject to prior review and approval by the Dental Director. If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150,  D0120 D0210,  D0220, D0230,  D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150,  D0120 D0210,  D0220, D0230,  D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140,  D7210 D2140,  D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140,  D2150, D2160,  D2161 D2330, D2331, D2332,  D2335 D2391,  D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit - multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit - multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| | | | | |
|---|---|---|---|---|
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750,  D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |
| | | | | |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE
SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these

programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➤ Oral Surgery
  - ➤ Endodontist
  - ➤ Periodontist
  - ➤ Orthodontist
  - ➤ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176-200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

3-31-2017
Date

Santiago A. Rojo, D.D.S., Inc.

Date

# EXHIBIT Q

## AGREEMENT BETWEEN
## MARCELO TOLEDO D.D.S. INC
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of June 16,2015 between Borrego Community Health Foundation ("BCHF") and Marcelo Toledo, D.D.S. INC. ("Dentist"), collectively the "Parties"

### RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Cathedral City 69175 Ramon Rd, Cathedral City, CA 92234 The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement.  The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the Palm Springs and Rialto, California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information )

### AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.  **DEFINITIONS**

A.  **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.  **SCOPE OF SERVICES.**  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II. ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement

## III. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other   This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value

## IV. PROFESSIONAL SERVICES

**A. COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

**B. SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director   "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy  "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients

**C. DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any)  The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes   In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records   "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF"  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF"  Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt

F. **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C F R.§51c 303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt  "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION. "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered  This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80 3-80 4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE**  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility

and record review in keeping with "BCHF" standards and applicable regulations "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner

**B. POLICIES AND PROCEDURES.** The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures. Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards   Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C. PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D. AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above   In particular,  "BCHF" shall retain ultimate authority over the following.

1  Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist"

3  Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below

**E. NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services   "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.** It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of

any kind (directly or indirectly), for the referral of individuals or business to either party by the other party

**B.**   "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected

**C.**   "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement. For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive  "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care

## VIII.   COMPENSATION

**A.**   **FEE SCHEDULE.** **"**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B"

**B.**   **ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.**   **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.   CASE MANAGEMENT

**A.**   **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.** "Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business

hours   "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".   "Dentist" will provide occasional after hour sessions to provide expanded availability   These sessions may include weekend clinics or after 5.00 p m  schedules. "Dentist" will accommodate dental emergencies as necessary   As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist"   If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such   The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients   "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist"  In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide

"BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF " Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff   No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification   Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry  Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement

C. **MISREPRESENTATION**  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable

1   To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S  Department of Labor regulations at 41 C.F  R. Part 60,

2.  To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3   To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S C  §7401 et. seq ) and the Federal Water Pollution  Control Act (33 U S C. § 1251 et seq.), as amended,

4   To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U S C. § 1352), and any applicable implementing regulations, as may be applicable; and

5   To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations

## XI.   RECORD KEEPING AND REPORTING

A. **PROGRAMMATIC RECORDS**   "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested   In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**  "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated   If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained   This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value

C. **PARTICIPATING PATIENT RECORDS**   "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement   All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF"  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D. **RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law   In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".   Record retention obligations survive the termination of this Agreement.

E. **OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist",

upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent, and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.** The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter

B.   "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least

1   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate, Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate, Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.   Workers' Compensation, as required under California State law

3   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party

**D.** Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage  Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees  Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements  Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages

**E.  INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students

## XIII. CONFIDENDIALITY

**A.** Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.** The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV. TERM AND TERMINATION

**A.  TERM.** This Agreement begins on June 16,  2015 and shall be automatically and

successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement, or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

**F.   SURVIVAL.**  Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page

**F.   DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i e , circumstances under which an extended resolution procedure may endanger the health and safety of the Participating Patients) Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.** This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

_____

Date  6/19/2015_____

Address  955 Harbor Island Drive, Suite 110

__San Diego, CA 92101_____

Phone:____619-873-3555_____

Contact _____Cynthia Preciado_____

  E-mail  cpreciado@borregomedical org___

Marcelo Toledo, DDS

_____

Date ____6/16/2015_____

Address ___1701 Palm Canyon Dr_____

_____Palm Springs, CA 92262_____

Phone ____760-~~422-5613~~  864- 8793

Contact  Debbie

E-mail Marcelotoledsddsinc@ hotmail.com

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of sliding fee are provided by "BCHF" guidelines

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals
Crowns
Partials
Dentures

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below   Crowns and root canals are subject to prior review and authorization by the Dental Director   If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at.

1701 Palm Canyon Drive
Palm Springs, CA 92262
Phone:  760-422-5613

During the hours of

Tuesdays
8 00 am – 5.00 pm

AND AT

326 N Riverside Avenue
Rialto, CA 92376
Phone: 909-875-1464

During the hours of.

Monday, Wednesdays and Fridays
8 00 am - 5:00 pm

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 16th day of June, 2015 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Marcelo Toledo, D.D S. Inc. hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties")
**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L  111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated June 16, 2015 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement,
NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I      <u>DEFINITIONS</u>

    A   <u>Catch-all definition</u>
       The following terms used in this Agreement shall have the same meaning as those
       terms in the HIPAA Rules  Breach, Data Aggregation, Designated Record Set,
       Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy

Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use  In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control

B   Specific definitions

1   Business Associate.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Marcelo Toledo, D.D S. Inc

2   Covered Entity.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160 103, and in reference to the party to this agreement, shall mean Borrego Health

3   HIPAA Rules.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4   Protected Health Information  "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual, and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual   "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below

5   Electronic Protected Health Information  "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media

II   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A. Business Associate agrees
1. Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law,

2. To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement,

3. To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including

EXHIBIT Q
PAGE 631

breaches of unsecured protected health information as required at 45 CFR 164 410, and any security incident of which it becomes aware  Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach,

4. In accordance with 45 CFR 164 502(e)(1)(ii) and 164 308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information,

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164 524;

6 To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164 526;

7 To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164 528,

8 To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s), and

9 To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10 Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement

B Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows.

1 As necessary to perform the services set forth in the underlying Service Agreement; and/or

2 As required by law

3 Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures

EXHIBIT Q
PAGE 632

    4   Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

    5   Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

    6.  Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate

    7   Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached

    8.  Business associate may provide data aggregation services relating to the health care operations of the covered entity

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement   Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware   Business Associate shall report to Covered Entity any Security Incident of which it becomes aware   Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system   In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement

III.   AVAILABILITY OF PHI

   A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164 522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164 526 of the HIPAA Security and Privacy Rule   In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164 528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis

IV.   TERM/TERMINATION

   A   Term  The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

   B   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement   If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately  Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

   C   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form   Business associate shall retain no copies of the protected health information.

   D   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement

V   MISCELLANEOUS

   A   Third Parties, Survival  Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties  The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement

and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B    Amendment, Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties   No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship.  This Agreement will be governed by the laws of the State of California.  No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.   Minimum Requirements. The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control   The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information

D    Severability. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect.   In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing.  For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above

COVERED ENTITY                                    BUSINESS ASSOCIATE.

By _____                  By _____
        Bruce Hebets, CEO                              Marcelo Toledo, DDS

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT Q

PAGE 637

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
### AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook. Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E." Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F."

Bruce Hebets/CEO

Dentist _Marcelo Toledo DDS_

Date: _6-19-2015_

Date _6-16-2015_

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal – Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70  per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

Addendum "F"
### DENTAL SLIDING FEE SCALE
### SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only  It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook – Manual of Criteria (Section 5)

The program includes·
- Exam and X-rays ·
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply  Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office  Your office may be required to provide limited assistance (e g  emailing an application or referring the applicant to one of our local clinics for assistance)  Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit  All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum  Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However BCHF will pay an additional $5 00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to
  - Oral Surgery
  - Endodontist
  - Periodontist
  - Orthodontist
  - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date. 06\19\15

Dentist _Marcelo Toledo DDS_

Date 06\16\15

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D |
|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% |

Revised 10/16/2012

| E |
|---|
| 176 -200% |
| 10% |

# EXHIBIT R

## AGREEMENT BETWEEN
## MARLENE M. THOMPSON, D.D.S., INC.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION
## FOR
## DENTAL SERVICES

**THIS DENTAL SERVICES AGREEMENT** ( "Agreement") is entered into as of April 18, 2013 between Borrego Community Health Foundation ("BCHF") and Marlene M. Thompson, D D S., Inc ("Dentist"), collectively the "Parties"

## RECITALS

**WHEREAS**, BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC)   BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico Escondido located at  1151 Washington Avenue Suite C Escondido CA 92220   The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS")   The approved scope includes performance of primary dental services, and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric and adolescent  patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC

**WHEREAS,**  "Dentist"  is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement   The "Dentist" provides the desired scope of services that meet the FQHC criteria, and

**WHEREAS**, "Dentist" operates and administers a private practice in the Escondido area of California and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients (Refer to Addendum "C" for dental office address and contact information )

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows

I.    **DEFINITIONS**

    A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF"

    B.   **SCOPE OF SERVICES.**  Those services approved by the Health Resource and

Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

## II. ACKNOWLEDGEMENT

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

## III. INDEPENDENT RELATIONSHIP

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

## IV. PROFESSIONAL SERVICES

A. **COVERED SERVICES.** Dentist agrees to provide primary care dental services described in Addendum "A" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services

B. **SERVICE AVAILABILITY.** "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C" Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C. **DOCUMENTATION AND DESCRIPTION OF SERVICES.** "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any) The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D. **PRIOR AUTHORIZATION.** For dental services needing individual consideration

EXHIBIT R
PAGE 647

or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service   In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E. **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF"  Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement   If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F. **SLIDING FEE**.  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R §51c 303(f)    "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G. **NON-DISCRIMINATION. "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status  Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80 3-80.4, and Civil Rights Act of 2007.

V. **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A. **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations.

"BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

**B.   POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards   Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

**C.   PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

**D.   AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above   In particular,  "BCHF" shall retain ultimate authority over the following·

1   Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4   The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below

**E.   NOTIFICATION.  "**Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

**VI.   NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

**A.**  It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either

party by the other party.

**B.** "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected

**C.** "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement   For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.   CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.   COMPENSATION

**A.   FEE SCHEDULE.   "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

**B.   ENCOUNTER SUBMISSION.** Dentist will complete a superbill for every visit   The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

**C.   TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement   Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances

## IX.   CASE MANAGEMENT

**A.   AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES. "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours   "Dentist" will communicate with BCHF management as to appointment

availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5 00 p.m  schedules. "Dentist" will accommodate dental emergencies as necessary.  As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.   VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist    "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment.  If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.   REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.   REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist"  In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient

**E.   REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services   Participating Patients will be provided information as to available specialists that are available in the community for such care   "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application

**X.   LEGAL**

**A.   LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any

other certification or qualification necessary to provide the services specified prior to entering into this Agreement, *and annually upon request of "BCHF."* Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification   Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement

C. **MISREPRESENTATION**  "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**.  In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

   1   To comply  with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination,  as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U S. Department of Labor regulations at 41 C F  R  Part 60,

   2   To make positive efforts to utilize small businesses, minority-owned  firms and women's business enterprises in connection with the work performed hereunder, whenever possible,

   3   To comply  with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U S.C. §7401 et. seq.) and the Federal Water Pollution  Control Act (33 U S C. § 1251 et seq.), as amended;

   4. To comply  with the certification  and disclosure requirements of the Byrd Anti-Lobbying  Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

   5. To certify  that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations

## XI.   RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS**.  "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested   In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS**  "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated.  If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation,  or other action is completed, whichever is later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained   This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value

**C.  PARTICIPATING PATIENT RECORDS**   "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**.  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law   In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF"   Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**.  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent  with  applicable  Federal and State

laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

A.   **PROOF OF COVERAGE.**  The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter

B.   "Dentist" will provide "BCHF" with sufficient  evidence of professional liability coverage in the amount of at least:

1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate

2.   Workers' Compensation, as required under California State law.

3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement

C.   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D.   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however,

shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E.  **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.  CONFIDENDIALITY

A.  Except as is necessary in the performance  of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer  diskettes)  as a result of performing obligations under this Agreement, or of which it is otherwise aware  The parties (and their directors, officers, employees, agents, and contractors)  also agree not to disclose, except to each other, any proprietary information, professional secrets or other information  obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B.  The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.  TERM AND TERMINATION

A.  **TERM.**  This Agreement begins on April 18, 2013 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other

sixty (60) days in advance of termination   Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

**B.   TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

**C.   TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

**D.   TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

**E.   IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement, or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement

**F.   SURVIVAL.**  Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement   "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination

**XV.   GENERAL PROVISIONS**

**A.   AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties  Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed   Amendments will take effect upon the date of execution of both parties.

**B.   ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

**C.   EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this

Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E. **NOTICE.** Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F. **DISPUTE RESOLUTION.** Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e , circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients)  Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available

G. **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H. **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

MARLENE THOMPSON, DDS.

_____
Date: _4-26 – 13_

_Marlene Thompson_
Date _4/18/13_

Address: _955 Harbor Island Drive_
_Suite 110_
_San Diego CA · 92101_

Address   988 EL NORTE PARKWAY
ESCONDIDO, CALIFORNIA. 92026

Phone _760 – 767 – 4633_

Phone:___760-740-2595

Contact: _Cynthia Preciado_

Contact _HENA - front office_

E-mail _Cpreciado@borregomedical.org_
_619-398-2405_
_ext 4811_

E-mail: _TOOTHNUT 99 @ yahoo.com_

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below   Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
|---|---|---|---|---|
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

988 el norte parkway
Escondido, California 92026


Phone:  (760)740-2595


During the hours of    *tuesday*    *Wednesday*    *thursday — friday*
*Monday*               *10-7*         *9-6*          *8.5*    *closed*
*10.7*

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This HIPAA Business Associate Addendum ("Addendum") supplements and is made a part of the agreement ("Agreement") be and between Borrego Community Health Foundation, ("BCHF") and Marlene M Thompson, DDS, Inc (" Dentist" and Business Associate") and is effective as of the date of the original agreement (the "Addendum Effective Date")

RECITALS

WHEREAS, "BCHF", pursuant to the terms of the Agreement, wishes to disclose to Business Associate certain information, some of which may constitute Protected Health Information ("PHI") for the purpose of providing Dental Services to Participating Patients, and

WHEREAS, PHI means any information, whether oral or recorded in any form or medium (i) that relates to the past, present, or future physical or mental condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and the regulations promulgated there under by the U S Department of Health and Human Services ("HIPAA Regulations"), including, but not limited to 45 CFR Parts 160 and 164, and

WHEREAS, Business Associate is an individual or entity which provides services, arranges, performs or assists in the performance or activities of "BCHF" and who uses or discloses PHI, pursuant to the HIPAA Regulations, 45 CFR Section 160 103, and

WHEREAS, BCHF and Business Associate desire to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with HIPAA and the HIPAA Regulations and other applicable laws and regulations, and

WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, Title 45 CFR Section 164 504(e), as the same may be amended from time to time

NOW, THEREFORE, in consideration of the mutual promises made below and the exchange of information pursuant to the Agreement, this Addendum (herein collectively the "Agreement"), the Parties agree as follows

1.   Responsibilities of Business Associate

   a_  Permitted Uses and Disclosures  Business Associate may use and/or disclose PHI received by Busines is Associate pursuant to the Agreement and this Addendum solely for the purpose of performing its obligations under the Agreement and this Addendum

EXHIBIT R
PAGE 662

b. <u>Restrictions of PHI</u>  Business Associate shall notify "BCHF" in writing within twenty-four (24) hours of receipt of any request by residents, Students or their representatives to restrict the use and disclosure of the PHI Business Associate maintains for or on behalf of "BCHF". Upon written notice from "BCHF", Business Associate agrees to comply with any instructions to modify, delete or otherwise restrict the use and disclosure of PHI it maintains for or on behalf of "BCHF".

c. <u>Use and Disclosure of PHI.</u> Business Associate may, if necessary, use and disclose PHI (i) for the proper management and administration of Business Associate's business or (ii) to carry out Business Associate's legal responsibilities.

d. <u>Nondisclosure</u>  Business Associate is not authorized and shall not use or further disclose "BCHF's" PHI other than as permitted under the Agreement or this Addendum, or as required by law or regulation

e. <u>Data Aggregation.</u> Except as otherwise limited by this Addendum and upon "BCHF's" request, Business Associate may use PHI to provide data aggregation services relating to BCHF's healthcare operations as permitted by 45 CFR Section 164 504.

f. <u>Safeguards</u>  Business Associate shall use appropriate administrative, technical and physical safeguards to prevent any use or disclosure of "BCHF's" PHI other than as provided for by the Agreement and this Addendum

g. <u>Notification of Breach</u>  Business Associate shall notify "BCHF" in writing within one (1) working day of any suspected or actual breach of security, intrusion, or unauthorized use or disclosure of PHI and/or any actual or suspected use or disclosure Of PHI in violation of the Agreement, this Addendum, HIPAA, the HIPAA regulations, or any applicable federal and state laws and regulations Business Associate shall take (i) prompt corrective action to cure any such deficiencies and (ii) any other action pertaining to such unauthorized disclosure as may be required by all applicable federal and state laws and regulations

h. <u>Compliance with Law</u>  Business Associate shall comply with all applicable federal and state laws and regulations, including, if applicable under the terms and requirements of the Agreement, the HIPAA Standards for Electronic Transactions, 45 CFR Parts 160 and 162

i. <u>Business Associate's Agents</u>  Business Associate shall ensure that its employees, agents, and subcontractors who receive "BCHF's" PHI from Business Associate will agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI. Additionally, all employees, agents, and subcontractors shall promptly notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached.

j. <u>Inspection of Information.</u> Business Associate shall, within twenty-four (24) hours, excluding weekends and holidays, of receipt of a written or oral request

allow "BCHF" and, if authorized in writing by "BCHF", allow the subject of the PHI to inspect records as may be required to fulfill "BCHF's" obligations to provide access to "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

k   Copies of Information. Business Associate shall, within two (2) calendar days of receipt of a written or oral request, make available to "BCHF", and if authorized in writing by BCHF, to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide a copy of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524, and other applicable federal and state laws and regulations.

l   Accounting of Information  Business Associate shall, within twenty (20) calendar days of receipt of a written request, make available to "BCHF" and, if authorized in writing by "BCHF", to the subject of the PHI, such information as may be required to fulfill "BCHF's" obligations to provide an accounting of disclosures of "BCHF's" PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164.524. The accounting shall include a listing of PHI disclosures that occurred during the past six (6) years, commencing April 14, 2003  Each accounting entry shall include  (1) the date of the disclosure; (ii) the name and address of the entity or person who received the PHI; (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose and basis for the disclosure, a copy of a written authorization for the disclosure pursuant to 45 CFR Section 164 508, or a copy of a written request for the disclosure pursuant to 45 CFR Sections 164 502 and/or 164.512.

m  Business Associate shall inform "BCHF" within five (5) working days of receipt of any request by or on behalf of the subject of the PHI to amend the PHI Business Associate maintains for or on behalf of "BCHF". Business Associate shall, within twenty (20) calendar days of receipt of a written request, make the subject's PHI available to "BCHF" as may be required to fulfill "BCHF's" obligations to amend PHI pursuant to HIPAA, the HIPAA Regulations, including, but not limited to, 45 CFR Section 164 526, and other applicable federal and state laws and regulations. Business Associate shall, as directed by "BCHF", incorporate any Addendums to "BCHF's" PHI into copies of such PHI maintained and disclosed by Business Associate

n.  Chain of Trust. If applicable, Business Associate shall protect the integrity and confidentiality of any "BCHF" PHI electronically exchanged between Business Associate, "BCHF", and others pursuant to 45 SCR Part 142.

o.  Regulatory Compliance. Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from "BCHF" (or
created or received by Business Associate on behalf of "BCHF") available to any state or federal agency, including the U.S. Department of Health and Human Services, for purposes of determining "BCHF's" compliance with the HIPAA Regulations.

EXHIBIT R
PAGE 664

p. Record Retention: Business Associate shall retain all HIPAA-related documentation pertaining to "BCHF's" PHI for a period of six (6) years, as required by HIPAA and the HIPAA regulations.

q Audits, Inspection, and Enforcement. Upon reasonable notice "BCHF" may inspect the facilities, systems, books, and records of Business Associate to monitor compliance with the Agreement and this Addendum. Business Associate shall promptly remedy any violation of any terms of the Agreement of this Addendum and shall certify such remedy in writing to "BCHF".

2  Termination

a. Material Breach. A breach by Business Associate of any material provision of this Addendum, as determined by "BCHF", shall constitute a material breach of the Agreement, and shall provide grounds for immediate termination of the Agreement by "BCHF".

b Effect of Termination. Upon termination of the Agreement for any reason, Business Associate shall return or, at the option of "BCHF", destroy all PHI received from "BCHF", or created and received by Business Associate on behalf of "BCHF", that Business Associate still maintains in any form, and shall retain no copies of such PHI. If return or destruction is not feasible, as determined by "BCHF", Business Associate shall continue to extend indefinitely the protections of this Addendum to such PHI, and immediately terminate any further use or disclosure of such PHI

3.  Changes to the Addendum

a. Compliance with Law  The "Parties" acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that changes to this Addendum may be required to ensure compliance with such developments  The "Parties" specifically agree to take such action as may be necessary to implement the standards and requirements of HIPAA, the HIPAA Regulations and other applicable federal and state laws and regulations relating to the security or confidentiality of PHI.

b. Negotiations  In the event that a federal or state law, statue, or regulation materially affects the Agreement or this Addendum, the "Parties" agree to negotiate immediately in good faith any necessary or appropriate revisions to the Agreement or this Addendum. If the "Parties" are unable to reach an agreement concerning such revisions within the earlier of sixty (60) calendar days after the date of notice seeking negotiations or the effective date of a change in law or regulation, or if the change is effective immediately, then "BCHF" may immediately terminate this Agreement upon written notice to Business Associate.

4.  Insurance and Indemnification

a. Insurance. Each Party, at its sole cost and expense, shall insure its activities in connection with this Addendum. Specifically, Business Associate and "BCHF" shall each obtain, keep in force and maintain insurance or equivalent programs of self-insurance with appropriate limits that shall cover losses that may arise

from breach of this Addendum, breach of security, or any unauthorized use of disclosure of PHI. It should be expressly understood, however, that the insurance required herein shall in no way limit the liability of Business Associate or "BCHF" with respect to its activities in connection with this Addendum

b.  <u>Indemnification by Business Associate.</u> Business Associate agrees to defend at BCHF's election, indemnify, and hold harmless "BCHF", its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of Business Associate, its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

c.  <u>Indemnification by "BCHF".</u>   "BCHF" agrees to defend at Business Associate's election, indemnify, and hold harmless Business Associate, its officers, agents and employees from and against any and all claims, liabilities, demands, damages, losses, costs and expenses, (including costs and reasonable attorneys' fees) or claims for injury or damages that are caused by or result from the acts or omissions of "BCHF", its officers, agents or employees with respect to the use and disclosure of "BCHF's" PHI.

5.  <u>Miscellaneous Provisions</u>

a   <u>Assistance in Litigation or Administrative Proceedings</u>  Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under the Agreement and this Addendum, available to "BCHF" at no cost to "BCHF" to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings against "BCHF", its directors, officers, agents or employees based upon claimed violation of HIPAA, the HIPAA Regulations or other federal and state laws and regulations relating to security and privacy and arising out of the Agreement or this Addendum.

b.  <u>No Third Party Beneficiaries</u>  Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer upon any person other than "BCHF", Business Associate and their respective successors or assignees, any rights, remedies, obligations or liabilities whatsoever

c.  <u>Notice to Secretary.</u> If "BCHF" knows of a pattern of activity or practice of Business Associate that constitutes a material breach or violation of Business Associate's obligation under this Addendum, if the breach or violation continues, and if termination of this Addendum is not feasible, "BCHF" is required by HIPAA and the HIPAA Regulations to report the problem to the Secretary of Health and Human Services.

d   <u>Survival.</u> The obligations of Business Associate under Sections 1(j), 1(k), 1(1), 1(m), 1(p), 2(b), 4(b), 4(c) and 5(a) of this Addendum shall survive the termination of this Agreement

e.  <u>Notices</u>  Any notices to be given to either party shall be made via U S  Mail or express courier to the addresses given below:

BCHF  Borrego Community Health Foundation
     Attn.  Bruce Hebets, Chief Executive Officer
     Corporate Office
     P.O. Box 2369
     Borrego Springs, CA  92004-2369

Dentist·  MARLENE THOMPSON, DDS.
     988 EL NONRTE PARKWAY
     ESCONDIDO, CALLIFORNIA. 92026
     760-740-2595

Each Party may change its address and that of its representative for notice by giving notice in the manner provided above.

<u>f</u> Interpretation   Any ambiguity in this addendum shall be resolved in favor of a meaning that permits "BCHF" to comply with HIPAA, the HIPAA Regulations, and other applicable federal and state laws and regulations.

**SIGNATURES:**     Marlene Thompson, DDS

**Bruce Hebets, CEO**

_____   _____

DATE____4-26-13_____  DATE____4/18/13_____

Borrego Community Health Foundation

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances."  A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Hebets CEO

Dentist: _Marlene Thompson DDS_

Date: ____5/8/14____

Date: ____5/1/14____

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
### ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740,D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110,D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT R

PAGE 670

Addendum "F"
## DENTAL SLIDING FEE SCALE
## SUMMARY OF BENEFITS

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook – Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

**Program Exclusions:**

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Date: _____ 5/9/14

Dentist: Marlene Thompson DDS

_Marlene Thompson DDS_

Date: 5 1 1 14

## Dental Sliding Fee Discount

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

Addendum "E"

## ADDITION OF SERVICE LOCATION
## TO THE
## AGREEMENT BETWEEN
## MARLENE THOMPSON, D.D.S, INC.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION

This addendum to the standing Dental Services Agreement between Marlene Thompson, D.D.S., INC. documents the full and complete understanding between the two organizations in regard to the request to add a second dental office that will provide preventive and additional dental services on behalf of Borrego Community Health Foundation (BCHF) at the following address:

126 W El Norte Parkway
Escondido, CA 92026

Phone: 760-480-5622

Hours of Operation: ___Mon - Thurs   9AM - 6 pm___

It is agreed and fully understood that this location will be subject to all of the terms and conditions of the original agreement and that it is operating under contract to provide services to patients of a Federally Qualified Health Center.  This site is subject to all licensing and quality standards and oversight as outlined in the original agreement and the records are subject to audit as records of this contractual agreement.

All requirements for malpractice and liability insurance must be adhered to and evidence of coverage provided.

Bruce Hebets, CEO                         Dentist: Marlene Thompson
Borrego Community Health Foundation       Marlene Thompson, D.D.S., INC

_____                 _____

Date: ___3-4-16___                        Date: ___02-25-2016___

Addendum "F"

## ADDITION OF SERVICE LOCATION
## TO THE
## AGREEMENT BETWEEN
## MARLENE THOMPSON, D.D.S, INC.
## AND
## BORREGO COMMUNITY HEALTH FOUNDATION

This addendum to the standing Dental Services Agreement between Marlene Thompson, D.D.S., INC. documents the full and complete understanding between the two organizations in regard to the request to add a second dental office that will provide preventive and additional dental services on behalf of Borrego Community Health Foundation (BCHF) at the following address:

191 North El Camino Real
Encinitas, CA 920224-5360

Phone: 760-436-0100

Hours of Operation:  Mon - Thurs   9 AM - 6 PM

It is agreed and fully understood that this location will be subject to all of the terms and conditions of the original agreement and that it is operating under contract to provide services to patients of a Federally Qualified Health Center.  This site is subject to all licensing and quality standards and oversight as outlined in the original agreement and the records are subject to audit as records of this contractual agreement.

All requirements for malpractice and liability insurance must be adhered to and evidence of coverage provided.

Bruce Hebets, CEO
Borrego Community Health Foundation

Dentist: Marlene Thompson
Marlene Thompson, D.D.S, INC

Date: 3-4-16

Date: 02-25-2016

# EXHIBIT S

**AGREEMENT BETWEEN**
**_____NESS DENTAL CORPORATION_____**
**AND**
**BORREGO COMMUNITY HEALTH FOUNDATION**
**FOR**
**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of May 2nd 2016 between Borrego Community Health Foundation ("BCHF") and Ness Dental Corporation dba Crown Dental Group ("Dentist"), collectively the "Parties".

**RECITALS**

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon at 133 Main Street, El Cajon, CA 92020.   The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC. .

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the National City, area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I.   **DEFINITIONS**

A.   **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to receive dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the FQHC operated by "BCHF".

B.   **SCOPE OF SERVICES.** Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

II.    **ACKNOWLEDGEMENT**
The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

III.   **INDEPENDENT RELATIONSHIP**
None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other.  This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

IV.   **PROFESSIONAL SERVICES**

A.    **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

B.    **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director.  "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement.  Such facilities must meet standards of practice expected of a licensed facility.  Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

C.    **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes.  In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records.  "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable laws or regulations.

D.    **PRIOR AUTHORIZATION.**  For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the

dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

E.   **AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

F.   **SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time or service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

G.   **NON-DISCRIMINATION.  "**Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

V.   **QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

A.   **QUALITY OF CARE**.  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services. The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and

procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC). "BCHF" will provide "Dentist with such requirements, policies, procedures and standards. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C. **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D. **AUTHORITY.** "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E. **NOTIFICATION.** "Dentist" shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

## VI. NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS

A. It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B. "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C. "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or

attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes of this paragraph, a "patient of BCHF" shall mean any patient seen or treated by "BCHF" (whether by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.  CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k)(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.  COMPENSATION

A.  **FEE SCHEDULE.  "**Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.  **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C. **TIMING OF PAYMENT.**   Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made within 3-4 weeks from submittal date to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.  CASE MANAGEMENT

A.  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.  "**Dentist" agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours.  "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need.  The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF".  "Dentist" will provide occasional after hour sessions to provide expanded availability.  These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary.  As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

B. **VERIFICATION OF PATIENT STATUS.**   "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist.   "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist".  If it is determined that the Participating

Patient is not a "BCHF" patient  on the date of service,  "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

C. **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES**. The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such.  The information will be made available in a timely manner according to established policies and procedures.  "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

D. **REFUSAL TO PROVIDE SERVICES.**  The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients.  "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

E. **REFERRAL FOR SPECIALTY SERVICES.**  "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services.  Participating Patients will be provided information as to available specialists that are available in the community for such care.  "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

X.    **LEGAL**

A. **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.**  Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement.  The same requirements apply to "Dentist" employees and staff.  No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification.  Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

B. **COMPLIANCE WITH THE LAW.**  "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is

grounds for immediate termination under Section XIV of this Agreement.

C. **MISREPRESENTATION**. "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

D. **COMPLIANCE WITH OTHER LAWS**. In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F.R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

XI.   **RECORD KEEPING AND REPORTING**

A. **PROGRAMMATIC RECORDS**. "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

B. **FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is

later.  "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription,  and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained.  This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

C.   **PARTICIPATING PATIENT RECORDS.**  "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement.  All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF".  "Dentist"  and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

D.   **RETENTION OF PATIENT RECORDS.**  Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law.   In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF".   Record retention obligations survive the termination of this Agreement.

E.   **OWNERSHIP OF PATIENT RECORDS.**  "Dentist" and "BCHF" agree that "BCHF" shall retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with  applicable  Federal and State laws and regulations  and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

XII.   **INSURANCE**

A.   **PROOF OF COVERAGE.**  The **"Dentist"** , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

B. "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

1. General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

2. Workers' Compensation, as required under California State law.

3. Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

C. It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

D. Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

E. **INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

XIII.   **CONFIDENTIALITY**

EXHIBIT S
PAGE 685

.

A. Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

B. The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.** This Agreement begins on _May 2nd__, 2016 and shall be automatically and successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

B. **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

C. **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

D. **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

E. **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

F. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by

"BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement. "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

XV.    **GENERAL PROVISIONS**

A.   **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B.   **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C.   **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a waiver of any future breaches.

D.   **EFFECT OF INVALIDITY.** The invalidity or un-enforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

E.   **NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

F.   **DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

G.   **CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

H.   **ENTIRE AGREEMENT.**  This Agreement represents the complete understanding of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Date: 5 - 6 - 2016

Address: PO Box 2369

Borrego Springs, CA 92004

Phone: (619) 444-5704

Contact: Travis Lyon
Contact:_____

E-mail: cdtlyon@borregomedical.org

_____NESS DENTAL CORPORATION___

Date:____5/2/2016_____

Address:__2405 Transportation Ave_____

_____National City, CA 91950_____

Phone:____619-649-8239_____

Norma: office manager

E-mail_____crowndentalinc@gmail.com NO
OK → dental2405 @ gmail .com

## Addendum "A"

### Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of  commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)

Crowns (prior review required by the "BCHF" Dental Director)

**Addendum "B"**

**Compensation of Dental Services**
**Medi-Cal**

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal
patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and
root canals are subject to prior review and authorization by the Dental Director.  If the service is
not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a
private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |

| Extractions - simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
|---|---|---|---|---|
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

**Addendum "C"**

**Location of Service**

All dental services under this agreement will be rendered at:

DBA _CROWN DENTAL GROUP_

Address _2405 TRANSPORTATION AVE._

_NATIONAL CITY, CA  91950_

Phone: _619 - 474 - 6200_

During the hours of:

_MONDAY THRU SATURDAY - 8:00 AM - 5 PM_

NPI Number - Organization _176 0869796_

NPI Number- Individual _1821105446_

Copies attached

1760869796
Corp.
**CROWN DENTAL GROUP**
**2405 TRANSPORTATION AVE**
**NATIONAL CITY CA 91950**

1821105446 -
Ind.

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the May 2nd, 2016 by and between Borrego Health, hereinafter referred to as "Covered Entity", and Ness Dental Corporation dba Crown Dental Group hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated May 2, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.     DEFINITIONS

A.  Catch-all definition:
The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the

HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control. Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  Specific definitions:

1.  Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Ness Dental Corporation dba Crown Dental Group.

2.  Covered Entity. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

3.  HIPAA Rules.   "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

4.  Protected Health Information. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

5.  Electronic Protected Health Information. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.   CONFIDENTIALITY AND SECURITY REQUIREMENTS

A.  Business Associate agrees:

1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the

time when Business Associate becomes aware of the breach;

4. In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5. To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6. To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7. To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8. To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9. To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B. Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1. As necessary to perform the services set forth in the underlying Service Agreement; and/or

2. As required by law.

3. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered

EXHIBIT S
PAGE 695

entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

III.   **AVAILABILITY OF PHI**

A. Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity. Business Associate agrees to make available

Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule. If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual. Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule. In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act. Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement. If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity, that the business associate still maintains in any form. Business associate shall retain no copies of the protected health information.

D.   Survival. The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.   Amendment; Independent Parties. This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create

EXHIBIT S
PAGE 697

any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C. <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D. <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____5-6-2016_____
Date

**BUSINESS ASSOCIATE:**

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

_____5/2/16_____
Date

EXHIBIT S
PAGE 698

**Addendum "D"**
**ADDITION OF MEDI-CAL ADULT DENTAL**
**AND SLIDING FEE**

The Ninth Circuit Court of Appeals decision in California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013)) allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

## SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances." A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

## EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

## SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income/uninsured as further outlined in "Addendum F".

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

5-6-2016
_____
Date

5/2/16
_____
Date

Addendum "E"

**COMPENSATION OF DENTAL SERVICES**
**ADULT MEDI-CAL**

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit  for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions - simple | D7111, D7140 | 1 | Per visit -- multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit -- multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal - Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

EXHIBIT S
PAGE 700

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740, D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

**Addendum "F"**

**DENTAL SLIDING FEE SCALE
SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**

The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook - Manual of Criteria (Section 5).

The program includes:

- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**

The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal

EXHIBIT S
PAGE 702

fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

Program Exclusions:

- Referrals to all specialists including but not limited to:
  - ➢ Oral Surgery
  - ➢ Endodontist
  - ➢ Periodontist
  - ➢ Orthodontist
  - ➢ Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| | | | | | | |
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150 % | 151-175 % | 176-200 |
| **Nominal Fee** | $50 | **Percent Discount** | 25% | 20% | 15% | 10% |

Bruce Hebets, CEO
Borrego Community Health Foundation

5-6-2016
Date

Dr. Douglas G. Ness
NESS DENTAL CORPORATION

5/2/16
Date

**Addendum "G"**

**HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development. Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers. Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification. A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained. PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system. This monthly fee will only be assessed once the online storage system is implemented. Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract. All other terms and conditions remain the same.

**SIGNATURES:**

_____
Bruce Hebets, CEO
Borrego Community Health Foundation

_____5-6-2016_____
Date

_____
Dr. Douglas G. Ness
NESS DENTAL CORPORATION

_____5-2-16_____
Date

# EXHIBIT T

**AGREEMENT BETWEEN**

**GEORGE C. JARED, DDS, INC.**

**AND**

**BORREGO COMMUNITY HEALTH FOUNDATION**

**FOR**

**DENTAL SERVICES**

**THIS DENTAL SERVICES AGREEMENT** ("Agreement") is entered into as of April 19, 2016 between Borrego Community Health Foundation ("BCHF") and George C. Jared, DDS, Inc. ("Dentist"), collectively the "Parties".

## RECITALS

**WHEREAS,** BCHF is a 501 (c) (3) non-profit public benefit corporation, organized under the laws of the State of California and is licensed to operate Federally Qualified Community Health Centers (FQHC). BCHF operates clinics throughout Riverside and San Diego Counties including Centro Medico El Cajon located at: 133 Main Street, El Cajon, CA 92020. The clinics provide comprehensive primary and specialty care according to the scope of services as approved by the Bureau of Primary Health Care ("BPHC") within the United States Department of Health and Human Services ("DHHS"). The approved scope includes performance of primary dental services; and

**WHEREAS, "BCHF"** desires to increase access to dental services for pediatric, adolescent and adult patients of the FQHC by entering into agreements with qualified Dentists to provide primary dental services for the FQHC.

**WHEREAS,** "Dentist" is duly licensed to provide dental services within the State of California and meets credentials required by "BCHF" to perform such services, and is not the subject of any Medicaid/Medicare related actions, suspensions, exclusions or debarments that would disqualify him or her from providing services under this Agreement. The "Dentist" provides the desired scope of services that meet the FQHC criteria; and

**WHEREAS,** "Dentist" operates and administers a private practice in the El Cajon, City area of California within "BCHF's" service area and agrees to provide primary dental services to patients on behalf of "BCHF" by entering into agreement to deliver such services in a professional manner to "BCHF" patients. (Refer to Addendum "C" for dental office address and contact information.)

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and agreements herein contained, and other good and valuable consideration, the "Parties" hereto mutually agree as follows:

I. **DEFINITIONS**

    A. **PARTICIPATING PATIENTS.** A "Participating Patient" who is eligible to received dental services under this Agreement is defined as any individual residing in FQHC's federally-approved service area and who is a patient of the

FQHC operated by "BCHF".

    **B.**  **SCOPE OF SERVICES.**  Those services approved by the Health Resource and Service Administration (HRSA) as Required and Additional Services that are authorized to be rendered by BCHF to residents of the specified service area.

**II.**  **ACKNOWLEDGEMENT**

The "Dentist" agrees to be bound by the terms and conditions of this Agreement insofar as said Agreement relates to rights, responsibilities and duties as "Dentist". This Agreement constitutes the entire understanding between the parties hereto and no changes, amendments or alterations shall be effective unless agreed to in writing by both parties and appended to this Agreement.

**III.**  **INDEPENDENT RELATIONSHIP**

None of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between "BCHF" and "Dentist" other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither of the parties hereto nor any of their respective employees shall be construed to be the agent, employee or representative of the other. This Agreement is entered into at an arm's length negotiated rate reflective of the fair market value.

**IV.**  **PROFESSIONAL SERVICES**

    **A.**  **COVERED SERVICES.**  Dentist agrees to provide primary care dental services described in Addendum "A" and Addendum "D" as "Covered Services", as required, to Participating Patients, in accordance with the attached "Payment Schedule" and as further described in Section VIII. "BCHF" is responsible for contacting "Dentist" to make initial appointments for Participating Patients. Notwithstanding, "BCHF" is under no obligation to utilize "Dentist" to provide dental services to any or all Participating Patients who require such services.

    **B.**  **SERVICE AVAILABILITY.**  "Dentist" shall provide primary dental services during hours of operations that are mutually agreed upon and outlined in "Addendum "C". Any changes require prior notification to the "BCHF" Dental Director. "Dentist" will maintain adequate facilities within the Service Area to meet the responsibilities of this Agreement. Such facilities must meet standards of practice expected of a licensed facility. Adequate trained, certified or licensed personnel will be provided quality standard of care and not place the health and well being of the patients in jeopardy. "Dentist" will provide a plan of after hour access for phone consultation and triage for dental emergencies of established patients.

    **C.**  **DOCUMENTATION AND DESCRIPTION OF SERVICES.**  "Dentist" agrees to establish and maintain dental records that will contain descriptions of any dental services provided to Participating Patients, as well as proposed follow-up treatment plans for subsequent visits (if any). The descriptions of the services will be made using American Dental Association CDT Standard Claims Codes. In the event that such records are housed in a location other than the dental office, "BCHF" shall have reasonable and timely access to such records. "Dentist" agrees to retain such records for a period of at least seven years or to the extent required by applicable

laws or regulations.

**D.   PRIOR AUTHORIZATION.**   For dental services needing individual consideration or prior approval the "Dentist" must provide such documentation necessary prior to rendering such service.  In addition to standard requirements of prior approval outlined by the Denti-Cal program or other third party payors, an additional list of services requiring prior approval may be provided by "BCHF".  As a satellite of an FQHC, Treatment Authorization Requests (TAR) must be fully documented in the dental record, but do not require submission to Denti-Cal for prior approval. This does not apply to treatment paid directly by Denti-Cal

**E.   AGREEMENT NOT TO CHARGE PATIENTS.** The "Parties" agree that all Participating Patients receiving services from "Dentist" pursuant to this Agreement shall be considered patients of "BCHF". Accordingly, "BCHF" shall be responsible for the billing of such patient services, as applicable, as well as the billing of Federal, State and private payors, and the collection and retention of any and all payments. "Dentist" agrees not to bill, charge or collect from Participating Patients or payors any amount for any dental services provided under this Agreement.  If "Dentist" should receive any payment from Participating Patients or payors for services provided hereunder, "Dentist" agrees to remit such payment to FQHC within ten (10) days of receipt.

**F.   SLIDING FEE.**  Notwithstanding the aforementioned, "Dentist" recognizes that certain Participating Patients may be charged at the time of service, in accordance with a fee schedule and, as applicable, schedule of sliding fee discounts established by "BCHF" pursuant to 42 C.F.R.§51c.303(f).   "Dentist" shall, on behalf of "BCHF" and consistent with "BCHF 's" guidelines, schedules and procedures, make every reasonable effort to collect fees from eligible Participating Patients at the time services are provided to such patients and to remit such payments to "BCHF" within ten (10) days of receipt. "BCHF" shall perform the follow-up activities necessary to collect patient fees not collected by "Dentist" at the time of service.

**G.   NON-DISCRIMINATION.**  "Dentist" agrees to provide dental services to Participating Patients in the same professional manner and pursuant to the same professional standards as generally provided by "Dentist" to his or her patients, regardless of an individual's or family's ability to pay for services rendered. This section shall not be read to prevent "Dentist" from limiting the number of hours and/or days during which "Dentist" agrees to see Participating Patients, provided that such limitation shall not be based on a Participating Patient's payor source or insurance status. Dentist also agrees not to differentiate or discriminate in the provision of services provided to Participating Patients on the basis of race, color, religious creed, age, marital status, national origin, alienage, sex, blindness, mental or physical disability or sexual orientation pursuant to Title 45 of the Code of Federal Regulations, §§ 80.3-80.4, and Civil Rights Act of 2007.

**V.   QUALITY OVERSIGHT AND EVALUATION OF SERVICES BY FQHC**

**A.   QUALITY OF CARE.**  "Dentist" shall provide care consistent with prevailing community standards for quality of care and in accordance with "BCHF" Section 330 grant and applicable grant-related expectations and requirements.   Services shall be within the scope of practice outlined in Addendum B for primary care dental services.

The "Dentist" will be subject to standards of quality review as though the care was provided by an employed dentist or the organization.   Such review will include facility and record review in keeping with "BCHF" standards and applicable regulations. "BCHF" will communicate in writing any corrective action that must be resolved in a timely manner.

B.   **POLICIES AND PROCEDURES.**  The "Dentist" will be subject to clinical policies and procedures established by "BCHF" regarding the provision of services pursuant to this agreement including but not limited to qualifications and credentials, clinical guidelines, standards of conduct, quality assurance standards, productivity standards, patient and provider grievance and complaint procedures.  Such policies and procedures are consistent with "BCHF's" requirements established by the Bureau of Primary Health Care (BPHC).  "BCHF" will provide "Dentist with such requirements, policies, procedures and standards.  Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of clinical services.

C.   **PATIENT RELATIONSHIP.** "Dentist" shall maintain a dentist/patient relationship with Participating Patients and shall be solely responsible for dental treatment and advice. Notwithstanding, nothing herein is intended to interfere with "Dentist's" professional judgment in connection with the provision of such services.

D.   **AUTHORITY.**  "BCHF", through its Executive Director and/or Dental Director or Medical Director, shall have and exercise ultimate authority and responsibility for the services provided to Participating Patients pursuant to this Agreement, consistent with the policies, procedures and standards set forth above.  In particular,  "BCHF" shall retain ultimate authority over the following:

1. Determination as to whether "Dentist" meets "BCHF's" qualifications and credentials, consistent with BCHF standards.

2. Interpretation of "BCHF's" policies and procedures, clinical guidelines, quality assurance standards, productivity standards, standards of conduct and provider and patient grievance and complaint resolution procedures, and their applicability to "Dentist".

3. Determination with respect to whether "Dentist" is performing satisfactorily and consistent with "BCHF's" policies, procedures and standards.

4. The Executive Director and/or Medical Director have the authority to terminate this agreement in accordance with Section XIV below.

E.   **NOTIFICATION.  "Dentist"** shall, as soon as reasonably practicable, notify "BCHF" of any action, event, claim, proceeding, or investigation (including, but not limited to, any report made to the National Practitioner Data Bank) that could result in the revocation, termination, suspension, limitation or restriction of "Dentist's" licensure, certification, or qualification to provide such services.  "BCHF" may suspend this Agreement, until such time as a final determination has been made with respect to the applicable action, event, claim, proceeding, or investigation.

VI.   **NO OBLIGATION TO REFER AND NON-SOLICITATION OF PATIENTS**

A.  It is specifically agreed and understood between the parties that nothing in this Agreement is intended to require, nor requires, nor provides payment or benefit of any kind (directly or indirectly), for the referral of individuals or business to either party by the other party.

B.  "Dentist" agrees that during the term of this Agreement, he or she shall not, directly or indirectly, solicit or attempt to solicit or treat, for his or her own account or for the account of any other person or entity, any patient of "BCHF." This non-solicitation clause shall survive termination of this Agreement for a period of two (2) years following termination, however such termination is affected.

C.  "Dentist" shall not cause any entity or individual he or she is employed by or with whom he or she is professionally associated to, directly or indirectly, solicit or attempt to solicit for his or her own account or for the account of any other person or entity, any patient of "BCHF" for whom "Dentist" provided care during the term of the Agreement.  For purposes  of this paragraph, a "patient  of BCHF" shall mean any patient seen or treated by "BCHF" (whether  by its employees or independent contractors) during the one (1) year period immediately preceding the termination or expiration of this Agreement, including, but not limited to, those patients treated by Dentist hereunder.

## VII.  CONTRACTS WITH OTHERS

This contract is non-exclusive. "BCHF" retains the authority to contract with other dentists or dental practices, if, and to the extent that, "BCHF" reasonably determines that such contracts are necessary in order to implement "BCHF" policies and procedures, or as otherwise may be necessary to assure appropriate collaboration with other local providers (as required by Section 330 (k )(3) (B)), to enhance patient freedom of choice, and/or to enhance accessibility, availability, quality and comprehensiveness of care.

## VIII.  COMPENSATION

A.  **FEE SCHEDULE.**  "Dentist" will be compensated for providing dental services under this Agreement in accordance with the attached Payment Schedule Addendum "B".

B.  **ENCOUNTER SUBMISSION.**  Dentist will complete a superbill for every visit.  The superbills will be batched and submitted on a daily basis along with the patient demographic information and a copy of the visit documentation.  Adequate supporting documentation must be made available to ensure that "BCHF" will be able to collect for services rendered and not place the organization in jeopardy of false claims.

C.  **TIMING OF PAYMENT.**  Payment will be made on claims that are paid to "BCHF" by third party payors.  The payment will be processed and made on the 15th day of each month to the "Dentist" with a detailed explanation of reimbursement.  Both "Dentist" and "BCHF" will be responsible for maintaining records of transactions to avoid duplication of reimbursement and resolve outstanding balances.

## IX.  CASE MANAGEMENT

A.  **AGREEMENT TO PROVIDE DESIGNATED NUMBER OF SERVICES.**  "Dentist"

agrees to provide services for the "BCHF" patients for a minimum of **ten** (10) visits a week and to be available at minimum three days a week during standard business hours. "Dentist" will communicate with BCHF management as to appointment availability so that adjustments can be made to accommodate the identified need. The "Dentist" reserves the right to fill these appointments if there are an insufficient number of referrals from "BCHF". "Dentist" will provide occasional after hour sessions to provide expanded availability. These sessions may include weekend clinics or after 5:00 p.m. schedules. "Dentist" will accommodate dental emergencies as necessary. As an FQHC satellite, at no time will the contract exceed twenty (20) hours a week.

**B.** **VERIFICATION OF PATIENT STATUS.** "BCHF" will verify each Participating Patient's status as a "BCHF" patient on the day on which an appointment is made for such patient with Dentist. "Dentist" will verify information regarding the patient's status as a "BCHF" patient on the date of service or otherwise mutually agreed upon method verification presenting to the "Dentist". If it is determined that the Participating Patient is not a "BCHF" patient on the date of service, "BCHF", in consultation with Dentist, will decide whether or not to authorize "Dentist" to proceed with treatment. If "BCHF" authorizes "Dentist" to proceed with treatment, "BCHF" will be responsible for payment for the services provided by the "Dentist" according to the compensation provisions in this Agreement.

**C.** **REPORTING AND INVESTIGATION OF PATIENT COMPLAINTS/GRIEVANCES.** The "Dentist" will cooperate fully with "BCHF" in the investigation of Participating Patient complaints and grievances by providing information necessary for review and resolution of such. The information will be made available in a timely manner according to established policies and procedures. "Dentist" will collaborate in the resolution of identified opportunities for improvement without retaliation against the Participating Patient and in keeping with the wellbeing of such.

**D.** **REFUSAL TO PROVIDE SERVICES.** The "Dentist" has the right to request termination of services for Participating Patients who behave in a disruptive manner or are grossly discourteous towards "Dentist", "Dentist's" employees or other patients. "Dentist" must promptly report all such instances to "BCHF", who will notify the Participating Patient that, unless the Participating Patient corrects such behavior immediately, he or she will no longer be eligible to receive dental services from the "Dentist". In the event of non-resolution or if the circumstances are severe in nature, "Dentist" will have no obligation to provide further services for the Participating Patient.

**E.** **REFERRAL FOR SPECIALTY SERVICES.** "Dentist" will provide services within the approved scope for "BCHF" to Participating Patients and as outlined in Addendum "A" that are within the "Dentist's" knowledge, skill and training. "Dentist" will inform "BCHF" as soon as practical when Participating Patients require specialty referral and/or services beyond the "Dentist" and "BCHF" scope of services. Participating Patients will be provided information as to available specialists that are available in the community for such care. "BCHF" maintains Care Coordination Specialists that may assist with healthcare coverage information and application.

**X.** **LEGAL**

**A.** **LICENSURE, CERTIFICATION AND OTHER QUALIFICATION.** Dentist will provide "BCHF" with evidence of current licensure within the State of California as well as any other certification or qualification necessary to provide the services specified prior to entering into this Agreement, and annually upon request of "BCHF." Dentist will maintain unrestricted licensure and/or certification and qualification as a Medi-Cal and, as applicable, Medicare participating provider during the term of this Agreement. "Dentist" agrees to have such additional qualifications and credentials as "BCHF" may reasonably require for "Dentist" to provide services, including but not limited to Basic Life Support (BLS), DEA number and others pursuant to this Agreement and shall maintain such qualifications and credentials during the term of this Agreement. The same requirements apply to "Dentist" employees and staff. No patients are to be treated by "Dentist" or other support staff who have not provided proper licensing and certification. Only the qualified of provider authorized by "BCHF" guidelines are allowed to render such services.

**B.** **COMPLIANCE WITH THE LAW.** "Dentist" will practice in accordance with the all Federal, State and local laws, regulations, and generally accepted principles applicable to the practice of dentistry. Failure to comply with this provision is grounds for immediate termination under Section XIV of this Agreement.

**C.** **MISREPRESENTATION.** "Dentist" acknowledges and agrees that willful misrepresentation of the type, frequency, reasonableness and/or necessity of dental services provided to Participating Patients may constitute a fraudulent act and may be referred by "BCHF" to the applicable Federal or State regulatory agency, and will be cause for immediate termination under XIV of this Agreement.

**D.** **COMPLIANCE WITH OTHER LAWS.** In connection with the provision of services pursuant to this Agreement, "Dentist" agrees to the following requirements, to the extent that such requirements are applicable:

1. To comply with the Civil Rights Act of 1964 and all other Federal, State or local laws, rules and orders prohibiting discrimination, as well as Executive Order 11246, entitled "Equal Employment Opportunity," as amended by Executive Order 11375, and as supplemented by U.S. Department of Labor regulations at 41 C.F. R. Part 60;

2. To make positive efforts to utilize small businesses, minority-owned firms and women's business enterprises in connection with the work performed hereunder, whenever possible;

3. To comply with all applicable standards, orders, and regulations issued pursuant to the Clean Air Act of 1970 (42 U.S.C. §7401 et. seq.) and the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), as amended;

4. To comply with the certification and disclosure requirements of the Byrd Anti-Lobbying Amendment (31 U.S.C. § 1352), and any applicable implementing regulations, as may be applicable; and

5. To certify that neither it, nor any of its principal employees, has been debarred or suspended from participation in federally-funded contracts, in accordance

with Executive Order 12549 and Executive Order 12689, entitled "Debarment and Suspension," and any applicable implementing regulations.

## XI.   RECORD KEEPING AND REPORTING

**A. PROGRAMMATIC RECORDS**. "Dentist" agrees to prepare and maintain programmatic, administrative and other records and information that pertain to the services provided hereunder and that "BCHF" and/or DHHS may reasonably deem appropriate and necessary for the monitoring and auditing of this Agreement, and to provide them to "BCHF" as reasonably requested. In addition, "Dentist" will maintain such records and provide such information to "BCHF" or to regulatory agencies as may be necessary for "BCHF" to comply with State or Federal laws, regulations or accreditation requirements, as well as "BCHF's" reporting obligations pursuant to its Section 330 grant.

**B. FINANCIAL RECORDS**. "Dentist" shall prepare and maintain financial records and reports, supporting documents, statistical records, and all other books, documents, papers or other records related and pertinent to this Agreement for a period of five (5) years from the date this Agreement expires or is terminated. If an audit, litigation, or other action involving the records is started before the end of the five (5) year period, "Dentist" agrees to maintain the records until the end of the five (5) year period or until the audit, litigation, or other action is completed, whichever is later. "Dentist" shall make available to "BCHF", DHHS and the Comptroller General of the United States, or any of their duly authorized representatives, upon appropriate notice, such financial systems, records, reports, books, documents, and papers as may be necessary for audit, examination, excerpt, transcription, and copy purposes, for as long as such systems, records, reports, books, documents, and papers are retained. This right also includes timely and reasonable access to "Dentist" personnel for the purpose of interview and discussion related to such documents. "Dentist" shall, upon request, transfer identified records to the custody of "BCHF" or DHHS when either "BCHF" or DHHS determine that such records possess long term retention value.

**C. PARTICIPATING PATIENT RECORDS**. "Dentist" agrees to establish and maintain dental records relating to the diagnosis and treatment of Participating Patients served pursuant to this Agreement. All such records shall be prepared in a mutually agreed upon format that is consistent with the clinical guidelines and standards established by "BCHF". "Dentist" and "BCHF" agree to maintain the privacy and confidentiality of such records, in compliance with all applicable Federal, State and local law including, but not limited to, the Health Insurance Portability and Accountability Act and consistent with "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records.

**D. RETENTION OF PATIENT RECORDS**. Dentist will retain dental records for seven (7) years beyond the last date of delivery of the services or to the extent required by applicable law. In the event that Dentist retires or discontinues his or her practice, Dentist must comply with the public and private notice provisions set forth in California State law and transfer all Participating Patient records to "BCHF". Record retention obligations survive the termination of this Agreement.

**E. OWNERSHIP OF PATIENT RECORDS**. "Dentist" and "BCHF" agree that "BCHF" shall

retain ownership of all dental records of this Agreement, regardless of the physical location in which such records are housed.   "Dentist" and "BCHF" agree that "Dentist", upon reasonable notice to "BCHF" and consistent with applicable Federal and State laws and regulations and "BCHF's" policies and procedures regarding the privacy and confidentiality of patient records, shall have timely and reasonable access to patient records to inspect and/or duplicate at "Dentist's" expense, any individual chart or record produced and/or maintained by "Dentist" to the extent necessary to: (i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. In the event that such records are housed in "Dentist's" practice location or any other location controlled by "Dentist", "BCHF" shall have reasonable and timely access to such records.

## XII.   INSURANCE

    **A.   PROOF OF COVERAGE.**  The "Dentist" , at his/her sole cost and expense, shall procure and maintain such policies of professional liability, and other insurance as are necessary to insure the "Dentist" and his/her employees, agents and affiliates against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by the "Dentist" the use of any property and facilities provided by the "Dentist" or his/her agents, and the activities performed by the "Dentist" in connection with this Agreement, or any amendment entered into thereafter.

    **B.**   "Dentist" will provide "BCHF" with sufficient evidence of professional liability coverage in the amount of at least:

        1.   General Liability (including broad form property damage and contractual liability) insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Sexual Abuse Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) three million dollars ($3,000,000) in the aggregate; Employer's Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; Professional Liability insurance on a per occurrence basis with a single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate; and automobile liability insurance for owned, hired and non-owned vehicles on a per occurrence basis with a combined single limit of not less than one million dollars ($1,000,000) and three million dollars ($3,000,000) in the aggregate.

        2.   Workers' Compensation, as required under California State law.

        3.   Such other insurance in such amounts which from time to time may be reasonably required by the mutual consent of "Dentist" and "BCHF" against other insurable risks relating to performance of this Agreement.

    **C.**   It should be expressly understood, however, that the coverages and limits required under this Section shall not in any way limit the liability of either Party.

**D.**   Additional insured endorsements are required for general, property damage, sexual abuse and automobile liability policy coverage. Such a provision, however, shall only apply in proportion to and to the extent of the negligent acts or omissions of the other "Party", its officers, agents, or employees. Each "Party", upon the execution of this Agreement, shall furnish the other "Party" with Certificates of Insurance evidencing compliance with all requirements. Certificates shall provide for thirty (30) days advance written notice to "BCHF" of any material modifications, change or cancellation of the above insurance coverages.

**E.   INDEMNITY.** "Dentist" shall defend, indemnify and hold "BCHF", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorney's fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent or intentional acts or omissions of Dentist, its officers, agents, or employees.

"BCHF" shall defend, indemnify and hold "Dentist", its officers, employees and agents harmless from and against any and all liability, loss, expense (including reasonable attorneys' fees) or claims for injury or damages arising out of the performance of this Agreement but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from the negligent, intentional acts, omissions or misconduct of "BCHF" its officers, agents, or students.

## XIII.   CONFIDENDIALITY

**A.**   Except as is necessary in the performance of this Agreement, or as authorized in writing by a party or by law, neither party (nor its directors, officers, employees, agents, and contractors) shall disclose to any person, institution, entity, company, or any other party, any information which is directly or indirectly related to the other party that it (or its directors, officers, employees, agents, and contractors) receives in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) as a result of performing obligations under this Agreement, or of which it is otherwise aware. The parties (and their directors, officers, employees, agents, and contractors) also agree not to disclose, except to each other, any proprietary information, professional secrets or other information obtained in any form (including, but not limited to, written, oral, or contained on video tapes, audio tapes or computer diskettes) during the course of carrying out the responsibilities under this Agreement, unless the disclosing party receives prior written authorization to do so from the other party or as authorized by law.

**B.**   The parties agree that their obligations and representations regarding confidential and proprietary information (including the continued confidentiality of information transmitted orally), shall be in effect during the term of this Agreement and shall survive the expiration or termination (regardless of the cause of termination) of this Agreement.

## XIV.   TERM AND TERMINATION

A. **TERM.**  This Agreement begins on April 19, 2016 and  shall be automatically and
B.  Successively renewed and extended for one year periods from and after the expiration date unless either party provides written notice of termination to the other sixty  (60) days in advance of termination.  Renewal is subject to "BCHF's" determination that "Dentist" performed satisfactorily and successful re-negotiation by the parties of key terms, as applicable.

C. **TERMINATION WITHOUT CAUSE.**  Either "Dentist" or "BCHF" may terminate this agreement, for any reason, at any time upon sixty (60) days written notice.

D. **TERMINATION FOR CONVENIENCE.**  This Agreement may be terminated at any time upon the mutual agreement of the parties.

E. **TERMINATION FOR BREACH.**  This Agreement may be terminated by either party upon written notice to the other party of such other party's material breach of any term of this Agreement, subject to a sixty (60) day opportunity to cure and failure to cure by the end of the sixty (60) day period.

F. **IMMEDIATE TERMINATION.**  In addition, "BCHF" may terminate this Agreement immediately upon written notice to "Dentist" of: (1) "Dentist's" violation of, or inability to comply with, his or her obligations set forth in this Agreement; or (2) the good faith determination of "BCHF" that the health, welfare and/or safety of Participating Patients receiving care from "Dentist" is or will be jeopardized by the continuation of this Agreement.

G. **SURVIVAL.** Upon termination, the rights and obligations of the "Dentist" and "BCHF" under this Agreement will terminate, except as otherwise noted in this Agreement. Termination, however, will not release "Dentist" from his or her obligation to complete any multi-step dental treatment which "Dentist" began prior to the effective date of the termination, provided that such termination did not result from a determination by "BCHF" that the health, welfare and/or safety of Participating Patients would be jeopardized by continuing this Agreement.  "Dentist" is not obligated to provide any other services. Termination of this Agreement does not release "BCHF" from its obligation to reimburse "Dentist" for any dental services provided on or before the effective date of the termination.

## XV.   GENERAL PROVISIONS

A. **AMENDMENT/MODIFICATION.**  This Agreement may be amended or modified from time to time upon the mutual written agreement of the parties. Any amendment or modification shall not affect the remaining provisions of the Agreement and, except for the specific provision amended or modified, this Agreement shall remain in full force and effect as originally executed.  Amendments will take effect upon the date of execution of both parties.

B. **ASSIGNMENT.**  This Agreement may not be assigned, delegated, or transferred by either party without the express written consent and authorization of the other party, provided prior to such action.

C. **EFFECT OF WAIVER.**  A party to this Agreement may waive the other party's breach of a provision of this Agreement, but such a waiver does not constitute a

EXHIBIT T
PAGE 716

waiver of any future breaches.

**D.   EFFECT OF INVALIDITY.** The invalidity or unenforceability of any provision of this Agreement in no way affects the validly or enforceability of any other provision, unless otherwise agreed.

**E.   NOTICE.**  Any notice required to be provided under this Agreement must be in writing and delivered in person or sent by registered or certified mail or by next business day delivery service to each party at the address set forth on the signature page.

**F.   DISPUTE RESOLUTION.**  Any dispute arising under this Agreement shall first be resolved by informal discussions between the parties, subject to good cause exceptions, including, but not limited to, disputes determined by either party to require immediate relief (i.e., circumstances under which an extended resolution  procedure may endanger the health and safety of the Participating Patients). Any dispute that has failed to be resolved by informal discussions between the parties within a reasonable period of time of the commencement of such discussions (not to exceed thirty (30) days), may be resolved through any and all means available.

**G.   CHOICE OF LAW.** This Agreement shall be governed in accordance with the laws of the State of California. Any disputes arising under this Agreement will be settled in accordance with the law of the State of California.

**H.   ENTIRE AGREEMENT.**  This Agreement represents the complete understanding  of the parties with regard to the subject matter herein and, as such, supersedes any and all other agreements or understandings between the parties, whether oral or written, relating to such subject matter. No such other agreements or understandings may be enforced by either party nor may they be employed for interpretation purposes in any dispute involving this Agreement.

**SIGNATURES:**

**Bruce Hebets, CEO**
Borrego Community Health Foundation

_____

Date:   5 - 6 - 2016

Address: PO Box 2369
 Borrego Springs, CA 92004

Phone: 619.444.5704

Contact: Travis Lyon

E-mail: cdtlyon@borregomedical.org

**George C. Jared, DDS, INC.**

_____

Date:   4-26-16

Address: 13465 Camino Canada Rd, 110-A
 El Cajon, CA 92021

Phone: 619-390-3669

Contact: Rose Jared, Mgr.

E-mail: eastcountydental@aol.com

EXHIBIT T
PAGE 717

Addendum "A"

Scope of Services

"Dentist" will provide services for Participating Patients with the following insurance:

Medi-Cal Recipients
Sliding Fee approved patients

The "Dentist" must follow all Denti-Cal rules and regulations in regards to maximum allowances and procedure limitations for patients eligible for Medi-Cal.  These are outlined in Section 5 of the Provider Manual under "Maximum Allowances".  Limitations of commercial contracts will be provided by "BCHF"

Exams (New, recall and limited)
X-rays
Fluoride Application
Prophylaxis
Periodontal scaling and root planning
Sealants
Fillings
Preventive Resin Restoration (PRR) for moderate to high risk caries risk patient permanent tooth.
Extractions
Stainless Steel Crowns
Space Maintainers
Root Canals (prior review required by the "BCHF" Dental Director)
Crowns (prior review required by the "BCHF" Dental Director)

Addendum "B"
Compensation of Dental Services
Medi-Cal

"Dentist" will be reimbursed according to patient's insurance type.  Services for Medi-Cal patients will be compensated on a per visit reimbursement rate as outlined below.  Crowns and root canals are subject to prior review and authorization by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payor as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Problem focused oral evaluation only with or without X-ray | D0140 D0220, D0230, D0270 | 1 | For relief of pain and medication | $90 |
| Problem focused exam including X-ray and treatment | D0140 D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis and Fluoride application | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 per visit |
| Sealants or PRR | D1351, D1352 | 1 or 2 | No less than per quadrant. | $26 per tooth |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Stainless Steel Crown | D2930, D2931 | 1 or more | 2 per visit | $180 per visit |
| Space Maintainer | D1510, D1515 | 2 | Unilateral Bilateral | $140 global $250 global |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |

| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
| Pulpal Debridement and Filling | D3220, D3221 | 1 | Excludes final restoration | $120 per visit |
| Crown | D2751 | 2 or more | Prep and delivery in global fee. | $400 global |
| Recement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70  per quadrant |
| Incision and Drainage of Abcess | D7520 | 1 | None | $100 |

Addendum C

Location of Service

All dental services under this agreement will be rendered at:

George C. Jared, DDS, INC.
East County Family Dental

13465 Camino Canada Road, Sute 110-A
El Cajon, CA 92021

Office Phone: 619-390-3669
Fax:

During the hours of:

 Monday---9:30 am to 6:30 pm
Tuesday      10:00am 8:00 pm
Wednesday   9:00am to 6:00 pm
Thursday      9:30am to 6:30 pm
Friday        Closed

NPI number Entity type Code Organization

**CONFIDENTIALITY OF STUDENT INFORMATION /
PROTECTED HEALTH INFORMATION (PHI)**

**HIPAA BUSINESS ASSOCIATE ADDENDUM**

This Agreement is made effective the 19th day of April, 2016 by and between, Borrego Health, hereinafter referred to as "Covered Entity", and George C. Jared, DDS, Inc. Hereinafter referred to as "Business Associate", (individually, a "Party" and collectively, the "Parties").

**RECITALS:**

WHEREAS, Sections 261 through 264 of the federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, known as "the Administrative Simplification provisions," direct the Department of Health and Human Services to develop standards to protect the security, confidentiality and integrity of health information;

WHEREAS, pursuant to the Administrative Simplification provisions, the Secretary of Health and Human Services issued regulations modifying 45 CFR Parts 160 and 164 (the "HIPAA Security and Privacy Rule");

WHEREAS, the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), pursuant to Title XIII of Division A and Title IV of Division B, called the "Health Information Technology for Economic and Clinical Health" ("HITECH") Act, provides modifications to the HIPAA Security and Privacy Rule (hereinafter, all references to the "HIPAA Security and Privacy Rule" are deemed to include all amendments to such rule contained in the HITECH Act and any accompanying regulations, and any other subsequently adopted amendments or regulations);

WHEREAS, the Parties wish to enter into or have entered into an arrangement whereby Business Associate will provide certain services to Covered Entity, and, pursuant to such arrangement, Business Associate may be considered a "business associate" of Covered Entity as defined in the HIPAA Security and Privacy Rule (the agreement evidencing such arrangement is entitled Dentist Contract, dated April 19, 2016 and is hereby referred to as the "Arrangement Agreement"); and

WHEREAS, Business Associate may have access to and/or use Protected Health Information (as defined below) in fulfilling its responsibilities under such arrangement;

NOW, THEREFORE, in consideration of the Parties' continuing obligations under the Arrangement Agreement, compliance with the HIPAA Security and Privacy Rule, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the provisions of this Agreement in order to address the requirements of the HIPAA Security and Privacy Rule and to protect the interests of both Parties.

I.   DEFINITIONS

   A.   Catch-all definition:
        The following terms used in this Agreement shall have the same meaning as those
        terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set,
        Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy
        Practices, Protected Health Information, Required By Law, Secretary, Security Incident,

Subcontractor, Unsecured Protected Health Information, and Use. In the event of an inconsistency between the provisions of this Agreement and mandatory provisions of the HIPAA Security and Privacy Rule, as amended, the HIPAA Security and Privacy Rule shall control.  Where provisions of this Agreement are different than those mandated in the HIPAA Security and Privacy Rule, but are nonetheless permitted by the HIPAA Security and Privacy Rule, the provisions of this Agreement shall control.

B.  <u>Specific definitions</u>:

    1.    <u>Business Associate</u>.  "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean George C. Jared, DDS, Inc.

    2.    <u>Covered Entity</u>.  "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean Borrego Health.

    3.    <u>HIPAA Rules</u>.  "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

    4.    <u>Protected Health Information</u>. "Protected Health Information (PHI)" shall mean individually identifiable health information including, without limitation, all information, data, documentation, and materials, including without limitation, demographic, medical and financial information, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  "Protected Health Information" includes without limitation "Electronic Protected Health Information" as defined below.

    5.    <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" shall mean Protected Health Information which is transmitted by Electronic Media (as defined in the HIPAA Security and Privacy Rule) or maintained in Electronic Media.

II.    <u>CONFIDENTIALITY AND SECURITY REQUIREMENTS</u>

A.  Business Associate agrees:

    1.  Not to use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

    2.  To use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

3.  To report to covered entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware. Such report shall be made by Business Associate to Covered Entity within twenty-four hours of the time when Business Associate becomes aware of the breach;

4.  In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, to ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the business associate agree to the same restrictions, conditions, and requirements that apply to the business associate with respect to such information;

5.  To make available protected health information in a designated record set to the individual or the individual's designee" as necessary to satisfy covered entity's obligations under 45 CFR 164.524;

6.  To make any amendment(s) to protected health information in a designated record set as directed or agreed to by the covered entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy covered entity's obligations under 45 CFR 164.526;

7.  To maintain and make available the information required to provide an accounting of disclosures to the individual as necessary to satisfy covered entity's obligations under 45 CFR 164.528;

8.  To the extent the business associate is to carry out one or more of covered entity's obligation(s) under Subpart E of 45 CFR Part 164, to comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and

9.  To make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

10. Business Associate acknowledges and agrees that all Protected Health Information that is created or received by Covered Entity and disclosed or made available in any form, including paper record, oral communication, audio recording, and electronic display by Covered Entity or its operating units to Business Associate or is created or received by Business Associate on Covered Entity's behalf shall be subject to this Agreement.

B.  Notwithstanding the prohibitions set forth in this Agreement, Business Associate may use and disclose Protected Health Information as follows:

1.  As necessary to perform the services set forth in the underlying Service Agreement; and/or

2.  As required by law.

3.  Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary

policies and procedures.

4. Business Associate may not use or disclose PHI in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

5. Business associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity.

6. Business associate may use protected health information for the proper management and administration of the business associate or to carry out the legal responsibilities of the business associate.

7. Business associate may disclose protected health information for the proper management and administration of business associate or to carry out the legal responsibilities of the business associate, provided the disclosures are required by law, or business associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies business associate of any instances of which it is aware in which the confidentiality of the information has been breached.

8. Business associate may provide data aggregation services relating to the health care operations of the covered entity.

C. Business Associate will implement appropriate safeguards to prevent use or disclosure of Protected Health Information other than as permitted in this Agreement. Business Associate will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity as required by the HIPAA Security and Privacy Rule.

D. The Secretary of Health and Human Services shall have the right to audit Business Associate's records and practices related to use and disclosure of Protected Health Information to ensure Covered Entity's compliance with the terms of the HIPAA Security and Privacy Rule.

E. Business Associate shall report to Covered Entity any use or disclosure of Protected Health Information which is not in compliance with the terms of this Agreement of which it becomes aware. Business Associate shall report to Covered Entity any Security Incident of which it becomes aware. Such report shall be made within twenty-four hours of the date and time upon which Business Associate becomes aware of the unauthorized use or disclosure and/or Security Incident.

For purposes of this Agreement, "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. In addition, Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Agreement.

EXHIBIT T
PAGE 725

III.   AVAILABILITY OF PHI

   A.   Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information pursuant to Section 164.522 of the HIPAA Security and Privacy Rule to which Covered Entity has agreed and of which Business Associate is notified by Covered Entity.  Business Associate agrees to make available Protected Health Information to the extent and in the manner required by Section 164.524 of the HIPAA Security and Privacy Rule.  If Business Associate maintains Protected Health Information electronically, it agrees to make such Protected Health Information electronically available to the applicable individual.  Business Associate agrees to make Protected Health Information available for amendment and incorporate any amendments to Protected Health Information in accordance with the requirements of Section 164.526 of the HIPAA Security and Privacy Rule.  In addition, Business Associate agrees to make Protected Health Information available for purposes of accounting of disclosures, as required by Section 164.528 of the HIPAA Security and Privacy Rule and Section 13405(c)(3) of the HITECH Act.  Business Associate and Covered Entity shall cooperate in providing any accounting required on a timely basis.

IV.   TERM/TERMINATION

   A.   Term. The Term of this Agreement shall be effective as of the date first listed above and shall continue in effect concurrently with the term of the Arrangement Agreement.

   B.   Termination. Notwithstanding anything in this Agreement to the contrary, Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately if Covered Entity determines that Business Associate has violated any material term of this Agreement.  If Covered Entity reasonably believes that Business Associate will violate a material term of this Agreement and, where practicable, Covered Entity gives written notice to Business Associate of such belief within a reasonable time after forming such belief, and Business Associate fails to provide adequate written assurances to Covered Entity that it will not breach the cited term of this Agreement within a reasonable period of time given the specific circumstances, but in any event, before the threatened breach is to occur, then Covered Entity shall have the right to terminate this Agreement and the Arrangement Agreement immediately. Covered Entity may seek injunctive relief and/or any other available remedy to prevent a breach of this Agreement.

   C.   Obligations of Business Associate Upon Termination. Upon termination of this Agreement for any reason, business associate shall return to covered entity all protected health information received from covered entity, or created, maintained, or received by business associate on behalf of covered entity that the business associate still maintains in any form.  Business associate shall retain no copies of the protected health information.

   D.   Survival.  The obligations of business associate under this Section shall survive the termination of this Agreement.

V.   MISCELLANEOUS

   A.   Third Parties; Survival. Except as expressly stated herein or the HIPAA Security and Privacy Rule, the Parties to this Agreement do not intend to create any rights in any third

parties. The obligations of Business Associate under this Section shall survive the expiration, termination, or cancellation of this Agreement, the Arrangement Agreement and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein.

B.   <u>Amendment; Independent Parties.</u> This Agreement may be amended or modified only in a writing signed by the Parties. No Party may assign its respective rights and obligations under this Agreement without the prior written consent of the other Party. None of the provisions of this Agreement are intended to create, nor will they be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other agreements between the Parties evidencing their business relationship. This Agreement will be governed by the laws of the State of California. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

C.   <u>Minimum Requirements.</u> The Parties agree that, in the event that any documentation of the arrangement pursuant to which Business Associate provides services to Covered Entity contains provisions relating to the use or disclosure of Protected Health Information which are more restrictive than the provisions of this Agreement, the provisions of the more restrictive documentation will control. The provisions of this Agreement are intended to establish the minimum requirements regarding Business Associate's use and disclosure of Protected Health Information.

D.   <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Agreement will remain in full force and effect. In addition, in the event a Party believes in good faith that any provision of this Agreement fails to comply with the then-current requirements of the HIPAA Security and Privacy Rule, including any then-current requirements of the HITECH Act or its regulations, such Party shall notify the other Party in writing. For a period of up to thirty days, the Parties shall address in good faith such concern and amend the terms of this Agreement, if necessary to bring it into compliance. If, after such thirty-day period, the Agreement fails to comply with the HIPAA Security and Privacy Rule, including the HITECH Act, then either Party has the right to terminate upon written notice to the other Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year written above.

**COVERED ENTITY:**

By: _____
       Bruce Hebets, CEO

**BUSINESS ASSOCIATE:**

By: _____
       George C. Jared, DDS, Inc.

Addendum "E"

## COMPENSATION OF DENTAL SERVICES
## ADULT MEDI-CAL

Services for Adults with current full scope Medi-Cal eligibility will be compensated on a per visit reimbursement rate as outlined below.  Crowns, root canals and bridges are subject to prior review and approval by the Dental Director.  If the service is not within the scope of "BCHF" the "Dentist" may bill this service directly to the payer as a private patient.

| Description | Codes (Denti-Cal rules apply) | Number of Visits | Special Consideration | Rate |
|---|---|---|---|---|
| Routine Exam and X-rays no Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274 | 1 | Refer to Denti-Cal manual. | $100 per |
| Routine Exam and X-rays with Prophy | D0150, D0120 D0210, D0220, D0230, D0272, D0274, D111 | 1 | Refer to Denti-Cal manual. | $130 per |
| Office visit for observation | D9430 | 1 | For relief of pain and medication | $90 |
| Problem focused X-ray and procedure | D0220, D0230, D0270 D7140, D7210 D2140, D2150, D2160 | 1 | For treatment with extraction or filling | $120 |
| Prophylaxis only | D1110, D1120 D1203, D1204 | 1 | Must be in combination. | $100 |
| Fillings, Amalgam Resins, Posteriors | D2140, D2150, D2160, D2161 D2330, D2331, D2332, D2335 D2391, D2392, D2393, D2394 | 1 or more | Per quadrant | $120 per visit |
| Extractions – simple | D7111, D7140 | 1 | Per visit – multiple extractions under anesthesia are not in scope. | $100 |
| Extractions | D7210, D7220, D7230, D7240 | 1 or more | Per visit – multiple extractions under general anesthesia are not in scope. | $165 |
| Root Canal – Anterior | D3310 | 1 or more | Excludes final restoration | $230 global |
| Root Canal – Bicuspid | D3320 | 2 or more | Excludes final restoration | $290 global |

| Root Canal - Molar | D3330 | 2 or more | Excludes final restoration | $350 global |
|---|---|---|---|---|
| Crown | D2740, D275, D2791 | 2 or more | Prep and delivery in global fee. | $400 global |
| Re-cement Permanent Crown | D2920 | 1 | None | $50 |
| Unspecified restorative procedure by report | D2999 | 1 | None | $75 |
| Periodontal Scaling | D4341, D4342 | 1 | 2 quadrants per visit | $70 per quadrant |
| Incision and Drainage of Abscess | D7520 | 1 | None | $100 |
| Dentures (Includes first two adjustments) | D5110, D5120 | 6 or more | Maxillary and Mandibular | $550 each denture |
| Removable Partial (Includes first two adjustments) | D5213, D5214 | 6 or more | Maxillary and Mandibular | $500 each partial |
| Partial denture | D5211, D5212 | 3 or more | Maxillary and Mandibular | $280 each partial |
| Repairs | D5510, D5520, D5610, D5640, D5650, D5660 | 1 or more | Maxillary and Mandibular | $100 each visit |
| Adjustments only (not following delivery) | D5410, D5411, D5421, D5422 | 1 | Maxillary and Mandibular | $60 |
| Reline | D5730, D5731, D5740, D5741, D5850, D5851 | 1 | Maxillary and Mandibular | $100 per visit |
| Reline (Laboratory) | D5750, D5751 D5760, D5761 | 2 or more | Maxillary and Mandibular | $180 global |
| Bridge (3 Unit) | D6211, D6241, D6245, D6740 D6751 | 3 or more | | $500 global |
| Suture Removal | | 1 | Following a surgical procedure | $40 |

EXHIBIT T
PAGE 729

Addendum "F"
**DENTAL SLIDING FEE SCALE**
**SUMMARY OF BENEFITS**

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to provide a sliding fee scale program for patients living at or below 200% of the Federal Poverty Level (FPL). Services must be provided despite a patient's inability to pay. Ability to pay is determined through an eligibility process in which the applicant provides proof of income and family size.

As a contract dental partner of BCHF, you are required to extend the sliding fee scale program to your practice.

**Benefits:**
The sliding fee scale is a limited benefit program that provides discounted rates for services rendered within the dental practice of the organization and contracted sites only. It does not extend to services rendered by specialists to whom the clinic may refer the patient for additional care. The scope of benefits is limited to services as outlined in the current Denti-Cal Provider Handbook -- Manual of Criteria (Section 5).

The program includes:
- Exam and X-rays
- Cleaning
- Fluoride Application
- Fillings
- Extractions (Limited to scope of General Dentistry)
- Root Canals (Limited to scope of General Dentistry)
- Crowns (Limited to non-precious metal)
- Dentures ($150 co-payment)
- Bridges (co-payment 50% of cost)

**Eligibility:**
The application process and eligibility determination is outlined in the BCHF Sliding Fee Policy and Procedure, which is amended from time to time to reflect current FPL (revised on an annual basis and published April 1.

Information regarding the Sliding Fee program will be made available in your office for cash patients that may desire to apply. Application assistance and eligibility determination will be conducted by BCHF staff upon referral from your office. Your office may be required to provide limited assistance (e.g. emailing an application or referring the applicant to one of our local clinics for assistance). Uninsured applicants will receive information about other program eligibility including Medi-Cal and/or Covered California and assisted with applying for these programs if deemed eligible.

Patients with family income at or below 100% of Federal Poverty Level (FPL) will pay a nominal fee of $50 per visit. All others living at or below 200% of poverty are assessed for a discounted rate for services based on the BCHF fee schedule that is part of this addendum. Adults and children with commercial dental benefits may also apply for the Sliding Fee to assist with the cost of co-payments and deductible charges if all other qualifications are met.

EXHIBIT T
PAGE 730

Addendum "D"

## ADDITION OF MEDI-CAL ADULT DENTAL
## AND SLIDING FEE

The Ninth Circuit Court of Appeals decision in *California Association of Rural Health Clinics vs. Douglas (738 F. 3d 1007, (2013))* allows for reinstatement of certain dental benefits for Medi-Cal beneficiaries ages 21 and older. Consequently, the parties desire to expand the services outlined in the Dental Service Agreements in include Adult Dental Services in accordance with this Addendum.

### SCOPE OF BENEFITS

The current scope of benefits for Federally Qualified Health Centers (FQHCs) for purpose of this contract is interpreted in the 2009 Denti-Cal Provider Handbook, Section 5, "Manual of Criteria and Schedule of Maximum Allowances."  A copy will be provided by BCHF.

The scope of approved services is subject to change, with or without notice, upon further clarification provided by the Department of Healthcare Services or other regulatory agencies. The scope and reimbursement rate is outlined in "Addendum E". Any procedures not listed in "Addendum E" require prior approval from BCHF.

### EMERGENCY COVERAGE

Dentist is required to ensure appropriate availability during and after hours to ensure access to emergency dental services. Dentist will provide BCHF with a written plan of during and after hours coverage, which may include an answering service, message center, cell phone or other method of patient communication that ensures patients have access to address any dental emergencies. This may include referral to the emergency room, medication and/or care instructions.

### SLIDING FEE

As a requirement of the FQHC program, BCHF is required by the Health Resources and Services Administration (HRSA) to provide a sliding fee scale for those living at or below 200% of the Federal Poverty Level (FPL) who do not have insurance or whose insurance does not cover dental benefits.

As a condition of this Addendum D, Dentist must also implement the sliding fee scale program for the low income uninsured as further outlined in "Addendum F"

Bruce Habets CEO

Dentist: _____

Date: __5-6-2016__

Date: __4-27-16__

Your office will collect from eligible patients the allowed fee according to the sliding scale and the BCHF fee schedule. The amount you collect from patients shall represent payment in full for services rendered under this sliding fee program. However, BCHF will pay an additional $5.00 upon receipt of a super bill for services rendered.

## Program Exclusions:

- Referrals to all specialists including but not limited to:
    - Oral Surgery
    - Endodontist
    - Periodontist
    - Orthodontist
    - Pedodontist
- Teeth Whitening
- Orthotics not listed
- Orthodontics
- Nobel Metal crowns
- Cosmetic procedures
- Mouth Guards

Bruce Hebets CEO

Dentist: _George C. Ojura, D.D.S. pchre._

Date: __5-6-2016__

Date: __4-27-16__

EXHIBIT T
PAGE 732

**Dental Sliding Fee Discount**

| Sliding Fee | A | | B | C | D | E |
|---|---|---|---|---|---|---|
| Level of Poverty | 0-100% | Level of Poverty | 101-125% | 126-150% | 151-175% | 176 -200% |
| Nominal Fee | $50 | Percent Discount | 25% | 20% | 15% | 10% |

Revised 10/16/2012

Addendum "G"

## HITRUST CERTIFICATION HIPAA COMPLIANT DATA STORAGE FEE

As a Federally Qualified Health Center (FQHC), Borrego Community Health Foundation (BCHF) is required to maintain patient records and data associated with patient visits to i) meet responsibilities to patients for whom "Dentist" provides services pursuant to this Agreement; (ii) respond to any government or payor audits; (iii) assist in the defense of any malpractice or other claims to which such chart or record may be pertinent; and (iv) for any other legitimate business purpose, consistent with patient confidentiality and to the extent permitted by law. Dentists are also required maintain these records.

An online system for claim submissions and patient record storage for the contract dental program is currently in development. Upon implementation of this system all patient records will also be stored online on Health Insurance Portability and Accountability Act (HIPAA) compliant servers. Dentist will have secure access to the system for all Dentist's patients under the contract dental program.

**HITRUST Certification:** In order to safely maintain the integrity of your patient data and meet HIPAA compliance, Premier Health Care Management (PHCM) conducts quarterly audits in order to maintain HITRUST Certification. A team of third party auditors conduct a three-tiered audit to achieve the highest HIPAA certification available. In addition to the technical audit, Dentist understands that PHCM will request semiannual access to computers running licensed software to ensure physical security standards are being maintained. PHCM will request access a week in advance unless a specific risk is determined.

Dentist agrees to pay One Hundred and Fifty Dollars ($150.00) per month for costs associated with record storage and HITRUST certification audits of the system. This monthly fee will only be assessed once the online storage system is implemented. Dentist will be provided notice of no less than 21 days prior to implementation and commencement of the monthly fee.

Nothing in this Addendum "G" relieves Dentist of its obligation to maintain patient records under the contract. All other terms and conditions remain the same.

**SIGNATURES:**

Bruce Hebets, CEO
Borrego Community Health Foundation

Dentist

5-6-2016
Date

4-26-16
Date

EXHIBIT T
PAGE 734