UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BORREGO COMMUNITY HEALTH FOUNDATION,

Plaintiff,

v.

KAREN HEBETS, an individual, et al.,

Defendants.

Case No.:  3:22-cv-01056-BEN-SBC

**ORDER GRANTING MOTIONS TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**[ECF Nos. 179, 180, 183, 184, 185, 187, 188, 191]**

Plaintiff Borrego Community Health Foundation brings its first amended complaint ("FAC") alleging fifty-nine claims for relief against forty Defendants.  *See* ECF No. 159.  Plaintiff alleges Defendants engaged in various schemes to siphon money from Plaintiff for their own benefit.  *Id*.  Before the Court are eight motions to dismiss the FAC made by various Defendants.[1]  Plaintiff submitted a consolidated opposition.  ECF No. 194 ("Oppo.").  Defendants replied.[2]  The motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the

---

[1] *See* ECF Nos. 179 ("Hawatmeh Mot."), 180 ("Wallis Mot."), 183 ("Thompson Mot."), 184 ("Ness Mot."), 185 ("Insiders Mot."), 187 ("JH Mot."), 188 ("Premier Mot.") and 191 ("KH Mot.").

[2] *See* ECF Nos. 195-97, 199, 201-204.

1

Federal Rules of Civil Procedure.  ECF No. 206.  For the reasons set forth below, the Court **GRANTS** Defendants' motions and **DISMISSES** the FAC in its entirety without prejudice.

# I.     BACKGROUND[3]

Borrego Community Health Foundation ("Plaintiff" or "BCHF") is a non-profit public benefit corporation which provides healthcare services to underserved communities in the state.  FAC at ¶ 1.  Between 2012 and 2020, Plaintiff alleges Defendants engaged in twelve distinct schemes to siphon money out of BCHF and into their own pockets or those of close associates.  *Id*. at ¶ 2.  The lengthy FAC conducts an ambitious overview of a decade of alleged misconduct.  Below is a summary of the Defendants and schemes.

## A. The Defendants

**1. Dentists.**  The FAC identifies twenty-five Defendants collectively referred to as "Dentist Defendants." (hereinafter "Dentist Defendants" or "Dentists").  *Id*. ¶¶ 29-44. With few exceptions, the Dentist Defendants are a combination of the individual Dentists and corresponding corporate entities.  *Id*.  Six Dentist Defendants filed three motions to dismiss addressed in this Order.  *See* ECF Nos. 179, 183, 184.  Thirteen more Dentist Defendants filed four "Notices of Joinder" purporting to join the motion to dismiss filed by Hawatmeh D.D.S.  *See* ECF Nos. 182, 189, 192, 193 ("Joinders").  Two Dentists, Michael Hoang D.M.D. and Mohammed Altekreeti D.D.S., filed Answers to the FAC. *See* ECF Nos. 186, 190.  One Dentist and his corporation were dismissed by stipulation;

---

[3] For the purposes of the motions to dismiss, the Court assumes facts pled in the FAC are true.  *Mazarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is not making factual findings.

another did not file a responsive pleading of any kind.[4]

**2. Borrego & Board Insiders.**  The FAC refers to Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball collectively as "Borrego Insiders."  FAC at ¶ 21.  Defendant Karen Hebets was the Vice President of Business Services at BCHF.[5]  *Id*. ¶ 13.  Defendant Mikia Wallis is an attorney who served as BCHF's Chief Legal Officer ("CLO") and served for a time as BCHF's CEO.  *Id*. at ¶ 15.  Ms. Wallis also served on the Board of Trustees until October 2, 2020.  *Id*.  Ms. Wallis was terminated by BCHF on December 15, 2020.  *Id*.  Defendant Diana Thompson (formerly Diana Troncoso) served as BCHF's Chief Financial Officer ("CFO") from March 2013 until her termination in March 2021.  *Id*. at ¶ 16.  Together, the Borrego Insiders are alleged to have orchestrated and covered up the various schemes from inside Borrego Health.  Karen Hebets and Mikia Wallis each filed a motion to dismiss addressed in this Order.  ECF Nos. 180 ("Wallis Mot."), 191 ("KH Mot.").  Diana Thompson filed an Answer to the Complaint.  *See* ECF No. 172.

Defendants Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are former members of BCHF's Board of Trustees and Executive/Finance Committee.  *Id*. at ¶¶ 17-21.  The FAC refers to these Defendants as a sub-group of the Borrego Insiders called the "Board Insiders."  *Id*. ¶ 21.  The Board Insiders collectively filed a motion to dismiss.  ECF No. 185 ("Insiders Mot.").

**3. Premier Defendants.**  Defendants Premier Healthcare Management, Inc.

---

[4] *See* ECF No. 212 (dismissing Defendants George Jared D.D.S. and George Jared D.D.S., Inc. by stipulation); *see also* ECF No. 178 (Dentist Santiago Rojo did not participate in the May 4, 2023, status conference with Magistrate Judge Karen Crawford and did not file a responsive pleading to the FAC).

[5] Karen Hebets was married to Bruce Hebets, who served as BCHF's Chief Executive Officer ("CEO") from 2004 until his retirement in September 2018.  *Id*. at ¶¶ 12-13.  Bruce Hebets was a central figure in most of the alleged schemes; the FAC states he would have been named a Defendant but for his death in January 2019.  *Id*. at ¶ 12.

("Premier"), Summit Healthcare Management, Inc. ("Summit"), and individuals Daryl Priest, Nicholas Priest and Travis Lyon are collectively referred to as "Premier Defendants." *Id*. ¶ 28.  Daryl Priest is the owner of Premier. *Id*. ¶ 25. Nicholas Priest, son of Daryl Priest, served as the CEO of Premier. *Id*. ¶ 26. Travis Lyon was the President and COO of Premier. *Id*. ¶ 27.  The Premier Defendants represent outside parties and corporate entities which worked with the Borrego Insiders to engage in unfavorable business deals to BCHF's detriment.  The Premier Defendants also collectively filed a motion to dismiss addressed in this order.  ECF No. 188 ("Premier Mot.").

**4. Jim Hebets & the Hebets Company.**  James "Jim" Hebets is the brother of deceased Bruce Hebets and the President and Founder of the Hebets Company.  *Id*. at ¶ 45-46.  Jim Hebets is alleged to have designed and sold exorbitant compensation packages (the 162B plans) to BCHF and provided false and misleading information to the Board about these plans. *Id*. ¶ 414.  Jim Hebets and the Hebets Company filed a motion to dismiss addressed in this order.  ECF No. 187 ("JH Mot.").

**5. KBH Healthcare Consulting, LLC.**  Defendant KBH Healthcare Consulting, LLC ("KBH") was a limited liability company formed in 2017 jointly owned by Bruce and Karen Hebets.  *Id*. ¶ 14.  KBH has not filed a responsive pleading or otherwise appeared in the case.

### B. The Schemes

The FAC alleges several fraudulent schemes, a civil RICO violation, intentional and negligent misrepresentations, and breaches of contract.  The twelve schemes are described below.

**1. The Borrego MSO/IPA Scheme.**  Bruce Hebets and other Borrego Insiders created two entities, Borrego Management Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians Association, A Professional Medical Corporation ("Borrego IPA"), for the purpose of providing sham services to BCHF. *Id*. ¶¶ 56-65.  Mikia Wallis assisted with the formation of these entities without charge and

4

was listed as the agent of service.  *Id.* ¶ 58.  This scheme culminated in BCHF's purchase of Borrego MSO and Borrego IPA in November 2012 for $ 2 million.  *Id.* ¶ 64.

**2. The Premier Scheme.**  Similarly, the Premier Scheme involved the formation of entities to provide "management services" for BCHF.  *Id.* ¶¶ 66-131.  Bruce Hebets originally proposed that he would partially own the entity providing management services, however the full BCHF Board rejected this proposal on October 29, 2015.  *Id.* ¶ 82.[6]  On March 1, 2016, unbeknownst to the full Board, Bruce Hebets and Premier executed an agreement for Premier to provide management services for BCHF's contract dental program (the "Dental MSA").  *Id.* ¶ 85.  The transition to Premier's services involved removal of existing staff managing the contract dental program.  *Id.* ¶ 87-89.  The existence of the Dental MSA was "kept concealed" by the Borrego Insiders.  *Id.* ¶ 86.  On September 8, 2017, Bruce Hebets and Premier entered into another Management Services Agreement, this time for BCHF's contract medical program ("Medical MSA").  *Id.* ¶ 97.   The Medical MSA was also executed without notice or consent from the full BCHF Board.  *Id.*

Premier did not perform the obligations set forth in either MSA.  *Id.* ¶ 102.  Instead, Premier Defendants trained contract dental providers to engage in fraudulent billing practices to "maximize their revenue at the expense of Borrego Health[.]" *Id.*  Premier then received $25 per claim it "reviewed."  *Id.*

**3. Fraudulent Billing Scheme.**  Noted above, Premier Defendants "coached dentists on how to fraudulently bill Borrego Health[.]" *Id.* ¶ 139.  Dentist Defendants knowingly engaged in this fraudulent billing practice.  *Id.* ¶¶ 146-281.  This included: (1) splitting services which could have been done in a single encounter into multiple

---

[6] It is unclear whether the full Board's rejection constituted a rejection of the plan because of Bruce Hebets' ownership interest, or a wholesale rejection of any outsourcing of management services to third parties. FAC ¶ 82.

encounters; (2) providing multiple services during a single encounter but falsely billing the services as occurring across multiple encounters; and (3) billing for services not rendered. *Id*. ¶ 133.  Between 2016 and 2020, thousands of fraudulent claims were purportedly submitted by Dentists to BCHF through Premier. *Id*. ¶¶ 143-145.

**4. Priest Leases Scheme.**  Plaintiff alleges the Borrego Insiders executed three leases on behalf of BCHF. *Id*. ¶ 336.  The specific terms of these leases were concealed from the full Board. *Id*. ¶ 350.  The terms of these leases were unconscionable and provided for rents far above fair market value. *Id*. ¶ 348. Two of the three leases have been terminated, with one remaining in effect and rent being paid under protest. *Id*.  The FAC does not allege the date the leases were signed and does not name the corporate entity lessors as Defendants in this action.

**5. Compensation / Benefits Scheme.**  Insiders Bruce Hebets, Karen Hebets, Diana Thompson, and Mikia Wallis all received "high salaries." *Id*. ¶¶ 360-363.  The Borrego Insiders disguised their above-market salaries and benefits by using improper evaluations prepared by "Jim Hebets and his companies." *Id*. ¶ 364.

**6. Nepotism Scheme.**  Karen Hebets and Diana Thompson hired family members who were not qualified to perform the positions for which they were hired. *Id*. ¶¶ 374-78. Many of the family members were hired for positions in the billing department and failed to recognize the fraudulent bills submitted by Premier because of "inexperience and the deceptive training provided by Karen Hebets and Diana Thompson." *Id*. ¶ 377.  The FAC does not allege when these family members were hired.

**7. De Anza Country Club Scheme.**  Borrego Insiders attempted to purchase De Anza Country Club located in Borrego Springs. *Id*. ¶ 379.  In October 2017, Insiders made a formal purchase offer including earnest money on behalf of BCHF without notification to the full BCHF board. *Id*. ¶¶ 382-83.  At some point "others" became aware of the purchase offer. *Id*. ¶ 384.  Outside counsel for BCHF emailed Mikia Wallis to warn of the potential negative ramifications of purchasing De Anza Country Club. *Id*. ¶ 386.  De Anza Country Club ultimately declined the offer sometime in 2018 and

6

returned the earnest money.  *Id.* ¶ 390.

**8.  Payout Scheme.**  In March 2018, Bruce Hebets suffered from worsening illness and stepped down from his position as CEO.  *Id.* ¶ 391.  The Borrego Insiders proposed BCHF provide a $5 million "payout" for Bruce Hebets.  *Id.*  BCHF hired a third party, FW Cook, to conduct an independent evaluation of a potential payout.  *Id.* ¶ 399.  FW Cook concluded that a $2 million payout would be appropriate.[7]  *Id.*  The full BCHF Board eventually agreed to the $2 million payout.  *Id.* ¶ 402.  At some point afterwards, BCHF received a 20% remittance payment penalty from the Internal Revenue Service ("IRS") due to the payout.  *Id.* ¶ 405.

**9.  Jim Hebets Scheme.**  In 2015, the Borrego Insiders contracted with the Jim Hebets company to review and approve inflated salaries and compensation packages.  *Id.* ¶¶ 407-408. This included "162B plans" which "appeared at first glance to be life insurance plans, [but] they were never intended as such but were instead a strategy to pay above market to insiders without added scrutiny or tax liability."  *Id.* ¶ 414.  Jim Hebets took affirmative steps to conceal his involvement would reveal the "obvious conflict of interest[.]"  *Id.* ¶ 409.

**10.  Julian Barn Scheme.**  Borrego Insider Chuck Kimball was the Vice President of a 501(c)(3) entity called Julian Medical Foundation, Inc. ("JMF").  *Id.* ¶¶ 423-24.  In April 2009, Kimball identified a piece of real estate with a horse barn already built on the property (the "Horse Barn") which could serve as a location for a future health clinic.  *Id.*  JMF leased the Horse Barn to BCHF beginning in October 2010.  *Id.* ¶ 433.  The Horse Barn was unusable, and the terms of the lease between Julian Medical Foundation and BCHF were unfair and to BCHF's detriment.  *Id.* ¶¶ 434-438.  The lease was terminated in 2022.  *Id.* ¶ 439.

**11.  Property Development Scheme.**  Board Insider Dennis Nourse owned

---

[7] Plaintiff alleges a vital piece of Bruce Hebets' compensation (a "162B plan") was concealed from FW Cook and therefore not factored into this analysis.  *Id.*

property in Borrego Springs, California (the "Palm Canyon Parcel").  *Id.* ¶ 444.
Approximately half of the Palm Canyon parcel was undevelopable foothills.  *Id.* ¶ 448.
Dennis Nourse, Bruce Hebets and Daryl Priest initially planned for Priest to acquire the
parcel from Nourse, develop it, and then lease it to BCHF.  *Id.* ¶ 447.  The plan, including
the proposed lease, was approved by either the full Board or Board Insiders.  *Id.* ¶ 456-
58.[8]  However, development of the parcel was met with resistance during the local
government approval process.  *Id.* ¶ 460.  In response, Priest proposed that BCHF
purchase the Palm Canyon parcel directly from Nourse, and then Priest would develop
the land under contract.  *Id.* ¶ 462.  Bruce Hebets and Mikia Wallis then "facilitated and
directed the actions necessary to execute the deal documents[.]" *Id.* ¶ 467.  The FAC does
not allege when these events took place.

**12.  KBH Healthcare Consulting Scheme.**  KBH Healthcare Consulting ("KBH")
was a company created in 2017 and jointly owned Bruce and Karen Hebets.  *Id.* ¶ 471-72.
In February 2017, KBH signed a contract to provide consulting services to Premier (the
"Consulting Agreement").  *Id.* ¶ 473.  The contract stated KBH would assist Premier
attaining a contract with a third-party OMNI Family Health.  *Id.*  However, when Premier
did not secure the OMNI Family Health contract, the Consulting Agreement was
amended to reflect KBH would assist Premier more generally in the procurement of
management services agreements.  *Id.* ¶ 477.

## II.    LEGAL STANDARDS

Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can
be granted." Fed. R. Civ. P. 12(b)(6).  A complaint may survive a motion to dismiss only
if, taking all well pled factual allegations as true, it contains enough facts to "state a claim

---

[8] It is unclear which gave the initial approval.  While the FAC states "The Board Insiders
approved of the plan[,]" it later states that Bruce Hebets and Dennis Nourse "decided not
*to go back* to the full Borrego Health Board of Trustees…" implying the approval
initially came from the full Board.  *See* FAC ¶¶ 456, 464.

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). Where a motion to dismiss is granted, leave to amend should be liberally allowed "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## III. DISCUSSION

### A. Rule 9(b) Particularity, Shotgun Pleading & "Defendant Lumping"

For claims based on fraud, Federal Rule of Civil Procedure Rule 9(b) applies. "In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be grounded in fraud or to sound in fraud, and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). Given the factual basis for all of Plaintiff's claims are the twelve fraudulent schemes, all must meet Rule 9(b)'s particularity requirement.

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct…so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Rule 9(b) does not allow a complaint to "merely lump multiple defendants together" and instead "requires plaintiffs to differentiate their allegations when suing more than one defendant…and inform each

9

defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 764-65 (citation omitted).  A plaintiff must plead the elements of fraud with the particularity demanded by Rule 9(b), outlining the who, what, when, and where of the alleged fraudulent acts.  *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004).  If the fraud concerns misrepresentations, then the complaint needs to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Edwards*, 356 F.3d at 1066 (citation omitted).

**1. Defendant Lumping**.  Moving Defendants universally challenge the FAC's tendency to lump Defendants together by groups.  The Court agrees that referring to Defendants collectively this way runs afoul of Rule 9(b)'s particularity requirement, especially when describing actions taken by an entire group.  *See, e.g.,* FAC ¶ 86 ("The existence of the Dental MSA was kept concealed by the Borrego Insiders[,]"); FAC ¶ 102 ("[T]he Premier Defendants trained dentists how to maximize their revenue…"); FAC ¶ 387 ("The Borrego Insiders continued to pursue this deal into 2018…").  This lack of particularity is compounded by the fact that many of these allegations are also conclusory.

Allegations referring to "Borrego Insiders" are prime examples of this problem.  The Borrego Insiders group is comprised of seven individuals.  At times, the FAC makes broad, conclusory statements about what the Borrego Insiders did (like "concealed" something), but will only specifically describe the actions of one or two individuals from this group.[9]  Other times, the FAC merely declares the Borrego Insiders did something

---

[9] *See e.g.*, the FAC alleges Dental MSA was "concealed" by Borrego Insiders but does not allege that Defendant Insiders Ilsley, Kimball or Nourse had any part in the Premier-Fraudulent Billing Schemes, at all (FAC ¶¶ 86-120); FAC alleges, "[t]he Borrego Insiders also attempted to conceal the impropriety of the generous 162B plan…" but only describes actions taken by one Defendant, Mikia Wallis (FAC ¶¶ 404).

(*i.e.*, "concealed" or "schemed") with no further explanation, leaving the Court and Defendants to guess not only what action was taken but also by whom.[10]  In several paragraphs, Plaintiff directly quotes a statement made by "[o]ne Borrego Insider" but fails to identify the speaker, again leaving the reader to guess which one of seven possible individuals made the statement.  *See* FAC ¶¶ 365, 389.

Another example relates to decisions that "Borrego Insiders" made during executive committee meetings.  As Defendant Karen Hebets points out, she was not a member of the executive committee and it was not even alleged that she attended these meetings.  KH Mot. at 9-10.  The FAC describes an executive committee meeting that occurred in October 2017 where "[b]oard members and staff attendees (including Bruce Hebets, Mikia Wallis, and Diana Thompson) discussed a proposal…"  *Id*. ¶ 379.  This list of attendees includes all the Borrego Insiders except Karen Hebets.  However, three paragraphs later the FAC alleges, "Borrego Insiders decided not to present the plan…to full [BCHF] Board."  *Id*. ¶ 382.  Although Karen Hebets is lumped into the Borrego Insiders group, this allegation does not appear to apply to her.  This and the other examples above are exactly the type of confusion Rule 9(b) is designed to prevent.

Accordingly, the Court will disregard general, conclusory allegations or those which impermissibly lump defendants together, examples of which are noted above.  While this is not fatal to Plaintiff's FAC by itself, it reduces the number of properly drafted allegations that the Court can review.  Ultimately, the FAC does contain some particularized allegations which delineate the actions of individuals and which are sufficient under Rule 9(b) for the Court to consider.  But, as will be seen later, this is true of the allegations regarding some Defendants more than others.

---

[10] *See e.g.*, "Harry Ilsley … agreed to work with Bruce Hebets and Denis [sic] Nourse to get the deal closed[,]" but provides no explanation of any actions taken by Harry Ilsley (FAC ¶ 465); "Bruce Hebets, Diana Thompson, and Mikia Wallis also schemed with The Hebets Company to increase executive compensation[,]" but does not describe any action taken by any of these individuals (FAC ¶ 417).

**2. Shotgun Pleading**.  Several Defendants also argue that the FAC employs an impermissible style of shotgun pleading.  "Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations.  They are unacceptable." *Solberger v. Wachovia Securities*, LLC, 2010 WL 2674456 at *4 (C.D. Cal. Jun. 30, 2010).  "One type of impermissible shotgun pleading is a complaint that asserts multiple claims against multiple defendants without specifying which one of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *TV Ears, Inc. v. Joyshiya Development Ltd*., 20-cv-1708-WQH-BGS, 2021 WL 5396111 at *13 (S.D. Cal. Nov. 18, 2021); *see also Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).

Unfortunately, this describes much of the FAC, including averments related to many of Plaintiff's state law claims.  The FAC's claims have two identifiable trends which the Court considers shogun pleading: (1) the claims against "all Defendants" which incorporate factual paragraphs only related to the Premier-Fraudulent Billing Schemes; and (2) the claims against "all Defendants" which reincorporate all factual allegations paragraph and contain only the most general legal descriptions of the basis for the claim.

Plaintiff's claim for inducing breach of contract is an example of the first trend. This claim is brought against all Defendants.  FAC ¶¶ 831-838.  However, the only factual allegations reincorporated into this claim are 1 through 56 (description of Defendants), and 66-334 of the FAC (description of the Premier-Fraudulent Billing Schemes).  *Id*. ¶ 831.  Right away there is a question whether this claim is meant to include all twelve schemes or just the two cited.  If forced to make an educated guess, the Court could assume the later, because the FAC's description of this claim only describe actions related to the Premier-Fraudulent Billing Schemes.  *Id*. ¶ 835 ("…Defendants intended to cause the contracted dental providers to breach the terms of their contract…").

But this is unworkable in several ways.  First, by the FAC's own bare terms, not all Defendants were involved in the Premier-Fraudulent Billing Schemes.  For example, the FAC does not allege Jim Hebets and the Hebets Company had any interaction or involvement with any of the Dentists, Premier Defendants or those two schemes, but still purports to include these Defendants in this claim.  Second, removing allegations that impermissibly lump Defendants together, it also appears the Board Insiders do not have any well-pled allegations connecting them with the Dentists, Premier or the two schemes.  This leaves at least six Defendants without notice of the basis of Plaintiff's claim.[11]

The second "shotgun pleading" trend involves five claims brought against "All Defendants" and which attempt to reincorporate all the factual allegations in the FAC.  *See* FAC ¶ 818 (False Promise), ¶ 826 (Conversion), ¶ 867 (UCL claim), ¶ 874 (Conspiracy) and ¶ 890 (Unjust Enrichment/Restitution).  Plaintiff's False Promise claim is a prime example of the confusion arising from this practice.  After incorporating 485 paragraphs, the FAC generally alleges, "As outlined herein, each and every Defendant made promises to Borrego Health." *Id*. ¶ 819.  Reviewing the incorporated paragraphs, the Court is at a loss to identify promises made by many of the Borrego Insiders Defendants or the Jim Hebets Defendants that might apply to this claim.

**B. Remaining Allegations**

Given the sheer number of allegations which lump multiple Defendants together, it is helpful and necessary at this point to outline the allegations remaining against each of the Defendants.

**1. Dentists**.  For the most part, the FAC provides a small section in its outline of the Fraudulent Billing Scheme listing a "sampling" of the fraudulent billing practices of

---

[11] *See also* Plaintiff's 46th, 47th and 48th claims for relief (also brought against "All Defendants" but only reference the Premier & Fraudulent Dental Schemes, and only reincorporate paragraphs related to those schemes).  FAC ¶¶ 839-866.

each individual Dentist corporation.  *See* FAC ¶¶ 167-281.  However, there are no specific examples of fraudulent billing listed for two of the Dentists.  See *Id.* ¶¶ 265-271 (Ness), ¶¶ (Hoang, D.M.D.).  Additionally, among the exemplar allegations there appear to be inconsistencies arising from the copy and paste nature of the allegations.  The FAC alleges Dentist Jilbert Bakramian D.D.S. was an employee of Arkelyan beginning in February 2018.  *Id.* ¶ 238.  However, the FAC goes on to allege that "Bakramian billed for more than five visits for the same patient in a seven-day period 3, 470 times between February 2017 and January 2021."  *Id.* ¶ 244.  This time period includes an entire year prior to Bakramian's employment with Arkelyan.[12]  Similar allegations noting this same time period (February 2017 to January 2021) are used for seven other Dentists.

**2.  Jim Hebets & the Hebets Company**.  The FAC sets forth a number of allegations about the Hebets Defendants.  The FAC alleges that Jim Hebets "and/or his companies": (1) prepared a "sham" fair market analysis approving the salaries of BCHF executives (*Id.* ¶ 407); (2) removed mention or indication of Jim Hebets name from the salary analysis (*Id.* ¶ 409); (3) sold a product (162B plans) that "appeared at first glance to be life insurance plans" but were actually "automatic bonuses" (*Id.* ¶ 414); (4) assisted Bruce and Karen Hebets with withdrawals from their 162B plan accounts (*Id.* ¶ 414); and (5) Jim Hebets praised that product twice.[13]  Unfortunately, the FAC does not indicate when the sham fair market analysis was allegedly created or presented to the Board.  *Id.* ¶ 409.  The FAC does not allege who presented this information to the Board, or how the

---

[12] Similarly, the FAC alleges examples of overbilling occurring in the same February 2017 to January 2021 time period against Mohammed Al Tekreeti D.D.S., who did not begin providing services until August 2017.  *See* FAC ¶ 232 (beginning of services), ¶ 236 (general time period allegation).

[13] *See* FAC ¶ 404 (Jim Hebets speaks in support of 162B plans during 2019 Board meeting) and FAC ¶ 417 (Jim Hebets praises plans in a July 2019 email to Mikia Wallis).

approval of the salaries was a "sham." *Id.* For the purposes of Rule 9(b), the allegations regarding the fair market review of executive salaries are not well pled.

Regarding the 162B plans, only Jim Hebets' email to Mikia Wallis in July 2019 identifies a specific misrepresentation—that the plans would not be subject to tax penalties. *Id.* ¶ 417. The only other alleged misrepresentation is less specific and occurred during a Board meeting presumably in "spring or summer 2019" where Jim Hebets "praise[d] the 162B plan." *Id.* ¶ 404. Even if the general word "praised" was a sufficient description of a misrepresentation (it is not), the FAC also fails to provide an explanation of how this is false or misleading. Given the above Rule 9(b) deficiencies, the entirety of Plaintiff's claims against Jim Hebets and the Hebets Company now rest on only two facts: (1) the company sold a "misleading" product; and (2) Jim Hebets represented this product would not incur tax penalties.

**3. Premier**. Premier is alleged to have entered into a contract with BCHF to provide management services (the Dental MSA). *Id.* ¶ 85. Under the terms of the MSA, Premier agreed to review claims submitted by contract dental providers for documentation errors, inconsistencies and ensuring the claims were in the proper format. *Id.* ¶ 92. Premier also agreed to provide "quality management, patient management, reporting, and other general administrative services." *Id.* The Dental MSA was amended on July 1, 2017 (*Id.* ¶ 93), which required BCHF to pay $25 for every contract dental claim Premier reviewed on BCHF's behalf. *Id.* ¶ 95. Premier was also responsible for training contract dental providers how to properly submit their claims to Premier for payment. *Id.* ¶ 135. The FAC alleges on information and belief Premier actively supported fraudulent billing (*Id.* ¶¶ 139-141) and routinely approved claims that could not have occurred (*Id.* ¶¶ 158, 173, 192).

**4. Travis Lyon**. Travis Lyon is the Premier Defendant about which the FAC offers the most specific factual allegations. The FAC alleges Mr. Lyon directly interfaced with BCHF's billing department (*Id.* ¶¶ 114, 143-145) and BCHF's Program Integrity team (*Id.* ¶¶ 176-177, 308, 324). The FAC also alleges Mr. Lyon was the point

of contact between Dentists and BCHF (*Id.* ¶ 212), personally set up compliance audit meetings for two Dentists (*Id.* ¶ 305) and weighed in on the Program Integrity teams' recommendations (*Id.* ¶¶ 180-181, 320).  Travis Lyon also interacted with various Borrego Insiders.  *See Id.* ¶ 135 (call with Karen Hebets to discuss training) ¶ 312 (worked with Mikia Wallis regarding approving new dental providers).

**5. Daryl Priest**.  The FAC contains the following allegations specific to Daryl Priest: (1) Daryl Priest signed the MSAs (*Id.* ¶¶ 94-95, 97); (2) negotiated a lease for the Palm Canyon Parcel with Bruce Hebets (*Id.* ¶ 450); (3) negotiated a lease for the Palm Canyon Parcel with BCHF (*Id.* ¶ 457); and (4) met with Bruce Hebets, Jim Hebets and Jim Hebets' son twice in a social setting (*Id.* ¶ 421).  The FAC only identifies a single misrepresentation by Daryl Priest, specifically: "Premier and Summit, through Daryl Priest, represented that they had the skill and experience necessary to fulfill their obligations under the Dental MSA and Medical MSA." *Id.* ¶ 98.  However, this does not describe when this representation was made, or to whom, and accordingly fails to meet Rule 9(b)'s heightened pleading requirement.

**6. Nick Priest**.  The FAC mentions Defendant Nick Priest in three paragraphs, only two of which describe his actions.  Nick Priest is alleged to have: (1) attended a single meeting of the credentialing committee in 2017 (*Id.* ¶ 314); and (2) occasionally called or emailed Dr. Martinez or Dr. Venugopal after they expressed concerns about Premier to Mikia Wallis (*Id.* ¶ 309).[14]  The FAC does not describe the dates or the content of the emails or phone calls, or allege that misrepresentations were made. Without more, the Court cannot conclude these sparse allegations are sufficient to state any claim for relief against Nick Priest.

---

[14] Even this allegation is unhelpfully vague: "…[Dr. Martinez and Dr. Venugopal] would immediately receive a call or email from Travis Lyon <u>or</u> Nick Priest." *Id.* (emphasis added).

**7. Summit Healthcare, Inc**.  Similarly, beyond the allegation that BCHF and Summit entered into an MSA, the FAC contains no allegations related to Summit.  The FAC does not allege, for example, that Summit engaged in any fraud related to the Medical MSA.  The bare fact that Summit was owned by Daryl Priest and maintained a contract with BCHF is not sufficient to state any claim against Summit.

**8. Mike Hickok**.  Borrego Insider Mike Hickok is alleged to: (1) been present at an August 27, 2015 meeting and supported a proposal that BCHF contract with a company to provide management services (*Id.* ¶ 77); (2) acknowledge the full Board did not approve of "Daryl" (the Dental MSA) (*Id.* ¶ 108)[15]; (3) failed to mention the Dental MSA with Premier during presentation of monthly financial reports to the full BCHF Board; (4) along with Harry Ilsley and Dennis Nourse, "decided to increase Bruce Hebets' salary in 2017[,]" and represented to the full BCHF Board this salary was fair market and comparable to other FQHCs (*Id.* ¶ 360); and (5) "mentioned" that he wanted BCHF to buy De Anza Country club during a committee meeting in October 2017 (*Id.* ¶¶ 379, 381).   These allegations, at most, appear to condense down to two lies by omission, one recurring monthly, and one occurring at an undetermined point in 2017.  Without specifics, both fail to meet Rule 9(b)'s requirements.

**9. Harry Ilsley**.  Allegations against Harry Ilsley are sparse.  Borrego Insider Harry Ilsley is alleged to: (1) been present at the August 27, 2015 meeting and supportive of the proposal (*Id.* ¶ 77); (2) along with Hickok and Nourse, "decided to increase Bruce Hebets' salary in 2017[,]" and represented to the full BCHF Board this salary was fair market and comparable to other FQHCs (*Id.* ¶ 360); and (3) suggested that certain BCHF executive committee members recuse themselves from the vote regarding De Anza

---

[15] The FAC also alleges Hickok "admitted to Chuck Kimball" that the Insiders had been keeping the full Board "out of the loop" regarding the contract dental program.  *Id.* ¶ 116. *See also* ¶ 118 (July 2020 email by Hickok to unknown person); ¶ 368 (August 2020 email by Hickok to unknown person).

Country Club (*Id.* ¶ 388). The FAC also alleges Harry Ilsley was involved in the Property Development Scheme, but these allegations are conclusory, not anchored in time and do not describe any specific action taken by Ilsley. *See Id.* ¶ 465 ("Bruce Hebets and Denis [sic] Nourse brought…Harry Ilsley into the fold. Harry Ilsley…agreed to work with [them] to get the deal closed.").

    **10. Chuck Kimball**. Borrego Insider Chuck Kimball is alleged to have: (1) been present at the August 27, 2015 meeting and supportive of the proposal (*Id.* ¶ 77); (2) commented during an October 2017 committee meeting that the full BCHF Board would "f**k it up" when referencing the De Anza Country Club purchase (*Id.* ¶ 382); (3) exchanged emails with Mikia Wallis and Diana Thompson in July and September 2018 (*Id.* ¶¶ 398, 400); and (4) proposed offering Bruce Hebets "an accelerated payment structure" so Bruce Hebets could receive his payout before his passing (*Id.* ¶ 401). The FAC also alleges Chuck Kimball "blocked a number of reform efforts" before his removal but does not describe what actions were taken or when they occurred. *Id.* ¶ 488.

    Chuck Kimball is alleged to be the primary participant of the Julian Barn Scheme. *Id.* ¶¶ 423-442. The Court notes the FAC does not allege Kimball or anyone else made any misrepresentations to BCHF regarding the Horse Barn lease, or that the Horse Barn lease was concealed from BCHF in any way. The FAC merely alleges "the lease terms were one-sided[.]" *Id.* 433.

    **11. Dennis Nourse**. Borrego Insider Dennis Nourse is alleged to have: (1) been present at the August 27, 2015 meeting and supportive of the proposal (*Id.* ¶ 77); (2) participated in a phone call with Bruce Hebets, Mikia Wallis and Diana Thompson on October 21, 2015 to discuss the management services proposal (*Id.* ¶ 81); and (3) along with Hickok and Ilsley, "decided to increase Bruce Hebets' salary in 2017[,]" and represented to full BCHF Board this salary was fair market and comparable to other FQHCs (*Id.* ¶ 360).

    Dennis Nourse is alleged to be the primary participant of the Property Development Scheme. *Id.* ¶¶ 443-468. The allegations related to the Property

Development Scheme are overwhelmingly conclusory, even as to those facts readily at Plaintiff's disposal (such as Mikia Wallis' "flawed" analysis).  Most notably, there are no dates alleged for any of the activities surrounding the Property Development scheme.  The FAC does not allege BCHF actually purchased the Palm Canyon Property or paid Nourse.

**12.  Mikia Wallis**.  As Travis Lyon is the Premier Defendant with the most specific allegations remaining against him, Mikia Wallis is the Borrego Insider with the most specific allegations surviving the Defendant lumping cull.  Almost unique among Defendants, allegations against her specifically are too numerous to reproduce in detail.  Accordingly, only the most significant allegations regarding each scheme will be identified below.

Regarding the Premier-Fraudulent Billing Schemes, Mikia Wallis is alleged to have: (1) drafted the MSAs and amendment documents (*Id*. ¶¶ 85, 94, 95); (2) told outside counsel BCFH had decided not to move forward with the management services proposal on December 26, 2015 (*Id*. ¶ 84); (3) edited minutes of committee meetings (*Id*. ¶ 113); (4) been part of the BCHF team making decisions to take "further action" in relation to the Program Integrity Team's findings (*Id*. ¶ 298); (5) was resistant to recommendations of Program Integrity Team or refused to address issues identified by Program Integrity team (*Id*. ¶¶ 309, 311-13, 321, 331); and (6) instructed Dr. Martinez to "cease further investigation" regarding Marua Tuso's allegations of fraud in March 2019 (*Id*. ¶¶ 324-25).

Regarding the Compensation & Nepotism Schemes, Mikia Wallis is alleged to have: (1) received a high salary (*Id*. ¶ 363); (2) failed to "look into" the legality of free perks executives received (*Id*. ¶ 369); (3) submitted several reports which "lacked the necessary information to make any appropriate decisions[,]" (*Id*. ¶ 371); and (4) "created a position" for her husband to work for BCHF (*Id*. ¶ 375).

Regarding the Payout Scheme, Mikia Wallis is alleged to have: (1) drafted the 'transition agreement' relating to Bruce Hebets (*Id*. ¶ 391); (2) told an unknown BCHF

Board member that she "represented no one" in the payout transaction (*Id.* ¶ 392); (3) received an email on September 27, 2018 where Kimball admitted "Insiders" were making decisions regarding BCHF that were "dodging the law[,]" (*Id.* ¶ 401); and (4) sometime in 2019, told an FW Cook employee that the 162B plans were performance-based bonuses (*Id.* ¶ 403).

Regarding the Property Development Scheme, Mikia Wallis is alleged to have: (1) at Bruce Hebets' request, "perform[ed] an analysis" regarding the Palm Canyon Parcel proposal (*Id.* ¶ 452); (2) the analysis was flawed and rendered poor legal advice (*Id.* ¶ 453); and (3) "facilitated and directed actions necessary to execute the deal documents" along with Bruce Hebets (*Id.* ¶ 467). The FAC does not describe how the analysis was flawed, or what actions were taken to facilitate and direct the execution of the Palm Canyon deal documents.

**13. Karen Hebets**. Borrego Insider Karen Hebets is alleged to have: (1) hired family members to work for BCHF (*Id.* ¶ 374); (2) trained these family members poorly, either intentionally or negligently (*Id.* ¶¶ 111, 302, 377); (3) was responsible for contract dental billing audits prior to 2017 (*Id.* ¶ 136); (4) participated in a telephone call with Travis Lyon to discuss training protocols for contract dental providers on February 20, 2018 (*Id.* ¶ 135); (5) "occasionally" did not follow through on claim reversals identified by the Program Integrity team (*Id.* ¶ 306); and (6) received a "high salary." (*Id.* ¶ 361).

**14. Diana Thompson**. Allegations regarding Borrego Insider Diana Thompson are very similar in number and nature to those against Karen Hebets. Diana Thompson is alleged to have: (1) hired family members to work for BCHF (*Id.* ¶ 376); (2) trained these family members poorly, either intentionally or negligently (*Id.* ¶¶ 111-12, 302, 377); and (3) suggested Insiders needed to inform the full BCHF Board they were continuing to discuss De Anza Country Club proposal (*Id.* ¶ 387).

Regarding the management services proposal (the beginning of the Premier Scheme), Diana Thompson is alleged to have: (1) been present during August 2015 meeting discussing the initial management services proposal (*Id.* ¶ 77); (2) in September

20

2015, was among those who tried to convince other Insiders it was a good idea (*Id.* ¶ 79); and (3) participated in a phone call with Bruce Hebets, Mikia Wallis and Dennis Nourse regarding the proposal (*Id.* ¶ 81).

**15. KBH Healthcare**. Finally, Defendant KBH Healthcare is alleged only to have: (1) been created in February 2017 (*Id.* ¶ 471); (2) entered into a consulting agreement with Defendant Premier (*Id.* ¶ 473); (3) modified the consulting agreement in May 2017 (*Id.* ¶ 476); and (4) made several ATM withdrawals from a KBH bank account at Barona Resort and Casino between February 2017 and October 2017 (with one withdrawal made in June 2019) (*Id.* ¶¶ 480-85).

## C. Plaintiff's Claims

Plaintiff's FAC is an ambitious undertaking attempting to describe a decade of fraudulent conduct.  Plaintiff's ambition, however, does not relieve it of RICO's substantive requirements or procedural requirements under Rule 9(b).  The FAC suffers many deficits.  The Court has carefully sifted through the allegations of the FAC to find those sufficiently alleged for inclusion in Plaintiff's claims.  Unfortunately, except for Defendants Mikia Wallis and Travis Lyon, once conclusory allegations are removed most Defendants are described in ten or fewer of the allegations out of the FAC's 510 factual paragraphs.  The remaining allegations are simply insufficient to support any of Plaintiff's claims, especially given the scatter-shot nature of the complaint.

Should Plaintiff elect to amend its complaint, Plaintiff will need to be more precise in its averments.  Regarding factual allegations, Plaintiff should remove those which improperly lump Defendants into groups when alleging specific actions, decisions, or statements.  With respect to Plaintiff's averments in its claims for relief, Plaintiff will need to remedy the shotgun nature of the claims and general lack of specificity when reincorporating the corresponding factual paragraphs.  Plaintiff should state how each Defendant is related to each claim for relief (or at least cite paragraphs that provide the basis of their claim as to each Defendant).

Plaintiff is reminded that, "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  Plaintiff's counsel is reminded under Rule 11(b), by presenting the Court with a pleading they represent to the Court that the legal contentions therein are "warranted by existing law" and the factual contentions "have evidentiary support or…will likely have evidentiary support[.]"  Fed. R. Civ. P. 11(b)(2)-(3).

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED.**  The FAC is **DISSMISSED** without prejudice in its entirety.

Plaintiff may file a Second Amended Complaint within twenty-one (21) days of this Order that cures the deficiencies identified herein.

**IT IS SO ORDERED.**

Dated: March 25, 2024

_____
**HON. ROGER T. BENITEZ**
United States District Judge