1
2
3
4
5

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

BORREGO COMMUNITY HEALTH
FOUNDATION, a California Nonprofit
Public Benefit Corporation,

                                    Plaintiff,

v.

KAREN HEBETS, et. al.,

                                    Defendants.

Case No.:  3:22-cv-01056-RBM-SBC

**ORDER:**

**(1) GRANTING DEFENDANTS
PREMIER, DARYL PRIEST,
NICHOLAS PRIEST, TRAVIS
LYON'S MOTION TO DISMISS
[DOC. 231]**

**(2) GRANTING DEFENDANT
KAREN HEBETS' MOTION TO
DISMISS AND DENYING AS MOOT
HER ALTERNATIVE MOTIONS
FOR A MORE DEFINITE
STATEMENT AND TO STRIKE
ALLEGATIONS [DOC. 239]**

**(3) GRANTING DEFENDANT
MIKIA WALLIS' MOTION TO
DISMISS [DOC. 230]**

**(4) GRANTING DEFENDANTS
HARRY ILSLEY, DENNIS NOURSE,
MIKE HICKOK, AND CHUCK
KIMBALL'S MOTION TO DISMISS
[DOC. 226]**

1

Plaintiff Borrego Community Health Foundation ("Plaintiff") filed a Second Amended Complaint ("SAC") asserting 73 causes of actions against 39 defendants. (Doc. 217 ["SAC"].)  In the SAC, Plaintiff broadly alleges that it "was a California nonprofit public benefit corporation operating a Federally Qualified Health Center ['FQHC']" that provided "healthcare services to historically underserved areas of San Diego, Riverside, and San Bernadino counties."  (SAC ¶ 1.[1])  Plaintiff then alleges that "individuals and entities both inside and outside of [Plaintiff] siphoned off money from [Plaintiff.]"  (*Id.* ¶ 2.)  These individuals and entities are the named Defendants in this action.

Pending before the Court are seven motions to dismiss the SAC made by various Defendants or groups thereof.  This Order address four separate motions to dismiss filed by Defendants Karen Hebets (Doc. 239), Mikia Wallis (Doc. 230), Harry Ilsley, Dennis Nourse, Mike Hickok, Chuck Kimball (Doc. 226), Premier Healthcare Management, Inc., Summit Healthcare Management, Inc., Daryl Priest, Nicholas Priest, and Travis Lyon (Doc. 231).  Defendants Karen Hebets, Mikia Wallis, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball are Plaintiff's former executives and/or Board of Trustees ("Board") members, and Defendants Premier Healthcare Management, Inc., Summit Healthcare Management, Inc., Daryl Priest, Nicholas Priest, and Travis Lyon are third parties who helped manage Plaintiff's contract dental program.  As alleged in the SAC, these Defendants appear to be at the center of the alleged fraud, so the Court addresses their motions together.

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons discussed below, Defendants Premier, Summit, Daryl Priest, Nick Priest, and Travis Lyon's Motion to Dismiss (the "Premier MTD") is **GRANTED** (Doc. 231); Defendant Karen Hebets' Motion to Dismiss (the "Hebets MTD") is **GRANTED** (Doc. 239); Defendant Mikia Wallis' Motion to

---

[1] The Court cites to the paragraph numbers of the Complaint or to the CM/ECF electronic pagination unless otherwise noted.

Dismiss (the "Wallis MTD") is **GRANTED** (Doc. 230); and Defendants Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball's Motion to Dismiss (the "Board Members' MTD") is **GRANTED** (Doc. 226). The Court also **DENIES AS MOOT** Defendant Karen Hebets' alternative motions for a more definite statement and to strike allegations. (*See* Doc. 239 at 1; Doc. 239-1 at 20, n.17; Doc. 239-1 at 30.)

# I. FACTUAL BACKGROUND[2]

## A. The Parties

### 1. The Executive and Board Member Defendants

Bruce and Karen Hebets. Bruce Hebets was Plaintiff's Chief Executive Officer ("CEO") from 2004 until his retirement in 2018. (SAC ¶ 12.) Bruce Hebets passed away in January 2019 and is not a defendant in this action. (*Id.*) Defendant Karen Hebets was Bruce Hebets' wife and Plaintiff's Vice President of Business Services. (*Id.* ¶ 13.)

KBH Healthcare Consulting, LLC. Defendant KBH Healthcare Consulting, LLC ("KBH") was a California Limited Liability Company with its principal place of business in Borrego Springs, California. (*Id.* ¶ 14.) Bruce Hebets and Defendant Karen Hebets shared a 50/50 interest in the company. (*Id.*)

Mikia Wallis. Defendant Mikia Wallis was Plaintiff's Chief Legal Officer ("CLO") and then became Plaintiff's CEO when Bruce Hebets retired. (*Id.* ¶ 15.) She also served on Plaintiff's Board until October 2, 2020. (*Id.*)

Diana Thompson. Defendant Diana Thompson, formerly Diana Troncoso, was Plaintiff's Chief Financial Officer ("CFO") from March 2013 until March 2021 when she was terminated. (*Id.* ¶ 16.) Defendant Diana Thompson's brother is married to one of Bruce and Karen Hebets' children. (*Id.*)

Harry Ilsley. Defendant Harry Ilsley served on Plaintiff's Board. (*Id.* ¶ 17.) He was also on the Board's Executive/Finance Committee. (*Id.*)

---

[2] The Court's summary of Plaintiff's SAC below reflects Plaintiff's factual and legal allegations, not conclusions of fact or law by this Court.

Dennis Nourse.  Defendant Dennis Nourse served on Plaintiff's Board beginning in mid-2012.  (*Id.* ¶ 18.)  He was also on the Board's Executive/Finance Committee.  (*Id.*)

Mike Hickok.  Defendant Mike Hickok served on Plaintiff's Board.  (*Id.* ¶ 19.)  He was also a member of the Board's Executive/Finance Committee.  (*Id.*)

Chuck Kimball.  Defendant Chuck Kimball served on Plaintiff's Board starting in approximately 2011.  He was also a member of the Board's Executive/Finance Committee. (*Id.*)

## 2.    The Premier, Priest, and Priest-Related Defendants

Premier Healthcare Management, Inc.  Defendant Premier Healthcare Management, Inc. ("Premier") is a California corporation with its principal place of business in El Cajon, California.  (*Id.* ¶ 22.)

Summit Healthcare Management, Inc.  Defendant Summit Healthcare Management, Inc. ("Summit") was a California corporation with its principal place of business in El Cajon, California.  (*Id.* ¶ 23.)  Defendant Summit merged with Defendant Premier in 2019.[3] (*Id.*)

Daryl Priest.  Defendant Daryl Priest is an individual with his place of residence in El Cajon, California.  (*Id.* ¶ 24.)  Defendant Daryl Priest owns Defendant Premier.  (*Id.*)

Nicholas ("Nick") Priest, Esq.  Defendant Nick Priest is an individual with his place of residence in San Diego, California.  (*Id.* ¶ 25.)  Defendant Nick Priest is Defendant Daryl Priest's son and Defendant Premier's CEO.  (*Id.*)

Travis Lyon.  Defendant Travis Lyon is an individual with his place of residence in Alpine, California.  (*Id.* ¶ 26.)  Defendant Lyon was Defendant Premier's President and Chief Operating Officer ("COO").  (*Id.*)

---

[3] As alleged, Defendant Summit is now Defendant Premier.  (*See id.* ¶ 161.)  For the purposes of this Order, the Court treats Defendant Premier and Defendant Summit as if they are the same entity and solely addresses Defendant Premier.  The Court notes that Plaintiff has asserted some causes of action against Defendant Premier and not Defendant Summit.

4

### 3.    The Jim Hebets Defendants

Plaintiff also asserts numerous causes of action against Defendants Jim Hebets and The Hebets Company (the "Jim Hebets Defendants"). (SAC at 211–73.) Defendant Jim Hebets is Bruce Hebets' brother. (*Id.* ¶ 41.) The Court will address the Jim Hebets Defendants' motion to dismiss in a separate order.

### 4.    The Dentist Defendants

Plaintiff also asserts numerous causes of action against various dentists and their practices (the "Dentist Defendants") for fraudulent billing. The Court will address the Dentist Defendants' motions to dismiss in a separate order.

## B.    The Contract Dental Schemes

Plaintiff began a contract dental program in 2014. (*Id.* ¶ 102.) "'[C]ontract dental' describes the arrangement where [Plaintiff] [entered] contracts with individual dentists and/or their practices. Under those contracts, the contracted dentists agreed to provide certain dental services to eligible patients of [Plaintiff]. Those services would then be billed to Medi-Cal by [Plaintiff]. [Plaintiff], in turn, pays the dentist a fee for the dental services rendered." (*Id.* ¶ 103.) Plaintiff alleges several fraudulent schemes related to its contract dental program—the Premier Scheme, the Fraudulent Dental Billing Scheme, and the Coverup Scheme. (SAC at 34–116.) The Court refers to these schemes collectively as the "Contract Dental Schemes."

### 1.    The Premier Scheme

Sometime in 2015, Bruce Hebets proposed that Plaintiff engage a Management Services Organization ("MSO") for its contract dental program. (SAC ¶ 111.) On or about October 29, 2015, Plaintiff's Board rejected Bruce Hebets' proposal to contract with an MSO in which he held ownership interest. (*Id.* ¶ 118.) Some of Plaintiff's Board members present at the meeting recall the Board rejecting the idea that Plaintiff use an MSO to manage its contract dental program entirely, regardless of who owned or operated it. (*Id.*)

Despite the Board's disapproval, on March 1, 2016, Bruce Hebets and Defendant Premier executed a Management Services Agreement for Plaintiff's contract dental

program (the "Dental MSA"). (*Id.* ¶ 121.) Bruce Hebets and Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball never informed Plaintiff's Board of the Dental MSA. (*Id.* ¶¶ 121, 129.) In fact, they took steps to conceal the Dental MSA. (*See e.g.*, *id.* ¶¶ 121–29, 144–48, 150–55.)

"Pursuant to the terms of the Dental MSA, [Plaintiff] was to pay [Defendant] Premier $5 per participating patient visit to any contract dentist for the first 8,000 visits, then $25 per participating patient visit thereafter. In return, [Defendant] Premier, by and through [Defendants] Daryl Priest, Nick Priest, and Travis Lyon, agreed to provide the services to [Plaintiff], including … claims management and processing … ." (*Id.* ¶ 130.) Claims management and processing included "'scrubbing' the contract dental claims for documentation errors or inconsistencies … ." (*Id.*)

The Dental MSA underwent two amendments on or about December 22, 2016 and July 1, 2017, respectively. (*Id.* ¶ 131.) The first amendment extended the term of the Dental MSA for five years beginning on January 1, 2017, subject to an automatic renewal of five years. (*Id.* ¶ 132.) It also removed the provision allowing Plaintiff to terminate the agreement without cause. (*Id.*) The second amendment "obligated [Plaintiff] to pay Premier $25 per visit, starting at the first visit rather than the previous term of $5 per visit for the first 8,000 visits." (*Id.* ¶ 133.)

Plaintiff alleges that "[t]wenty-five dollars per claim was an unreasonably high price. Before the Dental MSA was signed, [the person in charge of the contract dental program in 2016] told them that $5 per claim would be reasonable." (*Id.* ¶ 141.) Likewise, "at a September 24, 2020 Finance Committee Meeting, the Dental MSA was discussed. [One of the Board's trustees] indicated that billing software companies usually charge between $3-6 per claim, and that $25 per claim was outside of fair market value."[4] (*Id.* ¶ 158.)

---

[4] On September 8, 2017, Bruce Hebets and Defendant Daryl Priest entered into another management services agreement for Plaintiff's contract medical program (the "Medical

Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon did not perform the obligations set forth in the Dental MSA.  (*Id.* ¶ 140.)  Instead, Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon trained dentists on how to maximize their revenue at the expense of Plaintiff, which also increased Defendant Premier's revenue because it received $25 per claim.  (*Id.*)  Defendants Premier, Summit, Daryl Priest, Nick Priest, and Travis Lyon also failed to review and scrub dental claims for accuracy as evidenced by thousands of unsubstantiated, duplicate, or fraudulent claims.  (*Id.*)  "For each of these claims, [Defendant] Premier wrongfully received payment."  (*Id.*)  "Payment to the dentists was typically initiated within 24 hours of receiving a bill from the dentists, and well before any payment had been made by Medi-Cal.  [T]he payments from [Plaintiff] to the dentists were not recouped by Premier if Medi-Cal never paid [Plaintiff]."  (*Id.* ¶ 144.)

Plaintiff alleges that non-Defendant Board members only became aware of the arrangement in the summer of 2020.  (*Id.* ¶ 156.)  In fact, "on or about July 23, 2020, Mike Hickok admitted [in an email], '[a]s long as I have been on the Board our dealings with [Defendant Premier] have been secretive mysterious and above all off limits to Board members.' … The email also admitted that, among other things, the Dental MSA [was] never approved by the [Plaintiff's Board], [was] never put out for competitive bidding, and [was] never reported on 990 forms.  Mike Hickok also stated that the arrangement with Premier 'was hardly the extent of [Plaintiff's] involvement with the principals of Premier Healthcare' … ."  (*Id.* ¶ 157.)

## 2.    The Fraudulent Dental Billing Scheme

Plaintiff's contract dental program expanded quickly because Medi-Cal paid Plaintiff a fixed rate for each "encounter" or visit to one of Plaintiff's contract dentists.

---

MSA").  (*Id.* ¶ 135.)  Pursuant to the terms of the Medical MSA, another one of Defendant Daryl Priest's companies, Defendant Summit, agreed to provide services like those under the Dental MSA.  (*Id.*)  Plaintiff does not allege, however, how Defendant Summit or the Medical MSA are involved in any of the alleged civil RICO schemes.

(SAC ¶ 105.)  For this reason, Plaintiff was able to pay the contract dentists more than if they worked with Medi-Cal directly.  (*Id.* ¶ 107.)

As part of the Dental MSA, Defendant Premier, by and through Defendants Daryl Priest, Nick Priest, and Travis Lyon, engaged and reached out to new dental providers for the contract dental program.  (*Id.* ¶ 171.)  They were also responsible for training the dentists on how to properly submit their claims to Defendant Premier for payment.  (*Id.* ¶ 172.)  Defendant Travis Lyon and employee Maria Elena Fernandez conducted the training.  (*Id.* ¶ 173.)  Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball also ensured that Defendants Premier, Daryl Priest, Nick Priest and Travis Lyon trained the contract dental providers to maximize profits.  (*Id.*)

Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon were required to monitor the claims from the contract dentists to ensure they were compliant with federal and state regulations.  (*Id.* ¶ 175.)  Instead, they coached the contract dentists on how to fraudulently bill Plaintiff by "claim splitting" and billing for non-covered bridges.  (*Id.* ¶ 178.)  For example, if a dentist performed multiple procedures in one encounter, these Defendants coached the dentists to bill two encounters, one on the day it occurred and one the next day.  (*Id.* ¶ 179.)  These Defendants also coached the contract dentists to submit false and fraudulent bills for dental bridges, which are not covered by Medi-Cal, by instead billing for three crowns in separate encounters.  (*Id.* ¶ 180.)

Defendant Karen Hebets and Diana Thompson then trained their family members in Plaintiff's billing department to ignore billing issues or discrepancies.  (*Id.* ¶¶ 175, 182.)  Defendant Thompson's stepson processed Defendant Premier's payment.  (*Id.* ¶ 182.)

### 3.    The Coverup Scheme

As a result of the alleged Premier Scheme and the Fraudulent Dental Billing Scheme, Plaintiff was forced to develop a "Program Integrity" program to review and audit the contract dental claims and providers—tasks that Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon were supposed to perform under the Dental MSA.  (*Id.* ¶ 332.)  In

8

May 2017, Plaintiff hired Timothy Martinez, D.D.S. to be its Chief Dental Officer. (*Id.* ¶ 333.) Dr. Martinez was tasked with developing and implementing the Program Integrity program. (*Id.*) Dr. Martinez hired Dr. Nithya Venugopal as Plaintiff's Dental Director of Program Integrity. (*Id.* ¶ 333.)

After the creation of the Program Integrity Team, Defendants Daryl Priest, Nick Priest, and Travis Lyon worked with Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball "to stop further inquiries and protect the dentists from both detection and/or consequences." (*Id.* ¶ 347.) For example, Defendants Diana Thompson and Karen Hebets "hired several family members … in the billing and accounting department at [Plaintiff]. These family members were trained to ignore errors and duplications in the claims submitted by the Dental Defendants through [Defendants] Premier, Daryl Priest, Nick Priest and Travis Lyon." (*Id.* ¶ 348.) Additionally, "[Defendants] Premier, Daryl Priest, Nick Priest, and Travis Lyon, supported by [Defendants] Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball, would not permit Program Integrity audits to be random. It required Program Integrity to provide advance notice to dentists … ." (*Id.* ¶ 350.)

When the Program Integrity team identified false or fraudulent claims warranting reversal, Defendants Premier, Daryl Priest, Nick Priest, Travis Lyon, Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball would not follow through on claims reversals. (*Id.* ¶ 352.) Likewise, when the Program Integrity team would recommend or request that a contract dental provider's contract with Plaintiff be terminated, Defendants Premier, Daryl Priest, Nick Priest, Travis Lyon and Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball would refuse … ." (*Id.* ¶ 353.) On several occasions in 2019, contract dentists informed members of the Program Integrity team that Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon told them to bill for specific procedures covered by Medi-Cal and to split claims in certain ways. (*Id.* ¶ 354.)

When members of the Program Integrity team reported concerns to Defendant Mikia Wallis, they would immediately receive a call from Defendants Travis Lyon or Nick Priest, but the underlying concern would not be addressed.  (*Id.* ¶¶ 355, 357.)  Defendant Wallis also made herself unavailable for meetings with the Program Integrity team, only allowing 15-minute intervals for such meetings.  (*Id.* ¶ 356.)  Dr. Venugopal stated, "[Defendant Wallis] knew what we were doing but hated what we were finding."  (*Id.*)  Defendant Wallis would unreasonably defend the contract dental providers even when she was informed of problematic billing practices and poor quality.  (*Id.* ¶ 359.)

Defendants Mikia Wallis and Travis Lyon also pushed new contract dental providers through Plaintiff's credentialing process even when Dr. Martinez insisted that the providers needed to be thoroughly vetted.  (*Id.* ¶ 358.)  In fact, Defendants Travis Lyon and Nick Priest personally attended the June 2017 credentialing committee even though credentialing committees are usually autonomous bodies free from outside involvement. (*Id.* ¶ 360.)

On April 12, 2017, Dr. Martinez informed Defendant Travis Lyon of issues with excessive billing, but Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon did nothing to detect or prevent such billing.  (*Id.* ¶ 362.)  Similarly, On May 21, 2020, Defendant Travis Lyon falsely promised the Program Integrity team that he would implement a prior authorization requirement, meaning providers would need prior authorization to perform certain high-cost services.  (*Id.* ¶ 374.)  He did not.  (*Id.*)  Likewise, on June 16, 2020, Dr. Venugopal directed Defendant Lyon to tell providers not to bill bridges as single unit crowns, but Defendant Lyon refused.  (*Id.* ¶ 375.)

## C.    The Borrego MSA and IPA Scheme

Borrego Management Services Organization, LLC ("Borrego MSO") and Borrego Independent Physicians Association, a Professional Medical Corporation ("Borrego IPA") were formed on or about July 19, 2010.  (SAC ¶¶ 92, 94.)  Defendant Mikia Wallis drafted the agreements and paperwork for Borrego MSO and Borrego IPA.  (*Id.* ¶ 94.)  She was also the agent for Service of Process for both organizations.  (*Id.*)  Defendant Karen Hebets

was Borrego MSO's CEO and a shareholder.  (*Id.* ¶ 96.)

Borrego MSO and Borrego IPA contracted with Plaintiff to provide physician and administrative services.  (*Id.* ¶ 98.)  "However, these services were already being provided [by Plaintiff] without the unnecessary expense of contracting with outside companies."  (*Id.*)  On November 1, 2012, Plaintiff paid $2 million to acquire Borrego MSO and Borrego IPA even though the entities had no valuable assets.  (*Id.* ¶ 99.)

**D.    The Priest Leases Scheme**

Plaintiff alleges that it leased certain real property from entities related to Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon at rents and terms well above market value.  (*Id.* ¶ 382.)  Plaintiff alleges that it was victimized by three over-priced, 30-plus-year term facility leases engineered by Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, Chuck Kimball, Premier, Daryl Priest, Nick Priest, and Travis Lyon or entities related to them.  (*Id.*)  These leases were never subjected to due diligence or submitted to Plaintiff's Board for approval.  (*Id.*)  Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball then concealed the leases from Plaintiff's Board.  (*Id.*; *see also id.* ¶¶ 388, 396.)  For example, financial reports presented to Plaintiff's Board only showed the aggregate rents paid on all facilities.  (*Id.* ¶ 396.)

Promenade Square, LLC ("Promenade") is a California Limited Liability Company, whose sole member and manager is Defendant Daryl Priest.  (*Id.* ¶ 384.)  Plaintiff leased structures and appurtenances from Promenade, located at 133 and 155 West Main Street, El Cajon, California (the "Promenade Lease").  (*Id.*)  "The Promenade Lease calls for payment of nearly $40,000 per month over fair market rent, or more than $15,000,000 over fair market rent over the 33-year life of the lease[.]"  (*Id.* ¶ 396.b; *see also id.* ¶ 401.)

DRP Holdings, LLC ("DRP") is a California Limited Liability Company whose sole member and manager is Defendant Daryl Priest.  (*Id.* ¶ 385.)  Plaintiff leased the structures and appurtenances located at 590 North D Street in San Bernardino, California from DRP (the "DRP Lease").  (*Id.*)  "The DRP Lease calls for payment of nearly $39,000 per month

over fair market rent, or approximately $14,000,000 over fair market rent over the 30-year life of the lease[.]" (*Id.* ¶ 394.c; *see also id.* ¶ 401.)

Inland Valley Investments, LLC ("Inland Valley") is a California Limited Liability Company whose sole member and manager is Defendant Daryl Priest. (*Id.* ¶ 386.) Plaintiff leased the structures and appurtenances located at 750 East Main Street in Barstow, California from Inland Valley by way of assignment from DRP (the "Inland Valley Lease"). (*Id.*) In fact, Plaintiff signed the Inland Valley Lease before the Barstow facility even existed. (*Id.*) Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon then presented the over-market lease to secure financing for development. (*Id.*) Defendant Travis Lyon was the broker for the construction loan and personally collected signatures from Bruce Hebets and Defendant Diana Thompson. (*Id.*) "The Inland Valley Lease calls for payment of more than $80,000 per month over fair market rent, or approximately $29,000,000 above fair market rent over the 30-year life of the lease[.]" (*Id.* ¶ 394.d; *see also id.* ¶ 401.)

## E.    The Compensation/Benefits Scheme

Bruce Hebets and Defendants Karen Hebets, Diana Thompson, and Mikia Wallis received high salaries, bonuses, and/or allowances from Plaintiff. (*Id.* ¶¶ 407–10.) "[Defendants] Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball used [Defendant] Jim Hebets and his companies to create a bogus evaluation of the compensation packages, concluding—unsurprisingly—that they were appropriate." (*Id.* ¶ 411.) Defendant Mike Hickok admitted that the executives kept their base salaries low but received "bonuses" and other benefits "to avoid scrutiny." (*Id.* ¶ 412.)

"Board members [Defendants] Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball also received compensation and other improper benefits" even though payment to Board members was prohibited except for in very narrow circumstances. (*Id.* ¶ 413.) For example, Defendants "Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball received free access to [Plaintiff's] programs, benefits, prescription drugs and

12

even hearing aids." (*Id.* ¶ 414.)

In 2019, Plaintiff retained Compensation Resources, Inc. ("CRI") to review and analyze the compensation for 15 of Plaintiff's executives. (*Id.* ¶ 417.) On or about July 19, 2019, the CRI report concluded that the "[t]otal [c]ompensation [p]ackage … for [11] of [Plaintiff's] officers is currently *above the high end* of their respective Market Ranges of Reasonableness." (*Id.* (emphasis added).)

Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball concealed the compensation issues. (*Id.* ¶ 418.) For example, Defendant Mikia Wallis submitted multiple reports without necessary information. (*Id.*) In one of her reports, she noted salaries that had already been reduced by an "equitable" adjustment. (*Id.* ¶ 419.)

## F.    The Nepotism and Cronyism Scheme

"Bruce Hebets and Defendant Karen Hebets hired their family members to work at [Plaintiff,]" including their daughters Tiffany Hebets and Amanda Troncoso, who is also Defendant Diana Thompson's daughter-in-law. (*Id.* ¶ 421.)

Defendant Mikia Wallis created a position for her husband, Jeremy Noble. (*Id.* ¶ 422.) He was hired to be Plaintiff's Director of Site Facility Compliance in exchange for an annual base salary of $120,000. (*Id.*)

"[Defendant] Diana Thompson hired her family members to work in [Plaintiff's] billing department and elsewhere." (*Id.* ¶ 423.) These family members included (1) her brother, Jose Alfredo Villafana; (2) her brother, Luis Troncoso; (3) her sister, Breanda Troncoso; (4) her stepson, Julian Thompson; (5) her stepson, Jordan Thompson; and (6) her daughter-in-law, Amanda Troncoso. (*Id.*)

## G.    De Anza Country Club Scheme

At the October 2017 Executive/Finance Committee meeting, Bruce Hebets and Defendants Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball discussed purchasing the De Anza Country Club in Borrego Springs, California. (*Id.* ¶ 426.) Defendants Mike Hickok, Dennis Nourse, and Harry Ilsley were

members and nearby homeowners at De Anza Country Club.  (*Id.* ¶ 427; *see also id.* ¶ 435.)

Defendant Mike Hickok was on the De Anza Board and led the committee to arrange a purchaser for the country club.  (*Id.* ¶ 427.)  Defendant Mike Hickok wanted Plaintiff to buy the club so that Plaintiff could pay membership fees and then offer "free" membership and golf course access to medical and dental providers.  (*Id.* ¶ 428.)  Defendant Hickok admitted that most employees would not want this but that it made sense for Plaintiff to buy the country club since there was a "fire sale."  (*Id.*)

Defendants Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball did not present the plan to purchase the country club to Plaintiff's Board.  (*Id.* ¶ 429.)  Defendant Kimball said the Board would "f**k it up."  (*Id.*; *see also id.* ¶ 432.)

"Following the October 2017 meeting, [Plaintiff] made a formal offer to purchase the country club, including paying earnest money on the deal[,]" without the Board approving the transaction.  (*Id.* ¶ 430.)  However, Defendants "Mike Hickok and Harry Illsley were unable to obtain a written favorable vote from a majority of the equity members at the [] club.  Therefore, despite the improper efforts, the deal did not move forward, and [the club] returned the earnest money."  (*Id.* ¶ 437.)

## H.    The Payout Scheme

"In or about March 2018, Bruce Hebets suffered from a worsening illness and decided to step down from his position as CEO.  Without putting it on the agenda, [Defendants] Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball proposed a $5 million payout for Bruce Hebets as part of a 'transition agreement.'"[5]  (*Id.* ¶ 438.)  Despite the inherent conflict of interest, Defendant Mikia Wallis drafted the agreement and told one of Plaintiff's Board members

---

[5] The Court notes that Plaintiffs allege Defendant Karen Hebets was a part of this proposal even though she was not a member of Plaintiff's Board or the Executive/Finance Committee.

that she "represented no one" in the transaction even though she was Plaintiff's CLO and would soon become Plaintiff's CEO. (*Id.* ¶¶ 439–40.) Two non-defendant Board members objected to the payout. (*Id.* ¶ 441.)

Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball argued that the high buyout was appropriate because Bruce Hebets did not have retirement benefits. (*Id.* ¶ 442.) However, this was false; Bruce Hebets had a 162B plan. (*Id.*)

At the insistence of non-defendant Board members, Plaintiff retained FW Cook to evaluate the payout. (*Id.* ¶ 446.) FW Cook concluded that an appropriate payout would be $2 million, not $5 million. (*Id.*) However, the 162B plan was concealed from FW Cook. (*Id.*) Plaintiff's Board agreed to a $2 million payout. (*Id.* ¶ 448.)

After the payout had been approved, Marty Katz from FW Cook told one of Plaintiff's Board members that if he had known about the 162B plan, the recommended payout amount would have been lower. (*Id.* ¶ 449.)

## I. The Jim Hebets Scheme

Plaintiff alleges that Defendants Karen Hebets, Mikia Wallis, and Diana Thompson collaborated with Defendant Jim Hebets and The Hebets Company to review and approve sham, inflated salaries for Plaintiff's executives. (*Id.* ¶ 454.) When the sham fair market value analyses were presented to Plaintiff's Board, Defendant Jim Hebets removed his name from the masthead, drafted documents without referencing himself, and did not mention his last name to conceal his involvement and the obvious conflict of interest. (*Id.* ¶ 455.)

Bruce Hebets, and Defendants Diana Thompson and Mikia Wallis, "schemed with The Hebets Company to increase executive compensation through contributions through automatic 'bonuses' that were paid to 162B plans." (*Id.* ¶ 459.) These automatic bonuses were paid to Bruce Hebets and Defendants Diana Thompson, Mikia Wallis, and Karen Hebets. (*Id.*) Bruce Hebets and Defendant Karen Hebets worked with The Hebets Company to "borrow" from their 162B accounts and transfer the funds into their checking

15

accounts.  (*Id.* ¶ 460.)

To persuade Plaintiff to continue to use the 162B plans, Defendant Jim Hebets falsely represented that the plans would not subject Plaintiff to tax penalties.  (*Id.* ¶ 463.) "As of July 2020, [Plaintiff] was paying $240,000 per month for the 162B plans.  This is immensely disproportionate to the appropriate cost for such benefits."  (*Id.* ¶ 464.)

## J.    The Julian Barn Scheme

Bruce Hebets and Defendant Chuck Kimball were acquaintances prior to their relationship at Plaintiff.  (*Id.* ¶ 471.)  Beginning in April of 2009, Defendant Chuck Kimball, who at the time was the Vice President of Julian Medical Foundation, emailed Bruce Hebets "regarding acquiring a barn to serve as a site for a future clinic operated by [Plaintiff] in Julian."  (*Id.* ¶ 472.)  "[Defendant] Kimball wanted [Plaintiff] to subsidize the acquisition and development of the property and insulate Julian Medical Foundation from any risk from acquiring the property."  (*Id.* ¶ 473.)

In October 2010, Plaintiff leased the barn from Julian Medical Foundation and Defendant Chuck Kimball.  (*Id.* ¶ 479.)  The lease terms were one-sided, and the leased space was unneeded and unusable.  (*Id.* ¶¶ 479–80.)  For example, the lease amount was "whatever expenses Julian Medical Foundation had to own the property[,]" and the term of the lease was 20 years, with no clause permitting Plaintiff to terminate the lease if the property was never developed into a medical clinic.  (*Id.* ¶¶ 481, 483.)

## K.    The Property Development Scheme

Defendant Dennis Nourse owned commercial property located on Palm Canyon Drive in Borrego Springs, California (the "Palm Canyon Parcel").  (*Id.* ¶ 490.)  Defendant Daryl Priest proposed that Plaintiff purchase the Palm Canyon Parcel so that Defendant Priest could then contract with Plaintiff to develop the parcel.  (*Id*. ¶ 508.)  Bruce Hebets and Defendant "Mikia Wallis facilitated and directed the actions necessary to execute the deal documents without knowledge of [Plaintiff's] Board.  [Plaintiff] believes that Dennis Nourse received the $400,000 payment for the Palm Canyon Parcel."  (*Id.* ¶ 513; *see also id*. ¶ 510 (alleging that Bruce Hebets and Defendant Nourse did not bring the transaction

to Plaintiff's Board).)

**L.    The KBH Healthcare Consulting Scheme**

Defendant KBH was created in 2017. (*Id.* ¶ 517.) Defendant KBH's business address with the California Secretary of State is Bruce and Karen Hebets' home address. (*Id.*) Defendant Mikia Wallis drafted the operating agreement and the articles of incorporation for KBH while she was Plaintiff's CLO. (*Id.* ¶ 518.)

On or about February 1, 2017, Defendant KBH entered into a Consulting Agreement with Defendant Premier. (*Id.* ¶ 519.) "The 'services' that [Defendant KBH] agreed to provide pertained to OMNI Family Health, which [Defendant] Premier apparently wanted to contract with to manage their dental services." (*Id.*) Defendant KBH was to be paid a retainer of $200,000. (*Id.* ¶ 520.) However, Defendant Premier never contracted with OMNI. (*Id.* ¶ 522.)

In May 2017, the Consulting Agreement was amended to eliminate reference to OMNI Family Health. (*See id.* ¶ 523.) The amendment noted that a $200,000 retainer had already been paid to Defendant KBH and added that Defendant Premier was to pay Defendant KBH $75,000 per month for a period of 24 months. (*Id.* ¶ 524.) Defendant KBH had a bank account with Chase, including a debit card. (*Id.* ¶ 525.) The debit card was used at Barona Resort and Casino to withdraw thousands of dollars in cash. (*Id.* ¶¶ 527–31.)

## II.    LEGAL STANDARD

**A.    Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Rule 12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations

17

omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

When a Rule 12(b)(6) motion is granted, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**B.    Federal Rule of Civil Procedure 8**

Federal Rule of Civil Procedure 8(a) provides, "[a] pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction … ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."  Rule 8(d)(1) provides, "[e]ach allegation must be simple, concise, and direct."

**C.    Federal Rule of Civil Procedure 9**

As set forth in the Court's Order Granting Motions to Dismiss Plaintiff's First Amended Complaint ("FAC Order"), Federal Rule of Civil Procedure Rule 9(b) applies to claims based on fraud.  (Doc. 215 [FAC Order] at 9.)  A plaintiff must plead the elements

of fraud with the particularity demanded by Rule 9(b), outlining the who, what, when, and where of the alleged fraudulent acts. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). "In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be grounded in fraud or to sound in fraud, and the pleading of that claim … must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). "Given the factual basis for all of Plaintiff's claims are the twelve fraudulent schemes, all must meet Rule 9(b)'s particularity requirement." (Doc. 215 [FAC Order] at 9.)

## III.  DISCUSSION

### A.  Civil RICO Standing

"Under [the Racketeer Influenced and Corrupt Organizations Act's] ['RICO'] civil enforcement mechanism, '[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue … in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee … .'" *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (quoting 18 U.S.C. § 1964(c)). Therefore, "[t]o have standing under § 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) and *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

"The Supreme Court has interpreted the phrase 'by reason of' in 18 U.S.C. § 1964(c) to require … both proximate and but-for causation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (citing *Holmes*, 503 U.S. at 268). "The requirement of proximate cause seeks to 'limit a person's responsibility for the consequences of that person's own acts.'" *Id.* (quoting same). "Put another way, 'the proximate-cause requirement generally bars suits

19

for alleged harm that is 'too remote' from the defendant's unlawful conduct.'" *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). "Thus, it 'demand[s] ... some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes*, 503 U.S. at 268).

The Supreme Court in *Holmes* explained that the "direct relation" requirement is based upon three practical factors:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269–70.

On February 13, 2024, in response to arguments made in the moving Defendants' motions to dismiss, the Court issued an Order Requesting Supplemental Briefing Regarding Civil RICO Statutory Standing ("Supplemental Briefing Order"). (Doc. 282.) Specifically, the Court ordered the Parties to address whether Plaintiff has civil RICO statutory standing for each of the fraudulent schemes alleged in Plaintiff's SAC. (*Id.* at 3.) The Parties filed supplemental briefing on February 20, 2025, February 21, 2025, and February 24, 2025. (*See* Docs. 284, 286–95.) The Court determines whether Plaintiff has adequately alleged civil RICO statutory standing for each fraudulent scheme here.

### 1. The Contract Dental Schemes

As set forth above (*see* Section I.B), Plaintiff alleges several schemes related to its contract dental program: (1) the Premier Scheme, (2) the Fraudulent Dental Billing Scheme, and (3) the Coverup Scheme. Each of these schemes relates to fraudulent healthcare billing.

20

In its supplemental briefing, Plaintiff argues that Defendants' healthcare billing schemes directly and concretely injured Plaintiff in multiple ways. (Doc. 294 at 13–16.) First, Plaintiff asserts that Plaintiff paid the Dentist Defendants based on a fee schedule listing different prices for different dental services. (*Id.* at 13 (citing SAC, Ex. G, Addendum B).) However, Medi-Cal paid Plaintiff an inclusive, per encounter rate regardless of the number or value of services. (*Id.* (citing SAC ¶ 105).) The Dentist Defendants were therefore able to steal from Plaintiff without causing corresponding harm to Medi-Cal. (*Id.* at 13–14.) Plaintiff provides the following examples:

> In the situation where a dentist … falsely billed … a deep cleaning of two quadrants of the mouth in one visit ($140 for both quadrants) instead of a regular cleaning for the whole mouth, [Plaintiff] paid the Dentist $140 instead of $100. … When dentists billed [Plaintiff] for unnecessary (or fake) complex extractions rather than simple extractions, [Plaintiff] paid the dentists $165, rather than $100, for the service. [Plaintiff] is harmed by these overpayments of $40 and $65 per service, respectively. However, Medi-Cal is not harmed by these overpayments: it pays [Plaintiff] the same flat encounter rate regardless of the excessive service by the dentist.

(*Id.* at 22 (citations omitted).) Second, Plaintiff asserts that it lost money on non-dental services when Medi-Cal suspended Plaintiff because of the Dentist Defendants' fraudulent conduct. (*Id.* at 14.) Third, Plaintiff assert that it lost money on dental services not reimbursed by Medi-Cal after Plaintiff's suspension.[6] (*Id.*)

Regarding proximate causation, Plaintiff argues that the "direct target and intention" of the healthcare billing schemes was to steal money from Plaintiff, not Medi-Cal. (*Id.* at

---

[6] Plaintiff identifies three additional injuries (*see id.* at 14–15), but these alleged injuries do not alleviate the Court's concerns regarding civil RICO standing. For example, Plaintiff asserts that the Dentist Defendants billed multiple encounters to collect multiple times when the services could have been, or were performed, all at once. (*Id.* at 15.) However, Plaintiff also benefited from the Dentist Defendants billing for multiple encounters because they received a fixed fee from Medi-Cal for each encounter.

21.)  Plaintiff distinguishes this case from the cases cited by the Court in its Supplemental Briefing Order, where the Medicare/Medicaid programs were the direct target of the fraud and where the plaintiffs consistently benefitted from the fraudulent schemes alleged.  (*Id.* at 22–24.)  Plaintiff also argues that this case presents no apportioning concerns as Plaintiff is the only plaintiff and asserts that Plaintiff is the proper plaintiff to bring this challenge.  (*Id.* at 24–27.)

Although the allegations in Plaintiff's SAC are unclear, with this additional explanation and the examples provided by Plaintiff, the Court is persuaded that, at this stage, Plaintiff has adequately alleged injury to business or property "by reason of" the alleged RICO violations.[7]  18 U.S.C. § 1964.

### 2.    The Borrego MSA and IPA Scheme

Regarding the Borrego MSA and IPA Scheme, Plaintiff argues that they have civil RICO statutory standing because "Defendants devised a scheme to have [Plaintiff], specifically, incur unnecessary costs by providing physician services and administrative services to [Plaintiff] through Defendant-created and controlled companies."  (Doc. 294 at 18.)  The Court is persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the Borrego MSA and IPA Scheme.  18 U.S.C. § 1964.  Plaintiff alleges that the Borrego MSO and the Borrego IPA contracted with Plaintiff to provide physician and administrative services even though such services were already being performed in-house.  (SAC ¶ 98.)  Plaintiff then paid $2 million to acquire Borrego MSO and Borrego IPA even though the entities had no valuable assets.  (*Id.* ¶ 99.)  Therefore, at a minimum, Plaintiff has alleged that Defendant Hebets, a shareholder of the Borrego MSO, stole money from Plaintiff through this scheme.  *See* 18 U.S.C. § 1964.

---

[7] Plaintiff also notes that the California Department of Health Care Services ("DHCS" or "Medi-Cal") will be a primary beneficiary of its bankruptcy plan, further alleviating the Court's concern than Plaintiff is not the proper plaintiff to bring suit.  (Doc. 294 at 7–8, n.1.)

### 3. The Priest Leases Scheme

Plaintiff asserts that it "does not address the Priest Leases Scheme because it is subject to a separate action that has been remanded to state court and it is not being pursued in this case any longer as a result of the remand order." (Doc. 294 at 18, n.5.) As Plaintiff is no longer pursuing claims related to the Priest Leases Scheme in this action, any such claims are **<u>DISMISSED</u> without leave to amend**.[8] The Court **<u>ORDERS</u>** Plaintiff to remove these allegations from any amended complaint.

### 4. The Compensation/Benefits Scheme

Regarding the Compensation/Benefits Scheme, Plaintiff argues that "Defendants caused Borrego Health to pay high salaries and bonuses to Defendants and concealed doing so with improper evaluations." (Doc. 294 at 18.) The Court is persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the Compensation/Benefits Scheme. 18 U.S.C. § 1964. Plaintiff alleges that the executive Defendants—Defendants Karen Hebets, Mikia Wallis, and Diana Thompson—received high salaries, bonuses, or allowances, which were concealed through a "bogus evaluation" of the compensation packages and altered reports. (SAC ¶¶ 407–411, 418–19.) Plaintiffs also allege that the board member Defendants—Defendants Harry Ilsley, Dennis Nourse, Mike Hickock, and Chuck Kimball—received free access to Plaintiff's programs, benefits, prescription drugs, and hearing aids even though board member compensation was prohibited except for in narrow circumstances. (*Id.* ¶¶ 413–14.) Put simply, Plaintiff alleges that executive and Board member Defendants over-paid themselves. Thus, Plaintiff has adequately alleged injury to business or property "by reason of" the Compensation/Benefits Scheme. 18 U.S.C. § 1964.

---

[8] *See Borrego Cmty. Health Found. v. Inland Valley Invs., LLC*, No. 3:21-cv-01417-BEN-SBC, 2024 WL 1223468 (S.D. Cal. Mar. 21, 2024) (dismissing civil RICO claims based on the Priest Leases Scheme and declining to exercise supplemental jurisdiction over related state law claims).

3:22-cv-01056-RBM-SBC

### 5. The Nepotism/Cronyism Scheme

Regarding the Nepotism/Cronysim Scheme, Plaintiff argues that "Defendants caused [Plaintiff] to hire family members to keep other schemes operating." (Doc. 294 at 19.) The Court is persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the Nepotism/Cronyism Scheme. 18 U.S.C. § 1964. For example, Plaintiff alleges that Defendant Mikia Wallis created a position for her husband for a base salary of $120,000 even though he was not qualified for the position. (SAC ¶ 422.) Likewise, Plaintiffs allege that Defendants Karen Hebets and Diana Thompson hired their family members to help conceal fraudulent healthcare claims. (*Id.* ¶¶ 421, 423–24.) Thus, Plaintiff has adequately alleged injury to business or property "by reason of" the Nepotism/Cronyism Scheme. 18 U.S.C. § 1964.

### 6. De Anza Country Club Scheme

Regarding the De Anza Country Club Scheme, Plaintiff argues that "Defendants attempted to make Borrego Health purchase an ailing country club to ensure Defendants with homes nearby would not lose property values or investments in the club. … This scheme demonstrates Defendants long-standing efforts to engage in self-dealing at [Plaintiff's] expense." (Doc. 294 at 19 (citing SAC ¶¶ 426–437).) While these allegations reflect poorly on the Defendants involved, the Court is not persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the De Anza Country Club Scheme. 18 U.S.C. § 1964. In its SAC, Plaintiff concedes that "despite the improper efforts, the deal did not move forward, and [the club] returned the earnest money." (SAC ¶ 437.) Thus, Plaintiff has not alleged any harm to its business or property. *See* 18 U.S.C. § 1964. Given Plaintiff's concessions that the deal did not move forward and that the club returned the earnest money, without further allegations, these claims are **DISMISSED with leave to amend**.

### 7. The Payout Scheme

Regarding the Payout Scheme, Plaintiff argues that "Defendants required [Plaintiff] to payout an unreasonable sum to their retiring CEO, using an individual without expertise

or knowledge to conduct an audit of the payout and then providing a hired audit team with insufficient information." (Doc. 294 at 19.) The Court is persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the Payout Scheme. 18 U.S.C. § 1964. Plaintiff alleges that it retained FW Cook to evaluate the payout. (SAC ¶ 446.) FW Cook concluded that a $2 million payout was appropriate. (*Id.*) However, Bruce Hebets' 162B plan had been concealed from FW Cook. (*Id.*) FW Cook later informed Plaintiff's Board that it would have recommended a lower payout had it known about the 162B plan. (*Id.* ¶ 449.) Thus, Plaintiff has alleged harm to its business or property "by reason of" the Payout Scheme. 18 U.S.C. § 1964.

### 8. The Julian Barn Scheme

Regarding the Julian Barn Scheme, Plaintiff argues that "Defendants entered [Plaintiff] into a one-sided agreement to pay to lease a Horse Barn, which was unusable in its current state, to benefit Defendants." (Doc. 294 at 19.) The Court is persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the scheme. 18 U.S.C. § 1964. Plaintiff alleges that Defendant Chuck Kimball, the Vice President of Julian Medical Foundation, approached Bruce Hebets about acquiring a barn in Julian, California, which could be developed into a clinic. (SAC ¶ 472.) Plaintiff leased the barn from the Julian Medical Foundation for the amount Julian Medical Foundation needed to own the property. (*Id.* ¶ 481.) The lease term was 20 years, and Plaintiff had no ability to terminate the lease. (*Id.* ¶¶ 479–83.) Given the one-sided nature of the lease terms, Plaintiff has adequately alleged injury to business or property "by reason of" the Julian Barn Scheme. 18 U.S.C. § 1964.

### 9. The Property Development Scheme

Regarding the Property Development Scheme, Plaintiff argues that "Defendants entered [Plaintiff] into an agreement to lease a partially undevelopable parcel to [Plaintiff] at commercially unreasonable terms to benefit Defendants." (Doc. 294 at 20.) The Court is not persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the Property Development Scheme. 18 U.S.C. § 1964. First, Plaintiff's

assertion that it leased the parcel at commercially unreasonable terms contradicts the allegations in the SAC, which state that Plaintiff ultimately *purchased* a parcel in Borrego Springs from Dennis Nourse for $400,000. (SAC ¶ 513.) Further, Plaintiff does not allege that the $400,000 purchase price was unreasonable or that the parcel was unusable. Without any such allegations, Plaintiff has not adequately alleged injury to business or property "by reason of" the Property Development Scheme. Accordingly, Plaintiff's claims concerning the Property Development Scheme are **DISMISSED** **with leave to amend**.

### 10. The KBH Healthcare Consulting Scheme

Regarding the KBH Healthcare Consulting Scheme, Plaintiff argues that "Defendants compensated some Defendants for their participation in the schemes through a sham healthcare consulting agreement, which was paid a $200,000 retainer and monthly payments for unnecessary and unrendered services." (Doc. 294 at 20.) The Court is not persuaded that Plaintiff has adequately alleged injury to business or property "by reason of" the scheme. 18 U.S.C. § 1964. Plaintiff alleges that, in February 2017, KBH entered a consulting agreement with Defendant Premier for a $200,000 retainer and $75,000 per month for a period of 24 months. (SAC ¶¶ 519–24.) However, Plaintiff does not allege that it was a party to this contract. Allowing Plaintiff to recover money paid to Defendant Premier through the Contract Dental Schemes ***and*** money paid to Defendant Karen Hebets through the KBH Healthcare Consulting Scheme would likely result in impermissible double recovery. Thus, Plaintiff has not adequately alleged injury to business or property "by reason of" the KBH Healthcare Consulting Scheme. 18 U.S.C. § 1964. Accordingly, Plaintiff's claims concerning the KBH Healthcare Consulting Scheme are **DISMISSED** **with leave to amend**, as the Court is cognizant that these allegations are necessary to demonstrate what could be characterized as "kickbacks" from Defendant Premier to Bruce Hebets and Defendant Karen Hebets.

### B. The Premier MTD

In its SAC, Plaintiff asserts **17** causes of action against Defendants Premier, Summit,

26

Daryl Priest, Nick Priest, and Travis Lyon (the "Premier Defendants") for violations of RICO based on the Premier Scheme, the Fraudulent Dental Billing Scheme, the Coverup Scheme, the KBH Healthcare Consulting Scheme, or some combination thereof.[9]  (*See* SAC, Causes of Action 14, 6–18.)  Plaintiff also asserts **14** state law causes of action against the Premier Defendants for breach of contract (against Premier only), intentional misrepresentation, negligent misrepresentation, fraudulent concealment, false promise, conversion, inducing breach of contract, intentional interference with contractual relations, intentional interference with prospective economic relations, negligent interference with prospective economic relations, violations of Business & Professions Code § 17200, *et seq.*, conspiracy, constructive fraud, and unjust enrichment/restitution.  (*See id.*, Causes of Action 19, 31, 43, 56–64, 66–67.)

On April 29, 2024, the Premier Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint (the "Premier MTD").  (Doc. 231.)  In the Premier MTD, the Premier Defendants argue (1) the SAC does not meet the particularity standard of Rule 9(b) (*id.* at 15–19), (2) Plaintiff fails to state claims for fraud (*id.* at 19–20), (3) Plaintiff's RICO claims should be dismissed (*id.* at 20–23), (4) Plaintiff's claims are time-barred (*id.* at 24–26), (5) Plaintiff fails to allege alter ego liability against the individual Premier Defendants (*id.* at 26–28), (6) Plaintiff's state law claims should be dismissed (*id.* at 28–32), and (7) the SAC is a "shotgun pleading" in violation of Rule 8 (*id.* at 32).

As set forth below, Plaintiff's allegations against the Premier Defendants violate Federal Rules of Civil Procedure 8 and 9, which prohibit "defendant lumping" and "shotgun pleading."  Plaintiff also fails to state a civil RICO claim against the Premier Defendants.  Therefore, the Court need not address the Premier Defendants' remaining

---

[9] Because Plaintiff's allegation pertaining to the KBH Healthcare Consulting Scheme have been dismissed for lack of standing (*see* Section III.A.10), the Court limits its forthcoming analysis to a discussion of the Premier Scheme, the Fraudulent Dental Billing Scheme, and the Coverup Scheme (collectively, the Contract Dental Schemes).

arguments.

### 1.    Improper Pleading

#### a)    Rule 9(b)—Defendant Lumping

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge and not just deny that they have done anything wrong."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).  Rule 9(b) does not allow a complaint to "merely lump multiple defendants together" and instead "requires plaintiffs to differentiate their allegations when suing more than one defendant … and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  *Id.* at 764–65 (citation omitted).

In their motions to dismiss Plaintiff's FAC, Defendants challenged Plaintiff's tendency to lump Defendants together in groups.  (Doc. 215 [FAC Order] at 10.)  In its FAC Order, "[t]he Court agree[d] that referring to Defendants collectively … runs afoul of Rule 9(b)'s particularity requirement, especially when describing actions taken by an entire group."  (*Id.*)  The Court determined that it would "disregard general, conclusory allegations or those which impermissibly lump defendants together[,]" reducing "the number of properly drafted allegations that the Court can review."  (*Id.* at 11.)

The Premier Defendants now renew their challenge based on impermissible defendant lumping.  (*See* Doc. 231 at 9, 15–19.)  Plaintiff responds that it complied with the FAC Order and that the Premier Defendants "simply ignore the specific allegations of [Defendants] Daryl Priest, Nick Priest, and Travis Lyon's representations and omissions."  (Doc. 247 at 17.)  For the reasons set forth below, the Court agrees with the Premier Defendants that the SAC, like the FAC, suffers from impermissible defendant lumping.

Regarding the Contract Dental Schemes, Plaintiff alleges that Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon entered the Dental MSA and Medical MSA knowing that they had no intention or ability to comply with the terms of the agreements.  (SAC ¶¶ 130, 136–39, 142–43, 172, 175–76.)  Plaintiff alleges that Defendants Premier,

Daryl Priest, Nick Priest, and Travis Lyon did not comply with the terms of the Dental MSA or the Medical MSA and instead trained the contract dentists to maximize their revenue. (*Id.* ¶¶ 140, 177–79.) These broad allegations are the crux of Plaintiff's claims against the Premier Defendants and run afoul of Rule 9's particularity standard, as they lump the four Premier Defendants together and are not sufficient "to give defendants notice of the particular misconduct … so that they can defend against the charge … ." *Swartz*, 476 F.3d at 764. Indeed, the Court has not identified any particularized allegations against Defendants Daryl Priest or Nick Priest in connection with the Contract Dental Schemes. The Court has only identified particularized allegations against Defendant Travis Lyon. (*See e.g.,* SAC ¶ 153 (alleging that Defendant Travis Lyon told employees in Borrego Health's finance department that any communication regarding the Dental MSA needed to be directed to him); *id.* ¶¶ 182–84 (alleging that Defendant Travis Lyon emailed Defendant Diana Thompson invoices with fraudulent claims); *id.* ¶¶ 219–220 (alleging that Defendant Travis Lyon communicated with Dr. Martinez regarding fraudulent billing).)

### b) Rule 8—Shotgun Pleading

"Under Rule 8(a), a pleading must be '(1) a short and plain statement of the grounds for the court's jurisdiction … ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief' and clearly and fully set forth 'who is being sued, for what relief, and on what theory, with enough detail to guide discovery.'" *Giannini v. Cnty. of Sacramento*, No. 2:21-CV-00581-KJN, 2023 WL 6279437, at *1 (E.D. Cal. Sept. 26, 2023) (quoting *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996)). "Each allegation must be simple, concise, and direct." *Id.* (citation omitted). "Rule 8(d)'s requirement that each averment of a pleading be 'simple, concise, and direct,' applies to good claims as well as bad, and is a basis for dismissal independent of Rule 12(b)(6).'" *Id.* (quoting *McHenry*, 84 F.3d at 1179). "The practice of 'incorporating each preceding paragraph, regardless of relevancy has been harshly criticized as a form of 'shotgun pleading' that violates Rule 8's requirement of a 'short and plain statement' and interferes

with the court's ability to administer justice.'" *Id.* (quoting *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009)).

In its FAC order, the Court determined that "shotgun pleading" "describes much of the FAC" (Doc. 215 [FAC Order] at 12) and warned Plaintiff that it "will need to be more precise in its averments" (*id.* at 21). The Court stated, "Plaintiff will need to remedy the shotgun nature of the claims and general lack of specificity when reincorporating the corresponding factual paragraphs." (*Id.*)

The Premier Defendants now renew their challenge under Rule 8, arguing that the SAC is an impermissible "shotgun pleading." (Doc. 231 at 32.) Plaintiff responds that the SAC does not violate shotgun pleading rules. (Doc. 247 at 16–17.)

The Court finds that Plaintiff's SAC is woefully non-compliant with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). As just one example of Plaintiff's lack of precision, Plaintiff now alleges **17** civil RICO causes of action against the Premier Defendants based on their involvement in four different schemes. It is not clear why 17 different civil RICO causes of action are necessary when the Premier Defendants are only alleged to be a part of four schemes, three of which relate to Plaintiff's contract dental program. It seems that Plaintiff is now attempting to plead different combinations of schemes and Defendants to see which theory or theories are viable. However, this approach does not alleviate the Court's concerns regarding "shotgun pleading"—it aggravates those concerns. Further, each of these civil RICO causes of action rely heavily on the reincorporation of prior allegations in violation of the shotgun pleadings rules summarized above.

\* \* \*

Despite Plaintiff's non-compliance with Rules 8 and 9, in the interest of justice, the Court now turns to Plaintiff's substantive claims. However, the Court reminds Plaintiff and its counsel that "unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants

30

suffer, and society loses confidence in the court's ability to administer justice." *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 (11th Cir. 1996).

### 2. Civil RICO Claims

Plaintiff alleges that the Premier Defendants violated two provisions of RICO.  First, it alleges violations of 18 U.S.C. § 1962(c), which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Second, Plaintiff alleges violations of 18 U.S.C. § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  "[T]he survival of [Plaintiff's] claim under § 1962(c) [ensures] the survival of [its] claim under § 1962(d)."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000)).  As such, the Court addresses 18 U.S.C. § 1962(c) first.

### a) 18 U.S.C. § 1962(c)—Conducting the Affairs of a RICO Enterprise

"To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Odom*, 486 F.3d at 547 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 496).  In its MTD, the Premier Defendants argue that Plaintiff fails to allege the necessary elements for its RICO claims.  (Doc. 231 at 22.)

### (1) Conduct—Element 1

The Supreme Court has held that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' … one must participate in the *operation or management* of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)) (emphasis added).  In other words, "one must have some part in directing those affairs."  *Id.* at 179.  "Simply performing services for the enterprise does not rise to the level of direction … ."  *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).  "Whether [a defendant] rendered his services well or poorly, properly or

31

improperly, is irrelevant to the *Reves* test." *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993). Likewise, "[i]t is not enough that [a defendant] failed to stop illegal activity, for *Reves* requires 'some degree of direction.'" *Walter*, 538 F.3d at 1248 (quoting *Reves*, 507 U.S. at 179). "Allegations showing that a defendant *conducted its own affairs* is insufficient to raise the inference that the defendant conducted the affairs of an enterprise." *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1027 (N.D. Cal. 2020) (emphasis added).

In their MTD, the Premier Defendants assert that the SAC does not allege that they conducted or participated in the conduct of Plaintiff. (Doc. 231 at 20.) They argue that "Plaintiff fails to allege a single fact to support its allegation that each of the [Premier Defendants] 'had control over, participated in, and/or took part in [Plaintiff's] operations and management.'" (*Id.* at 21 (citing SAC ¶ 556).) They also argue that "the SAC and the attached agreements show that [Defendant Premier] facilitated contractual relationships between Plaintiff and medical and dental providers, and provided claims processing services to Plaintiff, which retained 'ultimate authority' over these programs." (*Id.*) The Premier Defendants assert that the SAC includes only conclusory allegations that they were "highly integrated" with Plaintiff "and thus collectively made management and operational decisions at [Plaintiff]." (*Id.* (citing SAC ¶ 129).)

Plaintiff responds that Defendant Daryl Priest created Defendant Premier and that Defendants Nick Priest and Travis Lyon subsequently took over Plaintiff's contract dental program. (Doc. 247 at 23.) Defendants Nick Priest and Travis Lyon then trained new dental providers to submit fraudulent claims and coordinated with Defendants Karen Hebets and Diana Thompson to push those claims through for payment. (*Id.*) Plaintiff therefore concludes that Plaintiff "alleges that [the Premier Defendants] gave directions within [Plaintiff], occupied a position in the chain of command, implemented management decisions, and were vital to the enterprise." (*Id.*)

The Court finds that Plaintiff has failed to allege that the Premier Defendants conducted the affairs of the RICO enterprise—Plaintiff. (*See* SAC ¶¶ 550, 555 (alleging

32

3:22-cv-01056-RBM-SBC

Plaintiff is the RICO enterprise).)  Instead, Plaintiff has alleged that the Premier Defendants oversaw Plaintiff's contract dental program pursuant to the terms of the Dental MSA.  *See id.* ¶ 121 (alleging that Bruce Hebets and Defendant Premier executed the Dental MSA); *id.* ¶ 125 (alleging a takeover of Plaintiff's contract dental program).   Performing management services for Plaintiff pursuant to the terms of a management services agreement does not rise to the level of directing Plaintiff's affairs.  *See Walter*, 538 F.3d at 1248–49; *Baumer*, 8 F.3d at 1344; *Pac. Recovery Sols.*, 481 F. Supp. 3d at 1027.  Additionally, Plaintiff's assertion that the Premier Defendants "gave directions within [Plaintiff], occupied a position in the chain of command, [and] implemented management decisions" (Doc. 247 at 23) contradicts its own allegation that "after Bruce Hebets retired, [Defendants] Mikia Wallis[,] Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball would be *completely in charge* of [Plaintiff]" (SAC ¶ 445 (emphasis added)).  Finally, Plaintiff's vague and conclusory allegations that Defendant Premier, through Defendants Daryl Priest, Nick Priest, and Travis Lyon, were "highly integrated" with Plaintiff's upper management and the Board are not sufficient to establish that Defendant Premier conducted Plaintiff's affairs.  (*See id.* ¶¶ 127, 129.)

Accordingly, Plaintiff has failed to allege that the Premier Defendants conducted the affairs of the RICO enterprise—Plaintiff—and Plaintiff's 18 U.S.C. § 1962(c) civil RICO claims against the Premier Defendants are **DISMISSED with leave to amend**.  Because Plaintiff has failed to allege the first element of its civil RICO claims, the Court need not address the remaining elements.

### b)    18 U.S.C. § 1962(d)—Conspiracy

Because Plaintiff has failed to plead a violation of 18 U.S.C. § 1962(c) against the Premier Defendants, Plaintiff has also failed to plead a violation of 18 U.S.C. § 1962(d) against the Premier Defendants.  *See Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751).  Therefore, Plaintiff's 18 U.S.C. § 1962(d) civil RICO claims against the Premier Defendants are **DISMISSED with leave to amend**.

### 3.    Plaintiff's State Law Claims

Because Plaintiff failed to state civil RICO claims against the Premier Defendants, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims against the Premier Defendants.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over [a state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  Accordingly, Plaintiff's state law claims are **<u>DISMISSED</u>**.

#### a)    Alter Ego Liability

Even if the Court were to exercise supplemental jurisdiction over Plaintiff's state law claims against the Premier Defendants, Plaintiff has failed to allege alter ego liability against the individual Premier Defendants—Defendants Daryl Priest, Nick Priest, and Travis Lyon.

"The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1135–36 (C.D. Cal. 2015) (quotation marks and citation omitted).  "Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) (quotation omitted). "Before the doctrine can be invoked, two elements must be alleged: 'First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.'" *Gerritsen*, 116 F. Supp. 3d at 1136 (quoting *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 526 (2000)).  "Conclusory allegations of 'alter

'ego' status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting both of the necessary elements." *Id.* (citations omitted).

"Among the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Id.* at 1137 (quotation omitted). "The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law." *Katzir's Floor & Home Design, Inc.*, 394 F.3d at 1149 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)).

Plaintiff alleges that, at all relevant times, Defendants Daryl Priest, Nick Priest, and Travis Lyon were the agents or employees of Defendant Premier. (SAC ¶ 47.) Plaintiff then alleges that Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon "operated in such a way as to make their individual identities indistinguishable, and therefore are mere alter-egos of one another." (*Id.* ¶ 49.) Plaintiff alleges that Defendants Premier, Daryl Priest, Nick Priest, and Travis Lyon acted "in concert with one another in furtherance of their common design and agreement to accomplish a particular result, namely extracting money from [Plaintiff]." (*Id.*) Plaintiff alleges that "[a]t all times relevant hereto, there was … a *unity of interest* and ownership between [Defendants] Premier, … Daryl Priest, Nick Priest and Travis Lyon such that the individual distinctions between them had ceased … ." (*Id.* ¶ 50 (emphasis added).)

In their MTD, the Premier Defendants argue that Plaintiff's alter ego allegations are boilerplate, conclusory, and insufficient to support the SAC's claims. (Doc. 231 at 26–27.) Specifically, the Premier Defendants argue that Plaintiff fail to plead a "unity of interest," such as the commingling of funds and assets, the disregard of corporate formalities, undercapitalization, or the use of the corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual. (*Id.* at 27.)

In a footnote, Plaintiff briefly responds that it has adequately alleged that Defendant

Premier and other Priest-related entities have the same ownership and use the same offices and employees despite being in different industries. (Doc. 247 at 17, n.2 (citing SAC ¶¶ 24, 26, 47–50, 384–86).) Plaintiff also responds that Defendant "Premier acted merely to profit Daryl Priest, Travis Lyon, and Nick Priest, as it was founded and utilized to get paid for fraudulent claims." (*Id.* (citing SAC ¶¶ 169–378).)

The Court finds that Plaintiff's allegations regarding alter ego liability are conclusory and lack factual support. Plaintiff's assertion in its brief that "Defendant Premier and other Priest-related entities have the same ownership and use the same offices" is not material, as the other Priest-related entities are not at issue here.[10] Therefore, even if the Court were to exercise supplemental jurisdiction over Plaintiff's state law claims, it would nonetheless find that Plaintiff failed to adequately allege alter ego liability against the individual Premier Defendants—Defendants Daryl Priest, Nick Priest, and Travis Lyon.

## C.    Hebets MTD

In its SAC, Plaintiff asserts **15** causes of action against Defendant Karen Hebets: (1) violations under RICO; (2) violations under RICO for the Premier Scheme, the Coverup Scheme, and the KBH Healthcare Consulting Scheme; (3) violations under RICO for the Premier Scheme, the Fraudulent Dental Billing Scheme, the Coverup Scheme, and the KBH Healthcare Consulting Scheme; (4) violations under RICO for the Jim Hebets Scheme; (5) fraudulent concealment; (6) conversion; (7) inducing breach of contract; (8) intentional interference with contractual relation; (9) intentional interference with prospective economic relations; (10) negligent interference with prospective economic relations; (11) Violations of Business & Professions Code § 17200, *et seq.* ; (12) conspiracy; (13) breach of fiduciary duty; (14) constructive fraud, and (15) unjust

---

[10] The Court also notes that the SAC does not identify a specific office location for Defendant Premier. Plaintiff only alleges that Defendant Premier has its principal place of business in El Cajon, CA. (SAC ¶ 22.)

enrichment/restitution. (SAC at 211–73.) These are the first, second, fourth, fifth, 56th, 58th, 59th, 60th, 61st, 62nd, 63rd, 64th, 65th, 66th, and 67th causes of action, respectively.[11]

On May 1, 2024, Defendant Karen Hebets filed a Motion to Dismiss Plaintiff's SAC ("Hebets MTD"). (Doc. 239.) In the Hebets MTD, Defendant Hebets argues that the claims against her should be dismissed because the SAC is a "shotgun pleading" that fails to allege a claim against her individually, the claims are barred by the relevant statutes of limitations, and the SAC fails to allege key elements of the causes of action. (Doc. 239-1 at 15–30.)

As set forth below, the Court finds that the SAC violates Federal Rules of Civil Procedure 8 and 9 and that Plaintiff has failed to state a civil RICO claim against Defendant Karen Hebets. The Court need not address Defendant Hebets' statute of limitations arguments or the key elements of Plaintiff's state law claims.

### 1. Improper Pleading

In her MTD, Defendant Karen Hebets argues that the claims against her should be dismissed because the SAC is a shotgun pleading that fails to allege a claim against her individually. (Doc. 239-1 at 15–20.) The Court addresses this argument here.

### a) Rule 9(b)—Defendant Lumping

As set forth above, Rule 9(b) does not allow a complaint to "merely lump multiple defendants together" and instead "requires plaintiffs to differentiate their allegations when suing more than one defendant … and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 764–65. Here, the Court finds that Plaintiff's particularized allegations against Defendant Karen Hebets are limited.

---

[11] As set forth above (*see* Section III.A.10), Plaintiff does not have standing to assert claims based on the KBH Healthcare Consulting Scheme. Therefore, the Court will limit its analysis to a discussion of the Premier Scheme, the Fraudulent Dental Billing Scheme, the Coverup Scheme, and the Jim Hebets Scheme.

Regarding the Contract Dental Schemes, Plaintiff alleges that Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball negotiated, entered, and concealed from the Board the Dental MSA and Medical MSA. (*See* SAC ¶¶ 121–29, 144–48, 150–55.) These broad allegations, lumping together seven defendants with distinct roles in the alleged "enterprise," run afoul of Rule 9's particularity standard and are not sufficient "to give defendants notice of the particular misconduct … so that they can defend against the charge … ." *Swartz*, 476 F.3d at 764. In fact, the only particularized allegations against Defendant Karen Hebets are that she concealed the existence of the Dental MSA, the Medical MSA, and fraudulent claims from Plaintiff's Board by hiring family members to work in Plaintiff's billing and accounting department. (*See* SAC ¶¶ 150, 174–75.)

Regarding the Jim Hebets Scheme, Plaintiff alleges that Defendant Karen Hebets, Mikia Wallis, and Diana Thompson entered arrangements with Defendants Jim Hebets and The Hebets Company to have him review and approve inflated executive salaries. (SAC ¶¶ 453–55, 466.) Plaintiff also allege that Bruce Hebets, Diana Thompson, and Mikia Wallis schemed with The Hebets Company to increase executive compensation through 162B plans. (*Id.* ¶¶ 459–65.) Surprisingly, Defendant Karen Hebets is not included in this allegation. (*See id.* ¶ 459.) As before, these broad allegations against three or four defendants, each with distinct roles in the alleged "enterprise," run afoul of Rule 9's particularity standard. *See Swartz*, 476 F.3d at 764. The only particularized allegations against Defendant Karen Hebets is that she and Bruce Hebets "worked directly with the Vice President and General Manager of The Hebets Company to 'borrow' from their 162B accounts and transfer the funds from their respective 162B plans into their checking accounts" and that she received tax free bonuses every month. (SAC ¶¶ 460–61.)

### b) Rule 8—Shotgun Pleading

As previously stated (*see* Section III.B.1.b), the Court finds that Plaintiff's pleading is non-compliant with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and allegations that are "simple, concise, and

direct."  Fed. R. Civ. P. 8(a)(2), (d)(1).  Plaintiff now alleges **4** RICO causes of action against Defendant Karen Hebets.  It is not clear why 4 different civil RICO causes of action, each involving a different group of Defendants, is necessary.  Alleging multiple civil RICO causes of action against one Defendant to see which theory or theories are viable seems to be just another form of "shotgun pleading."  Nevertheless, in the interest of justice, the Court will now turn to Plaintiff's substantive claims.

### 2.    Plaintiff's Civil RICO Claims

Plaintiff alleges Defendant Karen Hebets violated two provisions of RICO—18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  "[T]he survival of [Plaintiff's] claim under § 1962(c) [ensures] the survival of [its] claim under § 1962(d)."  *Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751).

### a)    18 U.S.C. § 1962(c)—Conducting the Affairs of a RICO Enterprise

"To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Odom*, 486 F.3d at 547 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 496).

### (1)    Conduct—Element 1

The Supreme Court in *Reves* held that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' … one must participate in the operation or management of the enterprise itself."  *Reves*, 507 U.S. at 185 (quoting 18 U.S.C. § 1962(c)).  In other words, "one must have some part in directing those affairs."  *Id.* at 179.

"*Reves* is the controlling authority on the point of what constitutes 'conduct.'"  *Walter*, 538 F.3d at 1247.  "While it is not necessary to be upper management to be liable, and the [Supreme] Court did not have to decide the extent to which low-level employees could 'participate' in the conduct of an enterprise's affairs … , it did observe that an enterprise 'also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it … .'"  *Id.* at 1248 (citing *Reves*, 507 U.S. at 184).  However, "[i]t is not enough that [a defendant] failed to stop illegal activity, for *Reves* requires 'some

39

degree of direction.'" *Id.* (quoting *Reves*, 507 U.S. at 179).  Additionally, "[s]ection 1962(c)'s 'conduct' requirement applies without regard to the nature of the enterprise. Otherwise, as *Reves* explains, simply being involved would suffice." *Id.* at 1249 (citing *Reves*, 507 U.S. at 177–78).

Defendant Karen Hebets argues that "the SAC does not allege any such direction or active role on [her] part and focuses instead on other peoples' various authorities (all of whom, at Borrego, were her *superiors and bosses*)." (Doc. 239-1 at 25 (emphasis in original).)  Plaintiff responds that Defendant Karen Hebets was the Vice President of Business Services, who conducted Plaintiff's billing audits, identified billing discrepancies, and trained Plaintiff's employees to review and process duplicate or unsupported claims.  (Doc. 253 at 25.)

The Court agrees with Plaintiff that, at this stage, it has sufficiently alleged that Defendant Karen Hebets played some part in directing Plaintiff's affairs.  *See Reves*, 507 U.S. at 179.  At a minimum, Plaintiff has alleged that Defendant Karen Hebets was the Vice President of Business Services who concealed the existence of the Dental MSA and Medical MSA and fraudulent claims from Plaintiff's Board by hiring family members to work in the Plaintiff's billing an accounting department.  (*See* SAC ¶¶ 150, 174–75; Section III.C.1.a (identifying particularized allegations against Defendant Karen Hebets).)

### (2)    Enterprise—Element 2

"'[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity … ."  18 U.S.C. § 1961(4).  The Supreme Court has explained that "the 'enterprise' in [18 U.S.C. 1962(c)] connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, *rather than the victim of that activity*."  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994) (emphasis added).  Applying this precedent, the Third Circuit reasoned, in dicta, that "a victim corporation 'drained of its own money' by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their

40

racketeering activity. Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant." *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 267 (3d Cir. 1995); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 393 (7th Cir. 1995) ("According to the [plaintiff's] theory, the RICO 'enterprise' here was the [plaintiff] itself, whose affairs [the individual defendant] allegedly 'conducted' through a pattern of racketeering activity. That theory is, to say the least, questionable under the Supreme Court's recent RICO decisions."); *but see United States v. Browne*, 505 F.3d 1229, 1272–73 (11th Cir. 2007) ("We find this dictum in *Jaguar Cars* to be unpersuasive.").

Relying on the Third Circuit's decision in *Jaguar Cars*, Defendant Karen Hebets challenges Plaintiff's identification of itself as both the victim and the "enterprise" through which the named Defendants perpetrated their schemes. (Doc. 239-1 at 25.) Defendant Hebets also asserts that Plaintiff has failed to allege a common purpose with the "dozens" of other Defendants. (*Id.* at 25–26.) Plaintiff responds that the common purpose of defrauding Plaintiff is sufficient. (Doc. 253 at 25–26.)

Here, the Court finds that Plaintiff's allegations regarding the "enterprise" are inconsistent and unclear. On one hand, Plaintiff recites case law defining an associated-in-fact enterprise. (*See* SAC ¶ 546.) On the other, Plaintiff, a non-profit entity, pleads that it is both the enterprise and the victim and that "[t]he Defendants are entities and individuals separate from the Enterprise" or merely "associated with the Enterprise." (*Id.* ¶¶ 553–54; *see also id.* ¶ 550 ("The 'Enterprise' is Borrego Health, a non-profit corporation in good standing, which the Defendants secretly commandeered for their own criminal purposes."); *id.* ¶ 555 ("Borrego Health is both the RICO enterprise and the victim."); *id.* ¶ 558 ("Borrego Health, the Enterprise, is engaged in interstate commerce acting as a FQHC.").)

Evaluating the SAC as a whole, the Court finds that Plaintiff has alleged that **it** is the enterprise. Plaintiff does not allege an associated-in-fact enterprise. The Court agrees

with the Third Circuit's reasoning in *Jaguar Cars*, which explains that a corporation being pilfered by its employees cannot be both the victim and the enterprise. Applying *Jaguar Cars* to the present case, Plaintiff may be able to plead an association of the executive, Board member, and other third-party Defendants who worked together with the common purpose to defraud Plaintiff. However, Plaintiff has not done so now. Therefore, Plaintiff has not adequately pled the existence of an enterprise, and Plaintiff's 18 U.S.C. § 1962(c) civil RICO claims against Defendant Hebets are **DISMISSED with leave to amend**.[12] Because Plaintiff has not adequately pled the existence of an enterprise, the Court need not address the remaining elements of Plaintiff's civil RICO claims.

### b) 18 U.S.C. § 1962(d)—Conspiracy

Because Plaintiff fails to plead a violation of 18 U.S.C. § 1962(c) against Defendant Karen Hebets, Plaintiff also fails to plead a violation of 18 U.S.C. § 1962(d) against Defendant Karen Hebets. *See Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751). Therefore, Plaintiff's 18 U.S.C. § 1962(d) civil RICO claims against Defendant Karen Hebets are **DISMISSED with leave to amend**.

### 3. Plaintiff's State Law Claims

Because Plaintiff failed to state a civil RICO claim against Defendant Karen Hebets, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant Karen Hebets. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers*, 383 U.S. at 726. Accordingly, Plaintiff's state law claims against Defendant Karen Hebets are **DISMISSED**.[13]

---

[12] Plaintiff's failure to properly allege an enterprise is fatal to all Plaintiff's civil RICO claims against every Defendant. Nevertheless, the Court will briefly address the arguments presented by the remaining Defendants below.

[13] Having dismissed all Plaintiff's claims against Defendant Karen Hebets, the Court also **DENIES AS MOOT** Defendant Karen Hebets' alternative motions for a more definite statement and to strike allegations. (*See* Doc. 239 at 1; Doc. 239-1 at 20, n.17; Doc. 239-1 at 30.)

**D.    Wallis MTD**

Plaintiff alleges **16** causes of action against Defendant Mikia Wallis: (1) violations of RICO; (2) violations of RICO for the Premier Scheme, the Coverup Scheme, and the KBH Healthcare Consulting Scheme; (3) violations of RICO for the Premier Scheme, the Fraudulent Dental Billing Scheme, the Coverup Scheme, and the KBH Healthcare Consulting Scheme; (4) violations of RICO for the Jim Hebets Scheme; (5) legal malpractice; (6) fraudulent concealment; (7) conversion; (8) inducing breach of contract; (9) intentional interference with contractual relations; (10) intentional interference with prospective economic relations; (11) negligent interference with prospective economic relations; (12) violations of Business & Professions Code § 17200, *et seq.*; (13) conspiracy; (14) breach of fiduciary duty; (15) constructive fraud; and (16) unjust enrichment/restitution.  (SAC at 211–268.)  These are the first, second, fourth, fifth, 55th, 56th, 58th, 59th, 60th, 61st, 62nd, 63rd, 64th, 65th, 66th, and 67th cause of action, respectively. (*Id.*)

On April 29, 2024, Defendant Mikia Wallis filed Motion to Dismiss Second Amended Complaint (F.R.C.P. § 12(b)(6)) ("Wallis MTD").  (Doc. 230.)  In her MTD, Defendant Wallis argues, among other things, that Plaintiff fails to plead the circumstances surrounding the alleged fraudulent acts with particularity in violation of Federal Rules of Civil Procedure 8 and 9, that Plaintiff failed to state facts sufficient to establish a RICO enterprise, and that Plaintiff failed to state facts sufficient to establish a pattern of racketeering.  (Doc. 230-1 at 8–12.)  The Court addresses these arguments below and does not reach Defendant Wallis' remaining arguments.

**1.    Improper Pleading**

As set forth above, Rule 9(b) does not allow a complaint to "merely lump multiple defendants together" and instead "requires plaintiffs to differentiate their allegations when suing more than one defendant … and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  *Swartz*, 476 F.3d at 764–65.

In contrast to the preceding Defendants, Defendant Wallis' Rule 9 challenge is not

well taken, as Plaintiff alleges numerous particularized allegations against Defendant Wallis.  In fact, Defendant Wallis, who served as Plaintiff's CLO and CEO, is alleged to be at the center of all the alleged fraud.  For example, Plaintiff alleges that Defendant Wallis drafted the agreements and paperwork for Borrego MSO and IPA Scheme (SAC ¶¶ 92, 94); that Defendant Wallis made herself unavailable for meetings with Plaintiff's Program Integrity team and would unreasonably defend the contract dental providers (*id.* ¶¶ 356, 359); that Defendant Wallis would submit financial reports without the information necessary to properly evaluate executive compensation (*id.* ¶¶ 418–19); and that Defendant Mikia Wallis created a position for her husband for a base salary of $120,000 even though he was not qualified for the position (*id.* ¶ 422).

Nevertheless, as previously explained (*see* Sections III.B.1.b and III.C.1.b), the Court finds that Plaintiff's SAC fails to comply with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and allegations that are "simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2), (d)(1).  It is unclear why Plaintiff pleads four civil RICO claims against Defendant Wallis, each involving a different group of Defendants and different collection of schemes, and each relying heavily on the reincorporation of prior allegations.  Despite Plaintiff's non-compliance with Rule 8, in the interest of justice, the Court now turns to Defendant Wallis' other arguments.

## 2.    Plaintiff's Civil RICO Claims

Plaintiff alleges Defendant Wallis violated two provisions of RICO—18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  "[T]he survival of [Plaintiff's] claim under § 1962(c) [ensures] the survival of [its] claim under § 1962(d)."  *Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751).  The Court addresses 18 U.S.C. § 1962(c) first.

### a)    18 U.S.C. § 1962(c)—Conducting the Affairs of a RICO Enterprise

"To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Odom*, 486 F.3d at 547 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 496).

### (1)    Enterprise—Element 2

In her MTD, Defendant Wallis asserts that "Plaintiff's attempt to define itself as both the 'RICO Enterprise' and the 'victim' is highly suspect." (Doc. 230-1 at 11.)  Plaintiff responds that "[t]he Ninth Circuit disagrees." (Doc. 251 at 22 (citing *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.*, 837 F.2d 356, 362 (9th Cir. 1988)).) Plaintiff then asserts that it has adequately alleged an associated-in-fact enterprise. (*Id.*)

As set forth in the Court's discussion above (*see* Section III.C.2.a.2), Plaintiff has not pled an associated-in-fact enterprise.  Plaintiff—a single, non-profit entity—has pled that it is the enterprise. (*See* SAC ¶¶ 550, 555, 558.)  Further, Plaintiff's reliance on *United Energy Owners Committee, Inc.* is not persuasive.  *United Energy Owners Committee, Inc.* precedes the Supreme Court's decision in *National Organization for Women, Inc.*, which states, "the 'enterprise' in [18 U.S.C. 1962(c)] connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity."  510 U.S. at 259.  The Court remains persuaded by the Third Circuit's reasoning in *Jaguar Cars*, which states, "the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant."  *Jaguar Cars, Inc.*, 46 F.3d at 267.

### (2)    Pattern of Racketeering Activity—Elements 3 and 4

"'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code … ."  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (citing 18 U.S.C. § 1961(1)).  "In order to constitute a 'pattern,' there must be at least two acts of racketeering activity within ten years of one another."  *Id.* (citing 18 U.S.C. § 1961(5)).  "However, while two predicate acts are required under the Act, they are not necessarily sufficient."  *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–38 (1989)).

"A 'pattern' of racketeering activity also requires proof that the racketeering predicates are related and 'that they amount to or pose a threat of continued criminal activity.'"  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 239).  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past

45

conduct that by its nature projects into the future with a threat of repetition … . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 239).

Plaintiff must also plead the predicate acts attributable to each Defendant with particularity. *See Mostowfi v. i2 Telecom Int'l, Inc.*, 269 F. App'x 621, 624 (9th Cir. 2008). In *Mostowfi*, the Ninth Circuit affirmed the dismissal of the plaintiffs' civil RICO claims because they failed to allege any predicate act with particularity. *Id.* The Ninth Circuit explained:

> The plaintiffs' RICO cause of action fails to meet Rule 9(b)'s heightened pleading standard. Most of the alleged predicate acts are general statements about actions committed by the defendants that fail to identify the 'who, what, when, where and how' of the misconduct charged. Likewise, several predicate acts allege violations of federal criminal statutes but do not specify who committed the violation, and when and where it occurred. *As the district court correctly observed, these problems are exacerbated because the plaintiffs lump together the defendants without identifying the particular acts or omissions that each defendant committed.*
>
> To be sure, it is possible to identify some of the specific factual allegations underlying the RICO claim through a painstaking review of the lengthy fact section. … [But] [s]ince the plaintiffs failed to detail specifically which factual allegations support each predicate act, none of the defendants could determine with any certainty what allegations fell within the RICO claim.

*Id.* (emphasis added).

In her MTD, Defendant Wallis asserts that the "alleged predicate acts contained within Plaintiff's SAC that can support a RICO claim are mail and wire fraud, 18 U.S.C. §§ 1341 & 1343, and transacting property derived from illegal activity, 18 U.S.C. § 1957." (Doc. 230-1 at 8.) Defendant Wallis then argues that "[t]he SAC fails to plead facts sufficient to establish that [she] participated in the commission of any of these offenses." (*Id.*) Plaintiff responds that Defendant Wallis is alleged to have spoken on the phone,

submitted invoices, received checks in the mail, and negotiated deals resulting in wire transfers. (Doc. 251 at 23–24.)

Applying *Mostowfi*, the Court finds that Plaintiff has failed to allege any predicate acts with the requisite particularity. 269 F. App'x at 624–25. Plaintiff alleges the predicate act of mail fraud pursuant to 18 U.S.C. § 1341. (*See* SAC ¶ 563 (identifying the mail fraud statute).) Plaintiff broadly alleges that the Defendants' schemes "could not work without the use of the United States Mail … ." (*Id.* ¶ 565.) Plaintiff then alleges that "mail and e-mail was used to send correspondence and payments under the Premier Scheme, to send bills and payments for the Fraudulent Dental Billing Scheme, … and to send rent checks under the Julian Barn Scheme." (*Id.* ¶ 566.) However, these allegations are insufficient as they do not specify "who committed the violation, and when and where it occurred." *Mostowfi*, 269 F. App'x at 624.

Plaintiff also alleges the predicate act of wire fraud under 18 U.S.C. § 1343. (SAC ¶ 568 (identifying the wire fraud statute).) Plaintiff asserts that "[t]he unlawful Schemes described above, including the electronic communications described above, constitute[] predicate acts under 18 U.S.C. § 1343 (Wire Fraud) that are a material part of the Schemes that [Plaintiff] could not avoid." (*Id.* ¶ 574.) Again, Plaintiff does not identify "who committed the violation, and when and where it occurred." *Mostowfi*, 269 F. App'x at 624.

Finally, Plaintiff alleges the predicate act of 18 U.S.C. § 1957—engaging in monetary transactions in property—derived from specified unlawful activity. (SAC ¶ 575.) Plaintiff, however, does not allege that any Defendant engaged in a monetary transaction exceeding $10,000 in property derived from specified unlawful activity. *See* 18 U.S.C. § 1957. In other words, Plaintiff again fails to identify "who committed the violation, and when and where it occurred." *Mostowfi*, 269 F. App'x at 624.

In sum, the SAC lacks "the cognitive organization that would allow the [Court] and [Defendants] to determine exactly what alleged factual conduct formed the basis of the RICO predicate acts." *Id.* at 625. While it may be "possible to identify some of the specific factual allegations underlying the RICO claim through a painstaking review of the lengthy

47

fact section[,]" such allegations are not sufficient.  *Id.* at 624.  Accordingly, Plaintiff fails
to allege the necessary predicate acts on the part of Defendant Wallis required to support a
civil RICO claim, and Plaintiff's 18 U.S.C. § 1962(c) civil RICO claims against Defendant
Wallis are **<u>DISMISSED</u> with leave to amend**.[14]

### b)    18 U.S.C. § 1962(d)—Conspiracy

Because Plaintiff has failed to plead a violation of 18 U.S.C. § 1962(c) against
Defendant Mikia Wallis, Plaintiff has also failed to plead a violation of 18 U.S.C. § 1962(d)
against Defendant Mikia Wallis.  *See Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at
751).  Therefore, Plaintiff's 18 U.S.C. § 1962(d) civil RICO claims against Defendant
Wallis are **<u>DISMISSED</u> with leave to amend**.

### 3.    Plaintiff's State Law Claims

Because Plaintiff failed to state civil RICO claims against Defendant Mikia Wallis,
the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims
against Defendant Mikia Wallis.  *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers*, 383
U.S. at 726.  Accordingly, Plaintiff's state law claims against Defendant Wallis are
**<u>DISMISSED</u>**.

### E.    Board Members' MTD

Plaintiff asserts **<u>13</u>** causes of action against Defendants Harry Ilsley, Dennis Nourse,
Mike Hickok, and Chuck Kimball (the "Board Member Defendants") for (1) violations of
RICO; (2) violations of RICO for the Premier Scheme, the Coverup Scheme, and the KBH
Healthcare Consulting Scheme; (3) violation of RICO for the Premier Scheme, the
Fraudulent Dental Billing Scheme, the Coverup Scheme, and the KBH Healthcare
Consulting Scheme; (4) fraudulent concealment; (5) inducing breach of contract; (6)

---

[14] Plaintiff's failure to properly allege a pattern of racketeering, including predicate acts by
each Defendant, is fatal to all Plaintiff's civil RICO claims against every Defendant.
Nevertheless, the Court will briefly address the arguments presented by the remaining
Defendants below.

intentional interference with contractual relations; (7) intentional interference with prospective economic relations; (8) negligent interference with prospective economic relations; (9) violations of Business & Professions Code § 17200, *et seq.*; (10) conspiracy; (11) breach of fiduciary duty; (12) constructive fraud; and (13) unjust enrichment/restitution.  (SAC at 211–73.)

On April 29, 2024, the Board Member Defendants filed a Rule 12(b)(6) Motion to Dismiss Plaintiff's Second Amended Complaint (the "Board Member MTD").  (Doc. 226.) In their MTD, the Board Member Defendants argue that Plaintiff's SAC fails to rectify the pleading deficiencies of the FAC.  (Doc. 226-1 at 8–9, 18.)  The Board Member Defendants also argue that Plaintiff fails to state civil RICO claims against them because Plaintiff has not alleged a pattern of racketeering.[15]  (*Id.* at 16–20.)  The Court addresses these arguments below.

### 1.    Improper Pleading

As set forth above, Rule 9(b) does not allow a complaint to "merely lump multiple defendants together" and instead "requires plaintiffs to differentiate their allegations when suing more than one defendant … and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  *Swartz*, 476 F.3d at 764–65.

Regarding the Contract Dental Schemes, Plaintiff alleges that Defendants Karen Hebets, Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball negotiated, entered, and concealed from the Board the Dental MSA and Medical MSA.  (SAC ¶¶ 121–29, 144–48, 150–55.)  At first glance, these broad allegations run afoul of Rule 9's particularity standard.  *See Swartz*, 476 F.3d at 764.  However, a closer look at Plaintiff's allegations related to the Contract Dental Schemes reveals that

---

[15] The Board Member Defendants also argue that Plaintiff has not adequately pled proximate cause.  (Doc. 226-1 at 20–21.)  The Court addressed proximate cause in its discussion on civil RICO statutory standing (*see* Section III.A) and will not re-visit the issue here.

Plaintiff has alleged permissible claims against each of the Board Member Defendants. For example, Plaintiff also alleges that Defendants Mikia Wallis, Diana Thompson, Harry Ilsley, Dennis Nourse, Mike Hickok, and Chuck Kimball—each a member of the Executive/Finance Committee—openly discussed withholding their dealings with Daryl Priest, including the Dental MSA, from the Board. (*Id.* ¶ 146.) Regarding the Compensation/Benefits Scheme, Plaintiff alleges that the Board Member Defendants received free access to Plaintiff's programs, benefits, prescription drugs, and hearing aids even though board member compensation was prohibited except for in narrow circumstances. (*Id.* ¶¶ 413–14.) Regarding the Julian Barn Scheme, Plaintiff alleges Defendant Chuck Kimball persuaded Plaintiff to lease a barn with unfavorable terms. (*Id.* ¶¶ 472–83.) Accordingly, at this stage, the Court finds that Plaintiff has alleged particularized allegations against each of the Board Member Defendants, and the SAC is not subject to dismissal for impermissible defendant lumping. However, as previously stated, the SAC violates Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). Nevertheless, in the interest of justice, the Court now turns to the Board Member Defendants' other arguments.

## 2. Plaintiff's Civil RICO Claims

Plaintiff alleges the Board Member Defendants violated two provisions of RICO— 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). "[T]he survival of [Plaintiff's] claim under § 1962(c) [ensures] the survival of [its] claim under § 1962(d)." *Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751).

### a) 18 U.S.C. § 1962(c)—Conducting the Affairs of a RICO Enterprise

"To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* at 547 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 496).

#### (1) Pattern of Racketeering Activity—Elements 3 and 4

As set forth above, "'[r]acketeering activity' is any act indictable under several

provisions of Title 18 of the United States Code … ." *Turner*, 362 F.3d at 1229 (citing 18 U.S.C. § 1961(1)). "In order to constitute a 'pattern,' there must be at least two acts of racketeering activity within ten years of one another." *Id.* (citing 18 U.S.C. § 1961(5)). "However, while two predicate acts are required under the Act, they are not necessarily sufficient." *Id.* (citing *H.J. Inc.*, 492 U.S. at 237–38). Plaintiff must plead the predicate acts attributable to each Defendant with particularity. *See Mostowfi*, 269 F. App'x at 624.

In their MTD, the Board Member Defendants assert that the only predicate acts that can support a RICO claim are mail and wire fraud, 18 U.S.C. §§ 1341, 1343, and transacting property derived from illegal activity, 18 U.S.C. § 1957. (Doc. 226-1 at 17.) The Board Member Defendants then argue that Plaintiff has not pled where, when, or how any of them committed mail or wire fraud or where, when, or how any of them received money or property derived from unlawful activity. (*Id.* at 18–19.) The Board Member Defendants therefore conclude that Plaintiff has not alleged that they engaged in a "pattern" of racketeering. (*Id.* at 19–20.)

Plaintiff responds that the Board Member Defendants committed mail and wire fraud when they participated in phone calls, when they sent emails, and when Defendant Chuck Kimball executed an amendment to the horse barn lease rent payments by mail. (Doc. 249 at 23.) Plaintiff also responds that it "alleges RICO predicate acts for violations of 'Federal health care offenses.'" (*Id.*)

As a preliminary matter, Plaintiff's discussion of various federal health care offenses is not pertinent, as these federal health care offenses do not constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). The Court agrees with the Board Member Defendants that the only predicate acts that can support a RICO claim are mail and wire fraud, *see* 18 U.S.C. §§ 1341, 1343, and transacting property derived from illegal activity, *see* 18 U.S.C. §1957. Further, as set forth in the Court's discussion above, Plaintiff has failed to allege **any** predicate act by **any** Defendant with the requisite particularity. (*See* Section III.D.2.a.2 (citing *Mostowfi*, 269 F. App'x at 624–25).) After disregarding the claims for which Plaintiff lacks civil RICO statutory standing (*see* Section III.A), the

Court has only identified the following conduct that could be construed as "predicate acts": (1) the Board Member Defendants' receipt of benefits even though Board member compensation was prohibited (SAC ¶¶ 413–14) and (2) rent payments facilitated by Defendant Chuck Kimball through the Julian Barn Scheme (*id.* ¶¶ 472–83). However, as stated previously, the "predicate acts" are not pled with the requisite particularity.

Accordingly, Plaintiff fails to allege the necessary predicate acts required to support a civil RICO claim, and Plaintiff's 18 U.S.C. § 1962(c) civil RICO claims against the Board Member Defendants are **DISMISSED with leave to amend**.

### b)    18 U.S.C. § 1962(d)—Conspiracy

Because Plaintiff has failed to plead a violation of 18 U.S.C. § 1962(c) against the Board Member Defendants, Plaintiff also failed to plead a violation of 18 U.S.C. § 1962(d) against the Board Member Defendants.  *See Odom*, 486 F.3d at 547 (citing *Howard*, 208 F.3d at 751).  Therefore, Plaintiff's 18 U.S.C. § 1962(d) civil RICO claims against the Board Member Defendants are **DISMISSED with leave to amend**.

### 3.    Plaintiff's State Law Claims

Because Plaintiff failed to state civil RICO claims against the Board Member Defendants, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims against the Board Member Defendants.  *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers*, 383 U.S. at 726.  Accordingly, Plaintiff's state law claims against the Board Member Defendants are **DISMISSED with leave to amend**.

## IV.    CONCLUSION

Plaintiff's SAC, like its FAC, "is an ambitious undertaking attempting to describe a decade of fraudulent conduct" that, if true, is deeply concerning.  (Doc. 215 [FAC Order] at 21.)   "Plaintiff's ambition, however, does not relieve it of RICO's substantive requirements or procedural requirements under Rule 9(b)."  (*Id.*)   As set forth above, Plaintiff's SAC fails to allege claims against many of the named Defendants without violating the pleading rules set forth in Federal Rules of Civil Procedure 8 and 9.  Plaintiff is reminded that it is not for the Court to identify "the specific factual allegations underlying

the RICO claim through a painstaking review of [a] lengthy fact section." *Mostowfi*, 269 F. App'x at 624.

Plaintiff also fails to allege a cogent civil RICO scheme against any of the moving Defendants. First, Plaintiff has not adequately alleged that the Premier Defendants, who were not executives or Board members for Plaintiff, conducted the enterprise. Second, Plaintiff has not adequately pled the existence of an enterprise. While Plaintiff may be able to plead an associated-in-fact enterprise, comprised of some combination of Defendants working together with the common purpose of defrauding Plaintiff, it has not done so in the SAC. Finally, Plaintiff has failed to allege any predicate acts supporting a pattern of racketeering with the requisite degree of particularity.

Accordingly, the Premier MTD (Doc. 231), the Hebets MTD (Doc. 239), the Wallis MTD (Doc. 230), and the Board Member MTD (Doc. 226) are **GRANTED**. The Court also **DENIES AS MOOT** Defendant Karen Hebets' alternative motions for a more definite statement and to strike allegations.[16, 17] (*See* Doc. 239 at 1; Doc. 239-1 at 20, n.17; Doc. 239-1 at 30.) Should Plaintiff choose to amend its SAC, it must do so by **April 11, 2025**. Defendant must then file a response by **April 25, 2025**.

---

[16] Defendant Diana Thompson filed a Notice of Joinder in the Hebets MTD. (Doc. 240.) Defendant Thompson also requested additional time to answer or otherwise respond to the SAC, which the Court granted. (*See* Docs. 241–42.) Despite this request, Defendant Thompson did not answer or otherwise respond to the SAC. The Court notes, however, that the reasoning set forth in this Order applies with equal force to Plaintiff's claims against Defendant Thompson and encourages Plaintiff to proceed accordingly.

[17] The Court also notes that Defendant KBH did not file a motion to dismiss and does not appear to be represented by counsel. Likewise, Defendant Karen Hebets is no longer represented by counsel. (*See* Doc. 285 (granting ex parte motion and motion of McKenzie Scott PC for leave to withdraw as counsel for Defendant Karen Hebets).) The Court encourages these parties to seek representation.

1       **IT IS SO ORDERED.**

2     DATE:  March 24, 2025

3

4

5     HON. RUTH BERMUDEZ MONTENEGRO
      UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3:22-cv-01056-RBM-SBC